1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3                    FRESNO DIVISION

4                      ---oOo---

5

6  JEFF SILVESTER, MICHAEL POESCHL,)
   BRANDON COMPS, The CALGUNS      )
7  FOUNDATION, INC., a non-profit  )
   organization, and THE SECOND    )
8  AMENDMENT FOUNDATION, INC., a   )
   non-profit organization,        )
9                                  )
            Plaintiffs,            )
10                                 )
        vs.                        )No. 1:11CV02137AWISKO
11                                 )
   KAMALA HARRIS, Attorney General )
12 of California (in her official  )
   capacity), and DOES 1 to 20,    )
13                                 )
            Defendants.            )
14 _____)

15

16

17                  DEPOSITION OF
                   JEFF SILVESTER
                 FRESNO, CALIFORNIA
18                  MAY 9, 2013

19

20

21

22 ATKINSON-BAKER, INC.
   COURT REPORTERS
23 (800) 288-3376
   WWW.DEPO.COM
24
   REPORTED BY:    THERESA G. MENDOZA, CSR NO. 12338
25 FILE NO.:       A703C37

Exhibit C

1

1        IN THE UNITED STATES DISTRICT COURT

2       FOR THE EASTERN DISTRICT OF CALIFORNIA

3              FRESNO DIVISION

4              ---oOo---

5

6  JEFF SILVESTER, MICHAEL POESCHL,)
    BRANDON COMPS, The CALGUNS    )
7  FOUNDATION, INC., a non-profit )
    organization, and THE SECOND  )
8  AMENDMENT FOUNDATION, INC., a   )
    non-profit organization,      )
9                       )
            Plaintiffs,      )
10                      )
        vs.             )No. 1:11CV02137AWISKO
11                      )
    KAMALA HARRIS, Attorney General )
12  of California (in her official  )
    capacity), and DOES 1 to 20,   )
13                      )
            Defendants.      )
14  _____)

15

16

17

18

19

20

21        Deposition of JEFF SILVESTER, taken on

22  behalf of Defendants, at 2550 Mariposa Mall, Fresno,

23  California, commencing at 8:57 a.m., Thursday, May 9,

24  2013 before Theresa G. Mendoza, CSR No. 12338.

25

```
 1                    A P P E A R A N C E S

 2

 3

 4   FOR THE PLAINTIFFS:

 5
     OTTEN & JOYCE, LLP
 6   BY:  VICTOR J. OTTEN, ESQUIRE
     3620 Pacific Coast Highway, Suite 100
 7   Torrance, California  90505

 8

 9
     FOR THE DEFENDANTS:
10

11   STATE OF CALIFORNIA
     DEPARTMENT OF JUSTICE
12   OFFICE OF THE ATTORNEY GENERAL
     BY:   JONATHAN M. EISENBERG, DEPUTY
13   300 South Spring Street, Suite 1702
     Los Angeles, California  90013
14

15   STATE OF CALIFORNIA
     DEPARTMENT OF JUSTICE
16   OFFICE OF THE ATTORNEY GENERAL
     DIVISION OF LAW ENFORCEMENT
17   BUREAU OF FIREARMS
     CIVIL DIVISION-GOVERNMENT LAW
18   BY:  KIMBERLY J. GRANGER, DEPUTY
     1300 I Street
19   Sacramento, California  95814

20

21

22

23

24

25
```

```
 1                      I N D E X

 2   WITNESS:   JEFF SILVESTER

 3   EXAMINATION                                    PAGE

 4        BY MR. EISENBERG                             5

 5        BY MR. OTTEN                               130

 6

 7   EXHIBITS
                              PLAINTIFF'S
 8   LETTER                   DESCRIPTION         PAGE

 9                              (NONE)

10
                              DEFENDANTS'
11   NUMBER                   DESCRIPTION         PAGE

12    1  -        Stipulation agreement E-mails     16

13    2  -          Stipulated Protective Order     16

14    3  -      Silver Start Custom Leather Posts   20

15    4  -          First Amended Complaint         38

16    5  -        Plaintiff's Initial Disclosures   80

17    6  -  Response to First Set of Interrogatories 86

18    7  -          Calguns Foundation Posts       114

19

20   QUESTIONS WITNESS WAS INSTRUCTED NOT TO ANSWER:

21                              (NONE)

22

23   INFORMATION TO BE SUPPLIED:

24                              (NONE)

25
```

4

1          Q.  Have there been firearms that you wanted
2   to purchase but were unable to because of the ten-day
3   waiting period?
4          A.  Yes.
5          Q.  More than one firearm?
6          A.  Yes.
7          Q.  How many firearms have you been unable to
8   purchase because of the ten-day waiting period?
9          A.  At least three.
10         Q.  When is the most recent time of those
11  three that you wanted to purchase and you weren't able
12  because of the ten-day waiting period?
13         A.  I'm unsure of the exact date, but late
14  last year.
15         Q.  Okay.
16         A.  So maybe November.
17         Q.  You're doing just fine in terms if you
18  don't remember the specific date, giving me your best
19  estimate.  That's just what I want and I appreciate
20  that.
21         A.  Okay.
22         Q.  On that occasion, what, what was the
23  reason -- sorry, on that occasion, how did the ten-day
24  waiting period make you unable to complete the
25  acquisition of that firearm?

1          A.   Can you ask that question in another way?

2          Q.   Okay.  What was the reason that you were

3     unable to finish the purchase of the acquisition of

4     that firearm?

5          A.   Return trips make it financially

6     unfeasible.

7          Q.   So this purchase was of a firearm that was

8     far away from your home?

9          A.   Correct.

10         Q.   How far way?

11         A.   200 or 300 miles.

12         Q.   Where did you -- what town was it that

13    were you trying to make that purchase?

14         A.   The particular firearm was located up

15    north in the Redding area.  I don't recall the exact

16    city.

17         Q.   Were you purchasing from a store, as

18    opposed to say a gun show?

19         A.   The person that owned the gun was a

20    private party, but all sales have to go through an FFL.

21         Q.   Right.  Did you travel from your home, the

22    200 or 300 miles north for the purpose of making that

23    firearm purchase?

24         A.   If I would have made the purchase, yeah.

25         Q.   In other words, when you went on that trip

the point was to go buy a firearm at that location?

A. Yes.

MR. OTTEN: He didn't say he went on a trip, I don't think.

Do you understand what he's asking you?

THE WITNESS: No.

MR. EISENBERG:

Q. All right. So you live in Hanford, and you went north a couple hundred miles to this private party, I guess it was the person's house?

A. I didn't make the trip.

Q. You didn't make the trip?

A. I wasn't able to purchase the firearm.

Q. How did you become aware of the -- pardon me. I didn't mean to interrupt you.

A. That's okay. I just couldn't make the trip because of the distance.

Q. Okay. How did you become aware of the existence of this firearm?

A. Friends.

Q. And so what, what kind of firearm was it?

A. I believe it was a Heritage .22 Revolver.

Q. Did you attempt to find that firearm at a closer location?

A. I've been looking for one and had not

1  found one until I found this one.

2        Q.  How did you communicate with the owner of

3  the firearm, the person that you might have bought it

4  from?

5        A.  Telephone once and e-mail, instant message

6  over the Internet.

7        Q.  Were you aware when you were communicating

8  with him that he was located a few hundred miles away?

9        A.  Yes.

10       Q.  Did you ever travel to his physical

11  location and look at the firearm?

12       A.  No.

13       Q.  Were there some characteristics about that

14  firearm that were unique that you needed that firearm,

15  as opposed to another firearm?

16       A.  Yes.

17       Q.  What were those characteristics?

18       A.  Good price.

19       Q.  Good price.  Any other characteristics?

20       A.  Suited my needs.  It was what I was

21  looking for.

22       Q.  Right.  So what needs were you trying to

23  satisfy by possibly obtaining --

24       A.  Add a .22 --

25       Q.  Can you let me finish my question.

1          A.   I apologize.

2          Q.   It's particularly difficult for the Court

3    Reporter, if two people or more are talking at the same

4    time.

5          MR. EISENBERG:  Can you read back the last

6    question.

7       (Whereupon the last question was read back.)

8          MR. EISENBERG:

9          Q.   The firearm.

10         A.   Add a .22 to my available firearms.

11         Q.   I guess I'm trying get more information

12   about why you needed that .22, as opposed to some other

13   firearm that you probably could obtain locally.

14         A.   I'm not a rich man.  I go where the prices

15   are good.

16         Q.   And so again, you did not actually ever

17   travel up there to try to complete the purchase?

18         A.   No.

19         Q.   Did you think about having the firearm

20   delivered to you by the mail or some other method where

21   you wouldn't have had to personally travel up north to

22   get the gun?

23         A.   Let me clarify.  Did I consider it?

24         Q.   Yes.

25         A.   Yes.

Q.   Okay.   Is there a reason that you did not
try to use that option?

        A.   Very cost preventative.

        Q.   So did you get a price on how much it
would cost to transport the firearm?

        A.   Yes.

        Q.   What was the price; do you remember?

        A.   Can you clarify, are you looking for the
shipping cost?

        Q.   Yes.

        A.   Or the transfer cost from another dealer?

        Q.   First, shipping cost, please.

        A.   Was minimal maybe $20.

        Q.   And you looked into having the owner ship
the firearm to another licensed, to a licensed dealer?

        A.   Correct.

        Q.   And there were fees associated with that
transfer?

        A.   Correct.

        Q.   How much were the fees, do you --

        A.   In excess of $100.

        Q.   Excess of $100, okay.   I believe you said
there were three times that you said you can recall
that you weren't able to purchase firearms because of
the ten-day waiting period?

1          A.   Uh-huh.

2          Q.   So let me move back to the second most

3     recent time.

4          A.   Okay.

5          Q.   What firearm were you attempting to acquire

6     at that time?

7          A.   I believe at that time I was looking for a

8     Kel-Tec PF9.

9          Q.   Would that be the same firearm that you

10    mentioned in that blog post?

11         A.   No.

12         Q.   It's the same kind of gun, correct?

13         A.   Correct.

14         Q.   So for this firearm that was a Kel-Tek PF9

15    that you have tried to purchase but ultimately didn't,

16    when were you trying to make that purchase?

17         A.   Sometime before this blog post.

18         Q.   And how far away was the gun, from your

19    house when you were trying to purchase it?

20         A.   In that situation, it was in LA.  So,

21    whatever the distance between here and LA.

22         Q.   How did you become aware of the existence

23    of that Kel-Tec PF9?

24         A.   Online classified ad.

25         Q.   What web site?

1          A.  I look at several, and I don't
2    specifically recall which one.
3          Q.  Okay.  Which are the ones, which are the
4    web sites that you generally look at, I guess when
5    you're looking to acquire firearms?
6          A.  Uh-huh.
7          Q.  What are the names of those web sites?
8          A.  I have looked at in the past Calguns.net.
9    I have looked at, I have looked at craigslist before,
10   and there's a third that I do not recall the name to.
11         Q.  This is not a memory contest, so don't --
12         A.  There is a third one, but without looking
13   at my e-mail, I can't --
14         Q.  That's fine.  If you happen to remember it
15   later --
16         A.  I'll be happy to forward it.
17         Q.  Or even later today.  If you say, oh, I
18   remember now, we can have you add that to the record.
19   But again, this deposition is not a memory contest.
20   When you have found out about the existence of the gun,
21   did you find out it was located in the LA area?
22         A.  Yes.
23         Q.  Was it your understanding that you could
24   not find that kind of gun, a Kel-Tec PF9, locally to
25   your house?

```
 1          A.  Yeah.

 2          Q.  What was the reason or reasons that you

 3  wanted to have a Kel-Tec PF9?

 4          A.  Portability.

 5          Q.  Do you have other handguns?

 6          A.  Yes.

 7          Q.  And you had other handguns at the time?

 8          A.  Yes.

 9          Q.  Is there something about the Kel-Tec PF9

10  that makes it more portable than the handguns you have

11  already?

12          A.  It is slimmer and smaller.

13          Q.  Now, did you travel to Los Angeles to look

14  for, you know, to try to obtain that firearm, the Kel-

15  Tec PF9?

16          A.  No.

17          Q.  Did you communicate with the person that

18  had the gun?

19          A.  Yes.

20          Q.  What means of communication did you use?

21          A.  Online instant message and e-mail.

22          Q.  And forgive me if I've asked you this

23  question already, what was the reason that you did not

24  ultimately purchase the firearm, the Kel-Tec PF9?

25          A.  The seller and I couldn't resolve the
```

distance terms.  He wanted to schedule something in

between where we could meet, and we couldn't work it

out.

          Q.  What was the problem working out a meeting

place?

          A.  He wasn't willing.

          Q.  He wasn't willing to travel?

          A.  Correct.

          Q.  So in other words, you said I'll travel

halfway and he said no, or something like that?

          A.  Something like that.

          Q.  So he said -- it was a he, first of all?

          A.  Yes.  I'm pretty sure.

          Q.  And he said you must come to my house --

          A.  Correct.

          Q.  -- to obtain it.

          A.  To his FFL.  Sorry to interrupt.

          Q.  Did you consider, you know, using the mail

or some other means to deliver the Kel-Tec PF9?

          A.  Not at that time.

          Q.  Were you aware that there -- at the time

were you aware that you possibly could have had the gun

delivered to you other than going out and getting it --

          A.  Yes.

          Q.  -- in person.  And so is there any reason

that you didn't pursue that option to obtain the Kel-
Tec PF9?

          A.   I had heard it was financially impossible.

          Q.   Did you, did you actually price it?

          A.   Not that time.

          Q.   So you are saying you heard it was --

          A.   Uh-huh.

          Q.   Where did you hear that information?

          A.   Friends in the community.

          Q.   And what was your understanding of the
cost -- let's be all inclusive, say transfer fees,
shipping cost, everything, what was that amount that
you thought the price would be?

          A.   To my understanding, it was going to cost
at least $150 to have it shipped.

          Q.   What was the price that was being asked
for that Kel-Tec PF9?

          A.   I don't recall specifically.

          Q.   Was the price of the firearm alone not
including another cost more or less than $150?

          A.   More.

          Q.   Do you recall a range, the best -- sorry.
Give me the best guess as to the price at the time.

          A.   Between 500 and 600 for the gun alone.

          Q.   So you had enough money to purchase the

gun?

     A.  Yes.

     Q.  But you did not have enough money to pay
the additional fees that would be required, if you were
going to have it brought to you?

     A.  Correct.

     Q.  Let's move back to the first firearm
purchase that you say you were not able to complete it
because of the ten-day waiting period.  What kind of
gun were you trying to purchase at that time, or
rather, in that instance?

     A.  Are we talking about the .22 from up
north?  What are we talking about?

     Q.  We talked about the most recent one.

     A.  Okay.

     Q.  Which is the one up north, 2, 300 miles away.
I forget the town.

     A.  Uh-huh.

     Q.  The Kel-Tec PF9.

     A.  Okay.

     Q.  You said there was another one?

     A.  Uh-huh.

     Q.  The attempt of purchase was earlier in
time.

     A.  Correct.

1      Q.  So for that firearm, what kind of firearm

2  was it?

3      A.  I believe it was a long rifle AR-15.

4      Q.  Before what -- sorry.  What year were you

5  trying to make that purchase?

6      A.  Best guess, 2009.

7      Q.  And where was this firearm located?

8      A.  I think this one was in the LA area also.

9      Q.  Was, was this firearm owned by the same

10  person who you almost bought the Kel-Tec PF9 from?

11     A.  No.

12     Q.  It just happened to be from the same

13  place, the same general place?

14     A.  Yes.

15     Q.  Okay.  How did you find out about the

16  existence of the AR-15?

17     A.  Online classified ads.

18     Q.  And so the person selling was a private

19  seller?

20     A.  Yes.  That may -- I don't recall

21  specifically.  It could have been a dealer.

22     Q.  And so do you recall if you looked up this

23  gun on the Internet and found it listed at an, at a

24  retailer's Internet site?

25     A.  I'm sorry, can you please ask that --

1          Q.   When you found out about the existence of
2    this gun, it was because you saw a listing for it at
3    an, at a firearm retailer's web site?
4          A.   No.   That's not the way I found out about
5    the gun.
6          Q.   Okay.   Did you communicate with the
7    potential seller?
8          A.   Yes.
9          Q.   What were your means of communication?
10         A.   E-mail, online instant messaging.
11         Q.   And what was the reason that you were
12   ultimately unable to complete the purchase?   What were
13   the reasons, if there is more than one?
14         A.   I had a scheduled trip that fell through
15   and was unable to make the distance.
16         Q.   This scheduled trip, was it for the
17   specific purpose of purchasing this firearm?
18         A.   No.   I scheduled a family vacation and was
19   going to stop and make the purchase and then make a
20   second trip at a later date, and the trip fell through,
21   and I could not justify making two trips for that
22   firearm.
23         Q.   When the trip was planned, it was going to
24   be more than a ten-day stay in the LA area?
25         A.   No.

```
 1              Q.   So it was less than a ten-day stay?

 2              A.   Correct.

 3              Q.   But the plan, the trip plan fell through?

 4              A.   Didn't work.

 5              Q.   For this, the AR-15, did you consider

 6   having it delivered to you by the mail or some other

 7   means that would mean that you didn't have to go

 8   physically get the firearm?

 9              A.   Yes.

10              Q.   What, what other methods of delivery did

11   you consider?

12              A.   Oh, I'm sorry.  I misunderstood the

13   question.

14              Q.   Go ahead.  What I'm -- let me rephrase.

15   Did you consider a delivery system or -- strike the

16   question.

17              Did you consider obtaining the firearm, the

18   AR-15 through the mail or some other means that would

19   have meant you didn't have to go to LA to get the

20   firearm?

21              A.   I considered having it shipped to a local

22   FFL, yes.

23              Q.   And obviously, you didn't follow through.

24   What were the reasons that you didn't?

25              A.   Same as before, cost preventative.
```

```
 1            Q.  Okay.  Do you recall what the asking price
 2   for the firearm was?
 3            A.  Not at all.
 4            Q.  Can you give me your best guess or your
 5   best estimate, rather, your best estimate?
 6            A.  Maybe $800.
 7            Q.  And when we talk about the potential cost
 8   of delivery, let's be all inclusive, dealer fees, etc.,
 9   what was that amount of money?
10            A.  At least $150.
11            Q.  And at the time did you have the $800 or
12   the amount of money that it would have cost --
13            A.  Yes.
14            Q.  -- to buy the firearm?
15            A.  Yes.
16            Q.  But you did not have the extra?
17            A.  No.
18            Q.  Okay.  I say extra, I mean for the
19   delivery.
20            A.  I understand.
21            Q.  Okay.  Let's look back at the Complaint.
22   I think it's Exhibit 4, paragraph 68, please, which is on
23   page 12.  Let me ask you to read that paragraph to
24   yourself.  You don't need to read it aloud, but just
25   tell me when you finish reading it.
```

as a City-owned property, to hold a rally or have a

protest regarding gun rights?

          A.   I don't believe so.

          Q.   You have ever tried to obtain a permit

for a protest, even if you were not going to be in the

protest?

          A.   Not to my knowledge.

          Q.   Have you ever borrowed a shotgun from

anyone?

          A.   Yes.

          Q.   If you -- have you ever -- let's see,

when -- how many times have you borrowed a shotgun from

somebody?

          A.   Only once that I can think of.

          Q.   Do you understand that if there was a time

when you were going through a ten-day waiting period

you would be able to go to somebody who you borrowed a

shotgun from before and be able to borrow it again?

          A.   I understand that that's a possibility,

but not a given.

          Q.   When is the last time you tried to borrow

any kind of firearm from anyone, and let's leave out,

for example, if you're shooting at, doing target

shooting or something?  Let's leave out something like

that.