Victor J. Otten (SBN 165800)
vic@ottenandjoyce.com
OTTEN & JOYCE, LLP
3620 Pacific Coast Hwy, Suite 100
Torrance, California 90505
Phone: (310) 378-8533
Fax: (310) 347-4225

Donald E.J. Kilmer (SBN 179986)
LAW OFFICES OF DONALD KILMER
A Professional Corporation
1645 Willow Street, Suite 150
San Jose, California 95125
Phone: (408) 264-8489
Fax: (408) 264-8487

Attorneys for Plaintiffs

# UNITED STATES DISTRICT COURT

# EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| **JEFF SILVESTER, BRANDON COMBS, THE CALGUNS FOUNDATION, INC., a non-profit organization, and THE SECOND AMENDMENT FOUNDATION, INC., a non-profit organization,**<br><br>**Plaintiffs,**<br>v.<br><br>**KAMALA HARRIS, Attorney General of California (in her official capacity), and DOES 1 to 20.** | Case No. 1:11-cv-02137-AWI-SKO<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT** |

# TABLE OF CONTENTS

I.     INTRODUCTION...................................................................................1

II.    STATEMENT OF FACTS.......................................................................4

III.   ARGUMENT.......................................................................................7

       A. Standards for Summary Judgment...............................................................7

       B. The Ten-Day Waiting Period Violates The Second Amendment..........................7

       C. The Numerous Exceptions To The Ten-Day Waiting Period Render...................14

OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## TABLE OF AUTHORITIES

**Cases**

Anderson v. City of Hermosa Beach

    (2010) 621 F. 3d 1051 (9th Cir. 2010)............................................................11

Board of Trustees v. Fox

    (1980) 492 U.S. 469, 480, 491 U.S. at 782-83........................................12

Citizens United v. FEC

    (2010) 538 U.S. 310, 130 S. Ct. 876, 898............................................11

City of Cleburne v. Cleburne Living Ctr.

    (1996) 116 S.Ct. 1620, 134 L.Ed.2d 855............................................15

Clark v. Jeter

    (1988) 286 U.S. 456, 461............................................................10

District of Columbia v. Heller

    (2008) 554 U.S. 570, 624-25....................................................Passim

Kasler v. Lockyer

    (2000) 23 Cal.4th 472..............................................................10

Moore v. Madigan

    (2012) 702 F.3d 933 (9th Cir. 2012).................................................9

Nordyke v. King

    (2003) 319 F.3d 1185, 1192 n.4 (9th Cir. 2003)................................14, 15

Parenthood v. Casey

    (1992) 833, 873-74 ..............................................................7, 8, 9

Romer v. Evans

    (1996) 116 S.Ct. 1620, 134 L.Ed.2d 855............................................15

Ezell v. City of Chicago

    (2011) 651 F. 3d 684 (7th Cir. 2011) .............................................7, 8, 9

Shapiro v. Thompson

    (1969) 618, 89 S.Ct. 1322, 22 L.Ed.2d 600........................................15

Silviera v. Lockyer

    (2003) 312 F.3d 1052 (9th Cir. 2003)........................................................10, 14

United States v. Chester

    (2010) 628 F.3d 673, 680 (4th Cir. 2010)..........................................................9

United States v. DeCastro

    (2010) 682 F.3d 160 (2d Cir. 2012)..............................................................9, 10

United States v. Marzzarella

    (2010) 614 F.3d 85, 89 (3rd Cir 2010)..............................................................9

United States v. Reese

    (2010) 627 F.3d 792, 800-01 (10th Cir. 2010)....................................................9

Ward v. Rock Against Racism

    (1989) 491 U.S. 781, 791........................................................................11

Zablocki v. Redhail

    (1986) 434 U.S. 432, 440, 105 S. Ct. 3249, 87 L.Ed.2d 313.................................15


**Statutes**

18 U.S.C. § 922(a)(3)...............................................................................10

56 UCLA L. Rev. 1343, 1376 (2009).............................................................11

California Penal Code §§ 26815....................................................................1

California Penal Code §§ 27540....................................................................1

California Penal Code §§ 28220....................................................................1

**Other**

California Assembly Bill 500....................................................................1, 10

## I.  INTRODUCTION

Cal. Penal Code §§ 26815 and 27540 impose a 10–day waiting period between the application to purchase a firearm and the final delivery of the firearm.[1] The waiting period is applicable to all purchasers except those who qualify under specific and narrow exemptions (generally law enforcement officers and the like). This lawsuit challenges the 10-day waiting period as an infringement of the right to keep and bear arms under the Second and Fourteenth Amendments to the United States Constitution as it applies to individuals who [A] are not prohibited from acquiring or possessing firearms and [B] who do currently possess registered firearms and/or who hold valid government-issued licenses that require the successful passage of a California Department of Justice (DOJ) background check that prove they are not prohibited from acquiring or possessing firearms, such as a Certificate of Eligibility (COE) issued by the DOJ or a license to carry a handgun in public (LTC) under Cal. Penal Code § 26150, *et seq.* (issued by a sheriff or chief of police, but requiring passage of a DOJ background check as a prerequisite to issuance[2]).

The Attorney General offers two rationalizations for the across-the-board

---

[1] As far as the waiting period is concerned, the two statutes are identical, and are treated as one law by the defendant; the same will be done by plaintiffs. Governor Brown recently signed new legislation, denominated California Assembly Bill 500, which effectively amends the waiting period laws. Under AB 500, Penal Code § 28220 is amended to provide that, (a) if the Attorney General determines that the prospective purchaser has been involuntarily confined for mental health treatment, or if he or she has been arrested for a felony that would disqualify the purchaser if there were a conviction, or if he or she may have purchased a firearm within 30 days of the new application and (b) the Attorney General is unable to ascertain the disposition of the mental health hold or arrest, or to determine whether there was a prior firearms purchase, the waiting period may be extended up to 30 days. The two provisions of the Penal Code establishing the mandatory minimum 10-day waiting period are not amended by AB 500, which therefore has no direct impact on this lawsuit. To the extent, however, that the new provisions permit unjustified, longer delays in taking possession of firearms by qualified purchasers, it would appear that they would have claims similar to those brought by plaintiffs.

[2] Cal. Penal Code § 26185(a)(2-3): "Upon receipt of the [handgun carry license applicant's] fingerprints and the fee as prescribed in Section 26190, the [DOJ] shall promptly furnish the forwarding licensing authority a report of all data and information pertaining to any applicant of which there is a record in its office, including information as to whether the person is prohibited by state or federal law from possessing, receiving, owning, or purchasing a firearm. No license shall be issued by any licensing authority until after receipt of the report from the department." (Emphasis added.)

1

waiting period, but neither is logical. First, they claim that the delay is required so that a background check can be performed. This argument may have made sense years ago, when background checks required time-consuming manual research and analysis to complete, but it can no longer be justified in light of the virtually-instantaneous electronic criminal and mental health background checks available to (and used by) the DOJ – not to mention DOJ's contemporaneous ability to see in their own databases that the buyer already owns firearms or possess a license of eligibility or the ability to carry an enumerated list of firearms. Second, they claim that a 10-day "cooling-off" period must be imposed on *every* purchaser and transferee because someone might impulsively purchase a gun to do harm. This argument fails to meet even the most basic Constitutional scrutiny. No "common sense" analysis, let alone evidence, suggests that imposing an additional 10-day ban on the delivery of a firearm to those who already known to the Attorney General to have one or more firearms has any positive effect on public safety.

 As the Attorney General noted in her brief, the facts of this case are largely undisputed. Certain facts set forth in the accompanying declarations serve to illustrate the negative impact these laws have on the Second Amendment rights of the individual plaintiffs and the those non-prohibited persons eligible to acquire and possess firearms represented by the organizational plaintiffs. Among the additional relevant facts is the immediately-available criminal background information available to the Defendants in the federal National Instant Check System (NICS), which is set forth in Plaintiff's Separate Statement of Facts.

 Ultimately, the case turns on the fact that California's 10-day waiting period operates as an irrational and unnecessary infringement of Plaintiffs' rights under the Second Amendment. The waiting period law applies to precisely the firearms that are "typically possessed by law-abiding citizens for lawful purposes" and "in common use." District of Columbia v. Heller, 554 U.S. 570, 624-25 (2008). While the period of time at issue here may appear brief, its actual impact on the

2

1  exercise of fundamental rights is substantial, both as a practical matter and in the
2  net effect on the individual right to keep and bear firearms for self-defense.

3      If someone who has already successfully completed the Attorney General's
4  background check wishes to purchase another firearm -- even if on the next day
5  after taking delivery of a registered firearm from a previous purchase -- they will be
6  required to visit the gun dealer twice, first to purchase the next firearm and again to
7  take possession of the firearm after the additional background check and waiting
8  period has been completed. The second visit (to take possession) must be carefully
9  timed to be after the ten 24-hour waiting period days have elapsed and the Attorney
10 General's approval of the background check, but before both the State and the
11 federally-mandated delivery windows close. If the purchaser were allowed to
12 complete the purchase and take possession of the firearm based upon the successful
13 passage of a background check through the databases immediately available to the
14 State (such as the aforementioned COE and LTC records) and/or a simultaneous
15 check of the federal NICS system, a tremendous amount of time and expense would
16 be saved at no risk to the Attorney General's asserted governmental interest.

17     In another example, a person who already has a registered firearm (such as a
18 high-powered handgun for hunting) and who wishes to exercise their right to
19 effective and immediate self-defense in the home by the keeping and bearing of a
20 more-appropriate firearm (such as a semi-automatic handgun in a caliber much less
21 likely to over-penetrate walls and doors) will find that it is not possible to do --
22 even if the person holds one of the previously-mentioned government licenses.

23     The Attorney General's arguments in favor of the waiting period (as it
24 applies to Plaintiffs) reflects their forlorn hope that the courts, including this one,
25 will not treat Second Amendment rights as seriously as others, or even with the
26 same regard as they do un-enumerated rights. Having already lost the argument
27 that the Constitution does not protect individuals' fundamental right to keep and
28 bear firearms, as well as the right to acquire and train with firearms, Defendant

3

1  hopes that by imposing an unrealistically high threshold standard for considering
2  Second Amendment claims, and urging a deferential standard of review, the State
3  of California can continue to disregard the rights of citizens to acquire and possess
4  firearms for self-defense.

5  While the Ninth Circuit has not yet decided the standard of review it will use
6  to scrutinize laws that infringe the Second Amendment rights of law-abiding
7  people, decisions in other circuits demonstrate that a higher standard of scrutiny is
8  appropriate than is posited by the defendant. Under the strict or intermediate
9  scrutiny tests that have been used by other courts to evaluate firearms laws for law-
10  abiding people, the waiting period laws as challenged here must be invalidated.

11  **II.    STATEMENT OF FACTS**

12  The Attorney General sets forth three undisputed material facts at pages 4
13  and 5 of its Memorandum of Points and Authorities in support of her Motion for
14  Summary Judgment. These are: that there is a minimum waiting period of ten days
15  between the purchase of a firearm and its delivery to the purchaser, and that each
16  Plaintiff has owned at least one firearm since before the action was filed.

17  The accompanying Separate Statement of Facts, the Declaration of Victor
18  Otten, and its attachments set forth additional facts that demonstrate the impact of
19  the 10-day waiting period and show that it is, at best, an imprecise fit with the
20  alleged goals of the challenged laws. The most central of the 10-day waiting
21  period's unconstitutional effects is that it causes each and every firearm purchaser –
22  even those the State knows to possess at least one firearm and/or be legally-eligible
23  to acquire others -- to be denied, for a period of time at least 10 days in duration,
24  and sometimes greater than 30 days, the exercise of fundamental Second
25  Amendment rights. Firearm purchasers are statutorily deprived of their use of a
26  Constitutionally-protected item they have purchased "for the purpose of *immediate*
27  self-defense.[3]"

28  ---
[3] *Heller*, at 2822. (Emphasis added.)

4

If a law were passed providing that each and every abortion could not be completed for a woman for at least 10 days after an examination, and further requiring the woman re-visit her doctor, out of fear that she might abuse her right to chose the courts would have no difficulty in striking down such a law. Yet, the Attorney General defends just such a practice here. Defendants now seek to apply an improper "common sense scrutiny" standard of review for considering Second Amendment claims, or failing that, a rational basis review cloaked as intermediate scrutiny. However, as the Seventh Circuit correctly held in Ezell v. Chicago, 651 F.3d 684 (7th Cir. 2011), "*McDonald* reiterated that the Court has long since abandoned 'the notion that the Fourteenth Amendment applies to the States only a watered-down, subjective version of the individual guarantees of the Bill of Rights'," and "decline[d] the invitation" to "import the 'undue burden' test from the Court's abortion cases....Both *Heller* and *McDonald* suggest that First Amendment analogues are more appropriate."

In addition to the general injury caused by the waiting period law, there are a number of specific damages that follow from it, including that Plaintiffs are forced to incur additional expenses to exercise their rights as a result of the waiting period laws, including the requirement that they made a second trip to the dealer to take delivery of the firearm within a window between the completion of the 10-day waiting period and before the 30-day application period expires. (See Plaintiffs' Separate Statement of Facts, ¶¶ 4, 5, 17.) This second visit poses a very real hardship of cost and time- especially for those of lessor means. Moreover, if, for some reason (such as sickness, work conflicts, or transportation availability issues), a buyer is unable to return to the dealer and take delivery of the firearm within that limited time window, they are forced to start the process over, incurring the expense of another Dealers Record of Sale (DROS) application, another 10-day waiting period, and another trip to the dealer. (See Plaintiffs' Separate Statement of Facts, ¶¶ 4-5.) This cycle of being unable to take possession of a purchased firearm and

5

1  starting the process over can go on for weeks or months and even lead to cancelled

2  sales, dealer fees, and other costs like restocking charges. Such risks are not merely

3  hypothetical; at least one of the individual plaintiffs (Combs) has experienced just

4  such an occurrence. (See Plaintiffs' Separate Statement of Facts, ¶ 5.)

5  There are also situations in which the acquisition of a firearm is urgent. If a

6  specific threat of violence has been made against a purchaser, the idea that a

7  Constitutionally-protected means of effective and immediate self-defense may be

8  available to them in a couple of weeks (or more) seems cold comfort. (See

9  Plaintiffs' Separate Statement of Facts, ¶ 18.) The Attorney General argues that an

10  individual who already owns one gun has a less-urgent need for a second. On the

11  contrary, a firearm that might have been acquired for a purpose such as target

12  practice, sporting competitions, or hunting large game, may very well be unsuitable

13  for self-defense; therefore, a purchaser may rationally seek to acquire a firearm in

14  common use for lawful purposes that meets their specific self-defense needs.

15  Critically, the Constitution does not protect the right to keep and bear 'an arm'.

16  Rather, the Second Amendment's textual use of the plural "arms" shows that the

17  framers expressly rejected limitations such as those defended by the Attorney

18  General.

19  The Attorney General's arguments obfuscate the facts that waiting period

20  laws were written long before the information age and that firearm purchasers can,

21  today, be subjected to an electronic (and, in nearly every case, instant) background

22  check that relies on the State's databases as well as the federal NICS system. (See

23  Plaintiffs' Separate Statement of Facts, ¶¶ 6-10.)

24  It is important to recognize that Plaintiffs are not challenging the requirement

25  that they submit to a background check for each firearm purchase transaction.

26  However, in nearly all cases the background check can be completed in mere

27  minutes through the resources available to Defendant, such as the federal NICS

28  system and/or other State-maintained databases (such as the DROS, COE and LTC

1    databases) -- as the process regularly occurs by the millions annually in nearly

2    every other state.[4] (See Plaintiffs' Separate Statement of Facts, ¶¶ 12-13.)

3    **III.  ARGUMENT**

4    **A. Standards for Summary Judgment**

5    Here, Plaintiffs have made a facial and as-applied challenge to the California

6    firearm delivery waiting period law. Plaintiffs do not disagree with the legal

7    standards for summary judgment set forth in the Attorney General's Motion for

8    Summary Judgment, which are, after all, familiar expressions of the applicable law.

9    However, Plaintiffs have offered evidence in opposition to the motion, primarily to

10    demonstrate the impact the waiting period has on individuals in addition to the

11    sweeping impact it has on all firearms purchasers. Plaintiffs urge that the

12    assumptions underlying the waiting period–at least insofar as it is intended to allow

13    more thorough background checks of purchasers–do not comport with the

14    availability of state and federal databases to DOJ, especially since the DOJ

15    maintains a database of those who have already purchased firearms.

16    **B. The 10-Day Waiting Period Violates The Second Amendment**

17    Relying primarily on a criminal case, United States v. DeCastro, 682 F.3d

18    160 (2d Cir. 2012), the Attorney General argues that a law regulating firearms can

19    be subjected to heightened scrutiny under the Second Amendment only if the law

20    imposes a "substantial burden" on the right to bear arms. This is similar to the

21    "undue burden" threshold test applied to restrictions on abortion applied in Planned

22    Parenthood v. Casey, 505 U.S. 833, 873-74 (1992), a case also relied upon by the

23    Attorney General. That test was flatly rejected by the Seventh Circuit in Ezell.

24    According to the Attorney General, firearm restrictions that do not constitute an

25    outright ban fall short of the need for heightened scrutiny and, as such, should be

26    [4] Recognizing that it is irrational and unconstitutional to ban or delay sales of firearms to those

known to the state as eligible to acquire and possess firearms, the State of Washington, for

27    example, exempts those who possess a Washington license to carry ("Concealed Pistol License"

or "CPL") from its 5-day waiting period for handgun purchases. Washington does not impose any

28    waiting period for firearm transactions that are not handguns. See,

http://www.dol.wa.gov/business/firearms/firchart.html, last visited October 15, 2013.

examined under the rational basis test. Anticipating such a tactic, however, the Supreme Court flatly rejected rational basis in Heller. "[W]e know that *Heller*'s reference to any standard of scrutiny means any *heightened* standard of scrutiny; the Court specifically excluded rational-basis review. *Id.* at 628-29 & n. 27, 128 S.Ct. 2783 ("If all that was required to overcome the right to keep and bear arms was a rational basis, the Second Amendment would be redundant with the separate constitutional prohibitions on irrational laws, and would have no effect."); *see also* Skoien, 614 F.3d at 641 ("If a rational basis were enough [to justify a firearms law], the Second Amendment would not do anything ... because a rational basis is essential for legislation in general.")." Ezell at 701.

As the Attorney General notes, the Ninth Circuit has not yet decided the form of scrutiny to apply to restrictions on the right to keep and bear arms or whether the standards of Casey and DeCastro are applicable to Second Amendment challenges. The Seventh Circuit in Ezell v. City of Chicago considered whether Chicago's prohibition of firing ranges within city limits ran afoul of the Second Amendment. Using Free Speech cases as a starting point, Ezell held that the analysis of a Second Amendment claim must begin with a determination of whether the object or activity in question falls within the "scope" of the Second Amendment. "If the government can establish that a challenged firearms law regulates activity falling outside the scope of the Second Amendment right as it was understood at the relevant historical moment–1791 or 1868–then the analysis can stop there; the regulated activity is categorically unprotected, and the law is not subject to further Second Amendment review." Ezell at 702-703.

Ezell then holds, "If the government cannot establish this–if the historical evidence is inconclusive or suggests that the regulated activity is not categorically unprotected–then there must be a second inquiry into the strength of the government's justification for restricting or regulating the exercise of Second Amendment rights. . . . Borrowing from the Court's First Amendment doctrine, the

8

rigor of this judicial review will depend on how close the law comes to the core of the Second Amendment right and the severity of the law's burden on the right." Ezell at 703; accord, e.g., Moore v. Madigan, 702 F.3d 933 (9th Cir. 2012); United States v Marzzarella, 614 F.3d 85, 89 (3d Cir. 2010); United States v. Chester, 628 F.3d 673, 680 (4th Cir. 2010); United States v. Reese, 627 F.3d 792, 800-01 (10th Cir. 2010).

Ezell specifically rejected the "undue burden" test derived from Casey and utilized in DeCastro. Chicago urged that the "undue burden" test be used, but the Ezell court noted that other circuits had begun to use tests derived from First Amendment doctrine. Ezell at 706-707. This is appropriate because, like freedom of speech, the right to bear arms is explicitly set forth in the Bill of Rights.

In 1791 and 1868 unregulated purchasing of firearms to keep and bear was common and waiting periods were not. Additionally, none of the cases decided since Heller specifically address a waiting period like that imposed by California. While the Attorney General describes the waiting period law as imposing "at worst, a minor burden or an inconvenience on the Second Amendment right," AG Memorandum at 11, that assessment does not accurately describe the impact of the waiting period law but does concede that it is a burden or infringement on the right to keep arms. Every gun purchaser in California is deprived of his or her right to bear arms for *at least* ten days and for an additional trip to the firearms dealer, regardless of whether the person is known by the State to possess firearms through registration records or government firearms licenses like the DROS, COE or LTC. These purchasers have no alternative means of legally-acquiring firearms suitable for the exercise of their fundamental rights without this burden or cost.

The only case cited by the Attorney General in support of the view that the burden imposed by the waiting period law is not substantial is DeCastro. But in that case, the defendant had transported a firearm from Florida into New York in alleged violation of 18 U.S.C. § 922(a)(3). He tried to justify his actions by

9

claiming that it would have been impossible for him to acquire a similar weapon in
New York, and that New York City would not have issued a permit for him to
possess the firearm to defend his business. As DeCastro noted, however, the claim
about the unavailability of alternatives was demonstrably false. More than 80% of
business applying for handgun permits in New York had received them. Thus,
DeCastro held, "In light of the ample alternative means of acquiring firearms for
self-defense purposes, § 922(a)(3) does not impose a substantial burden on the
exercise of Decastro's Second Amendment rights."

The burden imposed by the waiting period laws is, however, absolute. No
matter how serious the need or how great the cost and inconvenience of the waiting
period, there is no alternative under California law. Therefore, under even the cases
cited by the Attorney General, the waiting period law must be subject to either
intermediate or strict scrutiny.

Heller rejects any kind of "rational basis" or reasonableness test for assessing
the validity of laws that burden Second Amendment rights. See 554 U.S. at 628
n.27. At the same time, Heller does not specify what test should apply and under
what circumstances. Where legislation impinges upon a fundamental right, the
Supreme Court has applied strict scrutiny. See, e.g., Clark v. Jeter, 286 U.S. 456,
461 (1988) ("classifications affecting fundamental rights are given the most
exacting scrutiny"). Government classifications of Constitutionally-significant
artifacts (here, firearms) are subject to heightened scrutiny when the classifications
of those artifacts impinge on a fundamental right. The California Supreme Court
made exactly this point in Kasler v. Lockyer, 23 Cal. 4th 472 (2000), even as it
declined to subject semiautomatic rifle classifications to strict judicial review – but
based on the premise that California had no "right to keep and bear arms" in its
state constitution and the Second Amendment was at that time still dormant. The
United States Supreme Court has since obliterated that premise. See District of
Columbia v. Heller, 554 U.S. 570 (2008) and McDonald v. City of Chicago, 130 S.

Ct. 3020 (2010). To pass strict scrutiny, the government bears the burden of demonstrating that its law "furthers a compelling interest and is narrowly tailored to achieve that interest." Citizens United v. FEC, 538 U.S. 310, 130 S. Ct. 876, 898 (2010).

There is a considerable body of law pertaining to the exercise of First Amendment rights that can serve as a useful model for developing a framework for the standards to be applied in reviewing Second Amendment rights. See Nelson Lund, "The Second Amendment, Heller, and Originalist Jurisprudence", 56 UCLA L. Rev. 1343, 1376 (2009) ("The case law dealing with free speech and the free exercise of religion provides a particularly good analogue" for the Second Amendment). Laws that prohibit a particular form of speech, or subject it to a prior restraint, are reviewed under strict scrutiny, and are almost always invalid. See, e.g., Anderson v. City of Hermosa Beach, 621 F.3d 1051 (9th Cir. 2010) (ban on tattoo shops struck down). Laws that regulate the time, place and manner of speech are subject to more deferential, intermediate scrutiny review. See, e.g., Ward v. Rock Against Racism 491 U.S. 781, 791 (1989) (noise regulations applied to rock music upheld).

Plaintiffs urge that the waiting period applied against those who have previously purchased firearms or who possess state license is the equivalent of a prior restraint or a ban (of at least 10 days, but in some cases much longer) on the acquisition of firearms and should be adjudicated under the strict scrutiny standard. The Attorney General does not–and could not–demonstrate that the waiting period law is narrowly tailored to satisfy a compelling interest – especially where the Attorney General has actual knowledge of the purchaser's law-abiding nature.

But even if the waiting period law is viewed under the less rigorous intermediate scrutiny test, it cannot survive judicial review. To pass intermediate scrutiny, a law must be "substantially related to an important governmental objective," Clark, 486 U.S. at 461. That is, the government has the burden of

11

demonstrating a tight fit between the regulation and the objective, a "means narrowly tailored to achieve the desired objective." Board of Trustees v. Fox, 492 U.S. 469, 480 (1980); see Ward, 491 U.S. at 782-83 ("The requirement of narrow tailoring is satisfied so long as the regulation promotes a substantial governmental interest that would be achieved less effectively absent the regulation, and the means chosen are not substantially broader than necessary to achieve that interest").

The waiting period law fails on both counts. First, the Attorney General has failed to demonstrate with any evidence that the law is effective either in reducing gun violence or in keeping firearms out of the hands of unqualified purchasers where the government has a record of a previous sale to that purchaser or a record that it has issued that purchaser a COE or LTC. Second, the waiting period law– which directly impacts the rights of every gun purchaser whose previous purchase has been recorded by the government or who is licensed by the government as eligible or allowed to carry a loaded firearm in public – is the antithesis of narrow tailoring.

While the attorney general argues that the law is necessary so that a background check can be performed to weed out unqualified purchasers, such as those with felony convictions or a history of mental illness, there is no basis for concluding that the waiting period is necessary for that purpose where the attorney general has allowed a previous sale or licensed the purchase. Assembly Bill 500, which has recently been enacted into law, is the first step in the direction of a more focused approach. Under that measure, if a purchaser does not pass the initial screening because of a "red flag" or some material fact in the electronic database, such as charges filed for a crime that would be prohibiting but without a case disposition, an additional delay may be imposed of up to 20 days while the background check is completed. While AB 500 is not without its problems, the law at least recognizes that all firearms purchasers should be treated the same initially, and that only in cases where delay is *justified* may it be imposed.

1     As already stated, Plaintiffs do not challenge the concept of a background

2     check to compare the purchaser of a firearm against a list of known prohibited

3     persons, such as the federal NICS system, and this lawsuit does not question the

4     legitimacy of such a screening. Databases of criminal records and ongoing

5     background checks (including the State's own, as well as the FBI's) are readily

6     available online and/or by telephone, and the State's utilization of them would

7     quickly and effectively clear all but a handful of prospective purchasers.

8           The second rational basis justification for the 10-day delay is that it affords a

9     "cooling-off" period in case a purchaser is seeking the firearm for an impulsive act

10    of violence. While that claim may be attractive in the abstract, there is no evidence

11    to support the efficacy of the law in preventing violence. As the Separate Statement

12    of Facts states, the level of gun violence is lower in states without a waiting period

13    (but with background checks) than it is in California. (See Plaintiffs' Separate

14    Statement of Facts, ¶¶ 12-13.) Before a constitutional right may be burdened or

15    infringed, there must be at least some foundation showing that the restriction may

16    be expected to achieve the desired result. The speciousness of the "cooling-off"

17    period is especially evident when the waiting period law is applied to individuals

18    who already own firearms (and, particularly, when such fact is known to the State

19    in its registration and licensing databases). Any spontaneously evil or insane

20    proclivity a purchaser might have toward violence can be made manifest with the

21    weapons they already own, and no evidence has been offered that shows a gun

22    owner bent on violence was deterred by the inability to acquire another firearm.

23    The Attorney General cannot avoid the consequence of the waiting period laws: all

24    Californians are treated as guilty, being stripped of their fundamental

25    Constitutionally-enumerated rights, until the State's leisurely evaluation of criminal

26    records is complete and their factually-unsubstantiated "cooling-off" period has

27    elapsed even when the State has already approved a sale or issued a license.

28          Ultimately, the waiting period laws are invalid under any of the standards of

heightened scrutiny recognized as applicable to the review of laws that infringe a
fundamental right. Accordingly, the Attorney General's Motion for Summary
Judgment on Plaintiffs' Second Amendment claims must be denied.

### C. The Numerous Exceptions To The 10-Day Waiting Period Render The Waiting Period Laws Invalid Under The Equal Protection Claus

In addition to the generalized challenge to the waiting period laws, Plaintiffs
contend that the eighteen groups of statutory exceptions to the waiting period
violate the equal protection clause of the Fourteenth Amendment. The exceptions
apply to peace officers (whether or not the firearm is obtained for purposes of law
enforcement), firearms dealers delivering firearms other than handguns at auctions,
certain dealer-to-dealer transfers, transfers to people with permits for exotic
weapons such as assault weapons and machine guns, transfers for the repair or
servicing of firearms, dealer sales out of state, firearms deliveries to wholesalers,
and regulated lending of firearms at certain facilities, such as shooting ranges.

While the Attorney General goes to great pains to explain how each of these
exceptions has a rational basis, the argument is premised on the assumption that the
waiting law as a whole does not infringe on Second Amendment rights, and that the
validity of the underlying law means that the lowest degree of equal protection
scrutiny applies. The problem with that argument is that the plethora of exceptions
undercuts the rationale for the waiting period law itself. If the waiting period is so
vital to the government's interests that it must be applied even to firearms
purchasers who have a valid DOJ permit stating that they are able to acquire and
possess firearms (COE), or carry loaded handguns in public (LTC), then how can it
be even rational to grant such a wide swath of exceptions?

Before Heller, the 9th Circuit examined certain exceptions to the California
assault weapons law under the Equal Protection clause of the Fourteenth
Amendment. Silviers v. Lockyer, 312 F.3d 1052 (9th Cir. 2003). While the
decision in that case rejected a challenge to the law on Second Amendment grounds

before <u>Heller</u>, see <u>Nordyke v. King</u>, 319 F.3d 1185, 1192 n.4 (9th Cir. 2003), the decision did invalidate an exception to the assault weapons ban for retired police officers, finding that it violated the Equal Protection Clause. <u>Sliviera</u>, 312 F.3d at 1089-92.

The Equal Protection analysis in <u>Silviera</u> was premised on the supposition that the Second Amendment right to bear arms was not a fundamental individual right. Yet in applying the rational basis test to the exceptions in the assault weapons ban, the court relied on the fact that <u>Silviera</u> presented neither of the circumstances generally calling for heightened Equal Protection scrutiny.

Now that the Second Amendment is subject to a different interpretation, it is clear that the waiting period laws affect a fundamental right. Having shown no more than a rational basis for upholding the numerous exceptions to the waiting period laws, the Attorney General has not met the burden for summary judgment. Therefore, the motion should be denied as to the Equal Protection claims.

DATED:  October 15, 2013

OTTEN & JOYCE, LLP

Victor Otten, Esq.
Attorneys for Plaintiffs