EXHIBIT "D"

IN THE UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

- - - CERTIFIED COPY

JEFF SILVESTER, MICHAEL POESCHL, )
BRANDON COMBS, THE CALGUNS )
FOUNDATION, INC., a non-profit )
organization, and THE SECOND )
AMENDMENT FOUNDATION, INC., a )
non-profit organization, )
　　　　　　　　　　　　　　　　　　)
　　　　　　　Plaintiffs, )
　　　　　　　　　　　　　　　　　　)　Case No.
vs. )　1:11-CV-02137
　　　　　　　　　　　　　　　　　　)
KAMALA HARRIS, Attorney General )
of California (in her official )
capacity), and DOES 1 TO 20, )
　　　　　　　　　　　　　　　　　　)
　　　　　　　Defendants. )

30(b)(6) DEPOSITION OF THE CALGUNS FOUNDATION, INC.

BY AND THROUGH GENE HOFFMAN JR.

LOS ANGELES, CALIFORNIA

MAY 13, 2013

Atkinson-Baker, Inc.
Court Reporters
(800) 288-3376
www.depo.com

Reported by: Aileen Neitzert, RDR, CRR, CSR No. 5318

File No.: A703C3D

1  Q.  There has been an informal attempt to do so?
2  A.  Certainly there are conversations about how
3 much easier it is to be able to acquire firearms in the
4 used market, for example, in other states.
5  Q.  Has CGF ever attempted to determine whether the
6 ten-day waiting period in California is responsible for
7 any of the disparity between California and another
8 state?
9  A.  We have certainly compared it from a
10 criminologic standpoint and found that in fact
11 California's gun homicide rate continues to be higher
12 than those places that do not have a waiting period.
13  Q.  This research on the gun homicide rate was
14 related to the ten-day waiting period or not?
15  A.  The basket of California gun control.
16  Q.  In other words, it was about California's gun
17 laws as a group?
18  A.  I would say it's mostly about the background
19 check and the universal background check, as well as
20 the ten-day waiting period.
21  Q.  Did CGF determine or calculate any gun homicide
22 rates of its own in this research?
23  A.  No, because CGF is relying primarily on the FBI
24 and WISQARS data, as well as a Rand study in Los
25 Angeles.

1    A.   Washington state.  Florida.
2    Q.   Any others?
3    A.   Forty-nine others.  The ones that are most
4 applicable are the ones with larger urban environments.
5    Q.   What I'm asking -- I'm not asking you to name
6 the 45 states.  I'm saying, which states have you done
7 this comparative analysis for --
8    A.   We --
9    Q.   -- California and other states, which other
10 states?
11   A.   We focused on Texas.
12   Q.   Did you -- did CGF compile data for states
13 besides California and Texas?
14   A.   We reviewed the rest of the other 49, yes.
15   Q.   And so CGF's understanding is that Texas has a
16 lower gun homicide rate than California?
17   A.   That's correct.
18   Q.   And its gun homicide rate based on what
19 metrics?
20   A.   The FBI crime data.
21   Q.   Is it like a per capita --
22   A.   Yes --
23   Q.   -- rate?
24   A.   -- it's a per capita rate.
25   Q.   And CGF has determined that some amount of that

```
 1  difference is attributable to there being a ten-day
 2  waiting period in California?
 3       A.   I would say the other way around:  The ten-day
 4  waiting period does not seem to be as effective as no
 5  waiting is in Texas.
 6       Q.   You said that there were other things in the
 7  basket of California gun laws that CGF thinks are
 8  relevant to the gun homicide rate comparative data,
 9  correct?
10       A.   That's correct.
11       Q.   What percentage of the effect is from
12  California's ten-day waiting period versus other laws?
13       A.   I'd say 50 percent of it.
14       Q.   Why are you saying 50 percent?
15       A.   Because the other thing that matters is the
16  universal background check requirement.
17       Q.   In other words, there are two things that
18  affect this data.  Do you know that each thing affects
19  the data equally?
20       A.   That's our supposition.
21       Q.   What's the basis for the supposition?
22       A.   The fundamental difference between Texas law
23  and California law is the universal background check
24  and the ten-day waiting period.  When considered with
25  the fact that handguns are something near 80 or 90
```

1     A.    That's correct.

2     Q.    That person could be doing something else
3 besides going to the grocery store?

4     A.    That's correct.

5     Q.    Is there something about a CGF member making a
6 trip to a firearms seller that creates a different kind
7 of opportunity cost?

8     A.    Yes.

9     Q.    What's the difference?

10     A.    One can't do a single trip to be able to
11 acquire a firearm. You must do multiple trips.

12     Q.    If a CGF member's home is exactly five miles
13 away from a grocery store that the person uses and is
14 exactly five miles away in a slightly different
15 direction to a firearms retailer that the person uses
16 and the travel time to both places is the same, isn't
17 the opportunity cost of each trip the same?

18     A.    It doesn't take two trips to buy milk.

19     Q.    So it's the second trip that's required when a
20 person purchases a firearm that's causing an
21 opportunity cost that CGF objects to?

22     A.    It's one of the opportunity costs that CGF
23 objects to.

24     Q.    Yeah. I'm saying in that hypothetical.

25     A.    Yes.

1    A.   I do not believe there is any CGF board member
2 passed or present with a felony conviction.
3    Q.   Has CGF attempted to gather information from
4 members about whether the ten-day waiting period has
5 prevented them from effectively defending themselves or
6 their families in their homes?
7    A.   We are aware of a couple situations where it
8 has been a real hindrance, yes.
9    Q.   How did you find out about those couple of
10 instances?
11    A.   Usually word of mouth specifically around the
12 L.A. riots.
13    Q.   And has anyone at CGF interviewed or taken
14 statements from the people that made these contentions?
15    A.   This doesn't rise to more than a formal --
16 informal conversation.  Pardon.
17    Q.   So you say there are a couple of instances.  Do
18 you mean two?
19    A.   That I'm aware of.
20    Q.   Were both instances related to the L.A. riots?
21    A.   Yes.
22    Q.   Do you know the names of the people who have
23 made these contentions?
24    A.   One person actually wrote a well-known article
25 about it, but I don't recall the name or the article's

1  Q. Okay. All right. Let's move on to the other
2  instance. There is another CGF member who alleges, you
3  know, that the ten-day waiting period prevented the
4  person from getting a firearm to defend himself or
5  herself.
6  A. Um-hum.
7  Q. Actually, strike. Strike that. Let's move
8  back. Let's move back to the playwright. Was the
9  playwright attacked?
10 A. The playwright escaped during an opening night
11 from a mob and went home and basically figured out that
12 he couldn't then get a firearm and did as immediately
13 what he could.
14 Q. Do you know if the playwright ever acquired a
15 firearm even, you know, after waiting ten days?
16 A. He states that he did later, yes.
17 Q. And in the article does the playwright say that
18 he's used the firearm in self-defense?
19 A. I don't recall.
20 Q. All right. Let's move on to the other
21 instance. Do you know the name of the person who is
22 the other person that we're referring to?
23 A. I don't recall her name.
24 Q. Do you recall that the person is a female?
25 A. That's correct.

1  Q. And did she also attempt to obtain a firearm
2  during the time of the 1992 L.A. riots?
3  A. No.
4  Q. What was her attempt to obtain firearms in
5  connection with, if anything?
6  A. She had someone who she was concerned was a
7  stalker.
8  Q. Um-hum. When was she being stalked by this
9  person?
10 A. A couple years ago.
11 Q. Did this woman write an article or make any
12 writing describing her predicament?
13 A. No.
14 Q. How did you become aware that this woman had
15 this predicament?
16 A. A conversation with a friend of hers who was a
17 volunteer for us.
18 Q. And did you ever -- so you talked to a friend
19 of hers --
20 A. Correct.
21 Q. -- about this woman's problem --
22 A. Correct.
23 Q. -- with the stalker and --
24 A. Um-hum.
25 Q. -- not being able to get a firearm to defend

1     A.   I don't recall.
2     Q.   Have you ever heard anyone say that the
3 California background check system for prospective
4 firearms purchasers could be a national model, or words
5 to that effect?
6     A.   Yes.
7     Q.   Where have you heard such statements?
8     A.   Various members of the press, various advocates
9 for gun control.
10    Q.   Is it CGF's position that the California
11 background check system is the worst of the existing
12 systems?
13    A.   The background check system is not a problem.
14 In fact CGF's position is that the background check
15 system is in some -- many cases better than other
16 states.  It's the waiting period that's the problem.
17    Q.   Does CGF understand that the California
18 background check system takes ten days for the reason
19 that that's often how long it takes to do a background
20 check?
21    A.   That's actually not what we see from the FFLs
22 we know.
23    Q.   What's your understanding on why the background
24 check is presently at ten days?
25    A.   Arbitrarily set by the Legislature.

Department of Justice. At the same time, we are also aware that many of our plaintiffs are prescreened, so, therefore, it should be very easy to know whether or not they are prohibited or not.

Q. When you say "prescreened," what do you mean prescreened?

A. They either have a carry license or Certificate of Eligibility issued by the Department.

Q. There are CGF members that don't have either of those things, correct?

A. That's true.

Q. For that group of people, the people that lack the licenses or the certificates, does CGF understand that those people are subject to any kind of continuous or ongoing background check?

A. Yes, actually they are. Otherwise the APFS would not be adding people to it.

Q. So is it CGF's position that for a person who has been through the ten-day waiting period, once California can check to see if that person appears on the Armed Prohibited Persons List and thereby make a decision about whether the person should be allowed to obtain an additional firearm?

A. Yes.

Q. Is it CGF's position that that's the only