```
             IN THE UNITED STATES DISTRICT COURT

               EASTERN DISTRICT OF CALIFORNIA

                            - - -

JEFF SILVESTER, MICHAEL POESCHL,  )
BRANDON COMBS, THE CALGUNS        )
FOUNDATION, INC., a non-profit    )
organization, and THE SECOND      )
AMENDMENT FOUNDATION, INC., a     )
non-profit organization,          )
                                  )
            Plaintiffs,           )
                                  )
vs.                               )   Case No.
                                  )   1:11-CV-02137
KAMALA HARRIS, Attorney General   )
of California (in her official    )
capacity), and DOES 1 TO 20,      )
                                  )
            Defendants.           )
_____)



    30(b)(6) DEPOSITION OF THE CALGUNS FOUNDATION, INC.

              BY AND THROUGH GENE HOFFMAN JR.

                   LOS ANGELES, CALIFORNIA

                       MAY 13, 2013


Atkinson-Baker, Inc.
Court Reporters
(800) 288-3376
www.depo.com

Reported by:  Aileen Neitzert, RDR, CRR, CSR No. 5318

File No.:     A703C3D
```

1

```
                IN THE UNITED STATES DISTRICT COURT

                   EASTERN DISTRICT OF CALIFORNIA

                              - - -

JEFF SILVESTER, MICHAEL POESCHL, )
BRANDON COMBS, THE CALGUNS       )
FOUNDATION, INC., a non-profit   )
organization, and THE SECOND     )
AMENDMENT FOUNDATION, INC., a    )
non-profit organization,         )
                                 )
              Plaintiffs,        )
                                 )
vs.                              )  Case No.
                                 )  1:11-CV-02137
KAMALA HARRIS, Attorney General  )
of California (in her official   )
capacity), and DOES 1 TO 20,     )
                                 )
              Defendants.        )
_____)
```

        30(b)(6) Deposition of The Calguns Foundation, Inc., by and through GENE HOFFMAN JR., taken on behalf of the Defendant, at 300 South Spring Street, South Tower, Sixth Floor, Los Angeles, California, commencing at 9:28 a.m., Monday, May 13, 2013, before Aileen Neitzert, CSR No. 5318.

```
 1                 A P P E A R A N C E S

 2


 3   FOR THE PLAINTIFFS:

 4       OTTEN & JOYCE, LLP
         BY:  VICTOR J. OTTEN, ATTORNEY AT LAW
 5       3620 Pacific Coast Highway
         Suite 100
 6       Torrance, California 90505
         (310) 378-8533
 7


 8   FOR THE DEFENDANT:

 9       STATE OF CALIFORNIA
         DEPARTMENT OF JUSTICE
10       OFFICE OF THE ATTORNEY GENERAL
         BY:  JONATHAN M. EISENBERG,
11            DEPUTY ATTORNEY GENERAL
         300 South Spring Street
12       Suite 1702
         Los Angeles, California 90013
13       (213) 897-6505

14       STATE OF CALIFORNIA
         DEPARTMENT OF JUSTICE
15       OFFICE OF THE ATTORNEY GENERAL
         BY:  KIMBERLY GRANGER,
16            DEPUTY ATTORNEY GENERAL
         1300 "I" Street
17       Suite 1700
         Sacramento, California 95814-2919
18       (916) 445-9555
         (present by teleconference)
19

20

21

22

23

24

25
```

```
 1                      GENE HOFFMAN JR.,
 2                having first been duly sworn, was
 3                examined and testified as follows:
 4
 5                          EXAMINATION
 6   BY MR. EISENBERG:
 7       Q.   Hello.  Please state your full name for the
 8   record and spell your last name, please.
 9       A.   My full real name is Eugene E. Hoffman Jr., but
10   I go by Gene Hoffman Jr., G-e-n-e H-o-f-f-m-a-n.
11       Q.   Have you been through a deposition before?
12       A.   I have.
13       Q.   Are you represented by an attorney in today's
14   proceeding?
15       A.   I am.
16       Q.   Who is your attorney?
17       A.   Vic Otten.
18       Q.   And is he the gentleman sitting next to you?
19       A.   He is.
20       Q.   Did you review any documents in preparation for
21   today's deposition?
22       A.   I did.
23       Q.   Can you tell me what documents you looked at.
24       A.   I reviewed your request for the deposition
25   itself.  I also looked at a May 1991 Department of
```

1    A.    We theorize, without a lot of evidence, that it
2 might be the fact that carry licenses are widely
3 available.
4    Q.    In Texas?
5    A.    Correct.
6    Q.    How does CGF know that carry licenses are more
7 widely available in Texas than California?
8    A.    Texas law requires the issuance of a carry
9 license to anyone who meets objective standards, and
10 the total numbers of carry licenses per capita are
11 significantly higher in Texas than in California.
12   Q.    So CGF has the belief that because people in
13 Texas understand that many other people may be carrying
14 a concealed weapon, there is a deterrent effect that
15 reduces crime, correct?
16   A.    That's correct.
17   Q.    Does CGF have an understanding that it's the
18 carry laws that are more of an effect on -- have more
19 of an effect in this respect than the presence or
20 absence of a ten-day waiting period?
21   A.    Could you ask the question again.
22   Q.    Okay. So what I'm driving at -- this is not a
23 question. This is something that may aid in you
24 understanding my question.
25   A.    Yes.

```
 1      Q.   I'm trying to find out if CGF thinks that there
 2  is some factor that's primarily responsible for the
 3  difference in homicide rate -- the gun homicide rate in
 4  Texas versus California.  So my question is, does CGF
 5  understand that it's the difference in the carry laws
 6  between Texas and California that's the primary reason
 7  that there is a difference in the gun homicide rates?
 8      A.   Well, I will caveat answering that question
 9  with:  The criminological information here is thick,
10  rich, and hard to decouple.  It may also include the
11  value of the drug market in both states.  But to the
12  extent that we're talking about firearms policy, it is
13  CGF's supposition that the liberal carry issuance in
14  Texas is more of a deterrent than the reverse being
15  that the ten-day wait somehow decreases gun crime.
16      Q.   So, in other words, CGF understands that Texas
17  has the more liberal carry law?
18      A.   That's correct.
19      Q.   California has the more strict carry law?
20      A.   More restrictive, yes.
21      Q.   Texas has a more liberal waiting period by the
22  absence of a waiting period?
23      A.   That's correct.
24      Q.   California has a more rigid or strict waiting
25  period by the presence of a ten-day waiting period?
```

1   A.   That's correct.
2   Q.   And so CGF's understanding from this data is
3  it's not a ten-day waiting period that's making gun
4  homicide rates go down.  The evidence actually is to
5  the contrary?
6   A.   I'd say it this way:  There is no evidence that
7  it does help.
8   Q.   Okay.  And CGF has not put out any publication
9  about this data?
10  A.   No.
11  Q.   Is there a plan for CGF to put out a
12 publication on this data?
13  A.   Not at present.
14  Q.   Is there some plan to do so in the future?
15  A.   We are an educational group, so, you know, all
16 sorts of things happen in the future.
17  Q.   The media interviews that you reference -- the
18 Vancouver paper, NPR, the BBC -- when was the first of
19 those media appearances?
20  A.   The ones I just recalled were December of last
21 year.
22  Q.   When was the first time CGF made a public
23 statement regarding its findings in this research on
24 gun homicide data?
25  A.   Shortly after the Aurora shootings.

```
 1       A.   I do not believe there is any CGF board member
 2  passed or present with a felony conviction.
 3       Q.   Has CGF attempted to gather information from
 4  members about whether the ten-day waiting period has
 5  prevented them from effectively defending themselves or
 6  their families in their homes?
 7       A.   We are aware of a couple situations where it
 8  has been a real hindrance, yes.
 9       Q.   How did you find out about those couple of
10  instances?
11       A.   Usually word of mouth specifically around the
12  L.A. riots.
13       Q.   And has anyone at CGF interviewed or taken
14  statements from the people that made these contentions?
15       A.   This doesn't rise to more than a formal --
16  informal conversation.  Pardon.
17       Q.   So you say there are a couple of instances.  Do
18  you mean two?
19       A.   That I'm aware of.
20       Q.   Were both instances related to the L.A. riots?
21       A.   Yes.
22       Q.   Do you know the names of the people who have
23  made these contentions?
24       A.   One person actually wrote a well-known article
25  about it, but I don't recall the name or the article's
```

```
 1      Q.   And did she also attempt to obtain a firearm
 2  during the time of the 1992 L.A. riots?
 3      A.   No.
 4      Q.   ==What was her attempt to obtain firearms in
 5  connection with, if anything?==
 6      A.   ==She had someone who she was concerned was a
 7  stalker.==
 8      Q.   Um-hum.  When was she being stalked by this
 9  person?
10      A.   A couple years ago.
11      Q.   Did this woman write an article or make any
12  writing describing her predicament?
13      A.   No.
14      Q.   ==How did you become aware that this woman had
15  this predicament?==
16      A.   ==A conversation with a friend of hers who was a
17  volunteer for us.==
18      Q.   And did you ever -- so you talked to a friend
19  of hers --
20      A.   Correct.
21      Q.   -- about this woman's problem --
22      A.   Correct.
23      Q.   -- with the stalker and --
24      A.   Um-hum.
25      Q.   -- not being able to get a firearm to defend
```

138

```
 1  herself?
 2      A.   Yes.
 3      Q.   Did you ever talk to the woman directly?
 4      A.   No, I did not.
 5      Q.   Did anyone from CGF ever talk to the woman
 6  directly?
 7      A.   The volunteer did.
 8      Q.   The volunteer spoke to both -- oh, okay.
 9      A.   Yes.
10      Q.   The volunteer told somebody at CGF?
11      A.   Correct.
12      Q.   Who was the person at CGF who was told?
13      A.   Myself and I believe Josh Berger.
14      Q.   And who is Josh Berger in relation to C --
15      A.   Another board member.
16      Q.   Did you mention him in the earlier list?
17      A.   No.  I couldn't remember him.
18      Q.   Okay.  Given that it's lunchtime, I think I
19  might have remembered Berger.  Bad joke there.
20           All right.  So the volunteer spoke to this
21  woman.  Is the woman who suffered this predicament, is
22  she a CGF member?
23      A.   I believe she became one, yes.
24      Q.   Okay.  And you say there are about 30,000
25  members of CGF?
```