1  KAMALA D. HARRIS, State Bar No. 146672
   Attorney General of California
2  MARK R. BECKINGTON, State Bar No. 126009
   Supervising Deputy Attorney General
3  PETER H. CHANG, State Bar No. 241467
   Deputy Attorney General
4  JONATHAN M. EISENBERG, State Bar No. 184162
   Deputy Attorney General
5    300 South Spring Street, Suite 1702
     Los Angeles, CA  90013
6    Telephone:  (213) 897-6505
     Fax:  (213) 897-5775
7    E-mail:  Jonathan.Eisenberg@doj.ca.gov
   *Attorneys for Defendant Kamala D. Harris, Attorney*
8  *General of California*

9              IN THE UNITED STATES DISTRICT COURT

10            FOR THE EASTERN DISTRICT OF CALIFORNIA

11                     FRESNO DIVISION

12

| 13 | **JEFF SILVESTER, BRANDON COMBS, THE CALGUNS FOUNDATION, INC., a** | 1:11-cv-02137-AWI-SKO |
|---|---|---|
| 14 | **non-profit organization, and THE SECOND AMENDMENT FOUNDATION, INC., a** | **TRIAL BRIEF OF DEFENDANT** |
| 15 | **non-profit organization,** | **KAMALA D. HARRIS, ATTORNEY GENERAL OF CALIFORNIA** |
| 16 | Plaintiffs, | |

13  **JEFF SILVESTER, BRANDON COMBS,
    THE CALGUNS FOUNDATION, INC., a**
14  **non-profit organization, and THE SECOND
    AMENDMENT FOUNDATION, INC., a**
15  **non-profit organization,**

16                              Plaintiffs,

17          v.

18
    **KAMALA HARRIS, Attorney General of**
19  **California (in her official capacity), and
    DOES 1 to 20,**
20
21                              Defendants.

    1:11-cv-02137-AWI-SKO

    **TRIAL BRIEF OF DEFENDANT
    KAMALA D. HARRIS, ATTORNEY
    GENERAL OF CALIFORNIA**

    Dept:        8th Flr., Crtrm. 2
    Judge:       The Hon. Anthony W. Ishii
    Trial Date:  March 25, 2014
    Trial Time:  8:30 a.m.
    Action Filed: December 23, 2011

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

INTRODUCTION AND SUMMARY OF THE CASE FOR THE DEFENSE ............................ 1

BACKGROUND FACTS AND PROCEDURAL HISTORY ....................................... 4

I.    The Legislative History of the Waiting-Period Law ................................ 4

II.    Background Facts of the Present Case ................................... 6

THE CASE FOR THE DEFENSE ................................................. 9

I.    Summary of the Requisite Legal Analysis to Be Performed for this Case ............ 9

II.    The Two-step Second Amendment Analysis Described and Applied ................. 10

    A.    Step one—The Waiting-Period Law does not burden the Second Amendment right ....................................... 10

        1.    Step 1A—The Waiting-Period Law is a presumptively lawful regulatory measure whose constitutionality is not in doubt.................................................... 11

        2.    Step 1B—A textual and historical Second Amendment analysis vindicates the Waiting-Period Law ................................ 13

    B.    Step two—The Waiting-Period Law withstands heightened scrutiny ...... 16

        1.    Step 2A—A lenient form of intermediate scrutiny is appropriate........................................ 16

        2.    Step 2B—The Waiting-Period Law survives heightened scrutiny ......................................... 17

III.    *Peruta*'s "Alternative Approach" Has No Application Here ................................ 22

IV.    The Waiting-Period Law's Statutory Exceptions Do Not Implicate the Fourteenth Amendment........................................... 23

CONCLUSION ................................................................ 24

i

# TABLE OF AUTHORITIES

**Page**

## CASES

*Burdick v. Takushi*
    504 U.S. 428 (1992) ........................................................................................... 10

*District of Columbia v. Heller*
    554 U.S. 570 (2008) ("*Heller I*") ............................................................... passim

*Ezell v. City of Chicago*
    651 F.3d 684 (7th Cir. 2011) ........................................................................... 16

*Heller v. District of Columbia*
    670 F.3d 1244 (D.C. Cir. 2011) ("*Heller II*") ................................................ 9

*Kahawaiolaa v. Norton*
    386 F.3d 1271 (9th Cir. 2005) .......................................................................... 23

*People of State of New York v. O'Neill*
    359 U.S. 1 (1959) ............................................................................................ 11

*People v. Bickston*
    91 Cal. App. 3d Supp. 29 (1979) ...................................................................... 4

*Peruta v. County of San Diego*
    ___ F.3d ___, No. 10-056971, 2014 WL 555862 (9th Cir. Feb. 13, 2014) .................... passim

*Sachs v. Republic of Austria*
    737 F.3d 584 (9th Cir. 2013) ........................................................................... 13

*Town of Lockport v. Citizens for Community Action at Local Level, Inc.*
    430 U.S. 259 (1977) ........................................................................................ 11

*United States ex rel. Madden v. General Dynamics Corp.*
    4 F.3d 827 (9th Cir. 1993) ............................................................................... 11

*United States v. Chester*
    628 F.3d 673 (4th Cir. 2010) ............................................................................. 9

*United States v. Chovan*
    735 F.3d 1127 (9th Cir. 2013) ................................................................... passim

*United States v. Leon*
    468 U.S. 897 (1984) ........................................................................................ 20

*United States v. Marzzarella*
    614 F.3d 85 (3rd Cir. 2010) ....................................................................... 12, 13

ii

# TABLE OF AUTHORITIES
### (continued)

**Page**

*Zablocki v. Redhail*
434 U.S. 375 (1978) ...................................................................................... 10


**STATUTES**

Cal. Stats. 1923, Chapter 339, § 10 ................................................................ 4

California Penal Code § 12072 ..................................................................... 4, 6

California Penal Code § 26815 ................................................................. passim

California Penal Code § 27540 ................................................................. passim

Deering's General Laws (1924 ed.), Act 1970, § 10 ...................................... 4

**CONSTITUTIONAL PROVISIONS**

U.S. Const., Second Amend. ................................................................... passim

U.S. Const., Fourteenth Amend. ............................................................. passim

**OTHER AUTHORITIES**

"Brown Signs Tough Gun Control Bill," *The Sacramento Bee*, Sept. 24, 1975 ........................... 4

David A. Brent, *Firearms and Suicide*, Annals of New York Academy of Sciences, 225 (2001). ............................................................................................. 21

Greg M. de Moore, et al., *Survivors of Self-inflicted Firearm Injury*, 160 The Medical Journal of Australia (1994) ..................................................................... 20

James A. Fox, et al., *The Will to Kill: Making Sense of Senseless Murder, 4th Ed.* (Prentice Hall 2011) .................................................................................. 20

Robert A. Hahn, et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 American Journal of Preventive Medicine 40 (2005) ......................... 21

Samuel Johnson, *A Dictionary of the English Language (10th Ed.)* (1792) .......................... 14

Jack Larkin, *The Reshaping of Everyday Life, 1790-1840* (Harper & Row 1988) ..................... 15

Matthew Miller and David Hemenway, *The Relationship Between Firearms and Suicide: A Review of the Literature* 4 Aggression and Violent Behavior 59 (1999) .................. 21

iii

## TABLE OF AUTHORITIES
### (continued)

Page

Linda G. Peterson, et al., *Self-inflicted Gunshot Wounds: Lethality of Method Versus Intent*, 142 American Journal of Psychiatry 228 (Feb. 1985) .................................... 20

Charles Sellers, *The Market Revolution: Jacksonian America, 1815-1846* (Oxford Univ. Press 1991) ........................................................................................................... 15

Robert J. Spitzer, *The Politics of Gun Control, Fifth. Ed.* (Paradigm Publishers 2012) .............. 12

U.S. Department of Justice, Federal Bureau of Investigation, Criminal Justice Information Services Division, *National Instant Background Check System (NICS) Operations 2011* (2012) ....................................................................................................... 19

Daniel W. Webster and Jon S. Vernick, Eds., *Reducing Gun Violence in America: Informing Policy with Evidence and Analysis* (The Johns Hopkins Univ. Press 2013) .. passim

Adam Winkler, *Gunfight: The Battle over the Right to Bear Arms in America* (W.W. Norton 2011) ....................................................................................................... 4, 15

Garen J. Wintemute, et al., *Subsequent Criminal Activity Among Violent Misdemeanants Who Seek to Purchase Handguns: Risk Factors and Effectiveness of Denying Handgun Purchase*, 285 Journal of the American Medical Association 1019 (Feb. 2001) ....................................................................................................................... 19

Defendant Kamala D. Harris, Attorney General of California (the "Attorney General"), submits the following trial brief in the above-entitled civil action, adverse to Plaintiffs Jeff Silvester ("Silvester"), Brandon Combs ("Combs"), The Calguns Foundation, Inc. ("CGF"), and The Second Amendment Foundation, Inc. ("SAF," together with Silvester, Combs, and CGF, "Plaintiffs").

## INTRODUCTION AND SUMMARY OF THE CASE FOR THE DEFENSE

Plaintiffs mount a federal constitutional challenge to California's longstanding "Waiting-Period Law," California Penal Code sections 26815 and 27540,[1] and the statutory exemptions for that law. The Waiting-Period Law, in essence, requires a 10-day waiting period between an individual's application, through California's Dealer Record of Sale ("DROS") system, to purchase a firearm and his or her receipt of the firearm, for all California residents not statutorily exempt from the waiting period. During the 10-day period, California's Bureau of Firearms ("BOF") performs a critically important background check to ensure that the person seeking to acquire the firearm is not prohibited from obtaining it due to a felony or violent misdemeanor criminal conviction, mental-health issues, or other specified reasons, such as being subject to a restraining order or a condition of probation prohibiting ownership of firearms. The 10-day period also serves as a "cooling-off" period, to limit a person's immediate access to firearms, in case the person has an impulse to use a firearm to commit an act of violence, such as suicide. Notably, the individual plaintiffs herein, Silvester and Combs, already have firearms and have had them at all times during this litigation. During the course of this litigation, with the Waiting-Period Law in place, Silvester and Combs, assuming that they have remained legally entitled to acquire firearms, have had opportunities to purchase more than two dozen new handguns each, and an unlimited number of long guns. Nonetheless, Plaintiffs, invoking the Second and Fourteenth Amendments to the U.S. Constitution, seek an injunction against enforcement of the Waiting-Period Law as against all individuals who have successfully completed firearms transactions in California in the past and want *more* firearms.

---

[1] The differences between the two statutes appear to be irrelevant to the present case, and so the two statutes are treated as one statute here.

1

1    Recent opinions from the U.S. Court of Appeals, Ninth Circuit, *United States v. Chovan*,

2    735 F.3d 1127 (Nov. 19, 2013), and *Peruta v. County of San Diego*, ___ F.3d ___, No. 10-

3    056971, 2014 WL 555862 (Feb. 13, 2014), a split decision, set forth the two-step method for

4    analyzing Second Amendment claims and discuss how to allocate the burden of proof in Second

5    Amendment cases in the Ninth Circuit.[2]  "The Second Amendment inquiry we adopt (1) asks

6    whether the challenged law burdens conduct protected by the Second Amendment and (2) *if so*,

7    directs courts to apply an appropriate level of scrutiny."  *Chovan*, 735 F.3d at 1136 (emphasis

8    added); *accord Peruta*, 2014 WL 555862 at *3.

9    In the first step of the inquiry as applied here, the Court should find that the Waiting-Period

10   Law is akin to at least two of the longstanding firearms regulatory measures—the prohibitions on

11   the possession of firearms by felons and the mentally ill, and laws imposing conditions and

12   qualifications on the commercial sale of arms—that the United States Supreme Court, in *District

13   of Columbia v. Heller*, 554 U.S. 570, 625-27 (2008) ("*Heller I*"), said should not have "doubt"

14   cast upon them.  With this finding, the inquiry is effectively at an end, and the Waiting-Period

15   Law should survive.

16   Even if the Court does not make this finding about the Waiting-Period Law's similarity to

17   well-accepted firearms regulations, and goes on—still within the first step of the inquiry—to

18   analyze whether the Waiting-Period Law burdens the Second Amendment as historically

19   understood, by not only referring to the text of the Second Amendment but also surveying the

20   pertinent history, the inquiry should come to an end at the first step.  The history materials reveal

21   that the conditions of everyday life in the Founding Era were such that early Americans could not

22   have expected to obtain firearms essentially on demand, and at all times.  There was a built-in,

23   natural waiting period.  Therefore, the typical voter of the Founding Era would not have

24   considered a reasonable waiting period, as the Waiting-Period Law imposes, to conflict with an

25   _____

26   [2] *Chovan* and *Peruta* may be reheard.  A petition for rehearing or rehearing en banc is pending in *Chovan*.  There are motions to intervene and lodged petitions for rehearing or rehearing en banc, including one such motion-with-petition by the Attorney General, in *Peruta*.

27   The Attorney General assumes that, unless the Ninth Circuit grants any of the pending petitions, this Court will treat the current opinions in *Chovan* and *Peruta* as binding law at the trial.

28

2

1   individual right to keep and bear arms, and the Waiting-Period Law should not be found to

2   burden the Second Amendment right.

3          Assuming *arguendo* that the Court reaches the second step of the Second Amendment

4   inquiry in the present case, then the Court must choose the appropriate level of scrutiny—

5   something more severe than rational-basis review, up to strict scrutiny—for the Waiting-Period

6   Law.  At least three factors bear on this choice.  First, the core of the Second Amendment has

7   never been interpreted as being a right to have firearms essentially on demand and at all times.

8   Second, a brief waiting period before a person—especially one who already has a gun—can

9   legally purchase a gun is at most an inconvenience or a de minimis burden.  Third, the statutory

10  exemptions lessens the inconvenience even more.  Therefore, the Court should apply some form

11  of lenient intermediate scrutiny to the Waiting-Period Law.

12         Whatever level of scrutiny the Court selects, the standard will require determining the

13  importance of California's objective for the Waiting-Period Law, and the fit between the law and

14  the objective.  The outcome of the analysis should be a complete vindication of the Waiting-

15  Period Law.  It is "self-evident" that California, by the Waiting-Period Law, has an undeniably

16  important objective of keeping guns away from the people most likely to misuse them, and in

17  minimizing gun violence generally.  Even in this litigation, there is agreement that performing

18  background checks on people seeking to acquire firearms is unobjectionable.  The focus of the

19  analysis thus becomes the fit between the Waiting-Period Law and that compelling objective.

20  The evidence will reveal that the California Legislature has deliberated and settled upon the 10-

21  day waiting period as the shortest period that is protective of public safety, and took into

22  consideration that the background-check process would be partly computer-automated.  The

23  evidence will further reveal the positive effects of the cooling-off period, particularly for people

24  contemplating suicide.

25         The Waiting-Period Law's statutory exemptions reflect that the Legislature has narrowly

26  tailored the law to inconvenience as few people as reasonably possible.  Because the Waiting-

27  Period Law does not make suspect classifications among different groups of people, and does not

28  infringe on a fundamental right, the Court should conduct a rational-basis review of the law under

the Fourteenth Amendment's Equal Protection Clause, which test the Waiting-Period Law easily passes.  If, however, the Court finds that any of the exemptions violate the Equal Protection Clause, then the Court should resolve the problem by upholding the main law and invalidating some or all of the exemptions.

In conclusion, the Court should uphold the Waiting-Period Law at the first step of the mandated two-step *Chovan/Peruta* Second Amendment inquiry.  The Waiting-Period Law would also easily survive the second step of the inquiry.  And the law's statutory exemptions survive equal-protection analysis.  Therefore, the Court should deny Plaintiffs' claims in their entirety and enter judgment herein for the Attorney General.

## BACKGROUND FACTS AND PROCEDURAL HISTORY

### I.   THE LEGISLATIVE HISTORY OF THE WAITING-PERIOD LAW

The Waiting-Period Law, as amended, has been a feature of California's law-enforcement landscape since 1923.  As initially enacted, the waiting-period part of the Dangerous Weapons' Control Act provided, "In no event shall any [pistol, revolver, or other concealable firearm] be delivered to the purchaser upon the day of the application for the purchase thereof, and when delivered such firearm shall be securely wrapped and shall be unloaded."  Cal. Stats. 1923, ch. 339, § 10, p. 701; Deering's General Laws (1924 ed.), Act 1970, § 10, p. 668.  This law was taken from the uniform, model Revolver Act that the U.S. Revolver Association, a pro-gun-rights organization similar to the National Rifle Association (the "NRA"), proposed to the U.S. states that same year.  Adam Winkler, *Gunfight:  The Battle over the Right to Bear Arms in America* at 207 (W.W. Norton 2011).  Numerous other states, including West Virginia, New Jersey, Michigan, Indiana, Oregon, New Hampshire, North Dakota, and Connecticut also quickly enacted the law.  *Id.* at 207-08.

In 1953, the California Legislature codified this part of the law as California Penal Code section 12072.  In 1955, the Legislature increased the waiting period to three days.  In 1965, the waiting period went to five days.  In *People v. Bickston*, 91 Cal. App. 3d Supp. 29, 32 (1979), the court examined the records of the 1964 hearings leading to the 1965 amendment, and found that multiple witnesses had testified that law-enforcement authorities needed more time than three

4

1  days to complete background checks.  *Id.*  Two other witnesses recalled that the law was enacted

2  "to cool people off."  *Id.*

3      In 1975, following two firearm assassination attempts on U.S. President Gerald R. Ford, the

4  waiting period went to 15 days.  See "Brown Signs Tough Gun Control Bill," *The Sacramento*

5  *Bee*, Sept. 24, 1975 (a newspaper article that is in the legislative history).  A July 7, 1975, letter

6  from R. James Rasmussen, Bureau Chief, California Bureau of Identification, to Assemblyman

7  Frank Murphy, Jr., author of the relevant bill, which letter is in the legislative history, reflects that

8  "[i]t has been our experience that a five day period is unrealistic. . . .Considering all the factors

9  involved, it is the opinion of the Identification and Information Branch that a fifteen (15) day

10 delayed delivery is preferable.  We feel that this would permit our compliance in excess of 95%

11 of the sales of handguns.  A thirty (30) day period would allow for compliance in all situations."

12 A September 12, 1975, letter from Rodney J. Blonien, Executive Director, California Peace

13 Officers Association, to Edmund G. Brown Jr., Governor, stated, "This legislation is necessary

14 because the Department of Justice has found it impossible to check the record of each person who

15 purchases a handgun, and to relay this information back to the firearm vendor within the 5 day

16 waiting period.  As a result of this impossibility, a number of prior felons and others who are not

17 qualified to possess a handgun have purchased such weapons from vendors."  The 15-day waiting

18 period also allowed for a cooling-off period for people seeking to acquire firearms quickly.  Cal.

19 Assembly Comm. on Public Safety, Assembly Counsel Analysis of Sen. Bill 671 (1995-96 Reg.

20 Sess.), Jul. 11, 1995, p. 3.

21      In 1990, the waiting period was extended to cover long guns, vastly increasing the

22 background-check workload.  And in the early 1990s, at the behest of the Legislature, the

23 California Department of Justice (Cal. DOJ) began to develop an electronic DROS system that

24 did not depend on licensed firearm dealers sending by U.S. mail paper copies of requisite forms

25 to Cal. DOJ.  Cal. Senate Comm. on Crim. Proc., Report ("Firearm Dealer Record of Sale—

26 Electronic Transmission to the Department of Justice") on Sen. Bill 671 (1995-96 Reg. Sess.),

27 Mar. 28, 1995, p. 3.  One of the goals of implementing electronic DROS processing was to be

28 able safely to reduce the waiting period.  *Id.* at 4.  In 1996, Cal. DOJ stated its belief that a having

5

1   an electronic/telephonic DROS system could enable Cal. DOJ to meet a 10-day processing

2   deadline for all firearms.  Cal. Senate Public Safety Comm., Analysis on Third Reading of Sen.

3   Bill 1671 (1995-96 Reg. Sess.), as amended (RN9620429), p. 4.

4       Consequently, in 1997, the waiting period for all guns was able to be *reduced* to 10 days,

5   which remains the standard.

6       Presently, Penal Code section 26815[3] provides, in pertinent part, that no firearm shall be

7   delivered:

8       (a) Within 10 days of the application to purchase, or, after notice by [Cal. DOJ]
    within 10 days of the submission to [Cal. DOJ] of any correction to the application, or

9       within 10 days of the submission to [Cal. DOJ] of any fee required . . . whichever is
    later.

10

11       (b) Unless unloaded and securely wrapped or unloaded and in a locked container.

12       (c) Unless the purchaser, transferee, or person being loaned the firearm presents clear
    evidence of the person's identity and age to the dealer.

13       (d) Whenever the dealer is notified by [Cal. DOJ] that the person is prohibited by

14       state or federal law from processing, owning, purchasing, or receiving a firearm.  The
    dealer shall make available to the person in the prohibited class a prohibited notice

15       and transfer form, provided by [Cal. DOJ], stating that the person is prohibited from
    owning or possessing a firearm, and that the person may obtain from [Cal. DOJ] the

16       reason for the prohibition.

17   Penal Code section 27540 contains nearly identical provisions, but begins, "No dealer . . . shall

18   deliver a firearm to a person as follows," and also contains extra provisions not relevant here.

19   **II.   BACKGROUND FACTS OF THE PRESENT CASE**

20       Plaintiffs filed the present lawsuit just before Christmas in 2011.  It was amended once on

21   February 24, 2012, and then timely answered.  The February 24, 2012, first amended complaint

22   remains the operative complaint.  In that complaint, Plaintiffs invoked the Second Amendment

23   and the Fourteenth Amendment's Due Process Clause and Equal Protection Clause in seeking a

24   preliminary injunction[4] and a permanent injunction against enforcing the Waiting-Period Law "as

25   against those persons that may lawfully possess and acquire a firearm *and* possess proof of

26

27      [3] California's codified firearms laws were renumbered effective January 1, 2011.  Former
California Penal Code section 12072 was split to have many new numbers, including 26815.

28      [4] Plaintiffs never applied for a preliminary injunction.

1   firearm possession or ownership in their name within the State of California *and* from enacting,

2   publishing, promulgating, or otherwise enforcing any polices, rules, or procedures prohibiting or

3   otherwise restricting the delivery of firearms to said individuals within ten-days of applying for

4   the purchase of any firearms."  First Am. Compl. at 12-13 (emphasis added).

5       The opposing sides made their required initial disclosures, and the case proceeded to

6   discovery.  Plaintiffs propounded a set of document requests to the Attorney General, who

7   responded.  Plaintiffs did no further formal discovery.  The Attorney General propounded a set of

8   interrogatories on each of the four plaintiffs and obtained responses from each of the plaintiffs.[5]

9   The Attorney General also deposed the two individual plaintiffs and one corporate representative

10  of each organizational plaintiff.  There was no expert discovery in this case.  There were no

11  discovery disputes in this case.

12      In the fall of 2013, the Attorney General moved for summary judgment, but, on December

13  9, 2013, the Court denied that motion.

14      At a May 9, 2013, deposition in this case, Silvester testified, in part, as follows.  He owns

15  between six and 10 firearms.  Transcript of Depo. of Plf. Jeff Silvester ("Silvester Depo.") at

16  18:2-18:5.  He has been through the 10-day waiting period between six and 10 times.  *Id.* at 41:9-

17  41:18.  He purchased at least two of the firearms since February 24, 2012.  *Id.* at 39:25-40:8.

18  However, a couple of the firearms are not working.  *Id.* at 25:2-25:6.  Silvester does not have

19  proper ammunition for at least one of the firearms.  *Id.* at 28:18-28:21.  He has loaned out one of

20  his firearms to another person, for at least 24 hours, about five times, including once in the past

21  month or two.  *Id.* at 66:2-66:13.  He has borrowed a firearm for target-shooting purposes.  *Id.* at

22  128:8-129:2.  He has a license to carry a concealed weapon.  *Id.* at 33:11-33:13.

23      Silvester contends that he has been unable to purchase at least three firearms because of the

24  Waiting-Period Law.  Silvester Depo. at 42:1-42:9.  In each instance, Silvester was searching for

25  a specific firearm—a Heritage .22 Revolver, a Kel-Tec PF9, and an AR-15—to buy used from a

26  private seller, and found the firearm and seller located far away (but still in California).  *Id.* at 42-

27

28  _____

[5] There was a third individual plaintiff, who withdrew from the case many months ago.

7

57.  However, Silvester was unwilling to go to the location to start the DROS purchasing process, and either stay there for at least 10 days, make a return trip at least 10 days later, or pay to have the firearm shipped to a dealer local to Silvester, in order to obtain the firearm.  *Id.*

Silvester admits that he has purchased a firearm from a bricks-and-mortar (not Internet) gun store that is only about 10 or 12 miles from Silvester's house.  Silvester Depo. at 83:15-83:19  He further admits that he has never lived in California more than 41 miles from a gun store.  *Id.* at 109:7-109:10.

At a May 10, 2013, deposition in this case, Combs testified, in part, as follows.  He owns between one and five firearms.  Transcript of Depo. of Plf. Brandon Combs ("Combs Depo.") at 35:5-35:11.  He lacks ammunition that works with one of the firearms.  *Id.* at 55:3-55:16.  He has traveled as far as 700 miles to obtain a gun.  *Id.* at 134:2-135:4.  He has owned or co-owned about 50 firearms total over his lifetime. *Id.* at 35:21-36:6; 39:21-40:1.  His former spouse obtained about 15 of his formerly co-owned firearms in a divorce settlement.  *Id.* at 37:12-41:18; 47:22-48:17.  He has sold somewhere between 15 and 20 firearms in his lifetime, sometimes to get money to pay off bills.  *Id.* at 46:24-47:6; 49:24-50:1.  He has borrowed a firearm at a shooting range.  *Id.* at 96:27-96:25.  He has a license to carry a concealed weapon.  *Id.* at 74:12-74:14.  He has a "certificate of eligibility."  *Id.* at 80:1-82:6.

Combs contends that he has been unable to purchase firearms many times because of the Waiting-Period Law, and sometimes because of lack of money.  Combs Depo. at 87:19-90:22; 130:12-134:1; 206:3-207:5.  Combs has "window shopp[ed]" at many gun stores without completing purchases.  *Id.* at 88:9-89:9.  Without giving specifics, Combs estimates that over the course of his lifetime the Waiting-Period Law has caused him to incur about $1,500 in out-of-pocket costs that he would not have incurred in the absence of the law.  *Id.* at 170:17-171:4.  Combs admits that, from the house that he lived in until recently, he could get to a store that sold guns within 30-40 minutes by car.  Combs Depo. at 176:22-177:5.

Combs perceives a need—more or less acute—at *all* times to have a firearm for self-defense, even if there are no other people around.  Combs Depo. at 100-04.  He believes that he might need a firearm to defend himself from wild dogs, foxes, possums, raccoons, and other

8

1   animals typically found in Central California.  *Id.*  He believes that if he had 100 working

2   handguns in his house and ammunition for all the guns in his house, there still might be

3   situations, possibly involving mountain lions, in which he was insufficiently armed to defend

4   himself in his home.  *Id.* at 107:23-108:17.  He does not know whether he will always feel that his

5   firearm collection is inadequate for self-defense in at least some circumstances.  *Id.* at 152:1-

6   152:5.

7                          **THE CASE FOR THE DEFENSE**

8        In the recent decision in *Chovan*, and the very recent split decision in *Peruta*, the Ninth

9   Circuit has set forth the method for analyzing Second Amendment claims and discussed the

10   burden of proof in Second Amendment cases in the Ninth Circuit.  Petitions for rehearing or en

11   banc review are under consideration in both *Chovan* and *Peruta*.  The Attorney General submitted

12   one of the petitions for en banc review in *Peruta*.  Assuming that the extant opinions in *Chovan*

13   and *Peruta* will guide this Court's adjudication of the present case, the Attorney General presents

14   the following summary and application of the most pertinent parts of those cases, demonstrating

15   why the Court has multiple decision points at which the best decision is to affirm the

16   constitutionality of the Waiting-Period Law.

17   **I.     SUMMARY OF THE REQUISITE LEGAL ANALYSIS TO BE PERFORMED FOR THIS CASE**

18        *Chovan* teaches that the "Second Amendment inquiry we adopt (1) asks whether the

19   challenged law burdens conduct protected by the Second Amendment and (2) *if so*, directs courts

20   to apply an appropriate level of scrutiny."  735 F.3d at 1136 (emphasis added); *accord Peruta*,

21   2014 WL 555862 at *3; *Heller v. District of Columbia*, 670 F.3d 1244, 1252 (D.C. Cir. 2011)

22   ("*Heller II*"); *United States v. Chester*, 628 F.3d 673, 680 (4th Cir. 2010).

23        Significantly, *Chovan* underscores that "this two-step inquiry reflects the Supreme Court's

24   holding . . . that, while the Second Amendment protects an individual right to keep and bear arms,

25   the scope of that right is not unlimited."  735 F.3d at 1133 (quoting *Heller I*, 554 U.S. at 627).

26   *Chovan* continues by stating that there should be no doubt about the constitutionality of certain

27   "longstanding" firearms prohibitions, including but expressly not limited to prohibitions on the

28   possession of firearms by felons and the mentally ill, and laws imposing conditions and

                                        9

qualifications on the commercial sale of arms.  735 F.3d at 1133 (citing *Heller I*, 554 U.S. at 625-27).  These presumptively lawful prohibitions are not limited to those identified in *Chovan* and *Heller I*, as *Heller I* states that "our list [of presumptively lawful measures] does not purport to be exhaustive."  554 U.S. at 627 n.26.

Likewise, *Peruta* restates that the Second Amendment right is not unlimited (2014 WL 555862, at *4) and makes a point of "emphasizing, as nearly every other authority on the Second Amendment has recognized, *regulation* of the right to bear arms is not only legitimate but quite appropriate."  2014 WL 555862 at *29 (emphasis in original).

These admonitions should be heard clearly in the present case, as the Waiting-Period Law is a legitimate and quite appropriate firearm regulation.[6]

## II.   THE TWO-STEP SECOND AMENDMENT ANALYSIS DESCRIBED AND APPLIED

### A.   Step One—The Waiting-Period Law Does Not Burden the Second Amendment Right

*Chovan* explains that the first step of the Second Amendment inquiry asks whether the restricted activity falls within the Second Amendment right to keep and bear arms for the purpose of self-defense, as historically understood.  735 F.3d at 1136.  Regarding whose understanding of the scope of the Second Amendment is relevant, *Peruta* quotes *Heller I*'s teaching that "[t]o arrive at the original understanding of the right, we are guided by the principle that the Constitution was written to be understood by *the voters* . . . ."  *Peruta*, 2014 WL 555862 at *4 (quoting *Heller I*, 554 U.S. at 576 (emphasis added; other citation and internal punctuation

---

[6] These statements of law do not indicate that the Second Amendment right is being treated as less important than other rights.  Other constitutional rights are appropriately regulated, too.  For example, the right to marry is fundamental, but "reasonable regulations that do not significantly interfere with decisions to enter into the marital relationship" are not subject to the "rigorous scrutiny" that is applied to laws that "interfere directly and substantially with the right to marry."  *Zablocki v. Redhail*, 434 U.S. 374, 386-87 (1978).  The right to vote is fundamental, but "the rigorousness of our inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights."  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992); *see also Planned Parenthood of Se. Penn. v. Casey*, 505 U.S. 833, 873-74 (1992) ("[N]ot every ballot access limitation amounts to an infringement of the right to vote.  Rather, the States are granted substantial flexibility in establishing the framework within which voters choose the candidates for whom they wish to vote;" holding that fact that law which serves valid purpose has incidental effect of making it more difficult to exercise a right cannot be enough to invalidate law).

omitted)). *Heller I* goes on to clarify that the voters were the ordinary citizens of the Founding Era. 554 U.S. at 576.

Neither *Chovan* nor *Peruta* expressly states which side in a Second Amendment dispute over a firearm law, the side challenging the law or the other side defending the law, has the burden of proffering evidence on the preliminary issue of whether the restricted activity falls within the historically understood Second Amendment. The burden properly belongs with the side challenging the law. At the first step of the Second Amendment inquiry, based on general principles of constitutional analysis, a court should presume that the statute in question is constitutional. The reason is that there is a strong presumption that all regularly enacted state statutes are constitutional. *Town of Lockport v. Citizens for Community Action at Local Level, Inc.*, 430 U.S. 259, 272 (1977); *People of State of New York v. O'Neill*, 359 U.S. 1, 6 (1959). The presumption is based on the high respect of the judicial branch for legislatures; when courts are called upon to pass on the constitutionality of a legislative act, courts assume their gravest and most delicate duty. *United States ex rel. Madden v. General Dynamics Corp.*, 4 F.3d 827, 830 (9th Cir. 1993).

It would violate these principles for the Court here to undertake the first step of the inquiry essentially assuming that the Waiting-Period Law is unconstitutional, and that the Attorney General must provide evidence that the law does *not* implicate the Second Amendment as historically understood. Allocating the burden to Plaintiffs here, in this instance, is proper and would also be consistent with *Heller I*'s admonition that laws "imposing conditions and qualifications on the commercial sale of arms" are not to have "doubt" cast upon them. 554 U.S. at 626-27.

1.      **Step 1A—The Waiting-Period Law Is a Presumptively Lawful Regulatory Measure Whose Constitutionality Is Not in Doubt**

There appear to be two parts to the first step of the two-step Second Amendment analysis. In *Chovan*, the panel's first action in taking the first step was to consider whether the firearm law being analyzed was, or was akin to, a longstanding, presumptively lawful regulatory measure ("Step 1A"). *Chovan*, 735 F.3d at 1137 (citing *Heller I*, 554 U.S. at 625-27). Under *Chovan*, if a

11

court finds a challenged firearm law to be a presumptively lawful regulatory measure, then the inquiry effectively ends.  735 F.3d at 1136; *accord United States v. Marzzarella*, 614 F.3d 85, 89, 92 (3rd Cir. 2010) ("[If] the challenged law [does not] impose[] a burden on conduct falling within the scope of the Second Amendment's guarantee . . . the inquiry is complete"; *Heller I*'s "longstanding limitations are exceptions to the right to bear arms"); Order on Defendant's Motion for Summary Judgment, *Silvester v. Harris*, U.S. District Court, E.D. Cal., Case No. 1:11-cv-02137-AKI-SKO (Dec. 9, 2013) ("MSJ Order") at 6:25-6:26 (citations omitted).

Although this Court denied the Attorney General's motion for summary judgment in this case, in part because of the conclusion that the Waiting-Period Law does impose a burden on the Second Amendment (MSJ Order at 7:22-8:7), the Court should nonetheless find that law is valid under the rule accepting longstanding, presumptively lawful regulations.  The Waiting-Period Law *is* presumptively lawful and its constitutionality should not be doubted.  It is longstanding, having remained for more than 90 years in essentially the same substantive form—although the length of the waiting period has been adjusted within a range of 14 days.  And similar waiting period laws have been enacted in other locales.  In the 1930s, the NRA helped draft a handgun waiting-period law in the District of Columbia.  Robert J. Spitzer, *The Politics of Gun Control, Fifth. Ed.* at 130 (Paradigm Publishers 2012).  Presently, 10 U.S. states plus the District of Columbia have waiting periods (Law Center to Prevent Gun Violence, Waiting Periods Policy Summary, June 24, 2013 (available online at http://smartgunlaws.org/waiting-periods-policy-summary/)), and half a dozen other states have licensing or permitting requirements for firearms purchases that effectively impose waiting periods.  Law Center to Prevent Gun Violence, Licensing Gun Owners & Purchasers Policy Summary, Aug. 23, 2013 (available online at http://smartgunlaws.org/licensing-of-gun-owners-purchasers-policy-summary).  As far as the Attorney General is aware, no court has ever invalidated or partly invalidated a waiting-period law before.

Moreover, the Waiting-Period Law is akin to at least two of the examples of presumptively lawful firearms regulations expressly mentioned in *Heller I*.  First, the Waiting-Period Law is a condition or qualification on the commercial sale of arms.  All lawful firearms transactions in

12

1    California are subject to the 10-day waiting period, unless the transaction is covered by one of the

2    statutory exemptions.  Second, the Waiting-Period Law also enforces prohibitions against the

3    possession of firearms by felons or the mentally ill, who are identified through the background

4    checks done during the waiting periods.  Indeed, a primary purpose of the law is to make sure that

5    people who are most likely to misuse firearms do not have them.  As this Court noted, Plaintiffs

6    do not dispute the efficacy and propriety of background checks.  MSJ Order at 8:20-8:21.  Their

7    benevolent purpose is effectuated each time a DROS application is processed, even if the would-

8    be firearm acquirer has passed a background check and gone through a waiting period in the past.

9         Therefore, the analysis should end with this step, in which case Plaintiffs have lost their

10   case.

11        **2.    Step 1B—A Textual and Historical Second Amendment Analysis
              Vindicates the Waiting-Period Law**

12

13        If a court finds that the first part of the first step of the Second Amendment inquiry is not

14   dispositive, then the court should engage in a textual and historical analysis of the Second

15   Amendment, to determine the scope of the right, not in a vacuum but in relation to the manner of

16   the regulation at issue ("Step 1B").  *Chovan*, 735 F.3d at 1133; *Peruta*, 2014 WL 555862 at *5

17   n.3.  In performing this textual and historical analysis, the court should not only interpret the

18   Second Amendment's text but also consult historical and scholarly materials, including case law,

19   legislation, history books, law treatises, and law-review articles.  *See Chovan*, 735 F.3d at 1137

20   (citing such sources); *Peruta*, 2014 WL 55862 at *4-*19 (same).  The burden is just as much on

21   the side challenging the constitutionality of the law as the side defending the law to proffer

22   relevant historical materials.  *See Marzarella*, 614 F.3d at 93 & n. 11 (where party challenging

23   constitutionality of federal firearm law made history-based arguments and was implicitly

24   criticized for not citing supporting sources).

25        Where the constitutionality of a statute is challenged, as in the instant case, a court's

26   decision must be based largely on "legislative facts," whether or not those facts have been

27   developed on the record, if those facts are relevant to the "legal reasoning" of the statute.  *Sachs*

28   *v. Republic of Austria*, 737 F.3d 584, 596 n.10 (9th Cir. 2013); *Daggett v. Comm'n on*

13

1   *Governmental Ethics and Election Practices*, 205 F.3d 445, 455-56 (1st Cir. 2000) ("In a

2   [constitutional law] case like this, a conclusion of law as to a Federal right and a finding of fact

3   are so intermingled as to make it necessary, in order to pass upon the Federal question, to analyze

4   the [legislative] facts" (internal quotation and citation omitted)).

5        Once again, if the court concludes that the law in question does *not* burden the Second

6   Amendment right, as understood by ordinary citizens in the Founding Era, then the inquiry ends.

7   *Chovan*, 735 F.3d at 1136; *Heller I*, 554 U.S. at 576; *accord Marzzarella*, 614 F.3d at 89, 92;

8   MSJ Order at 6:25-6:26.  If and only if the court's historical survey reveals that the restricted

9   conduct does burden the Second Amendment right, or a lack of evidence prevents a finding that

10   the Second Amendment has no application to the activity being restricted, then the Court moves

11   on to the second step of the inquiry.  *Chovan*, 735 F.3d at 1137; *Peruta*, 2014 WL 555862, at *19.

12        A textual analysis of the Second Amendment is of little help to Plaintiffs here.  It is

13   noteworthy that the prohibition on infringing the "right of the people to keep and bear Arms" is

14   silent with respect to acquiring firearms.  The Attorney General does not dispute that acquiring

15   firearms is a prerequisite to keeping or bearing them.  Just the same, the Second Amendment does

16   not address the manner of acquiring firearms and cannot logically be interpreted as if written that

17   way, i.e., ascribing equal importance to acquiring firearms as to keeping and bearing them.  In

18   Second Amendment analysis, acquiring firearms should be treated differently from keeping and

19   bearing them.  In any event, in California, BOF processes hundreds of thousands of DROS

20   applications every few months; the Waiting-Period Law is not burdening people in acquiring,

21   keeping, or bearing firearms in California.

22        The meaning of the word "infringe[]" does not bolster Plaintiff's position, either.  Samuel

23   Johnson's (unpaginated) *A Dictionary of the English Language (10th Ed.)*, from 1792, gives the

24   following definition of "to infringe":  "1.  To violate; to break laws or contracts; 2.  To de[s]troy;

25   to hinder."  The primary definition of "to violate" is "[t]o injure; to hurt."  The most relevant

26   definition of "to destroy" is "[t]o put an end to; to bring to nought."  The primary definition of "to

27   hinder" is "to obstruct; to [s]top; to impede."  All these synonyms, especially "to destroy,"

28   indicate that a short delay, as occasioned by the Waiting-Period Law, before a right may be

14

1    exercised is not significant enough to be an infringement of that right.  By this analysis, the

2    Waiting-Period Law does not violate the Second Amendment.

3         As for a historical analysis of how the Second Amendment was understood in the Founding

4    Era, it is significant for the present case that in the late Eighteenth Century most Americans lived

5    on farms around a day's horseback ride away from the nearest store, which typically dispensed a

6    limited range of high-utility commodities, not necessarily including guns.  Charles Sellers, *The*

7    *Market Revolution: Jacksonian America, 1815-1846* at 14-15 (Oxford Univ. Press 1991); Jack

8    Larkin, *The Reshaping of Everyday Life, 1790-1840* at 6-7, 16 (Harper & Row 1988).  In the

9    1790s, the domestic manufacture of firearm parts was only "beginning," and would not hit a good

10   stride until the 1820s.  Larkin at 8.  From colonial times to the Civil War, guns were expensive,

11   cumbersome, and made from materials (mostly iron) that deteriorated rapidly even with regular

12   maintenance.  Spitzer at 8.  Accordingly, there could not have been an expectation that a new

13   firearm could be purchased easily, much less essentially instantaneously, after a person decided to

14   acquire a firearm.  Consequently, nobody would have conceived of a waiting period as a burden

15   on the Second Amendment right.

16        Furthermore, "[w]hen pressing public necessity demanded it, the founding fathers were . . .

17   willing to impress guns from law-abiding citizens, even if those citizens were left without guns to

18   defend themselves from a criminal attack."  Winkler at 12.  This evidence that such an extreme

19   intrusion on firearms ownership was acceptable in the Founding Era underscores that voters then

20   would not have conceived of a 10-day period of being without a firearm as a burden on the

21   Second Amendment right.

22        In conclusion, the text of the Second Amendment and the historical record demonstrates

23   that a reasonable waiting period would not have infringed on the Second Amendment right, as

24   that right was understood and operated in practice in the Founding Era.  Therefore, based on

25   analysis of the historically understood scope of the Second Amendment right in relation to the

26   Waiting-Period Law, i.e., step 1B, the Court should dismiss the Second Amendment challenge to

27   the Waiting-Period Law.

28   //

15

**B.     Step Two—The Waiting-Period Law Withstands Heightened Scrutiny**

     **1.     Step 2A—A Lenient Form of Intermediate Scrutiny Is Appropriate**

The second step of the Second Amendment inquiry also seems to have two parts.  If the second step of the inquiry is reached, then a choice must be made as to the appropriate level of scrutiny ("Step 2A"); the choice will depend on the nature of the conduct being regulated and the degree to which the challenged law burdens the right, as exercised by a typical, law-abiding, responsible citizen.  *Chovan*, 735 F.3d at 1138; *Peruta*, 2014 WL 555862 at *19.  "More specifically, the level of scrutiny should depend on (1) how close the law comes to the core of the Second Amendment right, and (2) the severity of the law's burden on the right."  *Chovan*, 735 F.3d at 1138 (citation and internal punctuation omitted); accord *Ezell v. City of Chicago*, 651 F.3d 684, 703 (7th Cir. 2011).  In *Chovan*, the Ninth Circuit applied intermediate scrutiny to a law that substantially burdened the Second Amendment right, but had exceptions that lessened the burden, and did not burden the core right.  735 F.3d at 1138.

Assuming *arguendo* that this Court finds that the Waiting-Period Law does burden the Second Amendment right as historically understood, the Court should apply some form of intermediate scrutiny (and not strict scrutiny) to the law.  "Although courts have used various terminology to describe the intermediate scrutiny standard, all forms of the standard require (1) the government's stated objective to be significant, substantial, or important; and (2) a reasonable fit between the challenged regulation and the asserted objective."  *Chovan*, 735 F.3d at 1139 (citation omitted).  The core of the Second Amendment has never been interpreted as being a right to have firearms essentially on demand and at all times, as Plaintiffs desire.  And a brief waiting period before a person—especially one who already has a gun—can legally purchase a gun is at most an inconvenience or a very minor burden on the Second Amendment right.

Indeed, as the deposition excerpts cited above prove, Silvester and Combs, the individual plaintiffs, have and at all relevant times have had multiple firearms with which to defend themselves.[7]  And provided that Silvester and Combs do not fall into a category of persons

---

     [7] Plaintiffs seek an injunction against imposition of the 10-day waiting period on *second-time or subsequent* firearm purchasers, and do not challenge the use of the waiting period for

(continued…)

1   prohibited by law from possessing firearms, the two individual plaintiffs, like most Californians,

2   may acquire more firearms in the future.  As noted above, during the course of this litigation, with

3   the Waiting-Period Law in place, Silvester and Combs, assuming that they have remained legally

4   entitled to acquire firearms, have had opportunities to purchase more than two dozen handguns

5   each, and an unlimited number of long guns.  In claiming a constitutional violation in the

6   Waiting-Period Law, Plaintiffs resort to exaggerating the minor inconvenience that the law may

7   create, such as requiring two trips instead of one trip to the gun store to acquire additional

8   firearms.  The Second Amendment right is simply not affected except in a de minimis way.

9   Plaintiffs' examples of the so-called burden do not compel this Court to apply very heightened

10  scrutiny to the Waiting-Period Law.

11      Furthermore, the Waiting-Period Law has multiple statutory exceptions, narrowing and

12  focusing the regulation.

13      Therefore, the Waiting-Period Law neither comes close to the core of the Second

14  Amendment right, nor imposes a severe burden on the right, meaning that some form of very

15  lenient intermediate scrutiny, far from strict scrutiny, should apply.

16              **2.      Step 2B—The Waiting-Period Law Survives Heightened Scrutiny**

17      In Second Amendment cases reaching the second step of the inquiry, once the proper level

18  of scrutiny, something more searching than rational-basis review, has been chosen, the court

19  proceeds to examine the government's stated objective behind the law in question as well as the

20  fit between the challenged regulation and the asserted objective ("Step 2B").  *Chovan*, 735 F.3d at

21  1138.  Of course, it is "self-evident" and hence indisputable that the government has a compelling

22  interest in keeping guns away from people most likely to misuse them, and in generally

23  minimizing gun violence.  *See id*. at 1139 (holding that reducing domestic gun violence is an

24  important governmental interest).  So the focus becomes the fit.  For an as-applied challenge to a

25  firearm law, as is being made here, the party challenging the law rightly bears the burden of

26  proving, by legislative history, social-science research, and the like, the constitutional invalidity

27  (…continued)
    first-time firearm purchasers.

28

1   of applying the law to the party.  *Id*. at 1141-42 (holding that defendant-appellant's social-science

2   and statistical evidence failed to vindicate as-applied challenge to gun-ownership restrictions on

3   persons convicted of domestic violence misdemeanors).  The party defending the firearm law

4   *facially* apparently should be deemed the party that has the burden to prove a satisfactory fit

5   between the challenged regulation and the public-safety objective.  See *id*. at 1140-41.

6           Assuming *arguendo* that some form of heightened scrutiny, most reasonably lenient

7   intermediate scrutiny, will be applied to the Waiting-Period Law, the Court should find that the

8   law passes the test readily.  As was already noted, the California Legislature has justified the

9   Waiting-Period Law on two grounds, as providing enough time for sufficient background checks

10  on prospective firearms purchasers, and as creating a cooling-off period for people who may

11  make seek guns impulsively to commit violent acts.  Thereby, the Waiting-Period Law serves

12  some of the most compelling of governmental objectives, public safety and the minimization of

13  gun violence.

14          As noted above, in this case, like many Second Amendment cases, the focus of heightened

15  scrutiny is on the fit between the effects of the regulation and the legislative purpose.  Regarding

16  the Waiting-Period Law's first justification, time to complete background checks, the witness

17  testimony to be given at trial will establish that California's background-check system—which is

18  partly computer-automated and partly handled by a group of more than two dozen trained BOF

19  professionals who often work overtime, processing upwards of one *million* DROS applications

20  annually—can and often does take up to 10 days (or more) to process each prospective firearm

21  purchaser's application.  Significantly, it is *not* the case that the background check can be done

22  more quickly for people who have had background checks before, or who have carry concealed

23  weapons ("CCW") licenses, or certificates of eligibility, which most certainly do *not* constitute

24  ongoing, real-time background checks, as Plaintiffs have claimed.  First Am. Compl., ¶¶4, 56-64.

25          Furthermore, California's background check not only incorporates the entire federal

26  National Instant Background Check System ("NICS") check, but also covers other important

27  criteria that NICS omits and hence misses.  For example, California checks to see if an

28  application ever has been on a 72-hour involuntary mental-health hold or has certain violent

TRIAL BRIEF OF DEFENDANT KAMALA D. HARRIS (1:11-cv-02137-AWI-SKO)

1    misdemeanor convictions, whereas NICS does not.  Because it is hazardous to public safety to let

2    people with such personal histories have firearms, California's system is more comprehensive

3    than NICS in this respect.  *See* Daniel W. Webster and Jon S. Vernick, Eds., *Reducing Gun*

4    *Violence in America:  Informing Policy with Evidence and Analysis* at 35 (The Johns Hopkins

5    Univ. Press 2013) (criticizing outdated mental-health screening of NICS system); *id.* at 88 ("*The*

6    *list of offenses now in use in California provides a reasonable model*" (emphasis added)).  For

7    another example, because of the 10-day wait, California's system has a chance to catch

8    information newly populated in the databases in the days after a DROS application comes in.  The

9    NICS system, nearly instantaneous for most applicants, and with a hard cut-off of three days for

10   delayed applicants, whether the background checks are done or not, erroneously clears about

11   3,000 convicted felons and other prohibited persons *annually* to obtain firearms.  U.S.

12   Department of Justice, Federal Bureau of Investigation, Criminal Justice Information Services

13   Division, *National Instant Criminal Background Check System (NICS) Operations 2011* at 14

14   (2012) ("NICS Operations 2011"; noting 3,166 "firearm retrieval action" referrals in 2011);

15   Webster and Vernick at 89; Garen J. Wintemute, et al., *Subsequent Criminal Activity Among*

16   *Violent Misdemeanants Who Seek to Purchase Handguns:  Risk Factors and Effectiveness of*

17   *Denying Handgun Purchase*, 285 Journal of the American Medical Association 1019, 1026 (Feb.

18   2001) (reporting a similar number in data as of 1999).  FBI agents then have to try to repossess

19   these lethal weapons from the violence-prone people harboring them.  NICS Operations 2011 at

20   14.

21           Additionally, as alluded to above, just because a person has passed a firearm background

22   check in the past does not mean that the person will pass a background check tomorrow.  In the

23   interim, the person may have been disqualified by law from possessing or acquiring firearms.  Or

24   old information that was not previously in the databases that are checked could have been input

25   into those databases.  The Waiting-Period Law's multiple background checks and multiple

26   waiting periods for multiple firearms transactions is well-justified.

27           The second justification for the Waiting-Period Law, the benevolent cooling-off effect, is

28   real, as well, as the social-science evidence establishes.  Social science is regularly treated as

1    legislative fact by courts.  For example, in *United States v. Leon*, a case in which the United

2    States Supreme Court decided whether the Fourth Amendment exclusionary rule should be

3    modified, the High Court considered social-science studies evaluating the impact of the exclusion

4    rule on the disposition of felony arrests.  *See* 468 U.S. 897, 907 n.6 (1984).  In an extensive

5    footnote, the High Court examined the findings of eight separate scientific studies published in

6    scientific journals and government reports.  *Id.*  Social-science studies are also the type of

7    material that the Ninth Circuit, as in *Chovan*, has readily accepted for consideration with respect

8    to the quasi-legal determinations that this Court will have to make about the justification for the

9    firearms laws in question.  *Chovan,* 75 F.3d at 1137 and 1139 (citing publications such as C.

10    Kevin Marshall, *Why Can't Martha Stewart Have a Gun?*, 32 Harv. J.L. & Pub. Pol'y 695, 698,

11    708 (2009), and Julia C. Babcock, et al., *Does Batterer's Treatment Work? A Meta-Analytics*

12    *Review of Domestic Violence Treatment,* 23 Clinical Psych. Rev. 1023, 1039 (2004), and

13    analyzing the legislative history of the challenged federal statute).  Notably, in Chovan, the Ninth

14    Circuit relied on social studies cited by the United States, even though the United States did not

15    offer expert testimony before the trial court.

16        Studies show that the implementation of the five-day federal waiting period in the 1990s

17    correlated closely with a steep decline in the number of men killing their wives, girlfriends, and

18    ex-girlfriends with firearms, while the number of male-female "intimate partner" homicide by

19    other means barely decreased.  James A. Fox, et al., *The Will to Kill:  Making Sense of Senseless*

20    *Murder, 4th Ed.* at 76 (Prentice Hall 2011).  The evidence is more robust for suicides.  Suicide

21    attempts appear to be relatively impulsive acts.  Greg M. de Moore, et al., *Survivors of Self-*

22    *inflicted Firearm Injury*, 160 The Medical Journal of Australia 421, 423 (Apr. 4, 1994).  In one

23    study of 33 adults who survived suicide attempts by firearms, the majority of the people reported

24    having suicidal thoughts for only three weeks or less time before making their attempts.  *Id.*  In

25    another study of 30 adults who survived suicide attempts by firearms, more than half of the

26    people reported having suicidal thoughts for less than 24 hours before making their

27    attempts.  Linda G. Peterson, et al., *Self-inflicted Gunshot Wounds:  Lethality of Method Versus*

28    *Intent*, 142 American Journal of Psychiatry 228, 230 (Feb. 1985).  Two researchers at the Harvard

School of Public Health have likewise declared plainly, "Suicidal individuals are often ambivalent about killing themselves, and the risk period is transient. *Reducing the availability of lethal instruments during this period may prevent suicide.* Psychiatric and penal institutions have long recognized the importance, in all age groups, of restricting access to lethal means of suicide for newly admitted and potentially suicidal inmates." Matthew Miller and David Hemenway, *The Relationship Between Firearms and Suicide: A Review of the Literature*, 4 Aggression and Violent Behavior, 59, 61 (1999) (emphasis added). The availability of only less-lethal substitutes may reduce total completed suicides. *Id.* Reviewing another study: "Gun suicide was affected by restrictions on both the buying and selling of guns. . . . Suicide rates by other methods were not affected by any of the restrictions. Overall, states with tougher handgun laws had lower overall suicide rates." *Id.* at 69. Reviewing another study: "Firearm license to purchase or waiting period to purchase laws were found to reduce the rate of white male suicides aged 20 to 64 by 3 suicides per 100,000 population." *Id.* at 70. In Queensland, Australia, when a 28-day cooling-off period, and handgun safety tests, were enacted into law, firearm suicide rates declined significantly in urban areas (but not rural areas). *Id.* at 72. A revised study of the federal five-day waiting period in place in the 1990s found as follows: "In particular, the waiting period required during phase one of [The Brady Act] may have slowed handgun acquisition by some people experiencing a suicidal impulse. . . .[O]ur analysis of suicide rates found some evidence that Brady may have reduced gun suicide rates among people aged 55 and older" (although the gains were partially offset by an increase in non-gun suicides). Webster and Vernick at 26. One critical review of the relevant literature lamented the small number of available studies of the effect of waiting periods, yet had to acknowledge the study that found a statistically significant decrease in firearm suicides by people older than 55 years, correlated with the introduction of a firearm-acquisition waiting period. Robert A. Hahn, et al., *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 American Journal of Preventive Medicine 40, 52 (2005). According to another literature review:

> Several studies have examined correlations between different aspects of firearms control legislation—such as the requirement for a waiting period, requirements for licensing, and restricted availability based on psychiatric and/or criminal records—

and the suicide rate.  All of these studies have shown an inverse relationship between the restrictiveness of firearms legislation and the overall suicide rates . . .  Although there was some evidence of method substitution, the overall impact on the suicide rate was still favorable.

David A. Brent, Firearms and Suicide, Annals of New York Academy of Sciences, 225, 232 (2001).

The cooling-off period can have an effect even for second-time or subsequent firearms purchasers, sometimes thought to already have guns that could be used to commit violent acts. What if, for example, the individual's firearm is broken and not immediately reparable or available?  A new firearm would let the individual act on the violent impulse.  The same is true if the individual (temporarily) gave his or her older firearms away to—or had them taken away by—a family member, perhaps because the individual was feeling suicidal.  The same is true if the older firearms were stolen.  Such examples, which are not exhaustive, show that Waiting-Period Law fits closely with undeniably legitimate governmental goals, even for people who have acquired firearms in the past.

### III.   PERUTA'S "ALTERNATIVE APPROACH" HAS NO APPLICATION HERE

Addressing an issue not presented here, *Peruta* prescribes "an alternative approach [to the second step of the inquiry] *for the most severe cases*."  *Peruta*, 2014 WL 555862 at *20 (emphasis added).  A law that destroys the Second Amendment right, and does not just burden the right, is "an infringement in any light," requiring no further analysis to be invalidated.  *Id.*  ("A law effecting a *destruction* of the right rather than merely *burdening* it is, after all, an infringement under any light"; quoting *Heller I*, 554 U.S. at 629 (emphasis in original; internal punctuation omitted).)  Yet *Peruta* concedes, "It is the rare law that 'destroys' the right."  *Id.* at *21.

It is indisputable that the Waiting-Period Law, especially as applied to people who already have firearms, does not destroy the Second Amendment right to have a firearm for the purpose of self-defense.  Indeed, Silvester and Combs admit that they have had personal firearms at all relevant times during this case.  And the Waiting-Period Law just delays, as opposed to prohibits,

lawful firearm purchases.  Therefore, Peruta's "alternative approach," even if it remains good law in the Ninth Circuit, should not be used here.

## IV.   THE WAITING-PERIOD LAW'S STATUTORY EXCEPTIONS DO NOT IMPLICATE THE FOURTEENTH AMENDMENT

Of the Waiting-Period Law, Plaintiffs claim a violation of the Fourteenth Amendment Equal Protection Clause, in that certain classes of people have statutory exemptions—a total of 18 groups of such exemptions (First. Am. Compl., ¶¶ 25-42)—while the individual plaintiffs and other people do not enjoy any exemptions.  However, as a matter of law, this claim of Plaintiffs cannot be sustained because each exemption is supported by sufficient justification, which the Attorney General laid out in her motion for summary judgment and, for the sake of brevity, will not repeat here.

Where an equal-protection claim is based on membership in a suspect class such as race or the burdening of a fundamental right, then heightened scrutiny is applied; otherwise only rational-basis review applies.  *See Kahawaiolaa v. Norton,* 386 F.3d 1271, 1277-78 (9th Cir. 2005) (stating that "[w]hen no suspect class is involved and no fundamental right is burdened, we apply a rational basis test to determine the legitimacy of the classifications"); (First Am. Compl., ¶ 70 (attacking exemptions as "arbitrary, capricious, and irrational").)

Plaintiffs do not and could not truthfully assert that any of the exemptions discriminates against any suspect class of people, such as racial or ethnic minorities.  And the Attorney General already has established that the Waiting Period Law does not burden the Second Amendment right, and the law passes even heightened scrutiny.  Nor do the exemptions themselves burden the rights of Plaintiffs, who would be unaffected if the exemptions were invalidated.  Therefore, the Court should subject each of the challenged groups of statutory exemptions to rational-basis review.  Critical analysis of the arguments and the evidence that the Attorney General already presented in the summary-judgment motion, and will present at trial, should lead easily to conclusions that all of the exemptions survive rational-basis review or even heightened scrutiny.

**CONCLUSION**

The Waiting-Period Law is presumptively lawful and does not burden any otherwise qualified person's Second Amendment right as historically understood.  The Waiting-Period Law survives application of any appropriate standard of review.  Plaintiffs, who possess firearms already, are complaining about the mere inconvenience of a waiting period that is well-justified as a public-safety measure.  Similarly, there is no violation of the Fourteenth Amendment merely because the California Legislature, in tailoring the waiting period narrowly, exempted certain groups of people from the waiting period.  This trial should lead to the upholding of the Waiting-Period Law.

Dated:  March 10, 2014                         Respectfully Submitted,

                                               KAMALA D. HARRIS
                                               Attorney General of California
                                               MARK R. BECKINGTON
                                               Supervising Deputy Attorney General
                                               PETER H. CHANG
                                               Deputy Attorney General


                                               _/s/_____
                                               JONATHAN M. EISENBERG
                                               Deputy Attorney General
                                               *Attorneys for Defendant Kamala D. Harris,*
                                               *Attorney General of California*

24

<u>**DECLARATION OF E-SERVICE**</u>

Case Name:    ***Silvester v. Harris***
Court Name:   **U.S. District Court, Eastern District of California (Fresno)**
Case No.:     **1:11-cv-02137-AWI-SKO**

I, Jonathan M. Eisenberg, declare:

I am employed in the Office of the California Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter; my business address is 300 South Spring Street, Suite 1702, Los Angeles, CA  90013.

I understand that all parties to the above-entitled case are represented by at least one attorney who is registered for electronic filing and service in the above-entitled court.

On <u>**March 10, 2014**</u>, I electronically filed and, therefore, to the best of my understanding, caused to be electronically serviced the attached **TRIAL BRIEF OF DEFENDANT KAMALA D. HARRIS, ATTORNEY GENERAL OF CALIFORNIA** to the following people at the following e-mail addresses:

Donald E. J. Kilmer, Jr.
don@dklawoffice.com;
Christina@dklawoffice.com

Victor John Otten
vic@ottenandjoyce.com

Jason Andrew Davis
jason@calgunlawyers.com;
jsndavis@gmail.com

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on <u>**March 10, 2014**</u>, at Los Angeles, California.

| Jonathan M. Eisenberg | /s/ |
|---|---|
| Declarant | Signature |