UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII


| | |
|---|---|
| JEFF SILVESTER, et al., ) | 1:11-cv-2137-AWI |
| ) | |
| Plaintiff, ) | |
| ) | COURT TRIAL |
| vs. ) | |
| ) | Day 1 |
| KAMALA D. HARRIS, Attorney ) | |
| General of California, and ) | |
| DOES 1 to 20, ) | |
| ) | |
| Defendants. ) | |

Fresno, California                    Tuesday, March 25, 2014




REPORTER'S TRANSCRIPT OF PROCEEDINGS



Volume 1, Pages 1 to 158, inclusive









REPORTED BY:   GAIL LACY THOMAS, RMR-CRR
Official Court Reporter
CSR NO. 3278

2

APPEARANCES OF COUNSEL:

For the Plaintiffs:                 OTTEN & JOYCE, LLP
                                    Attorneys at Law
                                    3620 Pacific Coast Highway
                                    Suite 100
                                    Torrance, California 90505
                                    By:  **Victor J. Otten**
and
                                    LAW OFFICES OF DONALD KILMER
                                    Attorneys at Law
                                    1645 Willow Street
                                    Suite 150
                                    San Jose, California 95125
                                    By:  **Donald E. J. Kilmer**, Jr.


For the Defendants:                 KAMALA D. HARRIS
                                    Attorney General of California
                                    By:  **Jonathan M. Eisenberg**
                                    Deputy Attorney General
                                    300 South Spring Street
                                    Suite 1702
                                    Los Angeles, CA 90013
                                    By:  **Peter H. Chang**
                                    Deputy Attorney General
                                    455 Golden Gate Avenue
                                    Suite 11000
                                    San Francisco, CA 94102

<u>INDEX</u>

<u>**PLAINTIFFS' WITNESSES**</u>:

**JEFF SILVESTER**                                              19
DIRECT EXAMINATION                                   20
BY MR. OTTEN
CROSS-EXAMINATION                                  31
BY MR. CHANG
REDIRECT EXAMINATION                          44
BY MR. OTTEN
**BRANDON COMBS**                                       48
DIRECT EXAMINATION                                   49
BY MR. OTTEN
CROSS-EXAMINATION                                  75
BY MR. EISENBERG
REDIRECT EXAMINATION                        100
BY MR. OTTEN
RECROSS-EXAMINATION                          109
BY MR. EISENBERG
**GENE HOFFMAN**                                         112
DIRECT EXAMINATION                                112
BY MR. OTTEN
CROSS-EXAMINATION                              145
BY MR. CHANG

\* \* \* \* \*

**EXHIBITS**

<u>PLAINTIFFS'</u>                                                    <u>RECEIVED</u>
 1 to 8                                                                  31

<u>DEFENDANTS'</u>
 AA to AS, AU to AZ, BA to BY, CA, CB, CC          140

4

|   |   |
|---|---|
| 1 | Tuesday, March 25, 2014            Fresno, California |
| 2 |                                   8:34 a.m. |
| 3 |   |
| 4 |       THE CLERK:  Number 1 on the calendar, CV-11-2137-AWI, |
| 5 | Jeff Silvester versus Kamala Harris, bench trial. |
| 6 |       THE COURT:  Okay, good morning.  If I could have your |
| 7 | appearances for the record, first on behalf of plaintiffs. |
| 8 |       MR. KILMER:  Donald Kilmer on behalf of the |
| 9 | plaintiff. |
| 10 |       MR. OTTEN:  Victor Otten on behalf of the plaintiff |
| 11 | as well. |
| 12 |       MR. KILMER:  Mr. Hoffman, who is chairman of the |
| 13 | Calguns Foundation, is seated at the counsel table.  The |
| 14 | plaintiffs, Brandon Combs and Mr. Jeff Silvester also seated |
| 15 | in the gallery. |
| 16 |       THE COURT:  On behalf of the defendants. |
| 17 |       MR. EISENBERG:  Jonathan Eisenberg, Deputy Attorney |
| 18 | General on behalf of the defense. |
| 19 |       MR. CHANG:  Peter Chang from the Attorney General's |
| 20 | Office on behalf of the defense. |
| 21 |       THE COURT:  All right.  Okay, before we get started |
| 22 | on the trial itself, are there any preliminary matters we need |
| 23 | to take up, first on behalf of plaintiffs? |
| 24 |       MR. KILMER:  Just the pending motions that the Court |
| 25 | took under submission from our prior appearance, Your Honor. |

1          THE COURT:  Okay, all right.  And on behalf of the

2     defendants?

3          MR. EISENBERG:  Your Honor, we would like to address

4     the scope of this trial, whether the plaintiffs are as their

5     pleadings and pretrial statements appear, seeking a tailored

6     injunction against enforcement of the Waiting-Period Law,

7     against people who have been through the Waiting-Period Law

8     before and have firearms registered with the State of

9     California versus what appears in the Trial Brief of the

10     plaintiffs seeking a broad injunction against enforcement of

11     the law in all circumstances, a facial challenge.

12          That second request for relief appears for the first

13     time in the Trial Brief and is beyond the scope of the case as

14     we've been working it up.

15          THE COURT:  Okay.  All right, and as to the motions

16     that were taken under submission, I'll continue to take those

17     under submission.  But as far as the scope of the trial, as

18     far as plaintiff is concerned?

19          MR. KILMER:  Your Honor, Mr. Eisenberg is correct,

20     and if there's any fault that there was some unclearness in

21     the Trial Brief, it belongs to me.  But it is a request for a

22     tailored injunctive relief.

23          Our position is that law-abiding citizens who by

24     definition meet that standard by the Department of Justice's

25     own rule, i.e., people who already have firearms registered to

1    them in the AFS system, people who have certificates of

2    eligibility that must be renewed every year to have firearms

3    and people that have license to carry that must be renewed

4    every two years by a local sheriff, that those people are

5    presumptively law-abiding, and although they should be

6    subjected to a background check, that a 10-day waiting period

7    is an overbroad regulation as to those groups.

8            THE COURT:  So as I understand, it's not a broad

9    facial challenge to the reg itself.  It is as applied to the

10   parties that are -- well, I guess the individuals who meet

11   that criteria?

12           MR. KILMER:  That's correct, Your Honor.  Perhaps the

13   misunderstanding arose with -- when we were trying to figure

14   out what sort of remedy this court could fashion.  Far be it

15   for us to presuppose what the Court would order, we can't

16   think of a way that the Court can force an injunction without

17   saying the 10-day waiting period has to be suspended until the

18   legislature thinks it should because the Court can't literally

19   make up rules.  But we propose two possible alternative

20   remedies, and if it were the remedies that suggested that led

21   to this misunderstanding, that's where it comes from.

22           THE COURT:  Okay.  Are defendants satisfied, then,

23   that the scope of the trial itself, the determination will be

24   on an as-applied basis as opposed to a broad facial challenge?

25           MR. EISENBERG:  Yes, Your Honor.

1          THE COURT:  Okay.  Are there any other preliminary

2     matters we need to address or should address?

3          MR. KILMER:  I do want to make one other

4     clarification.  There are two causes of action.  There is the

5     Second Amendment cause of action and the Fourteenth Amendment

6     cause of action.  The Fourteenth Amendment cause of action may

7     be a facial challenge based on the fact that there are these

8     exceptions that don't appear to have any rational

9     justifications.  While the remedy is still going to be focused

10    and tailored, it still is a broad facial challenge in the

11    sense that it is a Fourteenth Amendment challenge that

12    statutorily is unequal.

13         THE COURT:  Let me ask defense, has that changed, the

14    analysis as far as the scope of the trial?

15         MR. EISENBERG:  Well, our understanding of the law is

16    that it would not be proper to strike down the entire law

17    based on exemptions from the law that are not discriminating

18    against the people that are subject to the exemptions, and so

19    it would be appropriate to tailor a regulation that -- you

20    know, we don't agree that the law is unconstitutional, but

21    should the Court find the law unconstitutional on the basis of

22    the Fourteenth Amendment and the exemptions, the scope of the

23    injunction would be to eliminate the exemptions, not to

24    eliminate the main law.

25         MR. KILMER:  I don't necessarily disagree with that,

1    Your Honor, but the focus is on what the remedy should be.  As

2    far as what evidence the Court is going to hear, I think the

3    Court is going to hear an issue as to both the facial and as

4    to applied challenges.

5             THE COURT:  Okay.  All right, so do I understand,

6    then, the Fourteenth Amendment here is not simply to make a

7    Second Amendment applicable to the State's, but you're saying

8    there is a separate and distinct Fourteenth Amendment claim,

9    due process claim?

10            MR. KILMER:  Not due process, Your Honor, straight

11   equal protection on the basis of a fundamental right.  I think

12   *Arlington Heights* is the case that stands for that

13   proposition.  I also believe we cited *Morrissey v. Chicago* in

14   our brief.

15            THE COURT:  Okay, anything else preliminarily by the

16   defense?

17            MR. KILMER:  Unless the Court considers it a

18   preliminary matter as to who is going to start the trial,

19   Your Honor.

20            THE COURT:  Okay, well, let me do this:  What I'll

21   do -- and I don't know if you've had a chance to meet and

22   confer, but it seems to me the burden would be on the

23   defendants.  However, if for the process sake, if both sides

24   agree that the plaintiff would go first with your witnesses,

25   that's fine with me.  I just want to make sure -- as I said in

1   earlier proceedings, I want to make sure that there's a clear

2   record, and that both sides have had a chance to put on their

3   evidence.  Whether we start with the defense or we start with

4   the plaintiff, I'll leave it up to counsel.  I have no

5   particular preference other than it appears that the burden is

6   on the defendant.

7            MR. KILMER:  We have no objection to taking our

8   witnesses out of order and putting their testimony on the

9   record.  This is a bench trial.  I don't think it's going to

10  matter, Your Honor.

11           MR. EISENBERG:  Well, unfortunately that would

12  present some logistical difficulties for us because our

13  witnesses are in Sacramento, and the first of them are not

14  arriving until this afternoon.  So we had assumed that the

15  plaintiffs would go first.

16           THE COURT:  All right.

17           MR. EISENBERG:  And we're happy to continue to

18  proceed that way.

19           THE COURT:  Okay.

20           MR. KILMER:  Either way, it doesn't matter,

21  Your Honor.

22           THE COURT:  So we'll go ahead, and we'll start with

23  the plaintiff's side first, then.

24           Now, this morning, I did receive the request for

25  judicial notice and the objection.  I'll take that under

1   submission for now, and perhaps we can start by taking

2   testimony of witnesses.

3          MR. KILMER:  Thank you, Your Honor.

4          THE COURT:  Now, let me ask, you may -- you're not

5   required to, but if you think it is of assistance, each side

6   may make an opening statement.  Since the plaintiff is going

7   to proceed first, and if the plaintiff wishes to make an

8   opening statement, you can do so.

9          MR. KILMER:  We'll waive, otherwise I'll make a brief

10  opening statement.

11         MR. EISENBERG:  Oh, yes, we're not waiving.

12         MR. KILMER:  Then I'll make an opening statement,

13  Your Honor.

14         THE COURT:  All right.

15         MR. KILMER:  Your Honor, we believe that this is a

16  relatively simple and straightforward case.  Our position is

17  that the Department of Justice are hard-working law

18  enforcement officials.  They're quite diligent and competent

19  in their effort to keep prohibited people from getting

20  firearms, and our position is that when it comes to

21  law-abiding people who by definition aren't people who already

22  have firearms known to the State of California, people who

23  have a Certificate of Eligibility issued by the Department of

24  Justice, and people who have a license to carry a firearm are

25  by definition law-abiding people, and who already are known to

1    the State of California to be law-abiding people, two of those

2    groups, the Certificate of Eligibility holders and the

3    license-to-carry-holders also have submitted live scan or full

4    10-finger fingerprints to the Department of Justice in order

5    to obtain those permits.  So they have unique identifiers that

6    are within the California computer database, and our position

7    is that they can be identified immediately at a point of sale

8    so that they may pass the background check and immediately

9    leave a retail outlet with a firearm that they purchased that

10   is their property.

11          And that's what we hope the evidence will show,

12   Your Honor.  Thank you.

13          THE COURT:  And opening statement on behalf of

14   defense.

15          MR. EISENBERG:  May I use the lectern, Your Honor?

16          THE COURT:  Sure.

17          MR. EISENBERG:  Good morning.

18          THE COURT:  Good morning.

19          MR. EISENBERG:  As you know, the plaintiffs in this

20   case are making a constitutional attack on California's

21   firearms Waiting-Period Law, which, in essence, and as you

22   know, applies a 10-day waiting period between the time that a

23   person applies to purchase a firearm and the time that the

24   person receives the firearm from most firearms transactions in

25   California.

1      The Waiting-Period Law promotes the vital objective

2  of public safety in two ways:  First, and as the evidence will

3  show, the law gives California's Bureau of Firearms, which is

4  the agency in charge of enforcing the Waiting-Period Law, the

5  time needed to perform an effective background check on all

6  people applying to acquire a firearm for each firearm

7  transaction.

8      From the Attorney General's live witnesses,

9  Your Honor will learn how a background check verifies whether

10  the applicant to purchase firearms is legally eligible to

11  purchase them by analyzing the records and multiple computer

12  databases to determine the applicant's criminal and mental

13  health histories and if a protective or restraining order has

14  been filed against the applicant.  The point, of course, is to

15  keep guns away from the people who are most likely to use them

16  to commit acts of violence.

17      Second, and as the evidence will show, the

18  Waiting-Period Law creates a cooling-off period for a person

19  who may have an impulse to use a firearm to commit homicide or

20  suicide.  Scholarly studies offered with a request for

21  judicial notice explain the beneficial effects of cooling-off

22  periods, particularly for certain people contemplating

23  suicide.

24      As the Court is aware, in the *Chovan* framework for

25  analyzing the Second Amendment claims in the Ninth Circuit,

1    there is a two-step inquiry.  The first step in shorthand is

2    the burden step.  The second step is the scrutiny step.  We

3    anticipate that this trial will focus on the second step of

4    the *Chovan* framework, and more specifically, on the reasons

5    that California enacted and enforces the Waiting-Period Law.

6    With that expectation, we will -- we'll present five witnesses

7    who will demonstrate the serious need for the Waiting-Period

8    Law.

9            The first slated witness will be Steve Buford, who is

10   the assistant chief, the No. 2 person at the Bureau of

11   Firearms.  Assistant Chief Buford has devoted a quarter of a

12   century of service to the Bureau.  He is uniquely qualified to

13   provide an overview of the evolution of California's

14   background check system for perspective firearm purchasers.

15           Assistant Chief Buford is expected to testify about

16   the conceptions and designs of and the objectives behind the

17   many law enforcement databases used by Bureau of Firearms

18   employees, who conduct the background checks.

19           He will further testify about the nature of the

20   database's contents and their capacities and limitations.  It

21   has been suggested that California could just use the federal

22   NICS background check system, which is said to be faster than

23   California's system.  Assistant Chief Buford can and will

24   discuss multiple aspects and deficiencies of a NICS system,

25   based on his many years of working with that system dating

1   back to its development in the 1990's.

2           This evidence will show that the NICS system does not

3   check for such things as whether applicants have been on

4   72-hour mental health holds or have tried to use fake DMV

5   identifications.  In other words, the evidence will show that

6   if California used just the NICS system, then annually,

7   thousands of disturbed or dishonest people prohibited from

8   having guns probably would have received their guns.

9           It's also been suggested that California could just

10  use one of its own databases called APPS, A-P-P-S, the Armed

11  Prohibited Persons System, to do instant background checks at

12  least for people who have purchased firearms in California

13  before and/or who hold licenses to carry or the certificate of

14  eligibility.

15          Assistant Chief Buford can and will discuss multiple

16  aspects of APPS, including how it was never intended to be and

17  isn't a replacement for a background check in part because

18  APPS has information for only a small percentage of people

19  prohibited from having firearms.

20          Consequently, by Assistant Chief Buford's testimony,

21  the Court will have the basis to evaluate whether APPS really

22  can perform the background check, quote, in mere seconds,

23  unquote, as the plaintiffs have claimed in their Trial Brief.

24          Assistant Chief Buford is also expected to testify

25  that a person with a Carried Concealed Weapons Permit or a

1    Certificate of Eligibility is not subject to an ongoing

2    real-time background check, and thus is not precleared to

3    purchase firearms.

4           Finally, Assistant Chief Buford also has consulted

5    with the California legislature about and has personal

6    knowledge of many of the statutory exemptions to the

7    Waiting-Period Law.  Therefore, he is expected to testify

8    about the justifications for, and perhaps most importantly,

9    the public safety safeguards that are embedded in the

10   exemptions.  The evidence will show that most people who enjoy

11   the exemptions go through much more stringent background

12   investigations, not checks, but investigations.  And movie

13   studio personnel working under Entertainment Firearms Permits

14   use guns that don't shoot real bullets.

15          We will also put on as witnesses Donnette Orsi, a

16   long-time lead computer IT person at the Bureau of Firearms

17   who recently left BOF to work for another state agency, and

18   Mitch Matsumoto, one of the supervisors of the team of

19   professionals in BOF's purchaser clearance permit who conduct

20   the background checks.  Miss Orsi and Mr. Matsumoto will

21   testify in detail about how California's firearm acquisition

22   background check system works and why the checks take as long

23   as they do.  Their expected testimony will show how part of

24   each background check is automated and computerized.  Yet, in

25   the vast majority of cases, another part, an often

Plaintiffs' Opening Statement

16

1   time-consuming part requires a human being to track down

2   information such as missing criminal history records harbored

3   at far-flung courts, and/or to analyze other information,

4   sometimes very complicated and/or ambiguous about the

5   applicant, to determine whether he or she is indeed prohibited

6   from owning a firearm.

7              Mr. Matsumoto's testimony will also reveal the very

8   high, yet often varying volume of DROS, Dealer Record of Sale,

9   firearm purchase applications that the Bureau of Firearms is

10  constantly processing and the very low percentage of

11  background checks that are completely automated.  And also for

12  Mr. Matsumoto, Your Honor will hear how bureau employees have

13  caught hard-to-spot errors such as mistaken recordings of

14  felony convictions as misdemeanor convictions.  That if not

15  caught could have led to guns being released to prohibited

16  persons, and how the 10-day waiting period allows critical

17  extra time for new records to populate the databases several

18  days after the DROS form is submitted and to be reviewed and

19  factored into the decision to approve or to deny the

20  application.

21             The defense will also call Blake Graham, the

22  supervisor of the team of Bureau of Firearms special agents

23  who investigate and intercept, or if need be, try to undo by

24  retrieval so-called straw purchases of firearms and other

25  illegal firearms transactions and trafficking.

1        Special Agent Supervisor Graham has firsthand

2   experience in how the 10-day waiting period help special

3   agents do their crime-fighting work.  He is, therefore,

4   expected to provide accounts of various actual law enforcement

5   operations that demonstrate the benefits of having the

6   Waiting-Period Law even for second time or subsequent

7   purchasers, and that may clear how the elimination of the

8   Waiting-Period Law would hamper criminal investigations.

9        The final witness for the defense is slated to be

10  Bureau of Firearms Chief, Steve Lindley, who has a unique

11  perspective because he was a police officer for a local police

12  department for more than a decade before moving to the Bureau

13  of Firearms and rising to the ranks of chief of the bureau.

14        Chief Lindley is expected to testify about the

15  objectives behind and the justifications for the

16  Waiting-Period Law, including the exemptions, and how,

17  accordingly, the law is administered and enforced.  For

18  example, Your Honor will hear Chief Lindley to explain the

19  concept of time equals safety.  How more time for background

20  checks and a cooling-off period leads to greater public

21  safety.

22        Also Chief Lindley can and will explain the effects

23  of the State budget and civil service system on the

24  administration of the Waiting-Period Law.

25        The Attorney General is confident that after hearing

1   this detailed testimony from these five witnesses, the Court

2   will conclude that the Waiting-Period Law is well justified

3   under both the Second Amendment and the Fourteenth Amendment,

4   and, therefore, withstands even heightened scrutiny.

5           But additionally, the Attorney General notes the many

6   empirical studies that we have submitted with a request for

7   judicial notice, there need not be and will not be any witness

8   describing these studies to the Court, but the studies which

9   the plaintiffs have not attempted to rebut with competing

10  studies only bolsters the case for the Waiting-Period Law.  We

11  expect to address the studies further in post-trial briefing.

12          As the Court is aware, all of what I have just

13  discussed goes to the second scrutiny step of the two-step

14  *Chovan* Second Amendment inquiry.  As Your Honor knows, the

15  first step in the inquiry is to determine whether the

16  challenged law burdens the Second Amendment right as

17  historically understood.  To that end, once again, the

18  Attorney General has provided to the Court historical

19  references and related materials along with the request for

20  judicial notice.  And once again, we expect to address these

21  materials further in post-trial briefing.

22          The Attorney General submits that after reviewing

23  these materials, the Court will recognize that the

24  Waiting-Period Law does not burden the Second Amendment right.

25  Thus, the Court will be able to resolve this lawsuit at either

Plaintiffs' Opening Statement

19

1   the first step or the second step of the *Chovan* inquiry, in

2   favor of the Attorney General and with the result being the

3   vindication of an important public safety law, the

4   Waiting-Period Law.

5           Thank you, Your Honor.

6           THE COURT:  All right, thank you.  All right, we can

7   go ahead and take up evidence, and plaintiff may begin with

8   their first witness.

9           MR. OTTEN:  Thank you, Your Honor.  Is it okay to

10  question the witness from the table here?

11          THE COURT:  That's fine as long as you keep your

12  voices up, and that would apply to all parties.  If you wish

13  to do your inquiries from the table, I know you have a lot of

14  documents, folders, et cetera, it might be more convenient for

15  you, but just make sure you keep your voices up and use the

16  microphone.

17          MR. OTTEN:  We'd like to call Jeff Silvester,

18  Your Honor.

19          THE CLERK:  Come right up here.

20                      **JEFF SILVESTER**,

21  called as a witness on behalf of the Plaintiffs, having been

22  first duly sworn, testified as follows:

23          THE CLERK:  Take the witness stand right up here and

24  give us your full name, please.

25          THE WITNESS:  Right here.

|    |                                                        |
|----|--------------------------------------------------------|
| 1  | THE CLERK:  Yes, walk around and take a seat.          |
| 2  | DIRECT EXAMINATION                                      |
| 3  | BY MR. OTTEN:                                           |
| 4  | Q.  Good morning, Mr. Silvester.  How are you?         |
| 5  | A.  Very good, thank you.                              |
| 6  | Q.  Can you tell the Court your full name.             |
| 7  | A.  Jeffery Sherman Silvester.                         |
| 8  | Q.  Mr. Silvester, where do you currently reside?     |
| 9  | A.  2007 North Ordo Way, Hanford, California.         |
| 10 | Q.  And you're a California resident, then; correct?  |
| 11 | A.  Correct.                                           |
| 12 | Q.  How long have you been?                            |
| 13 | A.  Since 2001.                                        |
| 14 | Q.  Are you a U.S. citizen?                            |
| 15 | A.  Yes.                                               |
| 16 | Q.  Can you tell the Court if you're married?         |
| 17 | A.  Yes.                                               |
| 18 | Q.  Are you?                                           |
| 19 | A.  Yes, I am married.                                 |
| 20 | Q.  Do you have children?                              |
| 21 | A.  I do.                                               |
| 22 | Q.  How many?                                           |
| 23 | A.  I have three daughters, six, four, and two.       |
| 24 | Q.  Do you currently own a firearm?                    |
| 25 | A.  Yes, I do.                                         |

1  Q.  At all times -- first, you're aware of the lawsuit that

2  we're here for; correct?

3  A.  I am.

4  Q.  And have you owned a firearm at all from the time that we

5  filed this lawsuit to the present?

6  A.  Yes, I have.

7  Q.  Do you intend to own firearms in the future, to buy

8  firearms?

9  A.  Yes, I do.

10  Q.  You're not prohibited from owning a firearm; correct?

11  A.  I am not prohibited, correct.

12  Q.  Now, you've heard some stuff this morning about what we

13  have been referring to as the California waiting period laws;

14  correct?

15  A.  Correct.

16  Q.  Are you aware of what -- and I don't want detail but just

17  generally what that law says?

18  A.  That I have to wait a 10-day cooling-off period after

19  purchase.

20  Q.  So if you walked into a gun store today and tried to

21  purchase a gun, you would have to wait at least 10 days before

22  you receive it; correct?

23  A.  Before I can come back and pick it up.

24  Q.  Do you know which branch of the Government is in charge

25  for enforcing those laws?

Silvester - D

22

1   A.   The Department of Justice?

2   Q.   The Attorney General?

3   A.   Okay, yes, the Attorney General.  That makes sense.

4   Q.   Do you -- if you know, do you know what the reasons that

5   they have a waiting period is, or what do you understand it to

6   be?

7   A.   If I remember correctly, when I read the law, it

8   specifically highlights a cooling-off period, but that's

9   all -- that's all the further my knowledge goes.  They just

10  want to wait -- want to make me wait.

11  Q.   Do you know if when you purchase a gun, the State of

12  California knows that you have that gun?

13  A.   It's my understanding that they have a registry of the

14  handguns and now also of the long guns.

15  Q.   Is it your understanding, then, when you purchased a

16  handgun and go through the waiting period, and the Government

17  eventually says that you can have it, that that means that

18  you're not a prohibited person?

19         MR. CHANG:  Objection, Your Honor.  Leading.

20         THE COURT:  Overruled, if you can answer.

21         THE WITNESS:  It makes sense to me that if they're

22  going to allow me to have my gun, that it means that I am not

23  on a prohibited list.

24  BY MR. OTTEN:

25  Q.   Meaning, you're not a felon; correct?

Silvester - D

23

1    A.   Correct.

2    Q.   You're not in California convicted of some violent

3    misdemeanor; correct?

4    A.   Correct.

5    Q.   And don't have any kind of mental issue such as a 5150;

6    correct?

7    A.   Correct.

8    Q.   Do you have any licenses related to firearms?

9    A.   Yes, I do.

10   Q.   And can you tell the Court what licenses that you have?

11   A.   I have a license to carry a concealed handgun.

12   Q.   Now, when you say license to carry, that is the correct

13   way that the law defines it.  Sometimes it's referred to as a

14   CCW; correct?

15   A.   Correct.

16   Q.   Same thing?

17   A.   Correct.

18   Q.   Who issues that license?

19   A.   I think generally they're issued by the Sheriff's

20   Department.  I obtained mine through the City of Hanford

21   Police Department.

22   Q.   And what did you have to do to get that?

23   A.   Fill out a pretty extensive application, processing fees,

24   and a live scan fingerprinting, training courses.  I think

25   that's about it.

1    Q.   The training courses, is that like a handgun safety

2    certificate or something like that?

3    A.   No.  The City requires a certain amount of time in a

4    training class, and the City of Hanford additionally requires

5    that I demonstrate my ability to shoot by making me fire a

6    certain number of rounds certified by the instructor.

7    Q.   And a minute ago, you referred to something as a live

8    scan.  Can you explain to the Court what a live scan is?

9    A.   It was a fingerprinting process where I put my hands on a

10   piece of glass, and my fingerprints were magically taken

11   somewhere else and my background checked.

12   Q.   So the State of California has your fingerprints on file

13   all the time; correct?

14   A.   Yes.

15   Q.   And that's something different than somebody that just

16   wants to normally purchase a handgun; is that correct, if you

17   know?

18   A.   I believe so, yes.

19   Q.   So you've gone through some extensive process to get this

20   license to carry.  You're not a felon, you're not a violent

21   misdemeanant.  You don't have any mental health issues.  Your

22   sheriff has determined that you're qualified to carry that;

23   correct?

24            MR. CHANG:  Objection, Your Honor.

25            THE COURT:  Sustained.

1  BY MR. OTTEN:

2  Q.  Okay.  Is it fair to say that California considers you a

3  law-abiding citizen?

4  A.  Yes.

5       MR. CHANG:  Objection, Your Honor.  Assumes facts not

6  in evidence.

7       THE COURT:  Sustained.

8       MR. CHANG:  Calls for speculation.

9       THE COURT:  All right, sustained.

10  BY MR. OTTEN:

11  Q.  Mr. Silvester, do you consider yourself a law-abiding

12  citizen?

13  A.  I consider myself a law-abiding citizen, yes.

14       MR. OTTEN:  Your Honor, these have already been

15  deemed to be admitted, but if I can direct the Court's

16  attention to Exhibit JT-6.  It's Mr. Silvester's license to

17  carry a permit.

18       THE COURT:  Yes.

19       MR. OTTEN:  Your Honor, can I approach the witness

20  with that?

21       THE COURT:  Yes, you may.

22  BY MR. OTTEN:

23  Q.  Mr. Silvester, I just put an exhibit in front of you that

24  we've marked as JT-6.  Could you take a look at that.  Do you

25  recognize what that is?

1  A.  Yes.

2  Q.  And what is it?

3  A.  This is the front side of my License to Carry Concealed.

4  Q.  And is there -- if you flip the page here, is that the

5  back side?

6  A.  Yes.

7  Q.  Are you aware of any hardships that are imposed by the

8  10-day waiting period?

9       Let me ask you this:  Have you experienced any

10 hardships by California's 10-day Waiting-Period Law?

11 A.  Yes.  In my opinion having to return back to the original

12 place of purchase constitutes a hardship.  I have a busy

13 schedule.  I have children at home, and having to make a

14 second trip, I believe is a hardship.

15 Q.  Is that a financial hardship or a time hardship?

16 A.  It's a little of both.  My business, I rely on my own

17 time, and time is money, and any time taken away from that is

18 a financial impact.

19 Q.  Now, you mentioned your business.  Can you just briefly

20 tell the Court what you do for a living?

21 A.  Of course.  I'm a commercial insurance agent, a salesman.

22 Q.  Are you the sole provider for your family?

23 A.  Yes, I am.

24 Q.  Have there been any circumstances where you weren't able

25 to purchase a firearm because of the expense involved in

1   having to go to wherever it was located twice?

2   A.   Yes.   There have been opportunities in the past where I

3   was intent on making a purchase and could not because of the

4   financial impact of either transferring it to a local federal

5   firearms licensed dealer or because I couldn't make two trips.

6   Q.   So maybe you could explain to the Court.   Let's say you

7   find a gun in Los Angeles.   You live near Fresno; correct?

8   A.   Correct.

9   Q.   Would you have to drive to Los Angeles two times to

10  purchase that weapon?

11  A.   Yes.

12        MR. EISENBERG:   Objection.   This line of question is

13  assuming facts not in evidence, a trip to Los Angeles.

14        THE COURT:   Well, I'll sustain the objection.   Maybe

15  you can make it more definitive as to an actual situation.

16        MR. OTTEN:   Certainly, Your Honor.

17  BY MR. OTTEN:

18  Q.   Mr. Silvester, did you ever try and purchase -- or want to

19  purchase a firearm that was located outside of where you live?

20  A.   Yes.

21  Q.   And can you tell us what happened?

22  A.   There was a particular firearm located in the greater

23  Los Angeles area that I wanted to purchase.   I had talked with

24  the seller in order to make a private party transaction, but I

25  ultimately could not make the transaction happen because of

1   distance and the process involved with having to appear twice.

2   Q.  Why not just have that shipped to a local FFL?

3   A.  It's a little bit cost preventative.  Most dealers want to

4   have their customers come to them.  And having the firearm

5   transferred constituted an additional charge that was too

6   absorbent for me.

7            MR. EISENBERG:  Objection, move to strike.

8   Speculation about what the firearms dealers want to do or not

9   want to do about transfers.

10            THE COURT:  That portion is stricken.

11   BY MR. OTTEN:

12   Q.  In your particular case, Mr. Silvester, did you have -- do

13   you have any knowledge of why the firearm -- strike that.

14            Did you make any attempts to have that gun

15   transferred to a different FFL?

16   A.  I inquired of a couple of firearms dealers to find out

17   what the cost would be in order to transfer it, and I don't

18   recall the exact cost, but at the time I did not make the

19   transfer because the costs were high.

20   Q.  And you're the sole provider for your family?

21   A.  Correct.

22   Q.  Are you a rich man?

23   A.  Not by my definition.

24   Q.  Okay.  So 75 bucks, 200 bucks, whatever, that's a

25   hardship; correct?

1  A.  Yes.

2  Q.  Any other instances where you weren't able to purchase a

3  firearm because of financial reasons?

4  A.  Yes, there was a firearm located up north where I had a

5  similar discussion.  I was unable to make that purchase as

6  well for very similar reasons.  There was a third option as

7  well where the seller and I made arrangements to meet kind of

8  halfway at a mutually agreed upon federal firearms dealer, and

9  that deal fell through also.

10 Q.  Other than financial reasons, do you think that the 10-day

11 waiting periods imposes any kind of a hardship on you?

12 A.  Yes, I do.  It deprives me of property that I have paid

13 for and own for an arbitrary amount of time.  When I make the

14 purchase, I believe that I should be entitled to my property.

15 And I feel that I'm a law-abiding citizen that's entitled to

16 the things that I purchase, and the 10-day waiting period

17 denies me of that right.

18         MR. OTTEN:  Nothing further, Your Honor.

19         THE COURT:  Cross-examination?

20         MR. CHANG:  Your Honor, may we have a brief recess to

21 reset up?  I'd like to use the lectern so I can see

22 Mr. Silvester.

23         THE COURT:  All right.  How much time do you want?

24         MR. CHANG:  Ten minutes.

25         THE COURT:  All right, we'll take 10 minutes.  You

1   can step down if you wish and return to the table.

2              THE WITNESS:  Thank you.

3              (Recess.)

4              THE COURT:  Before you begin cross-examining, let me

5   just ask, maybe it would be for convenience -- procedural

6   convenience.  There are eight items that are marked joint

7   exhibits.  Is there any objection, or do the parties wish

8   those to be admitted?

9              MR. KILMER:  We're talking about the JT exhibits,

10  Your Honor?

11             THE COURT:  Only the JT's, only the joint exhibits.

12  I mean, I don't want -- you know, if we want to take them one

13  at a time.

14             MR. KILMER:  No, I'm just reviewing them now,

15  Your Honor.  I believe that the parties have already

16  stipulated that those are admissible, and we'll so stipulate

17  now as well.

18             THE COURT:  Because there was already a reference to

19  Joint Exhibit 6, and I just want to make sure that --

20             MR. KILMER:  Yes, Your Honor.

21             THE COURT:  -- that we formally admit them.  Is that

22  agreeable?

23             MR. CHANG:  Defense agrees.

24             THE COURT:  Okay, joints Exhibit 1 through 8 are

25  admitted into evidence and may be displayed and considered by

Silvester - X

31

1    the Court and the parties.

2              (Joint Exhibits 1 to 8, received in evidence.)

3              MR. KILMER:  Thank you.

4              THE COURT:  All right, you may begin

5    cross-examination of Mr. Silvester.

6              MR. CHANG:  That you, Your Honor.

7                         CROSS-EXAMINATION

8    BY MR. CHANG:

9    Q.  Mr. Silvester, I am Peter Chang.  I am Deputy Attorney

10   General representing the Attorney General in this case.

11             Now, you said in your testimony that you have

12   incurred some expenses because of the Waiting-Period Law;

13   correct?

14             MR. OTTEN:  I'm going to object, Your Honor.  It

15   misstates the testimony.

16             THE COURT:  All right.  Go ahead and rephrase.  I'll

17   sustain the objection.  Go ahead and rephrase.

18   BY MR. CHANG:

19   Q.  Mr. Silvester, during your testimony, did you say you

20   incurred some financial burden because of the Waiting-Period

21   Law?

22   A.  Yes.

23   Q.  Okay.  And you talked about shipping expenses and dealer

24   transfer fees; correct?

25   A.  I did.

1   Q.   Shipping expenses for handguns are generally about $20.

2   Correct?

3   A.   I don't know.

4   Q.   Okay.  Do you know what the ballpark is?

5   A.   I looked at it at the time, but it's been so long ago, and

6   I haven't looked at it since, that I am not aware of what the

7   ballpark expenses are.

8   Q.   Now, you recall -- you don't recall whether it's 20 to $50

9   or 200 to $500?

10  A.   I would guess that it would be under $100, but it really

11  has been a long time ago, and I don't remember what the exact

12  costs were.  I just remember at the time the total

13  accumulation of those costs made it preventative.

14  Q.   Let's talk about the total accumulation of those costs.

15  What is the ballpark range for the total accumulation of those

16  costs?

17  A.   Again, this is a memory issue, and I don't exactly

18  remember.  But I believe at the time, the total cost was in

19  the hundred dollar ballpark.

20  Q.   Okay.  So the total costs for transfer fees and -- for

21  dealer transfer fees and shipping fees is in the hundred

22  dollar ballpark; correct?

23  A.   No.  I believe that just the transfer fees and the fees

24  for the dealer was in the hundred dollar park.  I don't recall

25  the federal fees associated.

1  Q.  What are the federal fees that you're referring to?

2  A.  The -- the different DROS fees or whatever else was

3  involved.

4  Q.  Those federal fees, they would apply any time you purchase

5  a handgun; correct?

6  A.  Correct.

7  Q.  Okay.  Now, let's go back to the shipping costs.  Did you

8  estimate the shipping costs to be under a hundred dollars?

9  A.  I don't recall specifically, but if the total cost was

10  about a hundred, it was probably less, I would assume.

11  Q.  Okay.  Now, is it true that you claim some of the

12  additional expenses that you have to incur are because you

13  have to drive to the gun dealer a second time to pick up the

14  gun?

15  A.  Yes.

16  Q.  And that's because you have to wait 10 days, at least 10

17  days before you can pick up a gun that you've purchased?

18  A.  Yes.

19  Q.  You claim -- and one of those expenses is fuel expenses?

20  A.  Yes.

21  Q.  What kind of car do you drive?

22  A.  I drive a 2007 Hyundai Sonata.

23  Q.  What kind of mile per gallon do you get on that?

24  A.  About 20.

25  Q.  Okay.  And another one of the expenses associated with

1  driving is the wear and tear on your car; correct?

2  A.  Yes.

3  Q.  How would you estimate the wear and tear on your car,

4  let's say, for a hundred miles that you drive?

5  A.  I have no idea.

6  Q.  Okay.  But it's an estimation you've made in the past;

7  correct?

8  A.  Maybe not specifically, but generally, yes.

9  Q.  What do you mean by generally?

10  A.  Well, I know it's going to cause wear and tear to my

11  vehicle, but I don't know how to quantify a per mile

12  wear-and-tear cost.

13  Q.  Okay.  Let's come back to that later.

14       Now, we had talked about the shipping expenses and

15  dealer transfer fees.  You only pay those fees if you don't

16  make a second trip to the dealer; correct?

17  A.  I don't quite understand.  Please rephrase.

18  Q.  Sure.  So if you purchase a gun from your local dealer,

19  you have to make a second trip to that dealer to pick up the

20  gun.

21  A.  Yes.

22  Q.  However, if you have a gun shipped to your local dealer,

23  you only have to make one trip to that dealer; correct?

24  A.  Not my understanding, no.  I still have to make two trips.

25  Q.  Why -- well, the first time -- why would you have to make

1  two trips?

2  A.  My understanding of the way shipping a firearm works, I

3  would have it shipped, I would have to go to the dealer that

4  received the firearm and start the transaction and then wait

5  ten days or ten 24-hour periods and then go a second time to

6  pick up the firearm.

7  Q.  Now, you've estimated that you've spent -- you estimated

8  that -- excuse me.

9        Now, you have also talked about the instances when

10  you have been unable to purchase firearms because of having to

11  make a second trip; correct?

12  A.  Yes.

13  Q.  And one of the handguns you talked about was in Redding?

14  A.  Yes, or there -- local about.  I'm not specifically sure

15  that it was actually in Redding.

16  Q.  Sure.  And you live in Hanover, California?

17  A.  Hanford.

18  Q.  Hanford, California.  And it's about -- would you say it's

19  about 350 miles from your place, from Hanford to Redding?

20  A.  I'm not sure specifically, but it sounds about right.

21  Q.  So if the Waiting-Period Law did not apply to you, it

22  would not be a financial burden for you to drive from Hanford,

23  California to Redding, California one time to pick up the

24  handgun; correct?

25  A.  No, I would take my family camping.

```
1   Q.  Okay.  So you would make -- right.  Okay.

2        But to drive there a second time to pick up a handgun

3   makes it financially unfeasible to buy that gun?

4   A.  Yes.

5   Q.  So it's the expense of having to travel to a faraway

6   location like Redding a second time that makes it financially

7   unfeasible to buy that gun.  Right?

8   A.  Yes.

9   Q.  Now, the closest gun dealer to you is 8.2 miles from your

10  house; is that correct?

11  A.  Currently?

12  Q.  Currently.

13  A.  Today?  No.

14  Q.  Okay.  Today, what is the closest gun dealer to you?

15  A.  Maybe two miles.

16  Q.  Okay.  The closest gun dealer to you is two miles.  And

17  you have also bought a gun from a dealer as far away as

18  41 miles from your house; correct?

19  A.  Yes.

20  Q.  A gun shop called PRK Arms; correct?

21  A.  Correct.

22  Q.  And you take business trips, right, as part of your

23  business as a commercial insurance salesman?

24  A.  Yes.

25  Q.  And you drive while on these business trips, right?
```

Silvester - X

37

1   A.   Yes.

2   Q.   You drive on these business trips at least once a month?

3   A.   Yes.

4   Q.   In fact, you drive past one or more gun dealers while on

5   these business trips at least once a month; correct?

6   A.   Yes.

7   Q.   Now, Mr. Silvester, you testified you have a gun; correct?

8   A.   Yes.

9   Q.   In fact, you have more than one gun?

10  A.   Yes.

11  Q.   Now, these guns are legally registered to you?

12  A.   Yes.

13  Q.   These guns were not always available to you for use;

14  correct?

15  A.   Would you be more specific about what you mean?

16  Q.   Well, there are times when one or more of your guns were

17  not in working condition; correct?

18  A.   Yes.

19  Q.   In fact, there are times when one or more of your guns

20  were not in working condition for months at a time.

21  A.   Um-hmn.

22  Q.   If a gun is not in working condition, it's not available

23  for you to use; correct?

24  A.   Yes.

25  Q.   And there are times when you didn't have the proper

1   ammunition for one or more of your guns; correct?

2   A.   Yes.

3   Q.   In fact, there are times when you didn't have the proper

4   ammunition for one or more of your guns, and you had no

5   specific plans to acquire ammunition, the proper ammunition;

6   correct?

7   A.   Yes.

8   Q.   If a gun lacks the proper ammunition, it is not available

9   to be used; correct?

10  A.   Yes.

11  Q.   Different guns are also suitable for different purposes;

12  correct?

13  A.   Generally speaking, I would agree.

14  Q.   Okay.  For example, a gun that's suitable for sports

15  shooting or hunting may not be best suited for self-defense.

16  A.   By my personal definition of best suited, yeah.

17  Q.   What is your personal definition of best suited?

18  A.   The -- my personal definition would be something like, you

19  know, the best suited weapon for the environment and the

20  easiest for me to manipulate and handle for the situation.

21  Q.   Thank you.

22          Now, there's some exceptions to the Waiting-Period

23  Law that could apply to you, right?

24  A.   I'm not aware of any.

25  Q.   Well, for example, if your immediate family were to give

1  you a gun, it wouldn't be subject to the waiting period,
2  right?
3  A.  I'm not a hundred percent sure about the law, but -- I'm
4  going to say, no, because I'm not sure a hundred percent.
5  Q.  Well, your father has given you a gun; correct?
6  A.  Yes.
7  Q.  Now, when your father gave you the gun, was there a 10-day
8  waiting period before you could receive the gun?
9  A.  No, there was not.
10 Q.  You received the gun immediately; correct?
11 A.  Yes.
12 Q.  Now, if you loan a gun to someone, you also don't need to
13 wait 10 days; correct?
14 A.  Correct.
15 Q.  You can just give the gun to that person immediately?
16 A.  Um-hmn.
17 Q.  If you borrow a gun from someone, you don't need to wait
18 10 days for that; correct?
19 A.  Correct.
20 Q.  And you can just have the gun immediately?
21 A.  Correct.
22 Q.  Do you have friends who own firearms?
23 A.  A few.
24 Q.  You have loaned -- have you loaned guns to your friends?
25 A.  I have loaned one gun, yes.

Silvester - X

40

1    Q.  Have you loaned the same gun to your friends multiple

2    times?

3    A.  I don't believe so.

4    Q.  So it's your testimony that you have only loaned your

5    handgun to someone once.

6    A.  That I can remember currently, yes.

7    Q.  You were deposed in this case last year; correct?

8    A.  Yes.

9    Q.  My colleague, Jonathan Eisenberg, took the deposition,

10   right?

11   A.  Yes.

12   Q.  And your attorney Victor Otten was there?

13   A.  Yes.

14   Q.  And there was a court reporter?

15   A.  Yes.

16   Q.  And the court reporter wrote down the questions that were

17   asked and the answers that you gave?

18   A.  Yes.

19   Q.  This deposition was on May 9th, 2013?

20   A.  Yes.

21   Q.  And when you testified, you swore to tell the truth;

22   correct?

23   A.  Yes.

24   Q.  And you told the truth at the deposition?

25   A.  Yes.

Case 1:11-cv-02137-AWI-SKO   Document 85   Filed 04/10/14   Page 41 of 158

1    MR. CHANG:  Your Honor, may I approach the witness?

2    THE COURT:  Yes.

3    (Pause in the proceedings.)

4    BY MR. CHANG:

5    Q.  Now, Mr. Silvester, I'll direct your attention to the top

6    of the page, the deposition transcript I just handed you.  You

7    were asked this question, you gave this answer:

8    "Have you ever loaned your -- any of your firearms to

9    another individual where that person had the firearm for more

10   than 24 hours?

11   "Answer:  Yes.

12   "Question:  How many times have you loaned a firearm

13   to someone for 24 hours or more?

14   "Answer:  I'm unsure of the total number of times.

15   "Question:  Can you give me your best estimate,

16   please.

17   "Answer:  More than five."

18   That was the testimony you gave under oath at the

19   deposition?

20   A.  Yes.

21   Q.  What's the longest period of time you have ever loaned a

22   gun to a friend?

23   A.  I'm not sure.

24   Q.  You have loaned a gun to a friend for as long as two

25   weeks, right?

Silvester - X

42

1   A.   I believe so.

2   Q.   You have also borrowed a firearm from a friend; correct?

3   A.   Yes.

4   Q.   You have borrowed a shotgun from a friend?

5   A.   Yes.

6   Q.   You also own a shotgun; correct?

7   A.   Yes.

8   Q.   Mr. Silvester, you're not a California peace officer;

9   correct?

10  A.   Correct.

11  Q.   You don't have a federal firearms dealer license?

12  A.   Correct.

13  Q.   And you're not a California firearms dealer; correct?

14  A.   Correct.

15  Q.   And you're not the holder of a dangerous weapons permit

16  from the California Department of Justice; correct?

17  A.   Correct.

18  Q.   And you're not a federally licensed gunsmith?

19  A.   Correct.

20  Q.   And you're not the owner of a target range?

21  A.   Correct.

22  Q.   And you're not the holder of an Entertainment Firearm

23  Permit from the California Department of Justice; correct?

24  A.   Correct.

25  Q.   And you're not the holder of a certificate of eligibility

1    for a firearms consultant from the California Department of
2    Justice; correct?
3    A.   Correct.
4    Q.   Now, during your direct testimony, you mentioned that --
5    you mentioned a California firearms registry; correct?
6    A.   I don't remember what I said.
7    Q.   Did you say that your handgun is in the California
8    registry?
9    A.   My current handgun?
10   Q.   Correct.
11   A.   I don't recall what I said, but I believe that my gun is
12   in the registry, yes.
13   Q.   Okay.  Do you have any long guns?
14   A.   Yes.
15   Q.   Are you aware that the California firearm registry has
16   long guns in the database since only this year?
17   A.   Yes.
18   Q.   And unless someone volunteers to register an older long
19   gun, it's not in the registry; correct?
20   A.   Correct.
21   Q.   Now, you had -- you had talked about the Hanford Police
22   Department, before they gave you a concealed weapon permit, a
23   Concealed Carry Permit, that they required you to undergo
24   extra training; correct?
25   A.   Yes.

Silvester - RD

44

1   Q.  But you're not able to testify what any other city or

2   counties in California, what their requirements are; correct?

3   A.  Correct.

4   Q.  How long does it take for you to drive from your house to

5   the gun dealer that's closest to you?

6   A.  Currently the one, the new store that's opened in Hanford

7   takes 10 minutes max.

8   Q.  Okay.  You're aware of the Automated Firearm System, the

9   AFS?

10  A.  Aware of its existence?

11  Q.  Correct.

12  A.  Yes.

13  Q.  And are you aware that it's the AFS firearm registry that

14  only has -- that has handguns in its database since 1996?

15  A.  I don't have a specific knowledge of what it does or what

16  information it contains, no.

17          MR. CHANG:   That's all the questions I have,

18  Your Honor.

19          THE COURT:  And redirect?

20          MR. OTTEN:  Thank you, Your Honor.

21                       REDIRECT EXAMINATION

22  BY MR. OTTEN:

23  Q.  Mr. Silvester, a minute ago, you were asked a question

24  about whether or not you knew what other county or sheriffs'

25  requirement for CCW permits were, do you recall that?

Silvester - RD

1   A.  Yes.

2   Q.  Now, is it your understanding that the state mandates

3   training before anyone can get a license to carry a permit?

4   A.  If from my memory --

5           MR. EISENBERG:  Calls for speculation about what the

6   State requires or doesn't require.  He's not an expert on what

7   the State requires.

8           MR. OTTEN:  I asked if he had knowledge.

9           THE COURT:  Overruled on that basis.

10          THE WITNESS:  If I remember reading correctly in the

11  applications, the State requires a uniform four hours of

12  training.  And I was under the impression that that's a

13  statewide issue.

14  BY MR. OTTEN:

15  Q.  Okay.  Now, earlier, you also talked about some of the

16  expenses that could be incurred if you were to purchase a

17  firearm that's not in the area that you live.  Do you recall

18  that?

19  A.  Yes.

20  Q.  Talked about shipping, things like that.  Are you aware of

21  what the cost to the federal fire -- the FFL dealers is?

22  A.  No.

23  Q.  Do you have any understanding if those are increased, if

24  you buy a gun that's out of the area that you live in?

25          MR. CHANG:   Objection, Your Honor.  Leading.

1          THE COURT:  Sustained.

2     BY MR. OTTEN:

3     Q.  Can you tell us why, if -- why -- other than what you've

4     already talked about, the cost of shipping, the costs are

5     increased if you were to purchase a firearm, let's say, in

6     Los Angeles.

7     A.  I'm sorry.  I don't understand.

8          MR. OTTEN:  Okay.  May I approach, Your Honor?

9          THE COURT:  Yes.

10    BY MR. OTTEN:

11    Q.  I'll ask you to look at JT-6 again.  And that was your

12    license to carry a permit; correct?

13    A.  Yes.

14    Q.  Do you have your current license-to-carry card on you?

15    A.  Yes, I do.

16    Q.  Could you take it out for me.

17         MR. EISENBERG:  Objection, Your Honor.  We'd never

18    been presented with this document before.

19         MR. OTTEN:  I don't mind -- there's no secrets here.

20    I'm just going to point out that it's been redacted, the copy

21    that the Court has.  I think the license number we redacted

22    because it's a public record.

23         MR. EISENBERG:  Okay.

24    BY MR. OTTEN:

25    Q.  I just wanted you to tell the Court whether or not we'd

47

1    redacted any of the information that's on this exhibit from

2    what's actually on your card.

3    A.   It appears that the -- the permit number, the ORI number

4    has been redacted.

5    Q.   Anything else?

6    A.   My birth date has also been redacted.

7    Q.   Okay.  Do you know what a CII number is?

8    A.   I do.

9    Q.   I just want to make sure the record is clear on what's

10   been redacted.  Do you see where I'm pointing right there?

11   A.   Yes.

12   Q.   What's that say?

13   A.   CII number, and it's also redacted.

14   Q.   Okay, thank you.

15        And those CII numbers are on the permit that you

16   have; correct?

17   A.   Yes.

18   Q.   Are you aware of whether or not when you purchase a

19   firearm, there are federal fees associated with that?

20   A.   I believe there are state fees.  But I'm not sure about

21   federal fees.

22   Q.   Do you know whether or not the -- you know what an FFL

23   license is; correct?

24   A.   Correct.

25   Q.   So let's say you were to purchase a firearm from someone

Silvester - RD

48

1   with an FFL license in Los Angeles, okay?  Would there be a

2   fee that goes to that dealer?

3          MR. EISENBERG:  Objection.  These are hypothetical

4   questions.

5   BY MR. OTTEN:

6   Q.  If you know.

7          THE COURT:  Overruled, if you know.

8          THE WITNESS:  I'm not sure.

9          MR. OTTEN:  Okay.  Nothing further, Your Honor.

10          THE COURT:  And recross?

11          MR. CHANG:   Nothing further, Your Honor.

12          THE COURT:  All right.  Okay, Mr. Silvester, you're a

13   party in this case, so any party may stay.  They still may

14   call you back to testify.  You're still under oath, but you

15   can go ahead and step off the witness stand.

16          THE WITNESS:  Thank you.

17          MR. OTTEN:  Your Honor, we'd call Brandon Combs to

18   the stand.

19          THE COURT:  All right.

20          THE CLERK:  Raise your right hand.

21                          BRANDON COMBS,

22   called as a witness on behalf of the Plaintiffs, having been

23   first duly sworn, testified as follows:

24          THE CLERK:  Take the witness stand right up there and

25   give us your full name, please.

Combs - D

49

1      THE WITNESS:  Brandon Steven Combs.

2      THE CLERK:  Okay, go ahead and have a seat.

3                  DIRECT EXAMINATION

4  BY MR. OTTEN:

5  Q.  Good morning, Mr. Combs.

6  A.  Good morning.

7  Q.  You're a U.S. citizen?

8  A.  Yes, I am.

9  Q.  And you're obviously aware of the litigation that we filed

10 here today?

11 A.  Yes.

12 Q.  Okay.  And so do you currently own firearms?

13 A.  I do.

14 Q.  All the times from when you became a plaintiff in this

15 lawsuit to the present, have you owned firearms?

16 A.  Yes.

17 Q.  Is it your intent to own firearms, to purchase firearms in

18 the future?

19 A.  It is.

20 Q.  Are you currently employed?

21 A.  Yes, I am.

22 Q.  And who do you work for?

23 A.  I'm an independent contractor.  Combs Consulting is my

24 company.

25 Q.  Okay.  And generally what does Combs Consulting do?

Combs - D

50

1    A.   Provides management services to clients, including the

2    Calguns Foundation and Cal-FFL.

3    Q.   Okay.  So you are -- are you an employee of Calguns or an

4    independent contractor or just a consultant?

5    A.   I'm an independent contractor.

6    Q.   And what do you do for Calguns?

7    A.   A number of duties including constituent services,

8    research, various administerial tasks, fund-raising, public

9    relations.

10   Q.   About how much time do you dedicate to the organization

11   each month?

12   A.   If I had to guess, I would say 160 to 180 hours a month or

13   more.

14   Q.   And is part of what you do for Calguns is research

15   California law?

16   A.   Yes.

17   Q.   You're not an attorney; correct?

18   A.   That is correct.

19   Q.   Are you familiar with what we've been referring to as the

20   waiting-period laws?

21   A.   I am.

22   Q.   What's your understanding of what those laws say?

23   A.   My understanding is that a person such as myself cannot go

24   to a firearms retailer, purchase a firearm, and after being

25   subjected to a background check, take possession of my

Combs - D

1    property and go home.

2    Q.  So there's a certain period of time from when you purchase

3    the firearm to when you can accept delivery of it?

4    A.  That's my understanding.

5    Q.  What's your understanding of how long that is?

6    A.  Ten 24-hour periods at least.

7    Q.  Do you know which branch of the Government is in charge of

8    enforcing that wait law?

9    A.  The Attorney General through the Department of Justice.

10   Q.  Do you have an understanding of what the State of

11   California uses as the justification for the waiting period?

12   A.  My understanding is that they believe that there's a

13   cooling-off period necessary for all firearms purchases, as

14   well as a background check period.

15   Q.  And is it your understanding that that cooling-off period

16   would apply to somebody that already owns a firearm?

17   A.  My understanding is it is their contention that the

18   cooling-off period applies to all purchasers with some

19   exceptions.

20   Q.  Are you aware of -- strike that.

21            During the 10-day period, is there a background check

22   run?

23   A.  My understanding is that there is a background check run.

24   Q.  And do you know what the purposes of that background check

25   is?

1    A.  My understanding is that the State wants to prevent

2    firearms from being possessed by felons, violent

3    misdemeanants, and the mentally ill and so forth, prohibited

4    persons.

5    Q.  Do you know what a DROS application is?

6    A.  Yes, I do.

7    Q.  Can you tell the Court what that is?

8    A.  A DROS or Dealers Record of Sale application is where you

9    take your driver's license or identification card, provide it

10   to the retailer and enter your information for the purchase or

11   transfer of a firearm that's sent to the State, and that

12   initiates the background check.

13   Q.  Do you have any knowledge of what kind of a background

14   check is conducted?

15   A.  My understanding is the State conducts multiple background

16   checks through its automated systems.

17   Q.  So at some point, they'll run a name -- let's say you

18   purchased a gun.  You would fill out the DROS application;

19   correct?

20   A.  That's correct.

21   Q.  They do a background check on you; correct?

22   A.  That's correct.

23   Q.  And then make some kind of a determination of whether you

24   are prohibited or not prohibited?

25   A.  That's my understanding.

Combs - D

53

1    Q.  So once you take possession of that firearm, does the

2    State have your name in a database that associates you with

3    that firearm?

4    A.  Yes.

5    Q.  Is it your understanding that the State would say that you

6    are nonprohibited if you were a felon?  Strike that.

7            Is it your understanding that the law says that a

8    felon can't have a firearm in California?

9    A.  That is my understanding, yes.

10   Q.  And a violent misdemeanant?

11   A.  Yes.

12   Q.  Certain misdemeanors.  Do you know what a misdemeanor is?

13   You don't have to define it.

14   A.  Yes.

15   Q.  People with mental health deficiencies, certain ones.

16   A.  Correct.

17   Q.  So if the State of California releases its gun to Brandon

18   Combs, it knows that you're a nonprohibited person; correct?

19   A.  Yes.

20          MR. EISENBERG:  Objection.  Calls for speculation.

21          THE COURT:  Sustained.

22   BY MR. OTTEN:

23   Q.  Is it your understanding that when the state releases that

24   firearm to you, that it is saying that you're a nonprohibited

25   person and can have that gun?

1   A.   Yes.

2   Q.   And your name is in the database; correct?

3   A.   Yes.

4          MR. EISENBERG:   Objection.   Calls for speculation.

5          THE COURT:   Sustained.

6   BY MR. OTTEN:

7   Q.   It's your understanding?

8   A.   It's my understanding.

9   Q.   Are you aware of any exemptions to that 10-day waiting

10  period?

11  A.   I believe that there are 18 exemptions.

12  Q.   Just give us a couple examples.   We don't need them all.

13  A.   I believe the consultant evaluators are exempt, those with

14  dangerous weapons permits, entertainment industry folks that

15  are using firearms for their productions are all exempt.

16  Q.   Let's talk about any licenses that you hold with respect

17  to firearms.   Do you have any licenses?

18  A.   I do.

19  Q.   Can you tell the Court what they are.

20  A.   I currently have a number of firearms-related licenses

21  issued by the Government.   I hold a Certificate of Eligibility

22  issued by the Attorney General and the Department of Justice.

23  I also have a State of Utah carry license as well as a State

24  of Washington carry license.

25  Q.   Anything else, Curio and Relic license?

1   A.  Yes, I also have --

2          MR. EISENBERG:  Objection.  Leading the witness.

3          THE COURT:  Go ahead.

4          THE WITNESS:  Yes, I have a federal firearms license,

5   Type 3.

6   BY MR. OTTEN:

7   Q.  And can you tell the Court what that is.

8   A.  A Type 3, FFL or Federal Firearms License and a Curio and

9   Relic license issued by the federal Department of Alcohol,

10  Tobacco, and Firearms.

11  Q.  What does that permit allow you to do -- or the license?

12  A.  That's a federal license that allows me to, as a

13  collector, acquire certain firearms and dispose of certain

14  firearms.

15  Q.  Are they functional firearms?

16  A.  Yes.

17  Q.  What are the requirements to obtain that license?

18  A.  I have to complete an application and submit that to the

19  federal government, along with a fee.  My understanding is

20  that they perform a background check, and if my local sheriff,

21  the chief law enforcement officer in the county in which I

22  reside at the time of the submission of the application does

23  not object, that the license is issued, given that I pass the

24  background check.

25  Q.  Okay.  Does -- are you subject to a 10-day waiting period

1    when you purchase one of those curio and relics?

2    A.  My understanding is that there are some curio and relic

3    purchases that I would be exempt from by operation of the fact

4    that I have both an FFL-Type 3 and a Certificate of

5    Eligibility from the State of California.

6    Q.  Okay.  Are there any other curio and relics that you could

7    walk into, let's say, a gun store like Cabela's or something

8    and purchase and walk out of the store with it in California

9    on the same day?

10        MR. EISENBERG:  Objection.  Calls for speculation.

11        THE COURT:  Sustained.

12   BY MR. OTTEN:

13   Q.  I'm trying to, Mr. Combs, understand what that license

14   allows you to do and what it doesn't with respect to a 10-day

15   waiting period.  Is it your understanding of the law that you

16   are subject to that 10-day waiting period if you wanted to

17   purchase a curio or relic firearm?

18   A.  With my licenses, I am exempt from the 10-day waiting

19   period only for the purchase of curio and relic firearms.

20   Q.  Okay.  Now, for those of us that don't have a knowledge of

21   firearms like you, can you give the Court an example of what a

22   handgun would be if it was a curio or relic.  Is it a certain

23   number of years old?

24   A.  The Bureau of Alcohol --

25        MR. EISENBERG:  Objection.  Calls for speculation.

Combs - D

1          THE COURT:  Overruled.  Go ahead.

2          THE WITNESS:  The Bureau of Alcohol, Tobacco, and

3     Firearms publishes a list and maintains a list of curio and

4     relic firearms under federal law.  Any of the firearms on that

5     list would be curio and relics as well as certain very unique

6     firearms that have cultural significance or some other

7     interest that sets them apart from others.

8     BY MR. OTTEN:

9     Q.  Are there any handguns on that list that are, say, a

10    9-millimeter, .45?  I mean, I still am trying to understand

11    what -- I know what you're saying, but I want the Court to

12    understand the functionality of this.  What kind of handguns

13    are on that list?

14    A.  There's --

15          MR. EISENBERG:  Objection.  Vague and ambiguous.

16          THE COURT:  Overruled, if you understand the

17    question.

18          THE WITNESS:  There are many different types of

19    firearms and handguns on the list of curio and relic,

20    including things like old cowboy single-action guns, Colt 1911

21    platform firearms where the history goes back to the early

22    1900's.  A number of firearms along those lines.

23    BY MR. OTTEN:

24    Q.  So let's talk about that Colt 1911.  It can kill somebody,

25    correct, if it was functioning and you purchased one that was

1    functioning?

2            MR. EISENBERG:  Objection.  Calls for speculation.

3            THE COURT:  Overruled.

4            THE WITNESS:  Yes.

5    BY MR. OTTEN:

6    Q.   And that particular firearm would be just as lethal as one

7    that wasn't on the list, let's say, a modern 911.

8    A.   Yes.

9    Q.   And a 911, it's not -- it's a type of firearm.  Could you

10   explain to the Court what that is.  1911.

11   A.   A 1911 platform firearm is a Colt.  It's a Colt product

12   that John Moses Browning designed that was adopted by the

13   United States military in the early 1900's and 1911, and had

14   service all the way up until the present.  1911 platform

15   firearms are one of the most common firearms in terms of

16   handguns that are available.  They're in common use for lawful

17   purposes.

18   Q.   What are some modern versions of that platform?

19           MR. EISENBERG:  I want to object that this is sort of

20   an expert line of questioning that seems to have no point.

21   He's not a designated expert on firearms.

22           THE COURT:  Proffer?

23           MR. OTTEN:  Sure, Your Honor.  The point that we're

24   going to make here is that a 911 platform that might be a

25   relic is just as lethal as a modern version of that, and

1    that's not on the list.  So --

2              MR. KILMER:  And also, Your Honor, the witness has

3    testified that he has a license, and, therefore, he has the

4    sufficient knowledge to offer a lay opinion on this.

5              MR. EISENBERG:  May we respond, Your Honor?

6              THE COURT:  Yes.

7              MR. EISENBERG:  I just don't think that that's

8    something that he can have a lay opinion about unless he's

9    been shooting and killing people with both kinds of firearms.

10   I think this is an improper expert testimony.

11             THE COURT:  Well --

12             MR. KILMER:  May I address that?

13             THE COURT:  Sure.

14             MR. KILMER:  I think that every safety rule that

15   exists is that all firearms are lethal.  So we're prepared to

16   stipulate that all firearms are lethal.  But the point of this

17   line of questioning is that there are some curio and relics

18   that don't require a background check, and there are some

19   modern guns that do, and it seems to be an arbitrary

20   distinction.

21             THE COURT:  Anything else?  I'll overrule the

22   objection.  Go ahead.

23   BY MR. OTTEN:

24   Q.  Do you remember the question, Mr. Combs?  What a modern --

25   you talked about the 911 platform.  What would be a modern

1    version of that?

2    A.  Well, the modern 1911 could -- and are made by many

3    different manufacturers including Colt, one of the original

4    suppliers.  Smith & Wesson, Sig Sauer, Wilson Combat,

5    Springfield Armory.  There are multitudes of nuanced

6    variations on the core platform of the 1911.

7    Q.  And those modern versions are not on the list that you

8    talked about earlier; correct?

9    A.  That's correct.

10   Q.  So if you were to walk into Cabela's today and purchase

11   one of those modern rifles or handguns, would you be subject

12   to the 10-day waiting period?

13   A.  Yes, I would be.

14   Q.  Okay.  Lets talk about your COE.  Can you tell the Court

15   what that is first.

16   A.  A Certificate of Eligibility is issued by the Attorney

17   General, through the Department of Justice after one

18   successfully completes a background check and pays appropriate

19   fees.  The first time application required me to submit a live

20   scan fingerprint to the Department of Justice.

21   Q.  Other than the live scan fingerprint, is there any other

22   requirements to have that COE?

23   A.  The submission of a completed application and then the

24   fees, and then to keep it current, I have to pay $22 per year

25   to the State of California.

1  Q.  How long does it take you to get the COE permit?

2  A.  To the best of my recollection, I submitted my initial

3  application and live scan in December of 2010.  And to the

4  best of my recollection, I was issued the Certificate of

5  Eligibility in February of 2011.  So about two-and-a-half

6  months.

7  Q.  And it's good for a year?

8  A.  Yes.

9  Q.  And if you want to renew it, say, next year, what would

10  you do?

11  A.  Prior to the expiration of the license, I would submit the

12  payment of renewal fees to the Department of Justice.

13  Q.  Any other requirements on your end other than to paying

14  the fee?

15  A.  I would enclose the fee in an envelope and mail it to the

16  Department of Justice, along with their renewal form.

17  Q.  Do you have to sign any form that you send in with that

18  check?

19  A.  As I recall, yes, the renewal form I would sign and

20  basically say that I am intending to renew the license -- or

21  the certificate, rather.  And that the data that I provide is

22  accurate.

23       MR. OTTEN:  Your Honor, can I approach the witness to

24  go over some exhibits?

25       THE COURT:  Yes.

Combs - D

1    BY MR. OTTEN:

2    Q.   Now, Mr. Combs, we have a few exhibits.  I want you to

3    start and have you take a look at what's been marked as JT-1.

4    Just take a look at it and tell us if you recognize what that

5    is.

6    A.   I do recognize that, yes.

7    Q.   And what is it?

8    A.   It is a report that was sent to me, what appears to be a

9    partially redacted copy of a report that was sent to me by the

10   Department of Justice in response to a request for information

11   about my registered firearms.

12   Q.   Is there a date on there?

13   A.   I don't see a date on the form, no.

14   Q.   Do you recall roughly when that was sent to you, what

15   year?

16   A.   I believe that report was sent to me in 2011.

17   Q.   And what -- the purpose was to see which firearms the

18   State of California knew that you owned?

19   A.   That's correct.

20   Q.   Okay.  Let me have you take a look at what's been marked

21   as JT-2.  Do you recognize that document?

22   A.   I do.

23   Q.   And can you tell the Court what it is?

24   A.   This is the cover letter that was sent with the report,

25   the AFS or automated firearms system report that was discussed

1    as JT-1.

2    Q.   And is that letter dated?

3    A.   This letter is dated.

4    Q.   What's the date of that letter?

5    A.   July 6, 2011.

6    Q.   So when we are talking about the document right before

7    that that showed which firearms you had, that would be around

8    the time that they ran the check?

9    A.   That's correct.

10   Q.   Okay.  Let me have you take a look at what's been marked

11   as JT-3.  Can you tell the Court what that is?

12   A.   JT-3 is a copy of my federal firearms license.

13   Q.   And is -- that's the Type 3 that you were talking about

14   earlier?

15   A.   That's correct.

16   Q.   The curio and relic license?

17   A.   Yes.

18   Q.   And how many pages to that exhibit?

19   A.   32 pages.

20   Q.   Okay.  And the front page is?

21   A.   The front page appears to be the back page of the actual

22   document that was sent to me.

23   Q.   So the actual front page, you think, is the second

24   document in this exhibit?

25   A.   That's my understanding.

Combs - D

64

1    Q.   Okay.  Okay, can I have you take a look at JT-4.  Can you

2    tell the Court what that is?

3    A.   JT-4 is my certificate of eligibility, a confirmation

4    notice from the Attorney General and the Department of Justice

5    to me.

6    Q.   Is it a letter?

7    A.   Yes, it is.

8    Q.   Okay.  And then there's a second page.  Is that the actual

9    certificate?

10   A.   Yes, the second page is my certificate of eligibility.

11   Q.   Okay.  So we talked about your Type 3 federal license,

12   your certificate of eligibility, and you mentioned a third

13   license?  I think Utah -- I thought you mentioned three.  But

14   if you didn't, you didn't.

15   A.   Well, I did mention both a State of Utah carry license as

16   well as the State of Washington carry license.

17   Q.   Okay, and I just want to make sure, does the COE require a

18   live scan fingerprint?

19   A.   Yes, it did.  And the certificate that was returned to me

20   basically says that I'm eligible to purchase and possess

21   firearms.  That I'm not a prohibited person.

22   Q.   In other words, you're a law-abiding citizen?

23   A.   Yes.

24            MR. EISENBERG:  Objection.  Calls for speculation.

25            THE COURT:  Sustained.

1    BY MR. OTTEN:

2    Q.   Do you consider yourself a law-abiding citizen?

3    A.   Yes, I do.

4    Q.   Now, on an individual level, or with the work you've done

5    for Calguns, are you aware of any hardships imposed by the

6    10-day waiting period?

7    A.   Yes, I am aware.

8    Q.   Let's talk about financial hardships.  Are you aware of

9    any financial hardships associated with the waiting period?

10   A.   Yes, both on a personal basis as well as those hardships

11   shared with me by others.

12   Q.   Why don't we talk about on a personal basis.  Can you give

13   the Court an example of a hardship that you've suffered?

14   A.   One recent example is on December 31st of 2013, I

15   purchased three firearm receivers from PRK Arms in Fresno,

16   California.  Unfortunately the time period for me to go and

17   pick up the firearms after the 10-day waiting period, but

18   before the 30-day expiration of the period of validity for the

19   DROS transaction, my schedule was conflicted out of the

20   windows in which I could take possession of those firearms.

21   And so because of my scheduling conflicts, I was not able to

22   take possession of the firearms, which means that I have to

23   re-DROS, or basically start from scratch, submit new fees to

24   the dealer to be submitted to the state.  So there's --

25   there's another two trips to the dealer that I'm going to have

Combs - D

1   to make, plus the payment of DROS fees for each receiver.

2   Q.  So personal or work obligations kept you from being able

3   to come back and get -- pick up the firearm within 30 days.

4   Is that what you're saying?

5   A.  Yes.

6   Q.  And that could have been avoided if you didn't have to

7   have a 10-day waiting period.  Is that your point?

8   A.  If I was not subjected to the 10-day waiting period for

9   these modern receivers, then, yes, I would have just taken

10  possession of the property that I owned and went home with it.

11  Q.  Now, you mentioned that you -- you're aware of a hardship

12  on a personal level, and then I think you mentioned the

13  hardship of a nonpersonal level, another member of the public;

14  is that correct?

15  A.  Yes.

16  Q.  Can you tell the Court about that particular hardship that

17  you are aware of?

18          MR. EISENBERG:  Objection, and I believe this line of

19  questioning is going to call for hearsay, and it's also

20  calling for a narrative.

21          MR. OTTEN:  Well, Your Honor, we can't speculate as

22  to what's hearsay before we hear it, so --

23          THE COURT:  All right.  Okay, I'll overrule the

24  objection subject to a motion to strike.

25  BY MR. OTTEN:

Combs - D

1   Q.  So we're asking what you're aware of with respect to a

2   hardship of somebody else.

3   A.   Sure.  With this issue, particularly in discussing the

4   hardships that the people face, law-abiding Californians face

5   under the 10-day waiting period of the law, in my travels for

6   Calguns and for my efforts as a volunteer all across the

7   state, many, many Californians have expressed to me that the

8   10-day waiting period imposes financial hardships.  They have

9   to take time off of work.

10          I remember one conversation in particular while I was

11  in Los Angeles recently, Mr. Howard Wilner and I were having a

12  conversation about the fact that he is a collector.  He's a

13  licensed collector, very, very similarly situated to me.  He

14  has a Certificate of Eligibility and a FFL-Type 3.  And he was

15  expressing to me that -- the exact same concerns that I have

16  expressed with respect to the second trip, the time delays,

17  the taking time off of work, the expense of fuel and going to

18  and from a firearms retailer twice.  Plus, as a collector,

19  both of us have interests in unique -- you know, some unique

20  interests, and so because we're effectively prohibited from

21  exercising that aspect of the right, you know, there's real

22  damage to our Second Amendment rights and our level of

23  expression that we can participate in the Second Amendment

24  activity.

25          MR. EISENBERG:  Excuse me.  Let me make my objection.

1   I move to strike the entire line of questioning that's riddled

2   with hearsay and speculation.  The witness could have been --

3   the person who's named as the person who allegedly made these

4   statements is not on the witness list.  So I move to strike

5   the entire answer.

6         THE COURT:  All right.  Plaintiff's response?

7         MR. KILMER:  Your Honor, we have two entity

8   plaintiffs in this case.  The Second Amendment Foundation, the

9   Calguns Foundation.  Mr. Combs has previously testified that

10   he works with the Calguns Foundation and part of associational

11   and representational standing that these organizations can

12   assert the rights to their members and their associates.

13         MR. EISENBERG:  May I be heard?

14         THE COURT:  Sure.

15         MR. EISENBERG:  Mr. Combs is an individual plaintiff.

16   He's not testifying for the Calguns Foundation.  And even if

17   he were, he cannot testify to hearsay.

18         MR. KILMER:  Submit it, Your Honor.  Thank you.

19         THE COURT:  Yeah, I'm not aware that even if he were

20   representing an organization, that statements by others would

21   fall under some exception to the hearsay rule or exclusion

22   from the hearsay rule, so at this point in time, I'll go ahead

23   and sustain the objection, grant the motion to strike.  If

24   there's further consideration that I'm not aware of, the

25   parties can bring it up, and I'll reconsider that.

1   BY MR. OTTEN:

2   Q.  Mr. Combs, was Calguns involved with an individual in San

3   Francisco who was seeking assistance with respect to the

4   10-day waiting period?

5            MR. EISENBERG:  Objection.  Leading question.

6            THE COURT:  Overruled.

7            THE WITNESS:  I'm not sure that I understand the

8   question.

9   BY MR. OTTEN:

10  Q.  Has Calguns ever been involved with the Pink Pistols?

11  A.  Yes.

12  Q.  And is there an individual in the Pink Pistols that

13  Calguns has been aware -- that Calguns has known about a

14  hardship with respect to the 10-day waiting period?

15           MR. EISENBERG:  Objection.  This line of question is

16  also calling for hearsay.

17           THE COURT:  Plaintiff response?

18           MR. OTTEN:  Your Honor, he hasn't said any hearsay

19  yet.  I guess it would be what his response would be.  But if

20  he works for Calguns, and they were approached by a member of

21  the Pink Pistols in San Francisco who is having problems

22  obtaining a firearm, he certainly has knowledge of that, and

23  that's not hearsay.  We're not looking at statements from a

24  particular person.  We're looking at what Calguns' involvement

25  with that individual.

1      THE COURT:  Let me do this:  Go ahead and elicit the

2  answers.  It may well be very similar to the prior one, but at

3  least you can make a record on that.  If it turns out that

4  there is an exception or exclusion on the hearsay rule, then I

5  can go ahead and take that under consideration on a motion for

6  reconsideration.  But go ahead.

7  BY MR. OTTEN:

8  Q.  So, Mr. Combs, was Calguns involved with an individual in

9  San Francisco who is a member of the Pink Pistols?

10  A.  Yes.

11  Q.  What was Calguns' involvement?

12  A.  I've had a number of conversations with a gentleman named

13  Tom Boyer who was the former president of the Pink Pistols.

14  Q.  And where does Mr. Boyer live?

15  A.  In the City of San Francisco.

16  Q.  And are you aware of Mr. Boyer having any hardships

17  imposed by this 10-day waiting period?

18  A.  I've been in conversation with Mr. Boyer on a number of

19  occasions, yes.

20  Q.  What were the problems that he had?

21      MR. EISENBERG:  Objection.  Again, I need to object.

22  That question clearly calls for hearsay.

23      THE COURT:  All right.  What I'll do is, it will be a

24  running objection to the entire line of questioning regarding

25  this individual, subject to a motion to strike.

1          MR. EISENBERG:  Your Honor, point of clarification.

2     Should I make my motion to strike now or wait until the

3     testimony has finished?

4          THE COURT:  Wait until it's finished.

5          MR. EISENBERG:  Thank you.

6     BY MR. OTTEN:

7     Q.  So Mr. Boyer lives in San Francisco.  What is the hardship

8     that you became aware of with respect to the 10-day waiting

9     period that Mr. Boyer experienced?

10    A.  What was represented to me was that because he is very low

11    income, he is a very outspoken HIV positive low income gay

12    male living in San Francisco that lives in public housing.

13    Effectively sort of at the bottom of the socioeconomic strata

14    in the city, that because, you know, he has to make the second

15    trip to the firearms dealer in spite of the fact that he is a

16    gun owner known to the State and an instructor, certified

17    instructor, and in spite of all of those conditions, that he

18    was still forced to go and make that second trip and incur the

19    expense of -- and, frankly, I think that -- that his -- the

20    gist of what he was representing was just simply that the

21    second trip really made it impossible for him to exercise his

22    rights in the way that he would like to.

23    Q.  Was Calguns able to do anything to help him?

24    A.  I would say that this case represents one of the efforts

25    to remedy the issue of Mr. Boyer's hardship.

1   Q. So is it fair to say that the 10-day waiting period

2 imposes a special hardship on poor people of the state?

3         MR. EISENBERG: Objection. Calls for speculation.

4         THE COURT: Sustained.

5 BY MR. OTTEN:

6   Q. Okay. Let's move on from financial hardships real

7 quickly. Are there any hardships imposed on you by the 10-day

8 waiting period with respect to the right to defend yourself?

9         MR. EISENBERG: Your Honor, may I interpose? I think

10 he's moving on, and I'd like to make a motion to strike that I

11 mentioned before.

12         THE COURT: Yes.

13         MR. EISENBERG: I move to strike the entire testimony

14 of financial hardships based on what a man in San Francisco

15 allegedly told Mr. Combs and all of the related testimony

16 about his financial condition and whether he has HIV. All are

17 irrelevant, prejudicial, and hearsay.

18         THE COURT: Anything further on behalf of plaintiff?

19         MR. KILMER: My understanding, Your Honor, is that

20 the objection is solely limited to Mr. Combs' testimony about

21 Mr. Boyer, but not of his own personal financial hardships.

22         THE COURT: Yes. All right, I'll go ahead and

23 sustain the objection, grant the motion to strike as to

24 testimony regarding conversation with Mr. Boyer.

25         MR. EISENBERG: Your Honor, may I also ask for

1   allusions to other conversation that he's claimed to have had

2   traveling around on behalf of Calguns?

3          THE COURT:  Well, he can testify from his own

4   personal knowledge he traveled on behalf of Calguns.  Any

5   conversations that he had may be subject to objection on

6   hearsay grounds.  But what he personally did is not

7   objectionable on hearsay grounds.

8          MR. EISENBERG:  Your Honor, that's correct, and I'm

9   sorry that I did not make my point clear.  It's any

10  conversations with others that he's recounting.  That should

11  be stricken from the record.

12         THE COURT:  Right.  And the only one that I'm dealing

13  with and the only one he referred specifically is to Mr. Boyer

14  and that line -- that set of answers is stricken.

15         MR. EISENBERG:  Thank you, Your Honor.

16  BY MR. OTTEN:

17  Q.  So, Mr. Combs, just to clarify what -- discussion that the

18  Court just had with the litigants' attorneys, as employee or

19  contract of Calguns, you travel up and down the state;

20  correct?

21  A.  Yes, I do.

22  Q.  And you have become aware of individuals who have specific

23  hardships because of the 10-day waiting period; correct?

24         MR. EISENBERG:  Objection.  Calls for hearsay.

25         THE COURT:  Sustained.

1    BY MR. OTTEN:

2    Q.   Let's talk about self-defense.  You testified a little

3    while ago that you own firearms; correct?

4    A.   Yes.

5    Q.   Has the 10-day waiting period imposed upon you a hardship

6    with respect to your right to bear arms and defend yourself?

7    A.   Yes.

8    Q.   How so?

9    A.   I believe that the 10-day waiting period prohibits me from

10   exercising my Second Amendment right to take possession of

11   constitutionally-protected firearms that are in common use for

12   lawful purposes, many different lawful purposes mainly

13   centering around self-defense.

14   Q.   Can you give us an example of a specific burden --

15   sorry -- an example of how that waiting period has interfered

16   with your right to defend yourself.

17   A.   Well, again, the recent examples that I testified to

18   earlier with respect to the three firearms that I purchased in

19   December of 2013, but for the 10-day waiting period, I would

20   have taken possession of those, and those would have been

21   firearms that I could use for self-defense.  Many other

22   circumstances presented over the years in my course of being a

23   law-abiding gun owner, a certified law-abiding gun owner,

24   that, you know, but for the 10-day waiting period, I would

25   have purchased the firearm on the spot, submitted myself to a

background check and walked out with my personal property.

        MR. EISENBERG:  Objection.  This is a cumulative presentation of evidence.

        THE COURT:  Overruled.

        MR. OTTEN:  That's all I have for now, Your Honor.

        THE COURT:  All right.  Cross-examination.

        MR. EISENBERG:  Pardon me, Your Honor?

        THE COURT:  Cross-examination.

                    CROSS-EXAMINATION

BY MR. EISENBERG:

Q.  Good morning, Mr. Combs.  You know, you've met me before. I'll just remind you that I'm Jonathan Eisenberg, Deputy Attorney General, one of the attorneys for defendant Kamala D. Harris, the State Attorney General in this lawsuit.

        You heard the testimony of Mr. Silvester, that he is married; correct?

A.  Yes, I did.

Q.  You're divorced, aren't you?

A.  Yes.

Q.  You heard the testimony that Mr. Silvester has children, right?

A.  Yes.

Q.  You have no children; correct?

A.  That is correct.

Q.  You testified that you've been a consultant of the Calguns

1    Foundation; correct?

2    A.   I testified that I was an independent contractor for the

3    Calguns Foundation.

4    Q.   Don't you have the title "Executive Director" of the

5    Calguns Foundation?

6    A.   I do.

7    Q.   And you've had that title since August of 2012; correct?

8    A.   Yes.

9    Q.   So you've been getting paid to work for Calguns Foundation

10   since August of 2012; correct?

11   A.   Yes.

12   Q.   And this lawsuit's been on file since August of 2012.

13   A.   Yes.

14   Q.   What percentage of your overall income is derived from

15   your work for the Calguns Foundation?

16   A.   I don't believe that there is a consistent value for that.

17   As a general matter, I would say about two-thirds.

18   Q.   You've also been a staff member for The Second Amendment

19   Foundation, one of the other co-plaintiffs here; correct?

20   A.   Yes.

21   Q.   And you worked for The Second Amendment Foundation from

22   approximately October of 2012 to approximately April 2013;

23   correct?

24   A.   That's correct.

25   Q.   And you were paid to work for The Second Amendment

Combs - X

1    Foundation too; correct?

2    A.   That's correct.

3    Q.   I believe that you said that you billed The Second

4    Amendment Foundation at the rate of about $2,750 a month for

5    one-third time; correct?

6    A.   That sounds accurate.

7    Q.   You were involved in preparing interrogatory responses

8    with this case; correct?

9    A.   I was prepared only to the extent that I answered the

10   interrogatory answers for me.

11   Q.   And the work that you did preparing for the interrogatory

12   responses was in early 2013; correct?

13   A.   That sounds correct.

14   Q.   And you were working for pay for both the Calguns

15   Foundation and the Second Amendment Foundation at that time

16   when you prepared the interrogatory responses; correct?

17   A.   I'm not sure that I understand your question as it relates

18   to "prepare."

19   Q.   Okay.  You testified that you prepared interrogatory

20   responses; correct?

21   A.   I testified that I answered interrogatory questions.

22   Q.   Okay.  Let me rephrase using the word "answered."  You

23   were working for pay for both the Calguns Foundation and The

24   Second Amendment Foundation when you answered your

25   interrogatory responses; correct?

1    A.   Yes.

2    Q.   You're a California resident, Mr. Combs?

3    A.   Yes.

4    Q.   Born in California?

5    A.   Yes.

6    Q.   Would you consider yourself to be a lifelong California

7    resident?

8    A.   Yes.

9    Q.   In the last 10 years, have you lived continuously in

10   California, or have you lived out of state for any time?

11   A.   I domiciled in California for my entire life.

12   Q.   It's been stipulated that you own firearms and have owned

13   them at all times relevant to this lawsuit; correct?

14   A.   Yes.

15   Q.   The first time you owned a firearm was when you were about

16   25 years old; correct?

17   A.   Yes.

18   Q.   And are you about 29 or 30 years old now?

19   A.   I'm 30.

20   Q.   You recall that I deposed you in May of 2013?

21   A.   Yes.

22   Q.   I asked you to give me your best estimate of the number of

23   firearms that you've owned or co-owned over the course of your

24   life.

25   A.   Yes.

Combs - X

1    Q.   Do you remember the answer that you gave?

2    A.   I don't recall specifically.

3    Q.   You said as many as 50 firearms.

4    A.   That sounds accurate.

5    Q.   So that means that you acquired all 50 of those firearms

6    since you turned 25 about five years ago; correct?

7    A.   That would stand to reason.

8    Q.   And the Waiting-Period Law was in effect while you were

9    acquiring 50 firearms in a five-year period; correct?

10   A.   Yes.

11   Q.   You contend that you've been unable to purchase a number

12   of firearms, you couldn't even give me a count, because of the

13   Waiting-Period Law; is that correct?

14   A.   Yes.

15   Q.   Haven't you gone to many gun stores when you really didn't

16   have a specific intent to purchase a firearm, and what you

17   were really doing was window-shopping?

18   A.   I believe that I've gone to many gun stores with the

19   intent of looking through inventory with the intent to

20   purchase if I find something that's suitable for my needs.

21        MR. EISENBERG: I'd like to go over some of your

22   deposition testimony with you.  I've got two copies of the

23   deposition transcript.  I'd like to approach the witness,

24   Your Honor.

25        THE COURT:  Yes.

Combs - X

1        MR. EISENBERG:  And hand him one of the copies.

2   BY MR. EISENBERG:

3   Q.  Have you seen the deposition transcript for your

4   deposition before?

5   A.  Yes.

6   Q.  Does this look like -- does the document that I've handed

7   you look like the transcript?

8   A.  Yes.

9   Q.  What I'm trying to get at are questions that I think

10  there's a need for a lead-up to so, I intend to read the

11  transcript and then ask you the question.  And if I misstate

12  something, I'm happy to have somebody say I said a word wrong.

13  I'm going to try to read it accurately.  Okay?  So I'm going

14  to read you the transcript up to a point and then move on to

15  the question.

16          Starting at line 9, page 88.

17          I asked you:  "Okay, let's, have you" -- I'm sorry,

18  "have you ever gone to a firearms retailer or brick and mortar

19  store intending to buy a firearm and then not bought a firearm

20  because of the 10-day waiting period?"

21          You answered:  "Yes."

22          Do you see that?

23  A.  Yes, I do.

24  Q.  "What retailers have you entered with the purpose -- with

25  that purpose and being unable to complete the transaction?"

Combs - X

1          I don't want to read the whole thing, but you gave a

2     long list of retailers.  Do you see right there starting on

3     line 16?

4     A.  I do see that.

5          Next question:  "On any of those occasions, did you

6     go to the store not knowing about the 10-day waiting period?

7          And you answered:  "Actually at the beginning,

8     Irvington Arms, I think I -- actually predates my

9     understanding of that."

10         "Question:  But the other places that you went to the

11    stores -- but the other places you went to the stores knowing

12    about the 10-day waiting period, yes?"

13         And you answered, "yes."

14         That testimony is accurate?

15    A.  Yes.

16    Q.  "Question:  So why did you go to the stores if you thought

17    the 10-day waiting period was going to be a bar to your

18    purchasing?"

19         Will you read the answer at page 89, line 8.

20    A.  "Because window-shopping is still nice to do, even though

21    you know you can't."

22    Q.  So you were going to these stores knowing about the

23    waiting period, just to window-shop, weren't you?

24    A.  No.

25    Q.  Let me move on to line 15, page 89.

1        "So for those retailers that you went to, you knew in
2   advance you probably weren't really going to buy; correct?"
3        Your answer:  "No."
4        That's correct?
5   A.   Yes.
6   Q.   "You thought that you were going to buy?"
7        How did you answer?  It's on line 20.
8   A.   My answer was, "I had no specific intent."
9   BY MR. EISENBERG:
10  Q.   "Question:  You had no specific intent to do what?"
11       And your answer?
12  A.   "To make an acquisition."
13  Q.   All right, let's continue on from that point.  My next
14  question:  "You had no specific intent to make an acquisition
15  when you visited those firearm retailers?"
16       You answered:  "Many times I did.  Sometimes I
17  didn't."
18       Do you see that?
19  A.   I do see that.
20  Q.   Was that accurate?
21  A.   Yes.
22  Q.   Moving on to page 90.
23       "What is the best estimate of the times you did and
24  the percentage of times that you didn't?"
25       Would you read your answer, line 3, page 90.

1  A.  "75 percent of the time, I would have liked to have made a
2  purchase.  How about that?"
3  Q.  Then I ask you, "On those occasions was it a 10-day
4  waiting period that stopped you?"
5       Your answer:  "In many cases, yes."
6       Do you see that?
7  A.  Yes.
8  Q.  8.  Line 8:  "Was it the only thing that stopped you?"
9       What did you answer on line 9?
10 A.  "As a general matter, yes."
11 Q.  Number 10.  "Finances didn't stop you?"
12      Your answer, line 11, what did you say?
13 A.  "Sometimes."
14 Q.  "What percentage of times was finances an issue?"
15      Your answer, line 14.
16 A.  Should I go ahead and say it?
17 Q.  You can, please.
18 A.  "25 percent."
19 Q.  Then I say, "I say -- I see your point.  25 percent" --
20 pardon me.  I'm reading the answer.
21      My next question:  "Out of the 75 or out of the
22 total?"
23      Your answer:  "I say -- I see your point.  25 percent
24 out of the 20" -- "out of the 75 percent.  How about that?"
25      Do you see that?

1  A.  I do.

2  Q.  What's 25 percent of 75 percent?

3  A.  25 percent of 75 percent.

4  Q.  Right.  Can you express that as a fraction?

5  A.  25 divided by 75.

6  Q.  Isn't that really 33.3 percent?

7  A.  That could be true.

8  Q.  We mentioned a moment ago that you gave interrogatory

9  responses.  Do you recall?

10  A.  Yes.

11  Q.  And you gave interrogatory responses under oath?

12  A.  Yes.

13  Q.  And you verified the interrogatory responses.

14  A.  Yes.

15  Q.  In the responses that you -- you claim that you incurred

16  $1,500 lifetime in extra expenses caused by the Waiting-Period

17  Law; correct?

18  A.  Yes.

19  Q.  And you purchased 50 or more firearms in your lifetime?

20  A.  That sounds accurate.

21  Q.  All under the waiting period?

22  A.  Yes.

23  Q.  What's 1500 divided by 50?

24  A.  Give me a moment, please.

25  Q.  I can suggest an answer for you.  It's $30.  Correct?

1    A.  That sounds reasonably accurate.

2    Q.  So your extra expenses were $30 per firearm; correct?

3    A.  That's the math you represented to me, yes.

4    Q.  But you didn't even say it was only 50 firearms you

5    bought.  You said it might have been a little bit more, a

6    little bit less.

7    A.  I'm not sure what you're referring to in that.

8    Q.  Never mind.  I'll strike the question.

9        You also testified in your deposition that you didn't

10   consult any records in coming up with your figures of $1,500,

11   did you?

12   A.  I don't recall saying that.

13   Q.  Did you actually try to come up with that number, $1,500?

14   A.  Yes.  I performed some basic calculations based on miles

15   traveled, et cetera.

16   Q.  And you believe that you were giving accurate information

17   there?

18   A.  I believed that it was very reasonably accurate.

19   Q.  I'd like to move on to another line of questions.

20       You perceive a need for self-defense every day of

21   your life; correct?

22   A.  Can you ask the question one more time?

23   Q.  All right, let 's move to the deposition, please, other

24   than reasking.  Page 100.  I'm going to read you some of the

25   background question to what I'm getting at, going down the

1  page.  I know it's a little bit cumbersome, but I think it is

2  necessary to set up the question.

3          Line 5.  "Has there been a time when you believed

4  your person, you, were threatened, physically, and you were

5  unable to defend yourself?"

6          All right, and you answered, "When you say threatened

7  physically, do you mean actually having some sort of tangible,

8  physical encounter?"

9          I ask, "Let's say you thought you could be injured

10  physically but it hadn't happened yet."

11          You answered "sure."

12          "Question:  And you were unable to defend yourself?

13  How many times has that happened?

14          "Answer:  A number of times.

15          "Question:  How many is the number?"

16          And then your answer was, "Well, generally speaking,

17  those instances can occur every day, right."

18          My question:  "Have they occurred every day in your

19  life?"

20          You answered -- can you read what you wrote on --

21  starting line 21.

22  A.  "If you're asking me, I will perceive a need for

23  self-defense, it would be every day."

24  Q.  So isn't it the case that you perceived a need for

25  self-defense every day?

1   A.  Yes.

2   Q.  You also believe that if you had a hundred working

3   handguns with enough ammunition to use all of them in your

4   home, there might be circumstances where you couldn't defend

5   yourself in your home; correct?

6   A.  Yes.

7   Q.  So you've had a, quote, pretty pervasive, unquote, belief

8   during your life that you don't have adequate weapons with

9   which to defend yourself, don't you?

10  A.  I'm not sure which quote you're referring to.

11  Q.  Well, I'm not referring -- well, take that back.  You're

12  absolutely right.  Let's move to page 151 of the transcript.

13  The question at line 18, "How long has this situation

14  persisted where you've been with inadequate weapons to defend

15  yourself?"

16          Would you read your answer at line 21.

17  A.  "I suppose it's been pretty pervasive."

18  Q.  "Question:  During your life?"

19          "Answer:  Yeah."

20  BY MR. EISENBERG:

21  Q.  So you have had a pretty pervasive belief during your life

22  that you don't have adequate weapons with which to defend

23  yourself, don't you?

24  A.  Yes.

25  Q.  And you try to remedy that situation by continually

1   acquiring more firearms, don't you?

2   A.  I believe that that is the exercise of the Second

3   Amendment rights that I'm entitled to for my self-defense,

4   yes.

5           MR. EISENBERG:  Move to strike the answer as

6   nonresponsive.

7           THE COURT:  Overruled.

8   BY MR. EISENBERG:

9   Q.  You don't know whether you'll ever be able to remedy the

10  situation of believing that your firearm collection is

11  inadequate, do you?

12  A.  I'm sorry.  I don't understand the question.  Can you

13  rephrase it.

14  Q.  Let's move to page 152, 1 through 5.  I asked you, "Do you

15  think it's possible that you can actually remedy the

16  situation, or do you believe that you always feel your

17  firearm -- your firearm collection would be inadequate in at

18  least some circumstances?"  Your answer.

19  A.  I answered, "I don't know."

20  Q.  "Have you thought about that question before?"  Your

21  answer.

22  A.  "Not really, no."

23  Q.  Have you thought about that question since the deposition?

24  A.  Some.

25  Q.  Is your answer still "I don't know," or has it changed?

1   A.   I don't think my answer has changed.

2   Q.   You used to live in Madera; correct?

3   A.   Yes.

4   Q.   From your old house -- and you don't live there anymore;

5   correct?

6   A.   That's correct.

7   Q.   From your old house in Madera, there was a firearm dealer

8   that was about 30 to 40 minutes away by car; correct?

9   A.   I'm sure that's true.

10   Q.   I'm going to move on to questions about the exemptions to

11   the Waiting-Period Law.

12          You are not a California police officer; correct?

13   A.   Correct.

14   Q.   You're not a retired California police officer?

15   A.   I'm not.

16   Q.   You don't have a federal firearms dealer license; correct?

17   A.   Correct.

18   Q.   You're not a California firearms dealer, are you?

19   A.   I am not.

20   Q.   You're not the holder of a dangerous weapons permit from

21   the California Department of Justice?

22   A.   I'm not.

23   Q.   You're not a federally licensed gunsmith?

24   A.   I'm not.

25   Q.   Do you own a target range?

1    A.  I do not.

2    Q.  Are you the holder of an Entertainment Firearm Permit from

3    the California Department of Justice?

4    A.  I'm not.

5    Q.  Are you the holder of a certificate eligibility to be a

6    firearms consultant by the California Department of Justice?

7    A.  No, I do not.

8    Q.  I want to ask you about the 1911 gun.  How easy is it to

9    get a 1911 gun from 1911?

10   A.  Define "how easy."  What are you asking?

11   Q.  Have you ever purchased a 1911 gun that was made in 1911,

12   like an original issue.

13   A.  I have not.

14   Q.  Have you tried to?

15   A.  I have looked at different auction sites and things like

16   that for old 1911's.

17   Q.  Have you ever just walked into one of the gun dealers that

18   you've walked into expecting to find a 1911, vintage 1911 gun?

19   A.  A couple of stores, I think, that presented a high

20   likelihood of encountering at least an old curio and relic

21   1911.  As far as the specific year, I think it's difficult to

22   ascertain.

23   Q.  Is it any easier to find the modern versions of those

24   guns?

25   A.  Yes, and that's why I want to be able to purchase them and

1   walk out of the store with them.

2   Q.   Aren't relic guns almost by definition rare?

3   A.   Not necessarily.  In fact, there are millions and millions

4   of curio and relic firearms that are functionally equivalent

5   to modern firearms that I would have had access to with my

6   licenses.

7   Q.   And they're all located in California, all these guns?

8   A.   I don't believe I said that.

9   Q.   I know.  I'm asking you.

10  A.   I wouldn't guess that that would be true.

11         MR. EISENBERG:  One second.  May I go get my binder?

12         THE COURT:  Sure.

13  BY MR. EISENBERG:

14  Q.   Have you ever shot anybody with a 1911 gun of any kind?

15  A.   I have not.

16  Q.   Pardon me.  I want to ask you some questions about the

17  documentation that Mr. Otten asked you about.  If you could

18  turn to the exhibit that's marked JT-2.  Do you have it handy?

19  A.   I do not have it in front of me, no.

20         MR. KILMER:  May I approach the witness, Your Honor?

21         THE COURT:  Yes.

22  BY MR. EISENBERG:

23  Q.   I'll have you look at JT-2, which you identified as a

24  letter that you received on or around shortly after July 6,

25  2011?

Combs - X

1    A.  Yes, that's correct.

2    Q.  When you received this letter, did you read it?

3    A.  I did.

4    Q.  Let's have you look at the second paragraph, and I'll read

5    the statements to you.

6           "Please be advised that DOJ does not retain

7    information regarding sales of rifles or shotguns."

8           Do you see that statement?

9    A.  I do.

10   Q.  When you read that, did you think to yourself that's not

11   true?

12   A.  Your question is whether or not I believed the assertion

13   in the letter?

14   Q.  Right.

15   A.  I've been suspicious of that in the past.

16   Q.  What's the basis of your suspicion?

17   A.  Just in general knowledge of different people's

18   circumstances.

19   Q.  Do you think that the State of California has a registry

20   somewhere of all rifles and long guns that are in California?

21   A.  Your question goes to all?

22   Q.  Yeah.

23   A.  Probably not.

24   Q.  You're aware that the AFS, Automated Firearms System, has

25   only been recording information about long guns since

1   January 1, 2014; correct?

2   A.  I understand that it's only been recording information

3   retaining that information on some long guns since

4   January 1st.  A number of other long guns I'm sure have been

5   in the system for many years.

6   Q.  Do you know that there was a procedure whereby people

7   could voluntarily list their long guns in the AFS?

8   A.  Yes, I believe that's a voluntary registration

9   application.

10  Q.  And that that was the -- that was the law prior to January

11  4 -- 1st, 2014; correct?

12  A.  That's my understanding.

13  Q.  Let's move on to the next sentence.  I'll read it and ask

14  you some questions about it.  Okay?

15       "Pursuant to California Penal Code Section

16  11106(b)(1), all copies of the dealer's record of sales for

17  firearms that are not handguns shall be destroyed within 5

18  days of the clearance by the Attorney General."

19       Do you see that sentence?

20  A.  I do see it.

21  Q.  Did you read it when you got the letter the first time?

22  A.  Yes.

23  Q.  And did you think to yourself I don't believe that that's

24  true?

25  A.  As I mentioned earlier, I have always been suspicious of

1   that.

2   Q.  So what's your basis for thinking that the -- the dealer

3   record of sales for non-handguns are not -- were not being

4   destroyed?  What's your basis for saying that?

5   A.  Again, just general perceptions and circumstances that

6   have arisen in the due course of my experience.

7   Q.  Do you have any specific information that a Bureau of

8   Firearms employee was keeping these records that are supposed

9   to be destroyed?

10  A.  I can't recollect any one particular circumstance that

11  would have formed the basis for that opinion.

12  Q.  I'd like to move you over to JT-3.  I believe you

13  testified that this is a copy of your federal collector of

14  curio and relics, license or certificate; correct?

15  A.  Yes.

16  Q.  Do you understand that if you commit a prohibiting

17  offense, that this curio and relic license could be revoked?

18  A.  Yes.

19  Q.  Do you have any information about how quickly the

20  information that you were subject to a prohibiting offense

21  would pass through the system and your license would be

22  revoked.  In other words, how long would it take?  Do you have

23  any information about that?

24  A.  You're asking me when the issuing authority here, the ATF,

25  when they would know that I had become in some hypothetical

1    circumstance a prohibited person?

2    Q.   Thank you very much for understanding my garbled question.

3    That's exactly what I'm going for.

4    A.   My understanding is that with the systems that are in

5    place with the ATF, they could presumably get that information

6    instantly by e-mail or some other electronic means.

7    Q.   You say "presumably."  You're just presuming that,

8    correct?

9    A.   Well, I do operate many software programs that interface

10   with, for example, other computers in Virginia, West Virginia,

11   and Washington, D.C. where ATF is located.  I would assume

12   that if I can send a data in an encrypted way in seconds to

13   that location, that ATF could too.

14   Q.   So the data that you're referring to, you send it to ATF?

15   A.   No, I'm saying that in physical locations like Virginia

16   and Washington, D.C., I uplink to servers in those locations

17   in an encrypted way, and in seconds, that information and data

18   was transmitted.  I would presume that if I have access to

19   technology that allows me to transmit data in an encrypted way

20   across the United States in seconds, that the Government does

21   as well.

22   Q.   And so, again, that's just a presumption; correct?

23   A.   I would call it an informed presumption.

24   Q.   Are you an expert at the transmission of data through

25   telephone wires, et cetera?

Combs - X

96

1    A.   I don't know how you define expert.

2         MR. EISENBERG:  I move to strike the answer as

3    nonresponsive because it's based on no foundation, just

4    speculation.

5         THE COURT:  Overruled.  As a trier of fact, I'll give

6    it whatever weight it is entitled to.

7    BY MR. EISENBERG:

8    Q.   I'll ask you the same line of questions regarding your

9    Certificate of Eligibility.  Are you aware that there could be

10   a time period where you have become prohibited from having

11   firearms, but you still actually have your COE certificate?

12   A.   Are you representing that to be true?  I guess I don't

13   understand.

14   Q.   Okay.  Let me work on the questions a little.  Do you have

15   information indicating that if you become prohibited from

16   having a firearm in California, your Certificate of

17   Eligibility will be physically revoked from you immediately?

18   A.   My understanding is that should I become prohibited or

19   even be arrested for a prohibiting offense, that, you know,

20   should it lead to conviction, that I would be prohibited, that

21   that flags the system, and those sorts of flags are populated

22   throughout databases near instantly, if not instantly.

23   Q.   How do you know that it's instant or not instant?

24   A.   Electrons move very fast.

25   Q.   Do you know who issued -- sorry.

Combs - X

1      Q.   You're aware that you could become prohibited based

2    on an offense that is investigated at the county level, not

3    the state level; correct?

4    A.   Yes.

5    Q.   And that you could be investigated and perhaps prosecuted

6    for an offense at the City level; correct?

7    A.   Yes.

8    Q.   Do you contend that the Bureau of Firearms automatically

9    gets information from the counties and the cities about your

10   status as a prohibited person?

11   A.   It's my understanding of the law that there are duties

12   that establish that government agencies report that

13   information to the Department of Justice in specific time

14   frames.

15   Q.   So what are the time frames?

16   A.   As I sit here today, I don't recall, but I believe that

17   they're within 24 hours.

18   Q.   Let me have you look at -- oh, never mind.

19        When I deposed you in the spring of 2013, you

20   testified that you had ammunition for only one of your

21   firearms that you had at the time; correct?

22   A.   I believe that's true.

23   Q.   And one of the reasons that you gave for not having

24   ammunition for that firearm was that the available ammunition

25   was too expensive; correct?

Combs - X

1   A.  I believe that I said that there was a shortage.

2   Q.  If we can flip over to page 55.  If I can have you --

3           THE COURT:  Okay, let's do this:  It's 11:00.  We'll

4   take our morning recess, 15 minutes.

5           MR. EISENBERG:  Okay.

6           (Recess.)

7           THE COURT:  All right, back on the record.  We'll

8   continue with cross-examination.

9   BY MR. EISENBERG:

10  Q.  All right, Mr. Combs, if I could have you look at the

11  deposition transcript, page 56, lines 19 -- sorry, line 24.  I

12  asked you what's the reason that the ammunition was -- was not

13  satisfactory to you.  And you answered on the top of page 57.

14  Would you read your answer please.

15  A.  "Because it was very expensive ammunition that was just

16  unrelated to the purpose of the gun."

17  Q.  There is no waiting period for ammunition, is there?

18  A.  No, there's not.

19  Q.  And just to backtrack a little bit.  Have you ever been an

20  employee of ATF?

21  A.  No, I have not.

22  Q.  So you haven't worked their computer databases, have you?

23  A.  No, I have not.

24  Q.  Have you been an employee of the Department of Justice?

25  A.  No, I have not.

1  Q.  That would be the California Department of Justice?

2  A.  Which one were you referring to?

3  Q.  I'm trying to clarify my own question.  You haven't worked

4  for the California Department of Justice?

5  A.  No, I have not.

6  Q.  And you haven't worked their computer databases either;

7  correct?

8  A.  No, I have not.

9  Q.  Just because you legally purchased a firearm in the past

10  does not mean that you're legally entitled to possess that

11  particular firearm now, does it?

12  A.  I suppose that I can only answer that question by saying

13  that based on my understanding of the state systems and the

14  fact that the state is aware that I own a number of firearms

15  as we've discussed earlier, I would assume that the state

16  would put me in its APPS, Armed and Prohibited Persons System

17  file should I become prohibited at any time.

18       MR. EISENBERG:  Move to strike as nonresponsive and

19  also lacking foundation.

20       THE COURT:  All right, I'll grant the motion to

21  strike.  Go ahead and reask.

22       MR. EISENBERG:  I have no further questions at this

23  time.

24       THE COURT:  All right.  And redirect.

25       MR. OTTEN:  Thank you, Your Honor.

Combs - RD

100

```
1                        REDIRECT EXAMINATION

2    BY MR. OTTEN:

3    Q.  Mr. Combs, you were asked some questions earlier about the

4    work you do for Calguns Foundation and the Second Amendment

5    foundation.  Do you recall that?

6    A.  Yes.

7    Q.  At any time, have you ever received compensation for --

8    from either of those organizations for work that you have done

9    on this case?

10   A.  No.

11   Q.  Did you ever say that you did in your depo?

12   A.  I don't believe I ever did.

13   Q.  And you don't recall there being any testimony in that

14   depo about that; correct?

15   A.  I don't recall any.

16   Q.  Okay.  Let's talk about your stockpile of firearms.  You

17   were asked some questions from a depo about having 50

18   firearms; correct?

19   A.  Yes.

20   Q.  Now, let's talk about the reality.  During the time --

21   during the time of your deposition, how many firearms did you

22   own?

23   A.  I only had two.

24   Q.  Okay.  And what happened to the other firearms?

25   A.  The other firearms of the 50 that we discussed?
```

Combs - RD

101

1    Q.  Well, let's say -- I think you had up to 50 at a time in

2    your depo.  You didn't say you had 50.  So of the firearms

3    that you had -- strike that.

4             You and your wife own some guns together; correct?

5    A.  Yes, over the course of the marriage, she and I both

6    individually purchased a number of firearms, and then some we

7    sold because they weren't suitable for us for different

8    reasons.  So over the course of our marriage, and over the

9    course of my life, I believe my testimony in deposition was

10   that I had cumulatively over the course of my life owned as

11   many as 50 or so firearms.  I don't believe that I ever said

12   that it was 50 at one time.  I believe I just said that it

13   was, you know, cumulatively 50 or thereabouts.

14   Q.  Okay.  So at the time of your depo, you had two; correct?

15   A.  That is correct.

16   Q.  Now, you are divorced from your wife; correct?

17   A.  Yes.

18   Q.  Do you remember when the divorce decree was entered or

19   final?

20   A.  I believe it was October of 2012.

21   Q.  As part of her community property, did she get most of the

22   firearms?

23   A.  Yes, she did.

24   Q.  Okay.  So during the time of this lawsuit, you didn't have

25   50 firearms, you had two; correct?

Combs - BD

1    A.   That's correct.

2    Q.   Other than self-defense, why do you like buying firearms?

3    A.   They're very interesting pieces of engineering.  I have

4    always been fascinated with the different cultural qualities

5    to them, and from a very young age even reading magazines and

6    sort of understanding the heritage, the long-standing American

7    heritage of, you know, gun ownership by law-abiding people,

8    and so it's always been a fascination for me.  There are so

9    many different types of firearms with so many different

10   purposes and uses, that there's just so many -- aesthetically

11   and functionally compelling things for me, that I enjoy

12   collecting, I enjoy shooting, and I enjoy being around other

13   shooters.  And I'm exposed to many, many different variations

14   of both curio and relic and modern firearms that I'd like to

15   possess as personal property over the course of my life.  And

16   I'd like to exercise my Second Amendment rights in many

17   different ways, but, again, for the core purpose of

18   self-defense.

19   Q.   Okay, so let's talk about the two firearms that you had

20   when your deposition was taken.  I think earlier you testified

21   as to what their makes and models were.  Did you?

22   A.   I don't believe that I testified to that today.

23   Q.   Can you just generally tell the Court what the two

24   firearms were and what you used them for?

25   A.   Yes, during the course of depositions, I testified that I

Combs - RD

1   was the owner of a CZ SP-01, which is a 9-millimeter

2   semiautomatic handgun that was actually a customized version

3   by a gentleman named Matt Mink, who is a competitive shooter.

4          Sort of going back to the cultural aspect of it, it's

5   a very unique piece for me.  I own one.  I hope to never sell

6   it because Matt doesn't do that work anymore to my knowledge.

7          It's specifically built for target shooting and

8   competitive shooting for USPSA productions more specifically.

9   Q.   There was some testimony about $1,500 in expenses related

10  to the 10-day waiting period.  Do you recall that?

11  A.   Yes.

12  Q.   Now, when you testified about that number, would that

13  have -- obviously didn't include expenses that you had never

14  incurred; correct?

15  A.   That's correct.

16  Q.   So if you wanted to buy a gun in Los Angeles, would there

17  be an additional expenses related to that 10-day waiting

18  period?

19          MR. EISENBERG:  Objection.  Calls for speculation.

20          THE COURT:  All right, sustained.

21  BY MR. OTTEN:

22  Q.   That $1,500 that you testified to, that doesn't include

23  any other firearms you might want to purchase that might be

24  burdened by the 10-day waiting period; correct?

25  A.   The $1,500 figure was representative of what I thought a

Combs - RD

104

1    reasonable estimate was of the damages that I had suffered up

2    to the point where I made that statement.

3    Q.  Let's talk about a 1911 made in 1964.  Is that a common

4    firearm?

5         MR. EISENBERG:  Objection.  Calls for speculation,

6    calls for expert testimony.

7         THE COURT:  Foundation.  Just lay the foundation, if

8    you can.

9         MR. OTTEN:  Okay, and, Your Honor, I'll just for the

10   record, these questions were started by Jonathan and not me.

11   Q.  So you have a curio and relics license; correct?

12   A.  I do.

13   Q.  Are you familiar with a 1911 gun in general?

14   A.  Yes.

15   Q.  And those are made by different manufacturers?

16   A.  That is correct.

17   Q.  And they've been made over the course of probably -- I

18   might get this wrong, the last hundred years or so?

19   A.  Yeah, just over a hundred years.

20   Q.  Just over a hundred years?  So were the 1911's made in

21   1964?

22   A.  There were.

23   Q.  Have you looked at those guns?

24   A.  Yes, I have seen examples of 1911 firearms that were made

25   in the '50's and '60's, even some made in the '40's.

Combs - RD

105

1   Q.  If you wanted to purchase one of those today, how

2   difficult would that be?

3         MR. EISENBERG:  Objection.  Calls for speculation and

4   expert testimony.

5         THE COURT:  Overruled.

6         THE WITNESS:  Well, I know that I handled some when I

7   was in Los Angeles recently.  February 15th, actually the

8   afternoon of February 15th.  I was at Martin B. Redding in

9   Culver City, which is one of California's largest gun stores

10  in general, and they have a quite large collection of curio

11  and relic firearms for sale as well as modern firearms.

12  BY MR. OTTEN:

13  Q.  Could you have purchased one on the 15th when you were

14  there?

15  A.  Well, I could have actually purchased one of the curio and

16  relic 1911's there, but what I really wanted to buy was a 1911

17  made by Springfield.  The general manager, Alex Reyes, told me

18  that he would, if I wanted one, set aside for me one of these

19  custom shops Springfield 1911's.

20        MR. EISENBERG:  Objection.  Move to strike.  Hearsay.

21        THE COURT:  Overruled.  I'm not going to consider it

22  for the truth of the matter.

23  BY MR. OTTEN:

24  Q.  So -- but that 1911 Springfield, that's not on the list

25  that's considered a curio or relic; correct?

Combs - RD

106

1   A.  That's correct.

2   Q.  So if you were to purchase that particular firearm, you

3   would have to be subject to a 10-day waiting period; correct?

4   A.  That's correct.  I would have had to make another trip

5   down to Los Angeles after ten 24-hour periods, but before the

6   expiration of the DROS transaction window, which is 30 days.

7   So I would have had to have gone back to Los Angeles within

8   the 20-day window, assuming that the firearm was released on

9   that 10th day.

10  Q.  Now, -- so let me ask you this:  What is the caliber of a

11  1911?

12  A.  In general, it was designed around and most are commonly

13  .45 ACP.

14  Q.  Is that the same caliber as the Springfield 1911 you were

15  looking at?

16  A.  Identical.

17  Q.  So the 1964 '911's that are relics that you looked at,

18  were they operational?

19  A.  Yes.

20  Q.  Now, are all handguns that are over 50-years old

21  considered relics?

22          MR. EISENBERG:  Objection.  Calls for legal

23  knowledge, calls for speculation.

24  BY MR. OTTEN:

25  Q.  If you know.

Combs - BD

1          THE COURT:  Overruled.

2          THE WITNESS:  I do believe that the ATF has

3    promulgated regulations saying any firearm over 50-years old

4    is a curio or relic.

5    BY MR. OTTEN:

6    Q.  So on the 15th of February, when you were at the gun

7    store, you could have bought the 1964 '911 and walked out the

8    door with it right on the spot?

9          MR. EISENBERG:  Objection.  Assumes facts not in

10   evidence that a gun in 1964 is actually 50-years old as of

11   February 15th of this year.

12   BY MR. OTTEN:

13   Q.  Maybe I misstated the question wrong, though I don't think

14   I did.  But here is what I'm asking you:  You went down there

15   on February 15th, and there were some model 1911's that were

16   built in 1964; correct?

17   A.  I don't believe that I can recall that it was 1964

18   exactly, but I do know that it was in the 1950's or 1960's.

19   Q.  And you testified that those particular guns were

20   operational?

21   A.  Yes.

22   Q.  45-caliber?

23   A.  Yes.

24   Q.  So with your license, you could have walked into the store

25   that day, purchased that firearm and walked out the door with

Combs - RD

108

1    it; correct?

2    A.   Yes.

3    Q.   And gone to the shooting range and put 45-caliber

4    ammunition in it and target shot; correct?

5    A.   That's correct.

6    Q.   Is that particular gun any less lethal than the

7    Springfield 1911 that you couldn't just walk out the door

8    with?

9         MR. EISENBERG:  Objection.  Calls for speculation.

10        THE COURT:  Sustained.

11        MR. OTTEN:  May I approach, Your Honor?  I just want

12   to clarify one exhibit.

13        THE COURT:  Sure.

14   BY MR. OTTEN:

15   Q.   Mr. Combs, can you -- let me direct your attention to

16   JT-4.  And can you tell the Court again what that is.

17   A.   The JT-4 exhibit is my Certificate of Eligibility, my

18   current Certificate of Eligibility.

19   Q.   And what does it say?

20   A.   It says that, "This is to certify that the Department of

21   Justice, Bureau of Firearms, has completed a firearms

22   eligibility check on the above named individual.  As of the

23   date of issue, there is nothing that would prohibit the

24   individual from acquiring or possessing a firearm."  It says

25   that the date of issue is February 2nd, 2014, and that it

Combs - RX

109

1  expires February 1, 2015.

2  Q.  Thank you.

3        MR. OTTEN:  Nothing further, Your Honor.

4        THE COURT:  And recross?

5                    RECROSS-EXAMINATION

6  BY MR. EISENBERG:

7  Q.  Mr. Combs, isn't it true that there's a huge price

8  difference between buying a 50 or 60-year old 1911 versus a

9  current 1911?

10 A.  I don't know how to answer that.  I think that I would

11 need a specific scenario to even form an opinion.

12 Q.  Well, when you were in Los Angeles looking at these guns,

13 did you look at the prices?

14 A.  I did.

15 Q.  What were the prices for the ones from the '50's and

16 '60's?

17 A.  I think that those were around $1,500.

18 Q.  Have you been able to buy a firearm for less than $1,500

19 in your life?

20 A.  I have.

21 Q.  Can't you get a Glock for a couple hundred dollars?

22 A.  I suppose that I could if one were available.

23 Q.  The old 1911's, did you shop for them locally?

24 A.  Are you asking me if I shopped for 1911's in --

25 Q.  Where you live.

Combs - RX

1    A.   Within how far away from --

2    Q.   Twenty miles from where you live?

3    A.   Yeah, there's actually a gun store in downtown Turlock

4    Alquist Arms.

5    Q.   That sells 1911's from the '50's and '60's?

6    A.   Occasionally they do have them.

7    Q.   But you could buy one from that place instead of

8    Los Angeles, right?

9    A.   If they had one in stock that I wanted, but the value of

10   curios and relics are sometimes intrinsic to the specific

11   firearm, the serial number, which subcontractor in history

12   actually produced the firearm.  You might want a Remington

13   version versus a Colt, for whatever unique personal reason.

14   Q.   When you went to Los Angeles, were you looking for a

15   specific 1911 with specific characteristics like that?

16   A.   I am always looking for unique collectables that are of

17   interest to me.

18   Q.   But did you have a specific 1911 that you were searching

19   for?

20   A.   No.

21   Q.   Okay.  When you plan to buy a firearm in California,

22   you're aware that there's a 10-day waiting period; correct?

23   A.   Yes.

24   Q.   So you're on notice that -- you're going to have a window

25   of time after the 10-day waiting period passes to go pick up

1    your gun; correct?

2    A.   I'm aware that the condition is there, and unfortunately,

3    sometimes work and life happen, and that precludes me from

4    being able to take possession of the firearm, and that's why I

5    am a plaintiff in this case so that I don't have to suffer

6    those damages.

7    Q.   That if some event-- what events block you from getting

8    those three receivers that you testified about?

9    A.   I don't recall if there is any one specific event, but

10   I've been busy with work -- quite busy with work.  Between

11   that and a lot of travel for work, I simply could not get back

12   down to the dealership to take possession.

13   Q.   You don't have any control over your work schedule?

14   A.   I believe that I take my duties very seriously, and that

15   the performance of my obligations to my clients are of

16   paramount importance, and unfortunately, because of what I

17   think is an unconstitutional law, I had to suffer personal

18   damages of the exercise of my Second Amendment rights in order

19   to fulfill my contractual obligations to the Calguns

20   Foundation and Cal-FFL.

21        MR. EISENBERG:  All right, move to strike the entire

22   answer as nonresponsive.

23        THE COURT:  Sustained.  Motion to strike granted.

24   BY MR. EISENBERG:

25   Q.   You don't have any control over your work schedule?

1   A.   I don't think I represented that I had no control over it.

2            MR. EISENBERG:  Okay.  No further questions.

3            THE COURT:  Redirect?

4            MR. OTTEN:  None, Your Honor.

5            THE COURT:  Okay, you can step down.  You're a party

6   to the lawsuit, so either side may still call you back to

7   testify.  You're still under oath, but you can go ahead and

8   step down.

9            THE WITNESS:  Thank you, Your Honor.

10           THE COURT:  Um-hmn.

11           MR. OTTEN:  Your Honor, we'd like to call Gene

12  Hoffman to the stand.

13           THE COURT:  All right.

14                         **GENE HOFFMAN,**

15  called as a witness on behalf of the Plaintiffs, having been

16  first duly sworn, testified as follows:

17           THE CLERK:  Take the witness stand right over there

18  and give us your full name.

19           THE WITNESS:  I am Eugene Earl Hoffman Jr., but I'm

20  probably known as Gene Hoffman Jr.

21           THE REPORTER:  What was your middle name?

22           THE WITNESS:  Earl, E-A-R-L.

23                      DIRECT EXAMINATION

24  BY MR. OTTEN:

25  Q.   Good morning, Mr. Hoffman.

1    A.   Good morning.

2    Q.   What county do you reside in?

3    A.   San Mateo County.

4    Q.   Okay, and you're a U.S. citizen?

5    A.   I am.

6    Q.   Are you married?

7    A.   I am married.

8    Q.   Do you have children?

9    A.   I have two children, a daughter who is 12, and a daughter

10   who is seven.

11   Q.   Do you currently own a firearm?

12   A.   I do.

13   Q.   And at all relevant times during this litigation, have you

14   owned at least one firearm?

15   A.   I have.

16        MR. EISENBERG:  Objection.  I object to this line of

17   questioning.  He is a corporate representative of the Calguns

18   Foundation.  He's not an individual plaintiff.

19        THE COURT:  All right.

20        MR. OTTEN:  Background, Your Honor.

21        THE COURT:  All right, for that purpose only, I'll go

22   ahead and overrule the objection.

23   BY MR. OTTEN:

24   Q.   And as a gun enthusiast, do you anticipate buying firearms

25   in the future?

Hoffman - Di D.

114

1  A.  I do anticipate buying firearms.

2  Q.  Let's talk briefly about your education.  Did you go to

3  college?

4  A.  I did attend college.

5  Q.  What years were you in college?

6  A.  I started in 1993 at the University of North Carolina on a

7  basketball scholarship for basketball management.

8  Q.  Did you complete your course of studies?

9  A.  I didn't.  I'm in Dean Smith's biography as the only

10  basketball manager ever to go pro.

11  Q.  Why did you leave college early?

12  A.  I had founded an Internet company in Chapel Hill in 1995.

13  Q.  What was the name of that company?

14  A.  The company's name was Privenet.

15  Q.  What did Privenet do?

16  A.  Privenet wrote software that blocked Internet ads and

17  cookies.

18  Q.  And you were the founder of that company?

19  A.  I was one of the cofounders of that company.

20  Q.  What were your job duties as a cofounder?

21  A.  I ran the business, managed our litigation to the extent

22  we had some copyright cases; wrote large portions of the

23  software itself, and co-inventor of the patents that came from

24  that software.

25  Q.  And eventually did you sell the company or move on to

1   another job?

2   A.   That company was sold to PGP or Pretty Good Privacy.

3   Q.   What did you do after Privenet?

4   A.   When PGP acquired Privenet, I became the head of business

5   development.  I was the interim head of engineering and later

6   the head of the interaction and marketing for PGP.

7   Q.   As part of that job at Privenet, did you write any code?

8   A.   Yes, I wrote software.

9   Q.   What was your next job after what you just described?

10  A.   After PGP was sold to McAfee, I founded a company called

11  eMusic.com.

12  Q.   And what did eMusic.com do?

13  A.   Emusic licensed music and sold the first MP3 music, both

14  99 cents a song, 8.99 an album, or in a subscription model.

15  Q.   Is this around the time when Napster --

16  A.   This is certainly the time of Napster.  In fact, Napster

17  kind of publicly launched about six months after we'd gone

18  public with the first major label downloadable MP3.

19  Q.   Was there any kind of special software that's involved

20  with eMusic?

21  A.   Well, eMusic had  --

22          MR. CHANG:   Objection, Your Honor.  This -- this

23  line of inquiry is irrelevant in terms of how much software

24  experience the witness has.

25          MR. KILMER:  Your Honor, we are taking these

Hoffman - D

116

1     witnesses out of order, and some of Mr. Hoffman's testimony

2     may be in the nature of rebuttal, and, therefore, we're asking

3     that it be admitted now subject to an objection later.

4           MR. CHANG:   If I may be -- might be heard,

5     Your Honor.

6           THE COURT:   Sure.

7           MR. CHANG:   If there's to be rebuttal testimony on

8     redirect, then counsel is certainly open to bringing it up

9     then.   But currently, you know, his software experience is not

10    relevant.   We don't object to him giving a brief background of

11    where he's worked.   But his testimony regarding his software

12    experience is not relevant, Your Honor.

13          THE COURT:   All right, it might be a little easier

14    for me anyway on ruling, if it is going to be rebuttal, to see

15    what the defense is going to present as evidence first.   So --

16          MR. KILMER:   That's fine, Your Honor.

17          THE COURT:   Okay.

18    BY MR. OTTEN:

19    Q.   Where do you currently work?

20    A.   I work at Vindicia.

21    Q.   What's your job title?

22    A.   Chief executive officer and chairman.

23    Q.   Okay, and just briefly your job duties.

24    A.   Obviously I oversee the entire business, marketing, sales,

25    software development, the architectural infrastructure of our

1    subscription billing platform.

2    Q.   Let's talk about the Calguns Foundation.  And you're here,

3    as it's been pointed out, in a representative capacity of that

4    organization; correct?

5    A.   That's correct.

6    Q.   What is Calguns?

7    A.   Calguns Foundation is a 501(c)(3) public interest group

8    created by fellow gun owners who have some unique skills.  The

9    purposes of Calguns Foundation are to defend people who are

10   unjustly charged with violating California's complex firearms

11   laws and to challenge those laws that we feel are

12   unconstitutional under the Second and Fourteenth Amendment.

13   Q.   Does -- and I might refer to Calguns Foundation as CGF,

14   okay?

15   A.   Okay.

16   Q.   Does CGF have members?

17   A.   It does.

18   Q.   You briefly touched on this.  What does CGF actually do

19   now?  You said it started out protecting those wrongly accused

20   of crimes, or something like that.  What do they do now?

21   A.   Well, we still do quite a bit of defense of those people

22   who have been unjustly charged.  California's firearms laws

23   are somewhat complex, so people will be arrested for

24   concealing, for example, an unloaded shotgun, which is not

25   actually a crime in California.  Anyone who gets in trouble

1    for their firearms can call our hotline, and we will have a

2    lawyer take a look at their case and potentially actually fund

3    the defense of that case.

4         In addition, we run some offensive litigation to try

5    to get California's gun laws to be constitutional.

6    Q.   And are you the president?

7    A.   I'm the chairman, and I function as the president under

8    the corporation's code.

9    Q.   As examples of what you've done with respect to -- you

10   said Calguns is involved in litigation.

11   A.   That's correct.

12   Q.   Can you give us an example of what you've done as an

13   officer of Calguns with respect to working on litigation or

14   managing litigation?

15   A.   I'm certainly involved in the choosing --

16        MR. CHANG:   Objection, Your Honor.  This testimony

17   is not relevant to the current case.

18        MR. KILMER:  Your Honor, if the department is

19   prepared to stipulate to the institutional standing for

20   Calguns Foundation, we'll cut this short.

21        MR. CHANG:  I believe the witness has already

22   testified as to what his organization does.  Now, as to what

23   specific cases his organization is involved in, that's not in

24   this case, that's not relevant, Your Honor.

25        THE COURT:  All right, is this simply a standing

1   question with respect to Calguns?

2              MR. OTTEN:  Well, with -- go ahead, I'm sorry.

3              MR. KILMER:  Yes, Your Honor.  We're trying to

4   establish the elements of standing, so that there's not a

5   question about this.  I'm not hearing a stipulation.

6              MR. CHANG:  Well, Your Honor, the witness has already

7   testified as to what the organization does.  And that includes

8   bringing lawsuits, including the present lawsuit.  So any

9   additional lawsuits and what those lawsuits are about does not

10  add any more probative value as to the issue that the

11  plaintiff is trying to get across.

12             THE COURT:  All right, well, I think simplistically

13  what they're saying is in order to establish standing for

14  Calguns Foundation to be a party to this lawsuit, if the

15  Government has no objection and it's stipulated to, the

16  defense, then, it's my understanding, that that would cut off

17  some of this testimony.  So what's the defendants' position?

18             MR. CHANG:  There is no stipulation, Your Honor.  We

19  would like the plaintiff to show standing.

20             THE COURT:  All right.  The objection is overruled.

21  BY MR. OTTEN:

22  Q.  Okay, going back to the question, as president, your

23  involvement with litigation, can you give us some examples.

24  A.  Well, I help figure out which plaintiffs we will use in

25  our public interest litigation.  I'm certainly involved in the

1    theories and some of the drafting of various components of our

2    litigation.  I'm also involved in choosing which amicus briefs

3    we will support and appellate courts or the Supreme Court

4    throughout the United States.  Those are usually relevant to

5    what would be useful for us here in California.

6    Q.  And has Calguns Foundation work done any amicus briefs on

7    any significant matters?

8    A.  We were an amicus in the McDonald case.  We consulted in

9    the Heller case, but did not actually file an amicus in the

10   Heller case.

11   Q.  And did you work on those?

12   A.  I did.

13   Q.  Does Calguns do -- beyond litigation, any kind of

14   firearms, research, promotion, writing articles, anything like

15   that?

16        MR. CHANG:  Objection.  Leading, Your Honor.

17        THE COURT:  Overruled.  Just for -- help speed up the

18   process.

19        MR. OTTEN:  Exactly, Your Honor.  There is no jury.

20   We can get through this quicker if you allow some leniency

21   there like you have.  Thank you.

22        THE COURT:  Yes.

23        THE WITNESS:  We routinely publish white papers,

24   FAQ's, WikiQ's that explain how California's gun laws work to

25   point to, for example, the legislative history of the Penal

1    Code to explain, for example, how a California simulations and

2    programs are supposed to work for the sheriff and the chief of

3    police.

4    BY MR. OTTEN:

5    Q.   Other than statutory research, just history of guns or

6    anything like that that Calguns is involved in?

7    A.   We certainly get involved in that to some extent as we

8    look at which arms are protected.  We have to do quite a bit

9    of historical research to compare the frequency of that

10    firearm to the frequency of the firearms of 17, 90 and 1868.

11    Q.   Do you know how many members Calguns, CGF, has?

12    A.   Approximately 30,000.

13    Q.   And are some of those members in California, obviously?

14    A.   Most all of them are in California.  That's not a hundred

15    percent.

16    Q.   Are you aware of whether any of CGF's members have been

17    subject to the 10-day waiting period?

18    A.   Almost all of our members are subject to the 10-day

19    waiting period.

20    Q.   And is the one of the reasons Calguns is bringing this

21    lawsuit is to try and redress those problems with the 10-day

22    waiting period?

23    A.   We brought this lawsuit so that our members would not have

24    to wait 10 days if they had a COE license to carry or already

25    had firearms in the AFS system.

1  Q.  Let's talk a little bit about your role with the Second
2  Amendment Foundation.  Are you a board member?
3  A.  I am, I believe, technically a board of trustees, but it
4  is functionally equal to board member of the Second Amendment
5  Foundation.
6  Q.  And how long have you held that position?
7  A.  Approximately 18 months.
8  Q.  And were you a member of, just individually, of Second
9  Amendment foundation ever?
10 A.  I am and was.
11 Q.  Okay.  How many years?
12 A.  I've been a member for approximately three years, but I
13 believe I'm a life member now.
14 Q.  What are your general duties as sitting on the board?
15 A.  It is a general fiduciary responsibility, so it's
16 reviewing our tax filings, setting policy, making spending
17 decisions against what sorts of litigation or educational
18 programs Second Amendment Foundation would do.  Very standard
19 kind of board membership reviewing the chief executive's
20 decisions.
21 Q.  Are you authorized to comment about Second Amendment
22 Foundation policies and things like that?
23 A.  I certainly take a PR position for The Second Amendment
24 Foundation in the sense that I will speak as a Board member,
25 and I'm aware of our education and litigation strategies.

1   Q.  Does Second Amendment Foundation have members?

2   A.  Second Amendment Foundation does have members.

3   Q.  Do you know how many members currently?

4   A.  I believe we quote 650,000 members.

5   Q.  And some of those members, do they reside in California?

6   A.  Some of those members do reside in California.

7   Q.  Are you aware of whether or not any of the members of The

8   Second Amendment Foundation that reside in California have

9   been -- had issues with the 10-day waiting period?

10  A.  I assume the majority of the members of The Second

11  Amendment Foundation that reside in California are subject to

12  the 10-day waiting period.

13  Q.  Do you know why The Second Amendment Foundation is a

14  plaintiff in this action?

15  A.  The Second Amendment Foundation is a plaintiff in this

16  action because it believes the second waiting period on people

17  who already own firearms is unconstitutional.

18  Q.  Do you know whether the Second Amendment Foundation have a

19  mission statement or anything like that?

20  A.  It may, but I don't recall --

21          MR. CHANG:  Objection, Your Honor.  This goes

22  beyond -- this witness is not a corporate representative of

23  The Second Amendment Foundation.  He's here only as a

24  representative of the Calguns Foundation.

25          THE COURT:  Okay.  All right.  Response?

1          MR. KILMER:  I'm confused.  He was not being asked

2   what The Second Amendment Foundation's purpose statement is,

3   but asked if they had one.  So I think he can answer that

4   question.

5          MR. CHANG:  If I may be heard further, Your Honor?

6          THE COURT:  Sure.

7          MR. CHANG:  The -- you know, in this case, we had a

8   witness, Mr. Alan Gottlieb, who was the representative of --

9   who is the representative of The Second Amendment Foundation,

10  and the parties had reached a stipulation as to exactly what

11  he will testify to on behalf of The Second Amendment

12  Foundation.  So Mr. Hoffman is clearly not here to testify

13  about The Second Amendment Foundation.

14          In addition, the Plaintiffs' initial disclosures

15  clearly identified Mr. Hoffman as representative of the -- the

16  Calguns Foundation and not The Second Amendment Foundation.

17          THE COURT:  All right.  Okay, anything else, then?

18          MR. KILMER:  Nothing, Your Honor.

19          THE COURT:  I'll go ahead and sustain the objection.

20  Go ahead and proceed.

21  BY MR. OTTEN:

22  Q.  Are you familiar with the 10-day Waiting-Period Law in

23  California?

24  A.  I am.

25  Q.  What's your understanding of that law generally?

1   A.  That law generally requires someone to wait 10 days after

2   the purchase of a firearm to take possession of that firearm

3   with some limited exceptions.

4   Q.  Which branch of the Government is in charge of enforcing

5   those laws?

6   A.  The California Department of Justice, the Attorney

7   General.

8   Q.  Are you aware of what the policy of the state is with

9   respect to the waiting period?

10   A.  My understanding is the state claims that the waiting

11   period is necessary to include a background check and to cool

12   off the intended purchaser.

13   Q.  Do you have an understanding who the background -- what

14   the background check looks for?

15   A.  I do have an understanding of what the background check

16   looks for.

17        MR. CHANG:  Objection, Your Honor.  Improper

18   foundation.

19        THE COURT:  All right.  Foundation.

20   BY MR. OTTEN:

21   Q.  You've just testified that you're familiar with the

22   waiting-period laws; correct?

23   A.  I have testified.

24   Q.  And part of what Calguns Foundation does is research the

25   California law; correct?

Hoffman - D

1  A.  Correct.

2  Q.  And you've testified that there is a 10-day waiting period

3  in effect in California; correct?

4  A.  That's correct.

5  Q.  And that's what this lawsuit addresses; correct?

6  A.  That's correct.

7  Q.  Do you know what a -- how the state defines a prohibited

8  person?

9  A.  The Penal Code defines a prohibited person as someone who

10  has committed a felony, a list of specific violent

11  misdemeanors, someone who has been subject to certain types of

12  adjudicated mental holds, and someone subject to restraining

13  orders.

14  Q.  Is the purpose -- are you aware, is the purpose of the

15  10-day waiting period to keep prohibited people from having

16  firearms?

17  A.  I assume that's the purpose, yes.

18  Q.  Have you read, or do you have any knowledge about how the

19  attorney general's office actually conducts background checks?

20  A.  I've read a lot of documents that speak to how AFS and

21  CFIS and CLETS work.

22  Q.  Why don't you tell the Court, first of all, what those

23  databases are, starting with CLETS.

24       MR. CHANG:  Objection, Your Honor.  This, again, is

25  foundation, and it assumes facts not in evidence.

1           THE COURT:  Okay.  You need to lay the foundation

2      with respect to knowledge regarding the various systems.

3      BY MR. OTTEN:

4      Q.  Okay.  Are you aware -- obviously aware of the Brady Act?

5      A.  I'm aware of the Brady Act.

6      Q.  Did the Brady Act -- why don't you tell us, summarize

7      generally what your understanding of it is, and it's a big

8      Act, so just keep it short.

9      A.  The Brady Act required retail sales of firearms to have a

10     background check.  Initially there was a waiting period for a

11     couple of years while the automated systems were designed and

12     implemented by the National Instant Checks System.  After

13     that, and in most states, when you acquire a firearm, you

14     either phone in or use the web to run a background check based

15     on the data that the buyer fills out on the Form 4473, and

16     that background check is usually completed instantaneously or

17     at least 90 percent of the time.

18     Q.  Now, in your research that you've done with the Calguns

19     Foundation, you mentioned a CLETS database; correct?

20     A.  I did.

21     Q.  Can you tell the Court what that stands for?

22     A.  The California --

23          MR. CHANG:  Objection, Your Honor.  Again,

24     foundation, and it calls for speculative -- calls for

25     speculation.  The witness has not shown he knows anything

128

1    about the CLETS database.  He worked with the CLETS database.

2    And further, it's expert testimony.

3          THE COURT:  I'll do the following:  I'll allow

4    testimony regarding what his knowledge is, but in terms of the

5    internal workings, unless he's worked within the agency that

6    deals with CLETS, then I would probably sustain the objection.

7    But in terms of what his general knowledge is and the

8    knowledge that the general public can pick up regarding the

9    CLETS system or any other system, he can testify to, but not

10   the interworkings unless he lays a foundation for some

11   knowledge, having worked within the system or something like

12   that.  So I'll go ahead and to that extent, I'll sustain the

13   objection, but I'll overrule at least to the line of

14   questioning so far.

15   BY MR. OTTEN:

16   Q.  Okay, let's step back, then, and make this a little

17   easier.  The State of California runs background checks on

18   people; correct?

19   A.  That's correct.

20   Q.  And you mentioned in your readings and stuff that they

21   look at various databases; correct?

22   A.  That's correct.

23   Q.  Can you tell us which databases that you're aware of that

24   the State of California uses?

25   A.  I believe the State of California uses the National

1    Instant Check System.  It uses the CFIS, which has a large

2    number of databases in it.  It also uses a mental health

3    reporting database and generally interfaces with what's called

4    a CLETS to check the criminal record data that's available.

5    Q.  Let's just start with the first one, the NICS system.  Is

6    that part of -- was that established through the Brady Act?

7    A.  The NICS system was established by the Brady Act.

8    Q.  Do you know what information gets inputted into that

9    database?

10   A.  I assume criminal convictions and mental health

11   prohibiting data.

12           MR. CHANG:  Objection.  Speculation.  He's assuming.

13   Move to strike.

14           THE COURT:  Sustained.  Motion to strike granted.

15   BY MR. OTTEN:

16   Q.  Is there a waiting period longer than the Brady Act?

17   A.  There is not currently a Waiting-Period Law under the

18   Brady Act for states without a state law requiring the Brady

19   Act.

20   Q.  So the Brady Act allows the states to do things beyond

21   what their requirements are; is that correct?

22   A.  That's correct.

23   Q.  Have you done any research to determine how quickly a

24   background check could be done on the NICS system?

25           MR. CHANG:  Objection, Your Honor.  Foundation and

1    expert testimony.

2            THE COURT:  All right, well, as to this specific

3    question, if he's done research, I'll overrule the objection.

4    Subsequent to that, we'll see, but I'll overrule the

5    objection.

6            THE WITNESS:  Yes.

7    BY MR. OTTEN:

8    Q.  What was the result of the research you did?

9            MR. CHANG:  Objection, Your Honor.  Expert testimony

10   and lack of foundation.

11           THE COURT:  I'm going to overrule the objection.  I'm

12   not sure how much in depth he's going to go into, but it will

13   be subject to a motion to strike.

14           MR. OTTEN:  We're just 20,000 feet questions now,

15   Your Honor.  We're not going to get into depth on anything.

16           THE COURT:  Okay.

17           THE WITNESS:  The ATF routinely publishes a report

18   about how quickly they complete their background checks.  In

19   that report, they state that the target is more than

20   90 percent that should be immediately handled, and they were

21   actually closer to 93 percent in the most recent report.

22           MR. CHANG:  Objection, Your Honor.  It would be best

23   evidence.  He's talking about a document that's not in

24   evidence.

25           THE COURT:  Okay.  Sustained.

131

1        MR. CHANG:  Move to strike, Your Honor.

2        THE COURT:  All right, granted.

3   BY MR. OTTEN:

4   Q.   So that was one of the databases California looks at.

5   What was the second one?

6   A.   CFIS, Consolidated Firearms Information Service.

7   Q.   Do you know what kind of information goes in that

8   database?

9   A.   I believe that's where AFS actually lives, so the actual

10  transaction records from the DROS live there.

11  Q.   And you said A --

12  A.   F-S.

13  Q.   For the Court, what's that stand for, if you know?

14  A.   Automated Firearms System.

15  Q.   Okay.  You talked about mental health records, and that's

16  part of what the State of California -- your understanding of

17  what they look at for a background check, right?

18  A.   That's correct.

19  Q.   Do you know, is there a database of that information?

20  A.   There is a database that's mandated by the Penal Code.

21  Q.   Which Penal Code?

22  A.   The California Penal Code.

23  Q.   Okay.  And have you researched that particular Penal Code?

24  A.   Some.

25  Q.   Can you describe what you know about that briefly.

1    A.   The various mental health hospitals and mental health

2    intake places are mandatorily required to report in disabling

3    events 5150 holds, those sorts of things, directly to the

4    Department of Justice for storage on that database.

5    Q.   Does the Penal Code mandate how quickly they have to

6    report that information?

7    A.   It does.

8    Q.   What does it say?

9    A.   I believe the new law changed it to two business days if

10   my recall is correct.

11   Q.   And you mentioned a 5150 hold.  Is that where the police

12   come out and determine that somebody has some mental issues

13   that they need to be taken into custody or something?

14   A.   That's my understanding.

15        MR. CHANG:  Objection, Your Honor.  Foundation.

16        THE COURT:  Overruled.

17        THE WITNESS:  That's my understanding.

18   BY MR. OTTEN:

19   Q.   Okay, and so when you say within two days, the state law

20   says that once they make that determination, they have to --

21   however they do it, report that to the Attorney General's

22   Office?

23   A.   That's correct.

24   Q.   Okay.  So if the Attorney General's following the law,

25   within two days, if somebody being detained on a 5150 hold,

1   the State is going to know about it; correct?

2   A.   That's what the law says, yes.

3   Q.   Okay.  Do you in your research for Calguns, are you aware

4   of whether or not the State of California has information or

5   tracks who are the owners of the handguns?

6   A.   Yes.

7   Q.   And can you briefly describe what the law says on that or

8   how they do it.

9   A.   Frankly, since 1923, they have been being sent reports of

10  records of sales of handguns.  Since 1991, those have been

11  relatively automated and stored.  Certainly since 1996, there

12  is an on-line database of all of the sales and imports when

13  moving into the state of handguns.

14  Q.   And I don't think I've asked you.  I might have.  I'm

15  getting confused with all the witnesses today.  Who are the

16  prohibited people that can't have guns according to the State

17  of California?

18  A.   The major categories --

19        MR. CHANG:  Objection, Your Honor.  Foundation, calls

20  for speculation.

21        THE COURT:  Overruled.

22        THE WITNESS:  The major categories of prohibited

23  people are felons, those with certain violent misdemeanors,

24  those who have been adjudicated mentally ill, those with

25  restraining orders against them.

1  BY MR. OTTEN:

2  Q.  And in your research that you've done under the California

3  laws, are -- if somebody has a felony, is that part of a

4  database?

5  A.  Yes, a felony conviction generally is a database.

6  Q.  Okay, we already talked about the 5150 people.  They would

7  be in the database under the law, right?

8  A.  That's correct.

9  Q.  What about restraining orders?

10  A.  Restraining orders, I believe, are supposed to be reported

11  to the Department of Justice.

12  Q.  Okay.  So from your research, if you were to go fill out a

13  DROS application, at a process, you're determined to be

14  nonprohibited and receive your firearm, the State of

15  California would know that you had that gun, and that you were

16  a nonprohibited person; correct?

17  A.  That's correct.

18  Q.  Are there any exceptions that you're aware of to the

19  10-day waiting period?

20  A.  Yes.

21  Q.  Without all of them, why don't you tell us about a few of

22  them?

23  A.  For anyone who has a curio and relic license and a COE,

24  they can buy non-modern, so curio and relic firearms without

25  waiting.  Apparently something called a firearms consultant

1    evaluator can skip the waiting period.  Gunsmiths can skip the
2    waiting period.
3    Q.  People in the film industry?
4    A.  People with entertainment firearms permits can skip the
5    waiting period.
6    Q.  In the research that you've done with Calguns, have you
7    found any justifications that would explain why somebody
8    working on a film set is any less likely to use that firearm
9    in some violent way versus somebody that's not and doesn't
10   have the same exemption?
11   A.  No, I've seen no real difference between the two people.
12   Q.  And earlier, you heard some testimony regarding the
13   classic '911 from 1964.  Is there -- have you done any
14   research on whether there's -- there's any rational reason for
15   the exemption for somebody that has a curio and relics
16   license?
17   A.  There doesn't seem to be any rational difference between
18   somebody who would buy a 1940's or 1950, 1911 versus buying a
19   1990, 1911 right next to it --
20          MR. CHANG:  Objection, Your Honor.  Move to strike.
21   Nonresponsive.
22          THE COURT:  Sustained.  Granted.
23   BY MR. OTTEN:
24   Q.  Let's talk about any licenses that you possess for
25   firearms.  Do you have an LTC?

1   A.   I have a California License to Carry, yes.

2   Q.   And who issues that?

3   A.   In my case, the sheriff of San Mateo County.

4   Q.   What -- what are you allowed to do with that License to

5   Carry?

6   A.   That license allows me to conceal and carry a firearm

7   throughout the State of California.

8   Q.   What were the requirements to obtain that license?

9   A.   I had to complete a fingerprint based background check

10  through the live scan system.  I had to take training and live

11  fire shooting training from one of the sheriff's deputies.

12  Obviously my background had to come back without a prohibited

13  offense from the Department of Justice.

14  Q.   We heard some talk about live scan.  Have you -- do you

15  have an understanding of what that is?

16  A.   I do.

17  Q.   And can you tell us?

18  A.   Live scan is an automated scanner of fingerprints that

19  turns them into electronic images and then forwards them to

20  the various law enforcement agencies that would need to use

21  them to, for example, conduct a background check.

22  Q.   Do you have any understanding as to why a live scan is a

23  requirement for an LTC?

24  A.   I do.

25  Q.   And what's that?

1    A.  It's to make sure that your actual identity is checked

2    against the criminal records of FBI and the State to make sure

3    that your identity doesn't actually have a prohibiting felony

4    conviction, for example, because you're lying about who you

5    are versus your fingerprints.

6    Q.  Are there any statutes or regulations that you're aware of

7    with respect to reporting whether or not you become a

8    nonprohibited person if you have an LTC?

9    A.  Yes.

10   Q.  And what are those laws?

11   A.  The Penal Code requires the Department of Justice to

12   immediately inform the issuing authority of a License to Carry

13   holder if there is new data added that would be prohibited for

14   that carry permittee.

15   Q.  When you say immediately informed, is that something

16   defined in the Penal Code?

17   A.  I don't recall.

18   Q.  Do you have an understanding of if it's not defined, what

19   the practice is of the arresting agencies?

20           MR. CHANG:   Objection, Your Honor.  Foundation.

21           THE COURT:  Sustained.

22   BY MR. OTTEN:

23   Q.  Does the law state what has to happen if, say, for

24   example, you have a license to carry, and you're convicted of

25   a felony.

1  A.  It states that your License to Carry has to be revoked.

2  Q.  What about your guns?

3  A.  If you were prohibited from possessing firearms, obviously

4  the Court usually for the prohibiting offense itself would

5  require to you turn over the firearms.

6  Q.  You've heard some discussions about a COE license.

7         THE COURT:  Hold on.  I'm sorry.  It's a little after

8  12:00.  We'll take our noon recess to 1:30 this afternoon.

9  Return at 1:30.

10         THE WITNESS:  Thank you.

11         (Noon recess.)

12                    **AFTERNOON SESSION**

13         THE COURT:  Okay, we'll continue on with the

14  testimony.

15         MR. KILMER:  Your Honor, we have one preliminary

16  matter.

17         THE COURT:  Oh, sure.  Go ahead.

18         MR. KILMER:  Your Honor, in light of testimony that's

19  already been taken and the defendant's opening statements,

20  we're prepared to withdraw our objections to some of the

21  exhibits that were tendered by the defendants.

22         THE COURT:  All right.

23         MR. KILMER:  And so we would basically stipulate that

24  they are admissible.

25         MR. CHANG:   Okay.

1          MR. KILMER:  And I'll recite those into the record.

2          THE COURT:  Yes.

3          MR. KILMER:  We'll stipulate to the admissibility of

4    Exhibits AA through AS.  We also stipulate to the

5    admissibility of AU through AZ.  AT right now in the

6    defendants' submissions is a blank, but it's a document that

7    we have tendered and which we have not sought to introduce

8    yet.

9          We also stipulate to the admissibility of Exhibits BA

10   through BY.  We also stipulate to the admissibility of

11   Exhibits CA, CB, and CC.

12         THE COURT:  All right.  Okay.

13         MR. KILMER:  And if you want, Your Honor, I can

14   prepare a notice of withdrawal of objection to those so -- and

15   file that this afternoon.

16         THE COURT:  Okay, that's fine.  So Government's --

17   defense understands, those are the items that -- for which

18   there is no objection, at which time, then -- is it the

19   assumption that they would just be admitted?

20         MR. KILMER:  We have no objection to them simply

21   being admitted and available for witness use regardless of

22   which side is testifying, Your Honor.

23         MR. CHANG:  And, Your Honor, we're willing to

24   stipulate to their admissibility except as to Exhibit AT.  The

25   defendant isn't submitting Exhibit AT.  It's not on our

1    exhibit list, it's not in the documents lodged with

2    Your Honor, and it wasn't lodged or on the Plaintiffs' exhibit

3    list.  So right now, it's sort of a phantom document.

4              THE COURT:  Okay.

5              MR. KILMER:  Well, that's correct.  AT was designated

6    in the record as a blank page.  We actually submitted it as

7    part of our exhibit list that we filed on -- in our

8    Plaintiffs' separate exhibits, and it is attached as an

9    Attachment 06.  And the name of the document is AB 497

10   "Processing Alternatives," and it's Bates number AG-00766

11   through AG-000826.  I understand that the status of that is

12   not that it has been admitted at this particular point in

13   time.  We intend to try and introduce it later on

14   cross-examination of their witnesses.

15             THE COURT:  Okay.  So basically what's agreed to are

16   the defense exhibits marked AA through AS, AU through AZ, BA

17   through BY, CA, CB and CC?

18             MR. KILMER:  That is correct, Your Honor.

19             THE COURT:  All right.  Defense?

20             MR. CHANG:   We'll agree to that, Your Honor.

21             THE COURT:  All right, very well.  And they are

22   deemed admitted at this point in time.

23             (Defendants' Exhibits AA to AS, AU to AZ, BA to BY,

24   CA, CB, CC, received in evidence.)

25             MR. CHANG:   Thank you, Your Honor.

Hoffman - Di.

141

1        THE COURT:  Okay, any other preliminary matters,

2   then, before we continue on with the examination of our

3   witness?

4        MR. KILMER:  None from the plaintiffs, Your Honor.

5        THE COURT:  Okay.  We'll go ahead and continue with

6   the testimony of the witness.

7        MR. OTTEN:  Thank you, Your Honor.

8   BY MR. OTTEN:

9   Q.  Mr. Hoffman, when we were here the last time, we were

10  talking about the licenses that you have.  And I think you

11  talked about a License to Carry, a COE.  Any other licenses?

12  A.  I have quite a few other licenses from various states to

13  carry in their states.  And then I also have a O3 FFL, which I

14  think I mentioned before, as well as the COE and the License

15  to Carry in California.

16  Q.  And that -- the federal license, that was the same one

17  that Mr. Combs was talking about earlier, the curios and

18  relics?

19  A.  That's correct.  It's collector, curios and relics

20  firearms.

21  Q.  Do you consider yourself a law-abiding citizen?

22  A.  I do consider myself a law-abiding citizen.

23  Q.  Let's talk about the hardships imposed by the 10-day

24  waiting period.  Calguns has been involved with looking at gun

25  laws, in particular, this one; correct?

Hoffman - D

142

1   A.   That's correct.

2   Q.   What are the hardships that you're aware of related to the

3   10-day waiting period?

4            MR. CHANG:   Objection, Your Honor.   Calls for

5   hearsay, and it's also vague.   It's unclear in what capacity

6   he's testifying.

7            THE COURT:   All right, if I could get a proffer.

8            MR. OTTEN:   You know, the organization is -- one of

9   the things they do is research laws and file lawsuits like

10  this; you know, the basis for doing that and what they've

11  learned about the impositions that the 10-day waiting period

12  puts on its members.

13           THE COURT:   All right.   All right, I think

14  problematic, though, in terms of statements, I assume he's

15  gathering -- see, I'm not sure what the source is, whether

16  he's talking with individuals, or it may run into a hearsay

17  issue, or whether there were surveys conducted.   I'm not sure

18  upon what basis the information --

19           MR. OTTEN:   I can lay the foundation there if the

20  Court would like.

21           THE COURT:   Okay.

22  BY MR. OTTEN:

23  Q.   Have you done any -- with your work with Calguns any

24  surveys or anything related to -- or the 10-day waiting period

25  on your members?

1   A.  We haven't done any formal surveys, no.

2   Q.  Informal surveys?

3   A.  Yes, certainly speaking to gun owners, our members about

4   where and when they can buy firearms.

5           MR. CHANG:  Objection, Your Honor.  Hearsay.

6           THE COURT:  Okay.  Well, as to that specific

7   question, I'll overrule the objection, but there may be some

8   concerns regarding specific statements that have been made.

9           MR. CHANG:  Thank you, Your Honor.

10  BY MR. OTTEN:

11  Q.  Does Calguns maintain any kind of a blog where its members

12  could post problems that they're having with various laws?

13  A.  We do have a blog, but we also monitor a web form called

14  Calguns.net.

15  Q.  And some of the people that write on that discuss the

16  10-day waiting period?

17  A.  Quite a few do.  The other major thing that occurs on

18  Calguns.net is a classified ads effectively for private sales

19  of firearms.

20  Q.  Okay.  On a personal level, would you -- you know, how

21  close to Fresno do you live roughly?

22  A.  About a three-and-a-half-hour drive.

23  Q.  Would you buy a gun when you're leaving town here?

24  A.  If I had enough time to come back, I would.

25  Q.  Why -- why would the timing matter?

1   A.  Well, to return to the dealer here would be a

2   three-and-a-half hour one way, so nearly six hours, seven-hour

3   trip total.

4           The other option of shipping it and paying a transfer

5   fee, that's somewhere 50 and $150 per firearm makes it

6   somewhat cost prohibitive.

7   Q.  Let's talk about impositions with respect to you on an

8   individual level with respect to self-defense.  Does the

9   10-day waiting period impact your ability to bear arms and

10  defend yourself?

11  A.  It does to an extent.  I own a home and a boat, have an

12  office.  I have a license to carry.  In each of those

13  scenarios, the firearm I need for self-defense is often

14  somewhat different, but I can tell you that I, for example,

15  have not yet bought my primary self-defense firearm for my

16  boat because my travel schedule and my prep schedule for this,

17  for example, have been too busy for me to know when I'm going

18  to be able to make two trips to an FFL to take possession.

19  Q.  So if there wasn't the 10-day waiting period in effect,

20  you would be able to buy that gun?

21  A.  That's correct.

22          MR. OTTEN:  That's all I have, Your Honor.

23          THE COURT:  All right.  And cross-examination?

24          MR. CHANG:  May I have a couple minutes to gather my

25  materials, Your Honor?

1     THE COURT:  Sure.  You want to take a quick break?

2  We can wait.

3     MR. CHANG:  It will be two minutes.

4     THE COURT:  We'll wait.  That's fine.

5     (Pause in the proceedings.)

6                    CROSS-EXAMINATION

7  BY MR. CHANG:

8  Q.  Good afternoon, Mr. Hoffman.

9  A.  Good afternoon.

10  Q.  Now, Mr. Hoffman, you're not here on your personal

11  capacity?

12  A.  That's correct.

13  Q.  You're here to testify solely on behalf of the Calguns

14  Foundation; correct?

15  A.  That's correct, but I'm also a member of Calguns.

16  Q.  You're not a lawyer; correct?

17  A.  I'm not a lawyer.

18  Q.  Mr. Hoffman, the Calguns Foundation owns no guns; correct?

19  A.  The Calguns Foundation may actually own three firearms for

20  various odd reasons.

21  Q.  Those guns are registered in the name of the Calguns

22  Foundation?

23  A.  Ownership is taken, but they're actually stored at FFL's.

24  Q.  Okay.  Has the Calguns Foundation ever attempted to

25  purchase a firearm on its own behalf?

1    A.  No, not in the sense of acquiring it for self-defense, for

2    example.

3    Q.  The Calguns Foundation has members in its organization;

4    correct?

5    A.  That's correct.

6    Q.  One becomes a member by donating at least $10 to the

7    Calguns Foundation?

8    A.  That's correct.

9    Q.  For a person to stay a member, does the person have to

10   make that donation every year?

11   A.  We generally look back about 24 months before we consider

12   members.

13   Q.  Donations from members is how the Calguns Foundation

14   derives its revenue, right?

15   A.  That's correct.

16   Q.  And the Calguns Foundation requires a certain amount of

17   revenue to sustain its operations; correct?

18   A.  That's correct.

19   Q.  When the Calguns Foundation filed this complaint, it

20   issued a press release about this lawsuit, right?

21   A.  That's correct.

22   Q.  The press release discussed the Calguns Foundation role as

23   a plaintiff in this lawsuit; correct?

24   A.  That's correct.

25   Q.  You personally prepared the press release; correct?

1   A.  I was involved in preparing it, yes.

2   Q.  Around the time the Calguns Foundation filed this lawsuit,

3   Calguns Foundation distributed the complaint in this lawsuit

4   to its members; correct?

5   A.  That's correct.

6   Q.  Around the time the Calguns Foundation filed this lawsuit,

7   you also posted about this litigation on the Calguns.net

8   website, right?

9   A.  That's probably correct, yes.

10  Q.  The Calguns.net website is an Internet forum?

11  A.  That's correct.

12  Q.  There's at least one common board member between Calguns

13  Foundation and the Calguns.net website; correct?

14  A.  That's correct.

15  Q.  And all the board members of the Calguns Foundation and

16  most of the volunteers of the Calguns Foundation tend to

17  participate on the Calguns.net forum; correct?

18  A.  It certainly wanes and ebbs, but, yes, that's generally

19  correct for most of the board members.

20  Q.  And the Calguns Foundation communicates with its members

21  by blog posts on the Calguns.net website; correct?

22  A.  I wouldn't say it that way.  I would say that we

23  communicate with them by making posts on the web forum.  We

24  also have a blog on Calguns Foundation.org.

25  Q.  And does the Calguns Foundation communicate with its

1    members by blog posts on the Calguns Foundation website?

2    A.  Yes, we do.

3    Q.  Now, the Calguns Foundation posted a copy of the complaint

4    in this case to a blog post; correct?

5    A.  That's correct.

6    Q.  And when the Calguns Foundation put together the materials

7    for the complaint, it envisioned its members reading the

8    complaint; correct?

9    A.  That's correct.

10   Q.  The complaint in this case is a marketing tool for the

11   Calguns Foundation; correct?

12   A.  Any of our public outreach efforts are considered a

13   marketing tool from one perspective.  Our members expect us to

14   challenge the constitutional laws.

15          MR. CHANG:  Objection, Your Honor.  I move to strike

16   as nonresponsive.

17          THE COURT:  All right, sustained.  Motion granted.

18   BY MR. CHANG:

19   Q.  My question, Mr. Hoffman, the complaint in this case is a

20   marketing tool for the Calguns Foundation, yes or no?

21   A.  Yes.

22          MR. OTTEN:  I'm going to object on relevancy grounds,

23   Your Honor.

24          THE COURT:  All right, sustained.

25   BY MR. CHANG:

1   Q.   The Calguns Foundation was marketing to its members using

2   the complaint in this case; correct?

3            MR. OTTEN:   I'm going to object on relevancy grounds,

4   Your Honor.

5            MR. CHANG:   Your Honor -- may I be heard, Your Honor?

6            THE COURT:   Sure.

7            MR. CHANG:   This goes to bias.

8            THE COURT:   All right, for that limited purpose only,

9   I'll overrule the objection.   Go ahead.

10            MR. CHANG:   Thank you, Your Honor.

11            THE WITNESS:   Could you repeat the question?

12   BY MR. CHANG:

13   Q.   The Calguns Foundation was marketing to its members using

14   the complaint in this case; correct?

15   A.   As a part of what we're doing was marketing.   Also it is

16   the transparency that we're doing our public mission.

17            MR. CHANG:   Objection, Your Honor.   Move to strike.

18   It's nonresponsive.

19            THE COURT:   Overruled.

20   BY MR. CHANG:

21   Q.   The purpose of Calguns marketing to its members using

22   complaints was to derive additional donations; correct?

23   A.   One of the purposes was to derive additional donations.

24   Q.   Now, you testified earlier that the requirements for the

25   mental health database are provided for in the California

Hoffman - X

1   Penal Code; correct?

2   A.   That's correct.

3   Q.   Isn't it true that the requirements for the mental health

4   database are actually provided for in the Welfare and

5   Institutional -- Institutions Code?

6   A.   That may be correct.

7   Q.   So you don't know?

8   A.   Not right off without consulting the Penal Code whether --

9   the Welfare and Institutions Code.   Pardon.

10   Q.   Now, you mentioned also that shipping and transfer fees

11   are about 100 or $150 per gun; correct?

12   A.   That's correct.

13   Q.   And 100 or $150 was cost prohibitive for you to have that

14   gun shipped to a local gun dealer; correct?

15   A.   Yes.

16   Q.   So it's a financial issue that -- that's the financial

17   burden the Waiting-Period Law imposes on you?

18   A.   Yes, the law imposes that burden.

19   Q.   Now, you also mentioned that you need different handguns

20   because you have homes and a boat and different properties;

21   correct?

22   A.   That's correct.

23   Q.   How far away is the closest gun dealer to you?

24   A.   I'd speculate four miles.

25   Q.   What's the basis of that speculation?

1    A.  It's on my way back and forth from my office, and so I'm

2    just using my dead-reckoning guess of the actual distance.

3    Q.  So it's on your way back from your office.

4    A.  Correct.

5    Q.  Okay.  And how long would it take you to drive from your

6    home or your office to that -- to the nearest gun dealer?

7    A.  Approximately 10 minutes.

8    Q.  And -- you know, when you testified earlier, you

9    mentioned -- and please correct me if I'm wrong.  You

10   mentioned there is a handgun that you wanted to purchase that

11   was about 350 miles from your home.  Did you say that?

12   A.  I don't believe I said that.

13   Q.  Okay.  Did you mention a specific gun that you were

14   looking at, but didn't do so because of a second trip that you

15   would have had to make?

16   A.  I'm in the market actually for a long gun for my boat.

17   Handguns aren't necessarily the most appropriate for

18   nauticals' self-defense, frankly.

19   Q.  My question was actually -- move to strike, Your Honor.

20   Nonresponsive.

21        THE COURT:  All right, sustained.  Granted.

22   BY MR. CHANG:

23   Q.  My question, Mr. Hoffman, is actually -- you testified

24   that -- you know, was there a specific gun, a clarifying

25   question, is there a specific firearm that you were looking

1   for that was located in another location, that you didn't make

2   the purchase because the second trip that you would have had

3   to make was cost prohibitive?

4   A.   My testimony, I believe, was that I would make a trip here

5   to a local gun store that I know well, but I won't go buy one

6   here because I would have to return here to pick it up.

7   Q.   In Fresno.

8   A.   In Fresno.

9   Q.   Because it took you three-and-a-half hours to drive.

10   A.   That's correct.

11   Q.   Now, isn't -- and, you know, how much do you think -- but

12   you would make that first trip to come to Fresno to purchase

13   the gun?

14   A.   I happen to be in Fresno this week for obvious reasons,

15   and, therefore, it's very easy for me to otherwise purchase a

16   firearm if I can pass the background check and take it with

17   me.

18   Q.   Now, Mr. Hoffman, you have never personally worked for the

19   California Department of Justice; correct?

20   A.   I have not.

21   Q.   You have never personally worked for the Bureau of

22   Firearms?

23   A.   I have not.

24   Q.   You have never personally worked with the NICS system;

25   correct?

1  A.  I have not.

2  Q.  You have never personally worked with the mental health

3  database; correct?

4  A.  I have not.

5  Q.  You have never personally worked with CLETS; correct?

6  A.  I have not.

7  Q.  You have never personally worked with CFIS; correct?

8  A.  I have not.

9  Q.  You have never personally worked with APPS; correct?

10  A.  I have not.

11          MR. CHANG:   I have no more questions, Your Honor.

12          MR. OTTEN:  Nothing further, Your Honor.

13          THE COURT:  Okay, you can go ahead and step down.

14  Again, as a representative of one of the parties, you may

15  still be called back to testify.  But you can go ahead and

16  step down.  Thank you.

17          MR. KILMER:  The plaintiffs have no further

18  witnesses, and we were taking them out of order anyway because

19  it is the People -- the defendants' case at this point.  I

20  simply propose that we recess until tomorrow.

21          THE COURT:  Okay.  Excuse me.

22          MR. KILMER:  Your Honor, Mr. Eisenberg and I had a

23  discussion prior to the lunch break about how the Court wanted

24  to deal with Mr. Gottlieb's deposition.  Our proposal is that

25  it simply be -- it's already been admitted, and an order of

1   the Court that we read the testimony.  I don't have preference

2   that it be read into the record.  I don't know what the

3   Government's position is.

4         MR. EISENBERG:  We don't have any preference that it

5   be read into the record.  But if Your Honor would like it to

6   be read into the record, we'd be happy to do that.

7         MR. KILMER:  We would prefer not to burden the

8   reporter, Your Honor.

9         THE COURT:  If the parties are willing to stipulate

10   that the deposition -- I don't know if it's specifically been

11   marked as an exhibit per se.

12         MR. KILMER:  I don't know, but it's attached to it.

13   It was attached to a stipulation, and I believe the Court made

14   an order that it was to be admitted as testimony.

15         MR. EISENBERG:  Right, and just to further clarify,

16   we submitted the exact pages that we were stipulating to.

17         MR. KILMER:  That's correct.

18         THE COURT:  Okay.  All right.  So it's not the whole

19   deposition, it's only those portions that you stipulated to?

20         MR. KILMER:  That's correct, Your Honor.

21         THE COURT:  All right.  With that understanding, and

22   is that clearly marked so that both I will be aware of it and

23   it's part of the record as to which portions are stipulated

24   to?

25         MR. KILMER:  It is, Your Honor.

1          THE COURT:  All right.  Okay, in that case, I'll go

2     ahead and accept it.  If the parties agree that it need not be

3     read into the record, that's fine.  It will obviously,

4     however, the Court will accept it, then, as part of the record

5     and will consider it in terms of making an ultimate ruling on

6     the case.

7          MR. KILMER:  Thank you, Your Honor.

8          THE COURT:  All right.  All right, we can do a couple

9     of things.  Obviously we can recess until tomorrow, or if you

10    have witnesses here, with the understanding that the

11    Plaintiffs' side is not resting and obviously can call their

12    witnesses that they've designated back through witnesses who

13    have testified.

14         Also with respect to exhibits, probably what I'll do

15    is, we'll have an exhibit conference.  And we'll go through

16    each exhibit for which there are disputes, and then I'll go

17    ahead and rule on them.  Although I would prefer on some of

18    them, where there may be books, treatises, articles, whatever,

19    that if the concern is the totality, that is, if there may be

20    some portions that the parties wish to admit, then we can

21    focus in on those, and I'll allow counsel to meet and confer,

22    give you some time to do that, and we can obviously reconvene

23    on the exhibits.  And you've already stipulated to certain

24    ones.  We can narrow the scope down so that when I rule on

25    them, maybe we can -- again, narrow the scope of just how much

we all have to read through in order for me to make a
decision.

      But otherwise, we can certainly -- I know you
mentioned this morning, defense had witnesses available this
afternoon.

      MR. EISENBERG:  Your Honor, we understand that one of
our witnesses was in transit, and he -- barring some
unforeseen problem, he will be here at some point this
afternoon, but I'm not exactly sure when.

      THE COURT:  So you'll have one witness available for
today?

      MR. EISENBERG:  Well, correct.  And he is the witness
that we anticipate will take probably the longest.

      THE COURT:  Okay.  All right.  Well, if you -- if
there is a way to communicate with that person, find out.  The
thing is, obviously, I don't want you folks to wait around
until 4:00 and have a half an hour's worth of testimony.

      So let me take a brief recess.  Contact your witness
and meet and confer.  Now, if you agree, obviously we -- and,
again, in terms of the time frame, you know, I've obviously
set aside the whole week, so I don't have a problem if we need
to recess and start afresh tomorrow morning.

      Now, we started at 8:30.  Normally I start at 8:30
when I have jury trials because counsel and I meet and confer
before the jury comes in at 9:00.  Since this is a bench

1 trial, we will resume tomorrow at 9:00 regardless of whether

2 we take part of a witness' testimony today or not.

3          So let me take a quick break.  As soon as you're

4 ready to proceed, let me know.  If there is a relative

5 agreement that the witness will be here fairly soon, and we

6 can maybe get in at least an hour's worth of testimony, that's

7 fine.  But if the witness is simply in transit, and the

8 parties agree that, you know, it's best just to start up again

9 tomorrow morning, that's okay.  What I would ask you folks to

10 do is maybe just start the meet and confer process on the

11 exhibits to see if maybe there are some others that can be

12 resolved, so hopefully we can narrow the scope of the exhibits

13 anyway that we're going to have to go through individually

14 because I know there are a lot of exhibits for which there

15 might be objections.

16          So let me go ahead and take a break.  As soon as

17 you're ready, let me know, I'll come back in.  You can let me

18 know how you wish to proceed.

19          MR. KILMER:  Thank you, Your Honor.

20          THE COURT:  So we'll stand in recess until counsel

21 tells me you're ready.

22          (Recess.)

23          THE COURT:  All right, back on the record.  Go ahead

24 and have a seat.  Let me get an update on the status of the

25 defense presentation.

1          MR. EISENBERG:  Your Honor, the witness, Steve

2    Buford, has arrived in the courtroom.  He traveled from

3    Sacramento today.  We would prefer to give him the day to

4    rest, and I understand that plaintiff's counsel is not

5    objecting to that request.

6          THE COURT:  All right.

7          MR. EISENBERG:  And we would use the intervening time

8    to work on the disputed exhibits as you had suggested.

9          THE COURT:  All right.  Okay, is that agreeable with

10   plaintiffs?

11         MR. KILMER:  Agreeable, Your Honor.

12         THE COURT:  And that's perfectly fine with the Court.

13   All right, I'll go ahead and stand in recess.  Now, if for

14   whatever reason you need me back on the bench this afternoon,

15   just let us know.  Otherwise, you're free to leave and just

16   return here at 9:00 in the morning.  You can obviously

17   continue to work in here.  The courtroom will be available to

18   you.  And unless I hear otherwise, then I'll just be back on

19   the record tomorrow morning at 9:00.

20         MR. KILMER:  Thank you, Your Honor.

21         MR. EISENBERG:  Thank you very much, Your Honor.

22         THE COURT:  The Court will stand in recess.

23         (Court was adjourned at 2:05 PM.)

24

25