UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII


JEFF SILVESTER, et al.,          )     1:11-cv-2137-AWI
                                 )
          Plaintiff,             )
                                 )     COURT TRIAL
     vs.                         )
                                 )     Day 2
KAMALA D. HARRIS, Attorney       )
General of California, and       )
DOES 1 to 20,                    )
                                 )
          Defendants.            )
_____)

Fresno, California                  Wednesday, March 26, 2014



          REPORTER'S TRANSCRIPT OF PROCEEDINGS



Volume 2, Pages 159 to 366, inclusive









REPORTED BY:  GAIL LACY THOMAS, RMR-CRR
Official Court Reporter
CSR NO. 3278

APPEARANCES OF COUNSEL:

For the Plaintiffs:          OTTEN & JOYCE, LLP
                             Attorneys at Law
                             3620 Pacific Coast Highway
                             Suite 100
                             Torrance, California 90505
                             By:  **Victor J. Otten**
and
                             LAW OFFICES OF DONALD KILMER
                             Attorneys at Law
                             1645 Willow Street
                             Suite 150
                             San Jose, California 95125
                             By:  **Donald E. J. Kilmer**, Jr.


For the Defendants:          KAMALA D. HARRIS
                             Attorney General of California
                             By:  **Jonathan M. Eisenberg**
                             Deputy Attorney General
                             300 South Spring Street
                             Suite 1702
                             Los Angeles, CA 90013
                             By:  **Peter H. Chang**
                             Deputy Attorney General
                             455 Golden Gate Avenue
                             Suite 11000
                             San Francisco, CA 94102

# INDEX

**DEFENDANT'S WITNESSES:**

**STEVEN BUFORD** 163
DIRECT EXAMINATION 163
BY MR. EISENBERG
CROSS-EXAMINATION 230
BY MR. KILMER
REDIRECT EXAMINATION 281
BY MR. EISENBERG
RECROSS-EXAMINATION 284
BY MR. KILMER
**DONNETTE ORSI** 287
DIRECT EXAMINATION 287
BY MR. CHANG
CROSS-EXAMINATION 305
BY MR. KILMER
REDIRECT EXAMINATION 308
BY MR. CHANG
RECROSS-EXAMINATION 309
BY MR. KILMER
**MITCH MATSUMOTO** 311
DIRECT EXAMINATION 311
BY MR. CHANG
CROSS-EXAMINATION 327
BY MR. KILMER
**BLAKE GRAHAM** 333
DIRECT EXAMINATION 334
BY MR. EISENBERG

*****

Wednesday, March 26, 2014                    Fresno, California

                                            9:02 a.m.


        THE COURT:  Before we continue with testimony, are

there any matters we need to take up preliminarily?

        MR. KILMER:  Just to notify the Court that the

parties have conferred, and that later on this morning, we'll

have some further stipulations as to the admissibility of some

of the exhibits.  We're finalizing that now, Your Honor.

        THE COURT:  Great.  Thank you.

        Anything further from the defense at this time?

        Okay.  All right, are we ready, then, to proceed with

the defense witnesses?

        MR. EISENBERG:  Yes, Your Honor.

        THE COURT:  Okay, the defense may call its first

witness.

        MR. EISENBERG:  Good morning.  The defense would

quickly like to note that Kimberly Granger, an agency

representative, from the Bureau of Firearms is present in the

courtroom.  She is not a witness.

        THE COURT:  All right.

        MR. EISENBERG:  The first witness will be Assistant

Chief Steve Buford.

        THE CLERK:  Come right up here, sir.  Raise your

right hand.

1                    **STEVEN BUFORD**,

2  called as a witness on behalf of the Defendants, having been

3  first duly sworn, testified as follows:

4          THE CLERK:  Take the witness stand right over there

5  and give us your full name, please.

6          Counsel, you might want to get those exhibits, or

7  whatever they are.  I'm not sure you're going to need them.

8          MR. EISENBERG:  Right.

9          THE CLERK:  I'm not sure who they belong to.

10         MR. EISENBERG:  These papers are not needed.  They're

11 here by mistake.  We are probably going to be needing to use

12 some of the setup exhibits over here.

13         THE CLERK:  Okay.

14         MR. EISENBERG:  Thank you.

15         THE WITNESS:  My name is Steve Buford.  Steven

16 Buford, I'm sorry.

17         MR. EISENBERG:  May I proceed?

18         THE COURT:  Yes.

19                      DIRECT EXAMINATION

20 BY MR. EISENBERG:

21 Q.  Assistant Chief Buford, did you graduate from high school?

22 A.  Yes.

23 Q.  What year did you graduate?

24 A.  1979.

25 Q.  Did you attend college?

1    A.   Yes.

2    Q.   And what years did you attend college?

3    A.   In the '80's.  Early '80's.

4    Q.   Are you presently employed?

5    A.   Yes.

6    Q.   What's the name of your employer?

7    A.   The State of California, Department of Justice, Division

8    of Law Enforcement, and I work for the Bureau of Firearms

9    within the division of law enforcement.

10   Q.   What generally does the Bureau of Firearms do?

11   A.   The Bureau of Firearms is responsible for the

12   administration, regulation, education, and enforcement of the

13   State's firearms and lawsuits.

14   Q.   What is your job title?

15   A.   Assistant Bureau Chief.

16   Q.   How long have you had that job?

17   A.   About five years.

18   Q.   What generally are your job duties?

19   A.   I oversee the regulatory and programs sections within the

20   Bureau of Firearms, and those sections are responsible for

21   background checks and regulations and education of firearms

22   laws.

23   Q.   What are background checks in connection with the Bureau

24   of Firearms?

25   A.   It's pretty much the nexus of the operation.  We do a lot

1  of background checks basically.  The largest part of them have

2  to do with people buying firearms throughout the state.  We

3  also issue licenses and permits for folks working in the

4  firearms industry, folks that carry firearms as a part of

5  their jobs, peace officers, armed security guards, whatever

6  would have you.  And other folks that are -- excuse me,

7  concealed weapons permits and things of that nature.

8  Q.  Where do you rank in the organizational hierarchy at the

9  Bureau of Firearms?

10  A.  I'm the Assistant Chief, and the Chief is my -- my

11  manager.

12  Q.  Do you supervise any employees?

13  A.  I have about 73 individuals that work under my -- my

14  direct command.

15  Q.  Before you were the Assistant Chief at the Bureau of

16  Firearms, did you work for the Bureau of Firearms in some

17  other capacity?

18  A.  Yes.

19  Q.  When did you first start working for the Bureau of

20  Firearms?

21  A.  I started working for the Bureau of Firearms in May 1989.

22  Q.  So, in other words, you're just a couple months shy of 25

23  years at the agency?

24  A.  That's correct, at the Bureau of Firearms.  I have

25  actually 34-plus years with the Department of Justice.

1  Q.  Tell me by name and by years to the best of your

2  recollection the other jobs that you've held at the Bureau of

3  Firearms.

4  A.  I started in the Bureau of Firearms in 1989 as the

5  associate governmental program analyst.  From there, I

6  promoted within about, I would say, about a year or two to

7  criminal -- to a field representative.  Then I promoted from

8  field representative to criminal identification and

9  intelligence supervisor.

10         Then around about 1995, I promoted to the Department

11  of Justice Administrator I.  I did about three or four years

12  as the Department Administrator I, and I was promoted to

13  Department of Justice Administration II, and then I was

14  subsequently promoted to Department Administrator III, and

15  then my last promotion about four or five years ago was to

16  Assistant Bureau Chief.

17  Q.  Have you heard of the Waiting-Period Law, which is the

18  subject matter of this lawsuit?

19  A.  Yes.

20  Q.  Does the Bureau of Firearms play any role in connection

21  with the Waiting-Period Law?

22  A.  The department is responsible for administrating and

23  enforcing the waiting period.

24  Q.  What in your understanding is the waiting period?

25  A.  The waiting period is -- excuse me.  It's a 10-day waiting

1  period that all purchasers of firearms must adhere to under

2  state law.

3  Q.  Are you aware of justifications that have been given for

4  having a waiting period?

5  A.  Yes, a couple.

6  Q.  What are the justifications that you're aware of?

7  A.  The primary one -- or one of them has to do with a

8  cooling-off period for a purchaser of the firearms.  The other

9  purpose is to give the department time to review the records

10  of individuals that are purchasing firearms.

11  Q.  So the Bureau of Firearms itself is involved in doing the

12  background check?

13  A.  Yes.  I'm sorry.  Not only reviewing those records, but

14  also gives us time to reach out and notify the dealers in the

15  case of prohibited purchasers, not to deliver the firearm.

16  Q.  When you say "dealers," what kind of dealers are you

17  talking about?

18  A.  We're talking about firearms dealers, state-wide firearms

19  dealers.

20  Q.  At a very general level, how does the Bureau of Firearms

21  conduct a background check on a firearms purchaser applicant?

22  A.  You want me to go through the process step by step or --

23  Q.  Let's just talk about it just generally.

24  A.  Generally, the process starts with the verifying the

25  purchaser's identity, verifying whether the gun involved in

1    the transaction has been lost or stolen -- had been previously

2    reported lost or stolen.  And subsequently from that is

3    determining the eligibility of the purchaser to own or possess

4    firearms.

5    Q.  Okay, we'll get into more detail later, but thank you for

6    that answer.

7         Did you have any involvement in setting up any part

8    of the Bureau of Firearms background checks system?

9    A.  Yes.

10   Q.  What involvement have you had in setting up the system?

11   A.  Well, when I started with the Bureau in 1991, I was

12   responsible for developing and assisting with the development

13   of processes that would include long guns into the background

14   check process, as well as including other prohibited

15   categories into the background check process.  And prior to

16   1991, the only thing that the department looked for when

17   conducting background checks were -- had the -- purchasers had

18   previously been convicted of a felony.  Beginning

19   January 1991, as the -- as this part of the implementation of

20   AB 497 by Assemblyman Connelly, other categories were

21   incorporated into the background check process and that had

22   included violent misdemeanors, the mental patients, violent

23   juveniles, warrants, and restraining orders.  And so part of

24   my duties at that time were to work on the systems and develop

25   processes that would incorporate those prohibited categories

1  into the background checks process.

2  Q.  Around 1999, did you have any role in reengineering any of

3  the systems -- sorry, 1996?

4  A.  In 1996, I began the reengineering of the process to

5  reduce the waiting period from 15 days down to 10 days.  And

6  that required us to automate quite a bit of the process.

7  Prior to that, the process was completely paper.  It was

8  basically a quadruplicate form that was completed by the

9  dealer and dropped in the mail to the department, which took

10  probably seven to ten days to get to us in the mail on

11  average.  And so we looked at incorporating a process to allow

12  dealers to electronically submit their application information

13  to us, or telephonically submit application information to us.

14  And so I worked on that process as well.

15       I worked on the feasibility study, the budget,

16  changed proposal processes and documents and business

17  requirements necessary to adopt and implement that process.

18  Q.  Around 2007, did you have any work related to the DROS

19  entry system?

20  A.  I did oversee the reengineering of the system for the DROS

21  entry system because -- chiefly because the prior system that

22  we implemented in 1996 was a partnership between the

23  Department of Justice and the -- it was -- originally it was

24  MCI, and then subsequently became Verizon Wireless.  Verizon

25  decided that they wanted out of their government business

1    contracts, and so they noticed us that they were dropping the

2    contract, and that the State would be required -- you know,

3    that we would either have to go out and rebid with somebody

4    else, or the State would have to bring in the process with

5    in-house.  So we brought the process in-house.  So we began

6    development of the new system to bring the process in-house.

7    Q.  Have you yourself ever performed background checks?

8    A.  Yes.

9    Q.  When did you do that work?

10    A.  In the past, as my past manager and supervisor roles in

11    the firearms section, I had worked -- you know, during peak --

12    peak DROS season and other times to assist in the background

13    check process when we were overridden with lots of DROS

14    transactions.  And now more recently, I am pretty much only

15    involved when there's a high-profile shooting or something,

16    and the AG's office or the press office has interest and

17    they're trying to respond to press contacts regarding

18    people's -- you know, involvement in those crimes.

19    Q.  I want to ask for a clarification of an acronym.  You used

20    the word "DROS."  What is DROS?

21    A.  DROS is the acronym for Dealers Record of Sales.  And it's

22    the -- formally it's essentially the -- the application and

23    the process that kicks off the background check for people

24    that are engaged in the purchase of firearms.

25    Q.  How many background checks of DROS applications would you

1  estimate that you've done in your career?

2  A.  Probably thousands.

3  Q.  What is a DROS application?  Is it a paper form that is

4  filled out, or is it some other kind of means of communicating

5  information?

6  A.  Well, prior to 1996, it was a paper form.  After 1996,

7  it's an electronic transaction.  The dealer uses a personal

8  computer that's placed at their business.  The application is

9  an electronic form.  It asks for information about the

10  purchaser.  It has information about the gun and information

11  about the dealership.

12  Q.  Does the purchaser fill out the DROS application?

13  A.  No, not necessarily.  The dealer usually fills it out, but

14  has -- but has the purchaser there to ask questions.

15  Q.  Where would a DROS application be filled out?

16  A.  Usually at the dealer's place of business.  Occasionally

17  at gun shows.

18  Q.  After the DROS application is filled out and the dealer

19  handles it, what happens next to that application?

20  A.  The application is electronically submitted to the

21  department.  The department begins the background check

22  process, which -- which incorporates -- the first thing that

23  we do is we pull off the purchaser's name information and DMV

24  information, and we verify that against the Department of

25  Motor Vehicles files -- California Department of Motor

1  Vehicles files to ensure that the purchaser's identification

2  information is accurate.  We know who we're doing the

3  background check on.

4  Q.  Is it ever the case that a person applying for a firearm

5  uses an incorrect DMV license or a personal identification?

6  A.  Every day.

7  Q.  And if an applicant uses a mismatched or an incorrect

8  identification, what does that mean for the application?

9  A.  That means that the application has to be rejected.  And

10 so we reject the application and notify the dealer not to

11 deliver the firearm.

12 Q.  Is the -- is the DMV check, is it against the computer

13 database, is it against written records?  How is it --

14 A.  It goes against the DMV electronic database, the

15 Department of Motor Vehicles files electronic database.

16 Q.  Is the initial comparison done by a computer or by a

17 person?

18 A.  The initial comparison is done by the computer.

19 Q.  Is a human being ever involved in checking on the DMV

20 record?

21 A.  When there is a mismatch.

22 Q.  Why is a human being involved in that part of the process?

23 A.  Because we would not be able to keep up with the work.

24 There's just so many of them that happen.  Every day we

25 receive between -- at this point in time between 2 to 3,000

1  gun purchase applications a day.  So that was the process

2  because we collect the identification information, because

3  that information is automated within the Department of Motor

4  Vehicles.  It makes it easy for us to use the systems to run

5  that match because basically you're just matching numbers and

6  the information exactly.

7  Q.  Is there -- are there any other databases that are checked

8  at that initial point along with or near in time to the DMV

9  check?

10  A.  Yes.  We also strip off the information relating to the

11  firearm, and we run that information against the Department of

12  Justice Automated Firearms System to see if the firearm had

13  been previously reported lost or stolen by a law enforcement

14  agency.

15  Q.  Why does the Bureau of Firearms check if a firearm is

16  reported lost or stolen?

17  A.  Well, I believe it's Penal Code Section 11106 or -- yes,

18  Penal Code Section 11106 basically says that's the Attorney

19  General's role is to maintain a database to return lost or

20  stolen firearms.  And so part of the DROS process, a lot of

21  the firearms that are involved in that process potentially

22  could be used -- had been reported lost or stolen, and

23  occasionally we do bump into something, and we try to make

24  sure those guns are returned back to the rightful owners.

25  Q.  Is the AFS check done completely by a computer, or are

1  human beings involved?

2  A.  That's computerized as well because we have computerized

3  records of lost and stolen firearms as reported by law

4  enforcement.

5  Q.  If a DROS application runs through the AFS system and it

6  comes back that there is a hit, that this firearm matches up

7  to a lost or stolen firearm, what happens next in the process?

8  A.  The law enforcement agency that made the actual lost or

9  stolen entry is notified by the department and asked to

10  investigate to determine if the firearm involved in the

11  transaction is the actual firearm that had been previously

12  reported lost or stolen.  And they're also contacted to verify

13  whether lost or stolen entry in the database is still valid

14  and active.

15  Q.  So these law enforcement agencies, are they part of the

16  Bureau of Firearms?

17  A.  No, these are state-wide law enforcement agency,

18  state-wide police -- police offices and sheriff's offices.

19  Q.  When you say statewide, do you mean that they're part of

20  state government, and they're not part of local government?

21  A.  No, they're local government.  They're local chiefs --

22  local police stations, local Sheriff's Offices, County

23  Sheriff's Offices and City police and other police -- police

24  entities within the state.  Police agencies, I should say.

25  Q.  When there is a match for a lost or stolen firearm, and

1  the notification is made to the local law enforcement agency,

2  do they resolve that issue instantaneously or nearly

3  instantaneously?

4  A.  No, not always.

5  Q.  What is the process involved?

6  A.  The process basically involves them actually taking an

7  active role and going out and looking at the firearm, making

8  sure that it is the firearm -- the firearm involved is

9  actually the firearm that was reported lost or stolen.  And

10  occasionally, we have some agencies that, you know, depending

11  on what their priorities are, they may or may not get to it.

12  Q.  Is this something that always happens within one day, that

13  the investigation is complete, or could it take longer than a

14  day?

15  A.  It's rarely done within a day.

16  Q.  Let's talk about a typical DROS application coming

17  through.  If it passes the DMV check without any hits, so to

18  speak, and if it passes through the AFS check without any

19  hits, what happens next?

20  A.  The next process is to begin the process of inquiring into

21  the prohibited databases that might have information on the

22  purchaser that would indicate that the purchaser is not

23  eligible to own or possess firearms.

24  Q.  Okay.  Is there one database that's looked at, or are

25  there multiple database?

1  A.  There's several.

2  Q.  Are you aware of what all the different databases are?

3  A.  I believe so.

4  Q.  Okay.  I'll go ahead and take you through them one at a

5  time based on my understanding and correct me if my

6  understanding is wrong.

7       Have you heard of a database that goes by the name

8  ACHS?

9  A.  Yes.  That stands for Automated Criminal History System.

10  It's the California Automated Criminal History System.

11  Q.  What kind of records does the ACHS contain?

12  A.  It contains criminal history information reported to the

13  department by state-wide criminal justice agencies.

14  Q.  Is this database a state database, a federal database, or

15  some other entity's database?

16  A.  It's a state database.

17  Q.  What is the purpose of doing a check on the Automated

18  Criminal History System?

19  A.  Well, under state law, as well as federal law, persons

20  that are convicted felons cannot possess firearms.  So for

21  state and federal law, we would look there to see if people

22  had been convicted of a felony.

23       Under state law, there are people that if you've been

24  convicted of certain violent misdemeanors and other offenses,

25  you would be ineligible to own or possess a firearm.  So we

1 would look in that database for that particular information.

2 Q.  Is the ACH -- the ACHS database complete and up-to-date at

3 all times with criminal history records?

4 A.  No.

5 Q.  So why would the ACHS database ever be incomplete?

6 A.  The database is incomplete largely due in part to various

7 reasons.  One, could be there's a time lag between the actual

8 disposition being produced and the time it takes to reach the

9 department.  There are priority issues and funding issues

10 within the local courts.  Occasionally, records are lost,

11 purged, never reported.  There's a lot of reasons.  I can't

12 tell you all of them, but what I can tell you is that it's not

13 limited to California.  This is a national problem.  When I

14 talk to my colleagues outside of California, they have the

15 same problems.

16 Q.  Is the DROS application run through the ACHS in an

17 automated fashion?

18 A.  Yes.

19 Q.  Is there ever a point where a human being might be

20 involved in reviewing the output of the database search?

21 A.  Yes.

22 Q.  Is that something that happens never, hardly ever at all,

23 a lot of the time, almost all of the time?

24 A.  A lot of the time.

25 Q.  Why would a human being need to be involved in looking at

1  those records?

2  A.  Well, because the -- a lot of times people have been

3  arrested for offenses.  They could have been convicted for

4  offenses.  And the first thing we have to do is we have to

5  verify that the records that we're looking at actually match

6  the person because the background check is based on name and

7  date of birth.  It's not based on any kind of biometric data,

8  so we can't positively say that that record belongs to any

9  individual, so we have to have a human come in and look at

10  that information and make that determination.  That's the

11  first part.

12       The second part is that there might be information in

13  that record that we have to look at to make a determination

14  on.  People can have a lot of arrests, they can have a lot of

15  convictions, but they still may not be prohibited from owning

16  or possessing a firearm.  There are only certain offenses and

17  types of convictions that would make you prohibited.  So we to

18  have to look through the record to make sure that we're not

19  falsely disapproving somebody and not missing people that we

20  should be disapproving.

21  Q.  Isn't a person's name, John Smith, enough to find out that

22  person's complete record?

23  A.  Unfortunately, no.  California has 38,000,000 people.  We

24  have a lot of databases that we go through and look at with

25  lots of records.  John Smith, Jose Gonzalez, Robert Fong,

1   those common names create quite a conflict.  There are a lot

2   of false positives.  So we have to look through that, and

3   oftentimes people's date of births are very similar, very

4   close, and sometimes right on the money, and sometimes it

5   comes down to we have to have people actually go out and

6   submit fingerprints to us so we can verify that they're not

7   the same person.

8   Q.  Are there ever incomplete criminal records for a

9   particular arrest?

10  A.  Routinely.

11  Q.  What's an example of what might be in the database and

12  what might be lacking for a particular criminal incident?

13  A.  Let's say a person was recently arrested.  Let's say a

14  person was arrested for 273.5, which is corporal injury on a

15  spouse, which is under both state and federal law would be a

16  prohibiting offense.  There's an arrest information out there.

17  The arrest occurred, say -- say the arrest occurred two years

18  ago in 2012, and for whatever reason, the disposition is

19  missing.  We don't have the disposition.  So at that point in

20  time, we need to research that information to see where the

21  disposition is.  Was that person actually convicted, because

22  if they were convicted, obviously they would not be eligible

23  to own and possess a firearm.  If it was dismissed, then they

24  would be cleared.  But we have to research that information to

25  make sure.

1  Q.  Is that work that can just be done by a computer

2  instantaneously?

3  A.  No.

4  Q.  So does a human being need to be involved?

5  A.  Yes.  Typically what we do is, we have to call the courts.

6  A lot of times the courts won't take a phone call, so they'll

7  tell us you to have fax the information to us.  Some courts

8  will give us electronic access to their files.  Some courts

9  won't.  If the information is out-of-state conviction

10  information, it can take a while to contact that out-of-state

11  agency to get them to respond back to us.  So it can be a very

12  lengthy process in trying to resolve criminal history

13  information, missing information.

14  Q.  Let me jump back to the AFS, Automated Firearms System

15  because I erroneously forgot to ask you a couple questions

16  that I meant to.

17         Does the AFS have records on every gun in circulation

18  in California?

19  A.  No, it does not.

20  Q.  What kind of firearms records does it have?

21  A.  The bulk of the firearms records that are in AFS are

22  related to dealer's records of sales, and that's exactly what

23  it is.  It's a dealer records of sales.  It's not a

24  registration.  It's simply a record of a sale that was made at

25  a particular date and time.  And so that pretty much -- that's

1  a big part of the information in AFS.

2       The other part of the information in AFS has to do

3  with assault weapons registrations that were mandated back in

4  1989 and continued through -- I think through 2001 where

5  certain guns were identified as assault weapons under

6  California statute had to be registered by residents of

7  California.

8       The other records that are in AFS are records of

9  Carry Concealed Weapons license holders known as CCW's.  Also

10 on file at AFS are what we call law enforcement reports, which

11 relate to firearms that had been reported lost, stolen,

12 evidence, safekeeping, held for -- retained for official use.

13 And there's a few others.

14      And there's other types of what we call ownership

15 records in AFS as well, and those people that voluntarily

16 report a firearm that they have possession or ownership of a

17 firearm; those folks that report taking possession of a

18 firearm via operation of law; those folks that report firearms

19 because of an integral familiar transfer.  And also reports

20 taken in -- reported by those folks that have identified

21 themselves as curio and relic collectors.

22 Q.  Is there any limit in time for long gun records, like the

23 records only go back for a certain amount of time?

24 A.  With the exception of assault weapon registration, long

25 gun records, the department only began retaining long gun

1    records effective January 1st of 2014.

2    Q.  I have the same question for handguns.  How far back does

3    the handgun records go?

4    A.  I've seen the handgun records in AFS that go back to,

5    like, the early 1900's.

6    Q.  Is there complete -- are there complete handgun records

7    going back that far?

8    A.  They're not necessarily complete.  They were records that

9    were taken in at that particular time.

10   Q.  So if you have a DROS record from the early 1900s, does

11   that tell you who has the gun today?

12   A.  No, those people are probably long passed away.

13   Q.  If you have a DROS record at any time, does it tell you

14   that that same person has the gun today?

15   A.  No, not necessarily.

16   Q.  In your work at the Bureau of Firearms, have you heard of

17   another database that goes by the acronym CARPOS?

18   A.  Yes.

19   Q.  What does that stand for?

20   A.  California Restraining Order -- Restraining and Protective

21   Order System.

22   Q.  What kind of information is contained in that database?

23   A.  Typically restraining orders.  For us, we're looking for

24   domestic violence restraining orders and other firearms

25   prohibiting protective orders.

1   Q.  Does the DROS application go through a CARPOS check?

2   A.  Electronically, yes.

3   Q.  Is there ever human involvement in reviewing the records

4   from CARPOS?

5   A.  Excuse me, yes.

6   Q.  Why does a human being need to be involved in the process?

7   A.  Once again, since we don't have biometrics, and we're

8   relying on name-based information and date of birth

9   information, we have to make sure that that record actually

10   belongs on that particular individual that's purchasing the

11   firearm.

12   Q.  What are biometrics?

13   A.  Biometrics are fingerprints.  It could be your retina,

14   basically types of unique identifications that's unique to the

15   human body, physical body.

16   Q.  If a person has a domestic violence offense, is there a

17   fingerprint or retinal scan for that person in the Bureau of

18   Firearms systems?

19   A.  I think you meant to say domestic violence restraining

20   order.

21   Q.  Pardon me.  Yes, I did.

22   A.  Yes, if you're talking about a restraining order, then the

23   answer to that question is there is no fingerprints involved

24   for restraining orders.

25   Q.  If somebody has a restraining order, could that be a

1  prohibiting offense?

2  A.  Yes, under both state and federal law.

3  Q.  Among these databases, have you heard of the one that goes

4  by the acronym of WPS?

5  A.  Yes, that stands for Wanted Persons System.

6  Q.  Let me go back.  I missed a question on CARPOS.  Is CARPOS

7  a state database, federal database, or some other entity's

8  database?

9  A.  CARPOS is a state database.

10  Q.  Moving back to the WPS system.  What kind of records are

11  in the WPS database?

12  A.  Typically warrants, people that are wanted.  So warrant

13  information is in the WPS.

14  Q.  If a person is in the WPS database, does that mean that

15  the person is prohibited from having a firearm?

16  A.  Potentially, yes.

17  Q.  Always the case, sometimes the case?

18  A.  Not always the case.

19  Q.  Is the WPS database a state database, federal database, or

20  some other entity's database?

21  A.  It's a state database.

22  Q.  Why -- why is the Bureau of Firearms checking on whether

23  somebody's a wanted person?  What does that have to do with

24  firearms?

25  A.  Typically people are wanted for felons if they have

1  committed a felony offense, or they're wanted, or they have

2  been held for indictment and they're wanted, they would be

3  prohibited under state law.  Under federal law, anybody that

4  has a warrant issued for them is considered a fugitive from

5  justice and would be prohibited.  So under federal law, all

6  warrants are enforceable as a prohibitor.

7  Q.  Is the WPS check completely computerized, or are humans

8  involved?

9  A.  It's computerized.

10  Q.  Are humans ever involved in a WPS check?

11  A.  Humans are involved from reviewing the response

12  information resulting from a WPS check, yes.

13  Q.  Why would you need to have a human being involved in that?

14  A.  Once again, there are no biometrics associated with that.

15  It's based on a name information, so we to have make sure that

16  the information that we're looking at matches the person

17  that's the subject of the firearms purchase.

18  Q.  Have you heard of a database that goes by the acronym

19  MHFPS in your work at the bureau?

20  A.  Yes, Mental Health Firearms Prohibition System.

21  Q.  What kind of records does that database contain?

22  A.  Generally that database contains mental health records as

23  well as records of individuals that are -- what we call are

24  707(b) Welfare and Institutions Code, prohibited juveniles.

25  Q.  Is this database a state database, a federal database, or

1 some other entity's database?

2 A. It's a state database.

3 Q. Why is the Bureau of Firearms looking at people's mental

4 health records in relation to firearms purchases?

5 A. Because under California law, people that have been

6 involuntarily admitted to a mental health facility under

7 Welfare and Institutions Code Sections 5150, 5152, 5250, or

8 5350 are prohibited for a period of five years from owning and

9 possessing firearms as well as people that have been

10 identified as Tarasoff reporting, those folks are also

11 prohibited for a period of five years, as well as people that

12 have been reported to the bureau by the courts as Penal Code

13 Section 1026, mentally -- I think that's insane, Penal Code

14 Section 1370, incompetent to stand trial, or -- and also

15 folks, I think, under 5300 of the Welfare and Institutions

16 Code Section that have been identified as gravely disabled.

17 Those folks are prohibited under California law.

18 Q. You mentioned the term "Tarasoff." What is Tarasoff?

19 A. Tarasoff, I believe, it relates back to a case called

20 *Tarasoff* under California law where essentially an individual

21 went into their licensed psychologist or psychiatrist and made

22 a threat against themselves or reasonably identifiable

23 victims, subsequently carried out that threat, and I think

24 there was a lawsuit that ensued because the psychoanalyst did

25 not report that information to law enforcement.

1          So as a result now under California law, if an

2    individual does go into their -- their licensed

3    psychotherapist or psychologist and makes a threat against

4    themselves or reasonably identifiable victim, that

5    psychotherapist is required by California law to report that

6    information to law enforcement, who, in turn, reports it to

7    the Department of Justice.

8    Q.   Are there records in MHFPS complete and up-to-date for all

9    people with a mental health history?

10   A.   No.

11   Q.   Is there any lag about information getting into that

12   system?

13   A.   There is not only a lag, but there is also underreporting,

14   which was identified recently last year by the Bureau of State

15   Audits in an audit of the State's courts, and the audit

16   revealed that many of the courts were not reporting all of

17   their mental health prohibitions to the department as required

18   under state law.

19   Q.   Does the -- do records ever come in, you know, not --

20   well, do records of mental health prohibition adjudications

21   come into that MHFPS system instantaneously or nearly

22   instantaneously?

23   A.   Currently not all records come in instantaneously.  The

24   public and private mental health facilities statewide, and

25   there's approximately 200 of them, they have the capability to

1  report to us electronically via the Internet.  They've been

2  advised and trained and told that they are required to report

3  immediately, report people that they admit and assessed S-50

4  as a danger to themselves or a danger to others immediately.

5  Some of them do report immediately.  Others kind of take their

6  time.  You know, when they get a nice little stack and will

7  report them.

8  　　　　And then the reports that we receive from the courts,

9  as I said earlier, there's an underreporting by the courts.  A

10  lot of times many cases, the courts are underfunded,

11  understaffed.  The reports that we currently receive from the

12  courts come in on paper.  And so they come through the mail,

13  so that there are times when things -- there's a lag because

14  of the mail and because of the paper.  We are working to

15  automate that process for the courts as well.

16  Q.  Does the Bureau of Firearms get the social security number

17  for each person submitting a DROS application to purchase a

18  firearm?

19  A.  No.  In fact, state law in many cases prohibits government

20  agencies from requesting social security information on

21  various types of applications.

22  Q.  If you had social security information, would it make it

23  faster to identify people correctly?

24  A.  It would certainly help.

25  Q.  I'd like to move on and discuss any other databases.  Are

1  there any other systems or databases that are checked when a

2  DROS application comes through the Bureau of Firearms?

3  A.  Yes.  There is a check with the Consolidated Firearms

4  Information System, which is a system that's used to process

5  DROS information.  It looks for whether a DROS from the --

6  this individual -- or this individual had been previously

7  denied on a purchase before.  It's sort of a trigger, sort of

8  a reminder to people maybe you need to look a little harder,

9  dig a little deeper.  If you don't see anything out there now,

10  they may have been previously denied, so you need to look a

11  little bit deeper.

12       We also look at the federal databases, which is the

13  National Instant Criminal History Check System, known as NICS.

14  And under the NICS umbrella, there are a number of databases.

15  Q.  Let me go back quickly about CFIS.  If somebody had been

16  denied before to purchase a firearm, does that mean that the

17  person is automatically going to be denied again?

18  A.  No.

19  Q.  Why is that -- if somebody was denied before, why aren't

20  they automatically denied again?

21  A.  Because it's possible that they had a conviction that was

22  subsequently overturned.  It could have been a felony

23  conviction that they subsequently went back to court and had

24  that felony reduced to a misdemeanor.  It could be a number of

25  reasons why a person that had been previously denied would no

1  longer be -- be denied.  Some prohibitions are -- they only

2  last a certain amount of time.  For instance, the 5150

3  individuals are nonprohibited for a period of five years, so

4  after that five-year period, their prohibition expires.

5  Q.  Let's talk about the NICS system.  Have you actually

6  worked with the NICS system?

7  A.  Yes.

8  Q.  Have you personally played any role consulting or

9  development of the NICS system?

10  A.  I was part of the initial -- at the inception of NICS, I

11  participated in initial meetings with the federal authorities

12  that were developing the NICS database.  They had a lot of

13  questions of states that already had a background check

14  process in place, and this was back in 1998.  So I did provide

15  quite a bit of input.  They had a lot of questions in

16  California about how we did things, and we shared various

17  information with them on our processes and practices.  In

18  fact, I was given a placard for recognition for important

19  contributions to the NICS section.

20  Q.  So you mentioned that there are several databases in the

21  NICS system.

22  A.  Yes.

23  Q.  And these databases are checked as part of the California

24  system, or are they not checked as part of the California

25  system?

1  A.  They are checked as part of the California DROS process,
2  yes.
3  Q.  So is it fair to say that the California system is NICS
4  plus other checks?
5  A.  Yes.
6  Q.  Let me ask you about the different NICS databases.  Have
7  you heard of a database that goes by the acronym triple I?
8  A.  Yes, Interstate Identification Index.
9  Q.  Was does the triple I database contain, what kind of
10 records?
11 A.  It contains criminal history records from states that
12 participate and shared their records electronically with the
13 FBI -- their criminal history records electronically with the
14 FBI.
15 Q.  Does the State of California submit records to triple I?
16 A.  Yes.
17 Q.  So in the California background check, Bureau of Firearms
18 finds out information about criminal convictions that people
19 may have had in other states besides California?
20 A.  That's correct.
21 Q.  Why does the Bureau of Firearms care about out-of-state
22 convictions?
23 A.  Well, California is a point of contact state for the FBI
24 NICS.  And as a point of contact state, we have an agreement
25 with them to enforce federal law when we initiate our

1    background check process.  As well as under state law, there
2    are -- California law says that if you're convicted of a felon
3    in any state -- a felony of any state, then you would be
4    prohibited under California law as well.
5    Q.  Does the triple I database have complete and up-to-date
6    records on everybody's criminal convictions around the
7    country?
8    A.  No.
9    Q.  Can a triple I check be done instantaneously or nearly
10   instantaneously and be sure to get all the criminal conviction
11   records for a DROS applicant?
12   A.  No.  There's times when you still have to research that
13   information because there's missing disposition information.
14   Q.  And so a human analyst at the Bureau of Firearms may have
15   to check the information in triple I?
16   A.  We routinely chase out-of-state dispositions, yes.
17   Q.  So you said routinely.  This is something that happens
18   routinely, not very often, a lot?
19   A.  I would say routinely, yes.  I mean every day, we had
20   records from out of state that we have to check and chase down
21   dispositions.
22   Q.  When you say chase down dispositions, does that just mean
23   accessing an electronic database and getting the information
24   instantaneously?
25   A.  No, that often means that you call them by phone.

1  Sometimes you to have fax because the agency only accepts

2  information by fax.  The FBI has produced a -- somewhat of an

3  assistance -- document that tells that -- that gives

4  information to the POC states on how to chase dispositions,

5  and depending on where the states are at or if we're chasing

6  information from federal courts or military courts.  So there

7  are some protocols that we follow based on, you know,

8  experience with these courts in other states or at the federal

9  level.

10 Q.  So a BOF human analyst could be calling a court in any

11 state of the union, Maine, Vermont, Hawaii?

12 A.  Yes.

13 Q.  Have you heard of the NICS database called NCIC?

14 A.  Yes, National Crime Information Center.

15 Q.  What kind of records are in the NCIC database?

16 A.  Typically those are the federal level warrants, the

17 federal level domestic violence restraining orders.  And there

18 are other records in NCIC.  I think they also have stolen gun

19 information, things of that nature.

20 Q.  Is every person who has a record in the NCIC database also

21 linked up to a set of fingerprints?

22 A.  No.

23 Q.  And is a check of the NCIC database done instantaneously

24 in all cases?

25 A.  It's done electronically, yes.

1  Q.  Is there ever a human involvement in analyzing or
2  reviewing the results?
3  A.  Yes.
4  Q.  Why aren't human beings involved in the check, the NCIC
5  check?
6  A.  Once again, it's a name base information, so we have to
7  verify it, look at it and make sure it's the same person, same
8  individual, and also some of the information in the NCIC just
9  like California, the warrant may be in the database, but it
10  may no longer be active, so we have to contact the agency that
11  entered the warrant and say, "Is that warrant still active?"
12  Occasionally they'll tell us, "Oh, we're sorry, we forgot to
13  take it out.  It's no longer valid."
14  Q.  Are there any other NICS databases that are checked?
15  A.  Yes.
16  Q.  What are the other databases?
17  A.  Under the NICS umbrella, under NICS, there's basically
18  like four different areas.  There's triple I, there's NCIC.
19  There's NICS itself.  And under NICS itself, you have military
20  dishonorable dischargees, citizen renunciates.  There's a file
21  that used to be called VICTOG files, which stood for --
22         (Reporter interruption.)
23         THE WITNESS:  V-I-C-T-O-G, which stood for violent
24  gang and terrorist files.  It's now called something else, but
25  they still have that file there under the NICS umbrella.

1          And then also -- there's another database that NICS

2   will spawn off to called ICE, Immigration, Customs, and

3   Enforcement, and that helps us identify illegal and unlawful

4   aliens, people in the U.S. illegally or unlawfully.  There are

5   some other categories.  There are people that have made Secret

6   Service files, people that made threats against the President

7   that are also part of the NICS umbrella.

8   BY MR. EISENBERG:

9   Q.  Have you heard that states that just do the NICS check do

10  a large number of them instantaneously or nearly

11  instantaneously?

12  A.  I know that NICS does checks for other states that don't

13  have their own background check process in place.

14  Q.  And have you heard how long those checks take?

15  A.  Under federal law, a NICS check can't take any longer than

16  three days.

17  Q.  Is the NICS check in three days sufficient to catch

18  everyone who might be prohibited?

19          MR. KILMER:  I object at this point in time, Your

20  Honor.  Asking the witness to render an opinion on the federal

21  law and federal database system.

22          THE COURT:  Sustained as to the form of the question,

23  basically his personal knowledge.

24  BY MR. EISENBERG:

25  Q.  Do you have any knowledge that the NICS system ever allows

1  prohibited persons to be cleared and purchase firearms?

2  A.  Yes, that does happen occasionally.

3  Q.  Do you have data about how often that happens?

4  A.  I've seen some -- I've seen some reports.  I don't have

5  them in front of me right now.  I may have provided them to

6  you.  I don't know.  I thought I may have, but I believe that

7  there is some reports that talk about when those -- ATF is

8  notified, to go out and retrieve firearms.

9  Q.  If we were to show you those reports, would it refresh

10  your recollection, do you think?

11  A.  I believe so.

12       MR. EISENBERG:  All right, may we take a moment to

13  look at those reports?

14       THE COURT:  Yes.

15       MR. EISENBERG:  Your Honor, may I approach the

16  witness and supply him with one of the binders here that has

17  copies of the exhibits?

18       THE COURT:  Yes.

19       MR. EISENBERG:  Thank you.  This is Exhibit BO.

20       MR. OTTEN:  What is it?

21       MR. EISENBERG:  BO.

22       MR. OTTEN:  BO.

23  BY MR. EISENBERG:

24  Q.  I've placed in front of you Exhibit BO.  Is this a

25  document you've ever seen before?

1    A.  Yes.

2    Q.  If I could direct you to page AG-001803 by Bates numbers

3    little double I?

4    A.  Um-hmn.  Yes.

5    Q.  If you look at the bottom, the very last bullet point on

6    the page, does that refresh your recollection about the number

7    of firearms that have -- may have been released in a given

8    year by the NICS system even though the person was prohibited?

9    A.  Yes.

10   Q.  What's your -- what's your recollection, then, of the

11   number of firearms that are released to prohibited persons on

12   NICS checks only?

13   A.  I believe this covers a span of about a little bit over a

14   decade.  And it's 3,166 firearms is what it says here.

15          MR. KILMER:  Excuse me, what page are you on?

16          THE WITNESS:  I think it's AG-001803.

17          MR. KILMER:  Thank you.

18   BY MR. EISENBERG:

19   Q.  I'd like to move back to the processing of the DROS

20   transactions.  Do you know how many DROS transactions were

21   processed by the Bureau of Firearms in the year 2013?

22   A.  Approximately 960,000 transactions.

23   Q.  And do you know the number for the year 2012?

24   A.  Approximately 812,000.

25   Q.  And how do those totals compare to the numbers from five

1  years ago, say.

2  A.  They're up substantially.  I think the lowest year I

3  remember was 2003, which we were only at 290,000.  So that's a

4  significant increase from 2003.

5  Q.  If we have a DROS application that makes it through -- is

6  it possible for a DROS application to make it through all of

7  the databases that we just mentioned without there being any

8  hits at all?

9  A.  Yes.

10  Q.  Is there an internal name at BOF or a DROS application

11  that has that characteristic?

12  A.  Yes, we call those auto approvals.

13  Q.  What percentage of the DROS applications are auto

14  approvals?

15  A.  About 20 percent.

16  Q.  What's the basis for your information there?

17  A.  Just looking at the numbers over years from time and

18  trying to maintain it at the lowest possible level.  We try to

19  achieve a higher level than 20 percent.  We worked

20  continuously to try to keep it up as high as we can.

21  Q.  When you say looking at the numbers, where are these

22  numbers coming from?

23  A.  I get daily reports.

24  Q.  And do you know the source of the information, the

25  ultimate source of the information?

1   A.  The information comes out of our Consolidated Firearms

2   Information System database.  CFIS is the acronym, C-F-I-S.

3   Q.  If someone's DROS application is automatically approved,

4   does that mean that there's never a human being that looks at

5   the record?

6   A.  That's true.  Yes.

7   Q.  A human being never looks at an auto-approved record?

8   A.  Well, the only time that a human being would be asked to

9   look at an auto-approved record is if sometime within the

10   waiting period, we're contacted by a potentially treating

11   psychoanalyst, or somebody that says, "Hey, I just treated

12   this guy.  He told me he's purchased a gun.  I want to let you

13   know that we've held him as a 5150.  You need to stop that

14   transfer."  So occasionally we get those kind of contacts, or

15   we'll get a contact from a peace officer somewhere, or

16   occasionally something happens along with ATF or a U.S.

17   Marshal will call us or something and say, "Hey, I see you

18   guys did a background check on this guy.  Just to let you

19   know, there's something going on here.  This guy is being held

20   right now for a felony."  Something, somewhere else.  So we'll

21   get those calls occasionally.  And usually what we do is we

22   say, "Okay, you're going to have to give us something that

23   would sustain a prohibition."  So if it's a treating

24   psychoanalyst, we're asking for a 5150 report or some kind of

25   order from a judge or somebody that says that that person

1  can't have a gun.

2  Q.  So if somewhere in the neighborhood of 20 percent of the

3  DROS applications are auto-approved, that means that the rest

4  are not auto-approved; correct?

5  A.  That's correct.

6  Q.  So what happens to a DROS application if it does come

7  back, having gone through one of those databases, and it has

8  at least one hit, what's the next stage in the process?

9  A.  Next stage of the process is for an analyst to review it,

10  and what happens is, electronically it drops into what we call

11  a queue, an electronic queue.

12  Q.  Is there a name for the -- or a job title for the analyst

13  that do the human review of the records?

14  A.  Their official state job classification is Criminal

15  Identification Specialist II.

16  Q.  Have you ever heard of them referred to by an acronym?

17  A.  CIS's.

18  Q.  CIS's.  How many CIS's are there?

19  A.  I believe there's about 24 involved in the DROS process --

20  involved in just the background check process part of it.

21  There's a whole another group of individuals that we use to

22  chase dispositions.

23  Q.  Are all these people within a certain unit at the Bureau

24  of Firearms?

25  A.  Yes, they're in the purchaser clearance section.

1    Q.   How does the CIS actually see a DROS application?

2    A.   The information is brought up to them electronically on a

3    computer screen, and actually all the CIS's are equipped with

4    dual monitors.  So on one monitor is the application

5    information about the individual buying a gun, so they can be

6    the applicant's name, date of birth, personal descriptors,

7    driver's license, and information.  And on the other screen,

8    they can view information about the gun, or they can view

9    information about the actual hits that were associated --

10   database hits that were associated with that individual so

11   they can look back and forth and make a comparison to see if

12   it's the same individual.

13   Q.   Are the hits the same on every DROS application that comes

14   through, or do they vary?

15   A.   They vary.

16   Q.   What is the work that the CIS does with one of these DROS

17   applications that has come up on the screen?

18   A.   The primary thing that they do is they verify that the

19   individual purchasing the gun, and the individual -- the

20   prohibition record of the same individual.  From there, then

21   it's a look into the record to determine is there information

22   in that record that would make that subject prohibited.

23        From there, even if there's prohibited information in

24   the record, that information has to be verified because

25   oftentimes what we find is that there's a conviction there

1  that had been reduced that had been subsequently dismissed or

2  something of that nature, so we have to look for those types

3  of things.  And we're also looking to see if there's an arrest

4  with no disposition, where we have to go out and actually

5  chase that disposition.  So there is quite a bit of work that

6  goes into that.

7          And then if it is determined that the subject is

8  prohibited, then the next step is to notify the dealer, reach

9  out to the dealer and make the appropriate notifications to

10 the dealer to not deliver the firearm.

11 Q.  Does it always take a CIS the same amount of time to

12 process a DROS application, or does the time it takes vary?

13 A.  It varies.  Depends on the size of the records and number

14 of hits returned.

15 Q.  Does any of this work ever take more than a day for an

16 application?

17 A.  Yes.

18 Q.  Would you say that that's something that rarely happens,

19 sometimes happens, often happens?

20 A.  I would say -- it happens fairly routinely.

21 Q.  At the end of any given workday, have the CIS's reviewed

22 all of the DROS applications that are in the queue?

23 A.  No.

24 Q.  Are you aware of the work hours of the CIS's?

25 A.  Yes.

1  Q.  Do they work a standard 40-hour week?

2  A.  Typically that's what they're hired to do is to work a

3  40-hour week, but our CIS's typically work well in addition to

4  the 40 hours.  We usually -- we have overtime every Saturday

5  and Sunday.  We usually work the holidays, including

6  Christmas, New Years, we're at work.

7  Q.  Why are the CIS's working so hard?

8  A.  To keep up with the influx of DROS applications.

9  Q.  So if at the end of a given day, the CIS's have not

10 finished with all the DROS applications that are in the queue,

11 what happens to those DROS applications?

12 A.  They're just held over another day.  They age another day,

13 and they come in the next day and try to work them the next

14 day.  They work overtime.  They may work 10-hour days, some

15 occasionally they work 12-hour days.  They work as long as

16 they can.  They go home, they get rest, they come back the

17 next day to complete the work.

18 Q.  How often is it that there's a backlog, where there are

19 DROS applications that have been in the queue for more than a

20 day?

21 A.  Always.

22 Q.  Is the --

23 A.  Or almost always.

24 Q.  Is the size of the backlog always the same, or does the

25 amount of the backlog itself vary?

1  A.  I would say on average, it fluctuates between day six and
2  day eight.
3  Q.  Are the number of DROS applications coming in over the
4  course of the year consistent from month to month?
5  A.  No.
6  Q.  So there's a variance?
7  A.  There's times when there are peak purchase times.  For
8  instance, the holiday seasons, Christmas, that area,
9  Christmas, Thanksgiving, around Thanksgiving, things sort of
10 go crazy.  Black Friday is a huge day for us.  It's not
11 uncommon to see as many as 10,000 DROS applications come in on
12 a black Friday, and then throughout that whole holiday season,
13 it's peak time.  Any time there's any type of a strange event,
14 for instance, a mass shooting somewhere, you'll see what we
15 call a run on guns.  We've seen at times where there were
16 earthquakes, there's been a run on guns.  During the Rodney
17 King riot time, there was a run on guns.  And then there's
18 just the typical, you know, hunting season, things of that
19 nature, where certain peak times where people are out buying
20 firearms.
21 Q.  You're a manager at the Bureau of Firearms; correct?
22 A.  Yes.
23 Q.  So why don't you just hire temporary workers during those
24 spike periods?
25 A.  Well, the reason we don't hire temporary workers is --

1    there's a few reasons.  One is the state budget process

2    doesn't allow me to just go out and start hiring people.  You

3    have to go through the state process, which requires approval

4    by the state legislature as well as the governor.

5            Secondly, there is a training curve.  It takes us

6    from three to six months to train an individual to be able to

7    do those background checks.  They have to understand state

8    law.  They have to understand federal law.  They have to

9    understand that things in between, the court case decisions,

10   and things of that nature that help them -- that assist them

11   in determining whether someone is prohibited or not.  They

12   have to understand how to access the database, records, read

13   those database records, analyze those database records, and

14   understand them.  So it takes us a lot to train folks.

15   Q.  After a CIS has finished doing the review of a DROS

16   application, are there any decisions that have to be made

17   about the application?

18   A.  Yes.

19   Q.  What are the decision options?

20   A.  Well, it's either we're going to approve it.  If it's

21   missing information, we're going to delay it and chase that

22   information down.  Or if there's prohibiting information in

23   there, we're going to deny the individual.  And if it's a

24   situation where the DROS is coming to its maturity of 30 days

25   old, and we've exhausted all of our chasing efforts to try to

1  resolve things and we cannot resolve it, then they would

2  identify the record or identify the record as undetermined.

3  Q.  I'd like to ask you some further questions about the NICS

4  check.  I may need to go get an exhibit.  It seems I have

5  mismarked one.

6       Are there prohibiting events under California law

7  that are not looked for in just a NICS check?

8  A.  Yes, there's several.

9  Q.  What are some of those?

10  A.  The most notable are our violent misdemeanors, our 5150

11  Welfare and Institutions Codes.  NICS does not enforce those.

12  NICS does not enforce our 707(b) Welfare and Institutions

13  Code, violent juveniles.  They don't have access to the

14  information either.  NICS does not enforce California's --

15  they don't verify the identification information through DMV

16  to verify if the information -- if the -- if the person

17  involved in a transaction is really not the same person on the

18  ID.

19       NICS does not look for people -- under California

20  law, you can only buy one handgun in a 30-day period.  NICS

21  does not look for, nor enforce that.

22       NICS does not look for, nor enforce California's

23  five-year prohibition on Tarasoff folks.  And NICS does not

24  look for -- I can't say for sure, but I don't believe NICS

25  looks for whether guns involved in a transaction have

1 previously been reported stolen.  I don't think NICS receives

2 gun information on transactions.

3 Q.  California supplies some information to NICS; correct?

4 A.  Yes.

5 Q.  Why doesn't California just give all this information to

6 NICS so that they can be run through the NICS check?

7 A.  Because federal law does not give the NICS authority to

8 enforce some of the state prohibitors.

9 Q.  Can the State just force the FBI -- force them to put this

10 information into NICS?

11 A.  No.

12 Q.  Do you know the number of people that we're talking about

13 that would make it through a NICS check, but be barred from --

14 by a California check in a given year?

15 A.  Not off the top of my head.  I'd have to look through my

16 reports.  We have annual reports that we can produce on demand

17 that would tell us that information.

18         MR. EISENBERG:  If I may have a moment to go get that

19 report.

20         THE COURT:  Yes.

21         MR. EISENBERG:  It would refresh the witness'

22 recollection.

23         (Pause in the proceedings.)

24         MR. EISENBERG:  Your Honor, may I go get one of the

25 other binders and give it to the witness?

1    THE COURT:  Yes.

2    MR. EISENBERG:  Thank you.

3  BY MR. EISENBERG:

4  Q.  Assistant Chief Buford, may I have you turn to Exhibit Tab

5  AP, with the Bates number AG-002394.

6    THE CLERK:  Sorry, Counsel, which exhibit is it

7  again?

8    MR. EISENBERG:  AP as in "Peter."  And the Bates

9  number is AG-002394.

10    THE WITNESS:  Got it.

11  BY MR. EISENBERG:

12  Q.  Okay, have you ever seen this document before?

13  A.  Yes.

14  Q.  Where have you seen this document?

15  A.  This document is generated from the Consolidated Firearms

16  Information System report screen.

17  Q.  And you see that the left side columns have headers or

18  subheaders with the word "denial" in them?

19  A.  Yes.

20  Q.  What does a denial mean in this context?

21  A.  It means that the subject was matched to a prohibiting

22  record.  The purchaser was matched to a prohibiting record,

23  and the transaction was denied, and the dealer was contacted

24  and told not to deliver the firearm.

25  Q.  And on the right side of the left side column, there are

1  numbers.  What do those numbers represent?

2  A.  The number of denials.

3  Q.  Are there any categories, any rows here that reflect

4  denials that the NICS system doesn't check for?

5  A.  Yes.

6  Q.  Can you identify them for the Court, please?

7  A.  Yes.  The 30-day reject -- and this report is from January

8  through December 2013.  So for the 30-day reject, which would

9  enforce California law in that area, there have been 2,814

10  subjects.  For the mental health, 5150 and Tarasoff folks

11  individuals, there were 802.  For the violent juveniles, there

12  were 329.

13  Q.  Do each of these denials represent people who were

14  prohibited from getting firearms because of the California

15  check?

16  A.  Yes.  And, again, there were 926 violent misdemeanors as

17  well.

18  Q.  Are there other categories -- I didn't mean to cut you off

19  there.

20  A.  No, that was it.

21  Q.  Let me ask you to look at the -- the left side column, the

22  first entry is total DROS's received, and the number is

23  960,179?  What does that number reflect?

24  A.  That's the number of DROS applications that we received

25  during the calendar year 2013.

1   Q.  And they were all processed through this system that we've

2   been talking about?

3   A.  Yes.

4   Q.  If I could turn your attention to Exhibit AQ.  "Q" as in

5   "queen."  Page 2407.  Bates number 2407 at the bottom of the

6   page.  Actually the first page of AQ.

7   A.  Did you say 2407, AQ-002407.

8   Q.  Right, it should be the first page?

9   A.  I have 2406, and then it skips to 2408.

10   Q.  Oh, boy.  Okay.

11   A.  You said AQ, right?

12   Q.  AQ, yes.

13   A.  I'm in the wrong section.

14   Q.  There may be a little bit of a misstatement in some of the

15   numbering here.

16   A.  I have it.

17   Q.  Oh, you do have it?

18   A.  Yes.

19   Q.  The Bates number is AG-002407, and this document actually

20   has the AQ stamp right on there at the bottom.

21   A.  I have it.

22   Q.  Have you ever seen this report before?

23   A.  Yes.

24   Q.  What is this report in context -- in the context of the

25   Bureau of Firearms?

1  A.  This report is generated out of the Consolidated Firearms

2  Information System, the reports menu.  It's the -- it's an

3  on-demand report for DROS information -- DROS statistical

4  information.

5  Q.  What time period does this report cover?

6  A.  This report covers 1/1 of 2014 through January 31, 2014.

7  So the month of January only.

8  Q.  Let's look at the right side column.  First entry, Total

9  DROS Received, and there's a number 64,312.  What does that

10  number reflect?

11  A.  That's the number of DROS applications received during the

12  month of January 2014.

13  Q.  And was each of those applications processed by one of the

14  CIS's?

15  A.  Yes.

16  Q.  So there 64,000 just in the month of January this year.

17  A.  Yes.

18  Q.  Are the categories of denials that were made under the

19  California system, but that would not have even been checked

20  for under the NICS system, present on this report?

21  A.  Yes.

22  Q.  Could you point out to the line numbers and the numbers of

23  denials, please?

24  A.  Yeah, for the 30-day rejects, it's 122.  For the violent

25  misdemeanors, it's 44.  For the mental health, it's 30.  For

1  the violent juveniles, it was 11.

2  Q.  Are there any others?  Trying to make sure it's complete.

3  A.  I believe that's --

4  Q.  Okay.

5  A.  That's it.  I mean, there's some other areas here, but I

6  can't say if they were caught under the federal areas as well.

7  Q.  But, again, each of those denials represent somebody who

8  would have received a gun if only a NICS check had been done?

9  A.  That's correct.

10  Q.  Let me ask you to turn to Exhibit AN.  AN as in "Nancy."

11  A.  Got it.

12  Q.  If you look at 2131, are we seeing the same kind of report

13  for just the different month, December of 2011?

14  A.  Yes.

15  Q.  If I could just have you flip through each of these pages,

16  are we seeing that same kind of report for each month of the

17  year, 2011?

18  A.  Yes.

19  Q.  And so somebody could use these charts to figure out how

20  many people were caught by the California system and denied

21  firearms because they're prohibited people.  That would not

22  have even been checked for under the NICS system?

23  A.  Yes.

24  Q.  Let me have you turn to page -- to Exhibit AO, "O" as in

25  "Oliver."  So I'm not going to take you through the same

1  series of questions for each one.  I'd like to proceed more
2  generally unless the Court would prefer me to operate in
3  another way.
4          Document with Bates number AG-002144.  Is this the
5  same kind of report for the year 2012?
6  A.  Yes, this is for calendar year 2012.
7  Q.  And if you would look at just the top right side, there's
8  total received from vendor 817,748.  That represents what?
9  A.  That's the number of DROS transactions received that
10 calendar year.
11 Q.  And, again, if we were to take you through the other
12 denial categories, you could show which categories there are
13 California checks on and denials based on that would not have
14 been caught through the NICS system?
15 A.  Yes.
16 Q.  And the rest of the exhibit goes through the same data,
17 only breaks it down by month?
18 A.  Yes.
19 Q.  If we could have you look at AP.  And I'll focus your
20 attention on just the documents with the Bates numbers 2 --
21 AG-002049 through 2046.  Pardon me.
22 A.  2056.
23 Q.  I think you'll see that there's -- there's two different
24 kinds of reports in here.  There's like the one at 2186 that
25 has some gray lines.

1  A.  Are you talking AG-OO2052?

2  Q.  2186.

3  A.  2186.

4  Q.  And I'm only pointing those out to you to say we're not

5  going to talk about those ones.

6  A.  Okay.

7  Q.  But interspersed, we see a lot of these other reports that

8  are the Dealer Records of Sales Statistics for the various

9  months in 2013.  Do they contain the same kind of data that

10  we've just been talking about?  So like, for example, 2049,

11  2050, all the ones that say "Dealer Record of Sales

12  Statistics."

13  A.  Okay.  The reports from 2049 through 2051 are the same

14  report.

15  Q.  Right.

16  A.  The reports from 2052 to where you asked me to turn to

17  2186 and probably further, that's a totally different report.

18  That's a daily report.

19  Q.  Right.  Right.  If you go through, you'll actually see

20  that we go back to the Dealer Record of Sales Statistics every

21  so often.  They're kind of intermingled.

22       So what I'm just generally asking you are these

23  Dealer Records of Sales Statistics reports covering various

24  periods of time in 2013?

25  A.  Yes.

1  Q.  And if I were to take you through them laboriously, we
2  could show all the number of, you know, juvenile denials, 5150
3  denials, et cetera.
4  A.  Yes.
5  Q.  I am going to spare everybody the pain of going through
6  all of that.
7       MR. KILMER:  And furthermore, Your Honor, we'll
8  stipulate that the records are accurate.
9       THE COURT:  All right.
10 BY MR. EISENBERG:
11 Q.  You said that the --
12 A.  I'm going to just clarify one of the things that's not
13 reflected on the DROS statistical report that is reflected on
14 these other daily reports are the number of DMV mismatch
15 rejects.
16 Q.  Right.
17 A.  So those numbers as I called them off from this
18 statistical report did not include the daily amount of DMV
19 rejects that actually had been rejected.
20 Q.  Okay, thank you very much for that clarification.
21       Is the DMV reject something that NICS checks for?
22 A.  No.  No.
23 Q.  So your understanding if somebody is using a fake ID, fake
24 driver's license for a NICS check, it doesn't get caught?
25 A.  No, because NICS doesn't run -- they rely on the dealer to

1  check the identification.

2  Q.  I believe you testified earlier that a NICS check can take

3  up to three days.  That's your understanding?

4  A.  It can take no more than three days.

5  Q.  So what happens if a NICS check has not been completed

6  after three days?

7  A.  The dealer is advised that they may release the firearm at

8  their discretion.

9  Q.  So what would happen if the NICS system finds out on the

10  fifth or sixth day that the applicant is prohibited?

11  A.  NICS has to contact ATF and ask ATF to go out and retrieve

12  the firearm.

13  Q.  I'm going to move on to another topic, which is the APPS

14  system.  Have you heard of something called APPS within the

15  Bureau of Firearms?

16  A.  Yes.  It means Armed and Prohibited Persons System.

17  Q.  Have you heard of something called a PAPF?

18  A.  Prohibited Armed Persons File.

19  Q.  Right?

20  A.  Yes.

21  Q.  What is APPS?

22  A.  APPS is a database of persons that have been determined to

23  have a record on file with the department as being the last

24  person to be in possession of a particular firearm -- used

25  typically based on a Dealer Record of Sale that's subsequently

1    been determined to have become prohibited due to one of the

2    prohibiting categories that we talked about earlier.

3    Q.   And how does PAPF relate to APPS?

4    A.   PAPF and APPS are the same.   PAPF is the legislative name

5    given to the process.   APPS is the name that the department

6    gave to the system.

7    Q.   How do you know about APPS?

8    A.   I was involved in APPS since the inception.   I provide

9    paper on APPS.   I made presentations to DOJ management about

10   APPS.   I participated in the budget change proposals that

11   obtain state resources to implement and administer APPS, the

12   feasibility study report for the electronic data system

13   associated with the APPS; participated in the development of

14   the business requirements and system requirements that needed

15   to implement the system; wrote a lot of the information

16   bulletins that went to law enforcement advising them about

17   APPS and how to use APPS; and participated in a development of

18   a lot of APPS training materials around the state.   I actually

19   traveled with AG Brown to some zone meetings to present on to

20   law enforcement agencies about the APPS database.

21   Q.   When APPS was being envisioned, what was it supposed to

22   do?

23   A.   APPS was envisioned as a preemptive crime-fighting tool,

24   sort of to preempt crime.   It was something -- the thought was

25   is that we would -- we would locate those folks that were

1   prohibited that had firearms and get to them before they had a

2   chance to use those firearms in a way that would harm the

3   public or harm themselves.

4   Q.  Was APPS developed in order to do instant background

5   checks?

6   A.  No.

7   Q.  Why doesn't the Bureau of Firearms just use APPS for its

8   background checks?

9   A.  Because the information in APPS is -- at this point, it's

10   just information.  In fact, when law enforcement does an

11   inquiry in APPS, there's an admonishment notice that says do

12   not arrest based solely on this information.  That information

13   has to be looked at again, refreshed on a constant basis.  So

14   it's sort of a pointer tool, if nothing else.  It's just a

15   pointer that says this person is -- could be armed and

16   prohibited in your jurisdiction, but before you go out and do

17   any enforcement action, you need to refresh that information,

18   because as I said earlier, that restraining order may not be

19   active anymore.  That warrant may not be active anymore.  That

20   criminal conviction could have been reduced, could have been

21   subsequently dismissed through a court proceeding, so it's

22   just a pointer tool.

23   Q.  Could you use APPS as an instant background check at least

24   for people who purchase firearms in California before, would

25   it be an instant check for those people?

1  A.  No.

2  Q.  Why not?

3  A.  Again, the information is not necessarily up-to-date and

4  refreshed.  So we could be -- we could either be prohibiting

5  people from getting guns that are no longer prohibited, or we

6  could be giving guns to people that have become prohibited,

7  but have not been identified in APPS yet.  APPS does not have

8  every person in California that have owned a firearm, that it

9  has become prohibited.  It's not completely 100 percent

10 populated with that information.

11 Q.  Does information -- does up-to-date information -- does

12 accurate information get populated into the APPS database

13 instantaneously or nearly instantaneously?

14 A.  No.

15 Q.  Why isn't information not put in there instantaneously?

16 A.  The same reason, we don't have instant information for

17 DROS background checks.  A lot of times we have to go chase

18 down the disposition.  There is missing information.  We have

19 a huge gap in our records, not only on a state basis, but on a

20 national basis.

21 Q.  I'd like to move on to another topic.

22         THE COURT:  Before do you that, it's about 10:30.

23 We'll take our morning recess, 15 minutes.

24         MR. EISENBERG:  Thank you, Your Honor.

25         (Recess.)

1    THE COURT:  Back on the record.  The witness,

2    Mr. Buford, retake the witness stand.

3         MR. EISENBERG:  May we proceed, Your Honor?

4         THE COURT:  Yes.

5    BY MR. EISENBERG:

6    Q.  Assistant Chief Buford, if I may redirect your attention

7    back to Exhibit BO, the FBI NICS report that we were talking

8    about earlier.

9    A.  Sure.

10   Q.  BO as in Oliver.

11        MR. KILMER:  Got it.

12        THE WITNESS:  Yes.

13   BY MR. EISENBERG:

14   Q.  And have you turn to page AG-001818.  It's also number 14,

15   page 14 in the report itself.

16   A.  Got it.

17   Q.  If I could ask you to look at the first full paragraph

18   under "Firearm Retrieval Referrals."  The last sentence that

19   starts, "In 2011."

20   A.  Yes, I see it.  "In 2011, the NICS section referred 3,166

21   firearm retrieval actions to ATF."  So it was 3,166 in that

22   one year alone.  Not over the 10-year period.  I apologize.

23   Q.  I want to ask you a general question about the

24   incompleteness of the databases.  You have testified

25   essentially that the databases are not always up-to-date, and

1  they may have incomplete records.  Is that fair?

2  A.  That's correct, yes.

3  Q.  Does the State have anything in place to try to mitigate

4  the burden of that problem?

5  A.  I would say the only thing that we have on our side to

6  help mitigate that is the extra time that we have to do the

7  background checks, which is the 10-day waiting period.

8  Q.  I'll move on to another topic.  Have you in the course of

9  your work at the Bureau of Firearms heard of something called

10  a COE?

11  A.  Yes, Certificate of Eligibility.

12  Q.  What is, generally speaking, a COE?

13  A.  A Certificate of Eligibility is a background check that

14  includes submission of fingerprints to the department.  And

15  typically all firearms dealers are required to have a

16  Certificate of Eligibility, and it's also issued for other

17  reasons as well.

18  Q.  In the course of your work at COE, have you ever heard of

19  something called a rap-back?

20  A.  Yes.

21  Q.  What is a rap-back?

22  A.  The term "rap-back" or subsequent notification refers to

23  the capability of when a person is -- once they're

24  fingerprinted, and their fingerprints are on file with the

25  department, at any time should a fingerprint-based record be

1    submitted by a criminal justice agency, the agency or the

2    licensing authority that require the prints would be notified

3    of a subsequent arrest.

4    Q.   How does a rap-back relate to a Certificate of

5    Eligibility, if at all?

6    A.   Well, for the purposes of a Certificate of Eligibility,

7    people that have those in their possession, in the event they

8    are subsequently arrested in California, and California only,

9    the department would be notified of that arrest.

10   Q.   Does a rap-back contain records of every possible

11   prohibiting event that could occur to someone?

12   A.   Only those --

13          MR. KILMER:  I'm going to object, Your Honor.  That

14   misstates the testimony.  I believe that a rap-back refers to

15   a recall of when an agency -- now, he's talking about as a

16   database.  I'm misunderstanding.

17          THE COURT:  Let me go ahead and sustain the

18   objection.  Go ahead and --

19   BY MR. EISENBERG:

20   Q.   What form is a rap-back in?  Is it a database, is it a

21   paper record?  What kind of thing are we talking about?

22   A.   It can be both, depending on the agency receiving the

23   notification and depending on the process involved.

24   Q.   And what agencies or people make entries on rap-backs?

25   A.   For instance, armed security guards, where the Department

1  of Consumer Affairs is an issuing authority for the guard

2  card.  So if there is a rap-back or a subsequent arrest, they

3  would be notified.  In the past, they were notified by paper.

4  I believe we may be notifying them electronically now.

5          In the case of a COE, we -- we get paper

6  notifications in the patrol of firearms.  We don't get

7  electronic notifications on rap-back.  And peace officers, law

8  enforcement agencies would be subject to a rap-back, to where

9  a police officer or Sheriff's Officer employed by a law

10  enforcement agency that is subsequently arrested in California

11  where prints are submitted would be subsequent to rap-back

12  notification.

13  Q.  If a person gets put on a mental health hold, is that

14  record -- is the record of that occurrence put on that

15  person's rap-back?

16  A.  Not on a fingerprint-based rap-back, no.

17  Q.  What's the difference between fingerprint based and

18  nonfingerprint based?

19  A.  Well, rap-back is fingerprint based, so it means that the

20  match is done by fingerprint.  It's a positive identification.

21  We positively know that this person was subsequently arrested

22  because we've matched their prints with the prints that were

23  previously placed on file.

24  Q.  Does the rap-back for a person contain all of the checks

25  of all those databases that we mentioned before?

1    A.   No.  It would just be what happened lately.

2    Q.   If a person has --

3    A.   Let me correct that on a rap-back.  What a rap-back

4    usually does is it generates an updated copy of the records.

5    So it could include all the arrests in disposition of

6    information that DOJ had available.  But in some cases, DOJ

7    does sanitize the rap-back information.

8    Q.   Does a restraining order appear on someone's rap-back?

9    A.   Not on a fingerprint-based rap-back, no.

10   Q.   If a person has a COE, does that mean that the person is

11   eligible to purchase firearms up until the date of expiration

12   of the COE?

13   A.   No, not necessarily.

14   Q.   Why not?

15   A.   Once again, there's the issue of the records gap.  There

16   could have been some new information that came in.  The person

17   could have been arrested outside of California, could have

18   been admitted to a mental health facility outside of

19   California where we would not get subsequent notification of

20   that information.

21   Q.   Does a person who has a COE, is that person undergoing an

22   ongoing real-time background check?

23   A.   Not really.  I mean, they get ongoing California criminal

24   history information based on fingerprints, and that's it.

25   Q.   If someone who has a COE is convicted of a felony in

1  another state, does that go on the rap-back?

2  A.  No.

3  Q.  Have you heard of something called a CCW?

4  A.  Yes.

5  Q.  What is a CCW?

6  A.  Carry concealed weapons license.

7  Q.  If a person has a CCW, what does that -- what does that

8  mean?

9  A.  That means that they have undergone a fingerprint

10  background check.  They have applied through their local

11  police or sheriff's agency for that CCW.

12  Q.  What rights or benefits does a CCW allow to you exercise?

13  A.  It allows them to carry a -- a concealable handgun on

14  their person.

15  Q.  If a person has a CCW, are they subject to an ongoing

16  real-time background check?

17  A.  They're subsequent to rap-back.

18  Q.  Anything beyond the rap-back?  Or not?

19  A.  There's some -- there is another system that's available

20  to those folks called the firearms eligibility applicant file,

21  where there is some subsequent information that is provided

22  there based on name information -- based on a record match

23  based on name information.

24  Q.  If a person has a CCW, does that mean the person is

25  cleared to purchase firearms so long as the CCW is in effect?

1  A.  No.

2  Q.  I'd like to move on to the next topic, which will be the

3  statutory exemptions to the Waiting-Period Law.  Do you have

4  knowledge that there are, in fact, statutory exemptions to the

5  Waiting-Period Law?

6  A.  Yes.

7  Q.  What's the basis of your knowledge?

8  A.  My tenure with the Bureau of Firearms and reviewing

9  legislation and response to some of the proposals for some of

10  the -- the statutory exemptions.

11  Q.  Have you ever communicated with members of the California

12  legislature about bills for exemptions to the Waiting-Period

13  Law?

14  A.  Yes.

15  Q.  How have you come into contact with the legislature on

16  that topic?  Do you call people up and offer your advice, do

17  they come to you?

18  A.  Typically, the contacts that I have go through our office

19  of Legislative Affairs.  So I work with the department's

20  office of Legislative Affairs.  Occasionally, a legislative

21  staff will request a meeting with the folks involved in the

22  process, and I've been involved in some of those meetings

23  where we met face to face on various legislative issues.

24  Q.  Okay.  I want to ask you about some of the exemptions in

25  particular.  Have you of an exemption that is known

1  essentially as the peace officer exemption?

2  A.  Yes.

3  Q.  What's your understanding for why peace officers are

4  eligible for an exemption to the Waiting-Period Law?

5  A.  My understanding is that peace officers are exempt from

6  the waiting period because they have undergone a Peace

7  Officers Standards Training, which is a California

8  standardized training that's put on by POST, which is the

9  Peace Officers Standards and Training.  They go through

10  extensive psychological evaluation.  They go through an

11  extensive background check, which involves an investigator

12  going out and talking to their family, friends, neighbors, and

13  then they carry guns as part of their duties.  That the

14  legislature did not want to handle their access to firearms to

15  protect themselves while on and off duty.

16  Q.  Is the background check that a peace officer goes through,

17  the background investigation, is it the same thing as the

18  background check that a DROS applicant goes through?

19  A.  No, it's much more extensive.  As I indicated, they send

20  an investigator out to investigate, speak with family members,

21  friends.

22  Q.  Are you, sir, a peace officer?

23  A.  No, I am not.

24  Q.  How do you know about what the peace officers go through?

25  A.  I'm involved with working with POST on various things.

1   I've actually done POST training, taught POST classes,

2   POST-certified classes on behalf of the department in the area

3   of firearms.  I've been involved in some POST-related videos.

4   Excuse me.

5   Q.  Let me ask you about another exemption.

6   A.  Excuse me.

7   Q.  Are you okay?

8   A.  Yes.

9   Q.  Assistant Chief Buford, have you heard of something that's

10  known as the Dangerous Weapons Permit exemption?

11  A.  Yes.

12  Q.  What generally is the Dangerous Weapons Permit exemption?

13  A.  It exempts a holder of a dangerous weapons license from

14  the 10-day waiting period.

15  Q.  What's your understanding of why there is a Dangerous

16  Weapons Permit exemption?

17  A.  My understanding of that, the reason for that is because

18  licensees or dangerous weapons licensees also go through an

19  extensive background check.  The department -- when we license

20  these individuals, we actually send an investigator out to

21  their homes and businesses.  We speak with their friends,

22  their relatives, former employers.

23  Q.  Is that the same background --

24  A.  Excuse me.  Fighting a cold.

25  Q.  Is that the same background check that somebody who is a

1  DROS applicant to purchase a firearm goes through?

2  A.  No, it's not.  It's much more extensive as well.

3  Q.  Let me ask you about another exemption, something that's

4  known as the Entertainment Firearms Permit.  Have you heard of

5  such a thing?

6  A.  Yes.

7  Q.  What's your understanding of why there is that exemption?

8  A.  The Entertainment Firearms Permit is -- it's a permit

9  involved for folks that are associated with a Dangerous

10  Weapons License or permittee, and essentially, these folks are

11  employees of those licensees, and the permit allows them to be

12  exempt from the waiting period, to go to a prop house --

13  that's usually typically a movie prop house, which most of

14  them are located down in Southern California to obtain

15  firearms to be used in motion picture television and

16  theatrical events.

17  Q.  How are the firearms generally used in motion pictures --

18  A.  They're typically used as movie props.  Those are the guns

19  that we see in the movies with Arnold or -- Arnold

20  Schwarzenegger or Sylvester Stallone, whatever.  Those folks

21  that do movies with firearms.

22  Q.  In the consulting that you've had with the California

23  legislature and your work with -- of the bills that have led

24  to the exemptions, do you have any information that any of the

25  exemptions were passed in order to discriminate against any

1 group of people?

2 A.  No.

3       MR. EISENBERG:  I have no further questions for

4 Assistant Chief Buford.

5       THE COURT:  All right.  Cross-examination.

6       MR. EISENBERG:  Should we take a break before cross?

7       THE COURT:  Would you like a couple minutes?

8       THE WITNESS:  Sure.

9       MR. KILMER:  I have no objection to that.

10       THE COURT:  Let's take a quick five-minute break.

11 We'll come back in five minutes.

12       (Recess.)

13       THE COURT:  Back on the record with

14 cross-examination.

15       MR. KILMER:  Thank you, Your Honor.

16                    CROSS-EXAMINATION

17 BY MR. KILMER:

18 Q.  Good morning, Mr. Buford.  I'm Donald Kilmer.  I represent

19 the plaintiffs in this case.

20 A.  Good morning.

21 Q.  You testified earlier that waiting periods have two

22 primary purposes, and that is to prevent -- to a cooling-off

23 period to prevent impulsive violent acts, either a homicide or

24 suicide or assault and also to permit your organization to

25 conduct background checks.

A. Yes, as well as to notify the dealers.

Q. Okay, so the second reason for the 10-day waiting period is to not only perform the background check, but to notify the dealer to release the weapon.

A. To not release the weapon.

Q. Okay. So is that the way the system works, if the dealer doesn't hear back from you, they can just release it in 10 days?

A. Historically that's how it worked. It's different now. Now they get a red light, green light. Pretty much after the 10-day waiting period, the light turns green. Basically a button lights up and says that they can deliver the gun.

Q. And where is this button located?

A. It's on their PC.

Q. So this is part of the new system?

A. It's part of the new system. It's all automated now.

Q. And this is the new system that California took over on its own from, I believe, Verizon?

A. Yes, Verizon dropped the contract, and California essentially developed our own system to take on the front-end part of the system.

Q. All right. And does this system permit your department to immediately notify the dealer to take some action?

A. Yes, we can immediately notify them to deny a firearm.

Q. All right. And would it be fair to say that the three

1  categories of responses that a dealer can get from your agency
2  is to either approve the sale, deny the sale, or delay the
3  sale for further investigation?
4  A.  And there is a fourth category now called "undetermined."
5  Q.  And how does "undetermined" work?
6  A.  "Undetermined," those are when after 30 days, we're unable
7  to -- if we're unable to obtain the disposition or the
8  information we need, and so at that point in time, under state
9  law, the law that just took effect this year, we would
10  identify the DROS, and the dealer system is an undetermined,
11  and the dealer gets a letter indicating that they can deliver
12  the firearm at their discretion.
13  Q.  So that kind of almost works like a presumption of
14  innocence for the gun dealer?
15  A.  Yes, very similar to the NICS system.
16  Q.  All right.  I want to ask you a few questions about the
17  cooling-off period.  Now, I guess the logic behind the
18  cooling-off period is that we want to prevent people from
19  committing impulsive violent acts either from self-harm or
20  harm to another in buying a gun in a fit of rage; is that
21  correct?
22  A.  That's part of it.  That was part of the legislative
23  intent.
24  Q.  What is another part?
25  A.  The other part is to give the department time to review

1  the records and time to notify the dealer.

2  Q.  I just want to focus right now on the cooling-off period,

3  and we'll talk about the records clearance later.

4          So the cooling-off period is designed to create a

5  period of time that hopefully the person can't get ahold of

6  that weapon while they're in that state of anger?

7  A.  That's my understanding, yes.

8  Q.  Would that reason for a 10-day waiting period be effective

9  for anybody who already possess their own firearms?

10  A.  Potentially, because we don't know whether they own or

11  possess those firearms.

12  Q.  No, my question is, is that without anybody even

13  purchasing a firearm, somebody already owns a firearm, there's

14  no way to stop them from using the firearm because they become

15  angry or upset or suicidal.

16          MR. EISENBERG:  Objection.  Hypothetical question.

17          THE COURT:  Overruled.

18          THE WITNESS:  Well, the background check that we do

19  does not assume whether or not a person has a firearm.  It

20  assumes that people don't have firearms.  So we don't know

21  that.  So my answer to that would be, assuming from our

22  perspective, we don't know whether the person is in possession

23  of a firearm or not.  We -- we adhere to the waiting period

24  because of that.

25  BY MR. KILMER:

1　Q.　All right.　So getting back to the cooling-off period for
2　purposes of stopping impulsive violent acts, the background
3　check really has nothing to do with that, does it?
4　A.　That's separate.　The background check that we do is --
5　yeah, it's making sure that -- the assumption is that we don't
6　know whether you're legally lawfully eligible to own or
7　possess that gun.
8　Q.　And you mentioned a minute ago, that -- and I don't want
9　to misstate your testimony, that the DROS system basically
10　assumes everybody that applies does not have a firearm;
11　correct?
12　A.　That's our assumption, yes.
13　Q.　Okay.　And why does the agency assume that?
14　A.　Because we don't know.　We don't necessarily know.　That's
15　not something that we look for when we get the DROS
16　application.　That's not one of the first checks we do is do
17　you have a gun?　The assumption is that, you know, we're
18　essentially an administering state law that requires the
19　background check, and that's what we do.
20　Q.　All right.　But a point in fact, you testified earlier
21　that there is -- one of the databases that you administer is
22　something called an AFS system?
23　A.　Yes.
24　Q.　And that is the database of firearms or at least
25　historical firearms transactions in California?

1  A.  That's true.

2  Q.  And isn't it true that in California with some limited

3  exceptions -- and I'll ask you about those in a minute -- that

4  all transactions have to go through a DROS process?

5  A.  Yeah, after 1991.  That would be true for firearm

6  transfers that occurred subsequent to 1991.

7  Q.  Okay, so subsequent to 1991, that the way people purchase

8  firearms in California is they either go to a dealer, which is

9  licensed by the federal and state government, and they go

10  through the DROS system, and if the person also wants to, say,

11  buy a gun from a private party, state law at least says that

12  they must go through a dealer to do that.

13  A.  They're supposed to do that, yes.

14  Q.  All right.

15  A.  Not all of them do, though.

16  Q.  I'm not here talking about people who break the law.  I'm

17  talking about people who are following the law.  Okay.

18          So since 1991, all legal transactions of acquisitions

19  to firearms are supposed to go through a Dealer Record of

20  Sales process.  Is that true?

21  A.  That's fair.

22  Q.  Now, there are some minor exceptions, for instance,

23  interfamily transfers can happen without the DROS process;

24  correct?

25  A.  That's correct.

1  Q.  And an inheritance can sometimes happen -- of a firearm

2  can happen without going through the DROS process?

3  A.  Yes.

4  Q.  And I think antique firearms can also be transferred

5  without going through the DROS process; is that correct?

6  A.  Yes.  Antique long guns, yes.

7  Q.  That's a good distinction.  Antique handguns do require a

8  DROS process?

9  A.  I believe so, yes.

10  Q.  Okay.  You were speaking earlier about some of the

11  statistics about denials.  And you talked about something

12  called the DMV mismatch.

13  A.  Yes.

14  Q.  What is that?

15  A.  That's when essentially we talked about the first part of

16  the Dealer Records of Sales process is we take the purchaser's

17  identification information, and we run that against the

18  Department of Motor Vehicles files, because under California

19  law, purchasers are required to have a valid California

20  drivers license or a California identification card issued by

21  the State DMV to buy a gun.  So we verify that information

22  against DMV files.

23  Q.  Okay, and the purpose of that verification is to make sure

24  that the person who is representing themselves to the dealer

25  is the true person?

1  A.  It ensures that we're doing the background check on the
2  correct person, yes.
3  Q.  And you're not doing the background check on their twin or
4  their brother or something like that?
5  A.  That's the intent, yes.
6  Q.  And that's to help and stop straw purchases and that sort
7  of thing?
8  A.  Yes.  And otherwise people that would not be eligible to
9  just use a fake ID to buy a gun.
10  Q.  Are there reasons why there might be a mismatch between
11  the DMV record and the tendered dealer record of sale that is
12  not criminal or fraudulent?
13  A.  Yes.
14  Q.  Okay, could you give me an example?
15  A.  It could be that the dealer made a typo, made a mistake
16  when they entered the information.
17  Q.  Okay.
18  A.  It could be that the -- the license is no longer valid, or
19  it's been revoked by DMV.
20  Q.  All right.  It could even be as simple as somebody got
21  married and changed their maiden name and now using a
22  different name?  I mean, for instance, they were issued their
23  DMV license under their maiden name, and they're buying the
24  gun under their new married name.
25          MR. EISENBERG:  Objection.  Vague and unintelligible.

1  I don't believe there is a question pending.

2        THE COURT:  All right, do you understand the

3  question?

4        THE WITNESS:  Yes.

5        THE COURT:  All right.

6        THE WITNESS:  It's possible.

7  BY MR. KILMER:

8  Q.  Okay.  So would it be fair to say that these DMV holds or

9  mismatches don't necessarily always indicate a prohibited

10  person?

11  A.  That's -- that's true.  I mean, the initial mismatch,

12  that's true, yeah.

13  Q.  But that would be a reason --now, the mismatch, does that

14  result in a denial or a delay?

15  A.  It could result from somebody having to look at it.

16  Q.  Okay.

17  A.  So when we have those mismatches that we talked about

18  there where -- potentially where there is a maiden name

19  involved, or there is a typo by the dealer or something of

20  that nature, that's not an auto rejection.  We'll actually

21  look at that, and we'll make some phone calls to the dealer.

22  We'll try to clarify and correct it.  Just like we do when we

23  do the background check on criminal history, and it says the

24  person is prohibited, we verify that information before we

25  make that final determination.

1    Q.  All right, thank you.

2    A.  And that takes time.

3    Q.  All right.  So, for instance, if somebody's driver's

4    license is suspended for some reason, that's not

5    necessarily -- mean that they can't purchase a firearm.

6    A.  It does under California law.  The statute says they have

7    to have a valid California driver's license.

8    Q.  So if their driver's license is suspended, and they go and

9    get a California ID and come back and try and complete the

10   DROS, would that --

11   A.  Yes.

12   Q.  And if the identifier for a California ID and a California

13   driver's license, they're pretty similar, aren't they?

14   A.  They usually keep the same number.

15   Q.  You testified earlier about something called an auto

16   approved.

17   A.  Yes.

18   Q.  And what might result in an auto approval?  How does an

19   auto approval happen?

20   A.  Typically an auto approval happens because the person

21   has -- either their name, information, mismatched against DMV

22   files.  Their name information did not hit a prohibiting --

23   one of our prohibiting database files via state or federal,

24   and the gun involved in the transaction was clean and clear.

25   And that would result in an auto approval.

1   Q.   And how long does that process usually take?

2   A.   To determine whether a gun -- whether an auto approval can

3   happen?

4   Q.   Yes.

5   A.   It can happen fairly quickly, probably within an hour, an

6   hour or two of -- you know, the transactions coming in.

7   Q.   You spoke earlier about the difficulty of trying to

8   identify people that are unknown to the State so that you can

9   make sure that they're not a prohibited class.   You spoke

10  earlier about biometrics being an issue there.   And I think

11  you mentioned fingerprints and retina scans.

12  A.   Yes.

13  Q.   Does the State of California currently employ retina scans

14  for biometric identification for the general public?

15  A.   No, I was using biometrics as a term.   Basically I was

16  saying it would be nice to have fingerprints involved in the

17  process because fingerprints provide for positive

18  identification, so you're not matching names and looking at

19  different information.   If you have those fingerprints, it's

20  for sure.

21  Q.   Okay.   And some fingerprint records in California are just

22  a right or left thumbprint; is that correct?

23  A.   Not for criminal history.

24  Q.   No, but I mean for DMV record?

25  A.   For DMV, yes, it's like a thumbprint.

1  Q.  And I believe that part of the DROS process is that the

2  guy buyer also provides the thumbprint.

3  A.  Yeah, the dealer collects a thumbprint on the back of the

4  DROS.  It's not always legible.

5  Q.  And is that on a paper DROS?

6  A.  Yes, and dealers aren't trained to collect fingerprints,

7  so it's not always a legible print.

8  Q.  And are dealers required to keep these records, or do they

9  send them to you?

10  A.  They keep those records.

11  Q.  So, in other words, that's a record that they keep that

12  you will use in a future investigation if necessary?

13  A.  Yeah, maybe the DA.  If it's determined that the purchaser

14  lied on the -- under state or federal paperwork, they can try

15  to use that to sustain whether or not the person involved in

16  the transaction was really the person who used that ID.

17  Q.  Okay.  Now, somebody who's issued a COE, do they provide a

18  full fingerprint scan?

19  A.  Yes.

20  Q.  And is there a difference between ink and card fingerprint

21  and something called live scan?

22  A.  Yes, there's a minor difference.  What they do -- if they

23  live scan, they take their prints directly from a terminal

24  there that electronically captures the prints.  If they ink

25  the prints onto a card, those cards come into the department,

1  and they have a scanner that scans those prints and classifies

2  them electronically.  So it's just a slower process.

3  Q.  And what system does the Department of Justice require for

4  COE?

5  A.  COE, we usually ask people to go to a live scan terminal,

6  live scan operator.  If they live in California, they're

7  usually required to go to a live scan operator.

8  Q.  In fact, most Sheriff's Offices have live scans, don't

9  they?

10  A.  I believe so.

11  Q.  Do you know whether or not people who are issued concealed

12  carry permits also submit fingerprints?

13  A.  They do.

14  Q.  Do you know whether or not those are live scan

15  fingerprints?

16  A.  Typically they're live scan.

17  Q.  Now, you mentioned almost a dozen different databases in

18  your direct testimony.  Are those fingerprints for COE holders

19  contained within that database?

20  A.  For the COE holders, the purpose for those fingerprints

21  are to go against California criminal histories, to speed up

22  the criminal history check.

23  Q.  All right, but, in fact, you have those records on file?

24  A.  Yes.

25  Q.  And would that be the same for people who have concealed

1  carry permits?

2  A.  Yes.

3  Q.  Are you familiar with the term "globally unique

4  identifier?"

5  A.  No.

6  Q.  All right.  There is a number that appears on -- let's

7  take them one at a time -- on a Concealed Carried Permit

8  called a CII number.  Do you know what that is?

9  A.  Yes.

10 Q.  What is that?

11 A.  That's the criminal identification number.  That's the

12 number that the department uses to identify a record -- a

13 unique criminal record.

14 Q.  All right.  And so that number is assigned to a particular

15 person who has a record in the system?

16 A.  Who has a unique set of fingerprints, yes.

17 Q.  And that number is unique to that person?

18 A.  Yes.  In most cases, it's unique.

19 Q.  And so it would speed up the process of identifying that

20 person.

21 A.  Yes.

22 Q.  All right.  Do you know whether or not there's a CII

23 number also issued to COE holders?

24 A.  Yes.

25 Q.  All right.  And so is it the same kind of CII that's a

1  unique identifier?

2  A.  It's a unique identifier, yes.  There's different types of

3  numbers.  There's different types of records.  Those would be

4  called an APP record as opposed to a crim record.

5  Q.  All right.  Now, except for the statutory 10-day wait

6  period, is there any reason why your system couldn't simply

7  notify the dealer when the background check is complete and

8  the sale is approved?

9  A.  No.

10  Q.  So based on your earlier testimony that sometimes these

11  auto approves take an hour?

12  A.  Um-hmn.

13  Q.  Then the sale could be approved and the firearm could be

14  released except for the statute?

15  A.  It could, but keep in mind, within that 10 days, there

16  could be something that comes in that would -- you know, a

17  call from a mental health facility saying, you know, this

18  person is prohibited or something now because of -- they were

19  admitted involuntarily, or they're being treated at that point

20  in time.  So even though that we could -- and 20 percent of

21  the time, we do have those auto approvals.  There's a

22  percentage of those where we get subsequent information that

23  says that that person is no longer eligible.

24  Q.  But isn't that true for every gun owner in the state that

25  they could subsequently become prohibited?

1  A.  That's a possibility, yes.

2  Q.  In fact, that's what the Armed Prohibited System is

3  designed to do is to try and go out and capture firearms from

4  known firearm owners who have become prohibited.

5  A.  Yes.

6  Q.  Is there a similar unique identifier for just the gun

7  purchaser who doesn't have a COE or a -- I'll withdraw the

8  question and rephrase it.

9        Is there a unique identifier given to every DROS?

10 A.  Yes.

11 Q.  And what is the nature of that unique identifier?

12 A.  It's a DROS number.  Part of it is the dealer ID combined

13 with the Julian date and a generated number,

14 database-generated number that makes it unique.

15 Q.  So it's unique to the transaction and not necessarily the

16 gun owner?

17 A.  Makes the transaction unique, yes.  It's a time/date

18 stamp.

19 Q.  Now, you identified earlier several databases that get

20 accessed as part of the background check.  And the first one

21 is the DMV to verify the identity of the person, and then

22 there is a criminal history -- access to a criminal history

23 database, and then a mental health database, and then a wants

24 and warrants database.  Have I missed any?

25 A.  Yes.

1  Q.  Okay.

2  A.  There's the -- the check of the firearm against the

3  Automated Firearms System; the Mental Health Prohibition

4  database.  I think you left that one out.

5  Q.  All right.

6  A.  The California Restraining Order and Protection Order

7  System database.  And then all the federal systems.

8  Q.  Okay.  And for those auto approveds that can take as

9  little as an hour, all those databases are accessed and come

10  back with a green flag.

11  A.  Yeah, there are no hits returned.

12  Q.  No hits.  Okay.

13        THE COURT:  That raises an interesting question.  Do

14  you have -- like you indicated all these various databases, do

15  you have, like, a written flow chart or something that

16  indicates all of the databases that you -- that your office

17  goes --

18  A.  Yes, we do.

19        THE COURT:  Can you provide that?

20        THE WITNESS:  Yes, I believe Jonathan has it.

21        MR. KILMER:  Actually I can help, Your Honor.  I'd

22  ask that the witness -- we're going to take a look at Exhibit

23  CB, which has been previously identified and admitted.

24        MR. EISENBERG:  Your Honor, if I may, we had a

25  witness that we're planning to have introduce that document,

1   the person who actually wrote it.

2           THE COURT:  Oh, okay.  I'm sorry.  I jumped the gun.

3           MR. KILMER:  I still want to talk about it.

4           THE COURT:  Sure.

5           MR. KILMER:  Can you turn to CB.  This is a document

6   entitled, "Bureau of Firearms, Consolidated Firearms

7   Information System, Dealer of Record of Sale Processing."

8   It's been marked and identified and accepted into evidence as

9   Exhibit CB from the defendants.  It is Bates stamped

10  AG-000004.

11  A.  I don't believe I have that manual.  I have the A's -- A

12  through AS and B through BY.

13          MR. EISENBERG:  Pardon me.  It's in another one of

14  these binders.  With the Court's permission, I'll just bring

15  the actual document and not the binder up.  Is that okay?

16          THE COURT:  Yes.

17          MR. EISENBERG:  Are you just planning to use this

18  one?

19          MR. KILMER:  Um-hmn.

20  BY MR. KILMER:

21  Q.  Mr. Buford, please study that and let me know when you've

22  had a chance to look at it.

23  A.  Okay, yes, I've looked at it.

24  Q.  Have you seen this document before?

25  A.  Many times.

1   Q.  All right.  Is it an accurate representation of the

2   various databases that are accessed and records retrieved, and

3   apparently by the electronic program, decisions made before an

4   auto approved takes place?

5   A.  The parts to the far right, if that's what you're asking

6   me about, that part of it is accurate.  I can't talk about the

7   middle parts of it because that may have been -- that may have

8   changed a little bit since we did some redesigning.

9   Q.  Okay.  To identify what you're talking about here, on the

10   right-hand side of the document, if it's held in landscape,

11   there's 1, 2, 3, 4, 5, 6, 7 disks, and they're labeled DMV,

12   AFS, ACHS, WPS, CARPOS, and MHFPS and NICS, or N-I-C-S.  Is

13   that what you're talking about?

14   A.  Yes.

15   Q.  And they're all tied into a little icon that says "CLETS."

16   What is CLETS?

17   A.  Stands for California Law Enforcement Telecommunications

18   System.  It's a message-switching computer.

19   Q.  What does it do?

20   A.  It handles all the messages that goes to those different

21   databases.  So when those messages go out, what CLETS does is

22   it says this message came from this particular sender, and it

23   sends them all to all the databases, and when the messages

24   come back, CLETS grabs them, puts them all together and sends

25   them back to that particular request.

1    Q.  So it's a routing --

2    A.  Yeah --

3           MR. EISENBERG:  I'm going to object to this line of

4    questioning as outside the scope of direct.

5           THE COURT:  Overruled.  And let me just indicate,

6    normally what I do on this, is if either the person -- and

7    this applies to all counsel.  You can either take the witness

8    on your own, which then makes them subject to direct

9    examination by you, cross-examination by the other side, or

10   you just wait, but I just -- because it's a bench trial, I

11   think this is more convenient to go ahead and allow the

12   parties --

13          MR. KILMER:  That was the assumption I was proceeding

14   under, Your Honor.

15   BY MR. KILMER:

16   Q.  You were explaining CLETS.

17   A.  Yes, it's a message switcher -- message-switching

18   computer, so it handles all the messages, it routes them to

19   the different appropriate databases, and when the responses

20   comes back, it gathers those responses and consolidates them

21   to the originating place where the original request came from.

22   So it kind of organizes all the messages.  Kind of an

23   operator.

24   Q.  So, for example, if a family law judge issues a domestic

25   violence restraining order, and for the record, the domestic

1    violence restraining order is a prohibiting category for gun

2    purchases.  If a family law judge issues a domestic violence

3    restraining order, that fact and that restraining order and

4    the identification of the restraining party goes into the

5    CLETS system; is that correct?

6    A.   Provided all the protocols are followed appropriately.

7    That doesn't always happen, but, yeah, provided everything

8    happens the way it's supposed to, I believe the restraining

9    order is served by the local law enforcement agency, and once

10   it's served, then it's supposed to be entered into the -- into

11   CARPOS, and those messages usually originate somehow through

12   CLETS if the agency has CLETS access.

13   Q.   And that's so that a police officer who may be at a scene

14   where a domestic violence restraining order is being violated,

15   he'll have the knowledge that a restraining order has been

16   issued.  He can take appropriate law enforcement action?

17   A.   That's correct.

18   Q.   So it's important that that CLETS system -- what are the

19   hours of the CLETS system, is it offered 24/7?

20   A.   24/7, 365, yes.

21   Q.   While we're on the subject of family law judges, do you

22   know whether or not the family law judges are authorized to

23   access the AFS system when they're deciding whether or not to

24   issue a restraining order?

25   A.   No, I don't preside over that part of the department.

1          MR. EISENBERG:  Objection.  Assumes facts not in

2     evidence.

3          THE COURT:  Overruled.  The answer will stand.

4          THE WITNESS:  I don't -- there is another entity

5     within the department that handles all the system accesses

6     for -- for local law enforcement and that's knowledgeable

7     about that, so that's not something that I have extensive

8     knowledge about.

9     BY MR. KILMER:

10    Q.  Okay, well, I'm not going to ask you about the

11    technicalities of it, but do you know whether or not judges

12    need that information when they're making decisions about

13    restraining orders?

14         MR. EISENBERG:  Objection.  Calls for speculation.

15         THE COURT:  Foundation.  Sustained.

16         THE WITNESS:  Um --

17         THE COURT:  That's okay.  You don't have to answer.

18    BY MR. KILMER:

19    Q.  Does the AFS -- can the AFS system provide information to

20    police officers in the field with regard to whether weapons

21    are contained in the home or not?

22    A.  Yes.

23    Q.  And how is that information accessed by the officer in the

24    field?

25    A.  If some officers have mobile digital terminals in their

1    vehicles, if they have that, they have that kind of

2    connection, they can access it.  Some of them don't have that.

3    They may have to call a dispatcher and ask the dispatcher at

4    the agency to run the information to see if they can get that

5    information.

6    Q.   Does that come in through CLETS as well?

7    A.   Yes, it's usually through CLETS.

8    Q.   And then the CLETS system sends out a message, and that

9    accesses your AFS database?

10   A.   Yes.

11   Q.   All right.  So for public safety reasons, it's possible

12   for other agencies to access your AFS system to determine if

13   somebody at least in your system, on your records is shown to

14   have purchased a firearm and had not transferred it.

15   A.   AFS, again, it's a leads database.  So it doesn't mean

16   just because it says that, there's a firearm in that house.

17   It doesn't mean there's an actual firearm in the house.  We

18   don't have a registration process in California.  It's a lead,

19   so it's possible.  It alerts the officer to be a little bit

20   more cautious potentially, because potentially, there could be

21   a firearm there.

22   Q.   You said that earlier in your testimony, too.  You're

23   saying that California doesn't have a registration system.

24   A.   Right.

25   Q.   But, in fact, since 1991, at least for handguns, the State

1  of California has kept records for every transaction; correct?

2  A.  There are transaction records, yes.  But when people die,

3  or when they leave the State, when they sell the firearm out

4  of state, there is no requirement for them to notice the

5  department that they're no longer in possession.  That firearm

6  can leave the state, can come back into the state in various

7  ways.  So there is no real registration.  If there is real

8  registration, you'd have to reregister your gun every so many

9  years and say you're still in possession of that gun, or let

10 us know when you're no longer in possession of that firearm.

11 We don't have that.  So we're not really tracking it.  All we

12 know is what we believe was the last possessor of that

13 firearm.  That's what's in AFS.  It's a leads database.  It's

14 not an absolute database.

15 Q.  All right.  And so what is contained in the database?  Is

16 it the firearm itself and the serial number and the person and

17 their address and their physical description?

18 A.  There is -- if they run the firearm by serial number, it

19 will bring up the firearm by serial number and will give them

20 the lead on the last known possessor of that firearm, whether

21 it be a law enforcement agency, whether it be held in

22 evidence, whether it had been involved in a DROS transaction,

23 with a particular individual.

24 Q.  Okay.  And that AFS database that's accessing the DROS

25 information, it would also include for the California driver's

1  license.

2  A.  Yes.

3  Q.  Okay.  You testified earlier that your databases don't

4  have access to social security numbers?

5  A.  People are not required to use -- to provide social

6  security numbers, especially mental patients.  You know, when

7  people go into a mental health facility, oftentimes they don't

8  even have a California driver's license on them or anything.

9  So whatever information, you know, the facility can glean from

10  them to try to provide some sort of notification is what we're

11  left with.

12        So we don't always have the most up-to-date

13  information.  When somebody -- when a restraining order is

14  issued against somebody, you know, oftentimes the restrained

15  person is not even there when the restraining order is

16  initially issued, so you don't always have a lot of the

17  necessary information you would need to -- you know, to have

18  identifier -- identifying information on those individuals as

19  well.

20  Q.  Does the DMV collect social security numbers?

21  A.  I don't believe -- I don't work at DMV, so I can't tell

22  you whether they do or not.  I don't believe so anymore.  I

23  believe that the state legislature has basically said they

24  don't want California agencies collecting social security

25  number information anymore because of the identity theft

1    issues that are going on.  I know the military is in the

2    process of doing away with social security numbers as well.

3    Q.  All right.  You testified earlier about some of the

4    exceptions, and one of the exceptions is for peace officers.

5    And they're not required to submit to the 10-day background

6    check to purchase a firearm?

7    A.  No, they're exempt from the waiting period.  They still go

8    through a background check.

9    Q.  Thank you for correcting me.

10            So they have to go through the background check, but

11   not subject to the waiting period?

12   A.  That's correct.

13   Q.  All right.  So there is an assumption made that peace

14   officers, somebody who is already -- what is it, Penal Code

15   Section 830, peace officer, will never need a cooling-off

16   period to prevent them from committing an impulsive violent

17   act?

18            MR. EISENBERG:  Objection.  Assumes facts not in

19   evidence.  Calls for speculation.

20            THE COURT:  Sustained.  Form of the question.

21            MR. KILMER:  All right.

22   BY MR. KILMER:

23   Q.  Well, there are two reasons promulgated for the 10-day

24   waiting period.  One is a cooling-off period to stop angry and

25   violent acts.  And number two is so they don't have to go for

1   background checks.  The exception for the peace officer is

2   based on the fact that they don't have to go through a

3   background check because they already have; is that correct?

4   A.  They still go through the background check.  They just

5   don't have to observe the waiting period.

6   Q.  All right.  They don't have to observe the waiting period

7   because they're basically trustworthy gun owners?

8          MR. EISENBERG:  Objection.  Assumes facts not in

9   evidence, calls for speculation and vague.

10         THE COURT:  Sustained.

11  BY MR. KILMER:

12  Q.  All right.  Let's move on to the next exception.

13         There's no 10-day waiting period for a gun purchased

14  at an auction; is that correct?

15  A.  Are you talking about a gun purchased by a dealer at an

16  auction or another FFL holder that's -- where the dealers are

17  buying guns from a law enforcement agency that has made those

18  guns available for sale pursuant to the Penal Code section?

19  Q.  Yes.  For example, I don't expect you to know this by

20  heart.  I actually have a copy of the Penal Code.  It's Penal

21  Code Section 26955, "Exception to waiting periods at

22  auctions."

23         May I show it to the witness, Your Honor?

24         THE COURT:  Yes.

25  BY MR. KILMER:

1    Q.  Ask you to review that.  Let me know when you're finished.

2            MR. EISENBERG:  Your Honor, I'd like to make an

3    objection to this exhibit as being incomplete on its face.  It

4    references several other sections of the Penal Code, which has

5    not been presented to the witness.

6            THE COURT:  Okay, well, I'll overrule the objection

7    with the understanding that all he's looking at is that which

8    is in front of him, not references to any other Penal Code

9    sections.

10           MR. KILMER:  That's fine.

11           THE WITNESS:  This Penal Code section was superseded

12   by federal law.

13   BY MR. KILMER:

14   Q.  What federal law was it superseded by?

15   A.  The Brady Act.  The Brady Handgun Prevention Act of 1998.

16   And it only applied to long guns.  This auction had to do with

17   like, for instance, the California Waterfowl Association and

18   some of those different associations that would have auctions

19   and fund-raisers to give away long guns only.  It only applied

20   to long guns if you read the first sentence, or Subdivision A

21   of the Penal Code section.  And when the Brady Handgun

22   Violence Prevention Act took effect, it superseded this

23   particular portion of California law, and it requires all

24   firearms to go through a NICS check.  So these people were not

25   exempt.

1  Q.  But this section says that the waiting period described in

2  26815 does not apply to a dealer.  We're not talking about the

3  background check.

4  A.  Does not apply to a delete -- a dealer who delivers a

5  firearm.  So it's talking about a dealer who is delivering a

6  firearm to someone at the event, which would be a participant.

7  Someone -- a member of one of those specific associations that

8  were not -- they're nonprofit associations, I believe.

9  Q.  Okay.  So for the nonprofit association at the auction or

10 event, there is no waiting period to deliver the firearm?

11 A.  There is a waiting period.  This was superseded by federal

12 law.

13 Q.  But federal law -- federal law, there is no -- the NICS

14 check, you testified earlier can take no longer than three

15 days, and I believe that 90 percent of the cases, they're

16 instantaneous; is that correct?

17 A.  That's my understanding of a NICS check, yes.

18 Q.  So as long as a NICS check is also done, then there is no

19 waiting period for delivering a firearm at all?

20 A.  California is the point of contact for NICS, and

21 California doesn't have a three-day waiting period.  So people

22 that fall in this category must subscribe to the California

23 process, which is the Dealer Record of Sales process.  We

24 don't have a special process for these folks because there is

25 no statutory authority to have one.  Since they're subject to

1   the NICS check, then they're subject to the regular Dealer

2   Record of Sales process under California law.

3   Q.  But isn't Penal Code Section 26815, which is the Penal

4   Code section that is identified earlier in the statute, isn't

5   that the 10-day waiting period in the DROS system?

6   A.  Yes, but they're also required to go through the NICS

7   check, and the only NICS check that we have is the Dealer

8   Records of Sales process.

9   Q.  So this exception you're saying is not applicable in

10  California?

11  A.  It's no longer applicable in California.

12  Q.  And this -- I believe that this statute became operative

13  January 1, 2012; is that correct?

14  A.  It may have been renumbered at that time.  I think this is

15  an old statute that was on the books prior to this.  Probably

16  one of the old 12078 exemptions.  That was renumbered to

17  26815.

18  Q.  So your testimony here today is that there is still a

19  10-day waiting period for firearms to deliver a firearm at an

20  auction?

21  A.  Yes.  They have to go through the DROS process.

22  Q.  And what is the statutory authority for that?

23  A.  The NICS requirement that the people observe a NICS

24  background check, so federal authority.

25  Q.  You talked earlier about an entertainment exception to the

1   10-day waiting period.

2   A.  Yes.

3   Q.  And that is a person who either already has or works at

4   the direction of somebody else who has a Dangerous Weapons

5   Permit?

6   A.  That's correct.

7   Q.  Is there -- and then these weapons are typically used by,

8   I guess, actors and actresses in movies and theatrical events?

9   A.  That's correct.

10  Q.  Is there any requirement that the actors and actresses go

11  through either a background check or a waiting period before

12  they're handling these firearms?

13  A.  The dangerous weapons committees are educated that if

14  these people, if they know these people are prohibited, that

15  they cannot give them a gun.  There are some actors and

16  actresses that can not take possession of a firearm on a set.

17  But in addition to that, the dangerous weapon licensee has to

18  be present at the theatrical event where the firearm is being

19  used.  They have to be there.  They have to be present.  They

20  put the gun in the hand of the actor or actress, and it's up

21  to them to make sure that the actor or actress is not

22  prohibited.

23  Q.  So it's kind of an honor system?

24  A.  I wouldn't call it an honor system, but because typically

25  when actors or actresses are convicted, it's not -- it's

1  usually public information.  It's well known that they've been

2  convicted.

3  Q.  Would it be well known that they're subject to domestic

4  violence restraining orders, though?

5         MR. EISENBERG:  Objection.  Calls for speculation.

6         THE COURT:  Overruled, if you can answer.

7         THE WITNESS:  No.  I don't know.

8  BY MR. KILMER:

9  Q.  There is no waiting period for loaning a firearm at a

10  shooting range, is there?

11  A.  No.

12  Q.  So if a person goes to a shooting range regardless of what

13  their state of mind or criminal history is, if they pay the

14  fee to the gun range, range master, and the range master

15  doesn't personally know that they're prohibited, then they can

16  be handed a firearm?

17  A.  That's true.

18  Q.  Is there a 10-day waiting period for a gunsmith to return

19  a repaired firearm to an owner?

20  A.  I believe those are -- those transactions are exempt.

21  Q.  So if --

22  A.  As long as it's the same gun.

23  Q.  Yeah.  So if a gun owner had their gun into the gunsmith's

24  for repair, and the gunsmith calls up and says, "Okay, I've

25  got your gun ready," the person can simply come in and pay

1  whatever the charges were and pick up the firearm?
2  A.  Right, the assumption is they never surrendered possession
3  of the gun.  They still constructively possessed that firearm.
4  Q.  Okay.  What is a consultant evaluator?
5  A.  I believe we have one consultant evaluator in California,
6  and a consultant evaluator is a person that does research on
7  guns and then writes on their research, actually does some
8  sort of writing, usually some sort of major firearms-related
9  publication about the gun.
10 Q.  Is this like mass market media or something?
11 A.  I don't want to speculate on what it is.  I can just tell
12 you what essentially what my understanding of it is.  It's a
13 person that has some expertise in firearms.  They're usually
14 some kind of firearms expert.  They have enough knowledge to
15 where they can write about a firearm and its capabilities
16 and --
17 Q.  Would this be like a review of the firearm?  It's accurate
18 or --
19 A.  Yes, it's pretty much they write reviews on the firearm,
20 things of that nature.
21 Q.  So it's a popular literature writer?
22 A.  Yeah, and I believe there's some sort of federal exemption
23 in federal law that allows for these people to do this.
24 Q.  All right, does the Department of Justice issue a license
25 for that?

1   A.  We issue a Certificate of Eligibility that allows these

2   consultant evaluators to go and obtain a firearm from a

3   dealership and do -- conduct research on that firearm and

4   write about it, yes.

5   Q.  And they can take immediate possession of those firearms?

6   A.  Yes.

7   Q.  And is the COE for the consultant evaluator any different

8   than the COE we've been talking about earlier?

9   A.  No, but the COE is accompanied by a federal clearance as

10   well.  So there's some -- they have -- there's a clearance of

11   both federal law and state law, and they work together to

12   provide this authorization.  So it's one of those areas of law

13   where -- where both federal legislative and the state

14   legislatures kind of got together and said they were going to

15   do something.  That's these people.  Apparently there is a

16   need for it.

17   Q.  All right.

18        THE COURT:  It's 12:00.  We'll take our noon recess

19   until 1:30.

20        Just as a heads up, I do need to take just an

21   unscheduled break from 2:15 to 2:30 today.  But otherwise,

22   we'll keep our regular schedule.

23        MR. KILMER:  Thank you, Your Honor.

24        THE COURT:  All right, we'll resume at 1:30 this

25   afternoon.

1          (Noon recess.)

2                    **AFTERNOON SESSION**

3          THE COURT:

4          MR. EISENBERG:  Your Honor, may we be heard on a

5     point of procedure?

6          THE COURT:  Sure.

7          MR. EISENBERG:  This list of the plaintiffs' files is

8     Document 76.  And the docket does not list Assistant Chief

9     Buford as a witness.  I submit that he's not subject to direct

10    by the plaintiffs.

11         THE COURT:  Okay.  All right, I'll note the

12    objection, but obviously either side may call witnesses, not

13    necessarily subpoena them, but if they're in court, obviously

14    they have a right to question them, and I think that in the

15    interest of justice, as I indicated earlier, I think all

16    parties need to have the opportunity to make a full and

17    complete record.  I don't see the cross-examination or the

18    permitted direct examination so far to be so off track that it

19    is a surprise to defense counsel.

20         However, if plaintiffs' counsel raises issues that

21    have not been disclosed or discussed in pretrial discussions,

22    discovery, depositions, discovery documents, go ahead and

23    renew the objection, and if it is something new and different

24    that has not been disclosed to the defense, and the defense

25    has not had an opportunity to address or think about, then I

1   will certainly consider sustaining renewed objections.

2           MR. EISENBERG:  Thank you, Your Honor.

3           THE COURT:  All right.  Okay, we'll continue on with

4   cross-examination.

5           MR. KILMER:  Thank you, Your Honor.

6   BY MR. KILMER:

7   Q.  Mr. Buford, you had earlier expressed some familiarity

8   with the NICS system.  That's the National Instant Checks

9   System?

10  A.  Yes.

11  Q.  Are you familiar with what are the exceptions for a NICS

12  check?

13  A.  Not all the exceptions.  I know there are some.

14  Q.  For instance, is there an exception for anybody who has a

15  permit or a license to possess, acquire, or carry a firearm?

16  A.  There are certain states that have applied to have some of

17  their permits exempted.

18  Q.  All right.

19  A.  So it's on a state-by-state basis.  To get a Brady -- it's

20  called a Brady-exempt permit.  To get your permit, to be a

21  Brady-exempt permit, you have to apply to ATF and meet certain

22  criteria to have that permit basically blessed by ATF.

23  Q.  Okay.  And then obviously the State would have to have the

24  rule that they were going to exempt?

25  A.  Yes.  Typically there should be something in state -- in

1  the state statute to give authority for that.

2  Q.  Okay.  So there would be -- if the State of California

3  were to adopt a procedure that somebody would not need to be

4  subject to, let's say, either a background check or a waiting

5  period because the State of California was going to issue a

6  particular license, there was nothing in federal law that

7  would prevent that from happening.

8        MR. EISENBERG:  Objection.  Vague and ambiguous,

9  unintelligible, and asks a hypothetical question and calls for

10  speculation; lacks personal knowledge.

11        THE COURT:  Sustained.

12 BY MR. KILMER:

13 Q.  All right.  Would California be in violation of federal

14 law if it used a CCW or a COE as a substitute for a background

15 check and 10-day waiting period?

16        MR. EISENBERG:  Objection.  Calls for speculation.

17 The witness is not an expert on federal law.

18        THE COURT:  I'll sustain on that ground.

19 BY MR. KILMER:

20 Q.  Mr. Buford, did you provide a CV in connection with this

21 litigation?

22 A.  Pardon me, a CV?

23 Q.  Yeah, curriculum vitae?

24 A.  Yes.

25        MR. KILMER:  May I approach the witness, Your Honor?

1     THE COURT:  Yes.

2  BY MR. KILMER:

3  Q.  Mr. Buford, I'm going to ask you to take a look at a

4  document that's been previously marked for identification and

5  admitted into evidence, Exhibit BV.  It is Bates stamped AG in

6  the lower right-hand corner, AG-001922, and there is a second

7  page, Bates stamped AG-001923.

8  A.  Yes.

9  Q.  And is that the -- your resume?

10  A.  Yes.

11  Q.  It says here at the top under "Assistant Bureau Chief"

12  from May 2009 to present, that you're responsible for the

13  oversight and administration of over 30 state mandated

14  firearm-related programs.  You're responsible for the

15  oversight administration -- and you also serve as a state's

16  Federal Bureau Investigation, FBI national instant background

17  checks system point of contact.  What does that involve?

18  A.  I'm the State's representative for issues related to NICS

19  access and use of the NICS database.  I attend the annual NICS

20  conferences to discuss issues with background checks.  We work

21  with -- collaboratively with the other point of contact states

22  to examine ways of improving a process and identifying

23  pitfalls and trying to overcome them.

24  Q.  All right.  And the CV goes on to state that you also

25  evaluate and interpret federal and state firearms laws and

1    their effect on BOF -- I presume that's the Bureau of

2    Firearms, law enforcement, and the public; is that correct?

3    A.   That's correct, as they apply to the California background

4    check processes.

5    Q.   Okay.   So if California was to become one of those states

6    that would substitute a license to carry or CCW or a COE as an

7    alternate requirement under the NICS system, that would be the

8    procedure for -- California being exempt from NICS; is that

9    correct?

10   A.   If California would have requested a Brady-exempt permit

11   you're talking about similar to the entertainment firearms

12   permit?

13   Q.   As an example, yes.   Then that would qualify as an

14   exemption to the 10-day waiting period.

15   A.   Yes.

16   Q.   All right.   Now, some of the other exceptions to the

17   10-day waiting period, we kind of went over those a little bit

18   earlier.   One of the other exemptions are somebody who holds a

19   machine gun license; is that correct?

20   A.   That's a Dangerous Weapons License -- yeah, dangerous

21   weapons licensee or permittee, yeah.

22   Q.   Now, is that a different -- are there two licenses

23   involved, is there a dangerous weapons and a machine gun

24   permit, or are they separate?

25   A.   Under the dangerous license permit umbrella, there's

1    various types of permits.  There's explosive permits, there's

2    destructive device permits, machine gun permits, short barrel

3    rifle and shotgun permits, assault weapon permits.  All those

4    fall under the dangerous weapons umbrella.

5    Q.   Okay, so it's an umbrella designation, and underneath

6    there's a separate permit --

7    A.   But they're all called dangerous weapons licensees, yes.

8    Q.   As far as you know, somebody who holds a machine gun

9    license that is also a Dangerous Weapons Permit, they're

10   exempt from the 10-day waiting period?

11   A.   Yes.

12   Q.   On all firearms?

13   A.   I believe so, yes.

14   Q.   And if they also hold a Short-Barrelled License Permit

15   under the Dangerous Weapons Control Permit, they're also

16   exempt.

17   A.   Yes.

18   Q.   And if they hold a Destructive Device Permit under the

19   Dangerous Weapons Control Permit, they're also exempt from

20   the --

21   A.   Yes.

22   Q.   I think there's one more, but I don't remember off the top

23   of my head.

24        One of the other exemptions to the 10-day waiting

25   period is if somebody holds a CC & R, what is a CC & R, a

1  Curio and Relic License?

2  A.  You mean a Curio and Relic License?

3  Q.  Yeah.

4  A.  Yeah, they're exempt to buy -- to purchase curio and relic

5  firearms only.  They're exempt from the waiting period.  And

6  the assumption is because their curio and federal license

7  allows them to leave the state and purchase firearms under

8  federal law from out-of-state sources.

9  Q.  Okay.

10  A.  So that they can go and buy those firearms from out of

11  state under their federal license.  They're also required to

12  have a COE under California law to take advantage of that

13  exemption.  And then when they come home, they're required to

14  report those firearms to the department.

15  Q.  Okay.  And is there a statutory period as to when they're

16  supposed to report those firearms?

17  A.  I can't remember.

18  Q.  Two days or something?

19  A.  I'm not sure.

20  Q.  Okay.  Now, but that CC & R -- that dual requirement that

21  the federal CC & R license and the COE, California says that

22  those people will be exempt, but only for buying curio and

23  relic firearms?

24  A.  That's correct.  And the Curio and Relic License that's

25  issued by the federal -- by ATF, it's a form of the Federal

1  Firearms License, so it's one of the versions of the FFL.

2  Q.  Okay.  And what kind of a background check does somebody

3  go through to get a Curio and Relic License?

4  A.  I don't know what the federal background check entails.  I

5  can tell you that under the state background check, it's very

6  similar to the COE process, which would include fingerprints.

7  Q.  Okay.  And this COE that gets coupled with the CC & R

8  license isn't any different than the regular COE we've been

9  talking about?

10  A.  No, not really.

11  Q.  Not a special CC & R designation?

12  A.  No.

13  Q.  All right.  You testified about what other prohibiting

14  categories that result in a denial.  I think you used the word

15  "categorical denial" or "automatic denial?"  Am I remembering

16  wrong?

17  A.  You mean prohibited categories?

18  Q.  Yes, prohibited category.

19  A.  Okay.

20  Q.  And those are felons?

21  A.  Yes.

22  Q.  Okay.  Anybody who violate -- who gets convicted of a

23  violent misdemeanor, and that's a list from the California

24  Penal Code?

25  A.  Yes.

1  Q.  Anybody who is convicted of a misdemeanor crime and

2  domestic violence?

3  A.  Yes.

4  Q.  Anybody who is subject to a domestic violence restraining

5  order?

6  A.  Yes.

7  Q.  And you said anybody who has been placed on a mental

8  health hold under 5150 of the Welfare and Institutions Code?

9  A.  Yes.

10  Q.  And I think you had another category, and that was

11  juveniles who had been adjudicated a ward of the state while a

12  minor in a violent act?

13  A.  Yes.

14  Q.  And they're prohibited until they're like 30 --

15  A.  Age 30, yes.

16  Q.  Now, for each one of those categories, though -- well,

17  let's just take them in order.  In order to suffer a felony

18  conviction, somebody has to be arrested and adjudicated a

19  felon, and presumably they've had law enforcement contact in

20  order for that to happen?

21  A.  Yes.

22  Q.  Based on your understanding of California law and the

23  California Penal Code system, is there a pretty good chance

24  that that person's firearms have already been confiscated?

25  A.  Not always.

1    MR. EISENBERG:  Objection.  Calls for speculation.

2    THE COURT:  Sustained.  Foundation.

3    BY MR. KILMER:

4    Q.  If you know.  I'm not asking to you speculate.  If you

5    know the answer to the question, you can answer it.

6    A.  The firearms are not always confiscated.

7    Q.  Okay.  Now, you had mentioned a specific Penal Code

8    section earlier, Penal Code Section 273.5, and what does that

9    Penal Code entail?

10   A.  Corporal injury on spouse.

11   Q.  And you've read that Penal Code section?  You're familiar

12   with it?

13   A.  I'm familiar with it, generally.

14   Q.  And that's California's domestic violence statute that can

15   charge somebody with either a felony or a misdemeanor for

16   domestic violence?

17   A.  Yes.

18   Q.  And whether they suffer a felony or a misdemeanor

19   conviction, that not only goes in the California's database,

20   that's a national database as well, isn't it?

21   A.  Yes.  I believe it's a federal violation under 922(g)(9).

22   I think it's the Title 18, 922(g)(9) under federal law.

23   Q.  And as a consequence of that conviction, the person would

24   then presumably also be in the NICS database as prohibited.

25   MR. EISENBERG:  Objection.  Calls for speculation.

1     THE COURT:  Sustained.  Foundation.

2   BY MR. KILMER:

3   Q.  Do you know whether or not a conviction for 273.5 in

4   California results in any entry in the federal NICS system?

5   A.  It does not.

6   Q.  All right.

7   A.  It results in an entry into the NICS triple I database as

8   a criminal record, so as part of the criminal conviction or

9   regular criminal information, it would go to the Interstate

10  Identification Index.

11  Q.  Okay.

12  A.  But it would not be in the NICS index where they have a

13  special file.  The federal government does have a special file

14  under the NICS umbrella for 922(g)(9) convictions.  So it's

15  called misdemeanor crimes of domestic violence.

16  Q.  Okay.

17  A.  So it's a special file.  It would not automatically go

18  into that file.

19  Q.  All right.  But based on your understanding as set forth

20  in your CV earlier, you have some knowledge of the NICS

21  system.  If someone was convicted of a 273.5 in California and

22  then relocated to another state and tried to buy a gun, is it

23  likely that NICS would pick up that conviction?

24  A.  If they're savvy enough.  But it could be either NICS or

25  it could be another POC state.  Another POC state may not be

1    savvy enough about California law to recognize that that 273.5

2    is an all meet -- what they call an all meets under NICS law

3    for misdemeanor crime of domestic violence.

4    Q.   Is California statutorily required or by some regulation

5    required to report the 273.5 to NICS?

6    A.   The only time that we would report the 273.5 to the NICS

7    database is what they call a misdemeanor crime of domestic

8    violence, or MCDV, would be at the time we actually conducted

9    a background check for firearms purposes and made that

10   determination.  Then at that point in time, we can make an

11   entry directly into NICS, and we usually do that.

12   Q.   All right.

13   A.   If we process the person and we've done the research and

14   verified that they're actually -- that the conviction was

15   actually based on MCDV, we would enter them into the database.

16   And not all 273 point -- I mean, never mind.

17   Q.   All 273.5's are domestic violence.

18   A.   They are.

19   Q.   But it can be charged alternatively as a misdemeanor or a

20   felony.

21   A.   Yes.

22   Q.   All right.  Does the law in the State of California

23   require mental health providers to report a 5150 hold within a

24   certain period of time?

25   A.   I believe so.

1  Q.  What is that?

2  A.  I think the statute says immediately.  It may have been --

3  I think it was just recently amended to say within a certain

4  amount of time, but I can't remember if it's 24 or 48 hours,

5  but --

6  Q.  Is that a duty imposed on all mental health care providers

7  or just those that are state funded?

8  A.  It's just the public and private mental health facilities.

9  And with regard to the courts, it's still not clear, you know,

10  what the timetable is for the courts to report their mental

11  health prohibitive persons.

12  Q.  Now, you had talked about that earlier about courts

13  reporting mental health adjudications.

14  A.  Um-hmn.

15  Q.  Is that for instances where somebody is judged criminally

16  insane and unable to stand trial?

17  A.  There's various reasons.  It would be 1026, insane; 1370,

18  incompetent to stand trial; 5300, gravely disabled.  The folks

19  that are under conservatorship, the courts are required to

20  report those folks as well.

21  Q.  Okay.  But the 5150 is an automatic report whether the

22  person goes to court or not; is that correct?

23  A.  It's -- there's certain criteria that people have to meet

24  to be a 5150.  They have to meet the criteria outlined under

25  Welfare and Institutions Code 5150, 5151, and 5152.  So they

1  have to be assessed, admitted, assessed and held.

2  Q.  All right.  So that report would come -- a 5150 hold comes

3  directly from the hospital --

4  A.  Comes from the public and private facilities, right.

5  Q.  But the adjudication is whether it's for a conservatorship

6  or criminally insane, or -- that comes from the Court.

7  A.  That's correct.  And the Tarasoffs comes from the local

8  law enforcement.

9  Q.  All right.  I'd like to show you Exhibit AQ again.  Let me

10  see if we can find it.

11       I'd ask you to take a look at a document that has

12  previously been admitted as Exhibit AQ.  It is Bates number in

13  the lower right-hand corner AG-002407.  Do you have that in

14  front of you?

15  A.  Yes.

16  Q.  In the lower left-hand corner, there is a designation

17  called "30-day reject denial."  Can you explain what that is?

18  A.  Yeah.  Those are under California law, California limits

19  the amount of handguns an individual can buy, to one handgun

20  in a 30-day period.  And if an individual attempts to purchase

21  a hand -- more than one handgun in a 30-day period, the

22  transaction is rejected.

23  Q.  Is it a denial or is it a delay?

24  A.  It's a rejection.

25  Q.  It's a rejection because you can't buy more than one

1  handgun per month?

2  A.  Right.

3  Q.  So that reject doesn't necessarily indicate that the

4  person is prohibited from having guns?

5  A.  They are prohibited because it's against the law to make

6  that application.

7  Q.  Well, actually are they prohibited to purchase that gun or

8  they become a prohibited person by trying to make a purchase?

9  A.  They're prohibited from purchasing that particular gun at

10  that particular time.

11  Q.  Okay, so they don't fall under the category of prohibited

12  person like a felon or a misdemeanant?

13  A.  No, not necessarily.

14  Q.  So what's the process there, does the person say, oh, you

15  know, facepalm, and they say, oh, I bought a gun 28 days ago,

16  and they start the process over after 30 days?

17  A.  I don't know.  I'd be speculating on why people would try

18  to purchase more than one gun in a 30-day period.

19  Q.  Okay.  Is that a prosecutable offense?

20  A.  I believe so.

21  Q.  Do you know whether or not the Department of Justice

22  prosecutes people for those attempts to purchase a second

23  firearm within 30 days?

24  A.  I'm not aware of enforcement activities.

25  Q.  All right.

1    MR. KILMER:  Your Honor, may I have a moment to
2 confer with cocounsel and my clients?
3    THE COURT:  Yes.
4    (Pause in the proceedings.)
5    MR. KILMER:  I just have two more questions for you,
6 but don't hold me to that because it may turn into three.
7 BY MR. KILMER:
8 Q.  You testified earlier that you helped design the -- the
9 system of background checks.
10 A.  Yes.
11 Q.  All right.  Could the system be designed or redesigned --
12 and I'm asking technically here, not legally -- to run a gun
13 buyer through the standard background check, then also make
14 the following inquiry whether the person has a COE, a CCW, or
15 a gun already in the system and then generate a message based
16 on that information?
17    MR. EISENBERG:  Objection.  Lacks and compound.
18    THE COURT:  Overruled, if you can answer.
19    THE WITNESS:  It could, but it would be incomplete.
20 BY MR. KILMER:
21 Q.  So the answer is, yes, the system could generate --
22 A.  It could check to say yes or no whether a person has a COE
23 or whether a person has a CCW.  That's a simple check.  It's a
24 yes-or-no answer.
25 Q.  Okay.

1  A.  So, yeah, we could check that.  The problem is, that that

2  in itself doesn't mean that the person is still eligible to

3  own or possess a firearm.

4  Q.  Yeah, and maybe I --

5  A.  Because things change.

6  Q.  Maybe my question was a little long.  Because what I meant

7  to ask was, could the system be made to run the person through

8  the complete background check, and then as a last inquiry --

9  inquire whether they have a COE, a CCW, or a gun already in

10 the AFS system.  That's the question I want.

11 A.  It could run the background check, but then someone's

12 going to have to look at the hits, and someone's going to have

13 to match up the records, and someone's going to have to review

14 the record to make sure that the information in those records

15 is up-to-date, accurate, and correct.

16 Q.  Okay.  Now, you also testified earlier that approximately

17 20 percent of the DROS's that are processed are auto-approved

18 within an hour.

19 A.  Right.

20 Q.  Okay.  And of those 20 percent that are auto-approved

21 within an hour, you can add as a further check whether or not

22 the person has a COE, a CCW, or a gun already in the AFS

23 system.  That's possible.

24 A.  That's possible.

25       MR. KILMER:  Thank you.  Nothing further, Your Honor.

1          THE COURT:  And redirect.

2                    REDIRECT EXAMINATION

3    BY MR. EISENBERG:

4    Q.  Assistant Chief Buford, I want to talk a little bit about

5    the AFS.

6    A.  Sure.

7    Q.  Does the AFS give accurate information about whether a

8    person listed with the firearm has the firearm in working

9    condition?

10   A.  No, it doesn't.

11   Q.  Does the AFS system give accurate information about

12   whether the person listed as having a firearm has loaned it

13   out to someone?

14   A.  No, it doesn't.

15   Q.  Does it have -- does the AFS system have accurate

16   information about --

17   A.  Let me back up.  If the loan exceeds 30 days under state

18   law, the person is required to report that loan through a

19   dealer.  But if the loan does not exceed 30 days, then, no, it

20   would not.

21   Q.  Thank you for the clarification.

22            Does the AFS system tell you whether the person who

23   is listed as having the gun has working ammunition for the

24   gun?

25   A.  No, it does not.

1    Q.  Does the AFS system indicate whether the person who has

2    the gun has had it temporarily taken away by a family member

3    or a friend?

4    A.  No, it would not.

5    Q.  Does the Department of Justice mandate that firearms

6    dealers charge a certain shipping fee, a certain amount to

7    ship a firearm to another dealer?

8    A.  No.

9    Q.  Earlier, you were giving some testimony about something

10   called a CII?

11   A.  Yes.

12   Q.  Is there a CII associated with a person's mental health

13   records?

14   A.  No.

15   Q.  Is there a CII associated with a person's --

16   A.  Let me clarify.

17   Q.  Pardon?

18   A.  With regard to a mental health record, there are some

19   of -- some individuals that are criminals, but are also

20   criminals -- that also have a mental health adjudication

21   attached to their criminal record.  So in some cases, it is

22   possible to have a CI number attached to a mental patient.

23   But the majority of mental patients that we receive come from

24   public and private mental health facilities, and there are no

25   CI numbers associated with those individuals.

1  Q.  Is there a CII number for each entry for a person in the
2  CARPOS system?
3  A.  No, there is not.  Some of those individuals have criminal
4  records, though, when they would have a CI number, but it
5  doesn't necessarily link up.
6  Q.  During a background check, is there a check run for
7  whether the applicant has previously been approved for a
8  purchase of a firearm?
9  A.  No.  There is no check to determine if a person has been
10  previously approved.
11  Q.  If the system could just check if a person is previously
12  approved, couldn't there be an instantaneous or a nearly
13  instantaneous approval for the current application?
14  A.  No, because circumstances change.  They could become
15  prohibited, as we know through the Armed and Prohibited
16  Persons System that people legally purchase guns and
17  subsequently become prohibited.
18  Q.  You testified that not all of the state databases are
19  fingerprint based; correct?
20  A.  That's correct.
21  Q.  Do you recall which systems are fingerprint based?
22  A.  The Automated Criminal History System is fingerprint
23  based.
24  Q.  And what about the others?
25  A.  They're not fingerprint based.

1  Q.  Is it possible for a peace officer to become prohibited

2  from possessing a firearm?

3  A.  Yes.

4        MR. EISENBERG:  I have no further questions at this

5  time.

6        THE COURT:  And recross.

7        MR. KILMER:  Very short recross.

8                    RECROSS-EXAMINATION

9  BY MR. KILMER:

10  Q.  You testified earlier that the AFS system is basically a

11  library of the DROS's that have happened.

12  A.  Yes, that and some -- and some law enforcement records as

13  well.

14  Q.  Okay, thank you.

15        Would those records also include the date of the

16  transaction?

17  A.  Yes.

18  Q.  So if, for example, you were to run an AFS report on me,

19  it would -- it might show you the last firearm I purchased on

20  what date and from what dealer?

21  A.  Yes.

22        MR. EISENBERG:  Objection.  Assumes facts not in

23  evidence.  It assumes that it's legal to just run an AFS check

24  on a person randomly.

25        THE COURT:  All right.  Sustained.

1  BY MR. KILMER:

2  Q.  Suppose I had submitted a request that you run an AFS

3  check on the firearms that I have in the system.  Would that

4  include the date of the last transaction?

5  A.  No.  Typically what we do is if you want a copy of your

6  firearms records, what we would do is we would go into the

7  system and provide you a copy of your firearms records based

8  on the information we have on hand.

9  Q.  All right.  But does that information also include the

10 date of the last transaction?

11 A.  It could, yes.

12 Q.  And that would also be the date of the last time I was

13 cleared to purchase firearms.

14 A.  Most likely, yes.

15 Q.  And are you aware of any -- is the California Department

16 of Justice required to notify -- strike that.

17     CCW's are typically issued by chiefs of police and a

18 county sheriff; is that correct?

19 A.  That's correct.

20 Q.  All right.  And if the Department of Justice learns --

21 strike that.

22     And that permit, that CCW permit is also in your

23 database.

24 A.  Yes.

25 Q.  And if the Department of Justice learned that that person

1  becomes a prohibited person, either by all the categories we

2  named, you're required to immediately notify the issuing

3  authority, which could be a chief of police or a sheriff, that

4  that person has become prohibited.

5  A.  That's correct.

6  Q.  And does the Department of Justice take any independent

7  enforcement action?

8  A.  No, it's up to the chief or sheriff to go out and recover

9  the CCW license.

10 Q.  And is that typically what they do?

11 A.  I don't know.  I couldn't tell you what different chiefs

12 and sheriffs do.  They all operate differently.

13 Q.  Thank you very much.

14 A.  You're welcome.

15      MR. KILMER:  Nothing further, Your Honor.

16      THE COURT:  And further redirect?

17      MR. EISENBERG:  Nothing further, Your Honor.

18      THE COURT:  All right, any party wish this witness

19 remain subject to recall?

20      MR. EISENBERG:  Yes, we do, Your Honor.

21      THE COURT:  Okay, either side may still call you back

22 to testify.  You're still under oath.  You can go ahead and

23 leave the courtroom, and I'll leave it to counsel to give you

24 the date and time if necessary to return to testify.

25      THE WITNESS:  Thank you, Your Honor.

1    MR. CHANG:  Your Honor, our next witness, Miss

2 Donnette Orsi, she's not in the courtroom per your court's

3 order.  I know she's in the building.  I'll need a few minutes

4 to retrieve her.

5    THE COURT:  Okay.

6    MR. CHANG:  Might I suggest that we go ahead and take

7 the 2:15 break now?

8    THE COURT:  Well, I don't want to lose too much time

9 because I won't be back in until 2:30.  We lose a half an

10 hour.

11    MR. CHANG:  I can see whether she's outside.

12    THE COURT:  If she's right outside, we'll have her

13 come in and we'll have her testify for about 15 minutes or so.

14 We'll take a quick break.

15    THE CLERK:  Would you come right up here, ma'am.

16 Raise your right hand.

17                        **DONNETTE ORSI**,

18 called as a witness on behalf of the Defendants, having been

19 first duly sworn, testified as follows:

20    THE CLERK:  Take the witness stand right over there

21 and give us your full name, please.

22    THE WITNESS:  My name is Donnette Orsi.

23                    DIRECT EXAMINATION

24 BY MR. CHANG:

25 Q.  Good afternoon, Miss Orsi.  Miss Orsi, could you spell

1  your name for the court reporter, please.  It's a unique name.

2  A.  First name, D-O-N-N-E-T-T-E, O-R-S-I.

3  Q.  Miss Orsi, please tell the Court your current employer and

4  job title.

5  A.  Current employer is the Department of Housing and

6  Community Development, and I'm a Data Processing Manager II.

7  Q.  And where did you work prior to your current employment?

8  A.  I worked at the California Department of Justice.

9  Q.  And what was your title there?

10  A.  Data Processing Manager II.

11  Q.  Please give the Court a brief overview of when you worked

12  at the Department of Justice and your job title or titles at

13  the Department of Justice.

14  A.  I started with the Department of Justice in January of

15  1987, worked in several different positions, worked in the

16  firearms program.  But in November of 2001, I started within

17  the Hawkins Data Center at DOJ as an associate programmer

18  analyst.

19  Q.  And what was your next position after associate programmer

20  analyst?

21  A.  Then I moved up to a staff programmer analyst, senior

22  programmer analyst, and then the data processing manager.

23  Q.  When did you become the data processing manager?

24  A.  June of 2010.

25  Q.  And when did you leave the DOJ?

1    A.  In June of 2013.

2    Q.  Now, your last department at the Department of Justice was

3    as a Data Processing Manager II.  What were your duties and

4    responsibilities in that position?

5    A.  I managed a team of IT programmers, developers, and

6    systems analysts.  We maintained systems for the Bureau of

7    Firearms and for the Bureau of Forensic Services.  We

8    maintained their assistance, their applications, and also

9    developed new systems also.  Part of my job duties also was to

10   analyze any new legislation and come up with impact analysis

11   for those types of things.

12   Q.  Now, you mention you managed applications.  Do those

13   applications include DROS processing system?

14   A.  Correct.

15   Q.  Okay.  Does that include a DROS entry system?

16   A.  Correct.

17   Q.  When did you begin working with the DROS processing

18   system?

19   A.  When I started in November of 2001.

20   Q.  How did you come to work with the DROS processing system?

21   A.  Prior to me going into the data center, as I said, I

22   worked in the firearms program, so I was familiar with the

23   business, some of the business side of firearms, and I noticed

24   I had an aptitude for IT systems.  So that's when I -- when I

25   made the move into the IT world, that's when I became familiar

1  with the DROS processing system.

2  Q.  Now, you said you managed programmers -- software

3  programmers, and developers.

4  A.  Correct.

5  Q.  And you're familiar with the program.  Did you learn

6  programming or computer programming?

7  A.  Yes, I learned computer programming on the job.

8  Q.  And since 2001, you continued to work on the DROS

9  processing system until you moved to your current employment?

10  A.  Correct.

11  Q.  Now, Miss Orsi, I'm going to -- I'm going to put an

12  exhibit on your monitor.  This is Exhibit CB.  You'll see it

13  shortly.  Okay.  Do you see -- do you see Exhibit CB,

14  Miss Orsi?

15  A.  Yes, I do.

16  Q.  Have you seen this document before?

17  A.  Yes.

18  Q.  What is this document?

19  A.  This is what is called a context diagram.  It shows how

20  data flows through the DROS processing system.

21  Q.  How are you familiar with this document?

22  A.  I created this document.

23  Q.  Is this an accurate representation that the Bureau of

24  Firearms processing of DROS applications?

25  A.  It's pretty accurate.  I see that there are a few things

1   that need to be updated on this document.  But as far as the

2   data flow, it's accurate.

3   Q.  You mentioned there are some changes?

4   A.  Um-hmn.

5   Q.  As we go through this document, would you point out those

6   changes?

7   A.  Sure.

8   Q.  So let's talk about the DROS processing system.  You

9   mentioned that one of your duties at the Department of Justice

10   was maintaining the DROS processing system.  Could you give us

11   a brief description of what is the DROS processing system.

12   A.  So the DROS processing system is what we call an

13   application that the analysts within the Bureau of Firearms

14   use to review background checks that come from firearms

15   dealers regarding firearms purchases.

16   Q.  Does the DROS processing system include, in addition to

17   analysts, does the DROS processing system include computerized

18   database searches?

19   A.  Yes.  The DROS processing system also contains, as you can

20   see on the chart, the CFIS database.  That's where the data is

21   housed.

22   Q.  So let's look at this exhibit, and let's start from the

23   beginning.  What is the first thing that happens for a DROS

24   application to enter this DROS processing system?

25   A.  So it starts at -- over on the left-hand side where it

1    says "DROS Form," that is where the individual goes to the

2    firearms dealership and submits their transaction at the point

3    of sale.  One of the corrections here, it says "Verizon DROS."

4    Verizon is no longer the host of the DROS entry system.  It's

5    now -- was taken in-house and is managed by the Department of

6    Justice.

7    Q.  So looking at this process for the diagram, what happens

8    after the dealer submits the DROS application?

9    A.  So the next step is where it says "Batch DROS

10   Transactions" into the CFIS Oracle Database.  They're pulled

11   in internally into the CFIS database every minute.

12   Q.  What is the CFIS database?

13   A.  The CFIS database is the Consolidated Firearms Information

14   System, and it contains all of the data for several different

15   applications for firearms, one of them including the DROS

16   processing system.

17   Q.  So once the DROS application is in the CFIS database, what

18   happens then?

19   A.  So at that point, then the system builds the background

20   check, and it's noted here as the "BFEC Request," the Basic

21   Firearms Eligibility Check.

22   Q.  Now, to the right of the CFIS Oracle Database module

23   there, you just referenced "send BFEC Request."  There are

24   three modules following that flow.  What are those three

25   modules?

1   A.  Those three modules are the internal components that build

2   the request and are the message transportation system to go to

3   the databases that you see on the far right side.  So we need

4   to utilize those systems in order to access those other

5   databases.

6   Q.  Okay.  Do those three systems, do they contain -- are they

7   the information, repositories, or databases that the DROS

8   processing system is searching through?

9   A.  The one that's noted as CFIG, which is the California

10   Firearms Information Gateway, that system contains a lot of

11   the business logic that goes through and looks at the

12   responses coming back and parses through them and makes

13   determinations.  So there is some temporary housing of data

14   within it.

15        The other two, ReDIAL and CLETS, are mainly just

16   pass-throughs.  They're doing authorizations in order to get

17   to the other databases to ensure that, for instance, you know,

18   CFIS is allowed to go in and check any of those other

19   databases.

20   Q.  So let's go back to talk about what happens after a dealer

21   submits the DROS application.  Okay, I think -- so after the

22   information, you last talked about sending a BFEC request.

23   What happens when the CFIS sends a BFEC request?

24   A.  So the first thing that happens, it's building this

25   transaction in order to go through and go to the first

1  database to start the background check.

2  Q.  And what is the first database that it checks?

3  A.  The first database checks is DMV.

4  Q.  Could you briefly describe what information is looking for

5  in this DMV database check?

6  A.  What is sent to DMV is the California driver's license

7  number or the California ID number on the DROS transaction.

8  So what is sent back to DOJ is information about the person,

9  their name, their date of birth, their license status.

10  Q.  Why is their license status relevant?

11  A.  The license status is relevant because what happens when

12  it comes back to us, the system is looking to see if the

13  license status is valid.  So it checks for that.  It also

14  checks the name and date of birth against the record that we

15  have on the DROS transaction.

16  Q.  Why does it check the name and the date of birth as

17  returned against the DROS application?

18  A.  It's checking to see if it's a match or not.

19  Q.  Okay.  So what happens if it's a match?

20  A.  If it's a match, if the license status is valid and the

21  name and DOB match, then it continues on to the next check.

22  Q.  What happens if there's not a match?

23  A.  If it's not a match, it goes to a queue that's called the

24  DMV mismatch queue for an analyst to review within the Bureau

25  of Firearms.

1  Q.  Okay.  So what happens after -- okay, you said earlier
2  that if there is a match, then it goes in the queue for
3  analysts to review.  Right?
4  A.  If there is a mismatch.  If it mismatches, then the
5  background check stops at that point in time.
6  Q.  Okay.
7  A.  But otherwise, if the name, date of birth match, and the
8  license status is valid, then the check continues on.
9  Q.  What is the next step?
10 A.  The next step is, it goes to what's noted here as AFS, the
11 Automated Firearms System, to check to see if the gun is
12 stolen.
13 Q.  And this is the -- on the right-hand side of the exhibit,
14 the second module from the top; is that right?
15 A.  Correct.
16 Q.  Could you briefly describe this AFS database.
17 A.  What this inquiry does is we send a specific transaction
18 to them with the details about the gun that's being purchased.
19 And we're specifically looking to see if the gun is entered
20 into AFS as stolen.
21 Q.  And what if a positive result comes back, for example, if
22 there is a result that says the gun and the application was
23 reported stolen?
24 A.  So what the system does is it takes that information about
25 that record, and that's considered a hit.  So it appends that

1  result to the background check response.

2  Q.  And if the gun and the application was not in the AFS

3  database, what happens then?

4  A.  Continues on to the next step.

5  Q.  What is the next step?

6  A.  The next step is for handgun purchases only.  It does a

7  30-day purchase restriction check for individuals who are not

8  exempt from purchasing more than one handgun within 30 days.

9  Q.  Could you briefly describe the 30-day check?

10  A.  What the system does at that point in time, it looks into

11  itself to see if it's databased and looks to see if that

12  individual purchased a handgun within the 30-day time frame.

13  And if it does find that individual has, then that information

14  is appended to the background check results, and then the

15  background check stops at that point in time.

16  Q.  Okay.  What happens if there is no previous application

17  within the 30 days?

18  A.  If there is no previous application, then it continues on

19  to the next step.

20  Q.  Okay.  And what is the next step?

21  A.  The next step is it looks to see if there was a previous

22  denial within the -- within DROS itself, and it looks to see

23  if that person has any DROS's that were previously denied.

24  Q.  And what if that person had a previous DROS denial?

25  A.  There's summary information that's appended about the

1    previous denial such as the DROS number, and that is appended

2    to whatever results are already there and will be presented to

3    the analyst for review later.  But the background check

4    continues.

5    Q.  Okay.  So the background check, you mentioned the two

6    steps of the 30-day restriction check and the previous denial

7    check.  Where in this process flow that's shown in Exhibit CB

8    do those checks occur?

9    A.  Those checks, they're not within the -- any of the modules

10   on the far right.  They go back over to the CFIS Oracle

11   Database.

12   Q.  So the check is done with the CFIS Oracle Database.

13   A.  Correct.

14   Q.  So after the DROS processing system checks for previous

15   denials, what is the next step it takes?

16   A.  The next step is that the system builds the transaction to

17   go out to the -- what's noted here as ACHS, the Automated

18   Criminal History System.

19   Q.  What information is sent to the ACHS?

20   A.  For this first transaction to ACHS, the system sends the

21   name, date of birth, and any ID information that was contained

22   in the DROS transaction.

23   Q.  And are you aware of what the ACHS does with the

24   information?

25   A.  Yes.  What this particular transaction does, ACHS will do

1  an inquiry into its own database, but it also inquiries into

2  the other three below, noted as WPS, Wanted Person System,

3  CARPOS, the restraining order system, and the MHFPS, the

4  mental health system.

5  Q.  So ACHS does a separate check of the WPS, the CARPOS,

6  C-A-R-P-O-S, and the MHFPS?

7  A.  Correct.

8  Q.  What is the ACHS checking for?

9  A.  It's just checking to see if there are any potential hits

10 contained within those systems.  It returns summary

11 information such as flags so that if the system knows there

12 may be a hit in there.  So it's doing the initial checks on

13 behalf of us.  If there is nothing there, there is no reason

14 why we would have to do any subsequent checks.

15 Q.  You mentioned an initial check.  Why is there an initial

16 check?

17 A.  So this is the initial check just to see -- of those four

18 databases, is there any more detailed information that are

19 contained within any of those four databases, and if there

20 are, then the system will go out with different transaction

21 types to get the more detailed information.

22 Q.  When ACHS does this initial check within the other three

23 databases, is it using the name and date of birth that's on

24 the DROS application?

25 A.  Yes.  What it does is, it sends the name and date of

1   birth, but there are algorithms built behind the name such as
2   on a first name, it will do what we've called a diminutive
3   search, such as Robert, Bob, Bobby, and also the last name.
4   It will look for different variations of the last name.
5         Also on a date of birth, it does a date range around
6   the date of birth.  It goes three years either way of the date
7   of birth just to see if we can attain any hits on that
8   individual.
9   Q.  Why does the ACHS use this name variation and date of
10  birth range when it does this initial check?
11  A.  What it does is, it goes out with all these variations.
12  It will return in some instances multiple names with CII
13  numbers, and then what the system does, it takes those CII
14  numbers, and that's where it goes back with the separate
15  transaction to get the detailed information for each one of
16  those CII numbers.
17  Q.  So, for example, if, you know -- so variations and
18  diminutive names are used, so if someone's name is Jeffery,
19  then does the ACHS return both results for Jeffery and Jeff?
20  A.  Correct.
21        THE COURT:  Okay, let me take a quick break now.
22  Fifteen minutes.
23        (Recess.)
24        THE COURT:  We'll go ahead and resume testimony.
25  BY MR. CHANG:

1   Q.  Now, Miss Orsi, you had just told us about how the ACHS

2   uses name variations and date of birth ranges to do an initial

3   check.  What does the ACHS do with the results of that initial

4   check?

5   A.  What ACHS does is it will bring back the summary

6   information, the CII number, a name associated to it, and it

7   will -- it does that for ACHS.  It also sets flags for us for

8   the other three databases, WPS, CARPOS, and mental health to

9   let us know there's potentially hits in there also.  So the

10   system is looking for those flags.

11        So for ACHS with the CII number, what the system does

12   is it takes that CII number and then does a subsequent check

13   to get the detailed information from criminal history system.

14   Q.  When it does that subsequent detailed history check, does

15   it check any other databases besides the criminal history

16   system?

17   A.  Now, these are the specific checks for those databases, so

18   for CII number, the system goes to ACHS.  If there are those

19   flags for the other three, the CFIS system builds the

20   transaction based on the name and date of birth because those

21   other three databases do not contain CII numbers.

22   Q.  Now, this two-check process for those databases, is it

23   illustrated in Exhibit CB?

24   A.  It is -- I think it's written in the text.

25   Q.  It's hard to read.

1    Your Honor, may I approach with another copy?

2    THE COURT:  Yes.

3    THE WITNESS:  So for the first check, that initial

4  check, it's the one that's the bullet item that says "ACHS

5  with query."  That is the initial check into criminal history,

6  and then on our behalf, it goes to the other three databases

7  also.

8    The bullet item below it, "WPS, MHFPS and CARPOS

9  queries based on response from ACHS," that's where the system

10  is looking for those flags.  And if it finds that -- it sees

11  those flags, then it knows, okay, we have something else in

12  any of those other databases.  So it goes with the -- sends

13  the names, DOB, and ID information with the specific

14  transaction type to one or all of those three databases.

15  BY MR. CHANG:

16  Q.  And what happens after this two-step check through ACHS,

17  WPS, restraining order system and the mental health system?

18  A.  What this system does, we could send several messages over

19  inquiries to those systems based on how many we receive back

20  on initial inquiry.  It may not just be one, it could be five

21  for each one of those systems.  So when CFIS goes out and runs

22  all of those checks, all these results are bundled together

23  and appended to the background check results.

24  Q.  Okay.  And what happens next?  What's the next step in the

25  DROS process?

1   A.  So the next step is the federal database is checked.  So

2   the name and date of birth is sent to NICS, and NICS then

3   checks federal databases on our behalf.

4   Q.  The name and the date of birth, what is the source of that

5   name and date of birth that's fed into the federal database?

6   A.  The name and date of birth is from the DROS transaction.

7   Q.  It's not the same -- it's not the name variation and the

8   date of birth range that the ACHS had used?

9   A.  NICS does do a name -- they have a name algorithm and a

10  date range base check also.  But we just send the name and

11  date of birth that came in on the DROS transaction.

12  Q.  Okay.  Now, this diagram, Exhibit CB shows -- the last

13  module on the right-hand side, it shows NICS.  You know, are

14  there other federal databases in addition to NICS?

15  A.  Yes.  So when we send the NICS check to them, it checks

16  the NICS index, NCIC, triple I, and ICE, and it will only

17  check ICE if the record contained an AR number or 994 number.

18  Q.  Is NICS -- is the California DROS processing system, is

19  that on line 24/7?

20  A.  No.

21  Q.  Okay.  When does it shut down?

22  A.  It's not -- it shuts down at 10:00 at night and starts up

23  again at 5:00 AM our time.  And that's due to restrictions on

24  the NICS -- the NICS system.  They shut down back East, so

25  we're -- we have to wait until their systems come back up for

1    us in order to run a complete background check.  Otherwise,

2    the background checks would fail.

3    Q.   After this federal check with NICS and the other federal

4    databases, what is the next -- what happens if there are hits

5    in the NICS system?

6    A.   So if there are hits in the NICS system, what our system

7    does, it goes in the process through the response, and it

8    looks to see if there is an FBI number or a state ID number

9    from another state included in the response.  And if there is,

10   the CFIS system will send another transaction out specifically

11   to triple I with those numbers to see if there's any

12   additional information with those specific numbers.

13   Q.   And what happens after -- what's the next step after this

14   check?

15   A.   So after this check is complete, then the background check

16   is considered done, and all the results are appended together

17   and put into a queue that -- a DROS processing queue for an

18   analyst to review.

19   Q.   Do all DROS applications go to this queue for analysts to

20   review?

21   A.   Not all.

22   Q.   What applications don't go to a review queue?

23   A.   There are some transactions where if the system has gone

24   and checked all the databases, and there are no hits that have

25   come back from any of them, then those transactions are

1   considered an auto-approved or automatically approved by the

2   system.  So they're not put into any queue for a person to

3   review.

4   Q.  Let's talk about APPS.  Are you familiar with APPS?

5   A.  Yes.

6   Q.  Are records in APPS updated -- I'll rephrase.

7        How often are records in APPS updated?

8   A.  They're updated every day.

9   Q.  What kind of -- how is it updated every day?

10   A.  There is a nightly job that runs, that gets information

11   from the four DOJ databases, criminal history, wanted persons,

12   restraining order and mental health.  It sends updates that

13   are inserted into that database every day.  It's a file that's

14   created from each one, and it sends that information to the

15   APPS database.

16   Q.  And what does the APPS database do with this daily update

17   of its records?

18   A.  So what the APPS database does is it's doing a match on

19   any names or ID information that may be contained in the

20   record.  So it's looking for a name and date of birth match or

21   an ID number match, and if there is a match, then the

22   background check starts, as I just described for the DROS

23   background check.

24   Q.  So how does the APPS record matching, as you have just

25   described, how is that different than the regular DROS

1    processing?

2    A.  It's looking for an exact name and date of birth match

3    that are coming from those nightly files.  So that's the

4    difference.

5    Q.  And how is that different from the regular DROS

6    processing?

7    A.  The actual -- the background check itself is doing that --

8    you know, the name algorithm and the date range around the

9    date of birth, whereas the APPS on the matching is just

10   looking for an exact name and date of birth.

11   Q.  I see.  So if an entry in APPS is "Jeffrey," and a DROS

12   applicant puts "Jeff" on his DROS application, there wouldn't

13   be a match?

14   A.  Correct.

15   Q.  Okay.  And if the -- the APPS record entry, the name is

16   Jeffrey, J-E-F-F-R-E-Y, and the DROS application spells -- the

17   "Jeffery" is spelled J-E-F-F-E-R-Y, would there be a match?

18   A.  No match.

19          MR. CHANG:   That's all the questions I have,

20   Miss Orsi.

21          THE COURT:  Thank you.  Cross-examination.

22          MR. KILMER:  Thank you, Your Honor.

23                       CROSS-EXAMINATION

24   BY MR. KILMER:

25   Q.  Good afternoon, Miss Orsi.

1  A.  Thank you.

2  Q.  My name is Donald Kilmer, and I represent the plaintiffs

3  in this action.

4       The DROS system is a system designed to stop sales or

5  transfers based on the hits from the system; is that correct?

6  A.  The DROS system is used for analysts to review whether --

7  to make the determination on the person's eligibility to

8  possess firearms.

9  Q.  But because the DROS is used by a firearms dealer to

10  effect a transfer, whether it's a sale or a private party

11  transfer, its purpose is to stop the transfer of the firearm

12  from a gun dealer's inventory to a person or between two

13  persons; is that correct?

14  A.  The purpose is to send the information to DOJ in order for

15  us to run the background check to make that determination.

16  Q.  All right.  But the DROS system isn't used as an

17  investigative tool to try and locate prohibited persons in

18  possession of guns, is it?

19  A.  I don't know.  My role is from the IT perspective.

20  Q.  Okay.  Well, you testified earlier that you've been

21  working for the Department of Justice for how long?

22  A.  It was over 26 years.

23  Q.  And how long for the Bureau of Firearms?

24  A.  I worked for the Bureau of Firearms for about a year and a

25  half.

1  Q.  All right.  And that was the last year and a half before

2  you moved over to your new agency?

3  A.  No, that was before I moved into my IT role.  So I

4  actually worked on the program side for about a year and a

5  half.  And then I moved into IT, maintaining their systems for

6  them.

7  Q.  Okay.  The APPS system that you were discussing a few

8  minutes ago, its function is a little bit different than DROS,

9  in that it is designed to try and find or locate people who

10  are known to have guns and who subsequently become prohibited;

11  is that correct?

12  A.  Correct.

13  Q.  Were you involved at all in the design of this current

14  system that's on the display?

15  A.  Yes.

16  Q.  Did you run test programs as part of the design and

17  development of that system?

18  A.  Oh, yes.

19  Q.  Did you run any test programs for a DROS that would

20  auto-approve, for example?

21  A.  Yes.

22  Q.  And approximately how long would it take a DROS that you

23  had set up to be auto-approved to be -- to go through the

24  system from the moment it was entered until the moment you got

25  an auto approval?

1    A.  It depends pretty much on, you know, the status of the

2    databases at that time, the processing time, you know, what

3    other things are happening on the networks.  So our focus in

4    testing is more to ensure that the record is behaving properly

5    along its way, not so much the timing of it.

6    Q.  Okay.  Could you give me a range, five minutes, an hour?

7    A.  Just for an auto-approve?

8    Q.  For a test program that you would set up for you know that

9    it's going to be an auto-approve because it's going to go

10   through -- it's going to start and follow all of these flows

11   through here, and it will go through the DMV check, the AFS

12   check, the ACHS check, the WPS check, the CARPOS check, the

13   mental health check, and the NICS check and then return an

14   auto-approved.  Could you give me a range of time on how long

15   that might take?

16   A.  Again, it depends.  It could take anywhere from, you know,

17   a minute to five minutes.

18   Q.  Thank you.

19          MR. KILMER:  Nothing further, Your Honor.

20          THE COURT:  And redirect.

21                    REDIRECT EXAMINATION

22   BY MR. CHANG:

23   Q.  Miss Orsi, you just talked about how, when you ran test

24   programs, the time that it takes to run these -- these test

25   DROS applications through the system.  If there are no hits,

1  it could be a minute to five minutes; correct?

2  A.  Correct.

3  Q.  Now, in real life applications, are they always -- do they

4  always complete between a minute and five minutes?

5  A.  No.

6  Q.  What are some circumstances when it doesn't get completed

7  within a minute to five minutes?

8  A.  Databases could be down.  NICS goes down sometimes.  We

9  get out-of-service messages, so we can't complete the

10 transaction.  Even internally, we could have something go

11 down, or as I mentioned before, you know, network traffic

12 sometimes will cause slowness and the background check.  And

13 the other thing that was mentioned before is, you know, we

14 shut down at 10:00 at night, so any DROS's that come in after

15 that point in time aren't run until the next day.

16       MR. CHANG:   Thank you, Miss Orsi.

17       THE COURT:  Okay, and recross.

18       MR. KILMER:  Very short.

19                    RECROSS-EXAMINATION

20 BY MR. KILMER:

21 Q.  Same sort of question.  I'm not asking for how long it

22 takes to process the DROS application, but is it approximately

23 the same time frame even if the system is generating hits?

24 A.  There again, it depends a lot, if we -- what I described

25 as I walked through this, this is like where we would get a

1   hit from every database, especially going after the federal

2   databases may take a little bit longer --

3   Q.  Okay.

4   A.  -- in order to get the information back.

5   Q.  And now, you testified earlier when there are hits, it

6   goes into a queue for an analyst to take a further look at it.

7   Is that an electronic file, or does it generate a printout or

8   something?

9   A.  It drops into what is called their queue, so when they

10   open up their web browser and go and look at those particular

11   hits, it's in an electronic format for him.

12   Q.  And that's when the criminalist would take over and start

13   taking a look at something?

14   A.  Correct.

15   Q.  But once the auto-approves go -- make it through system

16   with no hits, no queue, goes automatically to an auto

17   approved?

18   A.  Correct.

19   Q.  Thank you.

20        MR. KILMER:  Nothing further, Your Honor.

21        THE COURT:  And further redirect?

22        MR. CHANG:  Nothing further, Your Honor.

23        THE COURT:  Any party wish this witness to remain

24   subject to recall?

25        MR. CHANG:  Defendants would.

1    THE COURT:  All right.  Okay, any party may still

2    call you back to testify.  You're still under oath, but you

3    can step down.  I'll have the attorneys let you know the date

4    and time if necessary to return.  Thank you.

5    MR. CHANG:   Your Honor, I believe our next witness

6    is outside.  We'll retrieve him now.

7    THE COURT:  All right.

8    THE CLERK:  Come right up here, sir.  Raise your

9    right hand.

10    **MITCH MATSUMOTO,**

11    called as a witness on behalf of the Defendants, having been

12    first duly sworn, testified as follows:

13    THE CLERK:  Take the witness stand right over there

14    and give us your full name, please.  Have a seat up there,

15    please.

16    THE WITNESS:  Okay.  My name is Gilbert Mitchell

17    Matsumoto.  I work for the Department of Justice.

18    DIRECT EXAMINATION

19    BY MR. CHANG:

20    Q.  Good afternoon Mr. Matsumoto.  You just mentioned you work

21    for the California Department of Justice, and you're with the

22    Bureau of Firearms; correct?

23    A.  That's correct.

24    Q.  Please tell the Court how long you have been with the

25    Bureau of Firearms and your position or positions within that

1    bureau.

2    A.   I've been with the Bureau of Firearms 10 years.  Six years

3    as a Criminal Identification Specialist II, and four years as

4    a Criminal Identification Specialist III.

5    Q.   Which department of the Bureau of Firearms are you with?

6    A.   The Purchaser Clearance Unit.

7    Q.   And have you been with the Purchaser Clearance Unit since

8    you started with the Bureau of Firearms?

9    A.   Yes.

10   Q.   What is the role of the Purchaser Clearance Unit within

11   the Bureau of Firearms?

12   A.   To determine eligibility of prospective purchasers of

13   firearms.

14   Q.   What are your present job duties as a -- as a Criminal

15   Identification Specialist III?

16   A.   To review and analyze criminal background checks on people

17   on purchasers applying to own guns in the State of California,

18   and I supervise 24 people.

19   Q.   What do those people do?

20   A.   They do criminal background checks on the Dealers Record

21   of Sale, applications that are submitted to the state.

22   Q.   What is their title?

23   A.   Criminal Identifications Specialist II's.

24   Q.   Okay.  Do you have any other job duties?

25   A.   Just supervisory and do criminal background checks on the

1 purchasers and keeps statistics for the Chief of the Bureau of
2 Firearms.
3 Q.  Do you have any training duties?
4 A.  I train all the new employees that are hired by the Bureau
5 of Firearms regarding Criminal Identifications Specialist II
6 positions.
7 Q.  Okay.  Now, how many hours a week do these analysts that
8 work for you, how many hours of work do they work on average?
9 A.  Including overtime?
10 Q.  Including overtime.
11 A.  Probably 80.
12 Q.  How many hours of the 80 is overtime?
13 A.  Forty.
14 Q.  Is overtime optional or mandatory?
15 A.  Mandatory.
16 Q.  How many hours do you work a week on average?
17 A.  Seventy.
18 Q.  How many hours of that is overtime?
19 A.  Thirty.
20 Q.  Why do you and the analysts who work for you work so much
21 overtime?
22 A.  To reduce the backlog of Dealers Record of Sales that are
23 coming into the department.
24 Q.  You mentioned the backlog of Dealer Record of Sales.  Is
25 that the DROS?

1   A.  Correct.

2   Q.  To reduce the backlog of the DROS?

3   A.  Processing.

4   Q.  Processing.  Can you tell us what -- how many -- let's

5   talk about that a little bit.  How many DROS applications does

6   the Bureau of Firearms process a year?

7   A.  A year?  Last year was 960,000.

8   Q.  And has the number of DROS applications submitted, has

9   that been increasing or decreasing?

10   A.  Increasing.

11   Q.  Has the Purchaser Clearance Unit ever cleared the DROS

12   backlog?

13   A.  No.

14   Q.  Typically what kind of backlog do you see?

15   A.  The backlog is predicated on which day we're working on,

16   so if -- we have 10 days to process that DROS to make a

17   decision whether to delay it, deny it, or approve it, and

18   we've been working on denying.

19   Q.  How many DROS applications are in this backlog?

20   A.  Right now 20,000.

21   Q.  There are 28,000 --

22   A.  20,000.

23   Q.  20,000?

24   A.  Currently.  But it depends on the time of year.

25   Q.  What's the -- what's the largest backlog that you've seen?

1  A.  28,000.

2  Q.  And when the backlog is high, what does the Bureau of

3  Firearms do?

4  A.  Order mandatory overtime.

5  Q.  Mr. Matsumoto, now I'll ask you some questions about the

6  background check process.  Can you briefly describe --

7  actually let me take this exhibit.

8        Can you briefly describe the background check process

9  beginning when a DROS application is submitted to the Bureau

10 of Firearms?

11 A.  Once the DROS is submitted to the Bureau of Firearms, it

12 goes into a queue, like a holding area where a basic firearms

13 or dealer check is run.  When it's run, it could determine

14 auto-approves, DROS's that are automatically approved, and the

15 DMV reject queue, and then the DROS processing queue.

16 Q.  You're talking about the computer database?

17 A.  Computer database.

18 Q.  And what happens when that computer database search is

19 complete?

20 A.  Then the CIS analyst reviews the computer database to

21 determine if there's any probable prohibitors that could

22 prohibit a person from owning or possessing a firearm in

23 California.

24 Q.  Other than that reason, do the analysts look for

25 prohibitors or prohibiting reasons, are there any other types

1  of DROS applications that are -- or database search results
2  that the analysts look at?
3  A.  The NICS, national instant gun checks system.  That's the
4  federal system.  That's the FBI, the Interstate Identification
5  Index, which checks out-of-state arrests.  There's a NICS
6  index that checks citizen renunciation, military, domestic
7  violence.
8  Q.  Now, that's part of the computer background check, the
9  results of which the analysts are reviewing; correct?
10 A.  Correct.
11 Q.  Now, other than those background checks, is there any
12 other type of files or queues that the analysts are reviewing?
13 A.  They're reviewing the DMV reject queue and the DROS
14 processing queue, temporary restraining orders, the wanted
15 persons queue, the firearms prohibition queue where the mental
16 health records are stored, and the wanted persons queue.
17 Q.  Let's talk about them one at a time.  You mentioned the
18 DMV mismatch queue or the DMV reject queue.  What is the DMV
19 mismatch queue?
20 A.  The DMV mismatch queue is when a DROS is -- Dealers of
21 Record of Sale is submitted to the department, and the DMV
22 mismatch -- the identification on the DMV mismatch must match
23 the identification, what's on his California driver's license.
24 It could mismatch because different date of birth, the names
25 got transposed.  He's using his last name as first name, first

1  name, last name.  Or his license can be suspended or revoked,

2  and that would create a mismatch.

3  Q.  So what do the analysts do with these mismatched DMV

4  mismatched applications?

5  A.  They reject them.

6  Q.  Is it -- well, so whenever a DROS application goes into

7  the DMV mismatch queue, the analyst just rejects it?

8  A.  No.  They check to see if the DMV matches.  They check to

9  see if there's a suspended or revoked license because

10  sometimes they could -- the dealers could enter a typo.  So

11  sometimes if they enter a typo, we will fix it and send it

12  through the normal process instead of rejecting it.

13  Q.  Okay.  So the analyst is looking at the application in the

14  mismatch queue to see if they can fix it or make a match?

15  A.  Correct.

16  Q.  That was the DMV mismatch queue.  Let's talk about this

17  other queue where the analyst reviewed the application after

18  it has gone through the database checks.  Okay?

19  A.  Okay.

20  Q.  Could you briefly describe for the Court how the analysts

21  reviewed the DROS applications that are in this database

22  review queue.

23  A.  After the database is populated electronically, we review

24  a person's -- a purchaser's criminal history record to see if

25  he could be prohibited or cleared of a firearm in the State of

1    California.  There's various databases we would have to check.

2    Sometimes there's a current arrest that we need a disposition

3    on, so we would have to try to obtain the disposition on that.

4    Q.  So let's break that down a little more.

5    A.  Okay.

6    Q.  So let's step back a little bit.  Okay, so we're talking

7    about the analysts reviewing the DROS applications that's in

8    this review queue.  And the application in the review queue, I

9    think you testified earlier that it shows the results of a

10   database searches?

11   A.  Correct.

12   Q.  So what is the analyst seeing at this point?

13   A.  The results of the database checks from the various --

14   from the various -- like the temporary restraining order that

15   results if there's any restraining orders on the individual,

16   or the results of the mental health, to see if the subject was

17   admitted to a mental health facility.  Or it checks the Wanted

18   Persons System to see if the subject has any outstanding

19   misdemeanor or felony warrants.  And it checks FBI.

20   Q.  So the analyst is looking at the results of these checks

21   from these databases?

22   A.  Correct.

23   Q.  And why is the analyst looking at these results?

24   A.  To determine eligibility of a purchaser who owns and

25   possesses in the State of California.

1  Q.  Why is an analyst needed for that?  Can't the computer do
2  that work?
3  A.  No.
4  Q.  Why not?
5  A.  Because the computer does not -- I'll give you an example
6  on that.  The computer is not set up to determine
7  misdemeanors -- certain misdemeanors that could prohibit a
8  person for 10 years from date of conviction, or it's not set
9  up to -- if there was a straight felony, like a 211, or a
10 11350(a), health and safety, if it was reduced to a
11 misdemeanor, the computer would automatically clear it based
12 on being a misdemeanor, when technically it should not because
13 those charges would be called straight felonies, charges that
14 cannot be reduced to a misdemeanor.
15 Q.  I see.  So the analyst is actually looking to see whether
16 a felony that's reduced to a misdemeanor could be reduced a
17 misdemeanor?
18 A.  Correct.
19 Q.  And the computer would not catch that?
20 A.  No.
21 Q.  Are there any other examples why a human analyst is
22 needed?
23 A.  Another example would be domestic violence, a domestic
24 violence offense.  Say, the individual was arrested for 273.5
25 in 1988, inflict corporate injury on spouse and cohabitant.

1    In 1989, he is sentenced in muni court for a 242 P.C., which

2    is battery.  That would only -- California would only carry a

3    10-year prohibition, so he would be prohibited from 1989 to

4    1999.  But under federal law, under -- we would have to check

5    to see on that particular battery charge, we need to determine

6    a relationship and cohabitation because that particular arrest

7    could fall under the MCDV criteria for lifetime prohibition.

8    Q.  So you mentioned that the analysts need to make a

9    determination.  How does the analyst make a determination, you

10   know, as to cohabitation or some of the other factors you just

11   mentioned.

12   A.  We would need to contact the arresting agency.  It could

13   be the police department in that county or the Sheriff's

14   Office, and if they do have the police report or sheriff's

15   report, and it meets the MCDV, we would deny the sale of a

16   firearm.  But if the Sheriff's Office or the PD report is not

17   available, we would approve it.

18   Q.  Why would the sheriff or the DA's office not have the

19   latest information?

20   A.  Because if the records could be destroyed or purged based

21   on the PD -- police department or Sheriff's Office purge

22   criteria.

23   Q.  Are there any other reasons that you can think of why a

24   human analyst is required to review the files?

25   A.  Out of state -- out-of-state arrests regarding military.

1  If an individual was arrested for -- well, say, Article 118,

2  which is possession of a controlled substance, we would need

3  to determine what happened to that arrest.  If there is not a

4  disposition on the record, and we would have to determine

5  whether there was a court marshal.  We also need his DD 214,

6  to determine what type of discharge he received, honorable or

7  other than honorable.

8  Q.  And does factors affect whether the person be prohibited

9  or not from owning a firearm?

10 A.  Yes.

11 Q.  So the information on whether a military personnel was --

12 you know, how the military personnel was discharged, wouldn't

13 that be in one of the databases that the DROS processing

14 checks?

15 A.  No.

16 Q.  And how would the analyst make the determination as to

17 whether -- how the military personnel was discharged?

18 A.  We would need -- we have a -- National Instant checks gun

19 checks system book that lists all the military contacts, and

20 we would contact that specific military, like if it was Army

21 or Air Force, Marines, that gives us a contact person that we

22 would try to obtain that information from them.

23 Q.  Okay.  Now, the -- you know, you mentioned this, all this

24 review is done after the DROS processing already, you know,

25 searches through the database.  You know, is this the records

1  that the analyst is reviewing at this point, are they always
2  correct?
3  A.   No.  If a DROS was -- the purchaser purchased today and
4  were in the backlog, and we don't see it until -- we don't
5  process it until day eight or day nine, I instructed staff, it
6  would be our policy that we run another background check
7  without the NICS check to see if we missed any possible
8  prohibitors.
9  Q.   So when the analyst review these DROS applications on day
10 eight, for example, the analyst actually reruns the DROS
11 application through the various databases, picks up NICS?
12 A.   Correct, because NICS -- you only could do the NICS
13 background check once every 30 days.
14 Q.   Why do the analysts run the database searches a second
15 time?
16 A.   Just in case we miss any other information that could
17 occur between the time he purchased until the time we review.
18 There's instances where a guy purchased a gun today and
19 tomorrow he was admitted to a mental facility, if we didn't
20 run that background check, he would have been cleared to own
21 and possess a firearm, and we would miss that prohibition.  So
22 that's the reason why we run the background check a second
23 time so we don't miss any possible prohibitors.
24 Q.   Okay.  And, you know, running this background check a
25 second time when the analysts review the files, is that a

1  Bureau of Firearms protocol?

2  A.  Yes.

3  Q.  Now, the databases that the DROS processing does the

4  background checks through, are those databases always updated

5  properly?

6  A.  Yes, at the time, yes.

7  Q.  So the information in those databases at the DROS

8  processing checks, the information in those databases are

9  up-to-date?

10  A.  Current or -- you mean like missing information, that

11  type?

12  Q.  For example, you know, is it missing information?  Could

13  it miss information?

14  A.  Yes.

15  Q.  Why would it miss information?

16  A.  Because an example would be -- if an individual was

17  arrested 2012 for battery, on the Automated Criminal History

18  System and without a disposition, we would not be able to

19  determine if the individual is eligible to possess a firearm

20  in California.  In order for us to prohibit, there must be a

21  conviction.

22  Q.  So how does the analyst determine disposition?

23  A.  We need to contact the County Sheriff's Office or police

24  department, and we contact the District Attorney in that

25  county and the superior or muni court in that county and that

1 probation to try to obtain that disposition.

2 Q. Well, if there's already a disposition, then those

3 agencies, wouldn't they have already inputted that information

4 into the databases?

5 A. No.

6 Q. But under California law, aren't they required to do it

7 within two days?

8 A. Yes.

9 Q. So do you know why they don't do it?

10 A. No. They could -- backlog reasons, like they're short

11 staffs. The courts are short staffed, and other -- there's

12 other various reasons.

13 Q. Okay. So it's your understanding that these -- you know,

14 the courts and the DA offices, these agencies, they don't

15 always input information into these various databases?

16 A. Correct.

17 Q. Mr. Matsumoto, let's talk about people who already own

18 guns.

19 A. Okay.

20 Q. If someone has gone through the California DROS processing

21 and application before, could the analysts, when reviewing the

22 hits in the database, could the analysts simply review the new

23 database entries that were created after the previous DROS

24 application was submitted?

25 A. No.

1  Q.  Why not?

2  A.  Because some state laws or federal laws change, and he

3  could have been approved at that time, but current laws have

4  changed, he might not be approved now.

5  Q.  Could you describe that or give us an example of that?

6  A.  Okay.  I'll give you an example of domestic violence.

7  273.5 PC, which is to inflict corporate injury on spouse and

8  cohabitant, and he was convicted of that particular offense,

9  and in 2004 is when that law changed.  If the purchaser had a

10  12021(c)(2) or a 1203.4 before that time, he would have been

11  eligible to possess a firearm.  But now, since that law

12  changed, ATF is no longer honoring that 12021(c)(2) or the

13  1203.4, which was an expungement.

14  Q.  Do you know what a CCW is?

15  A.  Carry a Concealed Weapon Permit.

16  Q.  Do you know what a COE is?

17  A.  Certificate of Eligibility permit.

18  Q.  For a DROS applicant with a CCW or a COE, are there

19  applications treated differently than someone without one of

20  those licenses?

21  A.  No.

22  Q.  Why not?

23  A.  Like I stated before, the laws change.  He could have

24  went -- the purchaser could have been approved back then in

25  2000, but he might be prohibited now in 2014.

1  Q.  Could you think of any other reasons?

2  A.  Not at this time.

3  Q.  Okay.  Let's turn to another topic.  You said earlier that

4  one of your job duties is to train analysts to perform

5  background checks; correct?

6  A.  Correct.

7  Q.  How long have you been training analysts?

8  A.  Eight years.

9  Q.  Could you briefly describe the process of how you train

10  analysts?

11  A.  The process how I train an analyst is I ask -- I try to

12  determine whether they know the difference between a felony,

13  misdemeanor, or infraction, and if they understand how to read

14  a criminal rap sheet or applicant rap sheet.  We have manuals

15  that we use, and Power Point examples that we use to train

16  these individuals so they could become efficient at their job.

17  Q.  How long does it take you to train a new analyst

18  typically?

19  A.  Six to eight months.

20  Q.  After six to eight months, is the analyst then proficient

21  at reviewing or performing these background checks?

22  A.  Well, after six months, I let them go into what we call

23  the live queue to process the Dealer's Record of Sale, and I

24  review -- we have a queue that we click on, and it's assigned

25  to that particular analyst, and I review each one of the

 1    purchases to see if they made a mistake, or if they didn't

 2    make a mistake.

 3    Q.  And how long do you review their results for?

 4    A.  Until I think they're proficient at the job.

 5    Q.  And how long does that typically take?

 6    A.  Two months.

 7    Q.  Is that two months after the six to eight months that you

 8    train them?

 9    A.  No, it's after the six months.  Two months is for me

10    reviewing their work to see if they're proficient enough to

11    process DROS.

12              MR. CHANG:  I have no more questions, Mr. Matsumoto.

13              THE COURT:  Cross-examination.

14                           CROSS-EXAMINATION

15    BY MR. KILMER:

16    Q.  Mr. Matsumoto, my name is Don Kilmer, and I represent the

17    plaintiff in this case and I have some questions for you.

18    A.  Okay.

19    Q.  Are you familiar with an acronym called CII?

20    A.  Yes.

21    Q.  What is that?

22    A.  Criminal Identification Index.

23    Q.  What is that?

24    A.  It's a person's -- no, it's a subject's criminal history

25    information.

1  Q.  And who are those -- who gets a CII?

2  A.  An individual -- a CII is -- it could be an applicant, or

3  it could be a criminal.

4  Q.  All right.  Typically it's somebody who has a set of

5  fingerprints on file too.

6  A.  Correct.

7  Q.  Do you know whether or not Concealed Carry Permit holders

8  have a CII number issued to them?

9  A.  No.

10  Q.  You don't know that?

11  A.  Well, that's -- I only do strictly background checks in

12  the Purchaser Clearance Unit.  The Certificate of Eligibility

13  and the Carried Concealed Weapons are processed by another

14  unit.

15  Q.  All right, then let me ask you about COE's.  Do COE's get

16  issued a CII number?

17  A.  Yes.

18  Q.  All right.  And how long is a COE good for?

19  A.  That's up to the other unit that processes within the

20  Bureau of Firearms.  It's called the Licensing and Permits

21  Unit.  They process the COE's and CCW's.  I don't.

22  Q.  I just want to focus just on the COE.  Do you know how

23  long a COE, a Certificate of Eligibility is good for, how long

24  before it has to be renewed?

25  A.  Not at this time.

1  Q.  You don't know?  Okay.

2      You mentioned in your direct testimony that there was

3  a law change regarding the federal recognition of misdemeanor

4  crimes of domestic violence.  What year did that change

5  happen?

6  A.  2004.

7  Q.  And as you sit here today, do you know the name of the law

8  or the title and code section for that change?

9  A.  No.

10  Q.  Okay.  You testified under direct that while there -- that

11  courts are required to enter conviction data within 24 hours.

12  Do you know under what law that --

13      MR. CHANG:  Objection, Your Honor.  Misstates --

14  assumes facts not in evidence.  It misstates his prior

15  testimony.

16      THE COURT:  Sustained.  Go ahead and rephrase.

17  BY MR. KILMER:

18  Q.  You testified earlier that convictions are supposed to be

19  entered into the Department of Justice criminal database by

20  some Superior Courts; is that correct?

21  A.  Correct.

22  Q.  All right, and how does that happen?

23  A.  They either submit it electronically through a tape, or

24  they send it to our disposition update section in another

25  bureau within the Department of Justice.

1  Q.  And so what might happen is, once the conviction is

2  entered, then presumably the clerk of the Court then either

3  enters it electronically or sends it to your agency.

4  A.  Correct.

5  Q.  And you stated under direct that there is a law that says

6  they have to do that.

7  A.  Yes.

8  Q.  Do you know what that Penal Code section is?

9  A.  No.

10  Q.  Do you know if it's in the government code or some other

11  code section?

12  A.  No.

13  Q.  But you're pretty certain it's a law.

14  A.  Yes.

15  Q.  All right.  And does -- do you know how long they have to

16  transmit that data under that law?

17  A.  Forty-eight hours or two days.

18  Q.  Would that be two business days or two calendar days?

19  A.  Two business days.  Not Saturday and Sunday.  Two business

20  days.

21  Q.  So if a conviction happened on a Friday, they would have

22  until Monday or Tuesday?

23  A.  Monday, correct.

24  Q.  All right.  You testified under direct that

25  approximately -- I think you said last year, 2013, you

1  processed 900,000 DROS's?

2  A.  960,000 DROS's were processed.

3  Q.  Okay.  As you sit here right now, do you know how many

4  resulted after all of your hard work resulted in an actual

5  final denial?

6  A.  No.

7           MR. KILMER:  Do you have your AP exhibit?

8           (Pause in the proceedings.)

9           MR. KILMER:  May I approach the witness, Your Honor?

10          THE COURT:  Yes.

11 BY MR. KILMER:

12 Q.  Mr. Matsumoto, I've just shown you a document that's

13 previously been admitted into evidence.  And it is part of

14 Exhibit AP, but it's a little bit further down in the stack.

15 It's actually Bates numbered AG-002394.  Do you see that in

16 front of you?

17 A.  Yes.

18 Q.  All right, the Bates number is in the lower right-hand

19 side.  And the upper right-hand corner, it talks about total

20 DROS's received.  I'm sorry, at the top of the page, it says

21 "Dealer Record of Sales statistics for 1/1/2013 through

22 12/31/2013."

23 A.  Correct.

24 Q.  And do you see that?

25 A.  Yes.

1  Q.  And in the upper right-hand corner, it talks about total

2  DROS's received.  Is that the number that you remember?

3  A.  Yes, 960,000.

4  Q.  And on the left-hand column down at the bottom, it looks

5  like there is a title of "Summary of Denials," and it shows a

6  total denial of 7,371.

7  A.  Yes.

8  Q.  Does that sound right to you?  I'm not asking you for an

9  exact memory.

10  A.  Yes.

11  Q.  So would it be accurate to say that denials end up being

12  pretty close to 1 percent or less than 1 percent of all DROS's

13  processed by your office?

14  A.  Yes.

15  Q.  Thank you.

16       One of the reasons of why you have to do further

17  investigations into arrests is because you can't deny a

18  firearm on the basis of just an arrest, a mere arrest; is that

19  right?

20  A.  That's correct.

21  Q.  Why is that?

22  A.  There must be a conviction in order for us to deny a

23  prospective purchaser.

24  Q.  All right.

25       MR. KILMER:  Nothing further, Your Honor.  May I take

1   the exhibit back from the witness?

2         THE COURT:  Yes.

3         MR. CHANG:  Nothing further from the defense,

4   Your Honor.

5         THE COURT:  All right, either party wish this witness

6   remain subject to recall?

7         MR. CHANG:  The defense would, Your Honor.

8         THE COURT:  All right.  Either party may still call

9   you back to testify.  You're still under oath, but you can go

10   ahead and leave the courtroom.  I'll leave it to counsel to

11   let you know the date and time if necessary to return.

12         THE WITNESS:  Okay.

13         THE COURT:  All right, thanks.

14         MR. EISENBERG:  Your Honor, the next witness will be

15   Blake Graham.  He is in the building, and we are trying to

16   locate him.

17         THE COURT:  All right, fine.

18         MR. EISENBERG:  Your Honor, here is the witness,

19   Mr. Graham.

20         THE CLERK:  Raise your right hand.

21                       **BLAKE GRAHAM**,

22   called as a witness on behalf of the Defendants, having been

23   first duly sworn, testified as follows:

24         THE CLERK:  Take the witness stand right over there

25   and give us your full name, please.

1    THE WITNESS:  First name is Blake, B-L-A-K-E, middle

2 is William, common spelling, Graham, G-R-A-H-A-M.

3                    DIRECT EXAMINATION

4 BY MR. EISENBERG:

5 Q.  Hello.  Sir, did you attend college?

6 A.  Yes.

7 Q.  Did you graduate from college?

8 A.  Yes.

9 Q.  What year did you graduate?

10 A.  1992.

11 Q.  What was your major?

12 A.  Criminal justice.

13 Q.  Are you currently employed?

14 A.  Yes.

15 Q.  Who is your employer?

16 A.  State of California, Department of Justice, Bureau of

17 Firearms.

18 Q.  What is your job title?

19 A.  Special agent supervisor.

20 Q.  May I call you Special Agent Supervisor Graham?

21 A.  Sure.

22 Q.  What in general are your job responsibilities as a special

23 agent supervisor?

24 A.  I supervise three different analysts, one is a special

25 agent, and that's as far as my supervisory role goes.

1 Actually an office technician as well.  I'm also in charge of

2 our armory, so duty weapons, we may issue out to the agents.

3 I review firearms that are submitted to be added to our not

4 unsafe handgun roster; training of existing agents that we

5 have, some outside training.  See, I actually do some criminal

6 investigations as well when I have time.

7 Q.  How long have you had the title of Special Agent

8 Supervisor?

9 A.  I was promoted in July of 2010.

10 Q.  Before becoming a Special Agent Supervisor, did you have

11 another job with the Bureau of Firearms?

12 A.  Yes.

13 Q.  What was your job title?

14 A.  I was a special agent with the Bureau of Firearms.

15 Q.  And how long were you a special agent?

16 A.  2002 is when I transferred to the -- actually it was at

17 the time of the firearms division, which then became the

18 Bureau of Firearms.

19 Q.  What in general were your job responsibilities as a

20 special agent?

21 A.  Within the Bureau of Firearms, basically enforcing

22 existing weapons laws in the State of California.  That could

23 be illegal possession by prohibited people.  It could be -- it

24 just flat-out illegal weapon possession or manufacturing,

25 importation, those types of things.

1  Q.  And do you currently, as your job title would suggest,

2  supervise special agents?

3  A.  I have one person under me at this time.

4  Q.  Have you had any training in law enforcement?

5  A.  Yes.

6  Q.  What kind of training have you had in law enforcement?

7  A.  I've received training as far as weapon -- different

8  weapon systems, and how those may apply to existing Penal Code

9  sections and actually federal sections.  Some of that was from

10  ATF, the ones dealing with weapons that might fall under

11  federal purview.  I received training, kind of on-the-job

12  training from, at the time, staff members of Department of

13  Justice about weapons that were at the time newly classified

14  as assault weapons.

15  Q.  Do you have training in the use of firearms?

16  A.  Yes.

17  Q.  Could you briefly describe the training that you have.

18  A.  Sure.  I've got certificates in -- as far as being a range

19  master for teaching other peace officers and whatnot, proper

20  range techniques and safety.  I have certificates from

21  other -- well, actually firearms manufacturers on how to take

22  apart and repair various weapons systems, Heckler & Coch

23  Glock, ArmaLite, Colt.  I'm trying to think of what other ones

24  are out there.  Those are the ones that come to mind right

25  now.

1  Q.  I want to ask you about some of your different work

2  assignments.  Have you heard of something called APPS?

3  A.  Yes.

4  Q.  What to your understanding is APPS?

5  A.  APPS is sort of like a pointer system.  It's -- data in

6  APPS is pulled from other existing DOJ databases that has

7  had -- basically computer systems have pushed data together,

8  and the people that might be pushed into the APPS database are

9  sort of candidates for placement in there after one or more

10  humans has looked at that data to see if they're eligible.

11  Q.  How is it that you know about APPS?

12  A.  I've been with DOJ for -- well, since '99 in another

13  bureau, and then since 2002 in the firearms division and then

14  the Bureau of Firearms.  So I've kind of seen the progression

15  of how this system has kind of come alive, if you will.  We

16  actually worked cases that were preAPPS cases.  Before the

17  system kind of went active, we would investigate the same type

18  of cases before the system really existed.

19  Q.  Approximately, when did the APPS system become active?

20  A.  Probably 2007 is when we actually started working the

21  cases that were kind of coming out of that system.

22  Q.  Do you work with the APPS system?

23  A.  Yes.

24  Q.  Are you aware of what kind of records are in the APPS

25  system?

1    A.   Yes.

2    Q.   What kind of records are in the APPS system?

3    A.   Basically there are people that have been identified by

4    the different databases that -- there's been at least one or

5    two levels of, you know, human kind of review as well.  And

6    there are about 21,000 people identified as armed and

7    prohibited.  And the weapons that they bought would have been

8    purchased prior to them becoming prohibited.

9    Q.   Have you heard of something called the AFS in the course

10   of your work?

11   A.   Yes.

12   Q.   What is the AFS?

13   A.   It's the Automated Firearms System.

14   Q.   Does AFS have any relationship with the APPS system?

15   A.   Yes.

16   Q.   What's the relationship?

17   A.   That's one of the databases that basically has to sort of

18   be filtered, if you will, to see if there is a person that may

19   or may not be eligible to go into the system -- into the APPS

20   system, that is.

21   Q.   Do you work with the AFS?

22   A.   Yes.

23   Q.   Are all guns in circulation in California listed in the

24   AFS?

25   A.   No.

1  Q.  Why not?

2  A.  Actually up until now, this -- January of this year, we

3  weren't actually allowed to track long gun sales in there.  So

4  once a background check was completed, we had about five days

5  to purge the data on a successful transaction, so that none of

6  those guns are in there until January 1st of this year.

7        Transfers that were kept in that system would be like

8  a handgun transaction, those types of entries.  And then you

9  have evidence entries, you'll have crime gun entries that were

10  usually pushed in there by a law enforcement entity.  There

11  will be certain other categories as well like pawn -- pawn

12  redemption.  You could have under observation entry, you could

13  have -- let me think, whatever else there is out there.  Yeah,

14  evidence.

15        That's pretty much the majority of them.  They'll

16  have assault weapon entries as well.  The registration

17  material, a very abbreviated version of that will be in there

18  as well.  So if someone runs a particular zero number on an

19  assault weapon, it would pop up as being a lawful registered

20  one if all the right data was put in there by the officer

21  doing the query.

22  Q.  You mentioned that long gun records have been put into the

23  system systematically since the beginning of the year; is that

24  right?

25  A.  Yes.

1  Q.  Is there a corresponding date for handguns?  Do they go
2  farther back in the system, in other words?
3  A.  Yeah, they do go farther back, but the people more on the
4  database side would have that.  I don't know what year all of
5  that really started.  I can say that over time, there have
6  been improvements.  Specifically in 1996, our systems got
7  better in the sense that they were tied to specific driver's
8  license numbers.  So the handguns after '96 are kind of the
9  pool that most of the APPS candidates are pulled from.  That
10  makes up the majority of the records and then records of
11  assault weapons as well.
12  Q.  Is there any prohibited person who is not in the APPS
13  database?
14  A.  Yes.
15  Q.  How could a person be prohibited and not be in the APPS
16  database?
17  A.  Well, there are 21,000, approximately, people in the APPS
18  database.  And there are many, many people that are not, I
19  guess, on record as being an owner of a weapon, post-1996, or
20  they may not have registered an assault weapon with us during
21  the appropriate registration windows.  So there's an unknown
22  number of prohibited people out there.
23  Q.  How up-to-date are APPS records?
24  A.  That's a very broad question.  So it's as up-to-date as
25  the data that's sent to us, I guess, is my best answer to that

1  question.

2  Q.  Does the Bureau of Firearms generate all of the data

3  that's in APPS?

4  A.  No.

5  Q.  Where does the data come from?

6  A.  From different databases out there.  We have the mental

7  health file, the hospitals generally send us the bulk of that

8  data.  There's -- I don't know, I think it's 1.5 million

9  records right now in the mental health system, and last year,

10  we had 225,000 mental health events get pushed to us mostly

11  from the hospital, some are from court records.  We have

12  warrants that get pushed into the system.  You know, there's

13  58 different counties.  Those different Sheriff's Departments

14  might push records to us.  You have criminal history

15  information.  The courts generally push that information to us

16  when there's -- hopefully when there's an update, they'll give

17  us all that data.  If there's been a reduction, for example,

18  they're supposed to send us the data on maybe felony

19  reductions, or something like that.  And then you could have

20  restraining orders.  Also those would come from the courts,

21  and supervised release data would also get sent to us.  So in

22  most senses, we're the repository or dumping ground if you

23  want to call it that.

24  Q.  Does the Bureau of Firearms have the power to make these

25  other agencies give them the records?

1  A.  In a layman's term, I would say no.  We can ask

2  vigorously.  I'm not sure if we have any real power to do much

3  other than send a nasty letter.

4  Q.  For each person listed in APPS, is there a fingerprint?

5  A.  Not necessarily.

6  Q.  For each person listed in APPS, is there a social security

7  number?

8  A.  Not necessarily.

9  Q.  I want to move on to another area of your work.  Are you

10  aware that there are gun shows that go on around the state?

11  A.  Yes.

12  Q.  Do you do any work related to gun shows?

13  A.  Yes.

14  Q.  What generally is the work that you do related to gun

15  shows?

16  A.  It's kind of, I guess, twofold.  It's either dealing with

17  the promoters of the shows themselves, making sure that they

18  are in compliance with state law.  We also try to regulate the

19  dealers that are present selling their wares, and then there

20  are also the clients or customers that come to the shows.

21  Sometimes the customers, you just want to make sure that those

22  people aren't prohibited themselves.  Maybe they're buying

23  ammunition or magazines.  A prohibited person in California

24  can't acquire magazines or ammunition if they're prohibited.

25  That would be breaking the law.

1          And also if you're straw purchasing, that would be a

2    problem under state and federal law as well.  Sometimes that

3    happens at gun shows.

4    Q.   What is a straw purchase?

5    A.   Straw purchase is kind of a -- it's called like an

6    industry slang term for a prohibited person, getting someone

7    that is, at least in their mind, cleaner than they are to go

8    out and try and acquire a weapon and then transfer it to them

9    without doing a proper transfer through a gun store or by some

10   other legal means.

11   Q.   Is the straw purchaser the person who is going to end up

12   with the gun in the end?

13   A.   No, that's the whole point.  It's the hidden buyer in the

14   sense, the person behind in the shadows, if you will.

15   Q.   So you've done work regarding straw purchasers at gun

16   shows.  How many gun shows have you worked in this capacity?

17   A.   Over 50 over the years.  I never tracked all the shows

18   I've ever been to.

19   Q.   When you do gun show work --

20          MR. KILMER:  At this point, Your Honor, I'm going to

21   object to this line of question.  We're getting kind of far

22   afield from the cause of action in this case.

23          MR. EISENBERG:  I'll make an offer of proof if you

24   want to sustain the objection.

25          THE COURT:  Proffer.

1          MR. EISENBERG:  I'm asking him these questions

2   because I want to show that he does gun show investigations of

3   straw purchasers, and they can take the full 10-day waiting

4   period, and he needs the time to do that.  It's part of the

5   whole Bureau of Firearms enforcement, law enforcement of the

6   firearms laws.

7          THE COURT:  Anything further?

8          MR. KILMER:  Objection withdrawn, Your Honor.

9          THE COURT:  Go ahead.

10  BY MR. EISENBERG:

11  Q.  When you work at a gun show -- I'm sorry, let me ask a

12  foundation question.  Are you a peace officer?

13  A.  Yes.

14  Q.  Do you have a uniform?

15  A.  Yes.

16  Q.  When you work at a gun show, are you in uniform usually?

17  A.  Not usually, no.

18  Q.  What kind of clothing are you wearing?

19  A.  Basically street clothes, depending on the weather.

20  Q.  Why are you in plain clothes as opposed to wearing a

21  uniform?

22  A.  The hope is we would -- me and my coworkers would blend in

23  and look like anyone else at the shows.

24  Q.  You've actually anticipated my next question.  When you're

25  working a gun show, are you working by yourself, or are you

1  working with a team of other people?

2  A.  With a team.

3  Q.  In a typical gun show, how big is the team of Bureau of

4  Firearms special agents?

5  A.  Usually a minimum of five, and then depending on the

6  availability, probably be no more than 10 on a really big

7  show.

8  Q.  Are you always the leader or the supervisor of a gun show

9  investigation?

10  A.  Not necessarily.

11  Q.  So there have been times when you've been just a member of

12  the team, not the leader.

13  A.  Sure.

14  Q.  There have also been times when you've been the leader?

15  A.  Yes.

16  Q.  I want to ask you some more questions about a straw

17  purchaser.  What do you do to determine if somebody is

18  suspected of being a straw purchaser?

19  A.  A straw purchaser is basically what we've seen over the

20  years at gun shows.  Specifically is we'll see people kind of

21  make the rounds amongst the tables, and there might be a lot

22  of interest from -- let's say a couple of people are walking

23  together.  And one person might be really interested in asking

24  a lot of questions and handling the weapons, and then they'll

25  make the rounds through the show, and the second time through

1  those same tables, the person that was kind of taking a second

2  seat in the sense, they're the one that actually might start

3  showing interest and actually filling out the paperwork.  This

4  commonly happens with -- you know, if it's a man and a woman,

5  the man will show a lot of interest, and then maybe when the

6  time came to do the paperwork to actually purchase it, the

7  woman would actually initiate the paperwork with the dealer

8  involved.

9  Q.  Are you describing scenarios that you've actually

10  witnessed?

11  A.  Yes.

12  Q.  After you suspect that you're observing a straw purchase,

13  what steps do you take?

14  A.  Well, you try to identify the parties involved, to see if

15  there is indeed a straw purchase or not, if there is a

16  conspiracy to provide a prohibited person with some weapons or

17  ammunitions and so forth.  That could involve in identifying

18  the table at which the transaction is going to be completed

19  through.  Sometimes the person selling the guns isn't, in

20  fact, a dealer themself, so they'll actually walk a weapon

21  over to a transfer dealer, who is a legitimate dealer, and

22  then that's where the paperwork gets completed.  So you may

23  have to identify someone at a table, and then a second table,

24  and then you've got potentially the straw purchaser and then

25  the real -- or the hidden buyer as well.  So maybe four more

1   people.

2   Q.  And what are you doing to identify all the people that

3   seem to be involved in the transaction?

4   A.  Sometimes you can get a license plate from one or more of

5   those parties.  Sometimes it may help from a business card

6   that's laying on the table.  You may have to do surveillance

7   at the closing of the show to see what cars people go to, if

8   it's people involved at the tables, and those are usually the

9   things -- a person's surveillance that goes on to identify the

10  parties.

11  Q.  Do you always complete all the identification in a matter

12  of minutes?

13  A.  No.

14  Q.  Matter of hours?

15  A.  I'd like to say, yes, but that's not always the case.

16  Q.  Have you ever had an investigation that went for longer

17  than a day.

18  A.  Yes.

19  Q.  What are the circumstances that would make an

20  investigation go longer than a day?

21  A.  Sometimes people that are engaged in straw purchasing,

22  they'll show up to shows in rental cars, and that puts another

23  hurdle in front of us in actually making a quicker

24  identification.  So you may have to contact a rental car

25  company.  Often the rental car company's corporate office has

1    nothing -- let's say, in San Francisco, has nothing to do with

2    the actual location of where that car was rented, for example.

3    Let's say it was a Sacramento rental, but the corporate office

4    might be down in San Francisco, which is where the vehicle is

5    actually plated to.  So we've got to do follow-ups with those

6    and jump through hoops and access and then dig around and see,

7    well, who rented the car, that sort of thing.

8    Q.   Have you ever had a straw purchaser investigation from a

9    gun show go longer than 10 days?

10   A.   Probably like 11 or 12 because the -- maybe the person

11   didn't come and pick up the weapon, you know, right on the

12   10th day perhaps or -- and into the 11th day, that sort of

13   thing.

14   Q.   Are you trying to finish the investigation within 10 days,

15   or do you not care about that 10-day deadline?

16   A.   Yeah.  We don't want the weapon to get out on the street

17   if we think there is a straw purchase involved.  So the best

18   thing I can say is an interception of what we think is a straw

19   purchase is the best scenario in this case.  We may not have

20   the people fully identified, though, because of various

21   factors, and we may actually have to contact them in the

22   parking lot at the gun store, as they walk out of the store,

23   or if we follow them back to their apartment or their house or

24   something like that.  So it may not be nice and tidy in the

25   sense because of all the factors I've talked about.

1   Q.  If the Waiting-Period Law was only three days, would you

2   be able to finish all of your straw purchaser investigations

3   in time to do intercepts?

4   A.  No, that would be nearly impossible to do, specifically

5   the ones with the gun shows, and some of the ones that we

6   become aware of that happen at normal gun dealers, you know,

7   seven days a week.

8   Q.  So if the waiting period were, say, only three days, how

9   would you stop the gun from being released to the purchaser?

10  A.  I don't know that we would even have most of the parties

11  involved -- identified by then.  Sometimes we do, but

12  sometimes we don't just because of the factors I've mentioned.

13  Q.  Why is it preferable to intercept the firearm rather than

14  try to retrieve it?

15  A.  Because the retrieval is problematic because the minute

16  that gun leaves the store, and then it's handed to the straw

17  purchaser, they may wait five minutes to transfer that weapon,

18  they may wait a, you know, day or two or longer.  It's just

19  once that gun hits the streets, we have a lot of trouble, you

20  know, having a hundred percent certainty that we're going to

21  get that gun back.

22  Q.  Have you ever done a gun retrieval operation?

23  A.  Yes.

24  Q.  What's safer, intercepting the gun before it gets to the

25  prohibited person or trying to retrieve it from the prohibited

1  person?

2  A.  In the sense that the public would be put less at risk, it

3  would be safer for the public if we can intercept all of them,

4  but that's never the case.  We're not in all places at all

5  times.

6  Q.  Do you know the number of special agents that do this kind

7  of work in California?

8  A.  Probably right now, we're somewhere in the neighborhood of

9  50 agents that are in the field that are available for this

10 kind of work.  It could be higher than that.  I'm not a

11 personnel specialist, so I don't know that number.

12 Q.  Have you ever worked a case where the straw purchaser was

13 somebody who is not a first-time buyer of firearms?

14 A.  Yes.

15 Q.  So you've seen something like a repeat straw purchaser?

16 A.  Yes.

17 Q.  If somebody who is a second-time purchaser did not have to

18 go through the 10-day waiting period at all, how would you

19 deal with a second-time straw purchaser?

20 A.  I think they most likely would end up having to do

21 retrievals, because the way I understand your question is, the

22 gun would just be immediately released after zero time or

23 three days?

24 Q.  Let's say zero time.  Let's say nearly instantaneous.

25 A.  Yeah, we would, for the most part -- I mean maybe

1  99 percent of the time, it would go into a retrieval method
2  because of manpower issues and stuff.
3  Q.  I want to ask you about some other of your work.  Are
4  there other ways that the special agents become aware of
5  possible straw purchases?
6  A.  Yes.
7  Q.  Can you tell me what some of those other ways are?
8  A.  Sometimes we get notified by the Bureau of Alcohol,
9  Tobacco, and Firearms.  Sometimes we'll be notified by a gun
10  dealer themself, and it might be a corporate chain.  Maybe
11  they did an audit of their past 30 days' worth of
12  transactions, and they may have caught something that they
13  thought retroactively was kind of suspicious.  So they will
14  contact us occasionally.
15      Actually I think the other time would be -- we have
16  our own field inspectors that are field reps that go out and
17  inspect the guns for us, and they will, just like the ATF
18  inspectors or investigators that go out, they will come across
19  suspicious transactions after a prohibited person is denied,
20  and maybe there's a common address or common last name.
21  Q.  I'll go ahead and be asking you questions about the
22  dealers' situation, and the field representative situation.
23  I'll take them one at a time.
24  A.  Sure.
25  Q.  So you're actually aware of cases where a dealer will call

1    the Bureau of Firearms and say, "I think somebody attempted to

2    make a straw purchase in that case."

3    A.   Yes.

4    Q.   When the Bureau of Firearms gets a call like that, what do

5    you do?

6    A.   Usually it will -- it might come to our field

7    representatives.  They'll try to pull together the data, if

8    it's available, such as transaction dates, whatever

9    information the FFL or federal firearms licensee would have

10   provided to us.  And then typically I'll get something

11   e-mailed to me like in a pdf format.  Ill review it and see if

12   it's something that I think is something we need to send out

13   to one of the field offices.

14   Q.   You mentioned the term "field rep."  What is a field rep?

15   A.   A field rep for DOJ is a field representative.  So they

16   have a few functions.  The biggest function they do is

17   actually inspecting the guns for us.  They also provide

18   training to the mental health facilities, to make sure they

19   are aware of when they have to go and let us know about maybe

20   a patient that was deemed to be a 5150, for example, those

21   types of things.  There are some other training aspects of

22   their job, that by and large, it's making sure that the gun

23   source is in compliance with state law.

24   Q.   If there was a suspected straw purchase that a dealer

25   called in, and you did not have a waiting period before the

1  gun was released, would you be able to intercept the sale?

2  A.  If there was zero waiting period, I would assume the

3  dealer would be calling us after the facts, given your fact

4  pattern, so it would be a retrieval mode is what we would go

5  into.

6  Q.  Does having a 10-day waiting period help you in your law

7  enforcement work related to the dealer reports of suspected

8  straw purchases?

9  A.  Yes.

10  Q.  I want to pick up the line of questioning about field

11  representatives.  I think you mentioned something about field

12  representatives inspecting dealers?

13  A.  Yes.

14  Q.  Do field representatives actually go out and inspect

15  dealers?

16  A.  Yes.

17  Q.  Are these -- are these inspections announced to the

18  dealers in advance?

19  A.  Sometimes they are.  They're not required to be, though.

20  They can be random or unannounced, if you will.

21  Q.  So are some of the inspections actually unannounced?

22  A.  Yes.

23  Q.  About how many gun dealers are there in California, do you

24  know?

25  A.  Not exactly.  I think the last number I heard was around

1  1800.

2  Q.  Are all of them subject to these inspections?

3  A.  Yes.

4  Q.  Is there an amount of -- number of times that an average

5  dealer is audited like a field representative?

6  A.  I think the general rule is, they try to get to each of

7  the dealers about every three years.  The other folks that may

8  be testifying as a course of this trial may have better

9  information than that, but that's my understanding.

10  Q.  Have the inspections ever uncovered straw purchases?

11  A.  Yes.

12  Q.  Do you have any examples of that?

13  A.  Yeah, some of the times that the field reps -- I'm

14  speaking about the California DOJ field reps.  They'll find

15  a -- during the course of inspection, a group of denial

16  letters that the DOJ, the mail unit has sent to the dealer.

17  Let's say there's 10 letters.  And they'll look at those 10

18  letters to make sure that those guns didn't, in fact, leave

19  the store with the prohibited person.  That's one of the

20  aspects of the inspection.

21       So assuming that didn't happen, the next thing is

22  they're going to go look at -- to see who that weapon -- if

23  those were subsequently sold, did they go to somebody with

24  maybe the same last name or the same physical address, those

25  are a couple things that they'll look at, and they will

1    often -- you know, let's say it's been three years since

2    they've been to that particular store.  They're going to find

3    over the course of that time maybe some suspicious

4    transactions.  I'll be notified and evaluate what we have,

5    and, again, I may ask for a team from the local office where

6    that store is located to go, you know, pull up some paperwork,

7    that sort of thing.

8    Q.  Why is it suspicious that two people from the same address

9    would try to buy the same firearm?

10   A.  Well, if there is someone that's going to get denied, I'll

11   just say a male/female situation.  If a male is prohibited, he

12   goes and tries to buy a pump shotgun with a particular sale

13   number.  We deny that person, for whatever reason, and then

14   nine or ten days later, a female goes in, same last name, and

15   buys the exact same weapon, the same serial number.  And, in

16   fact, sometimes I've even seen them use the same credit card.

17   It's a joint credit card or that sort of situation.  That --

18   you know, that's a scenario from another investigation that's

19   been pushed into our laps in a sense by a field rep

20   investigation.

21   Q.  What if there's not the same last name between the two

22   people, but the same physical address, why does that give you

23   any suspicion about the transaction?

24   A.  Again, the same kind of situation.  They will -- maybe

25   it's a roommate, or perhaps if it's boyfriend or girlfriend if

1   it's a male and female situation again, but there is no actual

2   marriage, but a common last name.  We've had that sort of

3   scenario pop up with the dealer inspection as well.  It could

4   be a relative.

5   Q.  Do the dealer inspections ever find guns that are actually

6   on 10-day wait?

7   A.  Yes.  Typically one of the batches of guns that will be in

8   a particular store are guns that are sitting there waiting to

9   be released at the conclusion of the 10-day waiting period.

10  Q.  So is there a chance that if a field inspection finds, you

11  know, the attempted transaction that was denied and then the

12  person with the same last name or the same address tries to

13  make that transaction, you might actually find that gun still

14  on hold because of the 10-day waiting period.  Is that

15  possible?

16  A.  Yes.

17  Q.  So does the fact that the gun has not yet been released

18  help you -- help you to enhance public safety in any way?

19  A.  Yes.  In that scenario, we would actually be able to

20  potentially intercept the weapon before it actually got onto

21  the street if you evaluated the case, and we felt it was a

22  straw purchase.

23  Q.  I'd like to ask you about another topic called CCW's.

24  Have you ever heard of something called a CCW in the context

25  of your work?

1  A.  Yes.

2  Q.  What is your understanding of a CCW?

3  A.  It's basically a Concealed Weapons Permit that is granted

4  by a local agency where the person resides.

5  Q.  Does the Bureau of Firearms issue CCW's?

6  A.  No.

7  Q.  Does the Bureau of Firearms keep the records of each CCW

8  that's been issued in the state?

9  A.  That's actually kept by the local agencies.  We might put

10  some data into the AFS system, in the sense that if I have a

11  CCW, my Smith and Wesson revolver would have an entry in that

12  system that indicated that it was a CCW permitted weapon.

13  Q.  If the -- are you aware of the Bureau of Firearms becoming

14  aware that a person who has a CCW license, for whatever

15  reason, becomes prohibited from having a firearm any longer?

16  A.  I am aware that the DOJ Bureau of Firearms has received

17  notice from the local agencies about revocations.  I'm not

18  sure about the end of your question there.

19  Q.  Okay, that was not a clear question.  Let me try again.

20      Are you aware of the Bureau of Firearms obtaining

21  information about criminal convictions of people in the state?

22  A.  Yes.

23  Q.  If the Bureau of Firearms gets a record of the criminal

24  conviction, is it possible to communicate to the local agency

25  or to -- or to an agency that has issued a CCW, that the

1  holder now has a criminal conviction?

2  A.  Yeah.  That's a possibility.

3  Q.  Is that something that's done instantly to all of the

4  local enforcement agencies?

5  A.  That's probably outside of my job scope, so I'm not sure

6  how that process would actually happen.

7  Q.  It's been suggested that a person who already has -- well,

8  let me lay some foundation.

9        Have you ever heard of the concept of a cooling-off

10  period for a firearm purchase?

11  A.  Yes.

12  Q.  What's your understanding of that concept?

13  A.  Basically the idea behind that concept, or at least my

14  understanding is, that it would allow a person to rethink

15  potential bad acts they may be planning, or something like

16  that if they were forced to delay the acquisition of a weapon

17  that they were trying to acquire.

18  Q.  It's been suggested that for a person who already has a

19  firearm, a cooling-off period really could not have an effect

20  in terms of reducing violence.  Are you aware of any

21  situations where the cooling-off effect could still be

22  possible if a person already has a gun?

23        MR. KILMER:  Objection.  Calls for speculation.

24        THE COURT:  Sustained.  Foundation.

25  BY MR. EISENBERG:

1   Q.  Are you aware of any situations where a person who already

2   has a firearm acquires a new firearm and uses the new firearm

3   to commit an act of violence?

4   A.  Yes.

5   Q.  Are you aware -- let me rephrase it.

6       How could it be the cooling-off period that could

7   have an effect on whether that person commits a violent act --

8       MR. KILMER:  Objection.  Calls for --

9       MR. EISENBERG:  -- with the new firearm.

10      MR. KILMER:  Objection.  Calls for speculation.

11      THE COURT:  Overruled.  Go ahead.

12      THE WITNESS:  If someone has, let's say, a single

13  shot .22 rifle or maybe a revolver, or something like that,

14  and they were planning on doing something outlandish and

15  illegal with those weapons, or their existing pool of weapons,

16  they may seek to acquire something that they could do more

17  harm with, maybe a semiautomatic or maybe something more

18  powerful along the lines of a rifle or shotgun or something

19  like that.  And you can purchase multiple long guns, for

20  example, in one transaction, so they might want to buy a clump

21  of weapons or a group of weapons on a successive purchase if

22  they already have, say, one or two.  So they could arm

23  themselves more, I guess, is my final there.

24      MR. KILMER:  I renew my objection, Your Honor.  Move

25  to strike.  The initial answer was whether or not he had

1  personal knowledge of somebody using a new firearm to commit

2  the violent act.  The previous testimony was all speculation

3  based on a hypothetical person.

4          THE COURT:  All right.  Response?

5          MR. EISENBERG:  I guess I can ask him more questions

6  to try to pin it down to a situation.

7          THE COURT:  All right.  I'll go ahead and sustain the

8  objection.  Go ahead.

9  BY MR. EISENBERG:

10 Q.  Special Officer Graham, are you merely speculating about

11 situations, or are there situations that you're aware of in

12 your law enforcement experience that are like that?

13 A.  The one thing that I can think of, there is a shooting

14 that occurred in the Cupertino area of the Bay Area in

15 California.  It was an individual that shot and killed

16 people -- I think it was at a rock quarry, or something like

17 this.  He had lawfully purchased some firearms, and at least

18 one, and then he acquired more.  So I think that was

19 responsive to your question in the way in which you phrased

20 it.  And I was thinking about that specific shooting incident.

21 Q.  I'd like to speak now about exemptions to the

22 Waiting-Period Law.  Are you aware that there are statutory

23 exemptions to the Waiting-Period Law?

24 A.  Yes.

25 Q.  Are you aware that there is an exemption for peace

1  officers?

2  A.  Yes.

3  Q.  And you testified before that you are a peace officer?

4  A.  Yes.

5  Q.  So does that mean that you can go into a gun store and

6  just buy a gun any time you want and walk out the door with

7  it?

8  A.  No.

9  Q.  Why not?

10 A.  It would require basically a department letterhead-type

11 letter, which would then have to indicate that my chain of

12 command, specifically head of agency was okay with me

13 acquiring the weapon or leaving the same day with it.  And

14 there's going to be certain other verbiage in the letter that

15 has to be specific to the gun involved.

16 Q.  How fast can you obtain one of these letters?

17 A.  It doesn't happen very often at the California Department

18 of Justice.

19 Q.  Have you ever come across a situation where, you know, you

20 saw a gun that you wanted to buy, and you took advantage of

21 the -- of the exemption that you have, and you just bought it

22 and walked out the store?

23 A.  Yeah, probably over five years ago, maybe between five and

24 ten years ago.

25 Q.  Is it something that occurs on a regular basis for you?

1    A.   No.

2    Q.   Are you aware of an exemption for dealers and the firearms

3    from the Waiting-Period Law?

4    A.   Yes.

5    Q.   What's your understanding of the dealer exemption?

6    A.   Basically dealers can transfer weapons from themselves to

7    another fully licensed dealer.  They don't have a waiting

8    period.  A dealer can transfer weapons to himself in a sense

9    like, basically, initiate a DROS Dealer Record of Sales to

10   themself.  And those are the two kind of most common ones.

11   Q.   You indicated that people in the Bureau of Firearms do

12   dealer inspections sometimes unannounced; correct?

13   A.   Yes.

14   Q.   Do you ever do inspections unannounced at just ordinary

15   people's houses?

16   A.   Inspect -- what would I inspect someone for?

17   Q.   To go see if someone has a firearm in his or her house?

18   A.   No, we don't randomly just show up to someone's house to

19   inspect an average system.

20   Q.   But that is something you could do with a dealer?

21   A.   Yeah, if they're open for business.  There are certain

22   conditions to that.  If they're open for business on certain

23   days, certain hours of the day, that's when the door is open

24   in a sense.

25   Q.   Are you aware of the exemption for Dangerous Weapons

1   Permit holders?

2   A.  Yes.

3   Q.  What's your understanding of that exemption?

4   A.  Dangerous Weapons Permits holders, I may call them DWP's

5   for slang or brevity.  A DWP holder are special weapons permit

6   holders folks.  They can acquire weapons without the 10-day

7   wait.  They've got special -- basically a more in-depth

8   background check than most even normal dealers do.

9   Q.  How are you aware that there is a special background check

10  for them?

11  A.  The agent that I spoke of earlier that I supervise, one of

12  his jobs is to actually do the background checks in Northern

13  California for the Dangerous Weapons Permits applications.

14  Q.  And you're the direct supervisor of this person?

15  A.  Yes.

16  Q.  Do you have in-depth knowledge of any of the other

17  exemptions?

18  A.  I think those are probably the two that come to mind that

19  I deal with, I'm most comfortable talking about.

20       MR. EISENBERG:  Okay.  I have no further questions at

21  this time.

22       THE COURT:  Okay, it's about 4:15.  We've begun going

23  a little bit longer than the normal hour and a half because I

24  took a break a little bit earlier.  I'm going to suggest that

25  we do cross-examination starting tomorrow morning.

1          MR. KILMER:  That's acceptable, Your Honor, for the

2     plaintiffs.  Thank you.

3          THE COURT:  All right.  Let me ask just for

4     scheduling purposes.  We'll finish up with the witness here,

5     and then you have another witness that will be here tomorrow

6     morning; is that correct?

7          MR. EISENBERG:  That's right, Your Honor.

8          THE COURT:  And then I would like to spend -- I don't

9     know if there are other witnesses.  Of course, there could be

10    either further testimony on behalf of plaintiffs' side or

11    rebuttal, whatever.  But in terms of the exhibits, I would

12    like to then spend sometime with you folks going over the

13    exhibits.

14         MR. KILMER:  That sounds like a good idea,

15    Your Honor.  I mean, if we can finish with Mr. Lindley

16    tomorrow morning, and barring some unforeseen circumstances,

17    I'm not certain, but I'd like to reserve the right that

18    plaintiffs won't have any more witnesses, then we can spend

19    the afternoon dealing with the rest of the exhibits.

20         MR. EISENBERG:  Would that include the request for

21    judicial notice exhibits, Your Honor?

22         THE COURT:  Yes, because that would be all part of

23    what I would accept or not accept in terms of the exhibits.

24         MR. KILMER:  That's acceptable to the plaintiffs.

25    Your Honor.

1          MR. EISENBERG:  Certainly acceptable to the defense.

2     Certainly acceptable to the defense, Your Honor.

3          THE COURT:  Okay, we'll go ahead and resume, then,

4     tomorrow morning at 9:00.

5          MR. KILMER:  Thank you, Your Honor.

6          THE COURT:  If you can return here at 9:00 tomorrow

7     morning for further testimony.

8          THE WITNESS:  Yes, sir.

9          THE COURT:  Okay, thank you.

10          You mentioned some stipulations, and maybe you can

11     let us know so we won't be worried about those over the

12     evening.  If you can just give it to us informally.

13          MR. KILMER:  I think it's in the nature of the

14     earlier ones where we're withdrawing some objections so that

15     we'll agree that some exhibits are admissible.  I think that

16     the defendants are withdrawing some exhibits, so that we don't

17     need to keep our objections going.

18          THE COURT:  Okay.

19          MR. KILMER:  We can provide the Court with that first

20     thing tomorrow morning.

21          THE COURT:  Okay.  All right.

22          MR. KILMER:  It's not very controversial.  These last

23     ones aren't very controversial.

24          MR. CHANG:  That's fine with the defense, Your Honor.

25     We can get that to you tomorrow morning.

1          THE COURT:  Why don't we do that first thing tomorrow

2    morning, and that way, I'll know what we might be dealing with

3    when I finish the testimony.

4          MR. KILMER:  Thank you.

5          (Court was adjourned at 4:19 PM.)

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25