UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII

| | | |
|---|---|---|
| JEFF SILVESTER, et al., | ) | 1:11-cv-2137-AWI |
| | ) | |
| Plaintiff, | ) | |
| | ) | COURT TRIAL |
| vs. | ) | |
| | ) | Day 3 |
| KAMALA D. HARRIS, Attorney | ) | |
| General of California, and | ) | |
| DOES 1 to 20, | ) | |
| | ) | |
| Defendants. | ) | |

Fresno, California                    Thursday, March 27, 2014

REPORTER'S TRANSCRIPT OF PROCEEDINGS

Volume 3, Pages 367 to 534, inclusive

REPORTED BY:   GAIL LACY THOMAS, RMR-CRR
Official Court Reporter
CSR NO. 3278

APPEARANCES OF COUNSEL:

For the Plaintiffs:          OTTEN & JOYCE, LLP
                             Attorneys at Law
                             3620 Pacific Coast Highway
                             Suite 100
                             Torrance, California 90505
                             By:  **Victor J. Otten**
and
                             LAW OFFICES OF DONALD KILMER
                             Attorneys at Law
                             1645 Willow Street
                             Suite 150
                             San Jose, California 95125
                             By:  **Donald E. J. Kilmer**, Jr.


For the Defendants:          KAMALA D. HARRIS
                             Attorney General of California
                             By:  **Jonathan M. Eisenberg**
                             Deputy Attorney General
                             300 South Spring Street
                             Suite 1702
                             Los Angeles, CA 90013
                             By:  **Peter H. Chang**
                             Deputy Attorney General
                             455 Golden Gate Avenue
                             Suite 11000
                             San Francisco, CA 94102

INDEX

**DEFENDANT'S WITNESSES:**

**BLAKE GRAHAM**                                          373
CROSS-EXAMINATION                                        374
BY MR. KILMER
REDIRECT EXAMINATION                                     432
BY MR. EISENBERG
RECROSS-EXAMINATION                                      439
BY MR. KILMER
FURTHER REDIRECT EXAMINATION                             446
BY MR. EISENBERG
**STEVE LINDLEY**                                        448
DIRECT EXAMINATION                                       448
BY MR. EISENBERG
CROSS-EXAMINATION                                        479
BY MR. KILMER

\* \* \* \* \*

EXHIBITS

GOVERNMENT'S                                RECEIVED
  06                                           372
  07                                           430
  8                                            517
  4, 5                                         519

DEFENDANT'S
  CS, CT                                       372

\* \* \* \* \*

| | |
|---|---|
| 1 | Thursday, March 27, 2014          Fresno, California |
| 2 | 9:03 a.m. |
| 3 | |
| 4 | THE COURT:  All right, on the record, before we |
| 5 | continue with the testimony, are there any matters we need to |
| 6 | take up, plaintiff's side? |
| 7 | MR. KILMER:  The parties have reached some |
| 8 | stipulation as to some additional exhibits, and I have |
| 9 | prepared a stipulation on that that I'll be filing later this |
| 10 | morning. |
| 11 | THE COURT:  Okay. |
| 12 | MR. KILMER:  And we'd like to recite it into the |
| 13 | record for now, though. |
| 14 | THE COURT:  Okay.  Great. |
| 15 | MR. KILMER:  And that is the parties are going to |
| 16 | stipulate that plaintiff's exhibit that has already been |
| 17 | marked for identification has O6 and was part of the black |
| 18 | binder that we submitted.  And the description of the document |
| 19 | is AV 497, Processing Alternatives Feasibility Study, Report |
| 20 | of Findings, and it's dated May 1991.  The author of the |
| 21 | report is the State of California Department of Justice, |
| 22 | Division of Law Enforcement.  The Bates number on the document |
| 23 | is AG-000766 through AG-000826.  The parties agree that that |
| 24 | can be admitted. |
| 25 | THE COURT:  All right. |

1          THE CLERK:  Clerk that was Plaintiffs' Exhibit 6?

2          MR. KILMER:  Yes, 06.  It's in this black binder, and

3     it's designated as 06 in this binder.

4          THE CLERK:  Okay.

5          MR. KILMER:  And in addition to that, the defendants'

6     exhibit, previously marked for identification as Exhibit CS,

7     the description of the document is Silver Star Custom Leather.

8     I don't have a Bates number on that.

9          MR. CHANG:  There is no Bates number.

10          MR. KILMER:  The parties agree that that may be

11    admitted.

12          Furthermore, defendants' exhibit marked for

13    identification CT, and the description on the document is the

14    "First Amended Complaint," the parties stipulate that that can

15    be admitted.  Did you want to recite the withdrawals?

16          MR. CHANG:  Sure.  And without objection from the

17    plaintiffs, the defendants withdraw -- defendant withdraws

18    exhibit -- Defendants' exhibits CK, CL, CM, CN, CO, CP, CQ,

19    CR, HA, and HB.

20          THE COURT:  Okay.  All right, there being no

21    objection, then, the Court will grant defense motion to

22    withdraw each of those exhibits, CK through CR and HA and HB.

23    The Court will admit into evidence, Plaintiffs' Exhibit No. 06

24    and admit into evidence Defense Exhibits CS and CT.  All

25    right.

1          (Plaintiffs' Exhibit O6, received in evidence.)

2          (Defendants' Exhibits CS, CT, received in evidence.)

3          MR. KILMER:  And we'll file a stipulation to that

4    effect later this morning, Your Honor.

5          THE COURT:  Thank you very much.

6          MR. CHANG:  And just -- Your Honor, just for a point

7    of clarification, the previous stipulation wherein the parties

8    stipulated to the admissibility of Exhibits A -- all the

9    exhibits that start with A, all the exhibits that start with B

10   and CA, CB, and CC, the Court has admitted those exhibits?

11         THE COURT:  Yes.

12         MR. KILMER:  That's my recollection.

13         MR. CHANG:  Thank you, Your Honor.

14         MR. KILMER:  One other preliminary matter,

15   Your Honor.  Are we going to be adhering to the plan in the

16   Pretrial Order that the parties will not be presenting closing

17   arguments?  We will simply conclude evidence, and the Court

18   will issue a briefing schedule?

19         THE COURT:  Yes.  We'll set a briefing schedule.  And

20   closing argument will be actually be set after the proposed

21   findings of facts and conclusions of law have been submitted,

22   and then you can argue off of those documents.

23         MR. KILMER:  Thank you, Your Honor.

24         THE COURT:  All right, if there are no other

25   preliminary matters, then, we'll have Mr. Graham retake the

1   witness stand, continue with his testimony.

2                           **BLAKE GRAHAM,**

3   resumed the stand as a witness on behalf of the Defendants,

4   having been previously duly sworn, testified further as

5   follows:

6           THE COURT:  All right, Mr. Graham, I just remind you

7   you're still under oath.

8           All right, we'll continue with the testimony.

9           MR. KILMER:  Your Honor, I'm going to at this point

10  in time renew my objection to some components of this witness'

11  testimony from yesterday and move to strike portions of it.

12  And I'd like to be heard on that matter.

13          THE COURT:  Okay, I'm sorry, yes.

14          MR. KILMER:  Yes, Your Honor, the waiting period has

15  been justified in all of the briefing in this case so far as

16  for the purpose of conducting background checks on prospective

17  purchasers and as cooling-off periods to prevent impulsive

18  violent acts.  Part of this witness' testimony yesterday dealt

19  with a third justification that has not been part of this case

20  until -- until yesterday's testimony, that somehow the 10-day

21  waiting period facilitates the investigation to straw man

22  purchases.  We'd ask that that testimony be stricken as not

23  relevant to these proceedings.

24          MR. EISENBERG:  Your Honor, may I be heard on this

25  point?

1          THE COURT:  Sure.

2          MR. EISENBERG:  Mr. Graham -- I'm sorry, Special

3    Agent Supervisor Graham's testimony is all about background

4    investigations.  That's part of the background check process.

5          Secondly, the plaintiffs took no depositions.

6    Special Agent Supervisor Graham has been disclosed as a

7    potential witness since sometime in the spring of 2012.  This

8    is not new information.  It's simply information that the

9    plaintiffs chose not to discover earlier.

10         THE COURT:  Anything further on behalf of plaintiffs

11   side, then?

12         MR. KILMER:  Nothing, Your Honor.

13         THE COURT:  I'm going to go ahead and overrule the

14   objection.  In terms of background check, it is important for

15   the record that whatever is involved in a background check be

16   disclosed because the background check obviously is part of

17   the question of whether or not the 10 days or any waiting

18   period regardless of the time frame is reasonable or not.

19         Okay, all right, any other preliminary matters, then?

20         MR. KILMER:  None, Your Honor.

21         THE COURT:  Okay, we'll go ahead and proceed and

22   continue on with the testimony of Mr. Graham.

23                        CROSS-EXAMINATION

24   BY MR. KILMER:

25   Q.  Agent Graham.

1   A.   Sir.

2   Q.   Is there some statutory authority that you can point to

3   that a straw man investigation is part of every Dealer Record

4   of Sale process?

5        MR. EISENBERG:   Objection.   Calls for speculation.

6   The witness is not an expert on the relevant law.

7        THE COURT:   Okay, I'll sustain the objection.

8   Foundation?

9   BY MR. KILMER:

10  Q.   You testified yesterday that you conduct straw man

11  purchases or investigations into straw man purchases; is that

12  correct?

13  A.   Yes.

14  Q.   And under what authority do you conduct those

15  investigations?

16  A.   The Penal Code provides that when neither party holds a

17  dealer license, they must go through a gun store, 27545, used

18  to be 12072(d).   That type of an investigation is tied into

19  the straw purchase investigation, because if a straw

20  purchaser, you know, makes the purchase and then hands it off

21  at some point later, there would be a 27545 violation

22  possibly.

23       Also the new Penal Codes are -- since the

24  renumbering, I'm not as good with them anymore, but it used to

25  be 12072(a)(1).   That was basically providing a firearm to a

1   known prohibited party.  In most cases, a straw purchaser is

2   kind of involved in that situation.  So those are the two

3   things that we would look for and potentially charge involved

4   in a straw purchase.

5   Q.  What is your involvement in the Dealer Records of Sale

6   program?

7   A.  In the course of a straw purchase investigation, you may

8   want to get ahold of the actual DROS document, Dealer Record

9   of Sale document.  If I say "DROS," that's what I mean.

10   There's a wealth of information on there from address, phone

11   number, some information about the weapon, things like that.

12   Q.  You submitted a curriculum vitae in connection with this

13   lawsuit; is that correct?

14   A.  Yes.

15   Q.  All right.  And you stated in here that you are currently

16   a special agent, supervisor, California Department of Justice

17   Bureau of Firearms Division.  That's correct?

18         MR. EISENBERG:  Objection, Your Honor.  The document

19   has not been presented to the defense.  It's not before the

20   witness.

21         MR. KILMER:  I'm assuming he's familiar with his CV,

22   Your Honor.

23         THE COURT:  Overruled.

24         THE WITNESS:  I'm actually -- it's obviously now been

25   updated to the Bureau of Firearms, but I think my wording in

1  there was the firearms division, and then it became the Bureau

2  of Firearms.

3  BY MR. KILMER:

4  Q.  Well, I think your curriculum vitae is correct.  It does

5  say Bureau of Firearms.

6  A.  Okay.

7  Q.  Do your duties with the Bureau of Firearms, are they

8  primarily on sort of the front-end paperwork keeping, or are

9  you primarily enforcement?

10  A.  I'd say maybe 50-50 actually.  I'm kind of unique in the

11  sense that there's -- there's less than 15 supervisors in the

12  Bureau of Firearms.  I'm sort of the -- I don't know, one-man

13  band within the headquarters in a sense, so I get a lot of

14  special projects.  If something is broken, I get assigned to

15  fix it.  My office is very close to the chief's and assistant

16  chief's, so I get a lot of special projects.

17  Q.  You've been employed with the Department of Justice in

18  some capacity since 1994.

19  A.  Actually, the Alcoholic Beverage Control from '94 to '99,

20  and then from '99 to present with the DOJ.

21  Q.  Okay.  Fair enough.

22       So you're somewhat of a utility player for the

23  Department of Justice?

24  A.  Correct.  Yes.

25  Q.  All right.  You've had extensive training in many classes

Graham - X

378

1    here.  In fact, let's go ahead and get your CV in front of you

2    here.

3              May I approach the witness, Your Honor?

4              THE COURT:  Yes.

5    BY MR. KILMER:

6    Q.  Agent Graham, I've just handed you a three-page document

7    that's been previously marked and admitted as Exhibit BU.  And

8    it is Bates stamp No. AG-001919 through 1921.  Do you see that

9    in front of you?

10   A.  Yes, I do.

11   Q.  And is that your curriculum vitae?

12   A.  At some point in the past, this was current and accurate,

13   but there's been a few additions to it since this document was

14   probably given to you.

15   Q.  And as we go through there, you'll correct me on my

16   updates?

17   A.  Sure.

18   Q.  Thank you.

19             Under the "Training Section," the second entry there,

20   there is an entry for a 32-hour class in entry weapons.  What

21   kind of class was that?

22   A.  So basically that's a class that at the time DOJ was

23   producing -- or not producing, but it's offering for agents,

24   so they would become familiar with the use of long guns during

25   the course of a search warrant service so that we would

1   properly use the weapons to their fullest extent and be safe

2   with them and so forth.

3   Q.  All right.  There is the next entry, has to do with

4   advanced tactical operations, less lethal munitions, and

5   chemical agent certifications.  What kind of classes with

6   those?

7   A.  It was part of the same block of training.  That

8   particular class was taught by the -- pretty much the same

9   group of instructors.  It's not up to the level like a SWAT

10  school, but something less than that, if you will.  More of

11  just tactical refinement of skills that he may already

12  possess, using those weapons systems.

13  Q.  On the next page, lower right-hand corner, Bates number

14  1920.  It continues the training that you've had.  The fourth

15  entry is on September 13th, 2004, you had a ballistics testing

16  exercise.  What did that involve?

17  A.  So back then, there was a request from the then director

18  of the firearms division, Randy Rossi, that we evaluate some

19  rounds that were produced by some outside source.  They had

20  some -- sort of like a bullet serialization-type stuff

21  imprinted upon them.  And we basically fired the rounds into

22  those substances that are mentioned on the CV.

23  Q.  With the ballistics gelatin and two car doors?

24  A.  Correct.

25  Q.  Was the purpose of that testing to test the, I guess,

1 destructive power of that particular round?

2 A.  No, actually it was just to see if -- once the rounds

3 struck those substances with a readable.

4 Q.  Okay, so there was some sort of identifier on the bullet,

5 and you wanted to make sure once it passed through some

6 medium, it would still be legible?

7 A.  That's correct.

8 Q.  All right.  Moving two entries down in March of 2006, you

9 completed a 16-hour Colt 1911 pistol armor school in

10 Sunnyvale.  Do you recall that?

11 A.  Yes.

12 Q.  What is the designation 1911?

13 A.  It's basically the model for a specific class of

14 semiautomatic pistols.  They're generally .45-caliber, but

15 there's some offshoots in that realm of weapons, but if

16 somebody says a 1911, 98 percent of the people that know about

17 firearms are going to say that's a .45.

18 Q.  Okay.  Thank you.

19      Now, does the designation 1911 also refer to the year

20 that that particular pistol was designed and introduced into

21 military service?

22 A.  That's my understanding, sir.

23 Q.  Do some of those firearms qualify as curios and relics?

24 A.  Yes.

25 Q.  And -- but the 1911 is also sold today as a modern

1    firearm, isn't it?

2    A.   Sure.

3    Q.   And what are some of the differences, if you know,

4    between, for instance, maybe a curio and relic 1911 and a

5    modern 1911?

6    A.   So there's several different manufacturers out there that

7    make modern 1911's.  Kimber, Springfield, Para Ordnance, you

8    know, several other companies that are smaller than those,

9    they may have a difference in the way that the guide rod and

10   spring interacts, the way the barrel net attaches to the

11   slide.  There could be changes with the extractor, an internal

12   versus an external extractor, things like that.

13   Q.   Don't some of the more modern firearms also have

14   additional safety features?

15   A.   Yeah, there are different versions of the weapon that will

16   be called -- sometimes by like series 80, series 90, and that

17   might be incorporated or somehow changed the model number.

18   It's still going to kind of fall in the 1911 family, if you

19   will.  But the exact model might be somehow tweaked a little

20   bit.

21   Q.   Okay.  And some of the modern 1911's are actually on the

22   California-approved roster of handguns, aren't they?

23   A.   Yes.

24   Q.   If you know, is there any difference between the lethality

25   of the round fired from, say, a curio and relic 1911 versus a

1   modern 1911?

2   A.  The lethality might only change between those two groups

3   of weapons if the barrel length was somehow different or the

4   round itself was somehow different.  Assuming, let's say, a

5   five-inch barrel and a round of the same box of ammo was fired

6   from both guns, should be the same.

7   Q.  All right.  Your CV goes on to identify during the course

8   of your career, you've assisted in the arrest of at least 30

9   persons for violations of illegal weapons possession.  Does

10  that number need to be updated now?

11  A.  Yeah, over time, it's changed, yeah.  I don't keep track.

12  I would say that's a low-end number.

13  Q.  So when you say at least 30, you're being modest.  It's

14  more than that.

15  A.  Yes.

16  Q.  All right.  And then it goes on to state also you've

17  participated in excess of 30 search warrants involving illegal

18  possession of firearms.

19  A.  Yes.  I did write that.

20  Q.  Are you being modest again; it's more than that?

21  A.  Yes.

22  Q.  Of those -- of the search warrants that you've assisted

23  in, how many of those have you written?

24  A.  That's a good question, over the years, about what that

25  specific type of crime, I don't know, less than 10 maybe.

1    Q.  All right.  I'd like you to focus on the 10 that you were

2    personally involved in.  I don't want you to testify about

3    anything you don't have any personal knowledge of.

4         When you're putting together a search warrant for

5    illegal possession of firearms, what would be an example of an

6    illegal possession of a firearm?

7         MR. EISENBERG:  Objection.  Assumes facts not in

8    evidence.  He's saying that the only ones that he was involved

9    with were the ones that he wrote.

10        THE COURT:  Overruled.  You can answer.

11        THE WITNESS:  Okay.  Could you repeat your question,

12   sir?

13   BY MR. KILMER:

14   Q.  Okay.  You testified that maybe you've personally written

15   10 search warrants.

16   A.  On that specific type of crime.

17   Q.  Okay, and the specific type of crime is illegal possession

18   of firearms.

19   A.  Correct.

20   Q.  So all 10 that you are going to talk about now were for

21   illegal possession of firearms.

22   A.  And they may have other crimes incorporated as well.

23   Q.  Okay.  Thank you.

24        And if that becomes relevant, you'll let me know.

25   A.  Sure.

1  Q.  Generally what is the crime of illegal possession of

2  firearms?

3  A.  It depends on the actual prohibition.  That's a broad

4  term, the illegal possession, because you could have someone

5  that's a felon in possession, you may have someone that's a

6  misdemeanant, one of the -- 30-plus misdemeanors in California

7  that are firearms prohibiting.  That's going to be a different

8  section.  Used to be 12021.  Then it became -- I think it's

9  now 29800.  The misdemeanor section used to be 12021(c)(1),

10  now it's 29, I think, 805.

11        There's also people that are prohibited from

12  possession of firearms due to conditions of probation.  You

13  have mental health reasons why they shouldn't have them.

14  That's under usually a 5150 commitment or some other Welfare

15  and Institutions Code.  The prohibitor is 8103 of the Welfare

16  and Institutions Code.  8103(i), I think.  Anyway, so there's

17  a few others out there that were more commonly involved.  A

18  lot of these are touching into the APPS database, and even

19  before APPS was around, the same sections generally applied

20  before the renumbering.

21  Q.  All right.  And in your work preparing these search

22  warrants, do you access any databases to confirm whether the

23  person -- do you access any databases on your research?

24  A.  Yes.

25  Q.  And what are the examples of some of those databases you

1    might access?

2    A.   We might look into the Armed Prohibited Persons System,

3    the APPS system, we might look into the restraining order

4    system, criminal history system, mental health.  We might look

5    at warrants to see if somebody has a warrant in addition to

6    what we're looking under them for.  There may be other

7    agencies that have had unresolved criminal matters, if there

8    is a warrant floating around for them.  Let's see, DMV.  We

9    look for vehicle information, driver history to see where they

10   might reside, things like that.

11   Q.   Okay, and those are all to identify somebody who might be

12   prohibited from having a firearm; correct?

13   A.   Yes.

14   Q.   And then make a positive ID of the person and try and

15   locate them.

16   A.   Correct.

17   Q.   Okay, but in order for you to get the warrant or persuade

18   the neutral and attached magistrate that a crime has been

19   committed, you also have to present evidence that the

20   person -- there is evidence that the person has a gun too;

21   correct?

22   A.   Yes.

23   Q.   And how do you go about doing that research?

24   A.   Depending if we know about the person on the front side

25   such as a -- like an APPS case, we'll have information -- the

1    Armed Prohibited Persons System might be there, and some of

2    that information, I think as I testified yesterday, comes from

3    the Automated Firearms System.  In the event that we're doing

4    a more fluid situation as opposed to a kind of a planned event

5    with an APPS case, if it's a gun show case, and we identify

6    somehow a felon at a gun show, and they're buying ammunition,

7    we don't necessarily know what gun they're asking -- that they

8    may have, but we know that they've bought a particular type of

9    ammunition, so we may have to ask a little bit broader, if

10    we're looking for a .45-caliber weapon that this felon has

11    just bought ammunition for an hour ago.

12    Q.  Isn't it true that under California law, that a

13    prohibited -- somebody is prohibited from having a gun is also

14    prohibited from having ammunition?

15    A.  Yes.

16          MR. EISENBERG:  Calls for a legal conclusion.

17          THE COURT:  Overruled.

18    BY MR. KILMER:

19    Q.  I want to make sure that the record is clear on that.  It

20    is a true statement that people who are prohibited from having

21    guns are also prohibited from having ammunition?

22    A.  Yes.

23    Q.  So they're also prohibited from purchasing ammunition?

24    A.  Yes.  When we catch them, we would arrest them for that if

25    we caught them in the middle of it.

Graham - X

387

1   Q.   So if a peace officer observes a known felon to purchase

2   ammunition, they can make an arrest on the spot.

3   A.   Yes.

4   Q.   Okay.  Is it fair to say that you access the AFS system

5   for evidence that somebody already has a firearm?

6   A.   That's one of the reasons, yes, sir.

7   Q.   All right.  And so if you can put those two together, the

8   fact that this person is in a prohibited class of people, and

9   the AFS system indicates that they already have firearms, is

10  that generally enough to at least approach a magistrate for a

11  warrant for a prohibited person of a possession of a gun?

12  A.   Not necessarily.  There may be a large staleness issue.

13  Q.   I'm sorry, a large --

14  A.   Staleness issue, where the specific gun was purchased in

15  1986.

16  Q.   All right.

17  A.   And clearly there is a long gap in between.  So we would

18  have to do a ton of research to figure out, hey, does this

19  person have any gun arrests that don't show an evidence entry,

20  or a warrant kind of linked to an evidentiary entry, an

21  Automated Firearm System, that sort of thing.

22  Q.   Now, when you access the AFS to try to determine if this

23  prohibited person has a gun, and it shows a firearm purchased

24  in the last, say, six months, does that make it easier to make

25  a decision to approach a magistrate about getting a warrant?

1  A.  It would make things a lot easier, but that still may not

2  be enough.  Certain DA's offices wouldn't -- they wouldn't

3  want to have that much of a window.

4  Q.  All right.

5  A.  So that -- it would really depend maybe prosecutor by

6  prosecutor.  We will typically run our search warrants through

7  a prosecutor before taking them to a judge.

8  Q.  Okay.  So the date on which the last purchase is

9  information that's available to you on the AFS system.

10  A.  If assuming it's a handgun or a registered assault weapon,

11  there's a date tied to it.  If there are long guns prior to

12  the 1-1-14, we don't have any information on those unless the

13  person put a -- like, say, a voluntary registration form or a

14  firearm ownership record in with us because they wanted to

15  self-register in a sense or self -- to identify themselves to

16  certain weapons.

17  Q.  Now, we've heard testimony that the AFS system does not

18  keep records of long gun sales prior to January 1st of this

19  year?

20  A.  That's correct.

21  Q.  But does the AFS system keep a record of the fact that a

22  transaction took place prior to that regardless of the weapon?

23  A.  No, AFS does not do that.

24  Q.  Okay.  When you make the entry while you're doing your

25  investigation and you access the database, and you make the --

1  I assume you sit at a terminal and enter your password and log

2  onto the system; correct?

3  A.   Yes.

4  Q.   And then you'll make an inquiry as to -- into the AFS

5  system, what kind of inquiries do you make -- do you type in?

6  A.   We might just do a name tied with a date of birth search,

7  John Smith, 1-1, you know, 2010 was the birth date I'll make

8  up --

9  Q.   All right.

10  A.   And try to see what weapons might be associated with that

11  person.  We'll have to somewhat filter it, maybe with the

12  driver's license or, you know, something like that.

13  Q.   All right.   And does that sometimes result in multiple

14  hits?

15  A.   Often.

16  Q.   Just because of commonality of names and that sort of

17  thing?

18  A.   Yes.

19  Q.   Are you also able to input into the system any unique

20  identifiers about people other than their name or date of

21  birth?

22  A.   Could you explain what you mean by unique identifiers?

23  Q.   Like a California driver's license number, for instance.

24  A.   I don't enter driver's license numbers and link them to, I

25  guess, an evidence entry, per se, or something like that.  I'm

1   not sure where you're going with that.  If you're talking

2   about querying the system, there may already be driver's

3   license info in there since 1996 on handguns.  Does that --

4   Q.  Yes, my question is could you use a California driver's

5   license as one of the -- one of your queries if you had it?

6   A.  In the way our format, I guess, offers the search

7   parameters to us, you can't just plug a driver's license in

8   and -- like, I can't run my driver's license to see what guns

9   I have.  I have to search "Blake Graham" and my birthday, and

10  then it would list out potential weapons that I have owned

11  over a period of time.

12  Q.  All right.  Are those the only two descriptors you can put

13  into the database to try and identify guns in the system?

14  A.  If I know the serial number, I can run the serial number

15  into the weapon, or if I've got a list of weapons, let's say,

16  are recovered in a crime, often we'll get queries from other

17  agencies about, "Hey, we've got this gun.  We don't see a

18  record, you know, on cable.  Send me a picture of what you

19  think the serial number is."  And I might do some searches

20  on -- if it's a foreign gun, often the numbers are kind of

21  jumbled, or whatever.  I might try to help the agency properly

22  identify a weapon.

23  Q.  Have you ever in your investigation, in preparation for a

24  search warrant, actually gone to a gun store where you think

25  the sale took place and asked to look at a physical copy of

1   the DROS?

2   A.   Yes.

3   Q.   And do the DROS's have unique numbers on them for each

4   transaction?

5   A.   There are DROS identifying numbers, yes.

6   Q.   Can you use that number to do a search as well?

7   A.   I think within -- not within AFS, but there might be

8   another system.  I would actually -- if you get down to that

9   level of the computer side of things, I'm going to lean on our

10  program staff, Mitch Matsumoto.  I might ask him to, "Hey, can

11  you help me out?  I want to make sure I'm looking at the right

12  thing here," that sort of thing.

13  Q.   And he's usually pretty helpful on that?

14  A.   Yes.

15  Q.   And returns the results pretty quickly?

16  A.   Yeah, they're very busy on background checks and whatnot.

17  So I'll ask, "Hey, can you help me out with this when you get

18  a chance."

19  Q.   But if you're involved in investigating a crime, that

20  might get some priority?

21  A.   Yes.

22  Q.   Have you ever helped prepare a search warrant to prosecute

23  or gather evidence for a straw man purchase?

24  A.   Yes.

25  Q.   How many?

1  A.  Off the top of my head right now, I'm thinking of three,

2  one in this county, one in Sacramento, and one in -- I think

3  it was Shasta County or Tehama.

4  Q.  All right.  In a straw man purchase scenario, that's where

5  one person is buying a gun, but another person is receiving

6  the gun; is that correct?

7  A.  Yes.

8  Q.  Is that always illegal?

9  A.  No.  There is a chance that it might be a legal-type

10 transaction if it's maybe intended as a gift, something like

11 that.  But that's something that we may not go down the path

12 of a search warrant.  If we have an indicator, we might turn

13 that into a knock-and-talk situation if we've got some pretty

14 good feelings about what it might be.

15 Q.  In fact, are you familiar with the -- a document called a

16 4473?

17 A.  Yes.

18        MR. KILMER:  May I show the witness a copy of this

19 document, Your Honor?

20        THE COURT:  Yes.

21        MR. KILMER:  I have a copy for the Court as well

22 that's not in the exhibit binder.

23 BY MR. KILMER:

24 Q.  I'd ask you to review this document and let me know once

25 you've finished taking a look at it.

1   A.  Okay, sir.

2   Q.  All right, this is a -- a six-page document.  It is -- the

3   title of the document is "The Firearms Transaction Record,

4   Part 1, Over the counter."  It's got an ONB number 1140-0020.

5   In the lower right hand corner, it's called an ATF Form 4473.

6   That's the document you have in front of you?

7   A.  Yes, sir.

8   Q.  And this is the federal form that dealers are required to

9   collect at the point of sale during a firearms transaction.

10  Is that generally accurate?

11  A.  Yes.

12  Q.  And these records are kept by the dealers, I guess, as

13  long as they're in business, and then when they go out of

14  business, they ship them off to ATF; is that correct?

15  A.  Yes, they would go to the out-of-business records group,

16  East Coast.

17  Q.  And at this point in time, these records of sales that the

18  federal government requires are not electronic?

19  A.  Yeah, not to my knowledge.  They're all basically paper,

20  kept in dusty boxes in gun stores across California.

21  Q.  Okay.  In fact, you've had to review these documents

22  sometimes in your investigations.

23  A.  Yes.

24  Q.  All right.  And on page 1 of this document, there is a

25  series of questions under paragraph 11, and I want to draw

1    your attention specifically to paragraph 11-A.

2    A.   Yes.

3    Q.   Do you see that?

4    A.   Yes.

5    Q.   That's the part of the questionnaire on the 4473 that is

6    designed to elicit information whether the person who's

7    filling out this form is going to be the person receiving the

8    gun; correct?

9    A.   Yes.

10   Q.   All right.  And this document is signed under penalty of

11   perjury?

12   A.   Correct.

13   Q.   And, in fact, prosecutions under federal law for straw

14   purchases are usually prosecuted as -- in many ways, correct,

15   under various -- various crime statutes?

16            MR. EISENBERG:  Objection.  Vague and ambiguous.

17            THE COURT:  Sustained.

18            MR. KILMER:  I'll rephrase the question.

19   BY MR. KILMER:

20   Q.   A prosecution for a straw man purchase can be prosecuted,

21   for example, as perjury with relation to making a false

22   statement on this form; correct?

23   A.   Yes.

24   Q.   It could also be prosecuted as a conspiracy to violate

25   United States gun law; correct?

1   A.   That would be one of my suggestions to the Assistant

2   United States Attorney if I was going to try to take a case

3   federally for this type of a violation.

4   Q.   And while we're on that, sometimes you jointly participate

5   in federal crime investigations, gun crime investigations;

6   correct?

7   A.   Yes, sir.  I'm a task force officer with ATF as well.

8   Q.   So you work with the federal government and help them

9   prosecute federal crimes.  Do they also help you prosecute

10   state crimes?

11   A.   In the sense they may have given us manpower or something

12   like that to help us out with something here and there, yeah.

13   I don't remember a time necessarily when they would come and

14   go to state court, you know what I mean?  I haven't seen a lot

15   of ATF agents in state court.  It's sort of a one-way street.

16   Q.   But you have appeared and testified in federal court.

17   A.   I'm trying to think here.  I've got stuff pending, but I

18   don't know if I've gone into federal court and testified.

19   Q.   All right.  Somebody who makes a false statement on this

20   4472 could also be prosecuted for just making a false

21   statement too; correct?

22   A.   I'm not sure about that, sir.  I haven't gone down that

23   road in a federal prosecution for that type of a violation.

24   Q.   Okay.  Are those crimes of making either conspiracy or

25   perjury, the two we've identified, those are felonies;

1   correct?

2   A.   On the state system, yes.  And federally, I would assume

3   the same, at least a wobbler, yes.

4   Q.   All right.  Serious charges?

5   A.   Yes.

6   Q.   I'd like to direct your attention to page 4 of 6 of this

7   document.  Well, actually let's go back one page to page 3 of

8   6.  And on that page in the lower half starts a series of

9   notices and instructions and definitions.  Do you see that?

10  A.   Yes, sir.

11  Q.   Are you familiar with this portion of this document?

12  A.   I've read it in the past, yeah.

13  Q.   So what follows in the next several pages are basically

14  the ATS's understanding of how to correctly fill out this

15  form.

16  A.   Yeah.  That would be their instructions to the purchaser,

17  yes.

18  Q.   All right.  And then going back to page 4 of 6, there is

19  an explanation of question 11-A.

20  A.   Correct.

21  Q.   Have you had an opportunity to read that?

22  A.   I did.  That was one of the things I've looked at while

23  you ask me to review the form earlier.

24  Q.   And this would be an example, it's stated in that section,

25  of where somebody who is filling out this form might not

1   actually be the person who is going to receive the gun.

2   Correct?

3   A.  Yes.  It identifies what -- under the federal law, the ATF

4   believes a purchaser is versus the intended recipient and kind

5   of walks them down some examples.

6   Q.  And one of the examples is, for instance, for a gift.

7   A.  Yes.

8   Q.  So, for example, extrapolating on an example that you gave

9   us yesterday, if you observed at a gun show a man having a

10  particular interest in a firearm, and then later the wife

11  purchased the firearm, you identified that as a potential

12  straw purchase.

13  A.  Yeah, that's one of the scenarios where we've had females

14  buy guns for prohibited males.

15  Q.  But if you just observe a man at a gun show express an

16  interest in a gun, and then his wife later buys it, is that

17  automatically a potential straw purchase?

18  A.  No.  I mean, if we've eventually identified that man as

19  being prohibited, I'm going to lean towards a straw purchase.

20  But just the fact that a woman buys a gun with a man in the

21  building, that's not, you know, necessarily the scenario.

22  Q.  So in order for that situation that you've described to be

23  suspicious, one or both of them have to be prohibited.

24  A.  Yeah, I mean, for the straw purchase, in my eyes, there's

25  going to be a prohibited party in the mix somewhere.  It

1    doesn't make much sense for -- in the example we're using,

2    we're talking about the woman being the straw buyer, doesn't

3    make much sense for a prohibited person to try and buy if the

4    hidden buyer is not prohibited because it's backwards.

5    Q.   Right.  So the only way to be certain that you might have

6    observed a straw purchase is whether or not the interested

7    party who is not filling out the paperwork is prohibited;

8    correct?

9    A.   Generally that's what we will spend our time on.  If we

10   can figure out if the -- you know, what -- maybe the hidden

11   buyer is prohibited, then we're going to probably go down the

12   path of this is a straw purchase on some level and put a lot

13   more energy into it.  If we've got -- if we've identified two

14   people that are, you know, let's say it's a husband and wife

15   scenario, and neither appears to be prohibited, we're probably

16   not going to have to go down the path of getting a search

17   warrant for something like that.  We'll probably just ask

18   them, hey, we'll contact them, maybe on the 10th day when they

19   pick up.  Just say, hey, we saw some stuff.  Can you explain

20   what's going on with this transaction, and we might explain

21   what we saw at a gun show, for example.  Can you explain

22   what's happening here?  We don't want to waste their time.  We

23   don't want to waste our time.  If we've got a prohibited

24   person that's doing the same kind of actions, we're going to

25   treat it a little differently, probably try to get a search

1  warrant, which may drag out our time commitment and whatnot as

2  well.

3  Q.  So we have two possible scenarios where you're at a gun

4  show and you observe multiple parties that appear to be acting

5  in concert to purchase a weapon, one person looking at the

6  gun, and another person willing to pay the money and do the

7  paperwork.

8  A.  Yes.

9  Q.  And some of those instances might be perfectly innocent?

10  A.  Yes.

11  Q.  And some of those might be a crime?

12  A.  Yes.

13  Q.  How would you know -- is there any way to determine

14  whether it is a crime while you're at the gun show itself?

15  A.  If we can identify what we think is a straw buyer and the

16  hidden buyer, basically just both parties that are kind of

17  maybe conspiring to purchase this weapon, we would have a very

18  good idea about is there a conspiracy going on potentially.

19  Is what -- you know, what violations may be happening.  Are

20  they a felon, is there a mental health hold on one of these

21  people, or something like that?  And we would have much more

22  certainty of what path we might take.

23  Q.  Would you have the resources while you're at the show to

24  make an inquiry as to whether one of the two parties is

25  prohibited?

1   A.  We may, depending on the vehicle that they came in, or if

2   we can somehow identify the people involved at the, you know,

3   table.  Maybe they're filling out the forms there.  If we can

4   get a look at the -- you know, if they're scratching out

5   information on there, we can make a call to try and identify

6   that person that's filling out the documents, we might be able

7   to get some kind of a workup while they're still at the show.

8   Q.  And in that circumstance, would you take any action to

9   alert the DROS system that this may be an illegal activity and

10  this sale perhaps should be put on hold?

11  A.  I don't know that we would have -- if there is a definite

12  crime involved there, we generally will try and go to kind of

13  like an intercept path, and we're going to probably let things

14  play out, and we don't want to necessarily tip off our hand to

15  the gun store unless it's a store that we feel we can trust,

16  or whatever.  Some stores will or might, you know, tip off the

17  people that, "Hey, the cops are looking at you.  You don't

18  need to come back here," or something like that.  So it

19  depends on what we feel about the store, if we've had problems

20  with the store before or something like that.

21  Q.  Okay, you've kind of shifted to guns stores, and we were

22  dealing mostly with gun shows.

23  A.  Gun shows are -- the vendors at the shows are often the

24  same people that have a storefront.

25  Q.  All right.  And while we're on that, is there any

1    difference at all except for a place in the background check

2    or the paperwork necessary to fill out to purchase a gun at a

3    gun show versus a gun store?

4    A.   I think for the most part, most of the same documents are

5    required.   I can't really think of anything that would be less

6    involved.

7    Q.   So in both instances, the buyer has to go through a

8    background check.

9    A.   Yes.   If there's a dealer sale to someone that sees

10    something at either store or a gun show, there is going to be

11    state and federal paperwork to be filled out, a right

12    thumbprint on the back of the DROS, a background check in the

13    next 10 days or so, those kinds of things, yeah.

14    Q.   And, in fact, even though in other states under the

15    federal background checks system, sales can take place between

16    private parties on the same day with just an exchange of money

17    for a gun.   That's not -- that's illegal in California, isn't

18    it?

19    A.   What type of -- you said individuals, is that what you

20    said?

21    Q.   Well, there's a term that's been bandied about called

22    private party sales.

23    A.   Okay.

24    Q.   That would be a firearm sale between two private parties

25    rather than a dealer and a party.

1   A.  Yeah, my answer will be that if the people have no

2   licensing attached to themselves, and they're just average

3   citizens, they generally have to go through a gun store of

4   some kind to do it -- to transact a firearm from one to

5   another.

6   Q.  Okay.  And that also involves the background check and the

7   waiting period.

8   A.  Yes.

9   Q.  And that -- the same thing, the same would apply to a

10  private-party sale taking place at a gun show as well.

11  A.  Yes, given those same set of circumstances.

12  Q.  And, in fact, most gun show promoters actually hire a

13  licensed dealer to be on site to facilitate those

14  transactions; correct?

15  A.  Yes, usually there's one or more transfer dealers is what

16  they're generally termed at every show, and often there are

17  individuals that are selling off maybe their personal

18  collection.  The right thing that should happen is a purchaser

19  would pick up a weapon.  "I want to buy that.  Okay, great.

20  Let's go over to the transfer dealer," and that's where the

21  paperwork can start.

22  Q.  And, in fact, as part of your duties for the Bureau of

23  Firearms in investigating gun shows, you will sometimes attend

24  a gun show as a -- well, undercover, I guess, that would be

25  the word you'd use?

1    A.   Yes.

2    Q.   To observe that the laws are being followed; correct?

3    A.   Yes.

4    Q.   And some of the checks that you'll do is make sure there's

5    a licensed dealer on the premises.

6    A.   Yeah.  The promoters actually have to provide us with that

7    information before the show actually starts, so we get a

8    listing of the vendors, and then we sort out before the show

9    actually starts who the licensed dealers are.  We tell the

10   promoter, hey, these are the licensed people and these that --

11   these names that you've given us are not licensed.  So the

12   promoter knows who can transact business as a transfer dealer,

13   so there is no, I guess, vagary about who can do the

14   transfers.

15   Q.   And it's also illegal for people, for instance, to go out

16   into the parking lot to try and escape notice and try to

17   transact business.  That's illegal?

18   A.   Yes.

19   Q.   And some of your duties might be to primarily make sure

20   people aren't doing that as well.

21   A.   Yes.

22   Q.   Does the -- do you know whether or not the California

23   Department of Justice has any programs to help educate dealers

24   on how to spot a straw man purchase?

25   A.   I don't believe California DOJ has that.  ATF has taken

1    the lead on that nationwide.  There's posters and some

2    information on their website and such.

3    Q.  Is that the "Don't Lie For the Other Guy" program?

4    A.  Yeah, something like that.

5    Q.  Have you familiarized yourself with that program?

6    A.  I think when it first -- you know, came out years ago, I

7    looked at the stuff, but I haven't -- maybe been to that web

8    page in a while.

9    Q.  All right.  Is it your recollection that it basically

10   alerts dealers to keep an eye on suspicious activity like one

11   person showing an interest in a firearm, and the other person

12   who actually tries to, you know, buy the gun?

13   A.  I think that's consistent.

14   Q.  All right.  Does it give the dealers any other pointers in

15   trying to find that?

16   A.  Yeah, like I said, it's been a while since I've looked at

17   their materials on that.

18   Q.  Do you know whether or not the training material includes

19   a way for the dealer to contact a law enforcement agency and

20   say, "I'm seeing suspicious activity, what should I do?"

21   A.  I think that was part of the group of suggestions and

22   advisories to the dealers that they could contact -- I think

23   at the time it was, hey, contact ATF if you see any suspicious

24   transactions that you think might be a straw purchase,

25   something along those lines.

1   Q.  Do you know whether or not dealers have the right to

2   refuse to conduct a sale of a firearm in California?

3   A.  Yes, they do.

4   Q.  So if a dealer sees suspicious activity, and they have the

5   right to say, you know, you're not buying a gun at my store?

6   A.  I don't know about those exact words, but I know that ATF

7   can -- ATF will back up a dealer that is concerned about a

8   straw purchase because the dealer doesn't want to become

9   involved in criminal activity, something along those lines.

10  Otherwise, you're going to get discrimination complaints maybe

11  if you say, you know, you can't because of X, Y, Z, whatever.

12  Q.  And, in fact, sometimes dealers themselves can be indicted

13  on charges of conspiracy to facilitate straw sales if they're

14  kind of, you know, turning a blind eye or engaged in a

15  wink-wink, nod-nod on a straw purchase; correct?

16  A.  I've heard of those types of prosecutions, but I've never

17  been involved in one of those that I can remember.

18  Q.  But it is something that can land the -- a firearms dealer

19  in prison?

20  A.  It could.

21  Q.  If they conspire to assist in a straw purchase.

22  A.  Yes.

23  Q.  So there's an incentive for dealers to themselves alert

24  law enforcement to suspicious activity of a straw purchase?

25  A.  Yes, I would say that.

1    Q.  Agent Graham, there's been previous testimony in this case

2    that the total number of Dealer Record of Sale inquiries and

3    approvals in the State of California for the year 2012

4    exceeded 800,000.  Do you have any reason to dispute that

5    number?

6    A.  That sounds right.  I think it was maybe 812,000.

7    Q.  There's also been testimony that in the year 2013, that

8    that number exceeded 900,000.

9    A.  That sounds accurate.  I was going to say around a million

10   or so.  Yes.

11   Q.  Okay.  In any one year of your observations of gun shows,

12   how many instances of suspicious activity for a straw man

13   purchase have you observed?

14   A.  In any one year, I'd say --

15   Q.  Let's take 2012, for example.

16   A.  Me personally, I can think of one right off the top of my

17   head, and I think it was Sacramento County.

18   Q.  For the year 2012, there was one that you personally

19   observed?

20   A.  That I personally was involved in the investigation on at

21   a gun show.

22   Q.  What about the year 2013?

23   A.  '13?  I don't -- I can't think of one right off the top of

24   my head for 2013.  I didn't go to a lot of shows in 2013.

25   Q.  Okay.

1   A.  I would say the more paperwork that I get involved in, the

2   less shows I go to on the weekends because my overtime ends up

3   being on the weekends trying to catch up with things that

4   happened during the week.  So --

5   Q.  That's the price you pay for advancing in your career,

6   huh?

7   A.  In a sense I guess, yes.

8   Q.  How many shows did you attend in 2012?

9   A.  2012?  Probably -- I don't know, three or four.

10  Q.  All right.  Did you observe -- were you able to observe in

11  2012 any straw man -- suspicious activity that might be a

12  straw man purchase at any gun stores in 2012?

13  A.  Not me personally.  I do receive reports from the field

14  representatives that when they inspect the stores, they've

15  come across documents that they believe are straw purchases,

16  and they will funnel that information to me.

17  Q.  Okay.  And what is the nature of those investigations that

18  funnel paperwork to you?

19  A.  Well, the field reps might see a denial in the denial

20  portion of the gun dealer's paperwork.

21  Q.  All right.

22  A.  And while looking at other documents, they may see that

23  that weapon was eventually transferred to someone with a

24  common address or maybe a common last name.  And usually it's

25  within 30 or 60 days, that gun will leave the store to someone

1   that had that same address or same last name.  They will then

2   make a photocopy of the DROS information, and then I'll --

3   probably within -- once they get back into the office because

4   they'll be at different stores statewide.  I'll get a copy of

5   that information and try to evaluate to see if there's

6   something to follow up on.

7   Q.  Okay.  And so in that example you just gave me, the

8   background check and the 10-day waiting period didn't stop

9   that straw purchase, did it?

10  A.  Sometimes they'll find them that they're actually in a

11  10-day wait, that second -- second swipe at that same gun by

12  maybe the involved parties are still pending.  But most of the

13  time, it's going to be a situation where the gun's gotten out

14  of the store already.  But there are times when they'll find

15  one in the 10-day wait that was tied to a previous denial.

16  Q.  As you sit here today, do you have any specific statistics

17  on the number of times that that straw purchase was caught

18  during the 10-day waiting period?

19  A.  I don't have a -- we don't do studies on that sort of

20  thing.  I can just say from experience on the last probably

21  five years, probably of the straws that get sent to me,

22  probably 15 percent of those, there might be like an active

23  one that we have to really jump on as opposed to kind that has

24  already gotten out, and we have to retrieve one.

25  Q.  And that's the basis of your statement that most straw

1  purchases are not caught during the 10-day period, they're

2  caught after?

3  A.   Yeah, in the sense that the field reps, when they find

4  them at a gun show, it's more of an active thing.  We might

5  actually be able to do it because I'm not the only person

6  going to gun shows.  There are different teams out there.

7  There's 90 to 100 shows a year.  And there are agents that go

8  to most of those.  But, you know, like I said, I'm not able to

9  be in 20 different places at once.  So other agents out there

10 may see something that I may not necessarily hear about.

11 Q.   But when a law enforcement agent observes suspicious

12 activity that might be a straw purchase, it's either because

13 they're there looking for that activity, or it's by random

14 chance that they see it?

15 A.   Yes.

16 Q.   In your work as enforcing California's gun laws, if you

17 receive information that a pending transaction might be

18 illegal, do you have the authority to stop the transaction?

19 A.   Could you give me more information on what you think is

20 going on in your hypothetical?

21 Q.   If you observe two people not at a gun show or not at a

22 gun store, and one is a known felon, and they appear to be

23 trying to exchange a firearm, could you intercede in that?

24 A.   Yes, if I somehow had prior knowledge that a person was a

25 felon, and one person was handing a gun to that felon, we'd

1    have probable cause to get ahold of that person and sort it

2    out and probably potentially arrest both if I could show that

3    the person giving the gun to the felon knew he was a felon.

4    Q.   Okay.   But in those cases where you don't have that kind

5    of certainty, you need to conduct an investigation?

6    A.   Yes, which takes time.

7    Q.   There's been some recent amendments to the California

8    Penal Code with regard to background checks.   I believe

9    AB 500.   Are you familiar with that law?

10   A.   Yes.

11   Q.   Can you tell the Court what AB 500 has done that's

12   different from prior to its passage.

13   A.   So as far as the bill number, I'm a little foggy on that,

14   so I'm assuming you're correct.   The change to the background

15   check process is what I'll discuss.   It's -- basically allows

16   DOJ after we have given our best efforts to get, let's say, a

17   disposition from a Court, when we've tried and tried to get a,

18   let's say, a conviction confirmation or dismissal information.

19   The courts have not given us that.   Specifically, within the

20   10 days, and then the new rule is that we can, after, I think,

21   30 days now.   And this is more of a Mitch Matsumoto issue.

22   It's something we don't get pulled into, but I kind of know in

23   a general sense, so I'll couch my answer that way.

24   Q.   Okay.

25   A.   We have the ability now to tell the dealers that, hey, we

1    weren't able to verify everything, so it's up to you at this

2    point, if you want to release the weapon, that's on you.

3    We're not denying or delaying the past 30 days.

4    Q.  All right.  So, in other words, it used to be that the

5    department only had 10 days to approve or deny a gun purchase.

6    And now, after AB 500, the department now has the ability to

7    approve, deny, delay, or have it undetermined.

8    A.  Yeah, the undetermined is, I think, the proper language

9    now, that those types of background checks might result in an

10   undetermined title or label.

11   Q.  All right.  Now, I want to talk, though, about one of the

12   other results, and that's the delay.  That can be delayed for

13   up to 30 days; is that correct?

14   A.  Yes, I think that's the term -- the term now.

15   Q.  And that's to conduct additional investigation to make

16   sure that this transaction is legal.

17   A.  Yes, that the person is or isn't prohibited and so forth.

18   Q.  All right, and also to identify the person.

19   A.  How do you mean identify the person?  I'm not sure why

20   that would take 30 days to identify them.  In the sense we

21   have a driver's license probably, that would be the

22   identifier.  Maybe in the event of maybe an identity theft

23   issue, but that's really small numbers there.

24   Q.  All right.  Would an investigation into whether a

25   particular transaction is a straw purchase be also a reason to

Graham - X

412

1  delay for up to 30 days?

2  A.  I don't know that we have gone -- have gone and done that.

3  Q.  Are you saying that you haven't done it, or you don't

4  believe that you're authorized under the law to do it?

5  A.  I'm saying that I don't remember if we have or haven't.

6  Q.  As you sit here today, do you know whether or not the law

7  authorizes you to delay the sale for up to 30 days if there is

8  suspicious activity relating to straw purchase?

9  A.  I think I would probably go to our background check unit

10 and/or our lawyers and say, "Hey, here is the situation.

11 What's your advice?"

12 Q.  Okay.  Have I given you an idea?

13 A.  Excuse me?

14 Q.  Have I given you an idea?

15 A.  About what?

16 Q.  To assist.  Well, you stated earlier that sometimes less

17 than -- you said maybe only 15 percent of the time do you

18 catch straw purchases within 10 days.  If you had an

19 additional 20 days, would that give you more time to try and

20 stop the sale based on the potential straw purchase?

21 A.  Yes, sometimes the timing isn't everything because

22 sometimes the straw buyer that's -- I'm sorry, the hidden

23 buyer, we may not be able to identify that person or persons

24 until we actually contact him face to face because they've

25 insulated themselves well enough.  It's going to take us

1    looking into their wallet to figure out who they really are.

2    So it wouldn't help in every eventuality.  But time is a

3    benefit to us to investigate straw purchases.

4    Q.  That was my question, though.  Wouldn't additional time

5    also be a benefit?

6    A.  I'm sorry, I thought I just said that towards the end of

7    my answer there.

8    Q.  Okay.  And the additional time between while you're doing

9    investigations for the straw purchase and the time the gun is

10   delivered, that also helps ensure public safety; correct?

11   A.  I believe so.

12   Q.  All right.  Have you ever stopped a straw purchase on the

13   day you observed a suspicious activity?

14   A.  I can't say that we have, because typically, if the straw

15   purchase occurs at a show, we know there's going to be a

16   10-day wait in a sense.  And if -- because of manpower

17   issues -- we have multiple things that are going on at the

18   shows often.  A straw purchase is often -- isn't the only

19   potential criminal violation we've seen.

20   Q.  All right.

21   A.  So we have to figure out what we can spend time on that

22   day.  And it will get handled because we don't want guns to

23   get out there that shouldn't to a straw buyer and hidden

24   purchaser scenario.

25   Q.  Yesterday you testified about a shooting by someone who

1  used a newly acquired purchase to commit a violent crime.  Do

2  you remember testifying about that?

3  A.  Yes.

4  Q.  I believe you said you think the shooting occurred in

5  Cupertino.

6  A.  Yes.

7  Q.  Do you -- as you sit here today, do you recall any other

8  instances of that scenario?

9  A.  Where a person that already owned a gun acquired a second

10  weapon and then used one of those in the shooting.  Is that

11  what you're getting at, sir?

12  Q.  Yes, I am.

13  A.  I would say that off the top of my head right now would be

14  one that comes to mind.  I don't -- I don't think I have

15  others.

16  Q.  So the one that you -- you were referring to, or the one

17  that you have knowledge of is the one that happened in

18  Cupertino recently?

19  A.  Yeah.  It was Shareef Allman, I think, was the shooter in

20  that case.

21  Q.  You didn't have the name yesterday, but you have it today?

22  A.  Yes.

23  Q.  Okay.  What can you tell us about the facts of that case?

24  A.  So when the shooting did happen, the -- when there's kind

25  have a mass shooting like that, myself and the two analysts

1    that work for me will sort of get an assignment to research

2    the -- the facts surrounding the case to see A, is the person

3    in APPS, are they prohibited?  Are there guns in the system

4    that we do know about that match the fact patterns that's

5    coming out in the news, something like that.

6            This happened probably a year or two ago.  I don't

7    remember who asked me to look into it, but I did myself, or my

8    analyst looked into it, and I ended up contacting -- I think

9    it was the sheriff's department and spoke to the detective

10   that was in charge of that just to figure out some of the news

11   they were putting out, that an AK-47 was involved.  And I was

12   trying to figure out if this was a true AK-47, or was it a

13   clone.  Was it an assault weapon, or did it have some type of

14   device that caused the magazine to be a fixed magazine versus

15   an attachable magazine, that sort of thing.  Just trying to

16   get to the bottom to get through what's put in the news.

17   Q.  Did Mr. Shareef use an AK-47?

18   A.  He had one.  Again, it was a clone-type weapon, and I

19   don't believe it was used in the shooting, but it was found, I

20   think, later the same day that he ended up -- he killed

21   himself.

22   Q.  And did -- did you conduct an investigation as to how many

23   firearms Mr. Shareef had?

24   A.  At the time within a day or so of that shooting, I was

25   involved in an investigation to see what weapons were known to

1   us.

2   Q.   And what weapons were known to you?

3   A.   There was at least one or two handguns and, I believe, an

4   AK-47.   I don't remember if it was a pistol version or a long

5   gun version of the AK.   And the long gun version obviously

6   wouldn't be in our systems, so I think that might have been

7   what prompted me to call the Sheriff's Department to get a

8   little more information about it.

9   Q.   Any other firearms?

10  A.   That's what I remember.   He may have had other ones, but I

11  don't remember.   It's been a while.

12  Q.   Are you aware that the District Attorney of Santa Clara

13  County issued a full report on that incident?

14  A.   No, sir.

15  Q.   Have you ever read that report?

16  A.   No.

17  Q.   Did you personally observe the AK-47 that Mr. --

18  A.   No.

19  Q.   So you're relying on the -- on other officers' reports?

20  A.   It was actually just a verbal.   I hadn't read any reports

21  by any of the agencies involved.   I basically just called to

22  figure out who was involved in the case and identified myself

23  and my position at DOJ and said, "Hey, is there something you

24  can tell me about this without, you know, giving away any, you

25  know, secrets, so to speak?"   Just trying to figure out if

1   it's an assault weapon or a clone, that kind of thing.

2   Q.  Would it surprise you to learn that the two weapons

3   recovered from Mr. Shareef were a Glock and a Caltech .223

4   rifle?

5   A.  The Glock, actually I remember there being a Glock

6   involved.  The Caltech, I don't really have a recollection of

7   that coming up in my conversation or even reading about it

8   like other people in the news or anything.

9   Q.  Did you conduct any further investigation to find out

10  whether or not Mr. Shareef had obtained these firearms

11  legally?

12  A.  I recall, you know, looking at the AFS record, and I think

13  there was a Glock.  There may have been at least one other

14  pistol, but I don't remember hearing much about the second

15  pistol or anything like that.  But I think -- yeah, because it

16  was in the system under his name.  So it was the handgun, I

17  want to say, was a lawfully purchased weapon.

18  Q.  All right.  And the Caltech being a rifle, you wouldn't

19  have a record on it past the approval; correct?

20  A.  Yeah, even less -- well, you know, after the approval had

21  been granted, then it would be purged on the computer side of

22  our systems.

23  Q.  That's because Caltech is a long arm.

24  A.  Caltech rifles are long arms.  There are a few Caltech

25  handguns out there, but we're talking about a rifle.

1    Q.   The DA report refers to a Caltech .223.

2    A.   Probably it was a SU-16 variant of some type.

3    Q.   Was there any evidence that that rifle was obtained

4    illegally by Mr. Shareef?

5    A.   I didn't get into anything like that.  That was the

6    Sheriff's Department.  And I figured if they needed help on

7    that level, they could get back to us.  I had already

8    contacted them, and the ATF often gets involved in these

9    because the tracing aspect of that and their -- the San Jose

10   office would have handled that for ATF.

11   Q.   And, in fact, when there is a crime involving a firearm,

12   the ATF does something called a time-to-crime trace.  Is that

13   accurate?

14   A.   Yeah.  Basically every crime gun entry that gets pushed

15   into AFS by local agencies here, when that information gets

16   sent back to them, either by eTrace or maybe by mail, there's

17   going to be a time-to-crime number thrown out there, and

18   that's going to be based upon the original date of sale and

19   then the recovery date.

20   Q.   So the ATF keeps statistics on the passage of time from a

21   lawful sale, because by definition, if ATF has a record of it,

22   it was a lawful sale, to the time to crime.

23   A.   Yes.

24   Q.   Do you know if those statistics are published publicly or

25   not?

1  A.  It may be.  I don't know.  I know that there are

2  ATF-tracing statistics, but I don't know if it gets down to

3  that level of detail.

4  Q.  Okay.  We can go to an ATF website and pull up a report on

5  that or something?

6  A.  Yeah, there are ATF published tracing data for California

7  and other states on their websites, I can assure you of that.

8  Q.  And it gives us statistics on average and probably

9  individual breakdown of the time it -- or the time from a

10  purchase to a crime?

11  A.  I don't know about the time-to-crime stats.  I can say

12  that it will give you raw numbers for sure about the number of

13  guns that were traced in a particular state, but I'm not sure

14  if they provide that time-to-crime information.

15  Q.  And this tragic incident involving Mr. Shareef Allman, I

16  think, is the man's name -- Allman, I think, is his last name.

17  S-H-A-R-E-E-F, A-L-L-M-A-N.  That event terminated with his

18  suicide, didn't it?

19  A.  As I understand it, yes.

20  Q.  Would it be fair to say that this was an instance in which

21  the background check and 10-day waiting period did not prevent

22  violent acts?

23  A.  Yes.

24  Q.  I want to ask you a little bit more about the APPS system.

25  This is a relatively new system, isn't it?

1    A.   In terms of DOJ systems, it's a baby.

2    Q.   Prior to that and because based on your resume and your

3    prior testimony, you'd have to kind of go to a bunch of

4    different databases to get your information to do your

5    enforcement work; correct?

6    A.   Correct.

7    Q.   And the APPS system is designed to kind of consolidate all

8    of that for you?

9    A.   Yeah, it will pull together a lot of data, where in the

10   past, you'd have to hunt around, yeah.

11   Q.   And would it be fair to say that the specific purpose of

12   the APPS system is to specifically identify people who are

13   known to the State of California to have a firearm and that

14   have had a subsequent prohibiting event and, therefore, should

15   not have a gun.

16   A.   In general, sense, yes, that's pretty good.

17   Q.   And, in fact, recently, there was by statute a transfer --

18   strike that.

19        Gun buyers in the State of California, when they

20   apply to purchase a gun, they pay what's called a DROS fee; is

21   that correct?

22   A.   Yes.

23   Q.   And I think it's varied over the years, but it's currently

24   $25, I think?

25   A.   Yeah, there is -- I think it's 19, and there's a dollar

1   fee for a couple things.  A dollar, and I think another $5

2   fee.  So the chief could probably give you a better breakdown

3   than I could.

4   Q.  As you sit here today, do you know how much it actually

5   costs the department to run a dealer record of sale to check

6   on somebody?

7            MR. EISENBERG:  Objection.  Irrelevant.

8            THE COURT:  Sustained.

9   BY MR. KILMER:

10  Q.  Did the Dealer Record of Sales fees, did they generate a

11  surplus of funds for the Department of Justice?

12           MR. EISENBERG:  Objection.  Irrelevant.

13           THE COURT:  Sustained.

14  BY MR. KILMER:

15  Q.  Is the APPS system partially funded with -- from surplus

16  funds that were made available for the Dealer Record of Sale

17  fee system?

18           MR. EISENBERG:  Same objection.

19           THE COURT:  Relevance?

20           MR. KILMER:  Your Honor, the Penal Code Section

21  30005, I believe, is cited in our brief.  It was a specific

22  allocation of excess funds from the Dealer Record of Sale fee

23  program specifically allocated to the APPS system, and this

24  witness has testified he's familiar with the APPS system.  I'm

25  asking him if he knows the source of funding for doing his

1   work.

2          THE COURT:  And the relevance to the issues at hand

3   here?

4          MR. KILMER:  There was earlier testimony, Your Honor,

5   that there was a lack of resources for conducting law

6   enforcement activity with respect to background checks and

7   public safety.

8          THE COURT:  Is lack of resources going to be an issue

9   in this case?

10          MR. KILMER:  We don't think that there should be a

11   lack of resources defense for enforcing and protecting

12   constitutional rights, Your Honor, but I anticipate that the

13   Government will and has made the argument that they're

14   overworked and understaffed and just can't get to all those --

15   all this work.

16          Also there is the issue, Your Honor, of we have more

17   than 99 percent of lawful gun purchasers because we've already

18   established that less than 1 percent are denials.  We have

19   99 percent lawful gun purchasers basically funding law

20   enforcement activities.

21          THE COURT:  Government response to the proffer in

22   terms of relevance?

23          MR. EISENBERG:  The specific question goes to fees

24   for APPS, which is not the sum total of law enforcement.  I

25   don't see how the funding that's been allocated for that

1   specific system can be relevant to whether there are agents in

2   the field, et cetera.  It's not BOF's decision if there's

3   money that's allocated to enhance the APPS system.  So I think

4   it's both irrelevant, and it's so narrow as to be especially

5   irrelevant.

6          THE COURT:  There may be some relevance, but is the

7   Government -- is the defense going to argue one factor to

8   consider is lack of resources, either human or budgetary or

9   actually they're sort of related, but --

10         MR. EISENBERG:  The Government's position is that

11  even if you doubled the number of CIS's, they can't make a

12  deputy sheriff in Shasta County put a record into the system

13  any faster.  There is a time lag that's inherent in a system

14  with multiple human beings and multiple locations, some of

15  them even out of the state getting records into the system on

16  time.  That's why an instant background check is somewhat of a

17  charade, frankly.  That's going to be the heart of our

18  position.

19         THE COURT:  Okay, and that would not have to do

20  with -- with the state per se, hospitals have to report,

21  courts have to report, and the various systems we've heard,

22  other local law enforcement agencies need to report.  So that

23  would be separate and apart from personnel and funding issues

24  within the State itself.

25         So if you're not going to make -- if the defense is

1    not going to make an argument of lack of funding within the

2    State itself or State employees, we've heard Mr. Matsumoto

3    testify there are only 24 people reviewing, and they're all

4    working 80 hours a week, but I don't know if that really goes

5    to lack -- if there is going to be an argument of lack of

6    resources, I suppose that funding availability might be an

7    issue.  It's not a major issue, but it is -- it has some

8    relevance.

9            MR. KILMER:  There's one additional relevant point

10   too, Your Honor, and that is that part of the central theme of

11   this case is that people with concealed carry permits and

12   people with COE's, and people who already have firearms that

13   are known to the State of California should be auto-approved.

14   And that the Government's counter argument is that, no, we

15   need a 10-day waiting period in case there's a superseding

16   intervening prohibiting event.  Our position is that the APPS

17   system is a more narrowly-tailored remedy for addressing

18   people who become prohibited rather than simply impose a

19   10-day waiting period on already-trustworthy gun owners.  And

20   because the Government has this APPS system, and it is already

21   well funded through the fees of law-abiding citizens, that

22   that APPS system is the better fit for addressing those three

23   categories of gun owners who are already trustworthy if they

24   become subsequently prohibited.  That's our point, Your Honor.

25            THE COURT:  Well, the fact that the system is in

1   place, unless there's some argument that it is deficient

2   because of a lack of funding, I think, may be relevant, but

3   right now it isn't relevant because the system apparently is

4   in place, and so far, there's been no argument that it is

5   deficient because of lack of funding.

6          So I'll sustain the objection for now.  You can

7   always raise it a little later on in case it should become

8   relevant.

9          MR. KILMER:  Thank you, Your Honor.

10          THE COURT:  Now, it is 10:30.  Take our morning

11   recess now?

12          MR. KILMER:  I have -- we'll take the recess,

13   Your Honor.

14          THE COURT:  All right, 15 minutes.

15          (Recess.)

16          MR. KILMER:  Are we ready to proceed again?

17          THE COURT:  All right, we'll continue on with the

18   testimony.

19          MR. EISENBERG:  Your Honor, if I may be heard for a

20   moment.

21          THE COURT:  Sure.

22          MR. EISENBERG:  We're going to withdraw the

23   objection.  You can ask the question of Special Agent Graham.

24          THE COURT:  Okay, all right.

25          MR. KILMER:  About funding?

Graham - X

426

1          MR. EISENBERG:  Yes.

2          MR. KILMER:  All right.

3          THE COURT:  Okay.  Go ahead and proceed with the

4    testimony.

5    BY MR. KILMER:

6    Q.   If you know the answer to the question, did the Dealer

7    Record of Sale program generate excess funds?

8    A.   I've heard in a general sense that we have a surplus.

9    Q.   All right.  And where was that surplus kept?

10   A.   I imagine a bank account.  I don't know.  I'm not into the

11   weeds on the budget stuff, sir.

12   Q.   And recently, there was legislation to transfer some of

13   that surplus to a fund specifically for APPS; is that correct?

14   A.   Yes.

15   Q.   Do you know the amount of that funding?

16   A.   The amount that was, I think, in the legislation was about

17   24,000,000.

18   Q.   All right.  And that's to be used exclusively for the APPS

19   system?

20   A.   Yeah.  I haven't read the nitty-gritty of that stuff.

21   That would be more something the chief and the people higher

22   up than me would get into, how it was exactly broken down in

23   the spending.

24   Q.   And in the organizational chart, or maybe chain of command

25   would be a better word, where do you fit in the APPS system?

1    A.   I'm just one of several supervisors in the state.

2    Q.   All right.  Is that broken down regionally or --

3    A.   Yeah, we have six regional offices.

4    Q.   All right.  So how are APPS cases worked up?

5    A.   In the sense like how does an analyst create one?

6    Q.   What generates your lead that there has been a crime?

7    A.   Okay, so if the computer systems have deemed someone to be

8    a candidate, they will get pushed into a queue.  A group of

9    analysts in our program side in the APPS unit will figure out

10   if they think the computers are accurate.  If the gun is still

11   in the system or still associated to the person, they will

12   then actually push the person into the live APPS system.

13   Q.   Okay, so the computer system itself is programmed to

14   basically flag people who would be defined as armed and

15   prohibited?

16           MR. EISENBERG:  Objection.  Assumes facts not in

17   evidence.

18           THE COURT:  Sustained.

19   BY MR. KILMER:

20   Q.   How are the leads that end up in the queue generated?

21   A.   It's my understanding that the different databases that

22   I've already testified about will find a commonality between a

23   person, a weapon, one or more weapons, and then one or more

24   prohibitions, and it will be pushed into a queue to be

25   verified by one or more human analysts.

1    Q.   Okay, and you're familiar with the terms "reasonable
2    suspicion?"
3    A.   Yes.
4    Q.   And probable cause?
5    A.   Yes.
6    Q.   And is there a difference between them?
7    A.   Yeah.  Probable cause is a higher threshold.
8    Q.   All right.  The databases that generate the information
9    that goes into the queue, would that be classified as what may
10   be reasonable suspicion?
11   A.   I don't know that anyone has ever asked me that question
12   before, so I haven't given it that much thought, frankly.
13   Q.   But it's at least an indicator that further investigation
14   is necessary.
15   A.   Yes.
16   Q.   And as the investigation proceeds, it might reach
17   reasonable suspicion?
18   A.   Possibly.
19   Q.   And that it might actually reach the threshold of probable
20   cause?
21   A.   Given a certain set of circumstances, it could.
22   Q.   And at that point in time, the APPS system is designed to
23   then call on resources to try and get a search warrant and
24   then go out and engage in some enforcement action to collect a
25   gun and make an arrest?

1  A.  It's sort of a -- I guess it's a repository for data about

2  possible illegal weapons possession by various people.  We can

3  go into the system and query a particular county, if you will.

4  Q.  Okay.

5  A.  Let's say we're going to work Placer County.

6  Q.  All right.

7  A.  We can figure out what -- you know, we need to have 10

8  people to look at this week or this day, or whatever, and the

9  enforcements CIS's, which are different than the program CIS's

10  that push them in, they will then look at the new -- you know,

11  those names, do a package and figure out if they're worthy for

12  going in the field.

13  Q.  All right, so I may be trying to oversimplify this, but

14  sounds like the APPS system basically generates a to-do list

15  for you guys?

16  A.  Yes, in the sense.

17  Q.  All right, and then you prioritize, based on certain

18  criteria, whether you're going to either work a certain

19  county, or you're going to look at the more serious cases.  Is

20  that how it generally goes?

21  A.  Yeah, it can be a number of factors.  Hey, how long has it

22  been since we've been to a particular county?  We might work

23  that county next because it's been, you know, a month or two

24  since we've visited the people in that -- and trying to find

25  people that allegedly live there, something like that.

Graham - X

430

1   Q.  Are there any special -- other than the computer system

2   itself, are there any special resources allocated to the APPS

3   system?  For example, did you purchase more vehicles or more

4   guns or hire more special agents with some of the funding?

5   A.  I'm aware that we're rehiring people that were laid off in

6   the past.

7   Q.  All right.  And are they -- are they specially designated

8   to work on the APPS system, or are they just hired for general

9   purposes?

10  A.  APPS-related enforcement.

11  Q.  Okay.

12          MR. KILMER:  Your Honor, at this time, I'd ask that

13  the exhibit I used earlier today, the 4473 Form, be marked for

14  identification as Plaintiff's Exhibit 07, I think is the next

15  in order, and that it be admitted, and I don't believe that

16  the defendants are going to object?

17          MR. EISENBERG:  Correct.  No objections, Your Honor.

18          THE COURT:  It will be marked as Plaintiffs' No. 07

19  and admitted into evidence.

20          (Plaintiffs' Exhibit 07, received in evidence.)

21          MR. KILMER:  May I submit that to your clerk,

22  Your Honor?

23          THE COURT:  Yes.

24          MR. KILMER:  My copy.  Thank you.

25  BY MR. KILMER:

1   Q.  Final housekeeping, the 4473 is a paper form, I think we

2   established that earlier.  The DROS form used to be paper

3   form; is that correct?

4   A.  There's a DROS work sheet that sometimes will get filled

5   out, you know, by the dealers, and it will get pushed in by

6   the dealer at their computer often.

7   Q.  Currently the system is electronic, though.  The entries

8   are made on a computer?

9   A.  Right.

10  Q.  All right.  Is there more information contained in the --

11  that can be inputted into the computer and then shows up on

12  the work sheet that gets printed out?

13  A.  Not that I know of.

14  Q.  Okay, so the printed version of it that a dealer might

15  print out is literally just identical to those that goes into

16  the computer screens?

17          MR. EISENBERG:  Objection.  Assumes facts not in

18  evidence about printing out the form.

19          THE COURT:  Sustained.  Foundation.

20  BY MR. KILMER:

21  Q.  Dealers currently use a computer to input the data for the

22  DROS system; correct?

23  A.  Yes.

24  Q.  They're also able to actually print out the DROS

25  application after it's complete; is that correct?

Graham - BR

432

1   A.  Yes.  Yes.

2   Q.  And the paperwork that gets printed out is populated with

3   the same information that's in the electronic form; is that

4   correct?

5   A.  Yes.

6   Q.  To your knowledge, that's the same information that is

7   printed out on the paper form that is contained in the

8   electronic form?

9   A.  That's my understanding, yes.

10          MR. KILMER:  Nothing further from this witness,

11  Your Honor.

12          THE COURT:  And redirect.

13          MR. EISENBERG:  May we proceed with the redirect,

14  Your Honor?

15          THE COURT:  Yes.

16                    REDIRECT EXAMINATION

17  BY MR. EISENBERG:

18  Q.  Special Agent Supervisor Graham, you testified earlier, I

19  believe, that you had three times written search warrants for

20  straw purchase?

21  A.  I testified earlier that I was involved in the preparation

22  of.  I think that's what his question was.

23  Q.  Three warrants?

24  A.  Yes, Mr. Kilmer's question, I think, said something to the

25  effect of was I involved in the preparation, or I assisted in

1   the preparation of three straw purchase-type investigations,

2   and I could remember three at that time that fall under his

3   question.

4   Q.   Are there other special agents at BOF that also write

5   those kind of warrants?

6   A.   Yes.

7   Q.   Do you know how many other warrants of that sort have been

8   written to the best of your memory and recollection?

9   A.   Most of those are going to be from the Sacramento regional

10  office, which I'm generally attached to.  There would be --

11  right now, I can think of at least three other agents that

12  have written straw purchase-type investigations in the last

13  couple years and -- but I know that they occur in other

14  offices, but I don't really have any numbers for those because

15  it's not something that would get funneled to me in the sense

16  of the follow-up.  We might tell them, hey, there's some straw

17  purchase possibilities with this case.  Take a look.  I don't

18  really get anything back unless there's some really odd

19  circumstance going on.

20  Q.   On the straw purchase warrants that you've written, have

21  any of them turned out to just be gift purchases?

22  A.   Not that I can remember.

23  Q.   Have you gone to more gun shows in past years than you

24  have in the last couple of years?

25  A.   Yes.

Graham - RD

434

1    Q.  And I believe you testified earlier, you're not the only

2    agent that works gun shows.

3    A.  Correct.

4    Q.  Have there been more than one -- have there been more than

5    one occasion where a straw purchase was discovered at a gun

6    show?

7    A.  Yes.

8        MR. KILMER:  The question is vague and ambiguous.

9        THE COURT:  Overruled.

10       THE WITNESS:  I think I already said yes.

11   BY MR. EISENBERG:

12   Q.  Do you know the number of times, say, over the last 10

13   years that BOF agents have discovered straw purchases during

14   their gun show investigations?

15   A.  Again, this is just speaking from memory.  There has been

16   probably a handful of times that were straw purchase cases

17   that we thought were straw purchases that turned out to be.

18   So I would say, you know, maybe five over the last several --

19   several years that I can think of.

20   Q.  And straw purchases don't occur only at gun shows;

21   correct?

22   A.  Right.

23   Q.  So your answers so far have not tried to quantify the

24   number of straw purchases that are identified by dealers'

25   self-reporting?

1    A.  No, those would be something separate from a from a gun

2    show-related event.  Typically those happen at a store.  Yeah.

3    It would be more of like a Monday through Friday kind of

4    thing, and we'll get a phone call possibly.

5    Q.  And do you have the numbers say in the last five years of

6    dealers' self-reports about straw purchases, or is that

7    something that you can't quantify?

8    A.  It would come in probably -- I'm thinking of that one

9    particular chain.  We'll probably get potentially like three

10   or four a year from one particular chain in Northern

11   California.  And there may be others that are also coming in,

12   but that's the one that comes to mind.

13   Q.  And do you have any quantification of the number of straw

14   purchases that are identified through the field audits that

15   you spoke about yesterday?

16   A.  When our field representatives go out, they will often get

17   sort of spurts or batches of these because they'll hit a

18   particular store, and if it's been a while, we may get, you

19   know, up to maybe three from one particular store as a result

20   of one inspection.  And they'll often hit multiple stores in a

21   particular town or county.  So in the course of a week, I

22   might get up to -- I don't know -- I remember one particular

23   busy week a few weeks ago, I think one field rep found up to

24   six in just a couple of stores.  The guns had already gone

25   out, and we had to evaluate to see what was left to do, if

1    anything.

2    Q.  Do you believe that the Bureau of Firearms has enough

3    agents working gun shows and gun dealers, given the number of

4    gun shows and gun dealers?

5            MR. KILMER:  Objection.  Calls for speculation.

6            THE COURT:  Overruled, if you can answer from your

7    own personal knowledge.

8            THE WITNESS:  When you say "enough," sir, what do you

9    mean, enough to do what?

10   BY MR. EISENBERG:

11   Q.  Would you be able to do your job more effectively, catch

12   more straw purchases if you had more agents?

13   A.  Yes.  In a general sense, yes.

14   Q.  You did testify that the dealer inspections are sometimes

15   only once every three years?

16   A.  Correct.

17   Q.  And there are about -- something like 1900 gun stores?

18   A.  There's about 1800 licensees, I think, in the state.

19   Q.  And the numbers of agents you have working doing this kind

20   of work for the whole state is how many?

21   A.  I'm not sure of the exact number, probably over 50 at this

22   point.

23   Q.  Can an APPS check be a replacement for a background check

24   on a gun purchaser?

25   A.  It would be an inadequate check for the existing

Graham - RD

437

background check that we do.

Q.   Why?

A.   There's staleness issues, some of the information in APPS
is dated, and the -- the number of prohibited people in
California is -- far exceed the number of people in APPS.
There -- I think I testified yesterday, there's about
1.5 million mental health records in the system alone.  And
just last year, we had 225,000 mental health events that gets
pushed in as part of that 1.5 million number.  There are only
about 21,000 people in APPS.  They have about -- around 4,000
mental health events spread amongst those 21,000 people.  So
you can see there's a tiny fraction of just the mental health
records are tied to those APPS people.

        The restraining order system isn't fingerprint-based,
so if someone -- well, APPS alone by itself wouldn't really --
it's not going to give you the full picture.  It would just be
like the pinhead in a sense on a larger group of people that
would need to be considered for a background check.

Q.   Is APPS a replacement for a background check for a DROS
applicant who has bought a gun before?

A.   It's not a -- it's not a replacement system that we use,
no.

Q.   Do the issues that you mentioned about the inadequacies of
APPS apply equally to a first-time firearm purchaser as to a
subsequent firearm purchaser?

1    A.   Yes.

2    Q.   When you're surveilling for possible straw purchases at

3    gun shows, do you suspect every male/female couple to be a

4    straw purchaser situation?

5    A.   No.  No.

6    Q.   What distinguishes a straw purchaser from just an ordinary

7    couple in your experience?  Or rather, what distinguishes a

8    potential straw purchaser from just an ordinary couple in your

9    experience?

10   A.   In the times in the past that I recall, the woman that's

11   interested in buying a gun for herself, she's probably going

12   to be a little more comfortable handling a weapon, and she may

13   not be standoffish.  There's -- the times that I can recall on

14   straw purchases when there was a male/female situation, the

15   male was very excited to handle the weapon and talking with

16   the person selling the gun or offering the gun for sale.  And

17   the female was kind of an afterthought.  In the times where

18   I've noticed what appeared to be more of a legitimate

19   transaction, it was an equal partnership, a husband and wife

20   or boyfriend/girlfriend, there was an equal amount of banter

21   amongst all three, and it was very -- very apparent that there

22   was an equal amount of interest on the gun with both the male

23   and the female.

24   Q.   When you suspect that you're observing the straw purchase

25   situation, and you do your investigation, can you get a search

1  warrant within a day in each case?

2  A.  Not in every case.

3  Q.  How long might it take you to work up the evidence so that

4  you can write a sufficient search warrant application?

5  A.  It can take several days.  I mean, if -- we generally

6  would only have 10 days at the most to put everything

7  together, and in some cases, we don't have enough time because

8  of the hidden buyer being somewhat good at obscuring their

9  whereabouts or their residence, that sort of thing.

10 Generally, it's a several-day process to get a warrant unless

11 there is a very finite set of facts, and that rarely happens

12 in our line of work.

13        MR. EISENBERG:  I have no further questions for this

14 witness right now, Your Honor.

15        THE COURT:  All right.  And recross.

16                    RECROSS-EXAMINATION

17 BY MR. KILMER:

18 Q.  One reason that the APPS system -- again, that's the Armed

19 Prohibited Persons System.

20 A.  Yes.

21 Q.  It can't be a substitute for a background check is because

22 it draws on the information from the background check, doesn't

23 it?

24        MR. EISENBERG:  Objection.  Vague and ambiguous.

25        THE COURT:  Sustained.

BY MR. KILMER:

Q.  You testified earlier that the APPS system couldn't be a substitute for a background check; correct?

A.  Yes.

Q.  And isn't one of the reasons for that is because the APPS system draws its information from all of the databases that the background system itself uses; is that correct?

MR. EISENBERG:  Objection.  Assumes facts not in evidence and/or misstates the evidence.

THE COURT:  Overruled, if you know.

THE WITNESS:  Could you rephrase it.  There's a lot to that question.

BY MR. KILMER:

Q.  Okay.  Let's -- one moment.

MR. KILMER:  May I approach the witness, Your Honor?

THE COURT:  Yes.

BY MR. KILMER:

Q.  I've handed you a document that's been previously marked and admitted into evidence, that's Exhibit CB.  And have you ever seen this document before?

A.  No.  Well, actually it was here maybe yesterday, when I came up here.  But other than that, no.

Q.  All right, I'd ask you to review it, then.

A.  Okay.  Okay, sir.

Q.  Okay.  This document purports to be a schematic of some of

Graham - RX

441

1    the databases that the California Department of Justice,

2    Bureau of Firearms Division, how the databases interact.  Do

3    you understand that?

4    A.  Yeah, it looks accurate, in the sense that a lot of the

5    databases that tie into -- you know, APPS are mentioned here

6    on the right side of the page.

7    Q.  Okay.  Could you please go through some of those for me.

8    The top one says DMV?

9    A.  DMV.  There's Automated Firearms System.  ACHS, which is

10   the criminal history system.

11   Q.  All right.

12   A.  WPS, the warrant system.  CARPOS, that's the restraining

13   order system.  Mental health is the next one down, and then

14   the NICS system on the bottom.

15   Q.  Okay, you're familiar with all of those databases?

16   A.  More or less, yes.  I have some more expertise in some

17   than I do in the other ones.

18   Q.  Okay, and because you access those databases in

19   researching search warrants and engage in enforcement actions;

20   is that correct?

21   A.  Most of them.  NICS, I don't really ever get into.

22   Q.  All right, fair enough.

23       Is the APPS system a separate database, or does it

24   access those databases?

25   A.  The databases on the right side of this particular page

Graham - RX

442

1    are what help populate APPS or provide candidates for

2    population of APPS.

3    Q.   Okay.  And in order for you to -- the AFS system, I

4    believe you earlier testified, is the system that is -- the

5    catalog of the Dealer Record of Sales that the Department of

6    Justice has, and that includes handguns since '91 and long

7    guns since January 1st of this year; correct?

8    A.   That's actually incorrect.

9    Q.   Okay.

10   A.   The handguns are from '96 to current.

11   Q.   Okay.

12   A.   And then long guns are from January of this year to

13   current.

14   Q.   That's the AFS system?

15   A.   AFS, and there's also registered assault weapons that

16   would also be in the pool of weapons that might trigger

17   someone being in APPS if they were lawful -- the lawful owner

18   of one of those weapons too.

19   Q.   Okay, and how would you assess the reliability of that --

20   of the AFS database in connection with the investigations

21   you've done?

22   A.   In the sense that there are -- the DROS entries are in

23   there are by and large good data.  Occasionally you'll have a

24   serial number error.  Maybe a dealer -- you know, hit the

25   wrong zero, instead of an O or something.  By and large,

Graham - RX

443

1    that's pretty good.  You may have a make issue or maybe a typo

2    in the model.  But it's pretty good information on the DROS's.

3    Q.  Pretty reliable?

4    A.  Yes.

5    Q.  In fact, the AFS system has also accessed real time by

6    these officers in the street investigating act of crimes

7    sometimes too, aren't they?

8    A.  AFS, yes.

9    Q.  For instance, an officer might be investigating, rolling

10   up to a scene of alleged domestic violence, and they want to

11   know whether there might be a gun in the house; is that

12   correct?

13   A.  That might be something that an officer would do, roll

14   into a hot caller.  The dispatcher would funnel that

15   information perhaps if there is a shots fired call or domestic

16   or something.

17   Q.  And that's an automated system and pretty fast?

18   A.  Yes, if you know the person that you're dealing with.  If

19   you've got prior calls for service, then maybe they might have

20   a name and date of birth already.

21   Q.  Have you ever relied upon the AFS database for an

22   investigation on the proposition that somebody had a gun in

23   the house, and then you later found out that they didn't have

24   a gun?

25   A.  Yeah.  Yes.  We'll knock on a door, and they'll say, "Oh,

Graham - RX

444

1  I sold it," or something like that.

2  Q.  How many times has that happened?

3  A.  Personally?

4  Q.  Sure.  I don't want you to testify unless you personally

5  know.

6  A.  Right.  Probably dozens of times.

7  Q.  Over the course of how many years?

8  A.  Ten years, let's say.

9  Q.  All right.  Do you -- in the course of your duties in

10 enforcing California firearms laws, you interact quite a bit

11 with licensed dealers; is that correct?

12 A.  Yes.

13 Q.  In fact, this whole system for ensuring that firearms

14 remain -- only go to law-abiding citizens remain out of the

15 hands of prohibited people wouldn't work if the licensed

16 dealers weren't trustworthy; is that correct?

17 A.  Yeah, the premise is that they're going to put the

18 accurate information in the computer, and they're going to

19 verify, let's say, the driver's license number and make sure

20 that the person -- the driver's license info matches the

21 person standing in front of them.  They'll take the

22 thumbprint, and then they'll push it on to the background

23 check unit through the DROS system.

24 Q.  So this whole system depends for the bulk of its

25 enforcement on the law-abiding people trusting each other and

1   following the law.

2   A.  I think I understand your question, but the dealers

3   provide us with information.  We background check it, and then

4   we tell the dealer yes or no as far as releasing the gun.  I'm

5   hoping I'm responsive to your question.

6   Q.  Okay, I have a follow-up question.  And if the dealers

7   were just saying, "No, the DOJ doesn't know what they're

8   doing, I'm going to give this guy a gun anyway," not only is

9   that a violation of the law, but it's a violation of the trust

10  and working relationship between the dealers and the

11  Department of Justice; correct?

12  A.  I would agree with that, yes.

13  Q.  And for those dealers who are inclined to not follow the

14  law, whether it's through either lack of training or because

15  they form the specific intent that they're not going to comply

16  with the law, they have you to deal with, don't they?

17  A.  ATF and DOJ and potentially local agencies if they are

18  involved in the discovery of crimes like that.

19  Q.  And you make it your business to make sure that -- that

20  you'll stop those violations and make sure that the system

21  runs correctly.

22  A.  Yes.

23  Q.  That's your job.

24  A.  Yeah, that's one of the jobs, one of the hats that we

25  wear.

1    MR. KILMER:  Thank you.  I have nothing further from

2  this witness, Your Honor.

3    THE COURT:  All right, redirect.

4    FURTHER REDIRECT EXAMINATION

5  BY MR. EISENBERG:

6  Q.  Special Agent Supervisor Graham, do you know if APPS pulls

7  information from NICS?

8  A.  I don't think that it -- well, I think the database people

9  would be the best person to answer that.  I don't know that it

10  does on a regular basis.  If it does, I'm not a hundred

11  percent on that.

12  Q.  Do you know if APPS does any kind of check for a name

13  verification?

14  A.  I think you're getting down to parameters of the program

15  inside.  We basically just go after what's in the system and

16  try to make sure that the person we're going to talk to is

17  prohibited, but I'm not sure like names, searches, or Soundex

18  or anything of that stuff.

19  Q.  So if you wanted to find the answer to that question, you

20  would consult somebody besides yourself?

21  A.  Yes.

22  Q.  Who would you consult?

23  A.  Probably Assistant Chief Buford, perhaps our programming

24  staff, maybe the people in the APPS unit that do the actual

25  pulling of the data and pushing them from the queue into the

1    active pool of people out there.

2    Q.  So you're not really that well versed in what databases

3    APPS pulls from, are you?

4    A.  I'm well versed in the ones that I use.  But I may not

5    know every single aspect of the system and all the business

6    rules on the computer side of things.

7              MR. EISENBERG:  Okay.  No further questions.

8              THE COURT:  And recross?

9              MR. KILMER:  Nothing further, Your Honor.

10             THE COURT:  Okay, either side may still call you back

11   to testify.  You're still under oath.  I'll leave it to

12   counsel to let you know the date and time if necessary to

13   return.

14             THE WITNESS:  Sure.  Thank you.

15             THE COURT:  All right.

16             MR. EISENBERG:  Your Honor, the defense would like to

17   call Bureau of Firearms Chief Steve Lindley.  May we have a

18   moment to locate him?  We understand that he's in the

19   building.

20             THE COURT:  Sure.

21             (Pause in the proceedings.)

22             THE CLERK:  Would you come right up here, sir.  Raise

23   your right hand.

24   ///

25   ///

Lindley - D

448

1                              **STEVE LINDLEY**,

2    called as a witness on behalf of the Defendants, having been

3    first duly sworn, testified as follows:

4              THE CLERK:  Take the witness stand right over there

5    and give us your full name, please.

6              THE WITNESS:  Stephen J. Lindley, L-I-N-D-L-E-Y.  I

7    spell Steven with a P-H.

8                           DIRECT EXAMINATION

9    BY MR. EISENBERG:

10   Q.  Good morning, Chief Lindley.

11   A.  Good morning.

12   Q.  I'd like to start by asking you some questions about your

13   education and professional background.  Now, Chief, did you

14   attend college?

15   A.  Yes.

16   Q.  Did you graduate from college?

17   A.  Yes.

18   Q.  What year did you graduate?

19   A.  1998 with my bachelor's.

20   Q.  And did you have a major course of study?

21   A.  Criminal justice.

22   Q.  Did you pursue formal education beyond your bachelor's

23   degree?

24   A.  Yes.

25   Q.  What other degrees, if any, did you obtain?

Lindsey B.

449

1    A.   I have a master's in business management.

2    Q.   What year did you receive that degree?

3    A.   Late 1999.

4    Q.   Have you had any professional employment in law

5    enforcement?

6    A.   Yes.

7    Q.   Will you tell me what was the name of the first law

8    enforcement agency for which you worked?

9    A.   The National City Police Department in San Diego County.

10   Q.   What years did you work for the National City PD?

11   A.   Roughly between 1990 and 2001.

12   Q.   What was your job title at the police department?

13   A.   I started off as a police cadet and left there as a police

14   sergeant.

15   Q.   Did you have any other jobs in between those two ranks?

16   A.   Yes, I was a reserve officer, a police officer, a

17   detective, and then a sergeant.

18   Q.   At some point, did your employment with the National City

19   Police Department conclude?

20   A.   Yes.

21   Q.   Did you move on to another law enforcement employer?

22   A.   Yes.

23   Q.   Which employer is that?

24   A.   The Department of Justice.

25   Q.   And what year did you begin work at Cal DOJ?

Lindsey, R.

450

1    A.   2001.

2    Q.   And you're presently employed at the California Department

3    of Justice?

4    A.   Yes.

5    Q.   What is your current job?

6    A.   I'm the Bureau Chief for the Bureau of Firearms.

7    Q.   How long have you been the Bureau Chief?

8    A.   Roughly four years.

9    Q.   So that takes us back to about 2009?

10   A.   Yes.

11   Q.   In the intervening years about 2001 and 2009, you're

12   employed by the Bureau of Firearms at all times?

13   A.   No.

14   Q.   What years were you employed between 2001 and 2009 with

15   the Bureau of Firearms?

16   A.   Well, actually I started off at the Department of Justice

17   in the California Bureau of Investigations as a special agent

18   assigned to the San Diego regional office.  In the summer of

19   2003, I was promoted and moved to the Los Angeles regional

20   office, and I handled a team working out of the Riverside

21   regional office where I was the supervisor.  In the summer of

22   2006, I was promoted up to the division's headquarters in

23   Sacramento.  I spent about a year there.  And then I moved

24   over to the Bureau of Firearms in July of 2007.

25   Q.   Okay, so I was mistaken.  Those years between 2001 and

1   2007, you were in the employment of the California Department

2   of Justice, but not the Bureau of Firearms within Cal DOJ; is

3   that right?

4   A.  Correct.

5   Q.  In your current position, do you supervise other

6   employees?

7   A.  Yes.

8   Q.  How many other employees do you supervise?

9   A.  Roughly about 224.

10  Q.  Are any of those employees peace officers?

11  A.  Yes.

12  Q.  Are you yourself a peace officer?

13  A.  Yes.

14  Q.  And are the remainder of the employees nonpeace officers?

15  A.  Yes.

16  Q.  Are you the supervisor for Assistant Chief Buford?

17  A.  Yes.

18  Q.  Are you the supervisor -- well, are you ultimately the

19  supervisor for Mitch Matsumoto?

20  A.  Yes.

21  Q.  Are you ultimately the supervisor for Special Agent

22  Supervisor Graham?

23  A.  Yes.

24  Q.  Have you ever worked as an instructor in any law

25  enforcement techniques?

1  A.  Yes.

2  Q.  Would you describe briefly that experience?

3  A.  I taught at the San Diego Sheriff's Academy for about four

4  years.  I believe around 1998 to 2002 or so, and I taught

5  criminal -- excuse me, I taught interview and interrogation

6  and preliminary investigation and occasionally ethics.

7  Q.  At the Bureau of Firearms, have you articulated a concept

8  known as "Time Equals Safety"?

9  A.  Yes.

10  Q.  Will you please explain what that concept is.

11  A.  The more time that we have to do a quality background

12  check, the better the public safety so that we can ensure that

13  we're not allowing any prohibited person to possess a firearm.

14  Q.  Is there a staff at the Bureau of Firearms that performs

15  the background checks on a prospective firearms purchasers?

16  A.  Yes, we have a unit that does that.

17  Q.  Do you know roughly how many people work in that unit?

18  A.  All told, somewhere probably between 28 and 30, that's

19  including management, admin staff, and then our analysts and

20  supervisors.

21  Q.  You've heard of the term, a "DROS application"?

22  A.  Yes.

23  Q.  What is a DROS application?

24  A.  It's an application from an individual to purchase a

25  firearm and allows us the opportunity to do a background check

1    on them.

2    Q.   So the Bureau of Firearms processes the DROS applications?

3    A.   Yes.

4    Q.   Do you know how many DROS applications the Bureau of

5    Firearms processed last year?

6    A.   I believe it was 960,179.  I might be off by a number or

7    two.

8    Q.   And do you have the figure for the prior year 2012?

9    A.   It was 817,248, I believe, give or take a few.

10   Q.   Is the staffing that you have to process the background

11   checks enough that the work can get done in a 40-hour week by

12   your staff?

13   A.   No.

14   Q.   Does your -- well, is there a name for the people that do

15   the background checks?  Do they have a job title?

16   A.   Are you talking about their specific job title or just the

17   unit?

18   Q.   The job title of the individuals.

19   A.   Usually they are Criminal Identification Specialists, and

20   their classification is a II based on their level of

21   expertise.

22   Q.   Have you ever heard that position referred to by just the

23   abbreviation CIS?

24   A.   Yes.

25   Q.   Do the CIS's work overtime?

1   A.   Yes.

2   Q.   Do you know how much overtime?

3   A.   Depends on the employee.  I have a set minimum that they

4   need to work on a monthly basis in order for us to keep our

5   heads above water.  But there are a number of analysts that

6   work well in excess of 100 hours of overtime a month.

7   Q.   You're the manager of those folks ultimately; correct?

8   A.   Yes.  I'm responsible for them.

9   Q.   Why are you having people work so much overtime?

10  A.   We have high volumes for the DROS applications.

11  Q.   Can you just bring in temporary CIS's when they are --

12  when there's a backlog of work?

13  A.   No, you cannot.

14  Q.   Why not?

15  A.   Through the process of just the state hiring, our

16  background checks that we do on the -- on our individual

17  employees before we employ them at the Bureau of Firearms as a

18  full -- not a criminal background check, but investigative

19  employment background check is an investigation on top of just

20  the time that it takes to train an individual, that can be

21  anywhere from four to nine months, depending on the

22  individual, for really they're qualified to do those checks,

23  and we feel comfortable allowing them to do them.

24  Q.   If you had an extra large sum of money, say, an extra

25  billion dollars just to hire and train CIS's, would you be

1    able to perform -- get all the background checks to perform

2    instantaneously or nearly instantaneously?

3    A.   No.

4    Q.   Why do you say that?

5    A.   There's still a wide variety of information that we have

6    to pull, and we talk about a background check, it sometimes

7    can be a background investigation.  If an individual has an

8    open disposition on an arrest, whether it's a recent arrest or

9    one a couple years old, and that disposition would be

10   prohibited if they were either convicted or pled guilty to

11   that charge, we have to chase down the disposition.  That's

12   just one of the issues.  We have to contact the courts and get

13   them to provide us that information.  That has proved very

14   challenging over the past several years.  We have to decipher

15   people's names because they're not always using the same name,

16   so we have aliases issues in order to find out about.

17            Mental health hospitals, when they send us the

18   information, they send us the information that they are

19   provided by the patient at that time.  But oftentimes when the

20   patient is coming in, they're not in their right mind.  That's

21   why they're in that facility.  And oftentimes when they're

22   leaving, they might be prescribed a number of drugs.  That

23   also might make them a little less lucent, so it's a problem

24   getting their names.  We have to decipher that.  They have to

25   contact that facility and make sure that we're not giving a

1   prohibited person a firearm and ensuring that the person is

2   not prohibited.  We make sure they're approved as well.  So

3   it's just not as easy as checking a box in order to do a

4   quality background check that we feel is in the public's best

5   safety sense.  It takes time to do that.

6          On top of it, we can't control the volume that comes

7   in.  Some days we get 1500.  There's been days we've gotten

8   10,000.

9   Q.  If the Bureau of Firearms was ordered to do an

10  instantaneous background check or near instantaneous

11  background check, how would that sync up with your philosophy

12  of time equals safety?

13  A.  We could do it.  It would be a very poor quality

14  background check.  We wouldn't have the time to check our work

15  and make sure that we're ensuring that people who are

16  prohibited don't possess a firearm.  It just wouldn't be very

17  quality, and it wouldn't be the -- it would be -- in my terms

18  kind of a crappy background check for California, and we'd be

19  allowing prohibited people to get a gun.

20  Q.  Are you familiar with the term "CCW?"  Actually let me

21  back up a second.

22          You spoke about people admitted to mental health

23  facilities maybe not giving correct identifying information

24  upon intake.  What's the basis for that knowledge that you're

25  claiming?

1   A.   I was a police officer for roughly 11 years on the

2   streets.   I've dealt with people with mental illness a

3   majority of that time.   Besides the social issues with that

4   and how we need to take care of them, they can pose a threat

5   to themselves or others at times.   You know, sometimes they

6   think they're the devil.   Sometimes they think aliens are

7   invading their body.   There's ones that think they have robots

8   inside their body.   They're giving names that aren't their

9   true person because they have some serious mental health

10  issues.   When we take them to the facility to be evaluated,

11  again, that evaluation takes some time by the doctors and the

12  staff there.   And then depending on when they're released and

13  what drugs they might be under in order to control the

14  psychosis, again, can interfere with their memory, you know,

15  just being lucent or not at that time.

16  Q.   Do you have an understanding of what the law is for

17  whether a person who has been on a mental health hold may

18  possess or acquire a firearm?

19  A.   There's roughly a five-year prohibition for a California

20  5150.   Also for a 5250, it's also a five-year prohibition in

21  California.   However, under federal law, that 5250 is a

22  lifetime prohibition.

23  Q.   What is a 5150?

24  A.   When someone who has been in a mental institution for

25  about 72 hours for evaluation, and under 5150 of the Welfare

1    and Institutions Code, that outlines.  If they're in there for

2    that time frame, and the facility believes they're a danger to

3    themselves or others, they would have what's called a 5150

4    placed on them.

5    Q.  If a person is a 5150, they're prohibited from having a

6    firearm under California law?

7    A.  Correct.

8    Q.  Are they prohibited from having a firearm under federal

9    law?

10   A.  Not under 5150, no.

11   Q.  Now, I'd like to move on to the questions about CCW's.

12   Have you heard the term "CCW" in the course of your work?

13   A.  Yes.

14   Q.  What's your understanding of what a CCW is?

15   A.  In laymen's terms, it's a permit to carry a concealed

16   weapon.  Normally a firearm.

17   Q.  Does the Bureau of Firearms issue CCW's to citizens?

18   A.  No, we do not.

19   Q.  Do you know what agency or agencies issues CCW's?

20   A.  Local Sheriff's Departments and police departments.

21   Q.  Is the Bureau of Firearms involved in any way in the

22   application for a CCW?

23   A.  Yes.

24   Q.  How?

25   A.  Depending on the county, depending on the City.  Normally

1   when they start the process to obtain a CCW, at some point

2   during that process, they need to have fingerprints taken and

3   sent to the Department of Justice to do a background check on

4   them.  We determine whether the person is prohibited or not

5   prohibited and forward that to the licensing agency along with

6   the copy of their California criminal history.

7   Q.  Does the Bureau of Firearms communicate to law enforcement

8   agencies that there's any kind of expiration date or time

9   period within which the check that you've done is valid?

10  A.  Like with our other processes, when we clear someone to

11  purchase a firearm, stating they're not prohibited, you

12  normally have 30 days.  That background check is good for 30

13  days.

14  Q.  And is it the case, to your knowledge, that the other law

15  enforcement agencies always issue the CCW's within that 30-day

16  window?

17  A.  I would say it's rare that they issue that license within

18  the 30-day window.

19  Q.  Do you know about the length of time it takes for the CCW

20  to issue?

21  A.  It really depends on the agency, but some agencies are as

22  far as nine months after we've done the background check, that

23  they're issuing the CCW permit to the citizen.

24  Q.  If a person has a CCW, does that entitle the person to

25  purchase a firearm without going through the 10-day waiting

1  period?

2  A.  No, it does not.

3  Q.  If a person has a CCW, does that entitle the person to

4  purchase a firearm without going through a background check?

5  A.  No, it does not.

6  Q.  Doesn't the fingerprinting and the background check that

7  the Bureau of Firearms did when the person applied count for

8  the length of the CCW?

9  A.  No, it does not.

10  Q.  Are you familiar with the California Penal Code?

11  A.  It's very large, but, yes.

12  Q.  In the course of doing the background check, is there a

13  check for whether the applicant is a trustworthy person?

14  A.  I don't believe that's in the Penal Code.

15  Q.  Is trustworthy person, is that a criteria that is measured

16  in the background check?

17  A.  Not the background check, no.

18  Q.  Do you understand that there is a firm definition in

19  criminal law of what a trustworthy person is?

20  A.  I'm not aware of that.

21  Q.  Are you aware that there are statutory exemptions to the

22  Waiting-Period Law?

23  A.  Yes.

24  Q.  I'd like to -- well, are you knowledgeable about the

25  different exemptions?

1   A.   For the most part, yes.

2   Q.   I'd like to ask you questions about the various

3   exemptions.

4        Are you aware that there is an exemption to the

5   waiting period for peace officers?

6   A.   Yes.

7   Q.   Do you know why there is an exemption for peace officers?

8   A.   It's designed so they can get their duty weapon that they

9   need to perform their duties.

10  Q.   Is a peace officer subject to a background check on, you

11  know, joining a police academy?

12  A.   A somewhat extensive background check, yes.  I mean, they

13  have psychological examinations, a polygraph examination.  The

14  background check that they do is more of a background

15  investigation into who they are, what they are, going back to

16  high school, college, checking their neighbors, past

17  employers, friends, family, girlfriends, boyfriends, and we

18  need to know what type of a character we're going to give that

19  authority to.

20       Top of that, if they are hired by the agency, they

21  have anywhere between 600 and 900 hours of training in an

22  academy.  Once they graduate there, they can have anywhere

23  from six months and a year of field training before they're

24  actually let out by themselves as a peace officer and then

25  constantly supervised by the agency.

1  Q.  Is the background -- the background investigation that you

2  mentioned, is it just the same as what a person going through

3  a DROS application background check goes through?

4  A.  No, apples and oranges.

5  Q.  Are you aware that there are exemptions for firearms

6  dealers from the Waiting-Period Law?

7  A.  Yes.

8  Q.  Why are firearms dealers exempt from the Waiting-Period

9  Law?

10  A.  Well, just the level of regulation that they're under, not

11  only from California, from DOJ, but also from ATF, the federal

12  firearms license.  They have to apply for federal firearms

13  license from the ATF.  Once that process has been completed

14  and they've been given that license, then they can apply for a

15  Certificate of Eligibility or COE from DOJ.  Again, that isn't

16  fingerprint-based alone.  More intensive of a background check

17  than would be done on DROS.

18        Top of that, they're heavily regulated at their place

19  of business.  For instance, any time during their normal

20  business hours, either ATF or DOJ can inspect that premise,

21  and they can't stop us from doing that.  That's part of

22  running that business and part of having those licenses.

23  Q.  Are you aware of an exemption to the Waiting-Period Law

24  for dangerous weapons permits holders?

25  A.  Yes.

1  Q.  Why is there such an exemption?

2  A.  Normally most dangerous weapons holders, permit holders,

3  oftentimes they're also FFL holders and COE holders, normal

4  firearms dealers in California, or they have some type of

5  contracting or business with the federal government.  So

6  they've gone through an intensive security check through them

7  as well.  We do the check, and we just don't do a background

8  check on them.  We actually do a background investigation very

9  similar to what we do for a peace officer.  We talk to them,

10  we talk to their neighbors, their business neighbors, we talk

11  to their family.  We talk to ex-wives, current wives,

12  boyfriends, relatives, to get somewhat of a knowledge about,

13  one, why they need that permit, and who they are because we're

14  giving them some great responsibility with that permit.

15        Again, they're heavily regulated by both DOJ and ATF

16  if they have an FFL, and they have constant supervision.  On

17  top of that, we inspect their premises and their firearms

18  regularly to make sure they're in compliance.

19  Q.  Is the background investigation that a person goes through

20  to get a dangerous weapons permit the same as for a person

21  submitting a DROS application to purchase a firearm?

22  A.  No, far more intensive.  I could actually add all

23  Dangerous Weapons Permits that are approved by the department

24  are approved by me, so I see all those and approve those.

25  That's a little bit different than most DROS applications.

1    Q.   There are peace officers in the Bureau of Firearms;

2    correct?

3    A.   Correct.

4    Q.   If a peace officer seeks to exercise the exemption, the

5    Waiting-Period Law exemption, is there anything that a peace

6    officer has to do, or can they just go to a gun store, flash

7    their badge and walk out with a gun?

8    A.   They have to request that letter through their chain of

9    command all the way up to my boss, which is the director of

10   the divisional law enforcement, and I have to make a

11   recommendation to him or her at the time.  If I approve of

12   that agent or that peace officer, I give him that exemption.

13   Q.   Do you routinely approve those applications?

14   A.   I have never approved one.

15   Q.   I'd like to move on to discuss another exemption.  Have

16   you heard that there is an exemption for people who hold a

17   curio and relic firearm permit?

18   A.   Yes.

19   Q.   What is a curio and relic firearm?

20   A.   One that is on the ATF's list of curio and relic firearms,

21   and that is normally 50 years older or old.

22   Q.   If a person has a curio and relic permit, has that been

23   obtained from the State of California?

24   A.   Partially from the State and partially from ATF, I

25   believe.

1    Q.  What are the agencies involved in granting this permit?

2    A.  Both DOJ and ATF, and, again, they have a Certificate of

3    Eligibility listing them as a curio and relic dealer.

4    Q.  Are you aware of the general availability of curio and

5    relic firearms in California?

6    A.  Roughly, yes.

7    Q.  Are curio and relic firearms as readily -- well, sorry.

8         Are you aware of the general availability of firearms

9    that are not curio and relic firearms in California?

10   A.  Yes.  There's roughly over 1900 dealers in California that

11   sell firearms.

12   Q.  Are curio and relic firearms as readily available as other

13   kinds of firearms?

14   A.  Generally, no.  Again, it's a small segment of firearm

15   purchases.  And it's based upon their age, their historical

16   value, maybe who possessed them before.  You know, whether it

17   was used in combat, let's say, like a Colt 1911.  And just

18   even though there are guns that are still out there, not a

19   large percentage of them come into the market for resale.

20   Q.  Are you aware of whether there are variations in the

21   quality of curio and relic firearms?

22   A.  Yes.  You could equate it to like vehicles compared to --

23   there's different qualities of T-Birds going all the way back

24   to 1957.  The better quality that it is, the more it can

25   command on the market as a price.

Lindley - D

466

1  Q.  Is it common to find a 50-year-old firearm in mint

2  condition?

3  A.  Common, no, but they're out there.

4  Q.  I'd like to move on to discuss another exemption.  Are you

5  aware of whether there is an exemption for the Waiting-Period

6  Law for gunsmiths?

7  A.  Yes.

8  Q.  What is a gunsmith?

9  A.  I guess in laymen's terms would be an individual with

10  training to work on firearms.  I would equate it to a very

11  good mechanic for a vehicle.

12  Q.  And gunsmiths are licensed by some entity?

13  A.  They're licensed by ATF.

14  Q.  Does the State of California license gunsmiths?

15  A.  I don't believe that we do.

16  Q.  Why is there an exemption for gunsmiths from the

17  Waiting-Period Law?

18  A.  They take in firearms from individuals, and under

19  California law, a firearm can be loaned to an individual up to

20  30 days, but oftentimes a gunsmithing process, depending on

21  what the individual wants done with that firearm and how

22  quickly the gunsmith can do it might take, 30, 60, 90 days.

23  So during that process, they would kind of be in violation of

24  California law.  Therefore, if we have an exemption for them,

25  again, the -- they've gone through the background passes with

1    ATF, and they're regulated by ATF, and that's part of their

2    business in order to bring in firearms to do work on them.

3    Q.  Like to move on to discuss another exemption.  Have you

4    heard of an exemption for firearm wholesalers?

5    A.  Yes.

6    Q.  Why are firearm wholesalers exempt from the Waiting-Period

7    Law?

8    A.  Again, very similar to regular firearm dealers is they're

9    transacting firearms back and forth, and they're regulated and

10   licensed not only by ATF, but by California DOJ as well.

11   They're open to inspection on other premises, they have to go

12   through certain processes in order to transfer those firearms,

13   so it's a regulated process for both what would be a normal

14   DROS application.

15   Q.  If a wholesaler wants to stop the Bureau of Firearms from

16   doing an inspection, can a wholesaler do that?

17   A.  Not during their normal business hours.

18   Q.  Does the Bureau of Firearms have to preannounce that

19   they're doing an inspection of a wholesaler?

20   A.  No, we do not.

21   Q.  I'd like to discuss another exemption.  Have you heard of

22   an exemption from the Waiting-Period Law for target shooting

23   facilities?

24   A.  Yes.

25   Q.  Why -- why does that exemption exist, to your

Lindley - D

468

1    understanding?

2    A.  Well, a lot of the firearm facilities that have --

3    shooting facilities that have firearms on the premises

4    oftentimes have a FFL and a COE in order to sell firearms.  I

5    would harken it towards people coming there, they want to try

6    different firearms and see how they feel in their hands, how

7    they shoot them.  Very similar to how someone wants to

8    purchase a vehicle, they want to take the car for a test

9    drive.  Kind of the same thing.  They might think they might

10   want a certain caliber, a certain type of a gun.  They can

11   test fire there.  If they don't, they find another one that

12   they do, and the facility can make that sale.

13          On top of that, the guns that they have there for

14   firing can't be taken off the premises.  A lot of facilities

15   oftentimes when a person is doing the shooting, oftentimes

16   that's one-on-one supervision from one of the range masters.

17   Q.  And, Chief, I'd like to ask you about another exemption.

18   Are you aware of whether there is an exemption that applies in

19   the entertainment industry?

20   A.  Yes.

21   Q.  Why is there an exemption for the entertainment industry

22   from the Waiting-Period Law?

23   A.  In order for them to be able to get firearms in use in

24   television movie productions.  But there's a couple of

25   distinctions with them that's far above what normal people or

Lindley - P

469

1  even normal businesses deal with.  One, they've gone through

2  the Dangerous Weapons Permit process normally, a slight

3  variation of the entertainment permit, so we've done a full

4  background on them.  Most of the firearms that they have on

5  the premise that they're using will oftentimes don't fire real

6  bullets anymore.  They've been gunsmithed to fire blank

7  ammunition.  A lot of that deals with the insurance companies

8  that insure these events, the movie industry.  And they have

9  very strict guidelines of what they want on those sets because

10 accidents have happened in the past.

11       So just the regulations that the insurance companies

12 and the movie industry has put on themselves are oftentimes

13 far greater than what we would have placed on them or have

14 placed on them.  But, again, they're subject to inspection by

15 us at any time.

16 Q.  What kind of safeguards are you aware that the movie

17 industry uses that's not necessarily required by state law?

18 A.  Well, I can talk about Universal Studios.  And they have

19 their prop masters that have dangerous weapons permits.  All

20 the stunt actors that would use that firearm also has a

21 Dangerous Weapon Permit.  That's just by their policy.  So

22 when their -- I guess one of the events they have is a

23 *Terminator* ride or a *Terminator* show, the prop master will

24 bring that firearm in a locked safe to the event, hand it to

25 the actor or the stunt person.  They check it, they use it,

470

1    they come back, it's put right back in the safe, locked and

2    taken back to their master safe.  And those firearms cannot

3    fire a regular 9-millimeter bullet.  It's some form of a blank

4    that is firing.  They're very protected because of insurance

5    purposes to ensure they don't have any accidents on the

6    facility.

7    Q.  You're aware that the background checks that the Bureau of

8    Firearms does sometimes lead to the denial of firearm

9    purchases; correct?

10   A.  Correct.

11   Q.  Does the Bureau of Firearms -- do they do any work

12   retrieving firearms that are in the hands of prohibited

13   people?

14   A.  We have our Armed Prohibited Person System.

15   Q.  In terms of public safety, is it preferable to have one

16   versus the other?  Is it preferable to stop the release of a

17   firearm to a prohibited person, or is it preferable to

18   retrieve a firearm from a prohibited person?

19   A.  It's always far easier, cheaper, and in the public's best

20   interest to prevent a prohibited person from possessing a

21   firearm in the first place.  Retrieving a firearm from

22   someone, especially, let's say, they have some mental health

23   issues, can be a very dangerous event for the public, for the

24   agents, or the officers that are allowed to do that, and for

25   the individual that's prohibited.

471

1  Q.  Are there any examples of where California's background

2  check system has prevented firearms from being released to

3  prohibited persons that you're aware of, any specific

4  instances?

5  A.  There are thousands of them, there's a couple that come to

6  mind as far as notable instances that happened within the last

7  couple years.

8  Q.  Please describe those instances.

9  A.  I believe his name is John Bedell, B-E-D-E-L-L.  He was

10  the Pentagon shooter back in March.  I believe he did the

11  shooting at the Pentagon early March of 2010.  That individual

12  was a California resident.  He tried to purchase a firearm, I

13  believe, in January of that year here in California.  That

14  purchase was denied because -- and he had some prohibitions.

15  Unfortunately, after that denial, he drove to Las Vegas and

16  purchased actually two handguns from a private dealer in

17  Las Vegas at a gun show, then drove out to Arlington, Virginia

18  and conducted the shooting at the Pentagon.

19      One of far more recent is the individual who shot

20  several people at the Santa Monica College.  Again, I believe

21  his name was John Zawahri, Z-A-W-A-R-I, I believe.  He tried

22  to purchase a handgun in California as well and was denied

23  because he had several firearm prohibitions.  Unfortunately,

24  he was able to obtain a gun illegally and conduct the shooting

25  at the college.  So those are the two instances where

1    California law prevented it.  They chose to get guns in other
2    illegal means, sometimes from another state.  But our process
3    worked in stopping a prohibited person from possessing a
4    firearm.
5    Q.  You're aware -- you testified that there are approximately
6    960,000 DROS applications processed by your bureau in 2013;
7    correct?
8    A.  Yes.
9    Q.  Do you know how many denials were issued?
10   A.  74' or 7500, roughly.
11   Q.  Do you know if any people who have been denied were second
12   time or subsequent purchasers; in other words, it was not the
13   first attempt to purchase a firearm?
14   A.  I know that it has happened, but it has been brought to my
15   attention.  I just can't remember the particular instances,
16   but that does happen.
17          When somebody is denied a firearm purchase because
18   they're prohibited, one of the things that DOJ does is we
19   notify the local jurisdiction that the gun purchase or the
20   attempted gun purchase was made in -- on top of contacting the
21   DA's office of that county, notifying them of that purchase,
22   or that attempted purchase took place, and that that is a
23   crime.
24          THE COURT:  All right, it's 12:00.  We'll take our
25   noon recess.  1:30 this afternoon.

1      MR. EISENBERG:  I actually only have one more

2   question.

3      THE COURT:  We'll finish up at least direct exam.

4   BY MR. EISENBERG:

5   Q.  If the waiting period were reduced from 10 days to a

6   smaller number, say, three days, zero days, would there be the

7   same number of denials in 2013?

8   A.  I believe denials would go up, denials could go down,

9   depending on what information we're able to obtain in three

10  days.  For instance, if someone -- if as I say goes down to

11  three days, someone purchased a firearm on Friday afternoon at

12  6:00, and they had an open disposition on an arrest, or they

13  had some type of 5150 that we needed to check information on,

14  we can't get to that information on Saturday or Sunday because

15  those businesses are closed, the courts are closed.  If the

16  Court is dark on Monday, we wouldn't be able to check at all

17  before the three 24-hour periods.  So we would not be able to

18  do an accurate or thorough background check because we just

19  don't have the time to do it because we rely on information

20  from other entities in order to make a good determination.

21  Q.  So would more guns go to prohibited persons on a

22  background check, or would you catch more people with a

23  shorter background check, a shorter waiting period?

24  A.  I look at it like this:  Time equals safety.  The longer

25  we can do a background check, and I think 10 days is a very

1   adequate time for to us get through a majority of those

2   background checks.  Anything lower than that, it's very

3   difficult for us to be able to contact the entities that we

4   need to do to determine whether somebody is prohibited or not

5   prohibited.

6           MR. EISENBERG:  I have no further questions for this

7   witness at this time, Your Honor.

8           THE COURT:  All right.  Okay, we'll take our noon

9   recess, 1:30 this afternoon.

10          THE WITNESS:  Thank you, Your Honor.

11          (Noon recess.)

12                      **AFTERNOON SESSION**

13          MR. EISENBERG:  Your Honor.

14          THE COURT:  All right, back on the record.

15          MR. EISENBERG:  Your Honor, during the break, I

16   realized that I might have a few more questions for the

17   witness.  I spoke with plaintiffs' counsel.  He said I could

18   just finish up and then -- is that all right with you?

19          THE COURT:  Oh, sure.  Fine.  Continue on with direct

20   examination.

21   BY MR. EISENBERG:

22   Q.  Good afternoon, Chief Lindley.

23          Have you heard of a term "refresher" in connection

24   with the background check?

25   A.  Yes.

1    Q.   What's your understanding of that term?

2    A.   Basically as the -- our DROS entry system gets the

3    information from the dealer, it's forwarded to our DROS

4    system.  A background check, electronic background check is

5    done at that time, so an analyst can analyze information to

6    see what actual work needs to be done.  That's usually done

7    day one, let's say.

8            Sometimes the analyst might not get to that

9    information for several more days.  Before they start their

10   background process, they will refresh that information to make

11   sure that any information that maybe came in in the past three

12   or four, five days is refreshed, and we have the best

13   information possible in order to start the background process

14   with.

15   Q.   Are you familiar with the system known as APPS, A-P-P-S?

16   A.   Yes.

17   Q.   Are you aware that APPS is a database system?

18   A.   It is a system that relies on information from other

19   databases, yes.

20   Q.   Okay, relies on information from other databases?

21   A.   Yes.

22   Q.   Do you know what databases APPS pulls its information

23   from?

24   A.   It uses our CFIS, AFS information to identify individuals

25   that have legally purchased firearms at one time or registered

1  assault weapons since 1989.  Then it compares that information

2  to the department's mental health system, our commission on

3  the Restraining Order System, the wanted persons system, and

4  our criminal history system.

5  Q.  Have you heard of a term called BFEC in your work at the

6  Bureau?

7  A.  Yes.  Our Basic Firearms Eligibility Check.

8  Q.  Are there databases consulted in a BFEC?

9  A.  Yes, basically the same ones, however, we also check the

10  National NICS system as part of BFEC.

11  Q.  Does the APPS database pull from NICS?

12  A.  No.  It is not allowed to.

13  Q.  Why is it not allowed to?

14  A.  I believe under federal law, that's not one of the uses

15  for a NICS check.

16  Q.  In your work either as a police officer or at the Bureau

17  of Firearms, have you ever come across a situation where one

18  family member wants to take firearm -- firearms away from

19  another family member who may be acting erratically or

20  depressed?

21  A.  Yes.  That happens a little more often as of late,

22  especially dealing with our soldiers that are returning from

23  Iraq and Afghanistan, and if that they have certain PTSD, or

24  Posttraumatic Distress Disorder.

25          MR. KILMER:  I object to this point, Your Honor, this

1    entire line of questioning.  Is the witness testifying as to

2    his own personal experience, or is he testifying to newspaper

3    articles he's read?

4             THE COURT:  All right.  Foundation?

5             MR. EISENBERG:  Okay.

6             THE COURT:  Sustained.  Foundation.

7    BY MR. EISENBERG:

8    Q.  Have you had any personal experience with the scenarios

9    described?

10   A.  Yes.

11   Q.  What's the basis of those experiences?

12   A.  They were forwarded to my telephone number, and I talked

13   to these family members personally.

14   Q.  In what capacity were you speaking to them?

15   A.  As the Chief of the Bureau of Firearms and as a police

16   officer, a human, someone they can turn to for some

17   assistance.

18   Q.  Is there anything that law enforcement is authorized to do

19   in a situation like that?

20   A.  Well, if an individual wants to surrender firearms for

21   safekeeping to law enforcement, they're allowed to do that.

22   And oftentimes, these citizens are doing that.  Oftentimes,

23   it's a wife or close family member that wants to get the

24   firearms out of the house until that individual, their loved

25   one can seek treatment through the VA system for their PTSD

478

1    that they sustained as a cause of the war.

2           They oftentimes tell me that, you know, they're not

3    going to commit suicide by taking pills, you know, jumping to

4    death, suffocating themselves or hanging themselves, but

5    because they're very familiar with firearms, they will shoot

6    themselves.  And they oftentimes quote the data, I think that

7    was a 2012 data, that the military especially the U.S. Army

8    was sustaining more losses through suicide, returning soldiers

9    than they were going through on --

10          MR. KILMER:  Objection.

11          MR. EISENBERG:  Let him finish his testimony.

12          THE COURT:  Well, hold on.

13          MR. KILMER:  The witness is testifying as an expert

14   now regarding mental health issues, Your Honor.

15          THE COURT:  Sustained.  Rephrase the question.

16   BY MR. EISENBERG:

17   Q.  Was the entire testimony stricken or just part of it,

18   Your Honor?

19          THE COURT:  Well, just for clarity, I'll strike the

20   entire last answer.  Go ahead and rephrase and restate the

21   question.

22   BY MR. EISENBERG:

23   Q.  What, if anything, can law enforcement do in a situation

24   like that where one family member wants to take guns away from

25   another family member?

1   A.  Well, in a case of a husband or wife, identify it as
2   community property so they can surrender those firearms to law
3   enforcement for safekeeping.
4           MR. EISENBERG:  I have no further questions at this
5   time.
6           THE COURT:  And cross-examination.
7           MR. KILMER:  Thank you, Your Honor.
8                       CROSS-EXAMINATION
9   BY MR. KILMER:
10  Q.  Good afternoon, Mr. Lindley.  Is it Director Lindley?
11  A.  It's Chief Lindley.
12  Q.  Chief Lindley, I'm sorry.
13          You testified earlier that when it comes to
14  regulating the sale of firearms, timing was safety.  Am I
15  accurately remembering your testimony?
16  A.  Yes.
17  Q.  Does that mean also more time equals more safety?
18  A.  I think there's a limit in order of what time frame we can
19  do the background check.  Oftentimes, we have to delay a
20  purchase for longer than the 10 days because we're trying to
21  trace down the disposition.  At one point, we can do that for
22  a much longer period.  Recently under current California law,
23  we can only now do that for 30 days.
24  Q.  All right.  So sometimes on one side of the equation, you
25  need more time in order to get to more safety.

1    A.   In order for us to make an accurate determination about

2    the person's status, yes.  It does take longer at times.

3    Q.   But the equation you gave us was time equals safety.

4    A.   In my opinion, it does.

5    Q.   Okay.  Is there such a thing as too much safety?

6    A.   I would say no.

7    Q.   So then how would you do a balancing test between time and

8    safety if there's not too much safety?

9    A.   Don't understand your question.

10   Q.   I mean, for example, you cited recent legislation that

11   allows you to delay a sale for up to 30 days.

12   A.   Correct.

13   Q.   To conduct further investigations.

14   A.   Correct.

15   Q.   Is 30 days always enough?

16   A.   No.

17   Q.   Is 60 days always enough?

18   A.   No.

19   Q.   Ninety days?

20   A.   That percentage, it's getting very small at that point,

21   but there are times where it takes longer than 90 days, yes.

22   Q.   What's the longest it's ever taken to complete a

23   background check?

24   A.   I believe we had ones that took as long as 12 to 16

25   months.

1   Q.  At what point does that become not just a delay, but

2   actually a denial of the right?

3         MR. EISENBERG:  Objection.  Vague and ambiguous,

4   calls for a legal conclusion.

5         THE COURT:  Sustained.

6   BY MR. KILMER:

7   Q.  Would it be fair to say that a goal of your background

8   check system and the 10-day waiting period system is to

9   hopefully get to almost a perfect record of denying people who

10  are not entitled to have guns?

11  A.  Okay, that was a little bit of a spin.  Maybe you can

12  clarify that.  I'm not exactly sure what you're asking.

13  Q.  I mean, for example, do you have any statistics on your

14  accuracy rate?  Are you denying 90 percent of unlawful

15  purchases?

16  A.  We have a percentage of people that we deny on an annual

17  basis.  We have that statistic.  I think he said earlier 7400

18  to 7500 last calendar year.

19  Q.  All right.  And that was against more than 900,000

20  approved sales?

21  A.  No, that was against 960,179 total sales.

22  Q.  All right.

23  A.  So you subtract that down, you're looking at somewhere

24  around 953,000, 152,000.

25  Q.  So would it be fair to say that less than 1 percent to

Lindley - X

482

1    have DROS applications resulted in a denial?

2    A.  If you look historically, it's right around 1 percent.

3    Some years it goes up slightly maybe to 1.1, 1.2 percent.

4    Other times it goes as low as .7 percent.  Looking at now last

5    year, somewhere between .7 and .8 percent.

6    Q.  All right.  Do you keep any statistics on mistakes made by

7    the system, for example, where a firearm was approved, and the

8    10-day waiting period lapsed, and there was a mistake?

9    A.  We keep those.

10   Q.  How many times has that happened?

11   A.  More than I would like it to.  Probably looking at about

12   10, 12 times a year.

13   Q.  So very small?

14   A.  It is very small.

15   Q.  So you'd characterize your system as pretty reliable?

16   A.  I would hope to be.  We want it to be absolutely reliable,

17   but we do have a human factor and a lot of information.

18   Q.  All right.  And that was the point of my earlier question

19   is that your goal as administrator of this system is to get to

20   where you're not falsely denying, and you're not falsely

21   approving sales?

22   A.  Absolutely.  I mean, I want to be in a zero failure

23   business.

24   Q.  All right.  But right now, you're pretty close to that if

25   you're only making a mistake of approving a sale -- I mean, if

1    you deny or delay a sale, the worse thing that happens is

2    somebody doesn't get a gun?

3    A.   Yes, and there's an appeal process for that because there

4    are times where we didn't get all the pertinent information,

5    and they have an appeals process for that.

6    Q.   But from a public safety perspective, the bottom line is

7    one gun has been kept off the street.  One person's rights may

8    need to still be further adjudicated, but one gun has been

9    kept off the street in a potentially dangerous situation.

10   A.   Yes, as far as the information we had, we denied that

11   purchase.

12   Q.   And a very minuscule, maybe 10 or less per year against

13   the background of sometimes a million sales a year, do you

14   accidentally approve a sale that shouldn't have been?

15   A.   That should have been denied?

16   Q.   Yes.

17   A.   Yes, that happens.

18   Q.   There are some exceptions to the waiting period, and you

19   testified about those earlier.  Are you aware of any exception

20   for a victim of domestic violence to obtain the means of

21   self-defense immediately after being a victim of domestic

22   violence?

23   A.   Either purchasing a gun or being able to obtain a gun

24   through other means?

25   Q.   To purchase a gun through your system.

1   A.   No.

2   Q.   So they would still have to wait the 10 days?

3   A.   They would have to wait the 10 days.

4   Q.   Or perhaps get somebody to loan them a gun?

5   A.   Correct.

6   Q.   And that would be legal under California law as long as

7   the loan didn't exceed 30 days?

8   A.   Correct, and the person believed that the person they were

9   loaning the gun to was not prohibited.

10  Q.   Okay.  So in that circumstance where somebody might have

11  an actual threat of violence against them based on, you know,

12  the arrest of the person who perpetrated the violence would

13  have somebody loan them a gun for a short period of time, and

14  that's kind of done on the honor system?

15          MR. EISENBERG:  Your Honor, I want to object to this

16  line of questioning as all hypothetical.

17          THE COURT:  All right, sustained.  But obviously

18  within his personal knowledge would be acceptable.

19          MR. KILMER:  I'll withdraw the question.

20  BY MR. KILMER:

21  Q.   You were remarkable with your numbers.  The year 2013, you

22  said there were 900-and-some thousand.  You actually had an

23  actual number.

24  A.   960,179, give or take a few.

25  Q.   Okay.  And those were approvals that went through the full

Lindley - X

485

1   process?

2   A.   Those weren't approvals, those were DROS's that went

3   through the process.

4   Q.   DROS's that went through the process.   And what would be

5   the number of ones that were actually approved?

6   A.   Well, you would subtract out the 74, 7500 from the

7   960,179, and that should roughly give you the number.   I don't

8   have the exact amount of the denials, but it's right around

9   that amount for, again, calendar year 2013.

10  Q.   Okay.   So maybe 940,000 if we just round off?

11  A.   It would be more like 950,000, but --

12  Q.   Okay.   So 950,000 approvals, lawful sales that went

13  through the 10-day waiting period and the background check.

14  A.   Again, we still had some delays as well during that.

15  Q.   Sure.

16  A.   But, yes.

17  Q.   These were people who got their guns.

18  A.   Yes.

19  Q.   All right.

20  A.   Those are approved DROS's.

21  Q.   All right.   And the bulk of them only waited 10 days, and

22  some of them may have waited a little bit longer based on the

23  new system.

24  A.   Not necessarily in the new system.   Oftentimes, it was

25  trying to track down information, usually on an open

Lindley - X

486

1    disposition or some issue about the name within the health

2    system.

3    Q.   Okay.  So that was approximately 950,000 times that

4    California citizens waited 10 days to get their lawfully

5    purchased firearms.

6    A.   Yes.

7    Q.   So that was approximately 9,500,000 days that Californians

8    collectively couldn't use their firearms that were eventually

9    lawfully turned over to them.

10            MR. EISENBERG:  Objection.  Argumentative.

11            THE COURT:  Sustained.

12   BY MR. KILMER:

13   Q.   You testified earlier about the Department of Justice's

14   involvement with the CCW process.

15   A.   Yes.

16   Q.   In fact, the form for CCW's -- let me back up a minute.

17   CCW's are issued by chiefs of police and sheriffs in the State

18   of California?

19   A.   Correct.

20   Q.   All right.  And, however, the permit or at least the

21   application is required to be created by the Department of

22   Justice.

23   A.   It's required to be created by the Department of Justice,

24   but it's also in cooperation with the California Sheriff's

25   Association and the California Police Chiefs Association, the

1    standardized one form and one permit statewide.

2    Q.   Okay.  In other words, the CCW application is a document

3    that the DOJ publishes as an agency, but with input from local

4    Sheriff's.

5    A.   Yes.

6    Q.   And it's a standardized form that's used throughout the

7    State.

8    A.   Yes.

9    Q.   And in order to get a CCW or a license to carry, the

10   person must get a background check?

11   A.   Yes.

12   Q.   They must get a full, all 10-digit fingerprint?

13   A.   Yes.

14   Q.   And that breaks down into -- sometimes it's ink and card

15   depending upon the jurisdiction, but for the most part, we

16   kind of transitioned to live scan?

17   A.   Yes, it's very rare for us to use the old print, rolled

18   cards.

19   Q.   Okay.

20   A.   But it does happen from time to time.

21   Q.   What's the advantage of using live scan?

22   A.   One of the things, just the time and order that it gets

23   from the live scan vendor to the Department of Justice,

24   doesn't have to go through a mail system, and I believe also

25   the accuracy.  The vendor can see right then and there how it

Lindley - X

488

1    looks, and I believe the computer gives it a score on how

2    clear those prints are.  So we don't have the back and forth

3    of the person having to be reprinted time and time again.

4    Q.  Is there any analysis done on these fingerprints?

5    A.  That analysis is done within the Department of Justice and

6    of the Bureau as far as making sure that it's clear and

7    identifiable.

8    Q.  Okay.  Now, when you say clear -- well, clear just means

9    that it's readable.

10   A.  Yes.  Again, I'm not a fingerprint analyst, but just --

11   you can look at it and make sure that you can look at the

12   ridges and make sure that you can have an identification off

13   that particular print.

14   Q.  All right.  And then that particular fingerprint is -- are

15   you familiar with a term called "CII?"

16   A.  Yes.

17   Q.  And what is that?

18   A.  It's basically a number that is given based off of your

19   fingerprint score, and it's going to be a tracking number.

20   Q.  So it would be a unique number assigned to each person?

21   A.  Yes.  I have a CII number based on my fingerprints when I

22   became a police officer.

23   Q.  All right.  And so as long as you're in the system, your

24   fingerprints are forever tied to the CII number; correct?

25   A.  I wouldn't say forever, but by design, we should be in

1  there for a very long time.

2  Q.  Okay.  And what other information is contained in a -- and

3  CII, what does that stand for?

4  A.  I don't know.

5  Q.  Criminal Identification Index?

6  A.  Well, people ask what the rap sheet is, and, you know --

7  but it's -- it's based on a criminal because lots of people

8  who have no criminal history have a CII number because they've

9  given the prints up to be a teacher, boy scout leader, peace

10  officer, an attorney.

11  Q.  All right.  Well, you taught me something I didn't know.

12       And there's other information that's linked to the

13  CII as well as the name and fingerprint; is that right?

14  A.  Yes, oftentimes a person's date of birth, maybe some

15  biographical information, a driver's license, height, weight,

16  that type of information is oftentimes obtained.

17  Q.  All right.  And that information is -- and that

18  information that's collected on the CCW application, in

19  addition to the fingerprints and the designation of a CII

20  number, is that all stored, collected by the Department of

21  Justice?

22  A.  Yes.

23  Q.  Is it stored electronically?

24  A.  Yes.

25  Q.  Does the information on a CCW permit also include things

1  like the firearm that the person is entitled to carry?

2  A.  Are you talking about when they first get their

3  fingerprints rolled or later on when they actually get the CCW

4  print issued to them?

5  Q.  I mean the actual permit when the -- the sheriffs usually

6  issue a permit.  Don't they usually also endorse what firearms

7  the person can carry?

8  A.  Yes, I'm following you?  Yes, it will -- normally it will

9  contain one to several firearms.  Usually the make, model,

10  caliber, and serial number of that firearm.

11  Q.  Now, the information on the firearm, the make, model, and

12  serial number, is that also transmitted to the Department of

13  Justice?

14  A.  It's not transmitted.  The Sheriff's Department, police

15  department send that permit to us, and then we input that into

16  our AFS system.  So you --

17  Q.  Sorry.  I apologize.  I interrupted you.

18  A.  No, that's used when a law enforcement officer pulls

19  somebody over, and they identify that they have that CCW

20  permit, and they want to verify that.  They verify that

21  through our AFS system, and they also verify what firearms

22  that that sheriff is authorized or that police chief has

23  authorized that person to carry as part of that permit.

24  Q.  Okay.  And, in fact, is there some penalty if somebody who

25  even has a concealed license permit is carrying a gun that's

Lindley - X

491

1   not designated on the license?

2   A.  That deals more with the issue and agency, not with what

3   DOJ looks at.

4   Q.  All right.  Do you have any familiarity with the NICS

5   system?

6   A.  Not as much as some of the other people you may have

7   talked to, but I'm very familiar with the system.

8   Q.  All right.  Do you know whether or not the NICS system

9   exempts people with licenses to carry from background checks

10  and waiting periods?

11  A.  I didn't follow you on that.  I apologize.

12  Q.  Does the federal government in its NICS background check

13  exempt somebody who has a license to carry?

14  A.  I don't believe so.

15  Q.  All right.  Does the Department of Justice have any duties

16  with respect to a concealed carry license if it learns that

17  the licensee has become prohibited?

18  A.  Yes.

19  Q.  And what is that duty?

20  A.  We will notify the issuing agency to see how they want to

21  handle it, and if it's a prohibition that we can enforce, we

22  might enforce that as well.

23  Q.  All right.  In fact, I believe the Penal Code requires to

24  you immediately notify the issuing agency.

25  A.  Yes.

Lindley - X

492

1    Q.   Why is that done?

2    A.   We want to take a firearm away from somebody who is

3    prohibited from possessing it.

4    Q.   All right.

5    A.   It poses a threat to public safety.

6    Q.   And how do you learn about that prohibition?

7    A.   We have a system which, in laymen's term, is called a

8    rap-back system.

9    Q.   Can you explain what that is?

10   A.   Based on the person's submitted fingerprints, if their

11   name comes up through the criminal history system as being

12   arrested, that goes into the system and would flag.  So I'll

13   use myself as an example.

14   Q.   All right.

15   A.   Let's say that last night, I was arrested for domestic

16   violence.  Taken down to county jail, my fingerprints were

17   rolled.  This morning, DOJ would have been notified by our own

18   system that I was arrested for domestic violence, which

19   potentially could be a prohibiting offense if I'm convicted or

20   plead guilty to it.  So that allows that agency to take some

21   action, especially since I'm a police officer, maybe to remove

22   me from the field, put me on admin leave, but they're notified

23   of that arrest.

24   Q.   All right.  What's the difference between rap-back and

25   APPS?

Lindley - X

493

1   A.   APPS is -- excuse me, it's just -- can I get some water,
2   please?
3   Q.   Absolutely.  Do you have a cup up there?
4   A.   Yes, there's a cup up here.
5        So the question was what's the difference between
6   rap-back and an Armed Prohibited Person System?
7   Q.   Yes, sir.
8   A.   Rap-back is designed for people that we have fingerprints
9   on.  People that go into APPS, we might not necessarily always
10  have fingerprints on them because they're contained in
11  different databases.  Like our mental health database,
12  restraining order database, or the wanted persons database.
13  Rap-back mainly deals with the people who are in the criminal
14  history system, and the CII number and that information goes
15  in and is part of the criminal history.  So if you ran a
16  criminal history on me, you'll only find that I have the CII
17  number and the two agencies that I used to be employed with.
18  DOJ, which I'm currently, and National City previously.
19  Q.   Okay, so the rap-back system sounds like a smaller
20  database.
21  A.   I don't know about numbers, but it only really checks
22  criminal history.
23  Q.   All right.
24  A.   And our automated criminal history system.
25  Q.   Does the APPS system also access rap-back?

1   A.  I don't believe so because it's designed a different way.

2   Q.  All right.  You testified earlier that a CCW or a --

3   strike that.

4           You're familiar with the term "COE?"

5   A.  Yes.

6   Q.  That's a Certificate of Eligibility?

7   A.  Yes, sir.

8   Q.  And does the person -- does the department have any

9   discretion in issuing COE's?

10          MR. EISENBERG:  Objection.  Lacks foundation as to

11  who issues COE's.

12          THE COURT:  Sustained.

13  BY MR. KILMER:

14  Q.  Does the Department of Justice issue the COE?

15  A.  Yes, the Department of Justice issues the COE based off

16  the result of the fingerprint.  We do have some discretion

17  because it really kind of depends on what they're applying

18  for, and if they completed the other requisite application

19  processes.

20  Q.  And what are the other processes?

21  A.  It depends on what they're getting the COE for, but let's

22  say in this case, they're getting the COE in order to be a

23  firearm dealer.  They would need to have a federal firearms

24  license before they apply for a COE.

25  Q.  All right.  And what are some of the other reasons that

Lindley - X

495

1   somebody might seek a COE?

2   A.   If they -- say, someone in the entertainment business,

3   someone has a dangerous weapons permit because they're dealing

4   as a vendor or a contractor or trainer for military or law

5   enforcement, maybe someone in the high tech industry because

6   they're working on some type of contract for the military.

7   There's others.  Those are the ones that come up to my mind

8   right now.

9   Q.   Does a COE also get a full live scan set of fingerprints?

10  A.   Yes.

11  Q.   Are they also issued a CII number?

12  A.   As part of that fingerprint process.  If they already

13  didn't have one, they would be issued one.

14  Q.   You testified earlier that a CCW is not an ongoing

15  background check process because I believe you said -- because

16  there is no way to know that a person has committed a

17  subsequent act that might be prohibiting.

18  A.   That's correct.

19  Q.   Does the APPS system keep track of people who have

20  concealed carry permits?

21  A.   It is not designed to track CCW permits, no.

22  Q.   May not be designed to, but does it?

23  A.   I don't believe it does.  Other than the firearms that a

24  person might have in their name, and if they do have a CCW

25  permit, that's listed in AFS.  But it's not independently

Lindley - X

496

1  tracking those.

2  Q.  All right.  How -- the APPS system is designed to flag for

3  further investigation people who are suspected to have guns

4  and who become prohibited.  Is that a fair description of the

5  system?

6  A.  I would clarify it a little bit differently, but that's

7  relatively close, yes.  APPS is a pointer system that

8  identifies, compares people who are in our CFIS or AFS system

9  to four databases.  Then the human analysts are based off

10  those triggering events to determine if that's the same

11  person.  And we have that information once a person is

12  identified as potentially possessing these firearms that they

13  purchased at one time legally and have subsequently become

14  prohibited due to several different issues.  Triggering events

15  hits if we identify that as accurate, then the person goes

16  into the APPS system, but APPS is a pointer system, it's an

17  investigative tool for law enforcement.  They still need to do

18  their due diligence off that.  And being in the APPS system

19  isn't probable cause for us to take action on somebody.  We

20  still have to develop the case.

21  Q.  Okay.  But suppose somebody committed a triggering act and

22  went into the APPS system and then applied to purchase a

23  firearm.  Would their Dealer Record of Sale application get

24  flagged or hit?

25  A.  It would get flagged or hit, but not by APPS.  It would

1   get flagged or hit based on their new prohibition and the new

2   background check.

3   Q.   Okay.  So then the APPS system is somewhat redundant.

4   A.   No.  APPS is designed to do exactly what it was supposed

5   to by the legislation.  SB 950 was very specific about what it

6   was supposed to do, and that system was based to do that.

7   It's an investigative tool for law enforcement.

8   Q.   Okay.

9   A.   To disarm prohibited people.

10  Q.   Okay.  Would it be fair to say that the Dealer Record of

11  Sale and background check, background check and waiting period

12  is designed to stop somebody from getting a firearm, whereas

13  the APPS system is designed to go get a firearm from somebody

14  who has become prohibited?

15  A.   That would be very accurate.

16  Q.   Okay.  So that way you've actually covered almost the

17  universe of -- of trying to stop gun crimes, keeping guns out

18  of the hand of bad people and taking them out of the hands of

19  bad people.

20  A.   Prevent people -- prohibit people from possessing them and

21  then taking the guns out of the hands of people who are

22  prohibited.

23  Q.   I use the term "bad people," and you use "prohibited."

24  You're very nice.

25          How often is the APPS system updated?

Lindley - X

498

1    A.   Nightly.

2    Q.   Is that every day of the week or just on business days?

3    A.   I believe it's every day of the week.

4    Q.   So it's a 24/7 or at least every 24 hours way of updating

5    people who are potentially in violation of the law because

6    they may have a firearm and be a prohibited person?

7    A.   Yes.

8    Q.   And then I think there was prior testimony that when that

9    hit or flag happens, that dumps the information for that case

10   into a queue, and then somebody in your -- in your bureau then

11   starts an investigation.

12   A.   Yes.

13   Q.   You testified earlier about some of the statutory

14   exceptions to the 10-day waiting period.  And most of your

15   testimony, if I recall, was based on some of the reasons for

16   the exceptions was that these were highly-regulated

17   individuals or highly-regulated activities, and, therefore,

18   additional waiting periods and background checks weren't

19   necessary.

20        MR. EISENBERG:  Objection.  Misstates the testimony.

21   He did not say the background checks were not done.

22        THE COURT:  Sustained.  Go ahead and rephrase.

23   BY MR. KILMER:

24   Q.   All right, then I'll rephrase the question.

25        That because these persons and activities were highly

1  regulated and inspected on a regular basis, that they did not

2  need to be subject to the 10-day waiting period to receive a

3  firearm?

4  A.   That's how the code reads, yes.

5  Q.   All right.   Are you aware that the 10-day waiting period

6  has been justified on the basis of two reasons:   One is to

7  make sure that only law-abiding people are handling firearms

8  through the background check and the time necessary to do

9  that.   And the other reason for the justification for the

10  10-day waiting period is to stop impulsive violent acts.   Are

11  you aware of that?

12  A.   I would characterize that differently, but I think we're

13  looking at we're trying to prevent prohibited people from

14  possessing firearms, and there's a public safety component to

15  it as well.

16  Q.   Are you familiar with the term "cooling-off period?"

17  A.   Yes, sir.

18  Q.   What does that mean to you?

19  A.   Cooling-off period is a period of time in order for you to

20  be able to gather your emotions so you don't make any

21  impulsive decision.

22  Q.   And the public safety aspect of that is that if we can

23  delay the sale to somebody who we'd have no information about,

24  we might prevent a suicide or other violent act.

25  A.   Yes.   Oftentimes people act impulsively.   This gives them

1  the opportunity to maybe rethink their decisions and also

2  allows us the time to do the background check.

3  Q.  Okay.  But the exception for the waiting period for peace

4  officers to obtain a firearm wouldn't stop a peace officer

5  from committing a violent act with a firearm or an impulsive

6  act, would it?

7          MR. EISENBERG:  Objection.  Assumes facts not in

8  evidence, and it's a hypothetical and an incomplete

9  hypothetical.

10          THE COURT:  Overruled, if you can answer.

11          THE WITNESS:  Would you ask the question again, sir.

12  Sorry.

13  BY MR. KILMER:

14  Q.  Sure.  I understand the rationale behind exempting a peace

15  officer from the waiting period because he doesn't need to

16  perform a background check.  He's considered trustworthy.  But

17  the other reason for the background check for the general

18  population is to impose a waiting period or chilling-off

19  period or chilling out --

20          MR. EISENBERG:  Chilling out?

21  BY MR. KILMER:

22  Q.  Chilling-off period.  Cooling-off period, excuse me.

23          To impose a cooling-off period.  So the exemption for

24  peace officers doesn't permit the imposition of a cooling-off

25  period for a peace officer, does it?

1          MR. EISENBERG:  Objection.  Misstates testimony.

2    There has been no testimony that peace officers do not go

3    through background checks because of the waiting exemption.

4          THE COURT:  Sustained.  Form of the question.

5    BY MR. KILMER:

6    Q.  All right.  For a peace officer who is exempt from the

7    10-day waiting period, and who has obtained all of the letters

8    and all of the procedures and requirements and permissions,

9    the reason why he's exempt from the waiting period is because

10   we don't need to do a background check on him; is that

11   correct?

12         MR. EISENBERG:  Objection.  Misstates the testimony.

13         THE COURT:  Yes, sustained.  I think the distinction,

14   there is a background check, but not done through the system.

15         MR. KILMER:  All right, I'll rephrase the question.

16   BY MR. KILMER:

17   Q.  So the peace officer is subjected to the background check

18   anyway.

19   A.  Yes, they are.

20   Q.  But he's not subjected to the 10-day waiting period.

21   A.  Based on approval from his command, yes.

22   Q.  All right.  So the rationale, the other rationale for the

23   waiting period being the cooling-off period is not applied to

24   the peace officer, is it?

25   A.  No.

1    Q.   Thank you.

2    A.   The question was a little bit -- but, yes, he doesn't, or

3    she doesn't, have to wait the 10 days.

4    Q.   Correct.  So the idea that we're going to prevent a

5    violent or impulsive act by making somebody rethink their

6    actions doesn't get applied to this peace officer who has had

7    the background check, but also has met the other exceptions

8    for the 10-day waiting period.

9             MR. EISENBERG:  Objection.  Assumes that the

10   background check happens instantaneously in this case.

11            THE COURT:  Overruled.

12            THE WITNESS:  If you're talking about police

13   officers, like I described before, they go through a lot more

14   intense scrutiny than the average individual, which includes

15   psychological examinations.

16   BY MR. KILMER:

17   Q.   Do peace officers ever commit suicide?

18   A.   Yes, they do.

19   Q.   Do people with dangerous weapons permits ever commit

20   suicide?

21   A.   Yes, they do.

22   Q.   Do people commit suicides at target-shooting places?

23   A.   Yes, they have.

24   Q.   You testified earlier that oftentimes target facilities

25   require a one-on-one supervision for -- for the loan or

503

1    renting of a gun; is that correct?

2    A.   That's based on their company policy.  I wouldn't say

3    standard, but an awful lot of them do that.  It's not

4    required.

5    Q.   But there is no law.  That was my question.

6    A.   Correct, no law.

7    Q.   That's a good idea?

8    A.   I think it's a good business practice.  Probably good

9    sales practice as well.

10   Q.   You testified earlier about guns used in entertainment,

11   and I believe you mentioned a specific example.  Is it

12   Paramount or Universal or --

13   A.   Universal Studios.

14   Q.   Is that based on personal experience?

15   A.   That's based on reading a lot of the background

16   investigations and their policies in handling firearms, yes.

17   Q.   Have you ever personally visited a movie set where

18   entertainment guns were being used?

19   A.   No, sir.

20   Q.   So your testimony that -- that they're transported in

21   locked containers and only given to the actor for the scene

22   and then returned to the locked container, is that based on

23   reports you read?

24   A.   Reports from witnesses that they're interviewing and just

25   reviewing some of their policies that they have in place.

504

1   Q.  All right.  And you also testified that somebody from the

2   Department of Justice sometimes inspects these movie sets

3   where the firearms are being used pursuant to a permit; is

4   that correct?

5   A.  Yes, sir.

6   Q.  All right.  You also testified that these entertainment

7   guns don't fire real bullets.  Am I misstating your testimony

8   there?

9   A.  No.  Oftentimes a majority of them do not fire real

10  bullets.  They're firing some sort of blanks.

11  Q.  But that doesn't mean I don't have a real gun, though,

12  does it?

13  A.  They are oftentimes real guns that have been gunsmithed to

14  only shoot blanks, but they were a real gun at one time.

15  Q.  All right.  And sometimes these entertainment guns are

16  modified machine guns even, aren't they?

17  A.  Yes, sir.

18  Q.  And sometimes they're modified to be able to fire blanks.

19  They're modified so they can fire blanks, which makes them

20  different from a machine gun that will fire real bullets; is

21  that correct?

22  A.  Not a gunsmith, but I think I followed you with that, yes.

23  Q.  Okay.  Are there background checks done on the actors who

24  use these guns?

25  A.  Certain studios do that, yes.

1    Q.   And how do they do that?

2    A.   They do that through our process for a Dangerous Weapons

3    Permit.

4    Q.   So the actor would have a Dangerous Weapons Permit?

5    A.   Yes.

6    Q.   And what percentage of actors who are using entertainment

7    guns have dangerous weapons?

8    A.   I couldn't tell you.

9    Q.   So it's not a -- it's not a formal policy.

10   A.   No.

11   Q.   All right.  There are normally -- there's been previous

12   testimony that the DROS system results in four possible

13   outcomes:  deny, a delay, an approval, and an undetermined.

14   Is that accurate?

15   A.   There's a couple other ones.  It would be a delay or a

16   deny -- I'm sorry, an approval or a denial after delay.  But,

17   yes.

18   Q.   All right, I just want to make sure we get clear on this,

19   because my understanding was that the DROS -- the Dealer

20   Record Sales would be submitted, and it will go through the

21   process and it will result in an approval, in which case the

22   dealer is instructed to release the firearm to the owner.

23   A.   Correct.

24   Q.   That's one possible outcome.  It can come through, and the

25   person can have a flag that says they were convicted of a

Lindley - X

506

1   robbery five years ago, they were a felon, they can never have

2   a gun.  That's a denial.

3   A.  The dealer would not know the reason for the denial, but,

4   yes.  We would inform them of the denial.

5   Q.  Okay, so that the dealer just gets a notification, deny

6   sale?

7   A.  Correct.

8   Q.  But you know it's because the guy is an armed robber or

9   something.

10  A.  Yes.

11  Q.  All right.  And a third one might be, we have a hit.  We

12  don't know if this person is prohibited.  They might be, but

13  further investigation is necessary.  That results in a denial;

14  is that correct?

15  A.  No.

16  Q.  I'm sorry, a delay.

17  A.  That will result in delay.  We can't determine that within

18  the 10 days.

19  Q.  Okay.  And the new legislation says you can take up to 30

20  days to complete the investigation on that.

21  A.  It gives us 30 days in order to delay an individual.

22  Q.  All right.

23  A.  If necessary.

24  Q.  And then if you exhaust the 30 days, and you still don't

25  have enough information to say either approve or deny, it will

1    be undetermined, and then it's up to the dealer whether they

2    want to release the firearm or not.

3    A.  Correct.

4    Q.  Okay.  Are you familiar with the term "auto approval?"

5    A.  Yes.

6    Q.  What is that?

7    A.  It's when all the stars are lined perfectly, and based on

8    all the information that we received from the dealer purchase,

9    it hits in none of our systems, including NICS.

10    Q.  Okay.  And so, then, the only reason -- if somebody is

11    auto-approved, then that means that they're not in a

12    prohibiting category.  There's no -- no flags, no hits.  So

13    then the only public policy reason for withholding the

14    delivery of the firearm is to complete the cooling-off period;

15    correct?

16    A.  Sometimes those are the -- the auto approvals are

17    rechecked later on, but for the most part, yes, he's just

18    waiting for the 10-day cooling-off period.

19    Q.  Why would they be rechecked?

20    A.  Just to refresh it because oftentimes the information

21    comes in on day one, and there are things that can change.

22    Q.  Wouldn't the APPS system that's also running 24/7 flag the

23    individual?

24    A.  Not until they pick up the firearm, and that information

25    is detained into AFS, and they have a subsequent prohibition.

Lindley - X

508

1   Q.  All right, but if they already had a gun, the APPS system
2   would flag them; correct?
3   A.  If an individual already had a gun, and then they had a
4   subsequent prohibition, that person would be contained in
5   APPS, yes.
6   Q.  Well, except for running the recheck, which is not
7   statutorily required, is it?
8   A.  No, sir.
9   Q.  Why not simply release firearms upon approval?
10  A.  Because we have the 10-day waiting period as a cooling-off
11  period as well.
12  Q.  All right, so the only thing that's stopping you from
13  releasing a firearm upon approval of the background check is
14  the statute, and the statute is based upon we still want a
15  cooling-off period.
16  A.  Once the background is approved?
17  Q.  Yes.
18  A.  Yes.
19  Q.  You testified earlier that APPS can't draw on the NICS
20  system.  Why is that?
21  A.  I believe it's federal law.
22  Q.  Okay.  But does APPS draw on any other federal database?
23  A.  I don't believe so.  There are occasions where we become
24  aware of a federal prohibition, and since that would still be
25  a prohibition for firearm possession, we would then put that

1  person in once we do the investigation.  For instance, you

2  have somebody that, say, that was dishonorably discharged from

3  the military.  Maybe their resident alien status has changed,

4  or we also find out that maybe they had a felony conviction in

5  another state.

6  Q.  All right, so then the only time that the NICS system and

7  the DROS system intersect is when an actual DROS is done.

8  A.  Correct.

9  Q.  All right.  And the way that system works is I think we've

10  had testimony yesterday that the DROS is run through the

11  various California databases, and that as a last check, it

12  also goes through NICS?

13  A.  I'm not sure what stage that happens, but, yes, it's

14  electronically sent off to the FBI.

15  Q.  That's probably a futile act to try to figure out when

16  because it's all in seconds anyway?

17          MR. EISENBERG:  Objection.  Misstates the prior

18  testimony.

19          THE COURT:  Sustained.  Go ahead.

20          MR. KILMER:  I need to look something up, Your Honor.

21  May I take just a short one-minute break?

22          THE COURT:  Sure.

23  BY MR. KILMER:

24  Q.  Chief Lindley, I asked you earlier if the department has

25  any discretion in issuing a Certificate of Eligibility, and I

1  have a Penal Code here on Certificates of Eligibility, Penal

2  Code Section 26710.  May I show it to you?

3  A.  Yes.

4          MR. EISENBERG:  Your Honor, we request a copy of

5  the --

6          MR. KILMER:  Sure.

7          THE WITNESS:  Which one do you want me to look at?

8          MR. KILMER:  26710.

9          MR. EISENBERG:  Do you have a copy for us?

10          MR. KILMER:  Not right now I don't.

11          MR. EISENBERG:  We're entitled to see it.  May I

12  approach the witness?

13          THE COURT:  Yes.

14          (Pause in the proceedings.)

15  BY MR. KILMER:

16  Q.  Have you had an opportunity to read that statute?

17  A.  The three paragraphs, A, B, C, and D?

18  Q.  Yes, sir.

19  A.  Yes.

20  Q.  Do you want to change your answer about whether the

21  Department of Justice has the discretion to issue a COE, or

22  whether it was mandatory?

23  A.  It still looks like that we have the ability to adopt

24  regulations for the administration of the process.

25  Q.  Regulations, yes.

1   A.  Yes.

2   Q.  But doesn't the statute say that the department shall

3   issue a CC -- or shall issue a COE to people who pass the

4   background check, submit the -- their fingerprints and pay the

5   filing fee and fill out the application?

6   A.  It does say the department shall examine its records and

7   available -- the records and the records available to the

8   department and the National Criminal Instant Justice System.

9   Q.  So if a person does pass the background check, pay the

10  filing fees, submit the fingerprints, then you're required to

11  issue a COE; is that correct?

12  A.  It would appear so, yes.

13  Q.  Thank you.

14          MR. EISENBERG:  I request that we mark this book as

15  an exhibit and put it in the record, please.

16          THE COURT:  Why don't we do this:  If you can get a

17  copy that everyone agrees on is the actual language of that

18  code section.

19          MR. KILMER:  What I will do, Your Honor, is I will --

20  at the afternoon break, I'll simply convert from LexisNexis a

21  pdf of that statute.  I will show it to opposing counsel and

22  ask them if they'll accept that.

23          THE COURT:  All right.

24  BY MR. KILMER:

25  Q.  Now, you testified earlier that the CCW background check

Lindley - X

1   is performed by the Department of Justice; is that correct?

2   A.  Well, I think there's two stages of that background check.

3   Q.  Sure.

4   A.  There's a background check to determine if the person is

5   prohibited or not prohibited from possessing a firearm.

6   Depending on the agency, they also do a further background

7   check into the, I guess, the suitability of that individual to

8   possess a firearm.

9   Q.  Okay.  And you do that work for the local issuing agency?

10  A.  We just do the determination whether that person is

11  prohibited or not prohibited from possessing a firearm and

12  then submit that information and a copy of the criminal

13  history to the issuing agency.

14  Q.  Okay.

15  A.  Or the requesting agency, actually.

16  Q.  All right, I understand.  As part of that check, do you

17  also consult NICS?

18  A.  I'm not sure.  I believe that we do.

19  Q.  Okay.  Is the process for renewal of a CCW the same as for

20  initial issuance, at least from your end?

21  A.  I would have to check with one of my people, but I believe

22  it's relatively the same.

23  Q.  All right.  And same questions for COE.  Is the NICS

24  system accessed or checked when you're issuing a COE?

25  A.  I believe so.

1    Q.  All right.  And you would go through the same check for a
2    renewal of a COE?
3    A.  Well, stand back.
4    Q.  Sure.
5    A.  On the initial COE, NICS is checked.
6    Q.  All right.
7    A.  On a renewal, I believe that it's checked.
8    Q.  All right.
9    A.  Clarifies?
10   Q.  All right.  That's a good enough answer for me.
11           We have nothing further, Your Honor.
12           THE COURT:  And redirect.
13           MR. EISENBERG:  Nothing further from the defense,
14   Your Honor.
15           THE COURT:  Any party can still call you back to
16   testify.  You're still under oath.  You can go ahead and leave
17   the courtroom.  I'll leave it to counsel to let you know the
18   date and time if necessary to return.
19           THE WITNESS:  Thank you, Your Honor.
20           THE COURT:  Thank you.  All right, further witnesses?
21           MR. EISENBERG:  No further witnesses, Your Honor.
22           THE COURT:  All right.  Further witnesses on behalf
23   of plaintiff?
24           MR. KILMER:  Your Honor, may I propose that we take
25   an afternoon recess at this particular point so I can confer

1   with my clients.  I'm anticipating the answer will be no.  We

2   don't have further witnesses.  I just want to check with them.

3          THE COURT:  Okay, we'll take a 15-minute recess.

4   Will that give you enough time?

5          MR. KILMER:  That will be plenty of time, Your Honor.

6          THE COURT:  All right.  Fifteen minute recess.

7          (Recess.)

8          THE COURT:  All right, back on the record.

9   Plaintiff?

10          MR. KILMER:  Plaintiffs have no further witnesses to

11   call, Your Honor.

12          THE COURT:  And let me just ask for both sides, are

13   there any other live witnesses?  I assume we have the

14   deposition transcript, but any other live witnesses?

15          MR. EISENBERG:  No, Your Honor.

16          MR. KILMER:  No, Your Honor.

17          THE COURT:  All right.  Okay.  Obviously we need to

18   go through the exhibits.  They're obviously fairly voluminous.

19   I did indicate earlier that once we finish the live testimony,

20   I'd take a break and allow counsel to meet and confer.

21          A couple of things.  First of all, if you can agree

22   on some of the -- some more of the exhibits, that would be

23   helpful.  And obviously from both sides, based upon the live

24   testimony and the exhibits that have already been received in

25   evidence, if you believe that some of your exhibits now that

1    are marked would not be necessary, that would be great, and

2    then we can sort of focus in and narrow down the exhibits for

3    which there are disputes.

4           The one thing I don't want to have to do, of course,

5    is to go through each exhibit page by page.  So perhaps, for

6    example, if one of the parties has excerpts from a book or

7    something like that, and it's 50 pages that you're really

8    going to focus in on two or three pages, that would certainly

9    be helpful.

10          If there's a recognition that some of the -- some of

11   the exhibits are not necessary, obviously that would be

12   helpful too.  But I would intend to recess and allow you folks

13   time to meet and confer.

14          But before I do that, is there anything further by

15   plaintiff before we take a break?

16          MR. KILMER:  The only thing is, Your Honor, is that

17   the defendants wanted a copy of the statute that I used my --

18   my LexisNexis code from, and I have emailed the statute to

19   your clerk, and I think he's going to print it out for us, and

20   I believe that there is no objection that it be admitted as

21   Plaintiff's, I believe, 08 as next in order.

22          MR. EISENBERG:  Actually, Your Honor, I'd like a

23   chance to examine it against the book version just to make

24   sure that they're the same.

25          THE COURT:  Sure, okay.

1          MR. KILMER:  I don't have any objection to that.

2          THE COURT:  Okay, so once it's printed out, we'll

3    have it marked as plaintiff's next in order.  And then when we

4    come back on the record, you can tell me what the status is in

5    terms of the admissibility.

6          Anything else for plaintiff's side before I take a

7    quick recess?

8          MR. KILMER:  None, Your Honor.

9          THE COURT:  Defense, anything?

10         MR. CHANG:  None, Your Honor.

11         THE COURT:  Okay, I'll go ahead and take a recess.

12   And basically I and my staff will be standing by.  Whatever

13   time frame you need is fine with me.  Obviously the more you

14   get resolved, the less we have to do on the record.  So take

15   whatever time you need.

16         Now, if it turns out, we still have obviously plenty

17   of time in the afternoon, but if you feel that you would like

18   to work on it for the rest of the afternoon and come back in

19   the morning with your decision, that's perfectly fine too.

20   But I'm going to be available all afternoon.  Obviously I've

21   still blocked out all of tomorrow too.  So obviously I would

22   like to -- and I'm sure you would like to get the exhibit

23   issues resolved.

24         So if there is nothing further on the record now,

25   I'll go ahead and stand in recess, and, again, I and my staff

1   will be standing by.

2           MR. KILMER:  All right, thank you, Your Honor.

3           THE COURT:  All right, we'll be in recess.

4           (Recess.)

5           THE COURT:  All right, back on the record.  If I can

6   just get an update on the status of exhibits.

7           MR. KILMER:  Yes, Your Honor.  I believe that the

8   defendants have had an opportunity to review plaintiffs'

9   proposed Exhibit 8, which is a printout from the LexisNexis

10  system of the statute that I questioned the last witness on,

11  and they've confirmed, I believe, that it matched the exhibit

12  that I showed the witness.  I believe there's a stipulation

13  that it will be admitted.

14          MR. EISENBERG:  That is correct, Your Honor.

15          THE COURT:  All right.  It is.  Plaintiff's 8 is

16  admitted.

17          (Plaintiffs' Exhibit 8, received in evidence.)

18          MR. KILMER:  Thank you, Your Honor.

19          THE COURT:  Okay.  And then with respect to -- is

20  there anything else with respect to all of plaintiffs'

21  exhibits?

22          MR. KILMER:  Plaintiffs' Exhibit 1, Your Honor, and

23  Plaintiffs's Exhibit 2 would be tendered at this point as

24  rebuttal, depending upon how the Court rules on the

25  defendants' proposed exhibits.  I believe Plaintiffs'

518

1    Exhibit 5 is already in evidence under another -- under the

2    defense tender.  I believe that Plaintiffs' Exhibit 6 has

3    already been admitted as well.

4            And so Plaintiffs' 1 through -- excuse me, 1 through

5    3, 1, 2, and 3 are reserved at this point, and 4 -- I don't

6    know if we introduced 4 or not.  Do you have any objection to

7    4 coming in?

8            MR. EISENBERG:  That's Brandon Combs' Certificate of

9    Eligibility.  No objection.

10           MR. KILMER:  So we'd ask that Plaintiffs's Exhibit 4,

11   which I can describe for the record, Your Honor, is a

12   January 14th letter, 2014, addressed to Brandon Combs

13   regarding a Certificate of Eligibility.  And page 2 of that

14   exhibit is the actual certificate of Eligibility.

15           And Plaintiffs' Exhibit 5 is the Concealed Weapons

16   Permit of Jeffery Sherman Silver -- I believe it's already in

17   evidence when Mr. Silvester was testifying.  Is that your

18   recollection as well?

19           MR. EISENBERG:  Pardon me?  I didn't hear what you

20   just said.

21           MR. KILMER:  That Plaintiffs' 5 is already in

22   evidence, I believe?

23           MR. EISENBERG:  If it's not, we're not objecting.

24           MR. KILMER:  So we'd ask that Plaintiffs' 5 be

25   admitted.

519

1          THE COURT:  If not already, Plaintiffs' 4 and 5 are

2     admitted into evidence if they have not already been.

3          (Plaintiffs' Exhibits 4, 5, received in evidence.)

4          THE COURT:  So we're basically dealing with

5     Plaintiffs' 1, 2, and 3?

6          Okay, let me turn, then, to defense exhibits.  If I

7     can just get an update on the status of the defense exhibits

8     which have not already been addressed.

9          MR. EISENBERG:  There are none.  The remaining

10     documents are all the ones that are subject to the request for

11     judicial notice.  And the parties have not been able to reach

12     an agreement on whether those documents are admissible.  And

13     those documents would include Exhibit 1, 2, and 3 on the

14     plaintiffs' side, I believe.  They're the same kind of

15     documents as the historical materials that the defense

16     submitted.  We've talked about ways to reach an agreement,

17     including proposals for stipulations, but we have not been

18     able to reach an agreement.  The only thing we have been able

19     to reach an agreement on is that we will -- we will provide

20     you excerpts of documents that you deem admitted.

21          MR. KILMER:  That is the agreement, Your Honor.

22          THE COURT:  All right.  Let me just -- in terms of

23     the defense exhibits, I have seven binders here of the defense

24     exhibits.  Obviously probably about three of the binders have

25     already been resolved, but I don't necessarily want to have to

1    go through as to each binder, each exhibit one by one to get

2    argument.  What I want to try to do is do this as efficiently

3    as possible.  I recognize, and counsel has noted that in the

4    various fairly recent cases of the Circuit, including the

5    *Peruta* case and the *Chovan* case, there was a discussion

6    regarding information that the courts really need to look at.

7            And, for example, in the *Peruta* case, the Court made

8    it very clear in criticizing contrary decisions on other

9    circuits, that they didn't do the full research that the Court

10   in *Peruta* did, and the Court reviewed -- and, of course, this

11   is on the issue of whether or not the Second Amendment applies

12   to the issue at hand, which is the right to bear arms

13   essentially outside the home.  And the Court does go through

14   the history of case authority.  The Court goes through

15   historical legislation, and the Court goes through

16   commentaries.  And the case authority dates back to what the

17   Court called 19th century case law.  The historical

18   legislation dated back to post civil war legislative scene.

19   And the commentaries, be considered post civil war

20   commentators, understanding of the right.  So it is fairly

21   clear that I have to consider each of those aspects in terms

22   of historical context.

23           So let me just say in general parameters -- and,

24   again, with respect to weight of the evidence as opposed to

25   admissibility, I am proposing to admit Law Review articles.

1   Courts generally cite to Law Review articles fairly

2   frequently.  Legislative histories, the courts can take

3   judicial notice of legislative histories.

4          To the extent that certain proposed exhibits are

5   dealing with public agency reports, notices, statistics, to

6   the extent that they are public records, I would consider

7   admitting those.

8          The big concern I have is with respect to articles,

9   because, frankly, with respect to articles, if it's one person

10  or a small body, a group of people's opinions, personal

11  opinions in the form of an article, I'm not sure that those

12  are the things that courts can take judicial notice of.

13  Certainly if they are in dispute, then that is one of the

14  factors on judicial notice because basically the Court can

15  only take judicial notice of those items or exhibits for which

16  they are relatively uncontroverted.  So that's problematic in

17  terms of taking judicial notice.

18         I also recognize, however, that I do need some

19  background information.  The only question is with these

20  various proposed exhibits, which ones are really helpful and

21  authoritative items of background information that are not

22  primarily editorial comment by one or more individuals

23  regarding their personal opinions regarding primarily, in this

24  case, any waiting periods or the impact of various state laws.

25         I'm certainly open to any suggestions with those sort

1    of parameters as to how we're going to deal with this.  If it

2    comes down to, okay, we're just going to set aside a couple

3    days, I'll start with exhibit whatever -- and I'll just use

4    this hypothetical -- Exhibit 1, and we will go through

5    Exhibit 1 through 100, and take up every page to see what's

6    relevant or not.  We can do that.  I don't propose to do that.

7         What I propose to do is allow defense counsel to

8    submit as to each exhibit for which there is a dispute the

9    basis for taking judicial notice; the -- a very brief summary

10   of what the exhibit states that would be relevant to the

11   particular issues at hand here; give plaintiff's counsel an

12   opportunity to respond, and then I would conduct another

13   hearing after I've had a chance to review that.  But I --

14   again, I'm not otherwise inclined to go through each exhibit

15   and hear arguments on each exhibits.  That would take arguably

16   days.  And I just don't see doing that.

17        So with that little bit of my thoughts, defense?

18        MR. EISENBERG:  Yes, Your Honor.  We certainly agree,

19   and the things like legislative history, Law Review articles,

20   early case law, legislation should come in.  We have submitted

21   some of those materials, and I would think, then, that you

22   would just deem them admitted without need of document by

23   document review.

24        THE COURT:  Right.

25        MR. EISENBERG:  So we certainly do not have a

1   negative response to that commentary.

2           As far as some of the other categories, we believe

3   that history books were cited, the Malcolm were cited  --

4   Joyce Lee Malcolm, the professor of history, her books have

5   been cited in either Heller or -- and McDonald or both.

6   Scholarly works of history seem to be something that is

7   definitely relied on in these kinds of cases.

8           I also want to draw your attention to an advisory

9   committee comment about Federal Rule of Evidence 201, because

10  we're talking about legislative facts as opposed to

11  adjudicative facts, and the standard of not controverted does

12  not apply.

13          Quote, "In determining the content or applicability

14  of the rule in domestic law, the judge is unrestricted in his

15  investigation and conclusion.  He may reject the propositions

16  of either party or of both parties.  He may consult the

17  sources of pertinent data to which they refer, or he may

18  refuse to do so.  He may make an independent search for

19  persuasive data or rest content with what he has or what the

20  parties present.

21          "The parties do no more than to assist.  They control

22  no part of the process."

23          That, and the case that we cited to *Daggett*, and just

24  simply the practice of the Ninth Circuit is that in a case

25  where you're considering the constitutionality of a law, a

1    wide range of materials come in even if there are, say, two

2    sides of a scholarly dispute.  The Heller opinion, you know,

3    showcased a scholarly dispute, and all of those materials were

4    considered.  They were not rejected on the grounds that they

5    were uncontroverted.

6              I don't think you're going to find very many books

7    about the history of the Second Amendment or the meanings that

8    are not controverted by one side or the other.  So, therefore

9    we have proposed excerpts from history books to be considered,

10   and the plaintiffs in their submission have done the same

11   thing.  You know, the Founders Amendment book by Stephen

12   Halbrook, a well-known NRA lawyer who definitely has a strong

13   position on the issue.  We're not going to say that you should

14   not even look at that material just because the author has a

15   perspective that a lot of people disagree with.  We believe

16   that our materials are ultimately going to be more persuasive

17   to you, but we think that they all should be admitted and

18   given the weight that you deem just.

19             And to back up my point, I actually want to quote

20   from the response of the plaintiffs to our motion on this

21   topic.  Now, we're dealing with the historical materials, not

22   the medical science studies that go to the second part of the

23   *Chovan* test.

24             But they wrote here, "Given that the United States

25   Supreme Court in both *District of Columbia v. Heller*" -- and

1    they give the cite, "and the *McDonald v. City of Chicago*" --

2    and then they give the site, "engaged in a survey of

3    historical evidence of the scope and meaning of the Second" --

4    well, they skipped the word "of" -- "scope and meaning of the

5    Second Amendment, the plaintiffs herein cannot and do not

6    object to that kind of evidence being derived from academic

7    studies and law journal articles."

8            MR. KILMER:  May I respond to that, Your Honor?

9            THE COURT:  Sure.  Are you done on that, then?

10           MR. EISENBERG:  Yeah, I would just submit that they

11   have already essentially conceded the point.

12           MR. KILMER:  Your Honor, I think the point we were

13   trying to make there, and I don't -- I'm not contradicting our

14   statement, but the kind of analysis that the Supreme Court

15   engaged in in the *District of Columbia v. Heller* and *McDonald*

16   *v. City of Chicago*, is that they did survey the historical

17   data, and they did derive some of the historical data from Law

18   Review articles.  That's without question.

19           However, the problem is that the defendants are

20   trying to admit as evidence the opinions and analysis of law

21   professors, and that's just not appropriate.  Now, if those

22   articles contain excerpts of law journals or statutes or

23   writings on the meaning of the Second Amendment at the time of

24   its ratification and at the time of its incorporation, those

25   obviously are relevant for the Court to look at, but there's a

1 difference between a court reading a case or reading a law

2 review article that is cited in a brief in order to have an

3 informed opinion and then calling the Law Review article

4 evidence.  It's not evidence.

5    THE COURT:  All right.

6    MR. KILMER:  Further comment on the suicide studies,

7 Your Honor --

8    MR. EISENBERG:  We haven't even addressed that issue.

9    THE COURT:  All right.  Okay, and I'm not sure how

10 the lower courts or Supreme Court did their survey, whether --

11 whether the trial court level documents were submitted as

12 exhibits as evidence, or whether or not there were simply a

13 list given -- I don't know.  I guess part of the problem is

14 certainly, it's sort of like, okay, I'm not sure how each of

15 these articles fit in.  I can obviously tell once there are

16 proposed findings of facts as articles are referred to and the

17 specific citations to specific articles would obviously be

18 helpful.  Of course, then it's what I allow first.  Do I admit

19 provisionally or otherwise these as exhibits and then take a

20 look and see when there are proposed findings of facts?  Just

21 whether or not I'm going to give -- then it's just a matter of

22 how much weight I would give to those references.

23    MR. KILMER:  Your Honor, if I may be somewhat

24 presumptuous in inquiring about how the Court is going to --

25 we're going to proceed with the findings of facts is my

1   suggested solution.  My understanding of how we're going to

2   proceed once the evidence is closed is that the parties

3   will -- the Court will set a briefing schedule.  We'll get

4   copies from the transcripts from this matter.  We'll each

5   prepare a proposed findings of facts and conclusions of law.

6   I'm assuming we're going to be able to also support that with

7   the memorandum of points and authorities, and then we'll also

8   be able to each submit what we -- excerpts of records, almost

9   like a Court of Appeal, we'll submit excerpts of record of

10  those exhibits and those portions of testimony that we want

11  the Court to focus on instead of just giving you a whole bunch

12  of documents.

13          I have no objection to the Court simply taking under

14  submission the admissibility of the contested exhibits and

15  then ruling on their admissibility in a separate memorandum

16  after you've taken a look at our proposed findings of facts

17  and conclusions of law and read our memorandum in support and

18  taken a look at the specific exhibits we think are important.

19  And then the Court can simply make its evidentiary ruling at

20  that time.  That may be the most efficient way to proceed.

21          THE COURT:  Defense?

22          MR. EISENBERG:  Mr. Kilmer, are you proposing to do

23  that for both the historical materials and the medical

24  studies?

25          MR. KILMER:  I'm proposing that -- that the parties

1   simply tender their arguments in their proposed findings of

2   fact and conclusions of law from exhibits that have been

3   marked.  I mean, I'm not in the business of censoring district

4   court judges.  If the judge wants to look at it and then say,

5   "No, this isn't admissible, I'm not going to allow it," and

6   it's always subject to a motion to strike, I suppose.

7           MR. EISENBERG:  Okay, with the understanding that all

8   of the submitted exhibits could be considered, and there's not

9   a category that you're saying that we're not permitted to even

10  cite to the judge, then we will agree to this proposal, which,

11  by the way, I have just heard for the first time.

12          THE COURT:  All right.  Okay.

13          MR. KILMER:  That's because I just thought of it for

14  the first time.

15          THE COURT:  That may be the most pragmatic thing to

16  do, understanding, then, that really your proposed findings of

17  facts will be essentially drafts because I may make certain

18  rulings that might cause you to modify them.  But that

19  certainly would be probably cleaner than saying, okay,

20  defense, instead of that, you're going to prepare little brief

21  excerpts of each of the documents here so that we can take a

22  look at that and I can rule on it.  Because it could well be

23  as we're going through your proposed findings of fact that you

24  may be able to really pinpoint more as to a particular exhibit

25  which portions of that exhibit that you want the Court to

1    refer to in terms of a proposed findings of fact.  And there

2    might be some that you might decide, well, we really don't

3    need that, it's duplicative.  Or this person's article is

4    really covered by this particular Law Review article, or

5    something like that, so it's really cumulative or redundant.

6    So that's a possibility, and I certainly don't have a problem

7    with that.

8            I will tell you, Miss Thomas, my court reporter, has

9    indicated that she can probably get to you a certified copy of

10   the transcript, if you ordered them in three weeks.  So that's

11   something --

12           MR. KILMER:  That's good.  So, Your Honor, the status

13   of the contested exhibits at this point is that they are

14   basically being that each of the exhibits are at this point in

15   time an offer of proof, subject to -- perhaps a motion to

16   strike, that the Court will rule on at the same time it

17   renders its decision in this case.

18           THE COURT:  I can take it -- each of the exhibits

19   under submission, and then once I've had a chance to take a

20   look at your proposed findings of fact, which would include

21   references to specific exhibits including the Plaintiffs'

22   Exhibits 1 through 3, and the various defense exhibits for

23   which have not yet been submitted or withdrawn.  That might be

24   a workable solution.  Defense?

25           MR. EISENBERG:  Your Honor, we are in agreement with

1    what we're hearing.  Thank you very much, Your Honor.

2            THE COURT:  Now -- and let me do this:  So right now,

3    what I would propose to do is just set a schedule.  Now, as it

4    turns out, as you think about this and start drafting your

5    proposed findings of facts, you're thinking, you know, there's

6    a problem here, then I don't have a problem in coming back and

7    we can talk about it further.  And in all candor, if at some

8    point in time, it's, "Judge, I'm sorry, we're going to have to

9    go through 1 through 100 before we continue on with our

10   proposed findings of facts," we can certainly do that.  I

11   don't have a problem with that because obviously this is

12   something that has been suggested, and it seems to be

13   workable.  It might turn out not to be.  But if it is

14   workable, obviously it's probably the cleanest way to do it.

15           So with that understanding, then, as far as preparing

16   proposed findings of facts and conclusions of law, and

17   assuming -- and I'm not sure if you're going to be requesting

18   or ordering transcripts.  If you are, that will be about three

19   weeks.  With that understanding, let me get a time frame for

20   submitting proposed findings of facts and conclusions of law.

21   If you want to chat first briefly about scheduling it, it

22   might be more productive to do that.

23           So let me just take a quick break.  You can meet and

24   confer, and if you can agree on a schedule and then a date

25   that I can set aside for essentially what would be closing

1   arguments, it would be after the parties have submitted your

2   proposed findings of facts and conclusions of law and that

3   will give us all frameworks to deal with closing arguments.

4          So let me take a quick break, and you can check.

5   Mr. Nazaroff will have my schedule, and obviously whatever

6   time frame, we'll just work it in.

7          MR. KILMER:  One quick question, Your Honor, just so

8   we understand the format.  So that we're going to agree on a

9   date where each party submits a proposed findings of facts and

10  conclusions of law, the excerpts that we want the Court to

11  look at, and then a legal memorandum addressing the points we

12  want to argue.  Will the parties then have an option to also

13  file simultaneous responses, and then we'll come back for oral

14  argument if necessary?

15         THE COURT:  Yeah, if you wish.  You can file a

16  response to the other side's proposed findings of facts and

17  conclusions of law and the memorandum.  That's fine.  Go ahead

18  and build that in.

19         MR. KILMER:  And I'm going to be the rude one and ask

20  what page limits does the Court want to impose on us?

21         THE COURT:  I'm not going to impose any page limits.

22  As I said, it's important, I said this at the outset, and I

23  still believe that we need to make sure that both sides within

24  the framework of the rules, et cetera, that you make as clear

25  and as complete record as possible.

1           MR. KILMER:  Thank you, Your Honor.

2           THE COURT:  I'm perfectly fine with that.

3           Let me take a quick break.  As soon as you're ready,

4    meet and confer.  Figure out on your schedules, check with

5    Mr. Nazaroff, make sure that we can carve out some time if you

6    think that we need a day, we need two days, or whatever, to do

7    the closing arguments, that's fine.  We'll just work out a

8    time frame.  And then figure out your own calendars as to what

9    will work out best.  As I've indicated, Miss Thomas, your

10   three weeks is --

11          (The court reporter nods.)

12          THE COURT:  As soon as you're ready to come back on

13   the record with a briefing schedule, I'll come back on the

14   record.  You can cite it on the record, and I'll be okay with

15   that.

16          MR. KILMER:  Thank you, Your Honor.

17          MR. EISENBERG:  Thank you, Your Honor.

18          THE COURT:  We'll take a brief recess.

19          (Recess.)

20          THE COURT:  All right, back on the record, update on

21   the status of the case, briefing schedule, et cetera.

22          MR. KILMER:  Yes, Your Honor.  I think we have agreed

23   on a schedule.  And that is that -- that madam reporter will

24   have until the 21st of April, which is a Monday, to have the

25   transcripts to us by then or sooner.  That the parties will

533

1   then file their initial findings of fact and proposed findings

2   of facts and conclusions of law, any memorandum of law that

3   they wish to accompany that, and then the excerpt of record

4   that they want the Court to consider, basically pinpointing

5   what they want the Court to look at.  And that filing date

6   will be June 16th.  And then each party will be entitled to

7   file a response on June 30th.  And then the parties would

8   return on July 21st for oral argument or closing argument.

9           THE COURT:  All right.  Defense?

10          MR. EISENBERG:  We agree with that schedule,

11  Your Honor.

12          THE COURT:  That will be the order of the Court,

13  then.  And if it turns out, when I get the initial briefing,

14  that it might take some further time, what I might do is just

15  move it to a separate date.  Monday is my law and motion day,

16  and if I think it needs more time, then I would try to move it

17  over to a different day rather than a Monday.  But I'll give

18  you plenty of notice so you can plan accordingly.  I'm not

19  just going to tell you a week before to show up on a Tuesday

20  instead of Monday.

21          MR. EISENBERG:  Your Honor, I'll be on a family

22  vacation July 26th to August 2nd.  If I don't tell you that,

23  my wife will be very angry with me.

24          THE COURT:  If I move it to a day other than the

25  21st, I'll obviously make sure it's a day that everyone is

1    available.

2            MR. KILMER:  Thank you, Your Honor.

3            THE COURT:  I won't just automatically move it.  I'll

4    consult both counsel first.

5            MR. EISENBERG:  Thank you, Your Honor.

6            THE COURT:  So that will be the order of the Court,

7    then, and so basically at this point in time, if there is

8    nothing further, this will conclude today's proceedings.

9            Now, if for whatever reason, it doesn't have to be

10   scheduling wise, but if you feel that you need to contact or

11   communicate with the Court, just contact my chambers,

12   Mr. Nazaroff.  We can set up telephonic conferences.  I can

13   have it reported by the court reporter if it's an update or

14   something comes up that you feel that you need to discuss with

15   me.  If you believe that it's best to have it in open court,

16   then we can also schedule that.

17           MR. KILMER:  Thank you.  Your Honor, will the Court

18   be preparing a minute order as to what happened today, or

19   should the parties prepare that or --

20           THE COURT:  Yeah, I think we'll do just a minute

21   order on that.  We'll do a minute order on that.

22           MR. KILMER:  Thank you, Your Honor.

23           MR. EISENBERG:  Thank you very much.

24           THE COURT:  Okay, so that will conclude today's

25   proceedings.

535

1          (Court was adjourned at 4:03 PM.)

2

3

4

5          I, Gail Lacy Thomas, Official Court Reporter, certify
   that the foregoing transcript is true and correct.

6

   Dated:  04/10/2014              /s/ Gail Lacy Thomas
7                                  GAIL LACY THOMAS, RMR-CRR

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25