1   KAMALA D. HARRIS, State Bar No. 146672
    Attorney General of California
2   MARK R. BECKINGTON, State Bar No. 126009
    Supervising Deputy Attorney General
3   PETER H. CHANG, State Bar No. 241467
    Deputy Attorney General
4   JONATHAN M. EISENBERG, State Bar No. 184162
    Deputy Attorney General
5     300 South Spring Street, Suite 1702
      Los Angeles, CA  90013
6     Telephone:  (213) 897-6505
      Fax:  (213) 897-5775
7     E-mail:  Jonathan.Eisenberg@doj.ca.gov
    *Attorneys for Defendant Kamala D. Harris,*
8   *Attorney General of California*

9              IN THE UNITED STATES DISTRICT COURT

10           FOR THE EASTERN DISTRICT OF CALIFORNIA

11                     FRESNO DIVISION

12

13  **JEFF SILVESTER, BRANDON COMBS,**          1:11-cv-02137-AWI-SKO
    **THE CALGUNS FOUNDATION, INC., a**
14  **non-profit organization, and THE SECOND**  **DEFENDANT KAMALA D. HARRIS'S**
    **AMENDMENT FOUNDATION, INC., a**            **PROPOSED FINDINGS OF FACT AND**
15  **non-profit organization,**                 **CONCLUSIONS OF LAW**

16                              Plaintiffs,    Date:        July 21, 2014
                                               Time:        1:30 p.m.
17           **v.**                            Dep't:       8th Flr., Crtrm. 2
                                               Judge:       Hon. Anthony W. Ishii
18  **KAMALA D. HARRIS, Attorney General of**  Trial Date:  March 25, 2014
    **California (in her official capacity),**  Action Filed:  December 23, 2011
19
                                Defendant.
20

21

22

23

24

25

26

27

28

                                    1

**TABLE OF CONTENTS**

PROPOSED FINDINGS OF FACT ....................................................................... 1

I.   The Waiting-Period Laws ........................................................................... 1

    A.   The Laws at Issue in the Present Lawsuit ................................................. 1

    B.   The History and Evolution of the Waiting-Period Laws .......................... 1

II.   The Parties .................................................................................................. 3

    A.   Plaintiff Jeffrey Silvester ......................................................................... 3

    B.   Plaintiff Brandon Combs .......................................................................... 3

    C.   Plaintiff Second Amendment Foundation, Inc. ........................................ 4

    D.   Plaintiff The Calguns Foundation, Inc. .................................................... 4

    E.   Defendant Attorney General Kamala D. Harris ....................................... 4

III.   The Waiting Period Law and the Scope Of Second Amendment as
Historically Understood ............................................................................. 4

IV.   The Waiting-Period Laws' Alleged Burden on Plaintiffs' Second
Amendment Right ...................................................................................... 8

    A.   With the Waiting-Period Laws in Effect, Plaintiffs Silvester and
Combs Have Been Able to Acquire Multiple Firearms ........................... 8

    B.   There Are Firearms Dealers Near Where Silvester and Combs Live ........ 8

    C.   Faraway Firearms Can Be Transferred from One Dealer to Another,
to Be Near Silvester or Combs, for About $100 Per Firearm ................... 8

    D.   There Are Few or Minimal Costs Imposed by the Waiting-Period
Laws ......................................................................................................... 8

    E.   Silvester Has Obtained Firearms in California Without Going
Through the 10-Day Waiting Period ......................................................... 9

V.   The Waiting-Period Laws Provide Time for a Background Check to Be
Conducted on a Prospective Firearm Purchaser ......................................... 9

    A.   Cal. DOJ Processes a Heavy Volume of DROS Applications Each
Year .......................................................................................................... 9

    B.   The Electronic DROS Application Processing System ........................... 10

        1.   Computer Databases Queried as Part of the Basic Firearms
Eligibility Check (BFEC) ............................................................ 11

            a.   Department of Motor Vehicles (DMV) ............................ 11

            b.   Automated Firearms System (AFS) ................................. 12

            c.   Consolidated Firearms Information System (CFIS) ......... 13

            d.   Automated Criminal History System (ACHS) .................. 14

            e.   Wanted Persons System (WPS) ....................................... 15

            f.   California Restraining Order and Protective Order
System (CARPOS) .......................................................... 15

            g.   Mental Health Firearms Prohibition System
(MHFPS) ......................................................................... 15

i

h. National Instant Criminal Background Check System (NICS) ................................................. 16

2. Auto-Approvals .......................................................................... 16

C. The 10-Day Waiting Period Provides Time for CIS Analysts to Track Down Information and Refresh Records ....................... 17

1. CIS analysts verify that the DROS applicant was correctly matched to a DMV record .......................................... 17

2. CIS analysts verify that database records matched to the DROS applicant in the electronic BFEC process were correctly matched to the applicant ................................ 18

3. CIS analysts investigate unreported dispositions or other missing information ............................................... 18

4. CIS analysts confirm that correct laws are applied .................... 20

5. CIS analysts rerun BFEC to obtain most up-to-date records ....... 20

D. The 10-Day Waiting Period Provides Time for Reporting Agencies to Update Cal. DOJ Databases .................................... 21

E. The 10-Day Waiting Period Provides Time for Law Enforcement to Investigate and Intercept Purchased Firearms Prior to Delivery to Prohibited Persons ..................................................................... 22

F. The Waiting-Period Laws Must Be Applied to Subsequent Purchasers to Ensure an Effective Background Check in the Interest of Public Safety ...................................................................... 24

1. Prohibiting events may have occurred after the prior DROS application was filed ........................................... 25

2. Records or laws may have been updated or changed after the prior DROS application was filed .................................. 26

G. Cal. DOJ's DROS Processing System Cannot Be Adequately Replaced by Other Systems ........................................................ 26

1. The Armed and Prohibited Persons System (APPS) Database Cannot Replace BFEC ................................. 26

2. The Federal NICS Check Cannot Replace BFEC ..................... 28

VI. The Waiting-Period Laws Provide a Cooling-off Time ............................ 29

A. Cooling-off Period Reduces Violent Acts by Firearms ..................... 30

B. Rationale and Benefits of a Cooling-off Period Apply to All Applicants, Including Subsequent Purchasers ............................. 32

1. Subsequent purchasers may no longer possess firearms or may possess non-working firearms ............................ 32

2. Subsequent purchasers may seek new firearms for specific purposes ........................................................ 33

VII. Exemptions to the Waiting-Period Laws ........................................... 33

A. Peace Officer Exemption ............................................................ 33

B. Dangerous-Weapons-Permit Exemption ...................................... 34

C. Entertainment Firearms Permit Exemption ................................... 34

ii

D.      Dealer Exemptions .................................................................. 34

E.      Curio And Relic Exemption ..................................................... 35

F.      Gunsmith Exemption ............................................................... 35

G.      Wholesaler Exemption ............................................................ 35

H.      Target Range Exemption .......................................................... 36

I.      Consultant Evaluator Exemption ............................................. 36

PROPOSED CONCLUSIONS OF LAW ................................................... 36

I.      Subject-Matter Jurisdiction and Venue ............................................. 36

II.     Standing of Organizational Plaintiffs ................................................ 37

III.    Second Amendment Analysis ............................................................ 38

        A.      The Waiting-Period Laws' Alleged Burden on the Second
                Amendment Right ..................................................................... 38

        B.      Heightened Scrutiny of the Waiting-Period Laws Under the Second
                Amendment ................................................................................ 39

IV.     Fourteenth Amendment Analysis ....................................................... 42

V.      Final Conclusion ................................................................................ 42

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**TABLE OF ABBREVIATIONS**

ACHS – Automated Criminal History System

AFS – Automated Firearms System

APPS – Armed and Prohibited Persons System

BATFE – Bureau of Alcohol, Tobacco, Firearms, and Explosives

BFEC – Basic Firearms Eligibility Check

BOF – Bureau of Firearms

Cal. DOJ – California Department of Justice

CARPOS – California Restraining and Protective Order System

CCW Permit – Carry Conceal Weapon Permit

CFIS – Consolidated Firearms Information System

CGF – The Calguns Foundation

CII – Criminal Identification Information

CIS Analyst – Criminal Identification Specialist Analyst

COE – Certificate of Eligibility

DMV – Department of Motor Vehicles

DROS – Dealer Record of Sales

DWP – Dangerous Weapons Permit

EFP – Entertainment Firearms Permit Exemption

ICE – Immigration and Customs Enforcement

III – Interstate Identification Index

MHFPS – Mental Health Firearms Prohibition System

NCIC – National Crime Information Center

NICS – National Instant Criminal Background Check System

SAF – The Second Amendment Foundation

WPS – Wanted Persons System

**PROPOSED FINDINGS OF FACT**

I.   **THE WAITING-PERIOD LAWS**

    **A.   The Laws at Issue in the Present Lawsuit**

    1.   California Penal Code section 26815(a) provides, in relevant part, as follows:  "No firearm shall be delivered: (a) Within 10 days of the application to purchase, or, after notice by the [California Department of Justice ("Cal. DOJ")] pursuant to Section 28220, within 10 days of the submission to [Cal. DOJ] of any correction to the application, or within 10 days of the submission to [Cal. DOJ] of any fee required pursuant to Section 28225, whichever is later."

    2.   California Penal Code section 27540(a) provides, in relevant part, as follows:  "A dealer . . . shall not deliver a firearm to a person, as follows: (a) Within 10 days of the application to purchase, or, after notice by the [Cal. DOJ] pursuant to Section 28220, within 10 days of the submission to [Cal. DOJ] of any correction to the application, or within 10 days of the submission to [Cal. DOJ] of any fee required pursuant to Section 28225, whichever is later."[1]

    3.   Plaintiffs herein, Jeffrey Silvester, Brandon Combs, The Calguns Foundation, Inc., and The Second Amendment Foundation, Inc., challenge, under the Second and Fourteenth Amendments to the U.S. Constitution, the constitutionality of California Penal Code sections 26815(a) and 27540(a) as applied to "[1] people who already have firearms registered to them in the AFS System [California's Automated Firearm System], [2] people who have certificates of eligibility that must be renewed every year to have firearms[,] and [3] people that have license to carry [firearms in public in California, which licenses] must be renewed every two years by a local sheriff."  (First Am. Compl. (Dkt. #10) at ¶¶ 67, 71, & Prayer for Relief; Trial Tr. 5:23-6:12 [Kilmer].)

    **B.   The History and Evolution of the Waiting-Period Laws**

    4.   In 1923, the California Legislature created a handgun-purchase waiting period whereby no handgun, pistol, or other concealable firearm could be delivered to its purchaser on the day of purchase.  (Def. Exh. CD [1923 Cal. Stat. ch. 339 §§ 10, 11].)

---

[1] California Penal Code sections 26815(a) and 27540(a) together are referenced herein as the "Waiting-Period Laws."

1

5.      The 1923 version of the waiting-period law was codified, with no substantive changes to the law's language, in the California Penal Code in 1953.  (Def. Exh. CE [1953 Cal. Stat. ch. 36 §§ 12071, 12072].)

6.      In 1955, the California Legislature extended the waiting period from one day to three days.  (Def. Exh. CF [1955 Cal. Stat. ch. 1521 §§ 12071, 12072].)

7.      In 1965, the California Legislature extended the waiting period from three days to five days.  (Def. Exh. CI, at AG000401-402 [1965 Cal. Stat. ch. 1007 §§ 12071, 12072].)

8.      The California Legislature extended the waiting period from three days to five days in 1965 because the three-day waiting period did not provide Cal. DOJ sufficient time to conduct proper background checks on prospective concealable firearms purchasers, before delivery of the firearms to their purchasers.  (Def. Exh. CI, at AG000468 [Cal. Assemblymember Beilenson letter to Cal. Gov. Brown Sr. (June 30, 1965)]; *People v. Bickston*, 91 Cal.App.3d Supp. 29, 32 (1979).)

9.      In 1975, the California Legislature extended the waiting period from five days to 15 days.  (Def. Exh. CH, at AG000232-233 [1975 Cal. Stat. ch. 997 §§ 12071, 12072].)

10.     The California Legislature extended the waiting period from five days to 15 days in 1975 to "[g]ive law enforcement authorities sufficient time to investigate the records of purchasers of handguns prior to delivery of the handguns."  (Def. Exh CH, at AG000298 [Cal. S. Comm. on the Judiciary, 1975-76 Regular Sess., Rep. on A.B. 1441, at 1-2 (1975)].)  A waiting period of five days had been "shown to be inadequate for the [California] Bureau [of Firearms] to thoroughly check all records of the purchasers . . ."  (Def. Exh. CH, at AG000344 [Cal. Assemblymember Murphy letter to Cal. Gov. Brown Jr. (Sept. 15, 1975)].)

11.     In 1996, the California Legislature reduced the waiting period from 15 days to 10 days.  (Def. Exh. CG, at AG000026 [Cal. S.B. 671, 1995-96 Regular Sess., ch. 128 sections 12071(b)(3)(A), 12072(c)(1)]; Trial Tr. 169:2-5 [Buford].)

12.     The California Legislature reduced the waiting period from 15 days to 10 days because Cal. DOJ's Bureau of Firearms (BOF), which conducted background checks on prospective firearms purchasers, switched to an electronic database system, which allowed faster processing of

2

background checks.  (Def. Exh. CG, at AG000061 [Cal. S.B. 671, 1995-96 Regular Sess., S. Third Reading, as amended Jun. 4, 1996].)

13.   In amending the waiting period in 1996, the California Legislature made clear that one purpose for the waiting period is to provide time for Cal. DOJ to conduct background checks. (Def. CG at 2099-0051 (Cal. S.B. 671, 1995-96 Regular Sess.).)

14.   The other purposes is "to provide a 'cooling-off' period, especially for handgun sales. (Def. CG at 2099-0051 (Cal. S.B. 671, 1995-96 Regular Sess.); *see also Bickston*, 91 Cal.App.3d Supp. at 32 ("[I]t appears that an original intent to provide at least an overnight cooling-off period from "application for the purchase" was supplemented over the years with additional time to allow the Department of Justice to investigate the prospective purchaser of the weapon").)

## II.   THE PARTIES

### A.   Plaintiff Jeffrey Silvester

15.   Plaintiff Jeffrey Silvester ("Silvester") owns more than one gun and possesses a Carry Conceal Weapon ("CCW") permit in Kings County.  (Trial Tr. 23:11-15, 37:7-10 [Silvester]; JT 6.)

### B.   Plaintiff Brandon Combs

16.   Plaintiff Brandon Combs ("Combs") owns more than one gun and possesses a "Certificate of Eligibility" ("COE") issued by Cal. DOJ.  (Trial Tr. 54:20-22, 78:22-79:4 [Combs]; *see also* Cal. Penal Code § 26710.)

17.   Combs is Executive Director of Plaintiff The Calguns Foundation, Inc.  ("CGF.") (Trial Tr. 76:4-11 [Combs].)

### C.   Plaintiff Second Amendment Foundation, Inc.

18.   Plaintiff The Second Amendment Foundation, Inc. ("SAF") claims to have between 30,000 and 40,000 members, supporters, and donors in California.  (Gottlieb Dep. Tr. 18:11-13.) One-third to half (i.e., 10,000 to 20,000) of the total of 30,000 to 40,000 members, supporters, and donors are dues-paying members.  (Gottlieb Dep. Tr. 18:16-19:4.)  The remaining people are non-dues paying supporters and donors.  (Gottlieb Dep. Tr. 16:18-17:12; 18:16-19:4.)

19.     SAF has never attempted to purchase a firearm in California.  (Gottlieb Dep. Tr. 33:17-20.)

20.     SAF has not incurred any expenses in acquiring firearms in California.  (Gottlieb Dep. Tr. 62:19-13.)

21.     SAF has not been stopped from or hindered in acquiring firearms in California because of the Waiting-Period Law.  (Gottlieb Dep. Tr. 33:21-25.)

**D.     Plaintiff The Calguns Foundation, Inc.**

22.     Plaintiff CGF claims to have approximately 30,000 members, most of whom are in California.  (Trial Tr. 121:11-14 [Hoffman].)

23.     CGF has never attempted to purchase a firearm on its own behalf for self-defense. (Trial Tr. 145:19-146:2 [Hoffman].)

**E.     Defendant Attorney General Kamala D. Harris**

24.     Defendant Kamala D. Harris, Attorney General of California (the "Attorney General"), sued here in her official capacity only, is the head of Cal. DOJ.  Cal. DOJ, and specifically its Bureau of Firearms ("BOF"), is responsible for administering and enforcing the Waiting-Period Laws.  (Trial Tr. 166:22-23 [Buford].)

25.     BOF conducts the background checks required of people seeking to purchase or obtain firearms lawfully in California.  (Trial Tr. 167:11-13 [Buford].)

**III.    THE WAITING PERIOD LAW AND THE SCOPE OF SECOND AMENDMENT AS HISTORICALLY UNDERSTOOD**

26.     Although Plaintiffs have cited pages from the book *American Archives: Documents of the American Revolution, 1774-76* (Northern Illinois University Libraries 2004) as evidence that firearms were widely available in the United States around the time of the American Revolution, the bulk of that book that addresses the topic of the prevalence of firearms proves that they were scarce during those years in most parts of the United States, and, moreover, it was not possible to acquire firearms instantaneously or close to instantaneously.  (*See id.* at v1:463, v1:1336; v2:412, v3:887, v4:1157 (*American Archives*'s online version, available at http://dig.lib.niu.edu/amarch/ (last visited June 16, 2014)).)

4

27. Although Plaintiffs have cited pages from the Henry J. Kauffman book, *The Pennsylvania-Kentucky Rifle* (Masthof Press 2005), as evidence that the Pennsylvania-Kentucky rifle was widely available in the Founding Era of the United States, the bulk of that book reveals that the Pennsylvania-Kentucky rifle was handmade in a time-consuming process, in only one state in the Union, and it was not possible to acquire that kind of rifle instantaneously or close to instantaneously. (*See id.* at 16, 19, 25, 91, 146-47, 252, 301 306, 312, 323-24, 330, 339.)

28. "Every schoolboy knows about the problems the Committees of Safety encountered in their attempts to have arms manufactured in America throughout the Revolution." Henry J. Kauffman, *The Pennsylvania-Kentucky Rifle* (Masthof Press 2005) at 91.

29. In the early 19th century in the United States, "Americans still lived in a world of small scale and scarcity. People, goods and information moved slowly. The tools they used and the routines of their work, their materials and sources of power, would have been immediately recognizable to a man or woman of the seventeenth century." (Def. Exh. EC (Jack Larkin, *The Reshaping of Everyday Life: 1790-1840* (HarperPerennial 1988)) at xv.)

30. "American families lived well apart from each other, on their own farmsteads. . . .American farmers' houses were . . . 'scattered all over the country.' . . .Families in the more thickly settled and cleared regions of America usually lived in sight of their nearest neighbors' houses, and at night could see the faint gleam of their candles. To the south and west dwellings became dispersed ever more thinly, as an early Western settler recalled, in 'little clearings detached from each other by intervening forest, through which foot paths, bridle paths, and narrow wagon roads obstructed with stumps, wound their way." (Def. Exh. EC at 6-7.)

31. "In New York State and New England, the five or six weeks of the haying season, between late June and early August, were the time of most concentrated effort, 'the hardest part of the labor required to be performed on a farm,' as the Maine Farmer noted in 1832. Throughout the countryside, most other work ceased as craftsmen, merchants and their clerks left shops and stores to go into the field." (Def. Exh. EC at 19.)

32. "For most Americans around 1800, county neighborhoods of a few dozen farms or less constituted the normal boundaries for everyday movement, on visits that intertwined

5

1  socializing, neighborly help and economic exchange.  Beyond their neighborhoods they made less

2  frequent trips to artisans' shops, stores, taverns and churches at villages or crossroads settlements.

3  In a New England town families even on the most outlying farms could make these journeys every

4  week since they were rarely more than a few hours' walk or an hour's ride away.  In frontier

5  Kentucky families might go a month or more between such trips."  (Def. Exh. EC at 213-14.)

6      33.     "In July [in the American countryside], during the rushed, exhausting and anxious

7  labor of getting in the Northern hay crop, most other activities were suspended.  Stores and shops

8  shuttered their doors or stood almost empty, visits sharply declined, few couples married and few

9  children were conceived."  (Def. Exh. EC at 263.)

10     34.     "Winter in the Northern states was a contradictory season, a time of growing

11 discomfort and greater leisure.  Family life contracted into a room or two, and even routine outdoor

12 chores grew increasingly difficult as the temperature dropped.  In severe cold and storm,

13 households could spend weeks in isolation."  (Def. Exh. EC at 263-64.)

14     35.     "The founding fathers enshrined the right to bear arms in the Second Amendment of

15 the U.S. Constitution, but they also supported gun control laws so extensive that few Americans

16 would today support them.  They barred large portions of the population from possessing firearms,

17 required many gun owners to register their weapons, and even conditioned the right on a person's

18 political leanings.  The Wild West, which occupies the very heart of America's gun culture, was

19 filled with firearms; yet frontier towns, where the civilized folks lived, had the most restrictive and

20 vigorously enforced gun laws in the nation.  Gun control is as much a part of the history of guns in

21 America as the Second Amendment."  (Def. Exh. EK (Adam Winkler, *Gunfight:  The Battle over*

22 *the Right to Bear Arms in America* (W.W. Norton & Co. 2011)) at IX; *see also id.* at 12, 13, 113-14,

23 116.)

24     36.     "The founders also declared that free white men were members of the militia and, as

25 such, were forced to appear with their guns at public 'musters' where government officials would

26 inspect the weapons and register them on the public rolls.  When pressing public necessity

27 demanded it, the founding fathers were also willing to impress guns from law-abiding citizens, even

28

1  if those citizens were left without guns to defend themselves from a criminal attack." (Def. Exh.

2  EK at 12.)

3      37.    "Ten of the thirteen colonies impressed privately owned firearms for the war effort

4  against England. Impressed guns would eventually be returned to their owners, but the seizure

5  itself might leave the owner without a firearm to defend himself against an ordinary criminal attack.

6  To the founding fathers, leaving an individual without a gun to defend himself was in light of the

7  public need for that firearm." (Def. Exh. EK at 114.)

8      38.    "The founders didn't think government should have the power to take away

9  everyone's guns, but they were perfectly willing to confiscate weapons from anyone deemed

10  untrustworthy—a category so broadly defined that it included a majority of the people." (Def. Exh.

11  EK at 116.)

12      39.    "The U.S. Revolver Association, a pro-gun organization formed, like the NRA, to

13  promote marksmanship and competitive shooting, proposed in 1923 a Revolver Act for states to

14  adopt. Under this proposal, civilians would have to obtain a permit to carry a concealed weapon.

15  Anyone who committed a crime while in possession of a handgun would receive an extra five years

16  in prison, and noncitizens would be prohibited from possessing handguns entirely. Gun dealers

17  would have to deliver to police detailed records of all handgun sales. The proposal also included a

18  one-day waiting period that meant dealers could not deliver a handgun to the purchaser until the day

19  after the sale. While these last two types of gun control—turning over records of sales to the police

20  and waiting periods—are vigorously opposed by gun rights advocates today, the Revolver Act was

21  quickly enacted by numerous states, among them West Virginia, New Jersey, Michigan, Indiana,

22  Oregon, California, New Hampshire, North Dakota, and Connecticut." (Def. Exh. EK at 207-08.)

23

24

25

26

27

28

## IV.   THE WAITING-PERIOD LAWS' ALLEGED BURDEN ON PLAINTIFFS' SECOND AMENDMENT RIGHT

### A.   With the Waiting-Period Laws in Effect, Plaintiffs Silvester and Combs Have Been Able to Acquire Multiple Firearms

40.     In the last five years, Combs has owned as many as 50 firearms cumulatively; all firearms were acquired in California with the Waiting-Period Laws in effect.  (Trial Tr. 78:9-14, 79:3-7 [Combs].)

41.     Silvester owns more than one firearm as well.  (JT 6; Trial Tr. 20:24-25 [Silvester].)

### B.   There Are Firearms Dealers Near Where Silvester and Combs Live

42.     Silvester complains that the Waiting-Period Laws burden him with having to make two trips, at least 10 days apart, to a gun seller to obtain a gun that he has purchased.  However, the closest gun dealer to Silvester's house is just two miles away.  (Trial Tr. 36:14-15 [Silvester].) Silvester also drives past one gun dealer or more at least once a month while on business trips. (Trial Tr. 37:4-6 [Silvester].)

43.     Combs lived 30-40 minutes away from a firearms dealer.  (Trial Tr. 89:7-9 [Combs].)

### C.   Faraway Firearms Can Be Transferred from One Dealer to Another, to Be Near Silvester or Combs, for About $100 Per Firearm

44.     Should Silvester or Combs choose to purchase firearms from faraway dealers, instead of nearby dealers, guns can be shipped from one dealer to another (dealers willing).  The cost of having a gun transferred from one dealer to another is between $50 to $150 per gun, or about $100, including transfer fees, dealer fees, and shipping costs.  (Trial Tr. 32:20-33:10 [Silvester]; 144:4-6 [Hoffman].)

### D.   There Are Few or Minimal Costs Imposed by the Waiting-Period Laws

45.     Combs estimates that overall he has had to spend about $1,500 extra in acquiring firearms, because of the 10-day waiting period.  (Trial Tr. 103:22-104:2 [Combs].)

46.     On a per-firearm basis for the firearms that Combs has purchased over the last five years, the extra expenses Combs has allegedly incurred as a result of the Waiting-Period Laws are about $30.  (Trial Tr. 84:15-85:3 [Combs].)

8

**E.     Silvester Has Obtained Firearms in California Without Going Through the 10-Day Waiting Period**

47.     Silvester has received firearms under circumstances in which the 10-day waiting period requirement did not apply.  For example, Silvester received a firearm from his father, without going through the 10-day waiting period.  (Trial Tr. 39:5-11 [Silvester].)  People can transfer firearms to their family members without going through the DROS process.  (Trial Tr. 235:22-25 [Buford].)

48.     Silvester has loaned his firearm to friends and also borrowed a firearm from a friend without being subject to the waiting period.  The 10-day waiting period does not apply to loans of firearms for less than 30 days.    (Trial Tr. 38:12-21, 41:8-21, 42:2-5 [Silvester]; Trial Tr. 281:17-20 [Buford].)

**V.     THE WAITING-PERIOD LAWS PROVIDE TIME FOR A BACKGROUND CHECK TO BE CONDUCTED ON A PROSPECTIVE FIREARM PURCHASER**

49.     One purpose for the 10-day waiting period is to give Cal. DOJ enough time to conduct background checks of individuals purchasing firearms.  (Def. Exh. CG, at AG000055; Trial Tr. 167:6-19 [Buford].)

**A.     Cal. DOJ Processes A Heavy Volume of DROS Applications Each Year**

50.     The Dealer Record of Sales ("DROS") is an application form that a gun dealer electronically submits to Cal. DOJ when someone seeks to purchase a firearm through that dealer. The DROS application contains information about the prospective purchaser, the firearm, and the dealership.  (Trial Tr. 170:19-24, 171:3-18 [Buford].)

51.     After Cal. DOJ receives a DROS application, BOF begins the background check process on the prospective purchaser.  (Trial Tr. 171:18-172:3 [Buford].)

52.     On average, Cal. DOJ receives about 2,000 to 3,000 DROS applications each day. (Trial Tr. 172:24-173:1 [Buford].)  Some days Cal. DOJ receives 1,500 DROS applications; other days Cal. DOJ receives 10,000 DROS applications.  (Trial Tr. 456:6-8 [Lindley].)

53.     Gun purchases tend to spike during holidays and on Black Fridays.  Purchases also tend to spike whenever there is an unusual event, such as a mass shooting, an earthquake, or a riot. (Trial Tr. 204:6-20 [Buford].)

54.     There has been a significant increase in the number of DROS applications submitted to Cal. DOJ since 2003, when only 290,000 applications were submitted for processing.  (Trial Tr. 197:25-198:4 [Buford]; 314:8-10 [Matsumoto].)

55.     Cal. DOJ processed 498,945 DROS applications in 2010, 601,243 in 2011, and 817,738 in 2012.  (Def. Exh. AA.)

56.     In 2013, Cal. DOJ processed 960,179 DROS applications.  (Trial Tr. 453:4-7 [Lindley].)

57.     There is always a backlog of DROS applications in the Cal. DOJ "queue" for background checks.  The current backlog stands at about 20,000 DROS applications.  (Trial Tr. 314:11-13, 19-20 [Matsumoto].)

58.     Cal. DOJ analysts who review DROS applications are known as Criminal Identification Specialist IIs ("CIS Analysts").  (Trial Tr. 200:12-17 [Buford].)

59.     There are 24 CIS Analysts and they typically work well in excess of 40 hours a week to keep up with the influx of DROS applications submitted by dealers.  (Trial Tr. 200:18-19, 203:1-8 [Buford]; 313:7-15, 314:11-13 [Matsumoto].)

60.     BOF is unable to hire temporary workers as CIS Analysts.  (Trial Tr. 204:23-205:8 [Buford].)  It is not feasible to do so; it typically takes six to eight months to train a new CIS Analyst.  (Trial Tr. 326:17-327:11 [Matsumoto].)  CIS Analysts have to understand complicated criminal statutes and case laws to help them determine whether an applicant is prohibited from owning or possessing a firearm.  CIS Analysts also have to understand how to access and analyze database records.  (Trial Tr. 205:5-14 [Buford].)

**B.     The Electronic DROS Application Processing System**

61.     After a dealer submits a DROS application to Cal. DOJ, the application is sent to Cal. DOJ's Consolidated Firearms Information System ("CFIS"), a computerized system.  CFIS coordinates the electronic portion of the background check process, called the Basic Firearms Eligibility Check ("BFEC"), by sending inquiries to other electronic databases and compiling the responses. (Trial Tr. 292:7-21 [Orsi].)

10

62.     The DROS processing system flow described below is illustrated in Defendant's Exhibit CB.

**1.     Computer Databases Queried as Part of the Basic Firearms Eligibility Check (BFEC)**

**a.     Department of Motor Vehicles (DMV)**

63.     The first database queried as part of the BFEC is California's Department of Motor Vehicles ("DMV") database.  (Trial Tr. 293:20-294:3 [Orsi].)

64.     Under California law, firearms purchasers are required to have a valid California driver license or identification card issued by DMV.  (Trial Tr. 236:15-22 [Buford].)

65.     Cal. DOJ sends a DROS applicant's California driver license or California identification number to the DMV database, which returns the person's name, date of birth, and license status to Cal. DOJ.  (Trial Tr. 294:4-9 [Orsi].)

66.     The name and date of birth returned by the DMV database are checked against the name and date of birth in the DROS application to see whether the information matches.  If the information matches and the driver license status is valid, the system continues with next part of the BFEC.  (Trial Tr. 294:4-21 [Orsi].)

67.     The identification information on the DROS application is verified with DMV to ensure that the background check is conducted on the correct person, to prevent the occurrence of "straw" purchases (in which the purchaser obtains a firearm for another, undisclosed person, who often is legally prohibited from possessing firearms), and to prevent people from using fake identification to purchase firearms.  (Trial Tr. 236:23-237:9 [Buford]; Trial Tr. 343:4-14 [Graham].)

68.     If the information does not match, a "DMV mismatch" is recorded, and the DROS application is sent to a DMV mismatch queue for CIS Analysts to review.  (Trial Tr. 294:22-295:6 [Orsi].)

69.     A DMV mismatch does not necessarily indicate that the person is prohibited from owning or possessing a firearm.  A DMV mismatch could occur for an innocent reason, such as if a dealer entered a typographical error into the DROS application transmission system, or if a DROS

1  applicant changed his or her name and is using a new name to purchase a firearm, but has not yet

2  updated that information with the DMV.  (Trial Tr. 237:10-238:12 [Buford].)

3        70.    DMV mismatches are reviewed by CIS Analysts who must verify the information

4  before making a final determination as to whether there is a mismatch.  (Trial Tr. 238:13-239:2

5  [Buford].)

6        71.    Unless a DMV mismatch can be corrected by a CIS Analyst, the DROS application

7  must be rejected.  (Trial Tr. 172:4-11, 16-21, 238:17-25 [Buford].)

8              **b.    Automated Firearms System (AFS)**

9        72.    After being checked against the DMV database, the DROS application is queried

10  against the Automated Firearms System ("AFS") database to determine whether the firearm being

11  purchased has been reported lost or stolen.  (Trial Tr. 173:7-14 [Buford]; 295:21-296:1 [Orsi].)

12  Many firearms involved in the DROS process have been reported lost or stolen.  (Trial Tr. 173:7-14

13  [Buford].)

14        73.    If a firearm that is the subject of the DROS application was reported as lost or stolen

15  in AFS, Cal. DOJ notifies the local law enforcement agency that made the report and requests that

16  the agency conduct an investigation to confirm that the firearm involved in the pending DROS

17  transaction is the same firearm that was reported lost or stolen, and to further confirm that the AFS

18  record is still valid and active.  The resulting investigations by local law enforcement agencies

19  require them to take an active role to confirm that the firearm on the DROS application is actually

20  the firearm that was reported lost or stolen.  How soon an agency begins its investigation depends

21  on an agency's priorities.  (Trial Tr. 174:5-14, 175:5-15 [Buford].)  The processing of the DROS

22  application may be affected by this delay.

23        74.    AFS is not a gun registry and does not have a record of every gun in circulation in

24  California.  (Trial Tr. 180:17-25 [Buford].)

25        75.    California does not have a gun registry.  Rather, since 1991, California has retained

26  transaction records for transfer of handguns.  However, when a person dies, leaves the State of

27  California, or sells a handgun out of state, there is no requirement that the person notify Cal. DOJ

28

12

1   that he or she is no longer in possession of the handgun or that the handgun is no longer in

2   California.  (Trial Tr. 252:25-253:7 [Buford].)

3        76.     The AFS database contains information on who Cal. DOJ believes was the last

4   possessor of a particular firearm based on the most recent DROS transaction BOF processed.  (Trial

5   Tr. 253:11-14 [Buford].)

6        77.     AFS is considered a "leads" database.  This means that it alerts a peace officer in the

7   field whether there could potentially be a firearm in a particular house.  (Trial Tr. 251:19-22, 252:6-

8   10 [Buford].)

9        78.     With the exception of assault weapons records, long gun records have been retained

10  by Cal. DOJ since only January 1, 2014.  (Trial Tr. 181:22-182:5 [Buford].)  Long gun records from

11  prior to 2014 are in AFS only if an owner voluntarily registered his or her long gun with the Cal.

12  DOJ.  (Trial Tr. 339:2-6, 388:10-16 [Graham].)

13       79.     The majority of AFS records are of handguns purchased after 1996, when AFS

14  records became tied to driver license numbers.  (Trial Tr. 340:1-11 [Graham].)

15       80.     The AFS database does not provide information about whether a firearm is in

16  working condition, whether it has been loaned out for less than 30 days, whether a possessor of a

17  firearm has working ammunition for the gun, or whether the gun was removed by a family member

18  or friend for safekeeping.  (Trial Tr. 281:7-284:4 [Buford].)

19              **c.      Consolidated Firearms Information System (CFIS)**

20       81.     For handgun purchases, CFIS conducts a 30-day purchase-restriction check.  (Trial

21  Tr. 296:6-8 [Orsi].)

22       82.     Under California law, a person can lawfully purchase only one handgun in a 30-day

23  period.  (Trial Tr. 206:19-21 [Buford].)

24       83.     CFIS checks within its own database to determine whether the DROS applicant

25  purchased another handgun within the previous 30 days.  If there has been another handgun

26  purchase within 30 days (and no applicable exception applies), the background check stops and the

27  DROS transaction is denied.  (Trial Tr. 296:5-15 [Orsi].)

28

84.     If the DROS applicant had not purchased a firearm within the previous 30 days, CFIS checks whether the applicant has had a previous application denied.  If so, summary information regarding the previous denial is electronically appended to the background check results for a CIS Analyst to review.  (Trial Tr. 296:20-297:13 [Orsi].)

### d.     Automated Criminal History System (ACHS)

85.     The Automated Criminal History System ("ACHS") is queried next.  ACHS contains criminal history information reported to Cal. DOJ by criminal justice agencies in California.  (Trial Tr. 175:16-23, 176:7-13 [Buford].)

86.     CFIS sends the name, date of birth, and any other identification information contained in the DROS application to ACHS.  (Trial Tr. 297:14-22 [Orsi].)

87.     When CFIS initially transmits a DROS applicant's information to ACHS, ACHS conducts a query within itself and also of the three other California statewide databases:  the Wanted Persons Systems ("WPS"), the California Restraining and Protective Order System ("CARPOS"), and the Mental Health Firearms Prohibition System ("MHFPS").  It does this to determine whether there are relevant records in any of those databases matching the DROS applicant.  (Trial Tr. 297:14-298:14 [Orsi].)

88.     In this initial inquiry, CFIS queries these databases based on variations of the name on the DROS application and a range of dates based on the date of birth on the DROS application.  For example, if the name "Jeffrey" is on the DROS application, CFIS would query variations of the name, such as "Jeff" and "Jeffrey," in the initial inquiry.  (Trial Tr. 298:22-299:20 [Orsi].)

89.     If the name variations and possible birth dates match records in ACHS, ACHS returns "criminal identification information" ("CII") numbers associated with the records.  CFIS then conducts a subsequent query of ACHS based on the unique CII numbers to obtain more detailed criminal history information about DROS applicant.  (Trial Tr. 300:1-13 [Orsi].)

90.      If the name variations and birth dates match records in the other California statewide databases, CFIS then queries those databases a second time to retrieve records that match the name variations and possible birth dates.  Unlike ACHS, the other state databases do not use CII numbers.  They use only names and birth dates.  (Trial Tr. 300:14-21, 301:3-14 [Orsi].)

14

### e.   Wanted Persons System (WPS)

91.   WPS is a California statewide database that contains records of warrant information. (Trial Tr. 184:3-5, 10-13, 19-21 [Buford].)

92.   A person with a record in WPS could be prohibited from possessing a firearm. (Trial Tr. 184:14-18 [Buford].)  Under federal law, any warrant prohibits the wanted person from owning or possessing a firearm.  Under state law, persons wanted for a felony offense is prohibited from owning or possessing a firearm.  (Trial Tr. 184:22-185:6 [Buford].)

### f.   California Restraining and Protective Order System (CARPOS)

93.   CARPOS is a California state database that contains information on restraining and protective orders.  (Trial Tr. 182:16-21, 184:6-9 [Buford].)

94.   CFIS queries CARPOS for domestic violence restraining orders and certain protective orders that prohibit the subject from owning or possessing a firearm.  (Trial Tr. 182:22-25 [Buford].)

95.   The CARPOS database is queried electronically, but a CIS Analysts must manually review the search results to confirm that CARPOS records are correctly matched with the individual purchasing the firearm, because the database is queried using only the name and date of birth of the DROS applicant.  (Trial Tr. 183:1-2, 6-11 [Buford].)

### g.   Mental Health Firearms Prohibition System (MHFPS)

96.   MHFPS is a California state database that contains mental health records and records of certain prohibited juveniles.  (Trial Tr. 185:7-17 [Buford].)

97.   CFIS queries MHFPS for prohibitions under California law relating to mental health issues.  (Trial Tr. 186:3-187:7 [Buford].)

**h.   National Instant Criminal Background Check System  (NICS)**

98.   After CFIS queries the statewide databases about a DROS application, CFIS then queries the federal National Instant Criminal Background Check System ("NICS") database.  (Trial Tr. 302:1-3 [Orsi].)

99.   As part of the California DROS background check, NICS checks its own NICS database and also several other federal databases.  (Trial Tr. 302:12-17 [Orsi].)

100.   NICS checks within its own database, which contains military records, citizen renunciates, and other records.  (Trial Tr. 194:17-25 [Buford].)

101.   NICS checks the Interstate Identification Index ("III"), which contains criminal history records from states, including California, that share their criminal history records with the FBI.  (Trial Tr. 191:6-16 [Buford].)  If a person is convicted of a felony in any state, that person is prohibited from owning or possessing a firearm under California law.  (Trial Tr. 192:1-4 [Buford].)

102.   NICS also checks the National Crime Information Center ("NCIC") database, which contains federal warrants, domestic violence restraining orders, and stolen gun information. (Trial Tr. 193:15-19 [Buford].)

103.   NICS also queries the Immigration and Customs Enforcement ("ICE") database, which helps Cal. DOJ identify people who are in the United States unlawfully.  (Trial Tr. 195:1-7 [Buford].)

104.   After the NICS check is completed, BFEC is considered to be complete.  All results obtained by CFIS are attached to the DROS application and placed into the DROS processing queue for a CIS Analyst to review.  (Trial Tr. 303:13-18 [Orsi].)

**2.   Auto-Approvals**

105.   If a DROS application returns no "hits" from any of the databases, the DROS application is deemed "auto-approved."  Approximately 20 percent of DROS applications are in this category.  (Trial Tr. 198:5-15 [Buford].)

106.   Auto-approved DROS applications are typically not reviewed by CIS Analysts. However, CIS Analysts may review these applications if, for example, within the 10-day waiting period, a psychoanalyst asks Cal. DOJ to stop a transfer because the would-be purchaser is the

16

1    subject of a "5150" mental health hold at a mental health facility, implemented after the DROS

2    application was submitted.  When this occurs, Cal. DOJ will seek a 5150 report or a court order to

3    stop the transfer.  (Trial Tr. 199:24-200:1 [Buford].)

4        107.   Cal. DOJ may also be contacted by federal and local law enforcement officers or

5    agencies to stop a transfer that was auto-approved.  For example, a law enforcement officer or

6    agency may inform Cal. DOJ that a background check was being processed on a person held in

7    custody for a felony.  When this occurs, Cal. DOJ will seek a court order to stop the transfer.  (Trial

8    Tr. 199:14-200:1 [Buford].)

9        108.   For these reasons (given in the immediately preceding two paragraphs), it would be

10   inimical to public safety for Cal. DOJ to release a firearm for purchase less than 10 days after

11   application to purchase, even if the applicant was auto-approved.

12       109.   Approximately 80 percent of the DROS applications are not auto-approved, and

13   therefore must be reviewed by a CIS analyst.  (Trial Tr. 200:2-5 [Buford].)

14   **C.     The 10-Day Waiting Period Provides Time for CIS Analysts to Track
         Down Information and Refresh Records**

15

16       110.   The results of the above-described computer database queries are collected for

     review by CIS Analysts.  (Trial Tr. 200:6-11 [Buford].)

17

18       111.   CIS Analysts are necessary to review the results of the computer database queries.

     (Trial Tr. 177:19-24 [Buford].)

19

20       **1.     CIS Analysts verify that the DROS applicant was correctly matched
             to a DMV record**

21       112.   CIS Analysts first review records in the DMV mismatch queue to determine whether

22   there is a real mismatch of the applicant's identity to the DMV records, or whether the records can

23   be fixed and thus allow a match to be made.  A simple mismatch that occurred because the dealer

24   made a typographical error can be corrected by a CIS Analyst, who will then send the DROS

25   application through the BFEC process rather than reject the application because of the

26   typographical error.  (Trial Tr. 316:17-317:15 [Matsumoto].)

27

28

**2.     CIS Analysts verify that database records matched to the DROS applicant in the electronic BFEC process were correctly matched to the applicant**

113.    When CIS Analysts review DROS applications, they verify that each DROS applicant is the same individual matched by the computer to the criminal and other database records. (Trial Tr. 201:16-20 [Buford].)  For example, if a criminal history record is matched to a DROS applicant, the CIS Analyst will review the identification information to confirm that it is an accurate match.  (Trial Tr. 178:2-11 [Buford].)

114.    Cal. DOJ does not always have the most accurate identification information on persons who are the subject of statewide database records.  For example, when a person checks into a mental health facility, that person often does not have a California driver license.  Cal. DOJ receives only whatever information the facility could glean from the patient.  (Trial Tr. 254:3-11 [Buford]; Trial Tr. 455:17-24 [Lindley].)  Cal. DOJ may also have to decipher individual's names in the statewide databases because aliases may be used.  (Trial Tr. 455:4-16 [Lindley].)

**3.     CIS Analysts investigate unreported dispositions or other missing information**

115.    Even if the records associated with a DROS application indicate that the applicant is prohibited from owning or possessing firearms, the accuracy and validity of the records must be verified by a CIS Analyst.  For example, if the disposition of an arrest record was a conviction, the person would not be eligible to own or possess a firearm; but if the conviction was dismissed or reduced, the person may be eligible.  (Trial Tr. 179:11-25 [Buford].)  Or an arrest may be recorded with no disposition information.  In that case, the CIS Analyst must obtain a final disposition on that arrest to determine whether the person is prohibited.  (Trial Tr. 201:23-202:6 [Buford].)

116.    Without disposition information, a CIS Analyst cannot determine whether an individual is eligible to own and possess firearms because there must be a conviction for there to be a prohibition.  (Trial Tr. 323:12-21 [Matsumoto].)

117.    If there is an open disposition, a CIS Analyst has to "chase" the records.  (Trial Tr. 201:23-202:6 [Buford].)  Chasing an open disposition could mean telephoning a local law

18

1   enforcement agency, a district attorney, or a court to try to find out the disposition (for example, a

2   conviction, or a dismissal).  (Trial Tr. 323:12-314:1 [Matsumoto].)

3        118.   Disposition records could be lost.  (Trial Tr. 176-177 [Buford.])  The information

4   may exist but not be input into any computer database that BOF can access, and it could be some

5   time before BOF can retrieve the record.  (Trial Tr. 179:8-10 [Buford].)  The process to chase down

6   missing criminal history information can be a very length process.  (Trial Tr. 180:4-13 [Buford].)

7        119.   Similarly, mental health facilities get information from the patients, who may not be

8   able to provide accurate personal information.  The CIS Analysts may have to contact the mental

9   health facility to ensure that a person is not prohibited.  (Trial Tr. 455:17-456:5 [Lindley].)  BOF

10  may also have to decipher people's names because aliases may be used.  (Trial Tr. 455:4-16

11  [Lindley].)

12       120.   In addition to chasing in-state records, CIS Analysts routinely chase out-of-state

13  dispositions.  The federal III, which contains criminal history information from other states, often

14  does not contain complete and accurate records on out-of-state criminal convictions.  (Trial Tr.

15  192:5-8 [Buford].)  Disposition information is frequently missing in the III records.  (Trial Tr.

16  192:9-13 [Buford].)  CIS Analysts then have to call or fax courts of other states or federal courts to

17  obtain the disposition information.  (Trial Tr. 192:22-193:12 [Buford].)

18       121.   CIS Analysts must also review and verify the results of the federal NCIC queries

19  because NCIC results are based on a person's name, and not a fingerprint match.  CIS Analysts may

20  also need to contact the relevant agencies to confirm that certain warrants are still active.  The

21  agencies sometimes admit to Cal. DOJ that they forgot to remove expired warrants from the system.

22  (Trial Tr. 194:4-13 [Buford].)

23       122.   In addition to obtaining missing disposition information, CIS Analysts must inquire

24  into the background or details of records to make the correct determination on a prohibition.  For

25  example, an individual arrested for corporal injury on a spouse or cohabitant could be convicted of

26  a misdemeanor battery.  (Cal. Penal Code § 273.5.)  Under state law, the misdemeanor battery

27  conviction results in a 10-year prohibition against owning or possessing a firearm.  Under federal

28  law, however, battery against a spouse or cohabitant is a lifetime prohibition.  Thus, CIS Analysts

19

1  are needed to investigate the relationship between the convicted individual and the battery victim.

2  To conduct that investigation, CIS Analysts must contact the arresting agency for a copy of the

3  arrest report and review that report and determine the relationship between the offender and the

4  victim.  (Trial Tr. 319:21-320:17 [Matsumoto].)

5      123.    Out-of-state arrests of military personnel constitute another example of why CIS

6  Analysts are necessary to Cal. DOJ's background-check process.  If a member of the military is

7  arrested out of state for possession of a controlled substance, a CIS Analyst must determine the

8  disposition, determine whether the member was subject to a court marshal, and find out the type of

9  discharge the individual received (i.e., honorable or dishonorable).  The CIS Analyst's findings

10  affect the individual's eligibility to own or possess firearms.  (Trial Tr. 320:23-321:7 [Matsumoto].)

11  To conduct this investigation, the CIS Analyst must obtain specific information from the military.

12  (Trial Tr. 321:16-22 [Matsumoto].)

### 4.    CIS Analysts confirm that correct laws are applied

14      124.    Only certain types of arrests and convictions prohibit an applicant from owning or

15  possessing a firearm.  CIS Analysts review criminal history and other records to confirm that Cal.

16  DOJ is correctly approving or disapproving DROS applications.  (Trial Tr. 178:12-20 [Buford].)

17      125.    For example, CIS Analysts are needed to determine whether a felony that has been

18  reduced (by a judge) to a misdemeanor was properly reduced.  A straight felony that has been

19  reduced to a misdemeanor could be cleared by a computer for approval, but, as a matter of law, a

20  straight felony cannot be reduced to a misdemeanor.  (*See People v. Douglas*, 79 Cal.App.4th 810,

21  812-13 (2000); *People v. Super. Ct.*, 29 Cal.App.4th 323, 330 (1994).)  A CIS Analyst is needed to

22  correct this mistake to ensure the person is not mistakenly approved during the DROS process.

23  (Trial Tr. 319:5-20  [Matsumoto].)

### 5.    CIS Analysts rerun BFEC to obtain most up-to-date records

25      126.    CIS Analysts typically review the DROS applications several days after BFEC is

26  automatically run through CFIS.  (Trial Tr. 322:3-5 [Matsumoto]; *see* Def. Exh. AR, first page

27  following tab (exemplar email explaining the number of days after Cal. DOJ receives DROS

28  applications that the CIS Analysts review the application.)  Depending on the backlog, DROS

applications may not be reviewed by CIS Analysts until eight or nine days after the electronic query of databases is complete.  (Trial Tr. 322:3-5 [Matsumoto].)

127.    Before CIS Analysts begin review of DROS applications, they will rerun the background check in the state databases to refresh that information and to ensure that it has been updated with any information that may have been entered into Cal. DOJ's databases after Cal. DOJ received the DROS application.  This ensures that the CIS Analysts have the best and most current information possible to conduct the background check.  (Trial Tr. 475:1-14 [Lindley]; 322:3-23 [Matsumoto].)

128.    There are instances when an individual applied to purchase a firearm and was subsequently admitted to a mental health facility during the 10-day wait.  If the CIS Analyst did not refresh the background check in the state databases, that person might have been erroneously cleared to own and possess that firearm.  (Trial Tr. 322:14-23 [Matsumoto].)

**D.     The 10-Day Waiting Period Provides Time for Reporting Agencies to Update Cal. DOJ Databases**

129.    Cal. DOJ databases may not have the most up-to-date information because reporting agencies may fail to submit information to the Cal. DOJ databases or may delay in submitting information to Cal. DOJ databases.  (Trial Tr. 324:13-16 [Matsumoto].)

130.    For example, ACHS is not always up-to-date with criminal history records.  (Trial Tr. 176-177 [Buford.])  ACHS could contain outdated information because of the time lag between a disposition and when the record is transmitted to Cal. DOJ.  (Trial Tr. 176-177 [Buford.])

131.    Records in the MHFPS are often not complete or up-to-date either.  (Trial Tr. 187:8-10 [Buford].)

132.    Mental health adjudications and mental health events are underreported.    (Trial Tr. 187:8-13 [Buford].)

133.    A 2013 audit by the Bureau of State Auditors shows that many state courts were not reporting mental health prohibition information to Cal. DOJ as required by state law.  (Trial Tr. 187:11-18 [Buford].)

134.     Courts are often understaffed and underfunded, which may lead to underreporting. Furthermore, courts report prohibiting events by mail, so there is a time lag between when courts mail their reports to Cal. DOJ and when Cal. DOJ receives and processes them.  (Trial Tr. 188:8-15 [Buford].)

135.     Mental health facilities also do not submit their records instantaneously.  Even though mental health facilities are required under state law to report prohibiting events immediately, some facilities still submit records only periodically.  (Trial Tr. 187:23-188:7 [Buford].)

136.     In addition, even though reporting agencies (courts and law enforcement agencies) are required to report disposition information within two days, they do not always do it promptly because they may have backlogs or staff shortages.  (Trial Tr. 324:2-16 [Matsumoto].)

137.     BOF does not have the authority to require reporting agencies to submit reports to Cal. DOJ.  (Trial Tr. 341:24-342:3 [Graham].)

138.     Providing more funding to BOF to hire more CIS Analysts to perform reviews does not speed up the background check process.  This is because the 10-day wait is due in part to the underreporting and late-reporting of criminal history and other records.  The 10-day wait provides the time required for CIS Analysts to seek and obtain missing or incomplete information from in-state and out-of-state law enforcement agencies, courts, and mental health facilities.  (Trial Tr. 454:24-456:5 [Lindley].)

139.     The 10-day waiting period provides time for Cal. DOJ to chase dispositions and update records to complete the background checks.  (Trial Tr. 220:23-221:7 [Buford].)

**E.     The 10-Day Waiting Period Provides Time for Law Enforcement to Investigate and Intercept Purchased Firearms Prior to Delivery to Prohibited Persons**

140.     A straw purchase is a purchase that a non-prohibited person makes for someone who is prohibited from owning and possessing a firearm.  The firearm is then illegally transferred by the straw purchaser to the prohibited person.  (Trial Tr. 343:4-14 [Graham].)

141.     Cal. DOJ special agents attend gun shows to identify potential straw purchasers at the gun shows.  (Trial Tr. 342:14-343:3 [Graham].)

22

142.     After Cal. DOJ special agents identify potential straw purchasers at gun shows, they conduct an investigation into whether there is a straw purchase, including identifying the suspected straw purchaser and the hidden buyer.  (Trial Tr. 346:12-347:10, 347:19-348:13 [Graham].)

143.     Cal. DOJ special agents have at most 10 days (i.e., the waiting period) to conduct a "straw purchase" investigation.  (Trial Tr. 439:3-12 [Graham].)

144.     Cal. DOJ special agents do their best to finish their investigation within the 10-day waiting period because they do not want the prohibited person to receive the firearm after the straw transaction is finalized.  (Trial Tr. 348:14-25 [Graham].)  A shorter waiting period would make it nearly impossible for Cal. DOJ special agents to complete a straw purchase investigation at gun shows.  There would be less time for Cal. DOJ special agents to identify the parties involved in a potential straw transaction and obtain the necessary warrants.  (Trial Tr. 349:1-12 [Graham].)

145.     The federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("BATFE") and gun dealers also may notify BOF of suspicious activities that could be straw purchases.  (Trial Tr. 351:7-20, 352:24-353:5 [Graham].)  The 10-day waiting period helps Cal. DOJ special agents in investigating these reported straw purchases.  (Trial Tr. 353:6-9 [Graham].)  (Trial Tr. 352:24-353:5 [Graham].)

146.     Cal. DOJ field representatives who conduct inspections of gun dealers have also uncovered straw purchases.  (Trial Tr. 354:10-355:7 [Graham].)

147.     In these instances, Cal. DOJ field representatives examine sales records and denial records at dealers.  If they notice a denial letter and sales record with the same last name or address, they would suspect that a straw purchase is being made and notify Cal. DOJ special agents of this suspicious activity.  Cal. DOJ special agent would then investigate the transaction.  (Trial Tr. 353:14-16, 354:12-356:4 [Graham].)

148.     Dealer inspections by Cal. DOJ field representatives also may reveal potential straw purchases during the 10-day waiting period.  If a potential straw purchase is detected during the waiting period, BOF would potentially be able to intercept the firearm before it is released to the straw purchaser.  (Trial Tr. 356:5-356:22 [Graham].)

23

149.    To ensure public safety, DOJ special agents prefer to intercept a firearm before it is released to a straw purchaser.  Once the firearm is released to a straw purchaser, it could be transferred to the prohibited person, which would make it more difficult for the DOJ special agents to retrieve the firearm.  (Trial Tr. 348:14-25, 349:13-21, 350:2-5 [Graham].)

150.    It is always far easier and in the public's interest to prevent a prohibited person from possessing a firearm in the first place than to retrieve it from a prohibited person after a firearm has been released.  Retrieving a firearm from someone, especially if they have mental health issues, can be very dangerous for the public and for the agents responsible for retrieving the firearm.  (Trial Tr. 470:11-25 [Lindley].)

151.    There are people who make repeated straw purchases for hidden buyers.  If the 10-day waiting period is not applied to them, Cal. DOJ special agents will almost certainly not be able to intercept the firearm before the straw purchaser transfers the firearm to a prohibited person. (Trial Tr. 350:15-351:2 [Graham].)

152.    Approximately 15 percent of the straw purchases caught by Cal. DOJ were caught during the 10-day waiting period.  (Trial Tr. 408:16-24 [Graham].)

153.    The 10-day waiting period is vital to the investigation of straw purchases conducted by DOJ special agents.  The time between the investigation and when the gun would be delivered to the straw purchaser helps ensure public safety by preventing the release of the firearm to the straw purchaser.  (Trial Tr. 413:2-3, 8-11 [Graham].)

**F.      The Waiting-Period Laws Must Be Applied to Subsequent Purchasers to Ensure an Effective Background Check in the Interest of Public Safety**

154.    In connection with each prospective firearm purchase in California, a full background check is conducted for all persons, not statutorily exempt, and even for persons holding COEs or CCW permits, or for persons who already have firearms registered to them in the AFS system.  (First Am. Compl. (Dkt. #10) at ¶ 64.)

24

**1.    Prohibiting events may have occurred after the prior DROS application was filed**

155.    Simply because a person holds a COE or CCW, or has a gun already in the AFS, does not mean that the person is eligible to own or possess firearms at the time of a DROS application.  (Trial Tr. 225:24-226:1, 279:11-280:15 [Buford].)

156.    The DROS background check process does not consider whether a person has been previously approved to own or possess firearms.  That information is irrelevant because circumstances change and a person who was previously approved could later become prohibited.  (Trial Tr. 283:6-17 [Buford].)

157.    Some CCW licenses may also be issued long after a background check is completed.  CCWs are issued by local law enforcement agencies.  BOF's only involvement in the CCW application process is in the processing of the background checks.  Some local law enforcement agencies issue CCWs as late as nine months after BOF completed the background check for a particular individual.  (Trial Tr. 458:19-459:6, 459:19-23 [Lindley].)

158.    Persons with CCW permits or COEs are not subject to ongoing real-time background checks.  (Trial Tr. 224:21-24, 225:15-17 [Buford].)

159.    Persons with CCW permits or COEs are subject to "rap-back" checks.  (Trial Tr. 222:4-9, 225:15-17 [Buford].)  A rap-back, or subsequent notification, refers to the notification that Cal. DOJ receives whenever someone with fingerprints on file with Cal. DOJ is the subject of a criminal justice agency record; for example, a notification of a subsequent arrest record.  (Trial Tr. 221:21-222:9 [Buford].)

160.    Many events that would prohibit a person from owning or possessing a firearm, however, are not part of rap-backs.  Non-fingerprint based events, such as a mental health hold, would not be discovered in a rap-back check, which is based on fingerprints.  (Trial Tr. 223:13-16 [Buford].)  Other prohibiting events that would not be subject of rap-backs include the issuance of a restraining order and a person's admission to a mental health facility in another state.  Cal. DOJ also does not receive rap-backs for persons who are arrested or convicted outside of California.  (Trial Tr. 224:8-20, 224:25-225:2 [Buford].)

25

### 2. Records or laws may have been updated or changed after the prior DROS application was filed

161.    Even if someone has been through the DROS background check previously, i.e., persons on behalf of whom plaintiffs bring the instant lawsuit, CIS Analysts cannot simply review the database entries created after the previous DROS application was submitted.  This is because laws could have changed since the previous application that would prohibit the individual from owning or possessing firearms based on a previous record.  (Trial Tr. 324:20-325:4 [Matsumoto].)

162.    For example, the law changed in 2004 for those convicted of violating Penal Code section 273.5, corporal injury on spouse and cohabitant.  If a purchaser had a Penal Code section 273.5 conviction expunged before 2004, he or she would have been eligible to possess a firearm. But after 2004, the federal government no longer honored such expungements and a person with a conviction under Penal Code section 273.5 would not be eligible to own or possess firearms, even though they might have been prior to 2004.  (Trial Tr. 325:6-13 [Matsumoto].)

163.    For this same reason, DROS applicants with COEs or CCW licenses are not treated differently than those without COEs or CCWs.  Laws could have changed between when the person received the COE or CCW license and when the person applies to purchase another firearm.  (Trial Tr. 325:18-25 [Matsumoto].)

### G. Cal. DOJ's DROS Processing System Cannot be Adequately Replaced by Other Systems

#### 1. The Armed and Prohibited Persons System (APPS) database cannot replace BFEC

164.    The Armed and Prohibited Persons System ("APPS") is a database that cross-references persons with firearm record in the AFS, typically a DROS record, with those who have a prohibiting conviction or circumstance.  (Trial Tr. 216:21-217:2 [Buford].)

165.    APPS became active in 2007.  (Trial Tr. 337:19-21 [Graham].)

166.    APPS is a preemptive crime-fighting tool.  The purpose behind APPS is to identify prohibited persons who have firearms and to enable law enforcement to retrieve the firearms before those persons can use the firearms to harm the public or themselves.  (Trial Tr. 217:21-218:3 [Buford].)

26

167.    APPS, however, is not an instant background check system and was not developed for that purpose.  It is a "pointer tool" that identifies persons who may be armed and prohibited in a particular law enforcement agency's jurisdiction.  Information in APPS needs to be updated and verified before any enforcement action is taken.  (Trial Tr. 218:4-219:7 [Buford]; 337:4-10 [Graham].)

168.    There are 21,000 people identified as armed and prohibited in the APPS.  These individuals purchased firearms prior to becoming prohibited to do so.  (Trial Tr. 338:2-8 [Graham].)

169.    Many people who should be in APPS are not in APPS.  (Trial Tr. 340:15-18 [Graham].)

170.    For example, there are 1.5 million records in MHFPS.  Out of those, only 225,000 records were entered into APPS.  (Trial Tr. 341:5-23 [Graham].)  Of those mental health records, only a tiny fraction—approximately 4,000—were matched to the 21,000 individuals in APPS. (Trial Tr. 437:3-18 [Graham].)

171.    Just as with the DROS background check process, CIS Analysts are needed to chase down missing dispositions and update the information in APPS.  (Trial Tr. 219:15-20 [Buford].)

172.    In addition, APPS records-matching software searches for only an exact name and date of birth match.  (Trial Tr. 304:16-23 [Orsi].)

173.    This is unlike the regular BFEC, which searches for name variants and date of birth ranges.  (Trial Tr. 304:24-305:10 [Orsi].)

174.    For example, if a DROS applicant uses the name "Jeff" on the DROS application, and the APPS entry is "Jeffrey," APPS would not identify a records match.  Or if "Jeffrey" is spelled in a different way, APPS would not identify a records match.  This is different from the regular BFEC, which checks name variations.  (Trial Tr. 304:24-305:18 [Orsi].)

175.    APPS also does not query the NICS databases, as it is not permitted to do so by federal law.  Out-of-state convictions are thus not identified in APPS.  (Trial Tr. 476:11-15 [Lindley]; Trial Tr. 192:5-8 [Buford].)

176.    For all these reasons, APPS is not an adequate substitute for a DROS background check, for any group of people.

## 2. The Federal NICS check cannot replace BFEC

177.    NICS cannot replace Cal. DOJ's background-check system without negative consequences for public safety.  There are prohibiting events under California law that are not in the NICS databases.  For example, NICS does not contain information on violent misdemeanors, certain mental health holds or violent juveniles.  NICS also does not verify identification information of the purchaser with the DMV to determine the validity or status of the purchaser's license or identification card.  (Trial Tr. 206:6-18 [Buford].)  A person with any of those prohibiting events would be cleared to purchase firearms, if just checked via the NICS.

178.    NICS does not check for or enforce California's restrictions on buying one handgun in a 30-day period or California's five-year prohibition on persons with a Tarasoff report.  NICS also does not check whether the gun associated with a DROS transaction has been reported as lost or stolen.  (Trial Tr. 206:19-207:2 [Buford].)

179.    NICS does not have the authority to enforce state prohibitors (such as violent misdemeanors, certain mental health holds, or violent juveniles).  (Trial Tr. 206:6-18, 207:3-8 [Buford].)

180.    NICS also does not check the California DMV database and therefore would not catch anyone attempting to purchase a firearm with fake or invalid identification.  (Trial Tr. 215:21-25 [Buford].)

181.    If California relied on NICS alone rather than BFEC, thousands of persons who are prohibited from owning or possessing firearms will obtain firearms.  (Trial Tr. 208-210, 212:7-9 [Buford].)

182.    In 2012, over 4,000 denials were made under California law that would not have been denials if the purchasers were subject only to a federal NICS check:  1,930 30-day rejects, 781 mental health denials, 373 violent juvenile denials, and 1,054 violent misdemeanor denials.  (Def. Exh. AO at AG002144 [Summary 2012 DROS statistics].)

183.    In 2013, nearly 5,000 denials were made under California law that would not have been denials if the purchasers were subject only to a federal NICS check:  2,814 30-day rejects, 802

1   mental health denials, 329 violent juvenile denials, and 926 violent misdemeanor denials.  (Trial Tr.

2   208-210, 212:7-9 [Buford]; Def. Exh. AP at AG002394 [Summary 2013 DROS statistics].)

3        184.    Under the California background check system, mistakes (i.e., prohibited persons

4   being cleared to purchase a firearm) are made only rarely—about 10 to 12 times a year.  (Trial Tr.

5   482:6-14 [Lindley].)

6        185.    Under the federal NICS check system, 3,166 firearm retrieval actions were referred

7   by NICS to ATF in 2011 alone.  (Trial Tr. 220:17-22 [Buford]; Def. Exh. BO at AG001818 [NICS

8   Operations 2011].)  This means that 3,166 persons who were prohibited from owning or possessing

9   firearms received firearms after a NICS check was conducted.

10        186.    It takes time to do a quality background check that is necessary to ensure public

11   safety.  (Trial Tr. 452:7-13, 456:2-5 [Lindley].)  The more time BOF has to do a quality background

12   check, the better BOF can ensure that a prohibited person will not come in possession of a firearm.

13        187.    If BOF is forced to do an instantaneous or near-instantaneous background check, it

14   would be a very poor quality background check.  BOF would not have time to ensure that people

15   who are prohibited do not obtain a firearm.  (Trial Tr. 456:9-19 [Lindley].)

16        188.    Anything less than ten days makes it very difficult for Cal. DOJ to contact the

17   reporting agencies necessary to determine whether a DROS applicant is prohibited in the event that

18   the person's criminal history and other records are incomplete.  (Trial Tr. 473:21-474:5 [Lindley].)

19   **VI.   THE WAITING-PERIOD LAWS PROVIDE A COOLING-OFF TIME**

20        189.    A primary justification for the waiting period is to provide a cooling-off time for a

21   firearms purchaser.  (Trial Tr. 167:6-8 [Buford]; *Bickston*, 91 Cal.App.3d Supp. at 32 ("Thus it

22   appears that an original intent to provide at least an overnight cooling-off period from 'application

23   for the purchase' was supplemented over the years with the additional time to allow the Department

24   of Justice to investigate the prospective purchaser of the weapon).)

25        190.    The cooling-off period serves a public safety function in preventing suicides or other

26   violent acts.  (Trial Tr. 499:22-25 [Lindley].)

27        191.    The cooling-off period is designed to create a period of time when a person cannot

28   get a hold of a weapon while he or she is in a state of anger.  (Trial Tr. 233:4-7 [Buford]; 499:19-21

29

[Lindley].)  A cooling-off period would allow persons time to rethink any potential bad acts that they may be planning.  (Trial Tr. 358:9-17 [Graham].)

### A. Cooling-off Period Reduces Violent Acts by Firearms

192.     Suicide attempts appear to be relatively impulsive acts.  (Def. Exh. DM (Greg M. de Moore, et al., *Survivors of Self-inflicted Firearm Injury*, 160 The Medical Journal of Australia 421 (Apr. 4, 1994)) at 422-23.).  In one study of 33 adults who survived suicide attempts by firearms, the majority of the people reported having suicidal thoughts for only three weeks or less time before making their attempts.  *Id.*  In another study of 30 adults who survived suicide attempts by firearms, more than half of the people reported having suicidal thoughts for less than 24 hours before making their attempts.  (Def. Exh. DS (Linda G. Peterson, et al., *Self-inflicted Gunshot Wounds: Lethality of Method Versus Intent*, 142 American Journal of Psychiatry (Feb. 1985)) at 228, 230; accord Def. Exh. DG (E. Michael Lewiecki, MD, and Sara A. Miller, PhD, "Suicide, Guns, and Public Policy," *American Journal of Public Health* (Jan. 2013)) at 27-28; *see also id.* at 29 (more evidence)).)

193.     Two researchers at the Harvard School of Public Health have likewise declared plainly, "Suicidal individuals are often ambivalent about killing themselves, and the risk period is transient. *Reducing the availability of lethal instruments during this period may prevent suicide.* Psychiatric and penal institutions have long recognized the importance, in all age groups, of restricting access to lethal means of suicide for newly admitted and potentially suicidal inmates." (Def. Exh. DT (Matthew Miller and David Hemenway, *The Relationship Between Firearms and Suicide: A Review of the Literature*, 4 Aggression and Violent Behavior 59 (1999)) at 61 (emphasis added); Def. Exh. DG at 29 ("A waiting period of seven days could be life-saving when an urge to commit suicide passes within one hour and a gun is not available in the household, but it might not be helpful if the suicidal impulse continues for two weeks"); Def. Exh. GN (regarding correlation between repeal of Missouri's background-check requirement and increase in murders).)  The availability of only less-lethal substitutes may reduce total completed suicides.  (Def. Exh. DT at 61.)  Reviewing another study:  "Gun suicide was affected by restrictions on both the buying and selling of guns. . . .  Suicide rates by other methods were not affected by any of the restrictions.  Overall, states with tougher handgun laws had lower overall

30

1  suicide rates." (*Id.* at 69.) Reviewing another study: "Firearm license to purchase or waiting

2  period to purchase laws were found to reduce the rate of white male suicides aged 20 to 64 by 3

3  suicides per 100,000 population." (*Id.* at 70.) In Queensland, Australia, when a 28-day cooling-off

4  period, and handgun safety tests, were enacted into law, firearm suicide rates declined significantly

5  in urban areas (but not rural areas). (*Id.* at 72; Def. Exh. DH (Jens Ludwig, PhD, and Philip J. Cook,

6  PhD, "Homicide and Suicide Rates Associated with Implementation of the Brady Handgun Violence

7  Prevention Act," *Journal of the American Medical Association* (Aug. 2, 2000)) at 583; *see also id.* at 584,

8  585, 588, 590 (more corroboration).) In Tasmania, when a 21-day cooling-off period was enacted into

9  law, the number of spontaneous acts with newly acquired firearms decreased. (Def. Exh. DQ (Kate

10  Warner, *Firearm Deaths and Firearm Crime After Gun Licensing in Tasmania* (Mar. 1999)) at 3.)

11       194.    A revised study of the federal five-day waiting period in place in the 1990s found as

12  follows: "In particular, the waiting period required during phase one of [The Brady Act] may have

13  slowed handgun acquisition by some people experiencing a suicidal impulse. . . .[O]ur analysis of

14  suicide rates found some evidence that Brady may have reduced gun suicide rates among people

15  aged 55 and older" (although the gains were partially offset by an increase in non-gun suicides).

16  (Def. Exh. EJ (*Webster and Vernick, eds.*, Reducing Gun Violence in America (2013)) at 26; Def.

17  Exh. DH at 588, 590; accord Def. Exh. DV (Garen J. Wintemute, M.D., M.P.H., et al., "Mortality Among

18  Recent Purchasers of Handguns," *The New England Journal of Medicine*, vol. 341:21 (1999)) at 1585; *see id.*

19  at 1583-84 (more corroboration).)

20       195.    One critical review of the relevant literature lamented the small number of available

21  studies of the effect of waiting periods, yet had to acknowledge the study that found a statistically

22  significant decrease in firearm suicides by people older than 55 years, correlated with the

23  introduction of a firearm-acquisition waiting period. (Def. Exh. DX (Robert A. Hahn, et al.,

24  *Firearms Laws and the Reduction of Violence: A Systematic Review*, 28 American Journal of

25  Preventive Medicine 40 (2005)) at 52; see also id. at 51 (more corroboration).)

26       196.    According to another literature review:

27      Several studies have examined correlations between different aspects of firearms
    control legislation—such as the requirement for a waiting period, requirements for
28      licensing, and restricted availability based on psychiatric and/or criminal records—and

31

the suicide rate.  All of these studies have shown an inverse relationship between the restrictiveness of firearms legislation and the overall suicide rates . . .  Although there was some evidence of method substitution, the overall impact on the suicide rate was still favorable.

(Def. Exh. DW (David A. Brent, Firearms and Suicide, Annals of New York Academy of Sciences, 225 (2001)) at 232; *see also id.*, at 225, 228, 229, 234-36 (more corroboration)).

## B. Rationale and Benefits of A Cooling-off Period Apply to All Applicants, Including Subsequent Purchasers

197.    If Cal. DOJ completes the background check of a prospective firearm purchaser prior to the end of the 10-day waiting period, Cal. DOJ does not release the firearm until after the waiting period ends, to give effect to the cooling-off period.  (Trial Tr. 508:6-8 [Lindley].)

### 1. Subsequent Purchasers May No Longer Possess Firearms or May Possess Non-Working Firearms

198.    A cooling-off period for a firearm purchase may be effective to prevent an act of violence to be committed by a person who previously purchased a firearm, because that person may no longer possess the previously purchased firearm and thus could not use it to commit an act of violence.  (Trial Tr. 233:8-24 [Buford].)

199.    The DROS system assumes that all DROS applicants do not have firearms, because, even for someone who has a firearm in the AFS, Cal. DOJ does not necessarily know whether that person still in fact has possession of the firearm in the AFS.  (Trial Tr. 234:8-19 [Buford].)

200.    Guns can be lost or stolen.  (Trial Tr. 173:20-22 [Buford].)

201.    The firearm already possessed by a subsequent firearm purchaser may also not be available to be used for acts of violence.  For example, there were times when one or more of Silvester's guns were not available for him to use, because the guns were not in working condition. (Trial Tr. 37:19-24 [Silvester].)  There are also times when one or more of Silvester's guns were not available for him to use because he lacked the proper ammunition for them.  (Trial Tr. 37:25-38:10 [Silvester].)  In some instances (not involving Silvester or Combs), a firearm owner or a family member will surrender firearms to law enforcement while the firearm owner seeks mental-health treatment.  (Trial Tr. 478:22-479:3.)

32

### 2. Subsequent Purchasers May Seek New Firearms for Specific Purposes

202.    A cooling-off period may be effective as to persons who already own firearms because such a person may choose to acquire new or additional firearms to commit a planned act of violence.  (Trial Tr. 359:1-4, 360:10-20 [Graham].)

203.    Different guns are suitable for different purposes.  (Trial Tr. 38:11-16 [Silvester].)

204.    In one example, Shareef Allman, who had lawfully purchased at least one firearm, decided to acquire additional firearms, including an AK-47, before using the firearms to shoot and kill people in Cupertino, California, before killing himself.  (Trial Tr. 360:10-20, 414:16-415:21 [Graham].)

## VII. EXEMPTIONS TO THE WAITING-PERIOD LAWS

### A. Peace Officer Exemption

205.    In certain circumstances, peace officers may be exempt from the Waiting-Period Law.

206.    Every peace officer undergoes Peace Officers Standards Training (POST), which includes an extensive psychological evaluation and background investigation that involves interviewing the subject's family, friends, and neighbors.  This background investigation is much more extensive than a DROS background check.  (Trial Tr. 227:5-12, 16-21 [Buford]; 461:10-25 [Lindley].)

207.    Peace officers hired by law enforcement agencies receive between 600 and 900 hours of training in the police academy.  After they graduate, they receive six-to-12 months of field training before they are assigned out to patrol without supervision.  (Trial Tr. 461:10-25 [Lindley].)

208.    Because peace officers carry firearms as part of their duties, the California Legislature did not want to hinder peace officers' access to firearms to protect themselves while on and off duty.  (Trial Tr. 227:13-15 [Buford].)  Peace officers are not similarly situated to other Californians in this respect.

209.    To avail themselves of this exemption to the Waiting-Period Law, peace officers are required to obtain a letter from the head of their law enforcement agency approving them for

33

1  immediate possession of the firearm.  (Trial Tr. 361:5-15 [Graham].)  BOF does not issue those

2  letters often.  (Trial Tr. 361:16-18 [Graham].)  BOF Chief Stephen Lindley has never issued such a

3  letter.  (Trial Tr. 464:4-14 [Lindley].)

4       **B.     Dangerous Weapons Permit Exemption**

5       210.    A holder of a dangerous weapon permit (DWP) is exempted from the 10-day waiting

6  period.  The reason is that Cal. DOJ conducts an extensive background investigation of each permit

7  holder prior to issuing the permit.  As part of the background investigation, Cal. DOJ sends

8  investigators to the applicant's home and business, and speaks to the applicant's friends, relatives,

9  and former employers.  This background investigation is much more extensive than a DROS

10 background check.  (Trial Tr. 228:15-229:2 [Buford].)

11      211.    DWP holders are heavily regulated by Cal. DOJ and federal BATFE, and are under

12 constant supervision.  For example, Cal. DOJ inspects DWP holders' premises and firearms

13 regularly to ensure that they are in compliance with the law.  (Trial Tr. 463:1-18 [Lindley].)  DWP

14 holders are not similarly situated to other Californians in this respect.

15      **C.     Entertainment Firearms Permit Exemption**

16      212.    A holder of an entertainment firearm permit (EFP) is exempted from the 10-day

17 waiting period.

18      213.    The entertainment industry in California needs the EFP exemption to obtain firearms

19 to use in television or movie productions.  The EFP holders have must also have DWPs, so they

20 have undergone full background investigations discussed above.  Additionally, most of the firearms

21 used by EFP holders have been gunsmithed to fire only blank ammunition.  EFP holders are also

22 subject to inspection by Cal. DOJ.  (Trial Tr. 468:21-469:15 [Lindley].)  EFP holders are not

23 similarly situated to other Californians in this respect.

24      **D.     Dealer Exemptions**

25      214.    A firearms dealer may transfer firearms to another dealer or himself or herself

26 without going through a waiting period.  (Trial Tr. 362:5-10 [Graham].)

27

28

215.     A dealer eligible for the exemption to the Waiting-Period Law has to have both a federal firearms license from BATFE and a COE from Cal. DOJ.  (Trial Tr. 462:8-22 [Lindley]; see also Penal Code § 26700.)

216.     Firearms dealers are also heavily regulated by both BOF and federal BATFE. Dealers are required to apply for a federal firearm license from the ATF and a COE from the DOJ. (Trial Tr. 462:8-22 [Lindley].)  Dealers are also subject to inspection by BOF and the federal BATFE.    (Trial Tr. 362:20-24 [Graham]; 462:8-22 [Lindley].)  Dealers are not similarly situated to other Californians in this respect.

**E.     Curio and Relic Exemption**

217.     A person with a federal curio and relic license and a COE issued in California is exempt from the waiting period when he or she purchases curio and relic firearms.  (Trial Tr. 270:2-24 [Buford].)

218.     Both BATFE and Cal. DOJ are involved in granting the curio and relic permit. (Trial Tr. 463:1-3 [Lindley].)

219.     Curio and relic firearms are generally not as readily available as other types of firearms.  Curio and relic firearms comprise of a small segment of firearm purchases.  (Trial Tr. 465:12-15 [Lindley].)  Curio and relic license holders with COEs are not similarly situated to other Californians in this respect.

**F.     Gunsmith Exemption**

220.     There is no waiting period for a gunsmith to return a repaired firearm to the owner of the firearm.  This is because the law considers the owner to still retain constructive possession of that firearm even while the firearm is in the hands of the gunsmith.  (Trial Tr. 261: 18-22, 262:2-3 [Buford].)

221.     Gunsmiths are also regulated by BATFE and are subject to inspection.  (Trial Tr. 466:16-467:2 [Lindley].)  Gunsmiths are not similarly situated to other Californians in this respect.

**G.     Wholesaler Exemption**

222.     A firearm wholesaler may be exempted from the 10-day waiting period.

223.    Wholesalers are similar to dealers.  Wholesalers transact in firearms, and they are regulated and licensed by Cal. DOJ and BATFE.  Wholesalers are open to inspection during business hours, and they have to go through a regulated process to transfer firearms.  (Trial Tr. 467:6-17 [Lindley].)  Wholesalers are not similarly situated to other Californians in this respect.

**H.    Target Range Exemption**

224.    There is no waiting period for loaning a firearm at a shooting range.  (Trial Tr. 261:9-11 [Buford].)

225.    Target range facilities often have dealer licenses and COEs to sell firearms, and thus are subject to Cal. DOJ and BATFE inspections.  People often want to try out guns and test fire them at target range facilities.  These guns cannot be taken off premises.  Range masters are also often present to supervise target range facilities.  (Trial Tr. 468:2-16 [Lindley].)

**I.    Consultant Evaluator Exemption**

226.    A consultant evaluator is a firearms expert who researches firearms and writes about his or her research.  Cal. DOJ issues a COE to consultant evaluators, and they are not subject to the waiting period.  There is only one consultant evaluator in California.  (Trial Tr. 262:4-20, 262:24-263:6 [Buford].)  Consultant evaluators are not similarly situated to other Californians in this respect.

**PROPOSED CONCLUSIONS OF LAW**

**I.    SUBJECT-MATTER JURISDICTION AND VENUE**

A.    This Court has jurisdiction over this civil action pursuant to 28 U.S.C. section 1331.  Venue is proper in this judicial district pursuant to 28 U.S.C. section 1391.

//
//
//
//
//
//
//

36

## II.     STANDING OF ORGANIZATIONAL PLAINTIFFS

B.     Because CGF, the organization, cannot legally purchase firearms in California and has not tried to do so, CGF does not have an injury in fact necessary for standing to maintain the present lawsuit on its own behalf, challenging the constitutionality of the Waiting-Period Laws. *Wash. Envtl. Council v. Bellon*, 732 F.3d 1131, 1139-40 (9th Cir. 2013). Moreover, CGF lacks standing to sue on its own behalf because of the lack of evidence that CGF has had to divert resources to avoid being injured by the Waiting-Period Laws, and has been frustrated in its mission because of the Waiting-Period Laws. *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 & n.4 (9th Cir. 2010).

C.     CGF does not have members whose interests CGF has the capacity to represent in this civil action. *See Bellon*, 732 F.3d at 1139 (*citing Friends of the Earth, Inc. v. Landlaw Envtl. Servs., Inc.*, 528 U.S. 167, 181 (2000)).

D.     Even assuming, *arguendo*, that CGF has supporters whose interests CGF has the capacity to represent in this civil action, CGF does not have standing to maintain the present lawsuit on behalf of CGF's supporters, because of the lack of evidence that they have been subject to the Waiting-Period Laws or have had their Second Amendment right burdened thereby. *Bellon*, 732 F.3d at 1139 (*citing Landlaw*, 528 U.S. 181); *Ecological Rights Found. v. Pac. Lumber Co.*, 230 F.3d 1141, 1147 (9th Cir. 2000) (*citing Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)).

E.     Because SAF, the organization, cannot legally purchase firearms in California and has not tried to do so, SAF does not have an injury in fact necessary for standing to maintain the present lawsuit on its own behalf, challenging the constitutionality of the Waiting-Period Laws. *Bellon*, 732 F.3d at 1139-40. Moreover, SAF lacks standing to sue on its own behalf because of the lack of evidence that SAF has had to divert resources to avoid being injured by the Waiting-Period Laws, and has been frustrated in its mission because of the Waiting-Period Laws. *La Asociacion*, 624 F.3d at 1088 & n.4.

1    F.    SAF does not have standing to maintain the present lawsuit on behalf of

2    SAF's members, because of the lack of evidence that they have been subject to the Waiting-

3    Period Laws or have had their Second Amendment right burdened thereby.  *Bellon*, 732

4    F.3d at 1139 (*citing Landlaw*, 528 U.S. at 181); *Ecological Rights*, 230 F.3d at 1147(*citing*

5    *Hunt*, 432 U.S. at 343).

6    **III.    SECOND AMENDMENT ANALYSIS**

7        **A.    The Waiting-Period Laws' Alleged Burden on the Second Amendment**
         **Right**
8

9        G.    The Second Amendment, as historically understood, did not protect the

10   alleged right of a person, not forbidden by law from acquiring a firearm, to acquire a firearm

11   within 10 days of deciding to acquire the firearm.  *See Jackson v. City and Cnty. of San*

12   *Francisco*, 746 F.3d 953, 960 (9th Cir. 2014) (holding that in first step of two-step Second

13   Amendment Inquiry, court asks whether challenged law burdens conduct protected by

14   Second Amendment based on historical understanding of scope of right or whether

15   challenged law falls within one or more of categories of longstanding presumptively lawful

16   regulations recognized by U.S. Supreme Court in *District of Columbia v. Heller*, 554 U.S.

17   570, 626-27 & n.26 (2008)).  The reason is that it was a fact of life that most people in the

18   Founding Era of the United States who were not forbidden by law from acquiring a firearm

19   usually could not purchase one within 10 days of deciding to acquire one, and would have

20   accepted a 10-day waiting period as lawful.  There is no contrary evidence, and thus good

21   reason to *dis*believe, that a person in the Founding Era who both was legally entitled to own

22   a firearm and already owned a firearm would have objected to a 10-day waiting period on

23   the acquisition of an additional firearm.

24       H.    The Waiting-Period Laws, as prohibitions on the possession of firearms by

25   felons and the mentally ill, are longstanding and presumptively lawful regulatory measures

26   that do not fall within the scope of the Second Amendment.  *See Jackson*, 746 F.3d at 960.

27

28

I.      The Waiting-Period Laws, as laws imposing conditions or qualifications on the commercial sale of arms, are longstanding and presumptively lawful regulatory measures that do not fall within the scope of the Second Amendment. *See Jackson*, 746 F.3d at 960.

J.      At all relevant times, while subject to the Waiting-Period Laws, Combs has been able to acquire firearms without any burden more than a de minimis burden on his Second Amendment right. *See Jackson*, 746 F.3d at 960.

K.      At all relevant times, while subject to the Waiting-Period Laws, Silvester has been able to acquire firearms without any burden more than a de minimis burden on his Second Amendment right. *See Jackson*, 746 F.3d at 960.

L.      The Waiting-Period Laws do not burden conduct protected by the Second Amendment. *See Jackson*, 746 F.3d at 960.

M.      The Waiting-Period Laws do not violate the Second Amendment right of any plaintiff herein. *See Jackson*, 746 F.3d at 960.

**B.      Heightened Scrutiny of The Waiting-Period Laws Under the Second Amendment[2]**

N.      The Waiting-Period Laws do not amount to a destruction of the Second Amendment right. *See Jackson*, 746 F.3d at 961.

O.      Rather, the Waiting-Period Laws mandate a 10-day temporal restriction on the exercise of the Second Amendment right.

---

[2] If the Court finds, as the Attorney General believes, that the Waiting-Period Laws do not burden the Second Amendment right of any plaintiff herein, then the Court does not need apply heightened scrutiny to the Waiting-Period Laws. The proposed conclusions of law regarding heightened scrutiny are offered for adoption in case the Court does find that heightened scrutiny is warranted.

39

1   P.     The Waiting-Period Laws do not come close to burdening the core of the

2   Second Amendment right because the Waiting-Period Laws pertain only to the acquisition

3   of firearms and do not prevent their possession or use.  *See Jackson*, 746 F.3d at 961

4   (holding that in second step of two-step Second Amendment inquiry, court determines

5   appropriate level of scrutiny of challenged law by considering (1) how close law comes to

6   core of Second Amendment right and (2) severity of law's burden on right).

7   Q.     The Waiting-Period Laws do not impose a severe burden on the Second

8   Amendment right; on the contrary, a 10-day waiting period is a non-severe burden on the

9   Second Amendment right, especially for a person who already has a firearm.  *See Jackson*,

10  746 F.3d at 961.

11  R.     Therefore, the Waiting-Period Laws are appropriately subject to intermediate,

12  not strict, scrutiny under the Second Amendment.  *See Jackson*, 746 F.3d at 961.

13  S.     The California Legislature sought to advance significant, substantial, or

14  important governmental objectives in enacting the Waiting-Period Laws.  *See United States*

15  *v. Chovan*, 735 F.3d 1127, 1139 (9th Cir. 2013) ("Although courts have used various

16  terminology to describe the intermediate scrutiny standard, all forms of the standard require

17  (1) the government's stated objective to be significant, substantial, or important; and (2) a

18  reasonable fit between the challenged regulation and the asserted objective").  Those

19  objectives were increasing public safety; reducing firearms violence; and keeping firearms

20  out of the hands of dangerous people, such as felons and the mentally ill, forbidden by law

21  from having them (collectively, "public safety").  *See id.* (recognizing as significant for

22  Second Amendment purposes governmental objective of keeping guns away from

23  dangerous people).

24

25

26

27

28

1    T.    The Waiting-Period Laws' 10-day waiting period between application to

2  purchase and delivery of a firearm is reasonably related to the advancement of the

3  governmental objective of public safety, because the 10-day waiting period affords BOF

4  sufficient time to conduct an adequate background check of each applicant to purchase a

5  firearm—including for people who are "auto-approved" by California's background-check

6  system, who already have a firearm registered in AFS, or who have a valid COE or a CCW

7  permit. *See Jackson*, 746 F.3d at 961.

8    U.    The Waiting-Period Laws' 10-day waiting period between application to

9  purchase and delivery of a firearm is reasonably related to the advancement of the

10  governmental objective of public safety, because the 10-day waiting period creates a

11  "cooling-off" period to prevent people who may have impulses to commit acts of violence

12  with firearms from doing so.  *See Jackson*, 746 F.3d at 961.

13    V.    California cannot be forced to use just the federal NICS background-check

14  system, or just California's APPS, instead of the full California background-check system

15  (which encompasses NICS and APPS and more).  If California were forced to use the

16  alternative background-check systems suggested by Plaintiffs, instead of the existing

17  California background-check system, California would be unjustifiably hindered in

18  advancing the governmental objective of public safety, by being unable to check on all

19  prohibiting events that might prevent a prospective firearms purchaser from being allowed

20  to have firearms.

21    W.    The Waiting-Period Laws do not violate the Second Amendment right of any

22  plaintiff herein.  *See Jackson*, 746 F.3d at 960.

23  //

24  //

25  //

26  //

27  //

28  //

## IV.   FOURTEENTH AMENDMENT ANALYSIS

X.     The California Legislature did not intentionally discriminate against any protected class of persons or target any fundamental right in enacting any of the exemptions to the Waiting-Period Laws, meaning that there should not be heightened Fourteenth Amendment Equal Protection Clause scrutiny of the enactment or enforcement of any of the exemptions. *See Alaska v. Equal Employment Opportunity Comm'n*, 564 F.3d 1062, 1068-69 (9th Cir. 2009) (identifying as prerequisites for heightened Fourteenth Amendment scrutiny that challenged law discriminates against suspect class or impinges upon fundamental right).

Y.     Each of the statutory exemptions to the Waiting-Period Laws makes a rational distinction between people who may invoke the exemption and other people who may not benefit from the exemption. *See RUI One Corp. v. City of Berkeley*, 371 F.3d 1137, 1154 (9th Cir. 2004) (establishing rational-basis review as standard of Fourteenth Amendment review for cases involving "social and economic policy," where challenged law neither targets suspect class nor impinges upon fundamental right).

Z.     None of the statutory exemptions to the Waiting-Period Laws violates the Fourteenth Amendment right of Combs or Silvester to equal protection under the law.

## V.   FINAL CONCLUSION

AA.     The Attorney General is entitled to a judgment in her favor in full.

Dated:  June 16, 2014                                  Respectfully submitted,

                                                       KAMALA D. HARRIS
                                                       Attorney General of California
                                                       MARK R. BECKINGTON
                                                       Supervising Deputy Attorney General
                                                       PETER H. CHANG
                                                       Deputy Attorney General


                                                       /s/ Jonathan M. Eisenberg
                                                       JONATHAN M. EISENBERG
                                                       Deputy Attorney General
                                                       *Attorneys for Defendants*