# EXHIBIT C

HISTORY

A fascinating history of the daily lives of Americans

in the first fifty years of the new republic,

told often in their own words.

The years between the patrician leadership of George Washington and the campaign that elected William Henry Harrison marked a period of startling changes in American life. However, most Americans were enmeshed in the myriad ordinary concerns of their lives, and although deeply affected by the great events of the time, their concern with them was intermittent. Jack Larkin describes the often gritty texture of life as these Americans experienced it, weaving the disparate threads of everyday life into the rich, complicated tapestry of American history during this transitional period.

"Recounting the customs and styles of life of ordinary people during a period of rapid and unsettling social and economic change, Jack Larkin, the chief historian at Old Sturbridge Village, the outdoor history museum in Sturbridge, Mass., illuminates an astounding range of activities. These include infant feeding, the care of chamber pots, privies and grave yards; the use of broadside ballads, parlor songs and communal dances; the celebration of holidays and routines of travel; the production, design and use of clothing and household items; even the treatment of pets. Habits of speech and manners are sketched, as well as broad patterns of work, religion, sexuality and family life. Virtually all human activity in the late 18th and early 19th centuries comes in for scrutiny in this compact and insightful work."
— *New York Times Book Review*

"More a guide than an interpreter, Larkin, through the steady accretion of detail and the comments of well-chosen contemporary voices, succeeds in building a remarkable and tangible portrait of an era."
— *Kirkus Reviews*

A volume in the Everyday Life series

HarperPerennial
*A Division of HarperCollins Publishers*

F5
290-0-06-0916-

2900060910665

LARKIN
NG OF EVERYDAY LIFE

E
164
L27
1988

Jack Larkin

THE RESHAPING OF EVERYDAY LIFE



1790-1840

Jack Larkin

THE
RESHAPING OF
EVERYDAY
LIFE

"In a triumphant feat of the most challenging sort of historical research, Jack Larkin has retrieved the irretrievable: the minutiae facts of everyday life that defined what people were really like."
— *American Heritage*



THE RESHAPING OF EVERYDAY LIFE

1790–1840

THE EVERYDAY LIFE IN AMERICA SERIES

EDITED BY

RICHARD BALKIN

Everyday Life in Early America
BY DAVID FREEMAN HAWKE

The Reshaping of Everyday Life, 1790–1840
BY JACK LARKIN

The Expansion of Everyday Life, 1860–1876
BY DANIEL E. SUTHERLAND

Victorian America
BY THOMAS J. SCHLERETH

The Uncertainty of Everyday Life, 1915–1945
BY HARVEY GREEN

As Various as Their Land
BY STEPHANIE GRAUMAN WOLF



Globe Village, Southbridge, MA, 1823, by Francis Alexander.

# The Reshaping of Everyday Life 1790–1840

JACK LARKIN

HarperPerennial
A Division of HarperCollinsPublishers

CAU Publishers GENL
LIBRARY
FEB 05 2014
LOS ANGELES

A hardcover edition of this book was published in 1988 by Harper & Row, Publishers.

THE RESHAPING OF EVERYDAY LIFE, 1790–1840.   Copyright © 1988 by Jack Larkin.  All rights reserved.  Printed in the United States of America.  No part of this book may be used or reproduced in any manner whatsoever without written permission except in the case of brief quotations embodied in critical articles and reviews.  For information address Harper & Row, Publishers, Inc., 10 E. 53rd Street, New York, N.Y. 10022.

First PERENNIAL LIBRARY edition published 1989.

The Library of Congress has catalogued the hardcover edition as follows:

Larkin, Jack, 1943–
  The reshaping of everyday life, 1790–1840.

  Includes index.
  1. United States—Social life and customs—1783–1865.
  I. Title.
E164.L27      1988           973.4            87-46152
ISBN 0-06-015905-7
ISBN 0-06-091606-0 (pbk.)

04 05   RRD   30  29  28  27  26  25

*To Barbara, and to the memory of my father-in-law*

lives is to give personal, experiential meaning to the bare bones of statistical description and generalization. Limits on the evidence and scope of historical inquiry mean that only a tiny fraction of the lives of past Americans can be recovered and understood in any detail. "Every individual," wrote another enormously perceptive portrayer of ordinary life, Harriet Beecher Stowe, "is part and parcel of a great picture of the society in which he lives and acts, and his life cannot be painted without reproducing the picture of the world he lived in." Capturing the commonplaces of past experience is a route to a fuller human understanding.

The beginning and ending years of this book, between the patrician leadership of George Washington and the democratic hoopla of the "log cabin and hard cider" campaign that elected William Henry Harrison, roughly mark off a time of often startling changes. During these decades the American people created a new national government, and a distinctive party system and culture of democratic politics. Their numbers continued to grow rapidly, as they had in the eighteenth century, nearly quadrupling between 1790 and 1840. They moved westward at an unprecedented speed, vigorously and often violently expanding the territorial limits of their society almost threefold. Americans built a national system of transportation on roads and rivers well before the railroad, and strikingly speeded up travel and the movement of goods and information. A new industrial economy emerged in the North, based on the organization of mass production in cities and rural communities alike and the first stages of mechanization; the calculating ways of the marketplace and the networks of commerce penetrated ever farther into the countryside. Reinvigorated by the increasing importance of cotton to industrial production, the slave-labor economy of the South expanded enormously. Measured by the total output of goods and services, Americans' average income per capita rose significantly. Yet the benefits of economic

growth were distributed with increasing inequality. The gap between the richest and the poorest Americans grew ever wider.

Successive waves of religious enthusiasm, the "Second Great Awakening," washed over communities in every region and created a powerful evangelical Protestant piety. What many Americans called a "spirit of reform" prompted them to examine and often to reconstruct their social arrangements and patterns of behavior—most explosively slavery, but also drink, schooling and childrearing, dietary and sexual habits, the role of women and of wage labor, and the care of criminals and the insane. They created an "age of association," covering much of the nation with thousands of voluntary associations from sewing circles to lyceums to Masonic lodges, and establishing new social and economic institutions on a state and national level.

But at the threshold of the nineteenth century, Americans still lived in a world of small scale and scarcity. People, goods and information moved slowly. The tools they used and the routines of their work, their materials and sources of power, would have been immediately recognizable to a man or woman of the seventeenth century.

Their lives continued to be constrained by the weather and the seasons. While assembling their energies to tame a continent they were still profoundly tied to the agricultural calendars of their localities, and each year's jagged alternations of heat and cold, its recurring times of health and sickness, birth, marriage and death.

The physical texture of American life was far closer to that in the villages of many third-world countries today than to anything in the present-day United States. Everywhere the nights were intensely dark and the stars intensely bright. Most houses were small and poorly lit. Americans were usually dirty and often insect-ridden. Smells—of the barnyard and stable, tannery and tavern, house and hearth, privy and chamber pot—

Americans were a predominantly rural people. In 1790, only one American in twenty lived in a place of more than twenty-five hundred people—and some of these were communities whose large areas were held a predominantly scattered population. American cities grew rapidly in the next five decades, but as late as 1840, no more than one in nine were urban even in this modest sense.

When she spoke of Americans "hacking and hewing their way," Mrs. Trollope was literally correct. The early-nineteenth-century landscape was the result of an immense labor of land clearing that had begun early in the seventeenth century. Americans on long-occupied farms knew, as a New England farmer's son said, that they were "the result of the labor of generations." Families in the West lived in small clearings next to stands of trees that had been "girdled," their bark cut through so that they would die, fall and rot to clear a new farm field. Americans had spent uncounted, exhausting hours with fire and ax, oxcart and stone drag, "making land," carving farms out of the forest. In the first half of the nineteenth century, as they completed the settlement of the wooded eastern portion of the "vast continent," their labor came to a climax. Shaped by their inheritance of land making, most Americans were deadly enemies of trees and woodlands. They vastly preferred the beauty of "a newly cleared piece of ground," noted the English-man Godfrey Vigne in 1833, to "the immense forests" or pictur-esque wooded prospects that remained. Most American farmers, thought the British visitor Margaret Hall, "would scarcely allow a tree to stand" near their houses.

European travelers were accustomed to seeing closely settled agricultural communities, but they soon learned that the major-ity of American families lived well apart from each other, on their own farmsteads. "We have no villages in America," Albert Gallatin, who had been Jefferson's secretary of the treasury, told the Frenchman Alexis de Tocqueville in 1831, "that is to say, none inhabited by people who cultivate the land." American

farmers' houses were instead "scattered all over the country." Most American rural communities were not sharply defined in space. Churches, stores and taverns were often strung along the roads, and families socialized and traded in country neigh-borhoods with vague boundaries. New Englanders continued to live closer together than other rural Americans, but most of them had long since abandoned their compact agricultural vil-lages of the seventeenth century. As the Massachusetts clergy-man Peter Whitney put it in 1790, their houses too "were scattered over the place without much order" on the roads that led to each community's centrally located meetinghouse and common. Families in the more thickly settled and cleared re-gions of America usually lived in sight of their nearest neigh-bors' houses, and at night could see the faint gleam of their candles. To the south and west dwellings became dispersed ever more thinly; as an early Western settler recalled, in "little clearings detached from each other by intervening forest, through which foot paths, bridle paths, and narrow wagon roads obstructed with stumps, wound their way."

What European observers might "take for villages," con-tinued Gallatin, "had better be called towns as they are inhab-ited by shopkeepers, craftsmen, and lawyers." Clustered settlements in America were almost always outposts of com-merce or industry. In the Northern countryside small cross-roads communities and "center villages" arose by the hundreds after 1800 as places where farmers came to trade and find services, the appearance of these rural commercial places sig-naled the birth of the American small town.

Another kind of village was emerging alongside them in the rural landscape. Francis Alexander's 1832 painting of Globe Village in Southbridge, Massachusetts, shows a small cluster of wooden two- and three-story buildings in a landscape of farm fields and small woodlots. (See frontispiece.) This settlement was rural, but not agricultural. Its small water-powered factory buildings, two- and four-family houses, and store were part of

the first phase of America's Industrial Revolution. "The manufacturing operations of the United States," wrote the Rhode Island industrialist Zachariah Allen in 1829, "are carried on in little hamlets . . . around the water fall which serves to turn the mill wheel." From Pennsylvania to southern New Hampshire, "mill villages" were built near many small and medium-sized streams. Beginning in the 1790s and with accelerated pace after 1820, rural factories harnessed waterwheels to pulleys and belts to drive machinery for spinning and weaving cotton and wool, or turning chair legs and gun barrels. Around the mills clustered the nation's first communities of factory workers.

In 1823 the site of Lowell was only a few farmers' fields being surveyed in an outlying corner of rural Chelmsford, Massachusetts. Less than two decades later, after the great falls of the Merrimack River had been harnessed, it was a true industrial city of twenty thousand, whose factories and boardinghouses reflected the organization of work, and the harnessing of power, on an unprecedented scale.

Gallatin might have admitted one important exception to his observation. There were true agricultural villages in America, and they were in the South. "The quarters of the slaves," noted the Englishman Isaac Weld in 1796, "give the residence of each planter the appearance of a little village," and travelers over the decades echoed him. Slave cabins on larger plantations were built close together along small "streets" in double or single rows, usually under the shadow of the planter family's "great house." Each quarter was a small, dense community of black households, whose adults left every morning for work in the fields.

Five seaport cities—New York, Philadelphia, New Orleans, Baltimore and Boston—each contained 90,000 people or more by 1840. New York City, with 312,000 inhabitants, "the great commercial maelstrom of the western world," as some Americans called it, was the largest. The other urban places of the United States—smaller ports on the coast, towns on inland riv-

ers or major road junctions—ranged from 50,000 people on down.

American cities were important far beyond their size; streams of goods, people, livestock, information and ideas flowed between them and the villages and farms. They were settlements of merchants and artisans, laborers and mariners, teamsters and boatmen, places where goods were bought and sold, moved and made. Early-nineteenth-century urban settlements were "walking cities," crowded and relatively small in area. They had to be compact, because almost all city dwellers walked everywhere and the transportation of goods was slow. Their streets were crowded with men and women afoot, and iron-tired wagons grated noisily over the paving stones. When Zadoc Long of Maine stayed in Boston to purchase goods for his country store, he complained about the noise making it hard to sleep. Cities were noisier, dirtier and more unhealthy than rural communities, but far more exciting, more anonymous, quicker paced and immersed in cash and trade. They were the focal points of culture as well as commerce. Just as cities took in agricultural produce and rural migrants, they exported not only goods but books and dress fashions, songs and dances, child-rearing ideas and furnishing styles to the countryside.

## "In Our Family"

Just after Chloe Peck was married in Rochester, New York, in 1820, she wrote to her sister of "our family, which consists of 7 persons." Living and eating together in the Pecks' establishment were the newly wedded couple and five unrelated men and boys—the journeymen and apprentices of Everard Peck's bookbinding shop. Today "family" denotes people bound together by marriage and kinship, and "household" describes a group residing and taking their meals together, but early-nineteenth-century Americans almost invariably echoed Chloe Peck in describing their domestic groups as their "families,"

18                    THE RESHAPING OF EVERYDAY LIFE

that settlers had made to new crops and to local soils and climates. The interweaving rhythms of crops and livestock, the timing of work on the land, the handling of animals, the choice of tools, were governed by the accumulated experience of farming communities and passed from one generation to the next. Encountering different soils and conditions as they moved west, American families retained their farming practices when they could and changed them when they had to.

The best-selling publications in early-nineteenth-century America were almanacs, the small pamphlets that came off the presses in many thousands of copies each year. Farmers read them much less for their predictions of the weather, jocular stories or solemn advice than for the traditional lore of astrology. For men and women who worked daily with plants and animals, the natural cycles of growth and procreation were still powerful mysteries, governed at least in part by the phases of the moon and the great celestial wheel of the zodiac. Rural folk "believed that many things must be done, or left undone, during the reign of each constellation," recalled the Cincinnati physician Daniel Drake of his Kentucky boyhood, and that 'the moon had a powerful influence on vegetation and animal life." Women planted radishes in their gardens "downward at the decrease of the moon, for they tapered downwards." Some crops had to be planted at the dark of the moon and still others while it was waxing toward full. The annual hog slaughtering in December had to avoid a waning moon as well; otherwise "the pork would shrink and wither away in the barrel." Choosing the time to wean a baby or a calf, or to begin making butter, sometimes awaited the arrival of a more auspicious sign in the heavens.

The most insistent and visible rhythms of Americans' work were those of plowing, planting, cultivation and harvest. They ranged from the long and intricate patterns of tobacco and rice cultivation to the sharp, comparatively short struggles to bring in the hay or harvest the wheat fields. In southern Louisiana the harvest season for the two great crops, cotton and corn, ended

"A Busy, Bustling, Industrious Population"                    19

only a few weeks before planting began again: "ploughing, planting, picking cotton, gathering the corn, and pulling and burning stalks took up the whole of the four seasons of the year." In Vermont and New Hampshire the time between plowing and harvest was startlingly brief. The most widely familiar routine of work was that of growing corn, America's virtually universal crop.

Across the United States, families North, West and South, white and black, shared the routines of growing corn, a staple in the diets of both people and livestock. Most often they planted it in "hills" three or four feet apart. Men plowed and cross-plowed their fields to start the hills, then dropped and covered the seeds. Corn did not require an all-out, intensive effort at harvest time; instead, it needed steady cultivation from late spring through the end of summer to kill the weeds and build the soil around each cornstalk. Often there were three hoeings—a "weeding," a "half-hilling," and a complete "hilling." Men went into the field to cut the ripened ears off the stalks and carted them back to the barn. They cut the stalks down for livestock fodder or allowed them to stand in the field for browsing. Husking and shelling corn were later fall and winter work, which often became the occasion for neighborhood "frolics," to share the work and celebrate the end of the harvest.

In New York State and New England, the five or six weeks of the haying season, between late June and early August, were the time of most concentrated effort, "the hardest part of the labor required to be performed on a farm," as the Maine Farmer noted in 1832. Throughout the countryside, most other work ceased as craftsmen, merchants and their clerks left shops and stores to go into the field. While he was supervising a force of teamsters hauling stone to repair Boston pavements in the 1820s, Asa Sheldon found it difficult to keep them at work during haying time. Farmers came right into the city to recruit his men on the street.

Haying, wrote John Burroughs of New York, had "the urge,"

cans' extraordinary mobility, their character as a "go-ahead" people, pushed them to travel as far and as fast as they could on roads that remained difficult.

Passing through western New York in 1822, the Englishman Henry Addington several times saw "the wreck of a coach or wagon, sticking in picturesque attitudes in some hole in the low road. . . . How any vehicle can get through such fearful breakers as those routes present sometimes for four or five miles continuously it is difficult for those who have experienced their ferocity to comprehend." Travelers in the early United States spent a good deal of ink on describing and lamenting the conditions of the roads they traversed; it was natural enough, since they usually spent more time on the highways than they did at their stopovers and destinations. Legally, American roads were defined as very wide rights of way—10, 20, even 40 rods wide, or from 160 to over 600 feet. But in reality most highways were narrow tracks within those bounds. Roads began as single-tracked bridle paths, usually later widened to accommodate carts and wagons, but off the largest thoroughfares there was often not enough space for two vehicles to pass abreast. The remainder of the right of way was often left in woodland or, if the timber had been cleared, allowed to grow up in brush or used for grazing livestock.

Northern hill roads, reminisced a Massachusetts man, were "strewn with loose stones of assorted sizes, over which horses stumbled." In the "rich mud roads of Ohio" that Harriet Martineau encountered, the slow-going sandy thoroughfares or "clayey roads cut into deep ruts" of the coastal South, teamsters often mired their wagons to the hubs. Farther west, or in newly settled northern New England, travelers saw nothing for hundreds of miles but newly cleared tracks still encumbered with tree stumps. Worst of all were the "corduroy" roads built of transversely placed logs, which Americans sometimes used to bridge swampy areas; to Henry Addington in 1823, traveling on

them seemed "an uninterrupted series of plunges from one hole to another."

A foreign traveler's readiness to be critical of American manners, social order and domestic arrangements usually increased as his ride became bumpier. But the reasons for the state of the early Republic's roads were not mysterious. Building and maintaining relatively comfortable and moderately safe roads took enormous amounts of labor. Gangs of men and teams of oxen or horses were required to remove rocks, fill in holes, dig ditches for drainage, grade surfaces with shovels, cart and spread stone and gravel. Thinly stretched town and county governments were primarily responsible for their construction and upkeep. Americans made the immense effort of building good roads only where population, commerce and traffic were dense enough to promise a return on the investment to the company or the community. In the Northeast and the more densely settled parts of the West, roads steadily improved in construction techniques, materials used and maintenance. Bringing Western or Southern roads up to the standards of Connecticut or eastern Pennsylvania, let alone the macadam-ized standards of England near London, was both beyond the resources of society and economically irrational. Thus American roads declined in speed, comfort and safety south of Baltimore and west of the Appalachians.

*Foot and Horseback, Wagon and Chaise*

Local travel, like local population movement, was less noteworthy and harder to see. For most Americans around 1800, country neighborhoods of a few dozen farms or less constituted the normal boundaries of everyday movement, on visits that intertwined socializing, neighborly help and economic exchange. Beyond their neighborhoods they made less frequent trips to artisans' shops, stores, taverns and churches at

villages or crossroads settlements. In a New England town families even on the most outlying farms could make these journeys every week since they were rarely more than a few hours' walk or an hour's ride away. In frontier Kentucky families might go a month or more between such trips. Although goods sometimes moved long distances by sea in pre-Revolutionary America, and settlers continuously pushed into the interiors of the seaboard states, few people traveled routinely outside their daily and weekly circles of neighborhood. By 1830 gradually improving local roads and circles of neighborhood. By meant that ordinary folk could move about more often and more easily within their communities.

Hundreds of thousands of people—their numbers seriously underestimated by observers chiefly impressed with the more dramatic traffic of horses and vehicles—still traveled primarily on foot. In early nineteenth-century landscape paintings which showed Americans on the road, there were sometimes pedestrian figures in the background, occasionally pictured giving directions to mounted travelers or families riding in carriages. "Without thinking it a trouble," as Alonzo Lewis of Lynn, Massachusetts, recalled, many poorer Americans were accustomed to walking "from three to six miles on Sabbath to meeting," or to visit stores and taverns.

Children ranked lowest on the scale of access to horses and vehicles and walked everywhere. In the towns of New England, the number and location of neighborhood district schools reflected a social consensus about just how far the younger scholars, four- or five-year olds, should walk—usually a distance of up to two miles one way. The New England clergyman William Ellery Channing recalled starting school before he was three years old, when he tired on the mile-long journey he was carried on his older brother's back. Youths and young men in particular were accustomed to covering long distances on foot. As a fourteen-year-old, P. T. Barnum was sent for a summer's higher schooling to an "Academy" three miles away. He

"marched and countermarched" the distance "six times per week." Young New Englanders "working out" during the week in other communities as farm laborers or schoolteachers sometimes walked eight to ten miles to be home on Sunday. Anxious to see a ship launched in Salem harbor, Asa Sheldon and a group of twelve- and thirteen-year-old farm boys walked fifteen miles from their town of Wilmington, Massachusetts, to the city overnight, spent the day and walked back, exhausted, the next evening.

In between "shank's pony," as walking was called, and the steam-powered railroad was the horse—the prime mover of early nineteenth-century travel. Reliable figures are difficult to come by, but the number of horses in the United States probably grew faster than the population between 1790 and 1840 as their use as draft animals in place of oxen increased and the number of horse-drawn vehicles increased. In the United States of 1840 there was on the average about one horse for every four or five people. After that time the ratio of horses to people ceased to increase and then slowly declined, as city-dwelling families, who were much less likely to own horses, became an ever greater proportion of the population. The evidence of tax assessments and household inventories makes it clear that they were far from universal possessions. They were distributed less equally than are automobiles among the American population today. The great majority of urban families owned no horses, as did close to half the farm families in many New England towns, where oxen remained the primary draft animals. Even in regions where horses were almost universally used for farm work, there were many rural Americans who exchanged labor or farm produce with better-endowed neighbors for the use of horses in plowing, hauling, or traveling.

Through the eighteenth century, vehicles other than crude, slow and uncomfortable two-wheeled carts were rare. Americans undertook most of their nonpedestrian travel on horseback. The number of conveyances and work vehicles

times before I shall see another *human* that does not belong to the family."

Some mistresses of plantations, particularly in the new cotton country of Alabama and Mississippi, felt similarly "entombed," although they were hardly alone. They were responsible for managing the domestic life of dozens, sometimes hundreds of others, white and black. Yet confined by childbearing and their heavy daily responsibilities, they too visited far less often than their husbands. Plantation life was punctuated by dances and open-air barbecues, elaborate christenings and weddings, but they were occasional events, not weekly ones. There was too much work to do and too much distance to cover.

But even widely scattered families sought to create a web of "private and family" visiting with abundance and desire for society," a Kentuckian recalled, was like "the desire of a hungry family for food." Frequent isolation also made them "social and hospitable," remarkably generous to acquaintances and passing travelers: "their insulation makes them glad to see each other." Less frequent sociability was often more intense. Southerners and Westerners defined their neighborhoods more widely in space than closer settled Northerners, and they built their social networks on more intermittent contact. A Southern planter's "notions of space" were "so, liberal," a Northerner noted in the 1830s, "that he will readily ride a dozen miles to dine." Crossroads churches or stores were often the centers of social interaction for areas several miles around.

Greeley remembered how his parents passed the nights in singing ballads and exchanging old stories with their New Hampshire neighbors. In the most pious of American households visitors may have confined their conversation to the prospects for a religious revival. More often, thought a Massachusetts man, visits were "sometimes made an occasion for gossip and tattle"; more charitably put, they dealt with the tangible and prosaic concerns of

everyday life. Eighteen-year-old Zeloda Barrett of New Hartford, Connecticut, took down "the heads of the discourse" when Eliphalet Ensign and his family visited the Barretts on a January evening in 1804. "1st was about Swine," she wrote, noting a conversation about livestock. "2nd Demicrat pigs" indicated lamentation in Federalist New Hartford about the recent success of Jefferson's party. The next topic of discussion was "about Mr. Spencer and Mr. Smith's arbitration," the settlement of a local property dispute. As the "discourse" ranged further, Zeloda kept track of it with at least an inward smile, from "Mrs. Ensign's sore finger" to "Colonel Kellogg's commission for a general" in the state militia. The evening concluded with heated talk "about the meetinghouse being seated," an important issue in the community as it concerned how families were to be assigned their pews in the Congregational meeting-house.

The times of social gathering in the American countryside moved against the season-driven swings of agricultural work. Between the spring plowing and fall harvest, visits were shorter and gatherings less frequent. In July, during the rushed, exhausting and anxious labor of getting in the Northern hay crop, most other activities were suspended. Stores and shops shuttered their doors or stood almost empty, visits sharply declined, few couples married and few children were conceived.

"On a late autumn day" after the crops had been brought in, recalled Ellen Rollins, the store in Wakefield, New Hampshire, "was like a miniature fair. . . . Incoming and outgoing wagons kept up a constant procession." The stores of rural America were more than their communities' crucial economic link to wider markets and manufactured goods. They were central gathering places that linked households and neighborhoods, community forums and information centers. Particularly just before planting or past harvest they were lively and crowded places. While "loafers . . . smoked and gossiped on the bench outside," men and women talked at country stores "of stock and

Case 1:11-cv-02137-AWI-SKO   Document 90-3   Filed 06/16/14   Page 14 of 27

produce; of sickness and mortality," and discussed the most recent births and marriages.

Economic exchanges and social relationships were deeply intertwined; business transactions proceeded at a leisurely, conversational pace. Husbands and wives headed for different parts of the store: "men made their coarser purchases" of tools, tobacco, hardware, while "women pulled over" the storekeeper's bolts of cloth, shoes, dishes, ribbons, combs and buttons, "and what they were too poor to buy talked over with admiring neighbors."

Winter in the Northern states was a contradictory season, a time of growing discomfort and greater leisure. Family life contracted into a room or two, and even routine outdoor chores grew increasingly difficult as the temperature dropped. In severe cold and storm, households could spend weeks in isolation. But when traveling was good "in the winter season"—on sleighs over frozen roads—"alternating visiting through a neighborhood in the evening was quite common," as Lyndon Freeman remembered. Winter was also the courting season, a time young people would later pleasantly remember for its parties, sleigh rides, singing schools and dances. Stores did less business in the winter, but often stayed open as men gathered there, sometimes late into the evening, and "compared the girths of cattle; made note of prices, forestalled the weather; praised the work of wives and daughters."

Urban Americans lived closer to one another than did those anywhere in the countryside. Some city neighborhoods had a closely knit social life centered around workshops and stores, the taverns and groceries where artisans and laborers gathered. Their wives walked in and out of each other's dwellings several times a day and could sit together outside on the steps. But cities were not necessarily places of social intimacy. Many, perhaps most, American city dwellers did not stay put long enough to develop long-enduring social connections. Poor and transient city neighborhoods created a real if always changing commu-

nity life that depended on quickly integrating newcomers into the social web.

But once residents of the larger American cities left the small worlds of their neighborhoods, they plunged into a "world of strangers"—a sea of people, few of whom even residents of long standing could identify. By the 1830s, New York had already become the quintessential world of strangers to many Americans; they saw the hurrying and unknowable throngs on Broadway as a stunning contrast to the communities of village and countryside.

Far freer than other women from household work, the wives and daughters of "the wealthier members of the community" in American cities, as the visiting Thomas Hamilton observed, spent much of their time in elaborate and very different networks of social exchange. In the evenings they "opened their houses to the reception of company," giving and attending dinner parties, dances and formal balls. They turned neighborly visiting into formal "morning calls," adopting "calling cards" and an increasingly complex etiquette which determined the length and frequency of calls, whether a call should be returned or not and the sorts of people to whom a family was, or was not, "at home." "Families connected by kinship, business and politics interchanged calls and invitations, but ranked and classified their acquaintances in ever more precise grades of social acceptability. Etiquette books, which articulated the rules of such social interchanges, sold increasingly well. Wealthy and fashionable families in Philadelphia, Hamilton thought, barricaded themselves behind "a system of exclusion" as rigorous as any in aristocratic England.

In the small, closely packed villages of the slave quarters, blacks led a communal life that was only poorly known to their masters. After their day's work they sat "up half the night, and over a fire in all seasons," Isaac Weld observed. Slaves passed their evening hours visiting, moving freely in and out of each other's cabins on the street, or talking and singing outdoors. On

# EXHIBIT D

# GUNFIGHT

*The Battle over the Right to
Bear Arms in America*

## ADAM WINKLER

CALIF. ATTY. GENL.
LIBRARY

JAN 2 2 2014

LOS ANGELES

W. W. NORTON & COMPANY

NEW YORK   LONDON

Winkler, Adam
Gunfight : the battle over the
right to bear arms in America

1
5

Copyright © 2011 by Adam Winkler

All rights reserved
Printed in the United States of America
First Edition

For information about permission to reproduce selections from this book,
write to Permissions, W. W. Norton & Company, Inc.,
500 Fifth Avenue, New York, NY 10110

For information about special discounts for bulk purchases, please contact
W. W. Norton Special Sales at specialsales@wwnorton.com or 800-233-4830

Manufacturing by Courier Westford
Book design by Lovedog Studio
Production manager: Anna Oler

Library of Congress Cataloging-in-Publication Data

Winkler, Adam.
Gunfight : the battle over the right to bear arms
in america / Adam Winkler.
p. cm.
Includes bibliographical references and index.
ISBN 978-0-393-07741-4 (hardcover)
1. Firearms—Law and legislation—United States—History.
2. Gun control—United States. 3. United States. Constitution.
2nd Amendment. I. Title.
KF3941.W56 2011
344.730'53—dc22
2011014429

W. W. Norton & Company, Inc.
500 Fifth Avenue, New York, N.Y. 10110
www.wwnorton.com

W. W. Norton & Company Ltd.
Castle House, 75/76 Wells Street, London W1T 3QT

1 2 3 4 5 6 7 8 9 0

*To Melissa, for her enduring inspiration;*
*and to Danny, for her smile.*

The longstanding effort to balance gun rights with gun control was just one of many surprising discoveries I made while researching this book. I also found that race and racism have played a central role in the evolution of gun law. America's founders strictly prohibited slaves and even free blacks from owning guns, lest they use them for the same purpose the colonists did in 1776: to revolt against tyranny. America's most notorious racists, the Ku Klux Klan, which was formed after the Civil War, made their first objective the confiscation of all guns from newly freed blacks, who gained access to guns in service to the Union Army. In the twentieth century, gun control laws were often enacted after blacks with guns came to be perceived as a threat to whites. Ironically, it was conservatives like Ronald Reagan—still a hero to the members of the National Rifle Association—who promoted new restrictions on guns.

Indeed, the gun rights movement so familiar to modern-day Americans is a relatively new phenomenon, even though the ability of individuals to bear arms is one of our oldest constitutional rights. For much of its history, the NRA, which was founded in 1871 by a former reporter for a newspaper not known for its sympathy for gun control rights, the *New York Times*, supported rather extensive gun control laws. When a wave of laws requiring a license to carry a concealed weapon swept the nation in the 1920s and 1930s, leaders of the NRA were closely involved with the drafting of the bills, which they then lobbied state governments to adopt. It wasn't until the 1970s that the NRA became the political powerhouse committed to a more extreme view of gun rights we know today.

What I learned about the Second Amendment was unexpected too. For all the attention paid to whether that ambiguously worded provision guarantees individuals a right to own guns or just protects states' right to form militias, the right to bear arms has never rested primarily on the U.S. Constitution. The vast majority of states—forty-three as of this printing—protect the right of individuals to bear arms in their own state constitutions, meaning most Americans would enjoy the right regardless of the Second Amendment. And while my research led me to conclude that the NRA was correct in reading the

Second Amendment to guarantee an individual right to bear arms, I was startled to discover that it was only recently that the NRA made the Second Amendment the heart of its mission. Although long a supporter of law-abiding individuals' access to firearms, the NRA for most of its history ignored the Second Amendment.

It was my desire to share these discoveries, which shatter so many of the myths of America's gun culture, that led me to write *Gunfight*.

in the gun debate reaches different conclusions, but they begin with the same premise: we can't have both an individual right to own guns and gun control. We must choose one or the other.

* * *

THE HISTORY and tradition of the right to bear arms in the United States tell a different story. Gun rights and gun control are not only compatible; they have lived together since the birth of America. Despite the controversy over the meaning of the Second Amendment, Americans have always had the right to keep and bear arms as a matter of state constitutional law. Today, nearly every state has such a provision in its own constitution, clearly protecting an individual right unattached to militia service. In fact, it is one of the oldest, most firmly established rights in America—regardless of the Second Amendment.

At the same time, we've also always had gun control. The founding fathers instituted gun control laws so intrusive that no self-respecting member of today's NRA board of directors would support them. Early Americans denied the right to gun ownership even to law-abiding people if they failed a political test of loyalty to the Revolution. The founders also declared that free white men were members of the militia and, as such, were forced to appear with their guns at public "musters" where government officials would inspect the weapons and register them on public rolls. When pressing public necessity demanded it, the founding fathers were also willing to impress guns from law-abiding, citizens, even if those citizens were left without guns to defend themselves from a criminal attack.

Unlike the unreasonable right to bear arms promoted by extremists in the gun debate, a reasonable right to bear arms has always been available to Americans—one that balances gun rights with gun control. Although the precise equilibrium has always been in flux, changing in response to the times, the story of guns in America is about regulation and right. We don't have to choose between fully automatic machine guns and water pistols. The history of guns in

America shows that we can take a middle course, recognizing the right to bear arms and the legitimacy of many forms of gun control.

This book shows how generations of Americans have struggled to find the proper balance between gun rights and regulation—and highlights how gun control, not just guns, transformed and shaped the American identity. When seen from this angle, much of what people commonly believe about guns is revealed to be wrong or incomplete. America, it is often said, has a gun culture. We've heard that so many times that it's become a cliché. It is less well recognized, however, that America also has a gun *control* culture. The frontier towns of the Wild West, where Hollywood tells us shootouts were common at high noon, in reality had extensive gun control and little gun violence. Town ordinances in the famous gun havens of the West, places like Tombstone, Arizona, and Dodge City, Kansas, required newcomers to hand their guns over to the sheriff or leave them with their horses at the stables on the outskirts of town. You are certain to see more gunfights in a two-hour movie about the Wild West than you would have seen in a year on the dusty streets of Deadwood, South Dakota.

When the nuanced history of gun rights and gun control is examined, odd contradictions and startling surprises abound. The South, today a bastion of strong gun rights, was the region where some of the earliest, most burdensome gun control laws in American history were first enacted. In many ways, the gun control laws of the South in the nineteenth century were stricter than those of the same states today. Surprisingly, many of those early laws were designed not to keep guns out of the hands of blacks but to reduce violence among white men. To be sure, like so much in America, gun rights and gun control have also been tainted by racism. Few people realize it, but the Ku Klux Klan began as a gun control organization; after the Civil War, the Klan and other violent racist groups sought to reaffirm white supremacy, which required confiscating the guns blacks had obtained for the first time during the conflict. To prevent blacks from fighting back, the night riders set out to achieve complete black disarmament. In the 1960s, race was also central to a new wave of gun control laws, which were backed by liberals and even some conservatives, like Ronald Reagan.

Amendment, as there was for human evolution. "The resurgence of academic interest in the Second Amendment," Clark Neily observed, "produced a body of scholarship that could neither be ignored nor dismissed by opponents of the individual-rights model—or, it turns out, by the federal courts."[40]

* * *

IN THE Revolutionary Era, gun laws were strict. Because there was no standing army, the national defense depended upon an armed citizenry capable of fighting off invading European powers or hostile Native tribes. With national defense becoming too important to leave to individual choice or the free market, the founders implemented laws that required all free men between the ages of eighteen and forty-five to outfit themselves with a musket, rifle, or other firearm suitable for military service. It didn't matter whether someone didn't like guns or already had a shotgun good for hunting birds. Every man of age was legally mandated to acquire a militarily useful gun. This mandate was enforced at "musters," public gatherings held several times a year where every person eligible for militia service was required to attend, military gun in hand. At the musters, government officials would inspect people's guns and account for the firearms on public rolls—an early version of gun registration.[41]

In some states, like New Hampshire and Rhode Island, government officials conducted door-to-door surveys of gun ownership in the community. In case of an attack, the government needed to know where the guns necessary to mount a defense were. If the government decided that a privately owned gun was needed, the founding fathers used a temporary form of gun confiscation known as "impressment" to seize the gun from its owner. Ten of the thirteen colonies impressed privately owned firearms for the war effort against England. Impressed guns would eventually be returned to their owners, but the seizure itself might leave the owner without a firearm to defend himself against an ordinary criminal attack. To the founding fathers, leaving an individual without a gun to defend himself was

"probably the most influential living American constitutional scholar"—weighed in on the side of Kates and Levinson. "I've gotten an avalanche of angry mail from apparent liberals who said, 'How could you?'" Tribe noted. "But as someone who takes the Constitution seriously, I thought I had a responsibility to see what the Second Amendment says, and how it fits."[37]

Levinson's article drew attention not simply because he was a liberal, although that certainly enhanced the story. Between 1983, when Kates's article was published, and 1989, when Levinson's came out, the gun issue had exploded onto the national political scene. In the 1988 presidential election, the NRA actively campaigned against the gun control supporter Michael Dukakis, running ads in twenty states featuring Charlton Heston and distributing "Defeat Dukakis" bumper stickers. Despite an early two-digit lead in the polls, Dukakis lost the election to George H. W. Bush, and political analysts pointed to guns as one of the primary reasons. Dukakis's running mate, Senator Lloyd Bentsen of Texas, blamed the loss on "the incredible effect of gun control." In the West and South, Bentsen lamented, "we lost a lot of Democrats on peripheral issues like gun control and the pledge" of allegiance. As another commentator said, "the gun issue turned what might have been a very close election into an electoral landslide."[38]

Some historians, like Jack Rakove, winner of a Pulitzer Prize, continued to argue that the Second Amendment was only about protecting militias. Others, like Saul Cornell and David Konig, rejected the traditional militia theory and argued that, while the amendment did guarantee an individual right, it was only a right to serve in militias. These latter scholars likened the right to keep and bear arms to jury service: more a civic duty than a libertarian right rooted in personal self-defense. These accounts emphasized the paucity of explicit discussions in the founding era about the importance of guns for protection against ordinary criminals.[39]

Yet the vast majority of the Second Amendment scholarship published since Don Kates first wrote his groundbreaking article made it increasingly seem that there was a standard model for the Second

immaterial in light of the public need for that firearm. Guns were privately owned, but, in a sense, they were assets to be used if necessary for the public good.

The Revolutionary-era militia laws alone amount to a set of onerous gun laws that few modern-day gun rights advocates would ever accept. Imagine the outcry if Massachusetts announced that every gun owner of a certain age was required to appear with his or her guns at a public gathering where government officials would inspect the weapons and register them on state rolls.

The founders believed that ordinary people should have guns and that government shouldn't be allowed to completely disarm the citizenry. Yet their vision was certainly not that of today's gun rights hard-liners, who dismiss nearly any gun regulation as an infringement on individual liberty. Although the fact is rarely discussed in the individual-rights literature, the founding generation had many forms of gun control. They might not have termed it "gun control," but the founders understood that gun rights had to be balanced with public safety needs.

Government efforts to enhance public safety by regulating guns are as old as guns themselves. Credit—or blame—for inventing the first gun is often given to a Franciscan monk named Berthold Schwarz, who lived in Germany in the late 1200s and early 1300s. The exact dating of the invention is far from certain. Explosive powder goes back nearly a thousand years earlier. The Chinese reportedly had a handheld device made of bamboo that used gunpowder to shoot arrows in the 1100s. Guns, however, began to appear in Europe in the first decades of the 1300s, and laws restricting weapons quickly followed. In 1328, England enacted the Statute of Northampton, which provided that "no man great nor small, of what condition soever he be," shall "come before the King's justices, or other of the King's ministers doing their office, with force and arms" or "ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers . . . upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." The law was intended mainly to limit traditional arms, like swords and knives, which were

far more numerous at the time, but it applied equally to Berthold Schwarz's new invention.[42]

After gun control was abused by James II, the English Bill of Rights adopted in his wake didn't put an end to regulation of guns. Although that bill recognized the right to bear arms, the right was clearly limited. It applied only to Protestants, and even they were merely allowed guns "suitable to their conditions and as allowed by law." Soon after the English Bill of Rights was adopted, Parliament passed a law restricting the stockpiling of weapons by Catholics, whom the Protestant majority thought untrustworthy.[43]

Gun safety regulation was commonplace in the American colonies from their earliest days. The threat of hostile Native tribes led to government policies on gun ownership and use. In 1611, Governor Lord De La Warr of Virginia—after whom the state of Delaware is named—responded to a drawn-out battle with the Powhatan by ordering that all of the Jamestown settlers' muskets were officially part of the colony's public arsenal. By the end of that century, Massachusetts and Connecticut had both outlawed "matchlocks"—an early type of gun with a mechanism to ignite the firearm's gunpowder, freeing the shooter from having to lower the burning wick by hand—because they weren't effective enough in confrontations with the Natives. More dependable was the "wheel lock," an invention of Leonardo da Vinci that, like a modern-day lighter, used the rotation of a small wheel pressed against a flint to throw off sparks. In numerous colonies, governments used their regulatory authority to require men to carry guns to church and public meetings in order to, as a 1643 law in Connecticut explained, "prevent or withstand such sudden assaults as may be made" by Natives. Colonial laws frequently barred gun owners from selling firearms to the Natives. The right to bear arms in the colonial era was not a libertarian license to do whatever a person wanted with a gun. When public safety demanded that gun owners do something, the government was recognized to have the authority to make them do it.[44]

Selective disarmament was well within that authority, at least in the view of the founding fathers. They supported forcible disarma-

ment of slaves, free blacks, and people of mixed race out of fear that these groups would use guns to revolt against slave masters. Even if free blacks and people of mixed race were completely law-abiding, they were prohibited from owning or carrying guns. Certain states were more liberal, like Virginia, where an 1806 law permitted "every negro or mulatto" who wasn't a slave to own a gun. Even here, however, they had to obtain permission from local officials, who had complete discretion over whether to grant the request.[45]

American colonists didn't bar only racial minorities from having guns. White people, too, were the target of gun control. Before the Revolution, at least one colony, Maryland, passed a law barring Catholics from possessing firearms. Other colonial governments prohibited any white person unwilling to affirm his allegiance to the British Crown from collecting firearms. Then, when the political winds shifted, people who didn't support the Revolution were ordered to turn over their guns. Only those prepared to swear their loyalty to the cause were entitled to keep and bear arms. The Loyalists disarmed by these rules, like those in Pennsylvania, weren't criminals or traitors who took up arms on behalf of the British. They were ordinary citizens exercising their fundamental right to freedom of conscience.[46]

The number of people eligible for disarmament by founding-era gun control was considerable. In some states, slaves and free blacks far outnumbered the white population. Some historians estimate that Loyalists opposed to the Revolution constituted up to 40 percent of the white population. Adding these groups together leaves only a small minority of people who fully enjoyed the right to keep and bear arms. The founders didn't think government should have the power to take away everyone's guns, but they were perfectly willing to confiscate weapons from anyone deemed untrustworthy—a category so broadly defined that it included a majority of the people.[47]

The burdensome militia laws and the disarmament of select groups were not the only forms of gun control in early America. The pressures to implement gun control in urban areas were intense even back then. Some cities and states adopted equivalents of today's "safe storage" laws. In several places, laws required that gunpowder

be stored on the top floor of a building. The explosive power, which was being sold at the time by a start-up company named DuPont, was considered a fire hazard. In South Carolina before the Revolution, safe storage requirements were imposed on slave owners, who were required to keep their firearms locked up. Just as modern-day laws seek to prevent children from gaining access to guns, southern states sought to ensure that slaves couldn't get hold of a firearm.[48]

When public safety demanded it, the founding fathers were willing to go even further. In Boston, city leaders determined that the combustibility of gunpowder posed such a danger that all loaded firearms had to be kept out of buildings. A law from 1783 imposed a fine on "any person" who "shall take into any dwelling-house, stable, barn, out-house, ware-house, store, shop, or other building, within the town of Boston, any . . . fire-arm, loaded with, or having gunpowder." A second provision of the law effectively prohibited keeping a loaded firearm even in one's own home: "all . . . fire-arms . . . of any kind, that shall be found in any dwelling-house . . . or other building, charged with, or having in them any gun-powder, shall be liable to be seized" and forfeited. Given how time-consuming the loading of a gun was in those days, these two provisions imposed a significant burden on one's ability to have a functional firearm available for self-defense in the home. Yet there is no record of anyone's complaining that this law infringed the people's right to keep and bear arms. Even though the inspiration for this law was prevention of fires, not, say, protecting children from accidental shootings, the lesson remains the same: pressing safety concerns led Bostonians to effectively ban loaded weapons from any building in the city.[49]

The individual-rights literature that arose in the wake of Don Kates's article featured countless confident claims that gun control was a modern, twentieth-century invention. The facts suggest otherwise. The founding fathers had numerous gun control laws that responded to the public safety needs of their era. While our own public safety needs are different and require different responses, the basic idea that gun possession must be balanced with gun safety laws was one that the founders endorsed.

immaterial in light of the public need for that firearm. Guns were privately owned, but, in a sense, they were assets to be used if necessary for the public good.

The Revolutionary-era militia laws alone amount to a set of onerous gun laws that few modern-day gun rights advocates would ever accept. Imagine the outcry if Massachusetts announced that every gun owner of a certain age was required to appear with his or her guns at a public gathering where government officials would inspect the weapons and register them on state rolls.

The founders believed that ordinary people should have guns and that government shouldn't be allowed to completely disarm the citizenry. Yet their vision was certainly not that of today's gun rights hard-liners, who dismiss nearly any gun regulation as an infringement on individual liberty. Although the fact is rarely discussed in the individual-rights literature, the founding generation had many forms of gun control. They might not have termed it "gun control," but the founders understood that gun rights had to be balanced with public safety needs.

Government efforts to enhance public safety by regulating guns are as old as guns themselves. Credit—or blame—for inventing the first gun is often given to a Franciscan monk named Berthold Schwarz, who lived in Germany in the late 1200s and early 1300s. The exact dating of the invention is far from certain. Explosive powder goes back nearly a thousand years earlier. The Chinese reportedly had a handheld device made of bamboo that used gunpowder to shoot arrows in the 1100s. Guns, however, began to appear in Europe in the first decades of the 1300s, and laws restricting weapons quickly followed. In 1328, England enacted the Statute of Northampton, which provided that, "no man great nor small, of what condition soever he be," shall "come before the King's justices, or other of the King's ministers doing their office, with force and arms" or "ride armed by night nor by day, in fairs, markets, nor in the presence of the justices or other ministers . . . upon pain to forfeit their armour to the King, and their bodies to prison at the King's pleasure." The law was intended mainly to limit traditional arms, like swords and knives, which were

far more numerous at the time, but it applied equally to Berthold Schwarz's new invention.[42]

After gun control was abused by James II, the English Bill of Rights adopted in his wake didn't put an end to regulation of guns. Although that bill recognized the right to bear arms, the right was clearly limited. It applied only to Protestants, and even they were merely allowed guns "suitable to their conditions and as allowed by law." Soon after the English Bill of Rights was adopted, Parliament passed a law restricting the stockpiling of weapons by Catholics, whom the Protestant majority thought untrustworthy.[43]

Gun safety regulation was commonplace in the American colonies from their earliest days. The threat of hostile Native tribes led to government policies on gun ownership and use. In 1611, Governor Lord De La Warr of Virginia—after whom the state of Delaware is named—responded to a drawn-out battle with the Powhatan by ordering that all of the Jamestown settlers' muskets were officially part of the colony's public arsenal. By the end of that century, Massachusetts and Connecticut had both outlawed "matchlocks"—an early type of gun with a mechanism to ignite the firearm's gunpowder, freeing the shooter from having to lower the burning wick by hand—because they weren't effective enough in confrontations with the Natives. More dependable was the "wheel lock," an invention of Leonardo da Vinci that, like a modern-day lighter, used the rotation of a small wheel pressed against a flint to throw off sparks. In numerous colonies, governments used their regulatory authority to require men to carry guns to church and public meetings in order to, as a 1643 law in Connecticut explained, "prevent or withstand such sudden assaults as may be made" by Natives. Colonial laws frequently barred gun owners from selling firearms to the Natives. The right to bear arms in the colonial era was not a libertarian license to do whatever a person wanted with a gun. When public safety demanded that gun owners do something, the government was recognized to have the authority to make them do it.[44]

Selective disarmament was well within that authority, at least in the view of the founding fathers. They supported forcible disarma-

ment of slaves, free blacks, and people of mixed race out of fear that these groups would use guns to revolt against slave masters. Even if free blacks and people of mixed race were completely law-abiding, they were prohibited from owning or carrying guns. Certain states were more liberal, like Virginia, where an 1806 law permitted "every negro or mulatto" who wasn't a slave to own a gun. Even here, however, they had to obtain permission from local officials, who had complete discretion over whether to grant the request.[45]

American colonists didn't bar only racial minorities from having guns. White people, too, were the target of gun control. Before the Revolution, at least one colony, Maryland, passed a law barring Catholics from possessing firearms. Other colonial governments prohibited any white person unwilling to affirm his allegiance to the British Crown from collecting firearms. Then, when the political winds shifted, people who didn't support the Revolution were ordered to turn over their guns. Only those prepared to swear their loyalty to the cause were entitled to keep and bear arms. The Loyalists disarmed by these rules, like those in Pennsylvania, weren't criminals or traitors who took up arms on behalf of the British. They were ordinary citizens exercising their fundamental right to freedom of conscience.[46]

The number of people eligible for disarmament by founding-era gun control was considerable. In some states, slaves and free blacks far outnumbered the white population. Some historians estimate that Loyalists opposed to the Revolution constituted up to 40 percent of the white population. Adding these groups together leaves only a small minority of people who fully enjoyed the right to keep and bear arms. The founders didn't think government should have the power to take away everyone's guns, but they were perfectly willing to confiscate weapons from anyone deemed untrustworthy—a category so broadly defined that it included a majority of the people.[47]

The burdensome militia laws and the disarmament of select groups were, not the only forms of gun control in early America. The pressures to implement gun control in urban areas were intense even back then. Some cities and states adopted equivalents of today's "safe storage" laws. In several places, laws required that gunpowder

be stored on the top floor of a building. The explosive power, which was being sold at the time by a start-up company named DuPont, was considered a safety hazard. In South Carolina before the Revolution, safe storage requirements were imposed on slave owners, who were required to keep their firearms locked up. Just as modern-day laws seek to prevent children from gaining access to guns, southern states sought to ensure that slaves couldn't get hold of a firearm.[48]

When public safety demanded it, the founding fathers were willing to go even further. In Boston, city leaders determined that the combustibility of gunpowder posed such a danger that all loaded firearms had to be kept out of buildings. A law from 1783 imposed a fine on "any person" who "shall take into any dwelling-house, stable, barn, out-house, ware-house, store, shop, or other building, within the town of Boston, any . . . fire-arm, loaded with, or having gunpowder." A second provision of the law effectively prohibited keeping a loaded firearm even in one's own home: "all . . . fire-arms . . . of any kind, that shall be found in any dwelling-house . . . or other building, charged with, or having in them any gun-powder, shall be liable to be seized" and forfeited. Given how time-consuming the loading of a gun was in those days, these two provisions imposed a significant burden on one's ability to have a functional firearm available for self-defense in the home. Yet there is no record of anyone's complaining that this law infringed the people's right to keep and bear arms. Even though the inspiration for this law was prevention of fires, not, say, protecting children from accidental shootings, the lesson remains the same: pressing safety concerns led Bostonians to effectively ban loaded weapons from any building in the city.[49]

The individual-rights literature that arose in the wake of Don Kates's article featured countless confident claims that gun control was a modern, twentieth-century invention. The facts suggest otherwise. The founding fathers had numerous gun control laws that responded to the public safety needs of their era. While our own public safety needs are different and require different responses, the basic idea that gun possession must be balanced with gun safety laws was one that the founders endorsed.

part of the story behind the law. New York's gun problem was often blamed on immigrants who brought with them to America a fondness for pocket pistols and habit of using them at the slightest provocation. One provision of the Sullivan law barred aliens from carrying guns in public, though unlike aliens in numerous other states, those in New York were allowed to keep handguns at home. Other provisions were framed neutrally but applied by police chiefs discriminatorily against immigrants—in that era, a phenomenon hardly unique to gun control.[58]

The motivations behind the Sullivan law were, however, far more tangled than simple racism. Everything about Big Tim's political career suggests that he wanted to help, not hurt, immigrants—if for no other reason than his own continued political success. He was an immigrant himself, from one of the many Irish families that joined the dense concentration of German, Jewish, Irish, Italian, Chinese, and Greek newcomers who filled lower Manhattan. Sullivan's political influence over the years was due largely to his appeal to immigrant communities. He was famous for serving free Christmas dinners to the poor and dispossessed of the Bowery; thousands came every year, and Sullivan never turned anyone away. Each summer he organized popular community festivals in his district, where downtrodden constituents would feast on chowder, chicken, and beer while enjoying music, parades, and pie-eating contests. Big Tim thought gun control was necessary not to disarm immigrants, but to make those in his district safer from what he called "the tough men, the men who tote guns and use them far too frequently."[59]

Moreover, the main provisions of the Sullivan law applied to all civilians regardless of where they hailed from. New York's gun problem was not limited to immigrants. Guns, especially handguns, were involved in an alarming number of incidents. In 1901, William McKinley became the third U.S. president to be assassinated when, during a visit to Buffalo, he was shot by a pistol-bearing anarchist—that era's brand of terrorist. In 1910, a disgruntled city employee used a pistol to shoot the popular mayor of New York City, William Jay Gaynor, at point-blank range. Although Gaynor survived, the inci-

dent was captured in a photograph that was especially disheartening to Americans. It showed the wounded mayor stumbling, blood all over his face and coat as he was being helped by another man. That other man was Robert Todd Lincoln, the only living son of the first U.S. president to be assassinated.[59]

Although political assassinations made the most headlines, gun violence was being felt by ordinary citizens too. In 1911, the New York City medical examiner reported that gun-related murders had jumped 50 percent the preceding year. "This city is like a wild Western town. The gun men rule," he wrote. Although this statement, as we've seen, exaggerated gun violence in frontier towns, the coroner's recommendation of "severe measures for the regulation of the indiscriminate sale and carrying of firearms" was influential. Across the country, reformers, including John Wanamaker, the nation's leading merchant, and John D. Rockefeller, began pushing for gun control legislation. A 1925 article in the *American Bar Association Journal*, entitled "Legislatures and the Pistol Problem," reported that a "current of public opinion is setting against the right of individuals to possess and carry freely revolvers capable of being concealed, and there is strong police sanction of this opinion." Enhancing public safety by regulating guns was of a piece with the progressive ferment that pushed for minimum-wage laws, child labor laws, and food quality legislation.[60]

The U.S. Revolver Association, a pro-gun organization formed, like the NRA, to promote marksmanship and competitive shooting, proposed in 1923 a Revolver Act for states to adopt. Under this proposal, civilians would have to obtain a permit to carry a concealed weapon. Anyone who committed a crime while in possession of a handgun would receive an extra five years in prison, and noncitizens would be prohibited from possessing handguns entirely. Gun dealers would have to deliver to police detailed records of all handgun sales. The proposal also included a one-day waiting period that meant dealers could not deliver a handgun to the purchaser until the day after the sale. While these last two types of gun control—turning over records of sales to the police and waiting periods—are vigorously opposed by

GUNFIGHT

gun rights advocates today, the Revolver Act was quickly enacted by numerous states, among them West Virginia, New Jersey, Michigan, Indiana, Oregon, California, New Hampshire, North Dakota, and Connecticut.[61]

The Revolver Act was the first important "model" gun control law. Around the turn of the century, lawyers and public officials increasingly saw the problems inherent in the patchwork of disparate laws in the then forty-odd states. Each state had its own set of laws and regulations. The wide variation among states bred inconsistency and confusion, especially for interstate businesses and an ever more mobile population. A movement began to promote consistency in the law among the states. In 1889, the American Bar Association resolved to work for "uniformity of the laws." Three years later, the first meeting of the National Conference of Commissioners on Uniform State Laws was held in Saratoga Springs, New York. By 1912, every state in the Union appointed commissioners to the national conference.[62]

In the 1920s, the National Conference of Commissioners turned its attention to gun control. Charles Imlay, one of the commissioners, wrote in 1926, "That there is need of more careful regulation of the use of firearms and in particular small firearms . . . is evidenced from the daily newspaper records of crimes of violence committed with the revolver." Imlay believed that the "same exigencies which demand the regulation of the sale and use of firearms require that the laws upon the subject be uniform." Because guns are easily transported across state lines, it was vital to enact consistent regulation so that the laws of one state were not undermined by the laxer laws of its neighbors.[63]

The model legislation endorsed by the National Conference of Commissioners was called the Uniform Firearms Act, and it borrowed liberally from the earlier Revolver Act. The Uniform Firearms Act's primary purpose was to "make it difficult for any person not a law-abiding citizen to obtain a pistol or revolver." The commissioners recommended that states require a license to have a concealed weapon in public and that a license be issued only to a "suitable person" with a "proper reason for carrying" a firearm. Dealers were to maintain

records of sales and automatically forward them to law enforcement officials. The Uniform Firearms Act also included a one-day waiting period for handgun sales, later extended to two days in a revised version of the act. Anyone who sold a handgun was to be licensed by the state and was prohibited from selling such a weapon to those convicted of crimes of violence, drug addicts, drunkards, and minors. Aliens weren't singled out and, assuming they met the ordinary standards, could possess a concealed weapon just like citizens.[64]

The commissioners did not seek to get rid of all the guns. Most of the provisions of the Uniform Firearms Act applied only to handguns, which were thought to be especially prevalent in criminal street crime. Ownership of shotguns and rifles, useful for hunting or protecting one's home from criminals, remained untouched. The commissioners were mindful of people's need to have firearms available for self-defense. The statement of principles that accompanied the act said the commissioners did not want to hamper "the facility of a law-abiding citizen to secure arms for the protection of his home."

The Uniform Firearms Act was eagerly adopted by numerous states, North and South. Alabama, Arkansas, Maryland, Montana, Pennsylvania, South Dakota, Virginia, Washington, and Wisconsin joined the states that had previously enacted the similar Revolver Act. By 1932, an article reviewing the spread of gun control legislation concluded that laws requiring a license to carry a concealed weapon "are in effect in practically every jurisdiction." Not all states adopted the Uniform Firearms Act in its totality. Some legislatures thought the model legislation went too far and supported only individual provisions. Legislatures in other states thought the act didn't go far enough. In Hawaii, Massachusetts, Michigan, West Virginia, and New Jersey, laws were passed requiring all purchasers of handguns, not just those who wanted to carry them concealed in public, to obtain a license first.[65]

New York was among the few states that didn't adopt one of the model gun control laws. Although a bill incorporating the Uniform Firearms Act passed both houses of the state legislature in 1932, the governor vetoed it. He thought that the Sullivan law was more

GUNFIGHT