1  Victor J. Otten (SBN 165800)
   OTTEN & JOYCE, LLP
2  3620 Pacific Coast Hwy, Suite 100
   Torrance, California 90505
3  Phone: (310) 378-8533
   Fax: (310) 347-4225
4  E-Mail: vic@ottenandjoyce.com

5  Donald E. J. Kilmer, Jr. (SBN: 179986)
   LAW OFFICES OF DONALD KILMER
6  1645 Willow Street, Suite 150
   San Jose, California 95125
7  Voice: (408) 264-8489
   Fax:   (408) 264-8487
8  E-Mail: Don@DKLawOffice.com

9  Attorneys for Plaintiffs

10

11              UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF CALIFORNIA
12                    FRESNO DIVISION
          2500 TULARE STREET | FRESNO, CA 93721
13

14  JEFF SILVESTER, BRANDON            Case No.:    1:11-CV-2137 AWI SKO
    COMBS, THE CALGUNS
15  FOUNDATION, INC., a non-profit     PLAINTIFFS' MEMORANDUM OF
    organization, and THE SECOND       POINTS AND AUTHORITIES IN
16  AMENDMENT FOUNDATION,              RESPONSE TO DEFENDANTS'
    INC., a non-profit organization,   CLOSING BRIEF (Doc 89)
17
                                       Judge:      Hon. Anthony W. Ishii
18       Plaintiffs,                   Courtroom:  8th Floor, Room 2
                                       Trial Date: March 25/26/27, 2014
19       vs.                           Case Filed: Dec. 23, 2011

20  KAMALA HARRIS, Attorney General    Argument:   July 21, 2014 | 1:30 p.m.
21  of California, and DOES 1 to 20,

22       Defendants.

23

24

25

26

27

28

Donald Kilmer
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

1

# TABLE OF CONTENTS

I.      Introduction.................................................................................................1

II.     The Institutional Plaintiffs Have Standing.....................................................5

III.    The WPL Burdens Rights Protected by the Second Amendment...................6

        A.      The Second Amendment Should be Analyzed.............................7
                Like the First Amendment

        B.      Regulations of Fundamental Rights ..........................................10
                Must Look to State Action

IV.     The WPL Does Not Survive Intermediate Scutiny.........................................11

V.      The Court Can Defer the Adjudication of the Plaintiffs'.................................18
        Viable and Compelling Equal Protection Claims

VI.     Conclusion....................................................................................................19

Declaration of Service ...................................................................................21

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

# TABLE OF AUTHORITIES

## FEDERAL CASES

*Chovan*, 2013 U.S. App. LEXIS 23199. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*District of Columbia v. Heller*, 554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . . . . 4

   *District of Columbia v. Heller*, 554 U.S. 570 (2008). . . . . . . . . . . . . . . . . . . . . . . 7

*Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . 7

   *Ezell v. City of Chicago*, 651 F.3d 684 (7th Cir. 2011). . . . . . . . . . . . . . . . . . . . 13

*Fair Housing Council of San Fernando Valley v. Roommate.com, LLC.*, 666
   F.3d 1216 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Gideon v. Wainright*, 372 U.S. 335 (1963). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Lederman v. United States*, 291 F.3d 36 (D.C. Cir. 2002). . . . . . . . . . . . . . . . . . . . . 14

*Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

*McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010). . . . . . . . . . . . . . . . . . . . . . 4, 7

*Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014). . . . . . . . . . . . . . . 7, 13

*Shelley v. Kraemer*, 334 U.S. 1 (1948). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002), *reh'g denied* 328 F.3d
   567 (9th Cir. 2003). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*Town of Lockport v. Citizens for Community Action at Local Level, Inc.*, 430
   U.S. 259 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*United States v. Alvarez*, 132 S. Ct. 2537 (2012). . . . . . . . . . . . . . . . . . . . . . . . . . 14

*United States v. Ramsey*, 431 U.S. 606 (1977). . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

*U.S. v. Chovan*, 735 F.3d 1127 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . 7, 13

   *U.S. v. Chovan*, 735 F.3d 1127 (9th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . 1

## STATE CASES

*Kasler v. Lockyer*, 23 Cal. 4th 472 (2000). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## DOCKETED CASES

*Edwards, et al., v. District of Columbia*, Case No.: 13-7063 (U.S. District
   Court of Appeals for the District of Columbia, June 27, 2014). . . . . . . . . . . . . . . 5

   *Edwards, et al., v. District of Columbia*, Case No.: 13-7063. . . . . . . . . . . . . . . . 13

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

Plaintiffs' Response to Defs' Closing Brief     -iii-      *Silvester, et al. v. Harris*

*McCullen, et al., v. Coakley, et al.*, Case No.: 12-1168 (U.S. Supreme Court, June 26, 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*McMullen, et al. v. Coakley, et al.*, Case No.: 12-1168 (June 26, 2014). . . . . . . . . .  14

## FEDERAL STATUTES

Act of July 31, 1789, c. 5, 1 Stat. 29. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

## STATE STATUTES

<u>Connecticut</u> - Conn. Gen. Stat. § 29-37a. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

<u>District of Columbia</u> - D.C. Code § 22-4508. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

<u>Florida</u> - Fla. Stat. § 790.0655. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

<u>Hawaii</u> - Haw. Rev. Stat. § 134-2 (e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

<u>Illinois</u> - Ill. Comp. Stat. § 5/24-3(A)(g). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

<u>Nebraska</u> - Neb. Rev. Stat. § 69-2404. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

<u>Rhode Island</u> - R.I. Gen. Laws §§ 11-47-35(a)(1). . . . . . . . . . . . . . . . . . . . . . . . . . .  3

<u>Washington</u> - Wash. Rev. Code § 9.41.090 *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . .  3

<u>Wisconsin</u> - Wis. Stat. 175-35 *et seq*. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  3

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

# I. INTRODUCTION

Defendants make the only arguments they can in light of the evidence provided by their own witnesses at trial.  They attempt to resuscitate their speculative argument that a market-based waiting period law (WPL) might have existed at the time the Second Amendment was ratified (1791) and/or incorporated via the 14th Amendment (1868) because guns were expensive and rare.  Failing that, they attempt to resurrect the idea that the WPL should be subject to a deferential standard of review that both the Ninth Circuit and Supreme Court have rejected.  Plaintiffs arguments are based on the facts presented at trial and the current state of the law in this Circuit.

The 31st Edition of State Laws and Published Ordinances  - Firearms (ATF P 5300.5) is available at the ATF website maintained by U.S. Dept. of Justice: https://www.atf.gov/publications/firearms/state-laws/31st-edition/index.html This publication summarizes firearms laws in all 50 States, the District of Columbia, Guam, Northern Mariana Islands, U.S. Virgin Islands, American Samoa and Puerto Rico.  A "Ready Reference" Table, from pgs. xi-xii of this publication is attached as Exhibit A.

The citations from the various jurisdictions, including any WPL statute, are also from this ATF Publication.  Some of the "purchaser waiting period" entries in the table are actually time limits for issuing permits/licenses (e.g., NY, NC, PA, TN) and are not true waiting periods that are triggered by a transfer or sale of a firearm, and/or the WPL in a particular jurisdiction has been abrogated by the state's participation in the Federal NICS system (e.g., SD).

Although all jurisdictions are subject to the Federal NICS check, which we know is available 99.87% of the time and has a 91.52% Immediate Determination Rate [See generally Exhibit BO, and the testimony of Steven Buford, Assistant Bureau Chief.  (TX Buford 163:2 - 286:25)]; only a handful of states impose point of purchase waiting periods; and most of those jurisdictions exempt from their WPLs

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

1   any persons holding licenses, permits and certificates that are substantially

2   identical to those held by Plaintiffs Silvester and Combs here in the state of

3   California.

4        For example:

5        <u>Connecticut</u> – Conn. Gen. Stat. § 29-37a imposes a two week waiting period

6   from the date of sale, but exempts "delivery at retail of  any firearm to a holder of a

7   valid state permit to carry a pistol or revolver issued under the provisions of section

8   29-28 or a valid eligibility certificate issued under the provisions of section 29-36f[.]"

9        <u>District of Columbia</u> – D.C. Code § 22-4508 is virtually identical to California

10  law, right down to the exceptions for various law enforcement employees.

11       <u>Florida</u> –  Fla. Stat. § 790.0655 imposes a 3-day waiting period.  However

12  Florida's WPL does not apply "[w]hen a handgun is being purchased by a holder of a

13  concealed weapons permit as de-fined in s. 790.06."

14       <u>Hawaii</u> –  Haw. Rev. Stat. § 134-2 (e) imposes a 14-day waiting period, but

15  exempts long-gun purchases for one year for every person who has already obtained

16  a permit to acquire any rifle for shotgun.

17       <u>Illinois</u> –  Ill. Comp. Stat. § 5/24-3(A)(g) imposes only a 72 hour waiting

18  period for handguns and a 24 hour waiting period for long guns.  The Illinois

19  statute has the usual exemptions for government employees in law enforcement.

20       <u>Maryland</u> – has a seven day waiting period that only applies to handguns

21  and Assault Weapons.  The purchase of long guns is exempt from the waiting

22  period.  Md. Code Ann., Pub. Safety §§ 5-123 – 5-125.

23       <u>Minnesota</u> – has no waiting period for long guns that are not classified as

24  Assault Weapons.  Possession of a License to Carry a Concealed Firearm exempts a

25  Minnesota gun-owner from the Assault Weapon and Handgun waiting periods.  A

26  Minnesota handgun purchase permit requires an initial 7 day wait, and is then

27  valid for a full year with no further waiting periods on subsequent purchases.

28  Minnesota Statutes §§ 624.7131/624.7132.

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

Plaintiffs' Response to Defs' Closing Brief                    -2-                    *Silvester, et al. v. Harris*

1   <u>Nebraska</u> – permits a chief of police or sheriff to take up to three (3) days to

2   conduct an investigation when a persons applies to purchase a handgun, and then

3   issues that person a certificate under Neb. Rev. Stat. § 69-2404.  Once issued the

4   certificate is good for three years and qualifies the person to purchase any number

5   of handguns without a waiting period.  § 69-2407.  No certificate or waiting period

6   is required to purchase long guns.

7   <u>New Jersey</u> – has a waiting period for handguns, but not for long guns.

8   Alternatively, NJ has a permit process that takes 7 days but is valid for 90 days

9   allowing additional purchases without waiting periods.  New Jersey Revised

10   Statutes 2C:58-3 *et seq.*

11   <u>Rhode Island</u> –  has a seven day waiting period for gun purchases, but

12   exempts the waiting period if someone has a License to Carry a Concealed Firearm

13   in that state.  R.I. Gen. Laws §§ 11-47-35(a)(1), 11-47-35.1, 11-47-35.2.

14   <u>U.S. Virgin Islands</u> – imposes a 48 hour waiting period on all firearms sales.

15   Virgin Islands Code § 466.

16   <u>Washington</u> – imposes a 5 business day waiting period for handgun purchase

17   unless the person holds a validly issued Washington Concealed Pistol Permit.

18   Wash. Rev. Code § 9.41.090 *et seq.*

19   <u>Wisconsin</u> – has a handgun only waiting period that is 48 hours and which

20   does not apply to private party transactions.  There is no waiting period for long

21   guns.  Wis. Stat. 175-35 *et seq.*

22   Two glaring points are raised by these inter-jurisdictional comparisons:

23   a.)  Defendants failed to show that waiting period laws, like California's (and

24   the District of Columbia) are even part of the current national norm.  They certainly

25   introduced no evidence that a WPL was ever part of the fabric of American firearm

26   regulations for any part of the nation's history during ratification and incorporation

27   of the Second Amendment.  One may infer that California's paternalistic

28   interference with gun purchases, even for people that the state has already deemed

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

Plaintiffs' Response to Defs' Closing Brief                    -3-                    *Silvester, et al. v. Harris*

1   trustworthy, is based on California's gun laws incubating (or metastasizing,

2   depending your point of view) in a state with no "right to keep and bear arms"

3   provision in its state constitution to provide check on regulatory overreach. *See*

4   *Kasler v. Lockyer* 23 Cal. 4th 472, 481 (2000).  It is questionable whether *Kasler* is

5   still good law after the Supreme Court's decision in *District of Columbia v. Heller*,

6   554 U.S. 570 (2008) and *McDonald v. City of Chicago* (2010) 130 S.Ct. 3020.  The

7   point of this lawsuit is to bring California's laws into compliance with the ideals of

8   the U.S. Constitution that the state failed to address in its own charter.

9         b.)  There isn't anything particularly significant about 10-days, even if

10   waiting periods for some gun purchases are constitutionally sound. The Defendants

11   admit in their Trial Brief that when first instituted in California, background

12   checks were required to be completed in three (3) days.  In 1965, the waiting period

13   was extended to five days.  Then in 1975 it was extended to 15 days and then it was

14   reduced to its present length of 10 days in 1997.  [Trial Brief of Defendant Kamala

15   Harris, Doc #65, pgs. 4-5] California and the District of Columbia are the only two

16   jurisdictions to zero in on 10 days.  Of the distinct minority of jurisdictions with a

17   WPL, most impose a period of anywhere from 48 hours to 5 business days, with the

18   ususal exemptions that include persons licensed to carry concealed weapons.  Two

19   states (CN & HI) impose two-weeks, but also exempt long gun purchases and

20   persons with designated permits.  Common sense, let alone constitutional scrutiny

21   compels the inquiry:  Why 10 days?  And in the context of this law suit, why 10-days

22   when the "cooling off" rationale is irrational for people who already have guns and

23   at least 20% of the million or so background checks for 2013 took only minutes?

24   California is reduced to the argument of a petty tyrant: "Because we said so."

25         The meat of this case lies in the Court's analysis of the facts adduced at trial

26   relating to the quality of evidence produced by the government and whether the

27   means California employs to stop impulsive acts of violence and conduct

28   background checks on gun sales is a constitutionally valid remedy.  There are two

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

Plaintiffs' Response to Defs' Closing Brief     -4-     *Silvester, et al. v. Harris*

1  recent cases that can assist this Court in making that analysis: *McCullen, et al., v.*
2  *Coakley, et al.*, Case No.: 12-1168 (U.S. Supreme Court, June 26, 2014) and
3  *Edwards, et al., v. District of Columbia*, Case No.: 13-7063 (U.S. District Court of
4  Appeals for the District of Columbia, June 27, 2014). Both of these brand new cases
5  analyze, in the context of the First Amendment, how a Court should adjudicate
6  overbroad statutes that impact fundamental rights.

7

8  ## I.  THE INSTITUTIONAL PLAINTIFFS HAVE STANDING.

9       Both the Plaintiffs and the Court offered to resolve the institutional standing
10  issue during Mr. Hoffman's testimony by way of stipulation. The Defense declined
11  that invitation and insisted on establishing institutional standing through
12  testimony.  Standing was established as to organization and representational
13  standing by way of testimony relating to Mr. Hoffman's membership in both
14  organizations (SAF & CGF), The Calguns Foundation's (CGF) involvement with
15  other Second Amendment cases, their commitment to protecting Second
16  Amendment rights for their members, and the un-controverted fact that virtually
17  all of its approximately 30,000 California members, including Mr. Hoffman, are
18  subject to the burdens of California's WPL. [TX Hoffman 119:3 – 126:17]

19       There was similar testimony from Mr.Gottlieb of the Second Amendment
20  Foundation (SAF). [See Doc 75, Gottlieb Deposition 18:8 – 19:23 for estimate of
21  SAF's California members and 22:3 – 34:23 for SAF's efforts taken outside of this
22  litigation on behalf of its members to advance Second Amendment rights.]

23       The leading case on institutional standing in the Ninth Circuit is *Fair*
24  *Housing Council of San Fernando Valley v. Roommate.com, LLC.*, 666 F.3d 1216 (9th
25  Cir. 2012).  That case held that an organization has "direct standing to sue [when]
26  it showed a drain on its resources from both a diversion of its resources and
27  frustration of its mission. *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir.
28  2002)." *Id., at* 1219.

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

The *Fair Housing* opinion did clarify that: " 'standing must be established independent of the lawsuit filed by the plaintiff.' *Comite de Jornaleros de Redondo Beach v. City of Redondo Beach*, 657 F.3d 936 (9th Cir. 2011) (quoting *Walker v. City of Lakewood*, 272 F.3d 1114, 1124 n.3 (9th Cir. 2001)). An organization "cannot manufacture [an] injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010); see also *Combs*, 285 F.3d at 903 ("[A]n organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit . . . ." (internal quotation marks omitted))." *Id., at* 1219.

This was accomplished by CGF and SAF in much the same manner as the *Fair Housing* plaintiffs: (1) Prior to commencing litigation, CGF and SAF investigated Defendants' alleged violations of the Second Amendment, including violations related to the 10-day WPL, and have spent resources to remedy those violations. [TX Hoffman 119:3 – 126:17; Doc 75, Gottlieb Deposition 18:8 – 19:23, 22:3 – 34:23].  (2) Both Mr. Hoffman [TX 119:3-126:17] and Mr. Gottlieb [Doc 75: 38:24 – 43:24] testified about the educational programs and other litigation strategies that both organizations sponsor.

The only rational inference to be drawn from these facts is that CGF and SAF had to divert resources, independent of the costs of this litigation, because Defendants conduct frustrates their organization's central mission – that of defending law-abiding citizens' Second Amendment rights.  The Court should find that all of the named plaintiffs have standing.

## II.  THE WPL BURDENS RIGHTS PROTECTED BY THE SECOND AMENDMENT.

The cases cited by the Defendants for the proposition that all statutes are presumed Constitutional dealt with a low level of scrutiny and did not involve fundamental rights.  *Town of Lockport v. Citizens for Community Action at Local*

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

Plaintiffs' Response to Defs' Closing Brief        -6-        *Silvester, et al. v. Harris*

1  *Level, Inc.*, 430 U.S. 259 (1977) was an equal protection case dealing with a

2  non-suspect class (voters in a specific district) and only required rational basis

3  scrutiny.  *People of State of New York v. O'Neil*, 359 U.S. 1 (1959) dealt with a

4  Privileges and Immunities Clause violation unrelated to the case at hand.

5      Defendants may <u>wish</u> for the Supreme Court cases of *District of Columbia v.*

6  *Heller*, 554 U.S. 570 (2008) and *McDonald v. City of Chicago*, 130 S. Ct. 3020 (2010),

7  and the relevant opinions from the various Circuit Courts, to be paper tigers, but

8  wishing doesn't make it so.

9

10      A.  The Second Amendment Should be Analyzed Like the First.

11      The emerging analysis of Second Amendment claims is that they should

12  mirror how First Amendment claims are adjudicated, *Ezell v. City of Chicago*, 651

13  F.3d 684 (7th Cir. 2011); *U.S. v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) and *Peruta*

14  *v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014).  The first step is a historical

15  inquiry that seeks to determine whether the conduct at issue was understood to be

16  within the scope of the right to keep and bear arms at the time of ratification.

17  *Chovan*, 735 F.3d at 1137; *Ezell*, 651 F.3d at 702-03.

18      Defendants repeat the mistaken analysis from their motion for summary

19  judgment in their post-trial briefing.  They concede that the WPL imposes **a** burden

20  on Silvester and Combs, they simply want the Court to jump the gun and conduct

21  the intermediate scrutiny test at step #1 by calling the burden "*de minimus*" in

22  order to short circuit the failure to carry their evidentiary burden, required by step

23  #2, at trial. [Def. Closing Brief Doc 89, page 4:11-17.]

24      This Court gave Defendants a road map on the burden of persuasion

25  regarding the first step of the *Ezell/Chovan/Peruta* test:

26          Under the *Chovan* framework, the first step is to
        determine whether the challenged law burdens a right
27          protected under the Second Amendment. The WPL
        prohibits every person who purchases a firearm from
28          taking possession of that firearm for a minimum of 10

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

1    days. That is, there is a period of at least 10 days in which
     California prohibits every person from exercising the
2    right to keep and bear a firearm. There can be no question
     that actual possession of a firearm is a necessary
3    prerequisite to exercising the right keep and bear arms.
     Further, there has been no showing that the Second
4    Amendment, as historically understood, did not apply for
     a period of time between the purchase/attempted
5    purchase of a firearm and possession of the firearm. [fn.3:
     The Court notes that Harris has not refuted Plaintiffs'
6    assertion that waiting periods of any duration before
     taking possession of a firearm were uncommon in both
7    1791 and 1868. Cf. *Ezell*, 651 F.3d at 702-03; *Chester*, 628
     F .3d at 680.]  Cf. *Chovan*, 2013 U.S. App. LEXIS 23199
8    at *25 (" .. . we are certainly not able to say that the
     Second Amendment, as historically understood, did not
9    apply to persons convicted of domestic violence
     misdemeanors."). Although Harris argues that the WPL is
10   a minor burden on the Second Amendment, Plaintiffs are
     correct that this is a tacit acknowledgment that a
11   protected Second Amendment right is burdened.
     Therefore, the Court concludes that the WPL burdens the
12   Second Amendment right to keep and bear arms.

13                   Order on Defendant's Motion
                     For Summary Judgment
14                   (Doc #44, pg. 7:22 - 8:7)

15        The point that the Defendants keep missing is that "how much" of a burden

16   the WPL imposes on the Second Amendment properly takes place under step #2 of

17   the analysis.  This is where, if they had <u>any</u> evidence, the Defendants could have

18   made the argument that somehow public safety is still advanced by imposing an

19   (alleged) *de minimus* burden of a 10-day waiting period, even though the state has

20   the ability to conduct instantaneous background checks for some people and

21   "cooling off" periods are nonsensical for people who already have guns.  Based on

22   the evidence adduced a trial, this would still be a flawed argument, but at least it

23   would be made at the appropriate juncture of the required analysis.

24        Defendants' other arguments relating to step #1 of the *Ezell / Chovan / Peruta*

25   analysis also lacks merit.

26        The 90 year-old 1-day WPL law that Defendants try to conflate with the

27   current 10-day WPL [at page 5:7-12 of their brief] is still not a long-standing law

28   that was in existence in 1791 or 1868.   Furthermore, the uncontradicted testimony

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

1   at trial is that California gun buyers are overwhelmingly approved for gun

2   purchases and therefore not presumptively subject to mental-health restrictions on

3   their rights. (See Doc 89, 5:9-12) With a 98.9% approval rate[1] (i.e., not felons, not

4   on probation, not a violent misdemeanant, not subject to restraining orders, not

5   subject to mental health restrictions, not under indictment, etc...) California gun-

6   buyers appear, on a per capita basis, to be more law-abiding than the California

7   State Senate.[2]

8        The final argument that Defendants make for why WPLs don't infringe the

9   Second Amendment is fatally and doctrinally flawed. Even in the abstract, the idea

10  that because guns were expensive and rare in 1791 and 1868, and therefore based

11  on those market conditions, the people who ratified the Second and Fourteenth

12  Amendments would have enacted WPLs if they had thought of them, is ridiculous

13  on its face.

14       Abortions were rare in 1791 and 1868, and depending upon the statistical

15  metrics employed, they may be rare today. That fact says nothing about their

16  constitutionality or about any constitutionally valid regulation of that right. The

17  capital investment in printing presses, paper and ink in 1791 and 1868 was

18  undoubtably substantially more than the cost of a firearm, lead ball and powder.

19  That fact says nothing about freedom of the press. Until *Gideon v. Wainwright*, 372

---

21       [1] The actual number of background check requests for 2013 was 960,179. Total denials

22  based on the purchaser being a prohibiting person were 7,371. An additional 2,814 denials were

23  based on persons attempting to purchase more than one hand-gun in any 30 day period. (i.e., they were not a prohibited person, this is a limitation on the number of guns one person can

24  purchase during any 30-day period) Even if 30-day denials are included in the total as a denial, the approval rate for gun purchases in 2013 exceeded 98.9%. See Trial Exhibit AP, Bates

25  AG002394.

26       [2] With the conviction of State Senator Rod Wright in January of 2013, the concurrent

27  indictment of State Senator Ronald Calderon (Washington Post, March 3, 2014, Reid Wilson) and the indictment while this trial was pending of State Senator Leland Yee (San Jose Mercury

28  News, March 26, 2014, Staff writers) the ratio of State Senators who are eligible to purchase guns in this state is only 92.5%, whereas California gun-buyers are approved at a rate of 98.9%.

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

1  U.S. 335 (1963) addressed the plight of indigent criminal defendants, lawyers were

2  expensive in 1791 and 1868, and still are for civil litigants and criminal defendants

3  with means.  That fact says nothing about the Sixth Amendment right to counsel.

4      Rights are not diminished by the private actions of the market.   The

5  touchstone of analyzing a civil rights violation is the finding of "state action" – for

6  that is what violates rights and makes those violations actionable in our courts, and

7  then only when a government practice or policy is the cause of the deprivation. *See*

8  *generally Shelley v. Kraemer*, 334 U.S. 1 (1948).  Plaintiffs are not complaining

9  about the unavailability or cost of the firearms they want to purchase.  They

10  brought this lawsuit because they want access to property they already purchased,

11  but must wait 10 days to take possession of.

12      B.    Regulations of Fundamental Rights Must Look to State Action

13      An example of a contemporaneous longstanding regulation that modifies the

14  concurrently ratified constitutional rights can be found in *United States v. Ramsey*,

15  431 U.S. 606, 616-617 (1977):

16          [...] The Congress which proposed the Bill of Rights,
           including the Fourth Amendment, to the state
17          legislatures on September 25, 1789, 1 Stat. 97, had, some
           two months prior to that proposal, enacted the first
18          customs statute, Act of July 31, 1789, c. 5, 1 Stat. 29.
           Section 24 of this statute granted customs officials "full
19          power and authority" to enter and search "any ship or
           vessel, in which they shall have reason to suspect any
20          goods, wares or merchandise subject to duty shall be
           concealed...." This acknowledgment of plenary customs
21          power was differentiated from the more limited power to
           enter and search "any particular dwelling-house, store,
22          building, or other place..." where a warrant upon "cause
           to suspect" was required. The historical importance of the
23          enactment of this customs statute by the same Congress
           which proposed the Fourth Amendment is, we think,
24          manifest. [footnotes omitted]

25      Because the Defendants produced no competent evidence during the trial

26  that government regulations imposed waiting period on firearms purchases during

27  the periods of 1791 and 1868, there is no reason for this Court to revisit its decision

28  from its order denying summary judgment.

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

### III.   THE WPL DOES NOT SURVIVE INTERMEDIATE SCRUTINY.

There is no such animal in the Ninth Circuit, or in any jurisdiction for that matter, as "lenient heightened scrutiny." The Supreme Court in *Heller* and *McDonald* already rejected the idea of treating the Second Amendment as a lesser fundamental right subject to some watered down version of constitutional analysis by judges considering these issues.

> We know of no other enumerated constitutional right whose core protection has been subjected to a freestanding "interest-balancing" approach. The very enumeration of the right takes out of the hands of government--even the Third Branch of Government--the power to decide on a case-by-case basis whether the right is really worth insisting upon. A constitutional guarantee subject to future judges' assessments of its usefulness is no constitutional guarantee at all. Constitutional rights are enshrined with the scope they were understood to have when the people adopted them, whether or not future legislatures or (yes) even future judges think that scope too broad. We would not apply an "interest-balancing" approach to the prohibition of a peaceful neo-Nazi march through Skokie. See *National Socialist Party of America v. Skokie*, 432 U.S. 43, 97 S. Ct. 2205, 53 L. Ed. 2d 96 (1977) (per curiam). The First Amendment contains the freedom-of-speech guarantee that the people ratified, which included exceptions for obscenity, libel, and disclosure of state secrets, but not for the expression of extremely unpopular and wrong headed views. The Second Amendment is no different. Like the First, it is the very product of an interest balancing by the people--which Justice Breyer would now conduct for them anew. And whatever else it leaves to future evaluation, it surely elevates above all other interests the right of law-abiding, responsible citizens to use arms in defense of hearth and home.

> *District of Columbia v. Heller* (2008)
> 554 U.S. 570, 634-35

And from *McDonald v. City of Chicago* (2010) 130 S.Ct. 3020, 3046-3047 (footnotes omitted):

> [...] Throughout the era of "selective incorporation," Justice Harlan in particular, invoking the values of federalism and state experimentation, fought a determined rearguard action to preserve the two-track approach. See, *e.g.*, *Roth v. United States*, 354 U.S. 476, 500-503, 77 S. Ct. 1304, 1 L. Ed. 2d 1498 (1957) (Harlan, J., concurring in result in part and dissenting in part);

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

*Mapp*, supra, at 678-680, 81 S. Ct. 1684, 6 L. Ed. 2d 1081 (Harlan, J., dissenting); *Gideon*, 372 U.S., at 352, 83 S. Ct. 792, 9 L. Ed. 2d 799 (Harlan, J., concurring); *Malloy*, 378 U.S., at 14-33, 84 S. Ct. 1489, 12 L. Ed. 2d 653 (Harlan, J., dissenting); *Pointer*, 380 U.S., at 408-409, 85 S. Ct. 1065, 13 L. Ed. 2d 923 (Harlan, J., concurring in result); *Washington*, 388 U.S., at 23-24, 87 S. Ct. 1920, 18 L. Ed. 2d 1019 (Harlan, J., concurring in result); *Duncan*, 391 U.S., at 171-193, 88 S. Ct. 1444, 20 L. Ed. 2d 491 (Harlan, J., dissenting); *Benton*, 395 U.S., at 808-809, 89 S. Ct. 2056, 23 L. Ed. 2d 707 (Harlan, J., dissenting); *Williams v. Florida*, 399 U.S. 78, 117, 90 S. Ct. 1893, 26 L. Ed. 2d 446 (1970) (Harlan, J., dissenting in part and concurring in result in part).

Time and again, however, those pleas failed. Unless we turn back the clock or adopt a special incorporation test applicable only to the Second Amendment, municipal respondents' argument must be rejected. Under our precedents, if a Bill of Rights guarantee is fundamental from an American perspective, then, unless stare decisis counsels otherwise, that guarantee is fully binding on the States and thus limits (but by no means eliminates) their ability to devise solutions to social problems that suit local needs and values. As noted by the 38 States that have appeared in this case as amici supporting petitioners, "[s]tate and local experimentation with reasonable firearms regulations will continue under the Second Amendment." Brief for State of Texas et al. as Amici Curiae 23.

Municipal respondents and their amici complain that incorporation of the Second Amendment right will lead to extensive and costly litigation, but this argument applies with even greater force to constitutional rights and remedies that have already been held to be binding on the States. Consider the exclusionary rule. Although the exclusionary rule "is not an individual right," *Herring v. United States*, 555 U.S. 135, 129 S. Ct. 695, 172 L. Ed. 2d 496, 504 (2009), but a "judicially created rule," *id.*, at ___, 129 S. Ct. 695, 172 L. Ed. 2d at 504, this Court made the rule applicable to the States. See *Mapp*, supra, at 660, 81 S. Ct. 1684, 6 L. Ed. 2d 1081. The exclusionary rule is said to result in "tens of thousands of contested suppression motions each year." Stuntz, The Virtues and Vices of the Exclusionary Rule, 20 Harv. J. Law & Pub. Pol'y, 443, 444 (1997).

Municipal respondents assert that, although most state constitutions protect firearms rights, state courts have held that these rights are subject to "interest-balancing" and have sustained a variety of restrictions. Brief for Municipal Respondents 23-31. In *Heller*, however, we expressly rejected the argument that the scope of the Second Amendment right should be

Donald Kilmer
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

Plaintiffs' Response to Defs' Closing Brief          -12-          *Silvester, et al. v. Harris*

1
2
3
4

> determined by judicial interest balancing, 554 U.S., at
> ___-___, 128 S. Ct. 2783, 171 L. Ed. 2d 637, and  this
> Court decades ago abandoned "the notion that the
> Fourteenth Amendment applies to the States only a
> watered-down, subjective version of the individual
> guarantees of the Bill of Rights," *Malloy, supra*, at 10-11,
> 84 S. Ct. 1489, 12 L. Ed. 2d 653 (internal quotation marks
> omitted).

5
6
7

As was argued in our opening brief, it is not necessary for this Court to choose between a strict or intermediate scrutiny analysis if the challenged statutes won't survive the intermediate analysis.

8
9
10
11
12
13

Exactly that approach was adopted by the D.C. Circuit Court of Appeals in the recent case of *Edwards, et al., v. District of Columbia*, Case No.: 13-7063, which was decided on the Friday before this brief was due.  "We need not determine whether strict scrutiny applies, however, because assuming the regulations are content-neutral, we hold they fail even under the more lenient standard of intermediate scrutiny."  *Id.,* page 7 of the slip opinion.

14
15
16
17
18
19
20
21
22
23
24
25

Since, as noted above, the emerging analysis of Second Amendment claims is that they should mirror how First Amendment claims are adjudicated, *Ezell v. City of Chicago,* 651 F.3d 684 (7th Cir. 2011); *U.S. v. Chovan*, 735 F.3d 1127 (9th Cir. 2013) and *Peruta v. County of San Diego*, 742 F.3d 1144 (9th Cir. 2014).  The *Edwards* case provides a provident example of how the evidence in an intermediate scrutiny case is to be evaluated.  One of the issues in *Edwards* dealt with a challenge by a tour operator to a 100-question exam that tour guides had to pass in order to obtain a license to discuss Washington, D.C.'s architecture and history with their customers.  The *Edwards* plaintiffs conducted tours of that city on a Segway, which is self-balancing, personal-transport vehicle.  As part of the service of renting these vehicles, the plaintiffs would also provide cultural information about the Nation's Capitol while they scooter around that City.

26
27
28

Like this case, the plaintiffs in *Edwards* did not challenge the premise that the government's interest was substantial.  But that does not end the inquiry.

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

1

2     [...] To satisfy narrow tailoring, the District must prove
the challenged regulations directly advance its asserted
interests. See *United States v. Alvarez*, 132 S. Ct. 2537,
2549 (2012) ("There must be a direct causal link between

3     the restriction imposed and the injury to be prevented.").
"This burden is not satisfied by mere speculation or

4     conjecture; rather, a governmental body seeking to
sustain a restriction on . . . speech must demonstrate that

5     the harms it recites are real and that its restriction will in
fact alleviate them to a material degree." *Edenfield v.*

6     *Fane*, 507 U.S. 761, 770–71 (1993); see also *Lederman v.*
*United States*, 291 F.3d 36, 44 (D.C. Cir. 2002) (noting

7     that courts "closely scrutinize challenged speech
restrictions to determine if they indeed promote the

8     Government's purposes in more than a speculative way").

9     [...] That said, the burden remains on the District to
establish the challenged regulations' efficacy, and a

10    regulation cannot be sustained "if there is little chance
that the restriction will advance the State's goal." [Citing

11    *Lorillard Tobacco Co. V. Reilly*, 533 U.S. 525, 566

12                    *Edwards v. District of Columbia*
                Case No.: 13-7063, Slip Opinion at 11, 12

13

14         The *Edwards* court went onto analyze the evidence adduced in that case and

15    the government came up short for the same reasons that this Court should reach

16    the conclusion that a 10-day WPL is overbroad as applied to Plaintiffs and people

17    similarly situated; i.e., because a waiting period cannot address the harm of

18    impulsive violence if a person already has a gun, and because there is no rational

19    basis for delaying the delivery of a sold firearm for 10 days to conduct a background

20    check, when at least 20% of background checks are for practical purposes - instant.

21         In a second case decided the Thursday before this brief was due, the U.S.

22    Supreme Court struck down a buffer-zone that regulated conduct and speech

23    around abortion clinics because those zones burdened substantially more speech

24    than was necessary to achieve the  government's asserted interest.  *McMullen, et al.*

25    *v. Coakley, et al.*, Case No.: 12-1168 (June 26, 2014). In both the *Edwards* case and

26    *McMullen*, the Court engaged in multiple speculations about the many ways

27    government can address their stated interest in narrow terms.  This Court doesn't

28    even have to engage in that kind of speculation.

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

Plaintiffs' Response to Defs' Closing Brief                    -14-                    *Silvester, et al. v. Harris*

1   California already has multiple safety-net programs to identify gun-owners

2   who become prohibited.  The State not only gets involved during the process of a

3   person acquiring a firearm, it also has a system for continuing to monitor the

4   eligibility of those gun owners who are known to the state to possess firearms.  That

5   system is the Armed and Prohibited Persons System (APPS).  Its specific purpose is

6   to identify people who are known to the State of California to have a firearm who

7   have a subsequent prohibiting event (conviction, mental health hold, restraining

8   order, etc…) and, therefore, should not have a gun.  [TX Graham 420:11-16.] [TX

9   Orsi 307:7-12]  The APPS database updates itself every day with data from the

10  Department of Justice databases relating to firearms (except for NICS [TX Lindley

11  476:12]) and generates reports for further investigation if it obtains a match as

12  described in the DROS background check. [TX Orsi 304:4-23]   The APPS system is

13  funded (currently with $24,000,000) through the fees paid by California gun-buyers

14  through their DROS fees.  [TX Graham 426:6-23]   In sum, where the DROS

15  Background check is designed stop somebody from getting a firearm, the APPS

16  system is designed to get a firearm from somebody who has become prohibited.  [TX

17  Lindley 497:10-15]

18      The existence of this "safety-net" system is relevant to the Court's inquiry

19  about whether California's WPL is overbroad in trying to address the government's

20  legitimate objectives for addressing public safety through its databases and systems

21  for monitoring gun sales and current gun ownership.

22      Narrow tailoring of the government's means is essential to survival of even

23  important government policies that burden fundamental rights. In this case, the

24  government offers one justification for its WPL on the grounds that it will prevent

25  impulsive acts of violence (assault, homicide and suicide) and that the waiting

26  period acts as a kind of cooling off period.  But the Defendants offer no evidence, or

27  even the hint of a hypothesis, that this cooling off period to purchase a new firearm

28  would deter an impulsive act of violence by someone who already has a gun in their

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

Plaintiffs' Response to Defs' Closing Brief                    -15-                    *Silvester, et al. v. Harris*

1 possession.  Instead their argument appears to be based on the assertion that the

2 highly motivated and competent employees of the Bureau of Firearms, some of

3 whom testified at trial, are incompetent or that the Department of Justice's systems

4 and databases cannot be trusted to render reliable or useful information. Which

5 invites the question:  Why have Californians been required to register all handguns

6 since 1996 and all long guns since January 1, 2014 if the data is unreliable?  In fact

7 the Special Agent who has to access this information for law enforcement purposes

8 considers the data base to be reliable. [Graham TX 442:19 – 443:16]

9     The Defendants' second[3] justification for the WPL is that it takes time it

10 takes to conduct background checks.  The gravamen of this prong of Plaintiffs'

11 constitutional challenge is the <u>length of time</u> it takes to conduct a background

12 check.  The thrust of our challenge is that if there is no reason to impose a "cooling

13 off" period (because the gun-buyer already has guns), then the newly purchased

14 firearm should be released upon approval of the background check instead of the

15 arbitrary policy of 10 days.  And that holders of certain licenses and permits should

16 be exempt from the 10-day wait in the same manner as the 18 statutory exceptions.

17     Indeed, Plaintiffs are quite puzzled that Defendants keep mis-characterizing

18 their arguments regarding the APPS system.  Plaintiffs are not suggesting that

19 APPS replace the DROS background check system.  Plaintiffs were responding to

20 Defendant's wildly speculative assertion that goes something like this: ***"What if***

21 ***someone with a CCW, or COE, or someone who already has guns becomes***

22 ***prohibited?"***  Plaintiffs' response is that the APPS system was passed into law,

23 funded by law-abiding gun-buyers through their DROS fees and is being

24

25     [3] Defendants – again – try to bootstrap a third justification for the 10-day waiting period
26 for the alleged purpose of investigating and stopping straw purchases.  This canard was
addressed in Plaintiffs prior brief (Doc #93, fn. 1).  The matter can be put to rest by the testimony
of Agent Graham at TX 409:21– 412:11 wherein he stated that he had authority to intercede in a
27 transaction to conduct additional investigation into a potential straw purchase.  And that AB 500
permits a transfer to be delayed for up to 30 days for additional investigation. The straw-man
28 investigation justification for the WPL is itself a straw-man.

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

1   implemented to address exactly that problem.  What was surprising during the trial

2   was the disclosure of additional tools available to the State to address "subsequent

3   disqualifications" specifically aimed at permit holders like Silvester and Combs.

4           Both the CCW held by Plaintiff Silvester [no more than 2 years, Penal Code §

5   26220] and the COE held by Plaintiffs Combs [annually, TX Combs 61:8] must be

6   renewed on a regular basis.  Furthermore, Deputy Bureau Chief Buford testified

7   that COEs and CCWs, because the Department of Justice monitors these

8   permits/licenses/certificates, they are subject to a procedure called "rap-back." [TX

9   Buford 221:21- 225:17]  The "rap-back" system is a process for positive identification

10  of a person based on the fingerprints that are already on file with the Department.

11  The rap-back system is used to notify the Department of the arrest of any person

12  with fingerprint records on file with the Department.  As Bureau Chief Lindley

13  went on to explain starting at TX 492:7:

14              A.      We have a system which, in laymen's term, is called a
                rap-back system.
15              Q. Can you explain what that is?

16              A. Based on the person's submitted fingerprints, if their
                name comes up through the criminal history system as being
17              arrested, that goes into the system and would flag. So I'll
                use myself as an example.
18
                Q. All right.
19
                A. Let's say that last night, I was arrested for domestic
20              violence. Taken down to county jail, my fingerprints were
21              rolled. This morning, DOJ would have been notified by our own
                system that I was arrested for domestic violence, which
22              potentially could be a prohibiting offense if I'm convicted or
23              plead guilty to it. So that allows that agency to take some
                action, especially since I'm a police officer, maybe to remove
24              me from the field, put me on admin leave, but they're notified
25              of that arrest.

26              [...]

27              A. Rap-back is designed for people that we have fingerprints
28              on. People that go into APPS, we might not necessarily always

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

1  have fingerprints on them because they're contained in
2  different databases. Like our mental health database,
3  restraining order database, or the wanted persons database.
4  Rap-back mainly deals with the people who are in the criminal
5  history system, and the CII number and that information goes
6  in and is part of the criminal history. So if you ran a
7  criminal history on me, you'll only find that I have the CII
   number and the two agencies that I used to be employed with.
8  DOJ, which I'm currently, and National City previously.

In what has the tenor of grasping at straws, the Defendants also assert the

highly speculative contention: ***"What if someone becomes prohibited during the***

***10 days?"***   This argument is nonsensical when taking into account other California

laws addressing firearms acquisition:

1. <u>Law Enforcement Gun Release</u> – Under Penal Code §§ 33850 *et seq.*, a
person who has had their firearms taken into custody by a law
enforcement agency, may use the administrative procedure outlined in
this set of penal codes to get the firearms returned.  This involves
substantially the same background check on the person and the guns
that is performed at a Firearm Dealer.   Once the Department of
Justices sanctions the return of the firearms, the clearance letter
issued to the gun-owner gives them 30 days to retrieve his/her firearms
from the agency that is holding the weapons. [See also BOF form 119]

2. <u>California DROS Background is Good for 30 days</u> – Under Penal Code
§ 26835(f) the gun-buyer has 30 days to pick up the firearm that they
were cleared to purchase.  By extrapolation, that means an additional
20 days can lapse after the initial 10-day waiting period and expiration
of the background check for the gun-buyer to become disqualified.

3. <u>APPS System</u> – If Plaintiffs' theory is that people with CCW permits,
COEs and those who already have a gun in the AFS system should be
exempt from the WPL, then the utility of delaying the sale of a new

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

1            gun for 10 days, if Agent Graham must still go out and seize firearms

2            already owned due to a failed background check, is an impotent

3            gesture.

4       In other words, the State already acts like it can trust gun-owners for at least

5 30 and 20 days after a clearance for the reacquisition of seized firearms and for any

6 delay after the initial 10 day wait, respectively; by what logic are CCW permit

7 holders like Mr. Silvester and COE certificate holders like Mr. Combs any less

8 trustworthy?

9

10          **IV.  THE COURT CAN DEFER THE ADJUDICATION OF PLAINTIFFS'**
               **VIABLE AND COMPELLING EQUAL PROTECTION CLAIMS**

11       Our suggestion that the Court can defer, or moot Plaintiffs' Equal Protection

12 claims is not a waiver of the claim, but an attempt to focus the inquiry and

13 approach the problem presented by this overbroad statute in the most conservative

14 way possible.   In footnote 2 of their closing brief, Defendants cite to a statement by

15 Plaintiffs' counsel that he did "not necessarily disagree" with the assertion that

16 invalidation of the exemptions may be a proper remedy.  And although Plaintiffs do

17 contend that the Court must either strike the statutory exceptions for the WPL

18 under a Fourteenth Amendment Equal Protection analysis, or expand them to

19 include Plaintiffs; we must admit that invalidation of peace officer exceptions to

20 California's Assault Weapon Control Act was the remedy the Ninth Circuit imposed

21 in *Silveira v. Lockyer*, 312 F.3d 1052 (9th Cir. 2002), *reh'g denied* 328 F.3d 567 (9th

22 Cir. 2003).

23       But that remedy is inappropriate in this case because merely striking the

24 exceptions will not address the continued infringement of the Plaintiffs' (and those

25 similarly situated) Second Amendment rights by a statute that is irrational as

26 applied to their circumstances.

27       The better solution is to provide incentives for California gun owners to

28 provide additional information (e.g., fingerprint based live scan background checks)

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

1  through the permit, license and certificate process, and for the state to keep

2  accurate records of firearms so that California can continue to do a good job of crime

3  detection and prevention.

4  <u>CONCLUSION</u>

5  The anecdotal evidence does not even strongly suggest that actual violence is

6  prevented by 10-day waiting periods.  Nor have the defendants presented any

7  evidence that a background checks can prevent anything more than the crime of a

8  prohibited person obtaining a firearm, with only a strongly implied premise that

9  this policy will have the derivative effect of stopping violence.

10  The trial testimony of Special Agent Graham is the best evidence on this

11  point. [TX Graham 414:4 – 419:23] After describing in some detail a mass shooting

12  that occurred in Cupertino, California in October of 2011.  Agent Graham testified

13  that the event terminated with Mr. Shareef Allman's suicide. The closing note on

14  that line of questions was:

15  Q. Would it be fair to say that this was an instance in which

16  the background check and 10-day waiting period did not prevent

17  violent acts?

18  A. Yes.

19  Plaintiffs' prayer for relief as set forth in their proposed findings of fact and

20  conclusions of law is a narrowly tailored approach to address the State's asserted

21  interest. The Court should adopt Plaintiffs' Findings of Fact and Conclusions of

22  Law.

23  Respectfully Submitted on June 30, 2014 by:

24    /s/ Victor Otten
  Victor J. Otten (SBN 165800)

25

26    /s/ Donald Kilmer
  Donald E. J. Kilmer, Jr. (SBN 179986)

27

28  Attorneys for Plaintiffs

**Donald Kilmer**
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487

Plaintiffs' Response to Defs' Closing Brief          -20-          *Silvester, et al. v. Harris*

## **DECLARATION OF E-SERVICE**

Case Name:          Silvester v. Harris

Court Name:         U.S. District Court, Eastern District of California (Fresno)

Case No.:           1:11-cv-02137-AWI-SKO

I, Donald Kilmer, declare:

I am employed in the at 1645 Willow Street, Suite 150, San Jose, CA . I am 18 years of age or older and not a party to this matter.

I understand that all parties to the above-entitled case are represented by at least one attorney who is registered for electronic filing and service in the above-entitled court.

On June 30, 2014, I electronically filed and, therefore, to the best of my understanding, caused to be electronically served through the Court's ECF system:

PLAINTIFFS' MEMORANDUM OF POINTS AND AUTHORITIES IN

RESPONSE TO DEFENDANTS' CLOSING BRIEF (Doc 89)

The foregoing is true and correct and that this declaration was executed on June 30, 2014, at San Jose, California.

 /s/ Donald Kilmer

Attorney for Plaintiffs.

Donald Kilmer
Attorney at Law
1645 Willow St.
Suite 150
San Jose, CA 95125
Vc: 408/264-8489
Fx: 408/264-8487